# EXHIBIT A

## MORTGAGE LOAN AGREEMENT

**THIS LOAN AGREEMENT** (this "Agreement") is made as of April 3, 2018 ("Closing Date"), by and between **STORE CAPITAL ACQUISITIONS, LLC**, a Delaware limited liability company ("Lender"), whose address is 8377 E. Hartford Drive, Suite 100, Scottsdale, Arizona 85255 and **5171 CAMPBELLS LAND CO., INC.**, a Pennsylvania corporation ("Debtor"), whose address is 6201 Steubenville Pike, Suite 100, McKees Rocks, Pennsylvania 15136.  Unless otherwise expressly provided herein, all defined terms used in this Agreement shall have the meanings set forth in Exhibit A attached hereto.

In consideration of the mutual covenants and provisions of this Agreement, the parties agree as follows:

**Section 1.  The Loan**.  On the terms and subject to the conditions set forth in the Loan Documents, Lender shall make the Loan to Debtor for the sole purpose of enabling Debtor to refinance existing debt.  The aggregate "Loan Amount" shall be $1,750,000.00.  Debtor shall repay the outstanding principal amount of the Loan together with interest thereon, in the manner and in accordance with the terms and conditions of the Note and the other Loan Documents. The Loan shall be advanced at the Closing in cash or otherwise immediately available funds subject to any prorations and adjustments required by this Agreement.  Debtor and Lender acknowledge and agree that any funds advance by Lender pursuant to this Agreement shall reduce the amount of funds available to Lessee under that certain Letter Agreement dated February 12, 2018 by and between Debtor and Lender with respect to a Forward Commitment/Renovation Funding in the amount of $4,345,000.00.

**Section 2.  Collateral**.  The Loan will be evidenced by the Note and secured by the Mortgages.  Guarantor will provide further security for the Loan by executing and delivering the Guaranty.  Each Guarantor will guaranty the obligations of Debtor under this Agreement, as described herein.

**Section 3.  Transaction Costs**.  Debtor shall pay all amounts which are the obligations of Debtor hereunder or under the other Loan Documents, including, without limitation, the Transaction Costs, Debtor's attorneys' fees, Lender's attorneys' fees and any Taxes and assessments that are due and payable prior to Closing.  Debtor shall be responsible for the payment of all Transaction Costs incurred by Debtor and Lender in connection with the Loan, whether or not the Loan closes. The provisions of this Section 3 shall survive Closing or termination of this Agreement for any reason.

**Section 4.  Escrow Agent**.  Debtor and Lender hereby employ Title Company to act as escrow agent in connection with the transaction described in this Agreement.  Title Company shall not cause the transaction to close unless and until it has received written instructions from Lender and Debtor to do so.  Debtor and Lender will deliver to Title Company all documents, pay to Title Company all sums and do or cause to be done all other things necessary or required by this Agreement, in the reasonable judgment of Title Company, to enable Title Company to comply herewith and to issue the title policies described in Section 9(a).  Title Company is authorized to pay, from any funds held by it for Lender's or Debtor's respective credit all amounts necessary to procure the delivery of such documents and to pay, on behalf of Lender and Debtor, all charges and obligations payable by them, respectively.  Debtor will pay all charges payable by it to Title Company.  Title Company is authorized, in the event any

conflicting demand is made upon it concerning these instructions or the escrow, at its election, to hold any documents and/or funds deposited hereunder until an action shall be brought in a court of competent jurisdiction to determine the rights of Debtor and Lender or to interplead such documents and/or funds in an action brought in any such court.  Deposit by Title Company of such documents and funds, after deducting therefrom its charges and its expenses and attorneys' fees incurred in connection with any such court action, shall relieve Title Company of all further liability and responsibility for such documents and funds.  Title Company's receipt of this Agreement and opening of an escrow pursuant to this Agreement shall be deemed to constitute conclusive evidence of Title Company's agreement to be bound by the terms and conditions of this Agreement pertaining to Title Company.  Disbursement of any funds shall be made by check, certified check or wire transfer, as directed by Debtor and Lender.  Title Company shall be under no obligation to disburse any funds represented by check or draft, and no check or draft shall be payment to Title Company in compliance with any of the requirements hereof, until it is advised by the bank in which such check or draft is deposited, that such check or draft has been honored.  Title Company is authorized to act upon any statement furnished by the holder or payee, or a collection agent for the holder or payee, of any lien on or charge or assessment in connection with each of the Properties, concerning the amount of such charge or assessment or the amount secured by such lien, without liability or responsibility for the accuracy of such statement.  The employment of Title Company as escrow agent shall not affect any rights of subrogation under the terms of any title policy issued pursuant to the provisions thereof.

      **Section 5. Representations and Warranties of Debtor**.  The representations and warranties of Debtor contained herein are being made by Debtor as of the date of this Agreement and the Closing Date to induce Lender to enter into this Agreement and consummate the transactions contemplated herein, and shall survive Closing.  Debtor represents and warrants to Lender as follows:

      (a)    ***Organization and Authority***.  Debtor is duly organized or formed, validly existing and in good standing under the laws of its state of incorporation, and qualified to do business in any jurisdiction where the failure to be qualified would reasonably be expected to result in a Material Adverse Effect.  All necessary action has been taken to authorize the execution, delivery and performance of this Agreement and the other Loan Documents.  The person(s) who have executed this Agreement on behalf of Debtor are duly authorized so to do.  Debtor is not, and if Debtor is a "disregarded entity," the owner of such disregarded entity is not, a "nonresident alien," "foreign corporation," "foreign partnership," "foreign trust," "foreign estate," or any other "person" that is not a "United States Person" (as those terms are defined by the Internal Revenue Code of 1986, as amended, and the regulations promulgated thereunder).  Debtor's U.S. Federal Tax Identification number, Organization Identification number and principal place of business are correctly set forth on the signature page of this Agreement.  None of the Debtor Parties, and no individual or entity owning directly or indirectly any interest in any of the Debtor Parties, is an individual or entity whose property or interests are subject to being blocked under any of the OFAC Laws and Regulations or is otherwise in violation of any of the OFAC Laws and Regulations.

      (b)    ***Enforceability of Documents***.  Upon execution by the Debtor Parties, as applicable, this Agreement and the other Loan Documents shall constitute the legal,

4833-5686-3584.2
STORE/Campbells (Perkins)
Mortgage Loan Agreement
3 Leasehold Properties
File No. 7210/02-588

valid and binding obligations of the Debtor Parties, respectively, enforceable against the Debtor Parties in accordance with their respective terms, except as such enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium, and general principles of equity.

(c)     *Litigation*.  There are no suits, actions, proceedings or investigations pending or, to the best of Debtor's knowledge, threatened, against or involving the Debtor Parties or the Properties before any arbitrator or Governmental Authority, except for such suits, actions, proceedings or investigations which, individually or in the aggregate, have not had, and would not reasonably be expected to result in a Material Adverse Effect.

(d)     *Absence of Breaches, Defaults or Other Rights*.  (i) The Debtor Parties are not; (ii) the authorization, execution, delivery and performance of this Agreement and the other Loan Documents will not result; and (iii) no condition exists or no event has occurred, which, with the lapse of time, if not cured, or with the giving of notice, or both, would result, in any breach or default under any other document, instrument or agreement to which the Debtor Parties are a party or by which the Debtor Parties, the Properties or any of the property of the Debtor Parties is subject or bound, except for such breaches or defaults which, individually or in the aggregate, have not had, and would not reasonably be expected to result in, a Material Adverse Effect.  The authorization, execution, delivery and performance of this Agreement and the other Loan Documents will not violate any Legal Requirement.  None of the Debtor Parties or the Properties are subject to any commitment, obligation or agreement, including, without limitation, any right of first refusal, option to purchase or lease granted to a third party, which could or would prevent or hinder Lender in making the Loan or exercising any of its rights or remedies under the Loan Documents or prevent or hinder Debtor from fulfilling its obligations under this Agreement or the other Loan Documents.

(e)     *Financial Information*.  Debtor has delivered to Lender the Financial Information, which Financial Information is true, correct and complete in all material respects and there have been no amendments to the Financial Information since the date of preparation or delivery thereof to Lender.  Debtor understands that Lender is relying upon such Financial Information and Debtor represents that such reliance is reasonable.  All financial statements included in the Financial Information were prepared in accordance with GAAP and accurately reflect as of the Closing Date, the financial condition of each individual or entity to which they pertain.  No change has occurred with respect to the financial condition of the Debtor Parties or the Properties as reflected in the Financial Information which has not been disclosed in writing to Lender or has had, or could reasonably be expected to result in, a Material Adverse Effect.

(f)     *No Insolvency Event*.  There is no actual Insolvency Event or, to Debtor's knowledge, any threatened Insolvency Event.

(g)     *Title; First Priority Lien*.  Debtor is the lessee under the Ground Leases, free and clear of all liens, encumbrances, charges and security interests of any nature whatsoever, except the Permitted Exceptions.  Upon Closing, Lender shall have a first

3

priority lien upon and security interest in each of the Properties pursuant to the Mortgages and the UCC Financing Statements.

(h)     **No Mechanics' Liens**.  There are no delinquent accounts payable or mechanics' liens in favor of any materialman, laborer, or any other person or entity in connection with labor or materials furnished to or performed on any portion of the Properties, and no work has been performed or is in progress nor have materials been supplied to any of the Properties or agreements entered into for work to be performed or materials to be supplied to any of the Properties prior to the date hereof, which will be delinquent on or before the Closing Date.

(i)     **Ground Leases**.  Debtor has delivered to Lender true, correct and complete copies of the Ground Leases relating to each Property.  The Ground Leases are the only leases with respect to the Properties, are in full force and effect, and constitute the legal, valid and binding obligations of the parties thereto, enforceable against such parties in accordance with their terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, liquidation, reorganization and other laws affecting the rights of creditors generally and general principles of equity.  Debtor has not assigned, transferred, mortgaged, hypothecated or otherwise encumbered any of the Ground Leases or any rights thereunder or any interest therein, nor has Debtor received any notice of default from a Ground Lessor which has not been cured or given any notice of default to Debtor which has not been cured.  No event has occurred and no condition exists which, with the giving of notice or the lapse of time, or both, would constitute a default by Debtor under the Ground Leases.

(j)     **Franchisor Provisions**.  Debtor has delivered to Lender a true, correct and complete copy of the Franchise Agreement for each Property.  To the best of Debtor's knowledge, the Franchise Agreement is in full force and effect and constitutes the legal, valid and binding obligations of the parties to the Franchise Agreement, enforceable in accordance with their terms, except as such enforceability may be limited by applicable bankruptcy insolvency, liquidation, reorganization and other laws affecting the rights of creditors generally and general principles of equity.  No notice of default from Franchisor has been received by Debtor under the Franchise Agreement which has not been cured and no notice of default to Franchisor has been given under the Franchise Agreement which has not been cured.  To the best of Debtor's knowledge, no event has occurred and no condition exists which; with the giving of notice or the lapse of time, or both, would constitute a default under the Franchise Agreement.

(k)     **Licenses and Permits**.  Debtor has all required licenses and permits, both governmental and private, to use and operate each Property as a Permitted Facility.

(l)     **Utilities; Zoning; Compliance With Laws; Access; Condemnation; Wetlands**.  Adequate public utilities are available at each of the Properties to permit utilization of each Property as a Permitted Facility and all utility connection fees and use charges will have been paid in full prior to delinquency.  The Properties are in compliance with all applicable zoning requirements and the use of each Property as a Permitted Facility does not constitute a nonconforming use under applicable zoning

4

requirements.   The Debtor and the Properties are in compliance with all Legal Requirements, except for such noncompliance which has not had, and would not reasonably be expected to result in, a Material Adverse Effect.   Adequate rights of access to public roads and ways are available to each Property for unrestricted ingress and egress, and otherwise to permit utilization of each Property for use as a Permitted Facility, and all such public roads and ways have been completed and dedicated for public use.   No condemnation or eminent domain proceedings' affecting any of the Properties has commenced or, to the best of Debtor's knowledge, are contemplated. None of the Properties and, to the best of Debtor's knowledge, none of the real property bordering any of the Properties, are designated as a wetlands by any Governmental Authority.

(m)   ***Condition***.  Each Property, including the Tangible Personal Property, is in good condition and repair, well maintained (ordinary wear and tear excepted), fully equipped and operational, free from structural defects, safe and properly lighted.

(n)   ***OFAC Compliance***.  No portion of the Properties has been or will be purchased, improved, equipped or furnished with proceeds of any illegal activity. Debtor, and to the best of Debtor's knowledge, after having made diligent inquiry, (i) each person or entity owning an interest in each Debtor Party and the Properties; (ii) the property manager, if any, of the Properties; and (iii) each tenant and subtenant at the Properties: (A) is not currently identified on the OFAC List, and (B) is not a person or entity with whom a citizen of the United States is prohibited from engaging in transactions by any trade embargo, economic sanction, or other prohibition of United States law, regulation or Executive Order of the President of the United States.

(o)   ***Representations and Warranties***.  No statement of fact made herein or in any of the other Loan Documents contains any untrue statement of a material fact or omits to state any material fact necessary to make statements contained herein or therein not misleading.  There is no fact presently known to Debtor which has not been disclosed in writing to Lender which has or is likely to have a Material Adverse Effect.

**Section 6.  Covenants**.  Debtor covenants to Lender from and after the Closing Date as follows:

(a)   ***Payment of the Note***.  Debtor shall punctually pay, or cause to be paid, the principal, interest and all other sums to become due in respect of the Note and the other Loan Documents in accordance with the terms set forth in the Note.  If the Note is mutilated, destroyed, lost or stolen (a "Lost Note"), Debtor shall promptly deliver to Lender, upon receipt of an affidavit from Lender stipulating that such Note has been mutilated, destroyed, lost or stolen, in substitution therefor, a new promissory note containing the same terms and conditions as such Lost Note with a notation thereon of the unpaid principal and accrued and unpaid interest.  Debtor shall provide 15 days' prior notice to Lender before making any payments to third parties in connection with a Lost Note.

(b)   ***Organization and Status of Debtor; Preservation of Existence***.  Each Debtor Party (excluding natural persons) (i) shall be validly existing and in good standing

4833-5686-3584.2
STORE/Campbells (Perkins)
Mortgage Loan Agreement
3 Leasehold Properties
File No. 7210/02-588

under the laws of its state of incorporation or formation; (ii) as applicable, shall be qualified to do business in the states where the Properties are located; and (iii) shall be qualified as a foreign corporation, partnership or limited liability company in any other jurisdiction where the failure to be qualified would reasonably be expected to result in a Material Adverse Effect. Debtor shall preserve its current form of organization and shall not change its legal name or its state of formation. Debtor shall not dissolve or liquidate, in whole or in part. In addition, Debtor shall require, and shall take reasonable measures to comply with the requirement, that no individual or entity owning directly or indirectly any interest in any Debtor Party or any of the Properties is an individual or entity whose property or interests are subject to being blocked under any of the OFAC Laws and Regulations or is otherwise in violation of any of the OFAC Laws and Regulations.

(c)     ***No Equity Transfer or Pledge***. Without limiting the terms and conditions of the Mortgages, Debtor agrees that, from and after the Closing Date and until all of the obligations under this Agreement, the Note and the other Loan Documents are satisfied in full (the "Obligations"): (i) Debtor shall not assign, transfer, or convey any voting stock, partnership interests, membership interests or other equitable and/or beneficial interests in any Debtor Party (an "Equity Transfer"), whether by operation of law or otherwise without the prior written consent of Lender, which consent will not be unreasonably withheld, considering such matters as the experience and financial strength of any such party acquiring an interest in Debtor; and (ii) no interest in the Debtor shall be pledged, encumbered, hypothecated or assigned as collateral for any obligation of any of the Debtor Parties (each, a "Pledge") without the prior written consent of Lender. In addition, no interest in the Debtor, or in any individual or person owning directly or indirectly any interest in any of the Debtor Parties, shall be transferred, assigned or conveyed to any individual or person whose property or interests are subject to being blocked under any of the OFAC Laws and Regulations and/or who is in violation of any of the OFAC Laws and Regulations, and any such transfer, assignment or conveyance shall not be effective until the transferee has provided written certification to Debtor and Lender that (A) the transferee or any person who owns directly or indirectly any interest in transferee, is not an individual or entity whose property or interests are subject to being blocked under any of the OFAC Laws and Regulations or is otherwise in violation of the OFAC Laws and Regulations; and (B) the transferee has taken reasonable measures to assure than any individual or entity who owns directly or indirectly any interest in transferee, is not an individual or entity whose property or interests are subject to being blocked under any of the OFAC Laws and Regulations or is otherwise in violation of the OFAC Laws and Regulations. Lender's consent to an Equity Transfer and/or Pledge shall be subject to the satisfaction of such conditions as Lender shall determine in its sole discretion, including, without limitation, (1) the execution and delivery of such modifications to the terms of the Loan Documents as Lender shall request, (2) the proposed Equity Transfer and/or Pledge having been approved by each of the rating agencies which have issued ratings in connection with any securitization of the Loan as well as any other rating agency selected by Lender, and (3) the proposed transferee having agreed to comply with all of the terms and conditions of the Loan Documents (including any modifications requested by Lender pursuant to clause (1) above). In addition, any such consent shall be conditioned upon payment by Debtor to Lender of (aa) a fee equal to 1% of the then outstanding principal balance of the Note; and (bb) all out-of-pocket costs and expenses incurred by Lender in connection with

4833-5686-3584.2
STORE/Campbells (Perkins)
Mortgage Loan Agreement
3 Leasehold Properties
File No. 7210/02-588

such consent, including, without limitation, reasonable attorneys' fees.  Lender shall not be required to demonstrate any actual impairment of its security or any increased risk of default hereunder in order to declare the Obligations immediately due and payable upon an Equity Transfer or Pledge in violation of this Section.  The provisions of this Section shall apply to every Equity Transfer or Pledge regardless of whether voluntary or not, or whether or not Lender has consented to any previous Equity Transfer or Pledge.

(d)     ***Title***.  Debtor shall maintain good and marketable title to the Tangible Personal Property, free and clear of all liens, encumbrances, charges and other exceptions to title, except the Permitted Exceptions.  Lender shall have a valid first lien upon and security interest in the Tangible Personal Property, pursuant to the UCC Financing Statements; provided, however such lien may be subject to any existing lien of Lender or an Affiliate of Lender.

(e)     ***Mechanics' Liens***.  Debtor shall be responsible for any and all claims for mechanics' liens and accounts payable that have arisen or may subsequently arise due to agreements entered into for and/or any work performed on, or materials supplied to each of the Properties whether arising prior to or after the Closing Date.  Debtor shall and does hereby agree to defend, indemnify and forever hold Lender and Lender's designees harmless for, from and against any and all such mechanics' lien claims, accounts payable or other commitments relating to each of the Properties.

(f)     ***Compliance***.  The use and occupation of each of the Properties, and the condition thereof, shall comply with all Legal Requirements now or hereafter in effect.  In addition, the Debtor Parties shall comply with all Legal Requirements now or hereafter in effect, including, without limitation, the OFAC Laws and Regulations, the Americans With Disabilities Act of 1990, and all regulations related thereto, as amended from time to time, and all Anti-Money Laundering Laws, and anti-terrorism, trade embargos and economic sanctions, now or hereafter in effect.  Debtor shall immediately notify Lender in writing if any individual or entity owning directly or indirectly any interest in any of the Debtor Parties or any director, officer, member, manager or partner of any of such holders is an individual or entity whose property or interests are subject to being blocked under any of the OFAC Laws and Regulations or is otherwise in violation of any of the OFAC Laws and Regulations, or is under investigation by any governmental entity for, or has been charged with, or convicted of, drug trafficking, terrorist-related activities or any violation of Anti-Money Laundering Laws, has been assessed civil penalties under these or related laws, or has had funds seized or forfeited in an action under these or related laws.

(g)     ***Taxes***.  Any and all payments by Debtor hereunder or under the Note or any other Loan Document shall be made free and clear of and without deduction or withholding for or on account of any and all present or future taxes, levies, imposts, deductions, charges or withholdings, and all liabilities with respect thereto, and Debtor shall be liable for all present or future taxes, franchise taxes, levies, imposts, deductions, charges or withholdings, and all liabilities arising from Lender having executed, delivered, made advances under or received a payment under, or enforced, this Agreement, the Note or any other Loan Document (each, individually, a "Tax" and, collectively, the "Taxes").  Debtor shall file all material tax returns when due and shall

4833-5686-3584.2
STORE/Campbells (Perkins)
Mortgage Loan Agreement
3 Leasehold Properties
File No. 7210/02-588

pay and discharge when due all Taxes, assessments and governmental charges or levies imposed upon it or upon its properties; *provided, however*, that Debtor shall not be required to pay or discharge any Tax, assessment, charge or levy that is being contested in good faith and by proper proceedings and with respect to which reserves, in accordance with GAAP, are being maintained by Debtor. Debtor agrees to indemnify Lender for the full amount of Taxes paid by Lender and any liability (including without limitation, penalties, interest and expenses if incurred due to Debtor's failure to timely or properly pay the same) arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally asserted.

(h) ***Financial Information***. Within forty five (45) days after the end of each fiscal quarter and within one hundred twenty (120) days after the end of each fiscal year of Debtor, Debtor shall deliver to Lender (i) complete consolidated financial statements that consolidate Debtor, including a balance sheet, profit and loss statement, statement of stockholders' equity and statement of cash flows and all other related schedules for the fiscal period then ended, such statements to detail separately interest expense, income taxes, non-cash expenses, non-recurring expenses, operating lease expense and current portion of long-term debt – capital leases; and (ii) income statements for the business at each of the Properties. All such financial statements shall be prepared in accordance with GAAP, and shall be certified to be accurate and complete by an officer or director of Debtor. In the event that Debtor's business at the Properties is ordinarily consolidated with other business for financial statements purposes, a separate profit and loss statement shall be provided showing separately the sales, profits and losses pertaining to each Property with interest expense, income taxes, non-cash expenses, non-recurring expenses and operating lease expense (rent), with the basis for allocation of overhead or other charges being clearly set forth. The financial statements delivered to Lender need not be audited, but Debtor shall deliver to Lender copies of any audited financial statements of Debtor which may be prepared, as soon as they are available.

(i) ***Ground Leases***. The Ground Leases shall not be modified, amended, terminated, cancelled or surrendered without Lender's prior written consent.

(j) ***Franchise Agreements***. Immediately upon receipt by Debtor, Debtor shall give prompt notice to Lender of any claim or event of default under the Franchise Agreement given to Debtor by the Franchisor or given by Debtor to the Franchisor, together with a complete copy or statement of any information submitted or referenced in support of such claim or event of default. Debtor shall give prompt notice to Lender of any extensions or renewals, or any expiration or termination, of the Franchise Agreement.

(k) ***Inspections***. Debtor shall, at all reasonable times, (i) provide Lender and Lender's officers, employees, agents, advisors, attorneys, accountants, architects, consultants and engineers with access to each of the Properties, all drawings, plans, and specifications for each of the Properties in possession of any of the Debtor Parties, all engineering reports relating to each of the Properties in the possession of any of the Debtor Parties, the files, correspondence and documents relating to each of the Properties, and the financial books and records, including lists of delinquencies, relating to the ownership, operation, and maintenance of each of the Properties (including,

4833-5686-3584.2
STORE/Campbells (Perkins)
Mortgage Loan Agreement
3 Leasehold Properties
File No. 7210/02-588

without limitation, any of the foregoing information stored in any computer files); and (ii) allow such persons to make such inspections, tests, copies, and verifications as Lender considers necessary.

(l)     ***Tangible Personal Property***.  Debtor shall at all times keep and maintain the Tangible Personal Property in good order, repair and condition and will promptly replace any part thereof that from time to time may become obsolete, badly worn or in a state of disrepair or, if supplies, be consumed in the normal course of Debtor's business operations.  Debtor shall promptly give written notice to Lender of the cessation of Debtor's business operations, or any part thereof, and of any loss or damage by fire or other casualty to any substantial part of the Tangible Personal Property.

(m)     **Environmental**.

(i)     ***Covenants***.

(A)     Debtor covenants to Lender, subject to the limitations of subsection (ii) below, as follows:

(1)     All uses and operations on or of the Properties, whether by Debtor or any other Person, shall be in compliance with all Environmental Laws and permits issued pursuant thereto.

(2)     There shall be no Releases in, on, under or from the Properties, except in Permitted Amounts.

(3)     There shall be no Hazardous Materials or Regulated Substances in, on or under the Properties, except in Permitted Amounts.  Above and below ground storage tanks shall be properly permitted and only used as permitted.

(4)     Debtor shall keep the Properties or cause the Properties to be kept free and clear of all Environmental Liens, whether due to any act or omission of Debtor or any other Person.

(5)     Debtor shall not act or fail to act or allow any other tenant, occupant, guest, customer or other user of the Properties to act or fail to act in any way that (1) materially increases a risk to human health or the environment, (2) poses an unreasonable or unacceptable risk of harm to any Person or the environment (whether on or off any of the Properties), (3) has a Material Adverse Effect, (4) is contrary to any material requirement set forth in the insurance policies maintained by Debtor or Lender, (5) constitutes a public or private nuisance or constitutes waste, (6) violates any covenant, condition, agreement or easement applicable to the Properties, or (7) would result in any reopening or reconsideration of any prior investigation or causes a new investigation by a Governmental Authority having jurisdiction over any Property.

9

(6)     Debtor shall, at its sole cost and expense, fully and expeditiously cooperate in all activities pursuant to this Section 6(m), including but not limited to providing all relevant information and making knowledgeable persons available for interviews.

(B)     Notwithstanding any provision of this Lease to the contrary, an Event of Default shall not be deemed to have occurred as a result of the failure of Debtor to satisfy any one or more of the covenants set forth in subsections (A) through (E) above provided that Debtor shall be in compliance with the requirements of any Governmental Authority with respect to the Remediation of any Release at the Properties.

(ii)     *Notification Requirements*.   Debtor shall immediately notify Lender in writing upon Debtor obtaining actual knowledge of (i) any Releases or Threatened Releases in, on, under or from any of the Properties other than in Permitted Amounts, or migrating towards any of the Properties; (ii) any non-compliance with any Environmental Laws related in any way to any of the Properties; (iii) any actual or potential Environmental Lien or activity use limitation; (iv) any required or proposed Remediation of environmental conditions relating to any of the Properties required by applicable Governmental Authorities; and (v) any written or oral notice or other communication of which Debtor becomes aware from any source whatsoever (including but not limited to a Governmental Authority) relating in any way to Hazardous Materials, Regulated Substances or above or below ground storage tanks, or Remediation thereof at or on any of the Properties, other than in Permitted Amounts, possible liability of any Person relating to any of the Properties pursuant to any Environmental Law, other environmental conditions in connection with any of the Properties, or any actual or potential administrative or judicial proceedings in connection with anything referred to in this Section.  Debtor shall, upon Lender's written request, deliver to Lender a certificate stating that Debtor is and has been in full compliance with all of the environmental representations, warranties and covenants in this Lease.

(iii)     *Remediation*.   Debtor shall, at its sole cost and expense, and without limiting any other provision of this Lease, effectuate any Remediation required by any Governmental Authority of any condition (including, but not limited to, a Release or Threatened Release) in, on, under or from the Properties and take any other reasonable action deemed necessary by any Governmental Authority for protection of human health or the environment.  Should Debtor fail to undertake any required Remediation in accordance with the preceding sentence, Lender, after written notice to Debtor and Debtor's failure to immediately undertake such Remediation, shall be permitted to complete such Remediation, and all Costs incurred in connection therewith shall be paid by Debtor.  Any Cost so paid by Lender, together with interest at the Default Rate, shall be deemed to be Additional Rental hereunder and shall be immediately due from Debtor to Lender.

4833-5686-3584.2
STORE/Campbells (Perkins)
Mortgage Loan Agreement
3 Leasehold Properties
File No. 7210/02-588

(iv)     ***Indemnification***.    Debtor shall, at its sole cost and expense, protect, defend, indemnify, release and hold harmless each of the Indemnified Parties from and against any and all Losses, including, but not limited to, all Costs of Remediation (whether or not performed voluntarily), arising out of or in any way relating to any Environmental Laws, Hazardous Materials, Regulated Substances, above or below ground storage tanks, or other environmental matters concerning the Properties.  It is expressly understood and agreed that Debtor's obligations under this Section shall survive the expiration or earlier termination of this Lease for any reason.

(v)     ***Right of Entry***.    In the event that Lender has a reasonable basis to believe that a Release or a violation of any Environmental Law has occurred, Lender and any other Person designated by Lender, including but not limited to any receiver, any representative of a Governmental Authority, and any environmental consultant, shall have the right, but not the obligation, to enter upon the Properties at all reasonable times to assess any and all aspects of the environmental condition of any Property and its use, including but not limited to conducting any environmental assessment or audit (the scope of which shall be determined in Lender's sole and absolute discretion) and taking samples of soil, groundwater or other water, air, or building materials, and conducting other invasive testing.  Debtor shall cooperate with and provide access to Lender and any other Person designated by Lender.  Any such assessment or investigation shall be at Debtor's sole cost and expense.

(vi)     ***Survival***.    The obligations of Debtor and the rights and remedies of Lender under this Section 6(m) shall survive the termination, expiration and/or release of this Lease.

**Section 7.  Survival**.    Except for the conditions of Closing set forth in Section 9 hereof, which shall be satisfied or waived as of the Closing Date, all representations and warranties of Debtor and Lender set forth in this Agreement shall be and will remain true and complete as of the Closing Date (or if later, the date on which the Loan is disbursed), and as of any future date or time contemplated by any such representation or warranty.  All covenants, agreements, obligations and indemnities of Debtor and Lender set forth in this Agreement shall be and will remain true and complete as of and subsequent to the Closing Date as if made and restated in full as of such time, and shall survive the Closing.

**Section 8.  Actions by Lender**.    Debtor agrees that, subject to the provisions of Section 10(c) hereof, Lender may, at its option, and without any obligation to do so, pay, perform, and discharge any and all amounts, costs, expenses and liabilities that are the responsibility of Debtor under this Agreement or the other Loan Documents if Debtor fails to timely pay, perform or discharge the same, and all amounts expended by Lender in so doing or in respect of or in connection with the Mortgaged Property shall become part of the obligations secured by the Loan Documents and shall be immediately due and payable by Debtor to Lender upon demand therefor and shall bear interest at the Default Rate.  Debtor agrees that, except as specifically amended, released or otherwise agreed to in writing by Lender, the Loan Documents shall remain in full effect, without waiver or surrender of any of Lender's rights thereunder, notwithstanding any one or more of the following: (a) extension of the time of

11

payment of the whole or any part of the Note; (b) any change in the terms and conditions of the Note; (c) substitution of any other evidence of indebtedness for the Note; (d) acceptance by Lender of any collateral or security of any kind for the payment of the Note; (e) surrender, release, exchange or alteration of any Mortgaged Property or other security, either in whole or in part; or (f) release, settlement, discharge, compromise, change or amendment, in whole or in part, of any claim of Lender against Debtor or any other guarantors or other party secondarily or additionally liable for the payment of the Note.

      **Section 9. Closing Conditions**.   The obligation of Lender to consummate the transaction contemplated by this Agreement is subject to the fulfillment or waiver of each of the following conditions:

          (a)    ***Title***.  Fee title to the Properties shall be vested in Debtor, free of all liens, encumbrances, restrictions, encroachments and easements, except the Permitted Exceptions and the liens created by the Mortgages and the UCC Financing Statements. Debtor shall be the owner of all of the Tangible Personal Property located on or at the Properties free and clear of all liens, encumbrances, charges and security interests, except the liens created by the Mortgages and the UCC Financing Statements and any purchase money security interests.  Lender shall have received for each of the Properties a preliminary title report and irrevocable commitment to insure title in the amount of the Loan relating to each of the Properties by means of a mortgagee's, ALTA extended coverage policy of title insurance (or its equivalent, in the event such form is not issued in the jurisdiction where the Properties are located) issued by Title Company showing Debtor vested with good and marketable title fee title in each of the Properties, committing to insure Lender's first priority lien upon and security interest in each of the Properties subject only to Permitted Exceptions, and containing such endorsements as Lender may require.

          (b)    ***Condition of Properties***.  Lender shall have inspected and approved, in its sole discretion, the Properties and the Tangible Personal Property.

          (c)    ***Survey***.  Lender shall have received a current "as-built" ALTA survey of each of the Properties, the form and substance of which shall be satisfactory to Lender in its sole discretion.  Debtor shall have provided Lender with evidence satisfactory to Lender that the location of each of the Properties are not within the 100-year flood plain or identified as a special flood hazard area as defined by the appropriate Governmental Authority, or if any Property is located in such a flood plain or special flood hazard area, Debtor shall provide Lender with evidence of flood insurance maintained on such Property in amounts and on terms and conditions satisfactory to Lender.

          (d)    ***Environmental***.  Lender shall have completed such environmental due diligence of the Properties as it deems necessary or advisable in its sole discretion, including without limitation, its review and approval of a Phase I environmental report (and a Phase II environmental report, if necessary), for each of the Properties, along with reliance letters issued for the benefit of Lender, and Lender shall have approved the environmental condition of the Properties in its sole discretion.

4833-5686-3584.2
STORE/Campbells (Perkins)
Mortgage Loan Agreement
3 Leasehold Properties
File No. 7210/02-588

(e)     *Zoning*.  Debtor shall have provided Lender with evidence satisfactory to Lender that each Property is properly zoned for use as a Permitted Facility and that such use constitutes a legal, conforming use under applicable zoning requirements.

(f)     **Resolution with Plan Administrator and Court Approval**.  Lender shall have received, in a form satisfactory to Lender, a written acknowledgment and release from the Plan Administrator addressed to Debtor that upon Debtor's payment of the sum of $1,750,000.00 to the Plan Administrator, (i) all conditions to closing under the Asset Purchase Agreement have been satisfied or waived in accordance with the Asset Purchase Agreement; (ii) Debtor's obligations to the Plan Administrator under the Deferred Consideration Note have been fully satisfied, discharged, and released; (iii) Debtor owes no further amounts to the Plan Administrator, Unique Ventures, or Unique Ventures' estate or its creditors or representatives, including without limitation, any cure costs, reimbursement for utility deposits, legal fees, and other costs or expenses; and (iv) the Plan Administrator fully releases Debtor and related parties from any and all claims, obligations, and liability in connection with the Sale.  The Bankruptcy Court shall have also entered a final, non-appealable order, in a form satisfactory to Lender, (i) that upon Debtor's payment of $1,750,000.00 to the Plan Administrator, the Sale shall be deemed closed, (ii) approving such written acknowledgment and release, and (iii) deeming Debtor's obligations under the Asset Purchase Agreement and the Bankruptcy Court's March 2, 2018 Order [Docket No. 1013] fully satisfied and discharged.

(g)     *Compliance With Representations, Warranties and Covenants*.  All obligations of Debtor under this Agreement shall have been fully performed and complied with, and no event shall have occurred or condition shall exist which would, upon the Closing Date, or, upon the giving of notice and/or passage of time, constitute a breach or default hereunder or under the Loan Documents, or any Other Agreement, the Debtor Parties pertaining to the subject matter hereof, and no event shall have occurred or condition shall exist or information shall have been disclosed by Debtor or discovered by Lender which has had or would have a Material Adverse Effect on the Properties, the Mortgaged Property, the Debtor Parties or Lender's willingness to consummate the transaction contemplated by this Agreement, as determined by Lender in its sole and absolute discretion.

(h)     *Proof of Insurance*.  Debtor shall have delivered to Lender certificates of insurance and copies of insurance policies showing that all insurance coverages and limits as set forth on <u>Exhibit C</u> attached hereto, attached hereto and incorporated herein, are in full force and effect.

(i)     *Evidence of Ownership; Searches*.  Lender shall have received reasonably satisfactory evidence that the Tangible Personal Property is owned by Debtor free and clear of all liens and encumbrances, and Lender shall have received and approved such UCC, bankruptcy, judgment and litigation searches as Lender shall require.

(j)     *Taxes; Other Assessments*.  Debtor shall have paid all Taxes and other assessments and charges relating to the Properties which are due and payable on or prior to the Closing Date as well as Taxes and other assessments and charges due and

13

4833-5686-3584.2
STORE/Campbells (Perkins)
Mortgage Loan Agreement
3 Leasehold Properties
File No. 7210/02-588

payable subsequent to the Closing Date but which Title Company requires to be paid at Closing as a condition to the issuance of the title insurance policy described in Section 9(a).

       (k)    **_Certificates; Organizational Documents_**.  Debtor shall have delivered to Lender certificates reasonably requested by Lender, in form and substance satisfactory to Lender, dated as of the date hereof, with appropriate insertions and attachments, including, without limitation, certified copies of all organizational documents of Debtor; good standing certificates from the state of formation with respect to the Debtor Parties, and appropriate resolutions and/or consents authorizing the transactions contemplated by the Loan Documents.

       (l)    **_Guaranty_**.  Debtor shall cause to be delivered to Lender a Guaranty executed by the Guarantors with respect to the Loan and the Leases.

       (m)    **_Closing Documents_**.  At or prior to the Closing Date, Lender and the Debtor Parties, as may be appropriate, shall have executed and delivered or shall have caused to be executed and delivered to Lender, or as Lender may otherwise direct, the Loan Documents and such other documents, payments, instruments and certificates, as Lender may require in form acceptable to Lender, include.

Upon fulfillment of all of the above conditions, Lender shall deposit funds necessary to close this transaction with Title Company and this transaction shall close in accordance with the terms and conditions of this Agreement.  In the event that Lender advances any funds to Debtor pursuant to the Note without fulfillment of the all of the above conditions, such funding shall in no event be deemed a waiver or amendment except by a written instrument unambiguously setting forth the matter waived or amended and signed by the party against which enforcement of such waiver or amendment is sought.  Waiver of any matter shall not be deemed a waiver of the same or any other matter on any future occasion.

       **Section 10.  Default**.  Each of the following shall be deemed an event of default by Debtor (each, an "Event of Default"):

       (a)    If any material representation or warranty of any Debtor Party set forth in any of the Loan Documents is false in any respect, or if any Debtor Party renders any material false statement or account.

       (b)    If any principal, interest or other monetary sum due under the Note, the Mortgages or any other Loan Document is not paid when due.

       (c)    If Debtor fails to observe or perform any of the other covenants, conditions, or obligations of this Agreement or the other Loan Documents; _provided, however_, if any such failure does not involve the payment of any monetary sum, is not willful or intentional, does not place any rights or interest in collateral of Lender in immediate jeopardy, and is within the reasonable power of Debtor to promptly cure after receipt of notice thereof, all as determined by Lender in its sole discretion, then such failure shall not constitute an Event of Default hereunder, unless otherwise expressly provided herein, unless and until Lender shall have given Debtor notice thereof and a

4833-5686-3584.2
STORE/Campbells (Perkins)
Mortgage Loan Agreement
3 Leasehold Properties
File No. 7210/02-588

period of 30 days shall have elapsed, during which period Debtor may correct or cure such failure, upon failure of which an Event of Default shall be deemed to have occurred hereunder without further notice or demand of any kind being required.  If such failure cannot reasonably be cured within such 30-day period, as determined by Lender in its sole discretion, and Debtor is diligently pursuing a cure of such failure, then Debtor shall have a reasonable period to cure such failure beyond such 30-day period, which shall not exceed 90 days after receiving notice of the failure from Lender.  If Debtor shall fail to correct or cure such failure within such period, an Event of Default shall be deemed to have occurred hereunder without further notice or demand of any kind being required.

      (d)      If there is any Insolvency Event.

      (e)      If any of the conditions set forth in Section 9 are not satisfied by Debtor.

      (f)      If there is an "Event of Default" under any other Loan Document, the Leases or a breach or default, after the passage of all applicable notice and cure or grace periods, under any of the Other Agreements.

**Section 11. Remedies**.   Upon the occurrence of an Event of Default, Lender may declare all or any part of the obligations of Debtor under this Agreement, the Note and any other Loan Document to be due and payable, and the same shall thereupon become due and payable without any presentment, demand, protest or notice of any kind except as otherwise expressly provided herein, and Debtor hereby waives notice of intent to accelerate the obligations secured by the Mortgages and notice of acceleration.  Thereafter, Lender may exercise, at its option, concurrently, successively or in any combination, all remedies available at law or in equity, including without limitation any one or more of the remedies available under the Note, the Mortgages or any other Loan Document.  Neither the acceptance of this Agreement nor its enforcement shall prejudice or in any manner affect Lender's right to realize upon or enforce any other security now or hereafter held by Lender, it being agreed that Lender shall be entitled to enforce this Agreement and any other security now or hereafter held by Lender in such order and manner as it may in its absolute discretion determine.  No remedy herein conferred upon or reserved to Lender is intended to be exclusive of any other remedy given hereunder or now or hereafter existing at law or in equity or by statute.  Every power or remedy given by any of the Loan Documents to Lender, or to which Lender may be otherwise entitled, may be exercised, concurrently or independently, from time to time and as often as may be deemed expedient by Lender.

4833-5686-3584.2
STORE/Campbells (Perkins)
Mortgage Loan Agreement
3 Leasehold Properties
File No. 7210/02-588

**Section 12.  Lender Assignment**. Lender may assign in whole or in part its rights under this Agreement and the other Loan Documents.   Upon any unconditional assignment of Lender's entire right and interest hereunder, Lender shall automatically be relieved, from and after the date of such assignment, of liability for the performance of any obligation of Lender contained herein.   On and after the date of any assignment, then, (i) all references to Lender in this Agreement and the other Loan Documents shall include such assignee or assignees to the extent of such assignment; (ii) all notices required to be delivered to Lender under this Agreement and the other Loan Documents shall be delivered to such assignee; and (iii) any action permitted to be taken by Lender hereunder, including, without limitation, pursuant to Section 11 of this Agreement, may be taken by such assignee or assignees.

**Section 13.  No Debtor Assignments**.   Debtor shall not, without the prior written consent of Lender, sell, assign, transfer, mortgage, convey, encumber or grant any easements or other rights or interests of any kind in the Properties, any of its rights or obligations under this Agreement or the other Loan Documents, or any interest in the Debtors, whether voluntarily, involuntarily or by operation of law or otherwise, including, without limitation, by merger, consolidation, dissolution or otherwise.

**Section 14.  Intentionally Deleted**.

**Section 15.  Indemnity; Release**.   Debtor shall, at its sole cost and expense, protect, defend, indemnify, release and hold harmless each of the Indemnified Parties for, from and against any and all claims, suits, liabilities (including, without limitation, strict liabilities), actions, proceedings, obligations, debts, damages, losses, costs, expenses, diminutions in value, fines, penalties, charges, fees, expenses, judgments, awards, amounts paid in settlement and damages of whatever kind or nature (including, without limitation, attorneys' fees, court costs and other costs of defense) (collectively, "Losses") (excluding Losses suffered by an Indemnified Party directly arising out of such Indemnified Party's gross negligence or willful misconduct; *provided, however*, that the term "gross negligence" shall not include gross negligence imputed as a matter of law to any of the Indemnified Parties solely by reason of Lender's interest in the Properties or Lender's failure to act in respect of matters which are or were the obligation of Debtor under the Loan Documents), imposed upon or incurred by or asserted against any Indemnified Parties, and directly or indirectly arising out of or in any way relating to any one or more of the following: (a) any personal injury, wrongful death, or property damage arising under any statutory or common law or tort law theory, including but not limited to damages assessed for the maintenance of a private or public nuisance or for the conducting of an abnormally dangerous activity on or near the Properties; (b) any disclosures of information, financial or otherwise, (i) made by Lender or Lender's employees, officers, members, managers, agents or any third party as contemplated by Section 14 of this Agreement, or (ii) obtained from any credit reporting agency with respect to Debtor, any guarantor of the Loan, any Affiliate of Debtor, any of the other Debtor Parties or any operator or lessee of the Properties; or (c) any misrepresentation or inaccuracy in any representation or warranty or material breach or failure to perform any covenants or other obligations pursuant to this Agreement.  Debtor fully and completely releases, waives and covenants not to assert any claims, liabilities, actions, defenses, challenges, contests or other opposition against Lender, however characterized, known or unknown, foreseen or unforeseen, now existing or arising in the future, relating to this Agreement and affecting the Properties.

16

**Section 16.  Miscellaneous**.

(a)     ***Transaction Characterization***.  It is the intent of the parties that the Loan Documents evidence one unitary, unseverable transaction pertaining to the Properties.    Debtor acknowledges that the Loan is cross-defaulted and cross-collateralized, and that such cross-default and cross-collateralization is a material inducement to Lender making the Loan.  It is the intent of the parties hereto that the business relationship created by this Agreement and the other Loan Documents is solely that of creditor and debtor and has been entered into by both parties in reliance upon the economic and legal bargains contained in the Loan Documents.   None of the agreements contained in this Agreement or the other Loan Documents is intended, nor shall the same be deemed or construed, to create a partnership (either de jure or de facto) between Debtor and Lender, to make them joint venturers, to make Debtor an agent, legal representative, partner, subsidiary or employee of Lender, nor to make Lender in any way responsible for the debts, obligations or losses of Debtor.

(b)     ***Notices***.  All notices, consents, approvals or other instruments required or permitted to be given by either party pursuant to this Agreement shall be in writing and given by (i) hand delivery; (ii) express overnight delivery service; (iii) email transmission; or (iv) certified or registered mail, return receipt requested, and shall be deemed to have been delivered upon (A) receipt, if hand delivered; (B) the next Business Day, if delivered by reputable express overnight delivery service; (C) receipt of confirmation of email transmission; or (D) the third Business Day following the day of deposit of such notice with the United States Postal Service, if sent by certified or registered mail, return receipt requested.  Notices shall be provided to the parties and addresses specified below:

| | |
|---|---|
| to Debtor: | 5171 Campbells Land Co., Inc. |
| | 6201 Steubenville Pike, Suite 100 |
| | McKees Rocks, PA  15136 |
| | Attention:     William Kane |
| | Email: wtkane25@gmail.com |
| | |
| to Lender: | STORE Capital Acquisitions, LLC |
| | 8377 E. Hartford Drive, Suite 100 |
| | Scottsdale, AZ  85255 |
| | Attention: Michael T. Bennett |
| | Executive Vice President — General Counsel |
| | Email:  mbennett@storecapital.com |
| | |
| copy to: | Kutak Rock LLP |
| | 1801 California Street, Suite 3000 |
| | Denver, CO  80202 |
| | Attention: Nathan P. Humphrey, Esq. |
| | Email:  nathan.humphrey@kutakrock.com |

17

or to such other address or such other person as either party may from time to time hereafter specify to the other party in a notice delivered in the manner provided above. Whenever in this Agreement the giving of notice is required, the giving thereof may be waived in writing at any time by the person or persons entitled to receive such notice. A copy of any notice delivered pursuant to this Section shall also contemporaneously be delivered in the manner herein specified to any assignee of Lender's interest which shall have duly notified Debtor in writing of its name and address.

      (c)     ***Brokers***. Debtor has taken no action which would cause any brokerage or other similar fee, commission or compensation to be payable in connection with the transactions contemplated hereunder. Lender and Debtor represent and warrant to each other that they have dealt with no real estate or mortgage broker, agent, finder or other intermediary in connection with the transactions contemplated by this Agreement or the other Loan Documents. Lender and Debtor shall indemnify and hold each other harmless from and against any costs, claims or expenses, including attorneys' fees, arising out of the breach of their respective representations and warranties contained within this Section.

      (d)     ***Estoppel Certificate***. At any time, and from time to time, each party agrees, promptly and in no event later than 10 days after a request from the other party, to execute, acknowledge and deliver to the other party a certificate in the form supplied by the other party, certifying: (i) to its knowledge, whether there are then any existing defaults by it or the other party in the performance of their respective obligations under this Agreement or any of the other Loan Documents, and, if there are any such defaults, specifying the nature and extent thereof; (ii) that no notice of default has been given or received by it under this Agreement or any of the other Loan Documents which has not been cured, except as to defaults specified in the certificate; (iii) the capacity of the person executing such certificate, and that such person is duly authorized to execute the same on behalf of it; and (iv) any other information reasonably requested by the other party in connection with this Agreement and the other Loan Documents.

      (e)     ***Waiver and Amendment; Document Review***. No provisions of this Agreement shall be deemed waived or amended except by a written instrument unambiguously setting forth the matter waived or amended and signed by the party against which enforcement of such waiver or amendment is sought. Waiver of any matter shall not be deemed a waiver of the same or any other matter on any future occasion. In the event Debtor makes any request upon Lender requiring Lender or Lender's attorneys to review and/or prepare (or cause to be reviewed and/or prepared) any documents, plans, specifications or other submissions in connection with or arising out of this Agreement or any of the other Loan Documents, then Debtor shall (i) reimburse Lender promptly upon Lender's demand for all out-of-pocket costs and expenses incurred by Lender in connection with such review and/or preparation, including, without limitation, reasonable attorneys' fees; and (ii) pay Lender a reasonable processing and review fee.

      (f)     ***Captions***. Captions are used throughout this Agreement for convenience of reference only and shall not be considered in any manner in the construction or interpretation hereof.

18

(g)     ***Lender's Liability***.  Notwithstanding anything to the contrary provided in this Agreement, it is specifically understood and agreed, such agreement being a primary consideration for the execution of this Agreement by Lender, that (i) there shall be absolutely no personal liability on the part of any member, manager, officer or employee of Lender, with respect to any of the terms, covenants and conditions of this Agreement or the other Loan Documents; (ii) Debtor waives all claims, demands and causes of action against Lender's officers, members, managers, employees and agents in the event of any breach by Lender of any of the terms, covenants and conditions of this Agreement or the other Loan Documents to be performed by Lender; and (iii) Debtor shall look solely to the assets of Lender for the satisfaction of each and every remedy of Debtor in the event of any breach by Lender of any of the terms, covenants and conditions of this Agreement or the other Loan Documents to be performed by Lender, such exculpation of liability to be absolute and without any exception whatsoever.

(h)     ***Severability***.  The provisions of this Agreement shall be deemed severable.  If any part of this Agreement shall be held unenforceable, the remainder shall remain in full force and effect, and such unenforceable provision shall be reformed by such court so as to give maximum legal effect to the intention of the parties as expressed therein.

(i)     ***Construction Generally***.  This is an agreement between parties who are experienced in sophisticated and complex matters similar to the transaction contemplated by this Agreement and is entered into by both parties in reliance upon the economic and legal bargains contained herein and shall be interpreted and construed in a fair and impartial manner without regard to such factors as the party which prepared the instrument, the relative bargaining powers of the parties or the domicile of any party. Debtor and Lender were each represented by legal counsel competent in advising them of their obligations and liabilities hereunder.

(j)     ***Entire Agreement***.  This Agreement and the other Loan Documents, together with any other certificates, instruments or agreements to be delivered in connection therewith, constitute the entire agreement between the parties with respect to the subject matter hereof, and there are no other representations, warranties or agreements, written or oral, between Debtor and Lender with respect to the subject matter of this Agreement.  Notwithstanding anything in this Agreement to the contrary, upon the execution and delivery of this Agreement by Debtor and Lender, the Commitment and all other agreements (written or oral) between Lender and any of the Debtor Parties or their representatives shall be deemed null and void and of no further force and effect and the terms and conditions of this Agreement shall control notwithstanding that such terms may be inconsistent with or vary from those set forth in the Commitment or such other agreements.

(k)     ***Forum Selection; Jurisdiction; Venue; Choice of Law***.  Debtor acknowledges that this Agreement was signed by Lender in the State of Arizona and delivered by Debtor in the State of Arizona, all payments under the Note will be delivered in the State of Arizona and there are substantial contacts between the parties and the transactions contemplated herein and the State of Arizona.  For purposes of any action or proceeding arising out of this Agreement, the parties hereto hereby expressly submit

19

to the jurisdiction of all federal and state courts located in the State of Arizona and Debtor consents that it may be served with any process or paper by registered mail or by personal service within or without the State of Arizona in accordance with applicable law. Furthermore, Debtor waives and agrees not to assert in any such action, suit or proceeding that it is not personally subject to the jurisdiction of such courts, that the action, suit or proceeding is brought in an inconvenient forum or that venue of the action, suit or proceeding is improper.  It is the intent of the parties hereto that all provisions of this Agreement shall be governed by and construed under the laws of the State of Arizona, without giving effect to its principles of conflicts of law.  To the extent that a court of competent jurisdiction finds Arizona law inapplicable with respect to any provisions hereof, then, as to those provisions only, the laws of the states where the Properties are located shall be deemed to apply.  Nothing in this Section shall limit or restrict the right of Lender to commence any proceeding in the federal or state courts located in the states in which the Properties are located to the extent Lender deems such proceeding necessary or advisable to exercise remedies available under this Agreement or the other Loan Documents.

(l)     ***Survival***.  Except for the conditions of Closing set forth in Section 9, which shall be satisfied or waived as of the Closing Date, all representations, warranties, agreements, obligations and indemnities of Debtor and Lender set forth in this Agreement shall survive the Closing.

(m)     ***Waiver of Jury Trial and Certain Damages***.  DEBTOR AND LENDER HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE THE RIGHT EITHER MAY HAVE TO A TRIAL BY JURY WITH RESPECT TO ANY AND ALL ISSUES PRESENTED IN ANY ACTION, PROCEEDING, CLAIM OR COUNTERCLAIM BROUGHT BY EITHER OF THE PARTIES HERETO AGAINST THE OTHER OR ITS SUCCESSORS WITH RESPECT TO ANY MATTER ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT, ANY OTHER LOAN DOCUMENT, OR ANY DOCUMENT CONTEMPLATED HEREIN OR THEREIN OR RELATED HERETO OR THERETO.  THIS WAIVER BY THE PARTIES HERETO OF ANY RIGHT EITHER MAY HAVE TO A TRIAL BY JURY HAS BEEN NEGOTIATED AND IS AN ESSENTIAL ASPECT OF THEIR BARGAIN.  FURTHERMORE, DEBTOR HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES THE RIGHT IT MAY HAVE TO SEEK PUNITIVE, CONSEQUENTIAL, SPECIAL AND INDIRECT DAMAGES FROM LENDER AND ANY OF LENDER'S AFFILIATES, OFFICERS, MEMBERS, MANAGERS OR EMPLOYEES OR ANY OF THEIR SUCCESSORS WITH RESPECT TO ANY AND ALL ISSUES PRESENTED IN ANY ACTION, PROCEEDING, CLAIM OR COUNTERCLAIM BROUGHT BY DEBTOR AGAINST LENDER OR ANY OF LENDER'S AFFILIATES, OFFICERS, MEMBERS, MANAGERS OR EMPLOYEES OR ANY OF THEIR SUCCESSORS WITH RESPECT TO ANY MATTER ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT OR ANY DOCUMENT CONTEMPLATED HEREIN OR RELATED HERETO.  THE WAIVER BY DEBTOR OF ANY RIGHT IT MAY HAVE TO SEEK PUNITIVE, CONSEQUENTIAL, SPECIAL AND INDIRECT DAMAGES HAS BEEN NEGOTIATED BY THE PARTIES HERETO AND IS AN ESSENTIAL ASPECT OF THEIR BARGAIN.

4833-5686-3584.2
STORE/Campbells (Perkins)
Mortgage Loan Agreement
3 Leasehold Properties
File No. 7210/02-588

(n)     ***Counterparts***.  This Agreement may be executed in counterparts, and if so executed, this Agreement shall be effective as if simultaneously executed.

(o)     ***Parties Interested Herein***.   This Agreement shall be for the sole and exclusive benefit of the parties and, subject to Section 13 hereof, their respective successors, assignees and transferees.   Nothing in this Agreement, expressed or implied, is intended or shall be construed to confer upon, or to give to, any other Person any right, remedy or claim under or by reason of this Agreement or any terms hereof.

(p)     ***Events Occurring on Days That Are Not Business Days***.  If the date for making any payment or the last day for performance of any act or the exercising of any right under this Agreement is a day that is not a Business Day, such payment may be made, such act may be performed or such right may be exercised on the next succeeding Business Day, with the same force and effect as if done on the nominal date provided herein.

(q)     ***Rights Cumulative***.  All rights and remedies herein given or granted to any party hereunder are cumulative, nonexclusive and in addition to any and all rights and remedies that may have or may be given by reason of any law, statute, ordinance or otherwise.

(r)     ***Limitation on Waivers***.  No delay or omission to exercise any right or power occurring upon any Event of Default or any other breach or default by any of the parties of or under any provision of this Agreement shall impair any such right or power or shall be construed to be a waiver thereof, but any such right and power may be exercised from time to time and as often as may be deemed appropriate.  In the event any Event of Default or any other breach or default by any of the parties of or under any provision of this Agreement shall be waived by another party hereto, such waiver shall not bind any party which has not waived the default or breach, shall be limited to the particular default or breach so waived and shall not be deemed to waive any other default or breach hereunder or constitute a waiver of the same breach on a future occasion.

(s)     ***Further Assurances and Corrective Instruments***.  The parties agree that so long as this Agreement is in full force and effect, each of them shall have full power to carry out the acts and agreements provided herein and they will from time to time, execute, acknowledge and deliver or cause to be executed, acknowledged and delivered such supplements hereto and such further instruments as may be reasonably required in order to carry out the intention of this Agreement.

(t)     ***Collection Costs***.  Debtor shall reimburse Lender for all reasonable expenses and costs, including, without limitation, fees and out-of-pocket expenses of attorneys and expert witnesses and costs of investigation, incurred by or on behalf of Lender in the enforcement or preservation of its rights under this Agreement and all of the other Loan Documents, including, without limitation, as a result of any failure by Debtor to pay any payments due hereunder or under any of the other Loan Documents or in connection with efforts to collect any amount due to Lender by Debtor under this Agreement, the Note or the other Loan Documents (including but not limited to efforts to

21

collect any prepayment amount) or to enforce the provisions hereof or thereof, including costs and expenses incurred in post-judgment collection efforts and in any insolvency, bankruptcy, debtor relief, dissolution, liquidation, reorganization or similar proceedings (including any action for relief from the automatic stay of any such proceeding) or judicial or non-judicial foreclosure proceeding (collectively, "Collection Costs").  Collection Costs that are not paid to Lender when due shall accrue interest at the Default Interest Rate until paid.

(u)     ***Binding Effect***.  This Agreement shall be binding upon and inure to the benefit of Debtor and Lender and, subject to Section 13 hereof, their respective successors and permitted assigns, including, without limitation, any United States trustee, any debtor-in-possession or any trustee appointed by a private panel.  Any permitted successor, assignee or transferee of any of the parties hereto shall succeed to the rights and obligations of its predecessor, assignor or transferor in the same manner as if it were named in this Agreement in the place of and instead of its predecessor, assignor or transferee, effective immediately after the later of the date any conditions to such succession set forth in this Agreement are satisfied or the date notice is given to the other parties in accordance with the notice provisions hereof.

[Remainder of page intentionally left blank; signature page(s) to follow]

4833-5686-3584.2
STORE/Campbells (Perkins)
Mortgage Loan Agreement
3 Leasehold Properties
File No. 7210/02-588

IN WITNESS WHEREOF, Debtor and Lender have entered into this Agreement as of the date first above written.

**LENDER:**

**STORE CAPITAL ACQUISITIONS, LLC**, a Delaware limited liability company

By: _____

Name: _____
<span>Michael T. Bennett
Executive Vice President
General Counsel</span>

Title: _____

STATE OF ARIZONA                )
                                ) ss.
COUNTY OF MARICOPA              )

Before me, the undersigned, a Notary Public of the State and County aforesaid, personally appeared Michael T. Bennett, with whom I am personally acquainted (or proved to me to be on the basis of satisfactory evidence), and who, upon oath, acknowledged himself to be the Executive Vice President – General Counsel of **STORE MASTER FUNDING XIII, LLC**, a Delaware limited liability company, the within named Lender, and that he as such officer, being authorized so to do, executed the within instrument for the purposes therein contained, by signing the name of Michael T. Bennett, as Executive Vice President – General Counsel by himself as such officer.

WITNESS my hand and Official Seal at office, this ___30___ day of March, 2018.

_____
Notary Public

My Commission Expires ___2/2/2019___

CARLA CAYE THOMAN
Notary Public, State of Arizona
Maricopa County
My Commission Expires
February 02, 2019

IN WITNESS WHEREOF, Debtor and Lender have entered into this Agreement as of the date first above written.

**DEBTOR:**

**5171 CAMPBELLS LAND CO., INC.,** a Pennsylvania corporation

By: _William T Kane_

Name: _WILLIAM T. KANE_

Title: _Pres._

STATE OF _Pennsylvania_     )
                            ) ss.
COUNTY OF _Allegheny_       )

Before me, the undersigned, a Notary Public of the State and County aforesaid, personally appeared _William T. Kane_, with whom I am personally acquainted (or proved to me to be on the basis of satisfactory evidence), and who, upon oath, acknowledged himself/herself to be the _President_ of **5171 CAMPBELLS LAND CO., INC.,** a Pennsylvania corporation, the within named Debtor, a _____, and that he/she as such officer, being authorized so to do, executed the within instrument for the purposes therein contained, by signing the name of _William T. Kane_ by himself/herself as such officer.

WITNESS my hand and Official Seal at office, this _2nd_ day of _April_, 2018.

_Rosanne M Penn_
Notary Public

My Commission Expires _9/13/20_

COMMONWEALTH OF PENNSYLVANIA
NOTARIAL SEAL
Rosanne M. Penn, Notary Public
City of Pittsburgh, Allegheny County
My Commission Expires Sept. 13, 2020
MEMBER, PENNSYLVANIA ASSOCIATION OF NOTARIES

**EXHIBIT A**

**DEFINITIONS**

The following terms shall have the following meanings for all purposes of this Agreement:

"*Affiliate*" means any Person which directly or indirectly controls, is under common control with, or is controlled by any other Person.  For purposes of this definition, "controls", "under common control with" and "controlled by" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities or otherwise.

"*Anti-Money Laundering Laws*" means all applicable laws, regulations and government guidance on the prevention and detection of money laundering, including 18 U.S.C. § § 1956 and 1957, and the BSA.

"*Asset Purchase Agreement*" means the Asset Purchase Agreement, dated January 26, 2018, between Unique Ventures and Debtor.

"*Bankruptcy Case*" means the bankruptcy case of Unique Ventures pending in the Bankruptcy Court, Case No. 17-20526-TPA.

"*Bankruptcy Court*" means the United States Bankruptcy Court for the Western District of Pennsylvania.

"*BSA*" means the Bank Secrecy Act (31 U.S.C. § § 5311 et. seq.), and its implementing regulations, Title 31 Part 103 of the U.S. Code of Federal Regulations.

"*Business Day*" means any day on which Lender is open for business other than a Saturday, Sunday or a legal holiday, ending at 5:00 p.m. Scottsdale, Arizona time.

"*Closing*" means the disbursement of the Loan Amount by Title Company as contemplated by this Agreement.

"*Collection Costs*" has the meaning set forth in Section 16(t).

"*Debtor Parties*" means, collectively, Debtor, Guarantors and any Affiliate thereof.

"*Default Rate*" has the meaning set forth in the Note.

"*Deferred Consideration Note*" means the Term Promissory Note, dated January 31, 2018, in the principal amount of $1,750,000.00 made by Debtor in favor of Unique Ventures pursuant to the Asset Purchase Agreement.

"*Equity Transfer*" has the meaning set forth in Section 9(d).

"*Event of Default*" has the meaning set forth in Section 10.

4833-5686-3584.2
STORE/Campbells (Perkins)
Mortgage Loan Agreement
3 Leasehold Properties
File No. 7210/02-588

"*Financial Information*" means all financial statements and other information concerning the Debtor Parties.

"*Franchise Agreement*" means one or more franchise, license and/or area development agreements with Franchisor for conduct of a Permitted Facility at the Properties

"*Franchisor*" means Perkins Restaurant and Bakery, a Delaware corporation, or its successors and permitted assigns

"*GAAP*" means generally accepted accounting principles consistently applied.

"*Governmental Authority*" means any governmental authority, agency, department, commission, bureau, board, instrumentality, court or quasi-governmental authority of the United States, the state where the Properties are located or any political subdivision thereof.

"*Ground Lease*" or "*Ground Leases*" means, individually and collectively, (i) that certain Lease dated as of October 29, 1973 by and between Gerald R. Fry Company Incorporated, a Pennsylvania corporation, as ground lessor, and Debtor, as lessee, together with that certain Lease Amendment Agreement dated June 18, 1986, and Lease Amendment, Assignment and Assumption, and Consent dated February 7, 2007, with respect to the real property located at 358 Hadley Road (19 Greenville Plaza), Greenville, PA 16125, (ii) that certain Lease dated as of September 27, 2000 by and between Gar Field Club LP, a Delaware limited partnership, as ground lessor, and Debtor, as ground lessee, together with that certain First Amendment dated October 27, 2000, and that Lease Amendment, Assignment and Assumption, and Consent dated February 7, 2007 and that Second Amendment dated May 31, 2016, with respect to the real property located at 3334 Wilmington Road, New Castle, PA 16105, and (iii) that certain Lease dated as of November 15, 1977 by and between Elmhurst Properties, Inc., a Ohio corporation, as ground lessor, and Debtor, as ground lessee, together with that certain Lease Amendment, Assignment and Assumption, and Consent dated February 7, 2007, each as amended, modified and assigned.

"*Ground Lessor*" means the lessor under any of the Ground Lease.

"*Guarantor*" or "*Guarantors*" means, individually and collectively, William Kane, Frank Kane and Ron Linaburg.

"*Guaranty*" means the unconditional guaranty of payment and performance of even date herewith with respect to the Loan and the Note, as the same may be amended from time to time.

"*Indemnified Parties*" means Lender, the trustees under the Mortgages, if applicable, and any Person who is or will have been involved in the origination of the Loan, any Person who is or will have been involved in the servicing of the Loan, any Person in whose name the encumbrance created by any of the Mortgages is or will have been recorded, Persons who may hold or acquire or will have held a full or partial interest in the Loan (including, but not limited to, investors or prospective investors in any securitization, participation or transfer, as well as custodians, trustees and other fiduciaries who hold or have held a full or partial interest in the Loan for the benefits of third parties), as well as the respective directors, officers, shareholders, partners, members, employees, lenders, agents, servants, representatives, contractors,

A-2

subcontractors, affiliates, subsidiaries, participants, successors and assigns of any and all of the foregoing (including, but not limited to, any other person or entity who holds or acquires or will have held a participation or other full or partial interest in the Loan or the Properties, whether during the term of the Loan or as a part of or following a foreclosure of the Loan and including, but not limited to, any successors by merger, consolidation or acquisition of all or a substantial portion of Lender's assets and business).

"*Insolvency Event*" means (a) any Debtor Party's (i) failure to generally pay its debts as such debts become due; (ii) admitting in writing its inability to pay its debts generally; or (iii) making a general assignment for the benefit of creditors; (b) any proceeding being instituted by or against any Debtor Party (i) seeking to adjudicate it a bankrupt or insolvent; (ii) seeking liquidation, winding up, reorganization, arrangement, adjustment, protection, relief, or composition of it or its debts under any law relating to bankruptcy, insolvency, or reorganization or relief of debtors; or (iii) seeking the entry of an order for relief or the appointment of a receiver, trustee, or other similar official for it or for any substantial part of its property, and in the case of any such proceeding instituted against any Debtor Party, either such proceeding shall remain undismissed for a period of 120 days or any of the actions sought in such proceeding shall occur; or (c) any Debtor Party taking any corporate action to authorize any of the actions set forth above in this definition.

"*Legal Requirements*" means, as to any Person, the certificate of incorporation, bylaws, operating agreement, partnership agreement or limited partnership agreement and certificate of limited partnership or other organization or governing documents of such Person, and any law, statute, order, consent, decree, ordinance, treaty, rule or regulation, or determination of an arbitrator or a court or other Governmental Authority, including, without limitation, all health, building, fire, safety and other codes, ordinances and requirements, all applicable standards of the National Board of Fire Underwriters and the Americans With Disabilities Act of 1990 and all policies or rules of common law, in each case, as amended, and any judicial or administrative interpretation thereof, and all covenants, agreements, restrictions and encumbrances, in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"*Lender Entities*" means, collectively, Lender, STORE Capital Corporation, a Maryland corporation, and STORE Master Funding XIII, LLC, a Delaware limited liability company, and any Affiliate thereof.

"*Loan*" means the loan for the Properties, as described in Section 1.

"*Loan Amount*" means the aggregate amount set forth in Section 1.

"*Loan Documents*" means, collectively, this Agreement, the Note, the Mortgages, the Guaranty, the UCC Financing Statements, and all other documents, instruments and agreements executed in connection therewith or contemplated thereby.

"*Losses*" has the meaning set forth in Section 15.

"*Lost Note*" has the meaning set forth in Section 6(a).

A-3

"*Material Adverse Effect*" means any event, circumstance or condition that is existing, or that is contemplated by Debtor, or about which Debtor may have knowledge (a) which has a reasonable probability of having a material adverse effect on the condition or business (financial or otherwise) of any Debtor Party, the Properties, the Mortgaged Property, or the transactions contemplated by this Agreement or the other Loan Documents; (b) which, except for any nonconsensual and non-contractual lien or encumbrance for Taxes or assessments or other governmental charges or levies (but excluding any judgment lien) that is not yet due and payable, in any way would adversely affect, or otherwise impair, encumber or dilute Lender's or Debtor's interest in, (i) the Properties or Mortgaged Property; or (ii) the validity or enforceability of this Agreement or the other Loan Documents; (c) which would materially adversely affect the ability of Debtor or Guarantors to perform their other obligations under this Agreement or the other Loan Documents; (d) which would impair, encumber or dilute Lender's or Debtor's interest in the Properties or Mortgaged Property; or (e) which would materially adversely affect the validity or enforceability of this Agreement and/or the other Loan Documents.

"*Mortgages*" means the mortgages dated as of the date of this Agreement executed by Debtor for the benefit of Lender with respect to a Property or the deeds of trust or mortgage dated as of the date of this Agreement to be executed by Debtor for the benefit of Lender with respect to all of the Properties, as the same may be amended from time to time.  A Mortgage will be executed for each Property.

"*Mortgaged Property*" has the meaning set forth in the Mortgage.

"*Note*" means the promissory note dated as of the date of this Agreement to be executed by Debtor in favor of Lender evidencing a Loan with respect to a Property or the promissory notes dated as of the date of this Agreement to be executed by Debtor in favor of Lender evidencing the Loan with respect to the Properties, as the same may be amended, restated and/or substituted from time to time.

"*Obligations*" has the meaning set forth in Section 6(d).

"*OFAC Laws and Regulations*" means Executive Order 13224 issued by the President of the United States of America, the Terrorism Sanctions Regulations (Title 31 Part 595 of the U.S. Code of Federal Regulations), the Terrorism List Governments Sanctions Regulations (Title 31 Part 596 of the U.S. Code of Federal Regulations), the Foreign Terrorist Organizations Sanctions Regulations (Title 31 Part 597 of the U.S. Code of Federal Regulations), and the Cuban Assets Control Regulations (Title 31 Part 515 of the U.S. Code of Federal Regulations), and all other present and future federal, state and local laws, ordinances, regulations, policies, lists (including, without limitation, the Specially Designated Nationals and Blocked Persons List) and any other requirements of any Governmental Authority (including, without limitation, the United States Department of the Treasury Office of Foreign Assets Control) addressing, relating to, or attempting to eliminate, terrorist acts and acts of war, each as hereafter supplemented, amended or modified from time to time, and the present and future rules, regulations and guidance documents promulgated under any of the foregoing, or under similar laws, ordinances, regulations, policies or requirements of other states or localities.

"*OFAC List*" means the list of specially designated nationals and blocked persons subject to financial sanctions that is maintained by the U.S. Treasury Department, Office of

4833-5686-3584.2
STORE/Campbells (Perkins)
Mortgage Loan Agreement
3 Leasehold Properties
File No. 7210/02-588

Foreign Assets Control and any other similar list maintained by the U.S. Treasury Department, Office of Foreign Assets Control pursuant to any Legal Requirements, including, without limitation, trade embargo, economic sanctions, or other prohibitions imposed by Executive Order of the President of the United States.  The OFAC List currently is accessible through the Internet website www.treas.gov/ofac/tllsdn.pdf.

"*Other Agreements*" means, collectively, all agreements and instruments between, among or by (a) any of the Debtor Entities, and, or for the benefit of; (b) any of the Lender Entities, including, without limitation, lease agreements, promissory notes and guaranties; *provided, however*, the term "Other Agreements" shall not include the agreements and instruments defined as the Loan Documents.  The term "Other Agreements" shall specifically include (i) that certain Lease Agreement dated February 12, 2018 between STORE Capital Acquisitions, LLC, as lessor, and Lessee with respect to the real property located at 1601 W. Prospect Road, Ashtabula, OH 44004, (ii) that certain Lease Agreement dated February 12, 2018 between STORE Capital Acquisitions, LLC, as lessor, and Lessee with respect to the real property located at 587 E. Main Street, Canfield, OH 44406, (iii) that certain Lease Agreement dated February 12, 2018 between STORE Capital Acquisitions, LLC, as lessor, and Lessee with respect to the real property located at 115 Ludlow Street, Warren, PA 16365, (iv) that certain Lease Agreement dated February 12, 2018 between STORE Capital Acquisitions, LLC, as lessor, and Lessee with respect to the real property located at 4896 Everhard Road NW, Canton, OH 44718,and/or (v) that certain Lease Agreement dated February 12, 2018 between STORE Capital Acquisitions, LLC, as lessor, and Lessee with respect to the real property located at 2945 East State Street, Hermitage, PA 16148, as each may be amended from time to time.

"*Permitted Facility*" means a Perkins Restaurant and Bakery, and uses incidental thereto.

"*Permitted Exceptions*" means those recorded easements, restrictions, liens and encumbrances set forth as exceptions in the title reports and title commitments referenced in Section 9(a), and approved by Lender in its sole discretion in connection with the closing of the Loan.

"*Person*" means any individual, corporation, partnership, limited liability company, trust, unincorporated organization, Governmental Authority or any other form of entity.

"*Plan Administrator*" means Albertson's Capital Services, LLC, as Plan Administrator of Unique Ventures, and any successor or assign under the Second Chapter 11 Plan Proposed by the Official Committee of Unsecured Creditors, as may be amended from time to time, confirmed in the Bankruptcy Case.

"*Pledge*" has the meaning set forth in Section 6(d).

"*Property*" or "*Properties*" means, as the context may require, Debtor's leasehold interest pursuant to the Ground Leases in and to the parcel or parcels of real estate corresponding to the legal descriptions and addresses identified on Exhibit B attached hereto, together with all rights, privileges and appurtenances associated therewith and all buildings, fixtures and other

A-5

improvements, equipment, trade fixtures, appliances and other personal property now or hereafter located thereon (whether or not affixed to such real estate).

"*Sale*" means the sale under the Asset Purchase Agreement, as approved by the Bankruptcy Court's Order Authorizing Sale of Substantially All of the Debtor's Assets Free and Clear of Liens, Claims, Encumbrances, and Interests as well as Related Relief [Docket No. 970].

"*Tangible Personal Property*" means any and all equipment, furniture, furnishings and other tangible personal property now existing or hereafter acquired by Debtor in connection with the Properties.

"*Tax*" or "*Taxes*" has the meaning set forth in Section 6(i).

"*Title Company*" means First American Title Insurance Company located at 2425 E. Camelback Road, Suite 300, Phoenix, Arizona 85016, Attention: Kristin Brown, National Commercial Services, or an alternative insurance company selected by Lender.

"*Transaction Costs*" means all of the costs and expenses incurred in connection with the transaction contemplated by this Agreement and the other Loan Documents, including, without limitation, costs for third-party reports (e.g., environmental, credit and similar third-party reports), site inspection and valuation costs, initial set up fees related to the Loan Documents, survey costs, title insurance premiums, costs of endorsements, UCC, tax, litigation and bankruptcy search charges, recording fees, escrow fees, stamp taxes, mortgage taxes and transfer and other taxes and fees, and all closing costs and all of Lender's and Debtor's out-of-pocket expenses, including the fees and expenses of Lender's legal counsel, accountants and other professional advisors.

"*UCC Financing Statements*" means such UCC Financing Statements as Lender shall require with respect to the transactions contemplated by this Agreement.

"*Unique Ventures*" means Unique Ventures Group, LLC.

A-6

**EXHIBIT B**

**PROPERTIES**

19 Greenville Plaza, Greenville, PA 16125

3334 Wilmington Road, New Castle, PA 16105

3870 Elm Road, NE, Warren, OH 44483

4833-5686-3584.2
STORE/Campbells (Perkins)
Mortgage Loan Agreement
3 Leasehold Properties
File No. 7210/02-588

**EXHIBIT C**

**INSURANCE**

**Section 1.01.  Insurance**.

(a)      ***Coverage***.  Debtor shall maintain, with respect to each of the Properties, at its sole expense, the following types and amounts of insurance, in addition to such other insurance as Lender may reasonably require from time to time:

(i)      Insurance against loss or damage to real property and personal property under an "all risk" or "special form" insurance policy, which shall include coverage against all risks of direct physical loss, including but not limited to loss by fire, lightning, wind, terrorism, and other risks normally included in the standard ISO special form (and shall also include National Flood and Excess Flood insurance for any Property located in Flood Zone A or Flood Zone V, as designated by FEMA, or otherwise located in a flood zone area identified by FEMA as a 100-year flood zone or special hazard area, and earthquake insurance if any Property is located within a moderate to high earthquake hazard zone as determined by an approved insurance company set forth below).  Such policy shall also include soft costs, a joint loss agreement, coverage for ordinance or law covering the loss of value of the undamaged portion of the Properties, costs to demolish and the increased costs of construction if any of the improvements located on, or the use of, the Properties shall at any time constitute legal non-conforming structures or uses.  Ordinance or law limits shall be in an amount equal to the full replacement cost for the loss of value of the undamaged portion of the Properties and no less than 25% of the replacement cost for costs to demolish and the increased cost of construction, or in an amount otherwise specified by Lender.  Such insurance shall be in amounts not less than 100% of the full insurable replacement cost values (without deduction for depreciation), with an agreed amount endorsement or without any coinsurance provision, and with sublimits satisfactory to Lender, as determined from time to time at Lender's request but not more frequently than once in any 12-month period.

(ii)      Commercial general liability insurance, including products and completed operation liability, covering Lender and Debtor against bodily injury liability, property damage liability and personal and advertising injury, including without limitation any liability arising out of the ownership, maintenance, repair, condition or operation of every Property or adjoining ways, streets, parking lots or sidewalks.  Such insurance policy or policies shall contain a broad form contractual liability endorsement under which the insurer agrees to insure Debtor's obligations under Article X hereof to the extent insurable, and a "severability of interest" clause or endorsement which precludes the insurer from denying the claim of Debtor or Lender because of the negligence or other acts of the other, shall be in amounts of not less than $10,000,000 per occurrence for bodily injury and property damage, and $10,000,000 general aggregate per

C-1

location, or such higher limits as Lender may reasonably require from time to time, and shall be of form and substance satisfactory to Lender.  Such limits of insurance can be acquired through Commercial General liability and Umbrella liability policies.

(iii)    Workers' compensation and Employers Liability insurance with statutorily mandated limits covering all persons employed by Debtor on the Properties in connection with any work done on or about any of the Properties for which claims for death or bodily injury could be asserted against Lender, Debtor or the Properties.

(iv)    Business interruption insurance including Rental Value Insurance payable to Lender at all locations for a period of not less than twelve (12) months.  Such insurance is to follow the form of the real property "all risk" or "special form" coverage and is not to contain a co-insurance clause.  Such insurance is to have a minimum of 180 days of extended period of indemnity.

(v)    Automobile liability insurance, including owned, non-owned and hired car liability insurance for combined limits of liability of $5,000,000 per occurrence.  The limits of liability can be provided in a combination of an automobile liability policy and an umbrella liability policy.

(vi)    Comprehensive Boiler and Machinery or Equipment Breakdown Insurance against loss or damage from explosion of any steam or pressure boilers or similar apparatus, if any, and other building equipment including HVAC units located in or about each Property and in an amount equal to the lesser of 25% of the 100% replacement cost of each Property or $5,000,000.

(vii)    Such additional and/or other insurance and in such amounts as at the time is customarily carried by prudent owners or tenants with respect to improvements and personal property similar in character, location and use and occupancy to each Property.

(b)    **_Insurance Provisions_**.  All insurance policies shall:

(i)    provide for a waiver of subrogation by the insurer as to claims against Lender, its employees and agents;

(ii)    be primary and provide that any "other insurance" clause in the insurance policy shall exclude any policies of insurance maintained by Lender and the insurance policy shall not be brought into contribution with insurance maintained by Lender;

(iii)    contain deductibles not to exceed $25,000;

(iv)    contain a standard non-contributory mortgagee clause or endorsement in favor of any Lender designated by Lender;

C-2

(v)      provide that the policy of insurance shall not be terminated, cancelled or amended without at least thirty (30) days' prior written notice to Lender and to any Lender covered by any standard mortgagee clause or endorsement;

(vi)      be in amounts sufficient at all times to satisfy any coinsurance requirements thereof;

(vii)      except for workers' compensation insurance referred to above, name Lender and any Lender Affiliate or Lender requested by Lender, as an "additional insured" with respect to liability insurance, and as an "additional named insured" or "additional insured" with respect to real property and rental value insurance, as appropriate and as their interests may appear;

(viii)      be evidenced by delivery to Lender and any Lender designated by Lender of an Acord Form 28 for property, business interruption and boiler & machinery coverage (or any other form requested by Lender) and an Acord Form 25 for commercial general liability, workers' compensation and umbrella coverage (or any other form requested by Lender); provided that in the event that either such form is no longer available, such evidence of insurance shall be in a form reasonably satisfactory to Lender and any Lender designated by Lender; and

(ix)      be issued by insurance companies licensed to do business in the states where the Properties are located and which are rated no less than A-X by Best's Insurance Guide or are otherwise approved by Lender.

(c)      ***Additional Obligations***.  It is expressly understood and agreed that (i) if any insurance required hereunder, or any part thereof, shall expire, be withdrawn, become void by breach of any condition thereof by Debtor, or become void or in jeopardy by reason of the failure or impairment of the capital of any insurer, Debtor shall immediately obtain new or additional insurance reasonably satisfactory to Lender and any Lender designated by Lender; (ii) the minimum limits of insurance coverage set forth in this Exhibit C shall not limit the liability of Debtor for its acts or omissions as provided in this Lease; (iii) Debtor shall procure policies for all insurance for periods of not less than one year and shall provide to Lender and any servicer or Lender of Lender certificates of insurance or, upon Lender's request, duplicate originals of insurance policies evidencing that insurance satisfying the requirements of this Lease is in effect at all times; (iv) Debtor shall pay as they become due all premiums for the insurance required by this Exhibit C; (v) in the event that Debtor fails to comply with any of the requirements set forth in this Exhibit C, within ten (10) days of the giving of written notice by Lender to Debtor, (A) Lender shall be entitled to procure such insurance; and (B) any sums expended by Lender in procuring such insurance shall be Additional Rental and shall be repaid by Debtor, together with interest thereon at the Default Rate, from the time of payment by Lender until fully paid by Debtor immediately upon written demand therefor by Lender; and (vi) Debtor shall maintain all insurance policies required in this Exhibit C not to be cancelled, invalidated or suspended on account of the conduct of Debtor, its officers, directors, managers, members, employees or agents, or anyone

C-3

4833-5686-3584.2
STORE/Campbells (Perkins)
Mortgage Loan Agreement
3 Leasehold Properties
File No. 7210/02-588

acting for Debtor or any subtenant or other occupant of the Properties, and shall comply with all policy conditions and warranties at all times to avoid a forfeiture of all or a part of any insurance payment.

***Blanket Policies***.   Notwithstanding anything to the contrary in this Exhibit C, any insurance which Debtor is required to obtain pursuant to this Exhibit C may be carried under a "blanket" policy or policies covering other properties or liabilities of Debtor provided that such "blanket" policy or policies otherwise comply with the provisions of this Exhibit C.

C-4

# EXHIBIT B

# PROMISSORY NOTE

$1,750,000.00

Dated as of April 3, 2018
Scottsdale, Arizona

      **5171 CAMPBELLS LAND CO., INC.**, a Pennsylvania corporation ("Debtor"), for value received, hereby promises to pay to **STORE CAPITAL ACQUISITIONS, LLC**, a Delaware limited liability company ("Lender"), whose address is 8377 E. Hartford Drive, Suite 100, Scottsdale, Arizona 85255, or order, on or before, April 15, 2019 (the "Maturity Date"), as herein provided, the principal sum of $1,750,000.00, and to pay interest on the unpaid principal amount of this Note from the date hereof to the Maturity Date at the rate of 8.50% per annum on the basis of a 360-day year of twelve 30-day months, such principal and interest to be paid in immediately available funds and in lawful money of the United States.

      1.    **Loan Agreement**.  Initially capitalized terms which are not otherwise defined in this Note shall have the meanings set forth in that certain Mortgage Loan Agreement dated as of the date of this Note between Debtor and Lender, as such agreement may be amended, restated and/or supplemented from time to time (the "Loan Agreement").

      2.    **Interest**.  Interest on the principal amount of this Note for the period commencing with the date such principal amount is advanced by Lender through the last day in the month in which this Note is dated shall be due and payable upon delivery of this Note.  Thereafter, principal and interest shall be payable in the amounts indicated on the Loan Amortization Schedule attached hereto and as further outlined in Section 4 below until the Maturity Date, at which time the outstanding principal and unpaid accrued interest shall be due and payable

      3.    **Prepayment**.  Debtor may prepay this Note in full, but not in part, including all accrued but unpaid interest hereunder and all sums advanced by Lender pursuant to the Loan Documents and any Other Agreements; provided that (i) no Event of Default has occurred under this Note or any of the other Loan Documents; and (ii) any such prepayment shall only be made on a regularly scheduled payment date.

      4.    **Method of Payment**.  Concurrently with the execution of this Note, Debtor shall deliver to Lender a completed Authorization Agreement—Pre Arranged Payments in the form of <u>Exhibit A</u> attached hereto and incorporated herein by this reference, together with a voided check for account verification, establishing arrangements whereby payments of principal and interest hereunder are transferred by Automated Clearing House Debit initiated by Lender directly from an account at a United States bank in the name of Debtor to such account as Lender may designate.  Lender will initiate four equal installments of the monthly payment due on the 7th, 15th, 22nd, and last calendar day of the month (or subsequent business day).

      5.    **Event of Default; Remedies**.  This Note is secured by the Mortgages and guaranteed by the Guarantors pursuant to the Guaranty.  An "Event of Default" shall be deemed to have occurred under this Note if (a) any principal, interest or other monetary sum due under this Note is not paid when due; or (b) an Event of Default or a breach or default, after the passage of all applicable notice and cure or grace periods, shall occur under any of the Loan Documents or the Other Agreements.

Upon the occurrence of an Event of Default under this Note, subject to the limitation set forth in clause (a) of the preceding paragraph, then, time being of the essence hereof, Lender may declare the entire unpaid principal balance of this Note, accrued interest, if any, and all other sums due under this Note and any Loan Documents or Other Agreements due and payable at once without notice to Debtor.

All past-due principal and/or interest shall bear interest from the due date to the date of actual payment at the lesser of the highest rate for which the undersigned may legally contract or the rate of eighteen percent (18%) per annum (the "Default Rate"), and such Default Rate shall continue to apply following a judgment in favor of Lender under this Note.  If Debtor fails to make any payment or installment due under this Note within five days of its due date, Debtor shall pay to Lender in addition to any other sum due Lender under this Note or any other Loan Document a late charge equal to five percent (5%) of such past-due payment or installment.

All payments of principal and interest due hereunder shall be made (i) without deduction of any present and future taxes, levies, imposts, deductions, charges or withholdings, which amounts shall be paid by Debtor; and (ii) without any other right of abatement, reduction, setoff, defense, counterclaim, interruption, deferment or recoupment for any reason whatsoever. Debtor will pay the amounts necessary such that the gross amount of the principal and interest received by Lender is not less than that required by this Note.

No delay or omission on the part of Lender in exercising any remedy, right or option under this Note shall operate as a waiver of such remedy, right or option.  In any event, a waiver on any one occasion shall not be construed as a waiver or bar to any such remedy, right or option on a future occasion.

Debtor hereby waives presentment, demand for payment, notice of dishonor, notice of protest, and protest, notice of intent to accelerate, notice of acceleration and all other notices or demands in connection with delivery, acceptance, performance, default or endorsement of this Note.

6.      **Aggregate Funds to Debtor**.  Debtor and Lender acknowledge and agree that any funds advance by Lender pursuant to this Agreement shall reduce the amount of funds available to Lessee under that certain Letter Agreement dated February 12, 2018 by and between Debtor and Lender with respect to a Forward Commitment/Renovation Funding in the amount of $4,345,000.00.

7.      **Notices**.   All notices, consents, approvals or other instruments required or permitted to be given by either party pursuant to this Note shall be given in accordance with the notice provisions of the Loan Agreement.

8.      **Waivers**.  Should any indebtedness represented by this Note be collected at law or in equity, or in bankruptcy or other proceedings, or should this Note be placed in the hands of attorneys for collection after default, Debtor shall pay, in addition to the principal and interest due and payable hereon, all costs of collecting or attempting to collect this Note (the "Costs"), including reasonable attorneys' fees and expenses of Lender (including those fees and expenses incurred in connection with any appeal) and court costs whether or not a judicial action is commenced by Lender.

2

9.      **Amendments**.  This Note may not be amended or modified except by a written agreement duly executed by the party against whom enforcement of this Note is sought.  In the event that any one or more of the provisions contained in this Note shall be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provision of this Note, and this Note shall be construed as if such provision had never been contained herein or therein.

10.      **Interest Savings**.  Notwithstanding anything to the contrary contained in any of the Loan Documents, the obligations of Debtor to Lender under this Note and any other Loan Documents are subject to the limitation that payments of interest and late charges to Lender shall not be required to the extent that receipt of any such payment by Lender would be contrary to provisions of applicable law limiting the maximum rate of interest that may be charged or collected by Lender.  The portion of any such payment received by Lender that is in excess of the maximum interest permitted by such provisions of law shall be credited to the principal balance of this Note or if such excess portion exceeds the outstanding principal balance of this Note, then such excess portion shall be refunded to Debtor.  All interest paid or agreed to be paid to Lender shall, to the extent permitted by applicable law, be amortized, prorated, allocated and/or spread throughout the full term of this Note (including, without limitation, the period of any renewal or extension thereof) so that interest for such full term shall not exceed the maximum amount permitted by applicable law.

11.      **Relationship**.  It is the intent of the parties hereto that the business relationship created by this Note and the other Loan Documents is solely that of creditor and debtor and has been entered into by both parties in reliance upon the economic and legal bargains contained in the Loan Documents.  None of the agreements contained in the Loan Documents is intended, nor shall the same be deemed or construed, to create a partnership between Lender and Debtor, to make them joint venturers, to make Debtor an agent, legal representative, partner, subsidiary or employee of Lender, nor to make Lender in any way responsible for the debts, obligations or losses of Debtor.

12.      **Construction**.  Lender, by accepting this Note, and Debtor acknowledge and warrant to each other that each has been represented by independent counsel and Debtor has executed this Note after being fully advised by said counsel as to its effect and significance. This Note shall be interpreted and construed in a fair and impartial manner without regard to such factors as the party which prepared the instrument, the relative bargaining powers of the parties or the domicile of any party.  Time is of the essence in the performance of each and every obligation under this Note.

13.      **Jurisdiction; Governing Law**.  Debtor acknowledges that this Note was substantially negotiated in the State of Arizona, this Note was delivered in the State of Arizona, all payments under this Note will be delivered in the State of Arizona and there are substantial contacts between the parties and the transactions contemplated herein and the State of Arizona.  For purposes of any action or proceeding arising out of this Note, the parties hereto expressly submit to the jurisdiction of all federal and state courts located in the State of Arizona. Debtor consents that it may be served with any process or paper by registered mail or by personal service within or without the State of Arizona in accordance with applicable law. Furthermore, Debtor waives and agrees not to assert in any such action, suit or proceeding that it is not personally subject to the jurisdiction of such courts, that the action, suit or proceeding is

3

brought in an inconvenient forum or that venue of the action, suit or proceeding is improper.  It is the intent of Debtor and Lender that all provisions of this Note shall be governed by and construed under the laws of the State of Arizona, without regard to its conflict of laws principles. Nothing contained in this paragraph shall limit or restrict the right of Lender to commence any proceeding in the federal or state courts located in the states in which the Properties are located to the extent Lender deems such proceeding necessary or advisable to exercise remedies available under the Loan Documents.

14.     **Waiver of Jury Trial**.  LENDER, BY ACCEPTING THIS NOTE, AND DEBTOR HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE THE RIGHT EITHER MAY HAVE TO A TRIAL BY JURY WITH RESPECT TO ANY AND ALL ISSUES PRESENTED IN ANY ACTION, PROCEEDING, CLAIM OR COUNTERCLAIM BROUGHT BY EITHER OF THE PARTIES HERETO AGAINST THE OTHER OR ITS SUCCESSORS WITH RESPECT TO ANY MATTER ARISING OUT OF OR IN CONNECTION WITH THIS NOTE, THE RELATIONSHIP OF Lender AND DEBTOR, DEBTOR'S USE OR OCCUPANCY OF THE PROPERTIES, AND/OR ANY CLAIM FOR INJURY OR DAMAGE, OR ANY EMERGENCY OR STATUTORY REMEDY.  THIS WAIVER BY THE PARTIES HERETO OF ANY RIGHT EITHER MAY HAVE TO A TRIAL BY JURY HAS BEEN NEGOTIATED AND IS AN ESSENTIAL ASPECT OF THEIR BARGAIN.    FURTHERMORE, DEBTOR HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES THE RIGHT IT MAY HAVE TO SEEK PUNITIVE, CONSEQUENTIAL, SPECIAL AND INDIRECT DAMAGES FROM Lender AND ANY OF Lender's AFFILIATES, OFFICERS, DIRECTORS OR EMPLOYEES OR ANY OF THEIR SUCCESSORS WITH RESPECT TO ANY AND ALL ISSUES PRESENTED IN ANY ACTION, PROCEEDING, CLAIM OR COUNTERCLAIM BROUGHT BY DEBTOR AGAINST Lender OR ANY OF Lender's AFFILIATES, OFFICERS, DIRECTORS OR EMPLOYEES OR ANY OF THEIR SUCCESSORS WITH RESPECT TO ANY MATTER ARISING OUT OF OR IN CONNECTION WITH THIS NOTE OR ANY DOCUMENT CONTEMPLATED HEREIN OR RELATED HERETO.  THE WAIVER BY DEBTOR OF ANY RIGHT IT MAY HAVE TO SEEK PUNITIVE, CONSEQUENTIAL, SPECIAL AND INDIRECT DAMAGES HAS BEEN NEGOTIATED BY THE PARTIES HERETO AND IS AN ESSENTIAL ASPECT OF THEIR BARGAIN.

15.     **Successors and Assigns**.  This obligation shall bind Debtor and its successors and assigns, and the benefits hereof shall inure to Lender and its successors and assigns. Lender may assign its rights under this Note as set forth in the Loan Agreement.

*[Remainder of page intentionally left blank; signature page to follow]*

4

**IN WITNESS WHEREOF**, Debtor has executed and delivered this Note effective as of the date first set forth above.

DEBTOR:

**5171 CAMPBELLS LAND CO., INC.**, a Pennsylvania corporation

By: _William T Kane_

Name: _WILLIAM T. KANE_

Title: _Pres_

STATE OF _Pennsylvania_ )
                                        ) ss.
COUNTY OF _Allegheny_ )

Before me, the undersigned, a Notary Public of the State and County aforesaid, personally appeared _William T. Kane_, with whom I am personally acquainted (or proved to me to be on the basis of satisfactory evidence), and who, upon oath, acknowledged himself/herself to be the _President_ of **5171 CAMPBELLS LAND CO., INC.**, a Pennsylvania corporation, the within named Lessee, a _____, and that he/she as such officer, being authorized so to do, executed the within instrument for the purposes therein contained, by signing the name of _William T Kane_ by himself/herself as such officer.

WITNESS my hand and Official Seal at office, this _2nd_ day of _April_, 2018.

_Rosanne M Penn_
Notary Public

My Commission Expires _9/13/20_

COMMONWEALTH OF PENNSYLVANIA
NOTARIAL SEAL
Rosanne M. Penn, Notary Public
City of Pittsburgh, Allegheny County
My Commission Expires Sept. 13, 2020
MEMBER, PENNSYLVANIA ASSOCIATION OF NOTARIES

**LOAN AMORTIZATION SCHEDULE**

See attached.

**STORE Capital Acquisitions, LLC**
**LOAN AMORTIZATION SCHEDULE - 5171 CAMPBELLS LAND CO., INC.**

| | | | | |
|---|---|---|---|---|
| **Annual Interest Rate:** | 8.500% | **Closing Date:** | 4/3/2018 |
| **Amortization Period (in years):** | 1 | **First payment Date:** | 5/15/2018 |
| **Beginning principal balance:** | $1,750,000.00 | **Final Payment Date:** | 4/15/2019 |
| **Monthly P & I payment:** | $152,634.62 | **Installment Due Four Times per Month:** | $38,158.66 |

| | | Loan Amortization | | |
|---|---|---|---|---|
| | Payment Due Date | Beginning Principal Balance | Interest Payment (this is for interest accruable in the prior month) | Principal Payment | Ending Principal Balance |
| 0 | 4/15/2018 | 1,750,000.00 | 4,958.33 | - | 1,750,000.00 |
| 1 | 5/15/2018 | 1,750,000.00 | 12,395.83 | 140,238.79 | 1,609,761.21 |
| 2 | 6/15/2018 | 1,609,761.21 | 11,402.48 | 141,232.14 | 1,468,529.07 |
| 3 | 7/15/2018 | 1,468,529.07 | 10,402.08 | 142,232.54 | 1,326,296.53 |
| 4 | 8/15/2018 | 1,326,296.53 | 9,394.60 | 143,240.02 | 1,183,056.51 |
| 5 | 9/15/2018 | 1,183,056.51 | 8,379.98 | 144,254.64 | 1,038,801.87 |
| 6 | 10/15/2018 | 1,038,801.87 | 7,358.18 | 145,276.44 | 893,525.43 |
| 7 | 11/15/2018 | 893,525.43 | 6,329.14 | 146,305.48 | 747,219.95 |
| 8 | 12/15/2018 | 747,219.95 | 5,292.81 | 147,341.81 | 599,878.14 |
| 9 | 1/15/2019 | 599,878.14 | 4,249.14 | 148,385.48 | 451,492.66 |
| 10 | 2/15/2019 | 451,492.66 | 3,198.07 | 149,436.55 | 302,056.11 |
| 11 | 3/15/2019 | 302,056.11 | 2,139.56 | 150,495.06 | 151,561.05 |
| 12 | 4/15/2019 | 151,561.05 | 1,073.56 | 151,561.05 | - |
| | | | 86,573.76 | 1,750,000.00 | |

# EXHIBIT C

**UNCONDITIONAL GUARANTY
OF PAYMENT AND PERFORMANCE**

**THIS UNCONDITIONAL GUARANTY OF PAYMENT AND PERFORMANCE** (this "Guaranty") is made as of April 3, 2018 by **WILLIAM KANE**, **FRANK KANE** and **RON LINABURG** (each, a "Guarantor" and collectively, "Guarantors"), for the benefit of **STORE CAPITAL ACQUISITIONS, LLC**, a Delaware limited liability company (together with its successors and assigns under the Lease (as defined below), "Lender").

1.      FOR VALUABLE CONSIDERATION, the receipt of which is hereby acknowledged, Guarantors unconditionally, absolutely and irrevocably guarantees and promises to pay to Lender, or order, any and all amounts, including, without limitation, principal and interest, taxes, insurance premiums, impounds, reimbursements, late charges, default interest, damages and all other amounts, costs, fees, expenses and charges of any kind or type whatsoever, which may or at any time be due to Lender pursuant to the following agreements (collectively, the "Documents"):

(a)      Mortgage Loan Agreement (the "Loan Agreement") dated as of the date hereof, between Lender and 5171 Campbells Land Co., Inc., a Pennsylvania corporation ("Debtor") pertaining to that certain loan (the "Loan") secured by Debtor's in the Properties, as described in the Loan Agreement;

(b)      Promissory Note, dated as of the date hereof, executed by Debtor and payable to Lender in the amount of $1,750,000.00, evidencing the Loan (the "Note");

(c)      each of the Mortgages, Assignment of Rents and Leases, Security Agreement and Fixture Filing (collectively, the "Mortgages), each dated as of the date hereof, executed by Debtor for the benefit of Lender, providing a lien upon and security interest in the Properties as security for the Note;

(d)      any other document, agreement, instrument or certificate contemplated by any of the foregoing agreements, or any other documents, agreements, instruments or certificates now or hereafter entered into between Lender and Debtor; and

(e)      any amendment of the foregoing agreements or other documents, agreements, instruments or certificates now or hereafter entered into between Lender and Debtor.

Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Loan Agreement.

2.      Each Guarantor unconditionally, absolutely and irrevocably guarantees the truthfulness and accuracy of all representations, warranties and certifications of Debtor, the satisfaction of all conditions by Debtor and the full and timely performance of all obligations to be performed by Debtor, under or pursuant to the Documents (the "Obligations").

3.      The obligation of each Guarantor is primary, joint and several and independent of the obligation of any and every other Guarantor of the Obligations or of Debtor, and a separate

action or actions may be brought and executed against each Guarantor or any other such Guarantor, whether or not such action is brought against Debtor or any other such Guarantor and whether or not Debtor or any other such Guarantor be joined in such action or actions. References in this Guaranty to Guarantor are to each Guarantor signing this Guaranty, and the liability of each such Guarantor is joint and several.

4.      This is an absolute and unconditional guaranty of payment and performance and not of collection and each Guarantor unconditionally (a) waives any requirement that Lender first make demand upon, or seek to enforce or exhaust remedies against, Debtor or any other person or entity (including any other Guarantor) or any of the collateral or property of Debtor or such other person or entity before demanding payment from, or seeking to enforce this Guaranty against, Guarantor; (b) waives and agrees not to assert any and all rights, benefits and defenses which might operate, contrary to Guarantor's agreements in this Guaranty, to limit Guarantor's liability under, or the enforcement of, this Guaranty; (c) covenants that this Guaranty will not be discharged until all of the Obligations are fully satisfied; (d) agrees that this Guaranty shall remain in full effect without regard to, and shall not be affected or impaired by, any invalidity, irregularity or unenforceability in whole or in part of any of the Documents, or any limitation of the liability of Debtor or Guarantor thereunder, or any limitation on the method or terms of payment thereunder which may now or hereafter be caused or imposed in any manner whatsoever; and (e) waives notice of acceptance of this Guaranty, notice of defaults under any of the Documents, presentment, protest, and diligence.

5.      This Guaranty is a continuing guaranty, and the obligations, undertakings and conditions to be performed or observed by each Guarantor under this Guaranty shall not be affected or impaired by reason of the happening from time to time of the following with respect to the Documents, all without notice to, or the further consent of, Guarantors: (a) the waiver by Lender of the observance or performance by Debtor, or Guarantors of any of the obligations, undertakings, conditions or other provisions contained in any of the Documents, except to the extent of such waiver; (b) the extension, in whole or in part, of the time for payment of any amount owing or payable under the Documents; (c) the modification or amendment (whether material or otherwise) of any of the obligations of Debtor under, or any other provisions of, any of the Documents, except to the extent of such modification or amendment; (d) the taking or the omission of any of the actions referred to in any of the Documents (including, without limitation, the giving of any consent referred to therein); (e) any failure, omission, delay or lack on the part of Lender to enforce, assert or exercise any provision of the Documents, including any right, power or remedy conferred on Lender in any of the Documents or any action on the part of Lender granting indulgence or extension in any form; (f) the assignment to or assumption by any third party of any or all of the rights or obligations of Debtor under all or any of the Documents; (g) the release or discharge of Debtor from the performance or observance of any obligation, undertaking or condition to be performed by Debtor under any of the Documents by operation of law, including any rejection or disaffirmance of any of the Documents in any bankruptcy or similar proceedings; (h) the receipt and acceptance by Lender or any other person or entity of notes, checks or other instruments for the payment of money and extensions and renewals thereof; (i) any action, inaction or election of remedies by Lender which results in any impairment or destruction of any subrogation rights of Guarantors, or any rights of Guarantors to proceed against any other person or entity for reimbursement; (j) any setoff, defense, counterclaim, abatement, recoupment, reduction, change in law or any other event or circumstance which might otherwise constitute a legal or equitable discharge or defense of a Guarantor, indemnitor or

2

surety under the laws of the State of Arizona, the states in which the Properties are located or any other jurisdiction; or (k) the termination or renewal of any of the Obligations or any other provision thereof.

6.      Each Guarantor represents and warrants to Lender that: (a) neither the execution nor delivery of this Guaranty nor fulfillment of nor compliance with the terms and provisions hereof will conflict with, or result in a breach of the terms or conditions of, or constitute a default under, or result in the creation of any lien, charge or encumbrance upon any property or assets of Guarantors under any agreement or instrument to which a Guarantor is now a party or by which a Guarantor may be bound, which conflict, breach, default, lien, charge or encumbrance could result in a material adverse change in the financial condition of a Guarantor; (b) no further consents, approvals or authorizations are required for the execution and delivery of this Guaranty by Guarantors or for Guarantors' compliance with the terms and provisions of this Guaranty; (c) this Guaranty is the legal, valid and binding agreement of Guarantors and is enforceable against Guarantors in accordance with its terms; (d) each Guarantor has the full power, authority, capacity and legal right to execute and deliver this Guaranty, and, to the extent a Guarantor is a corporation, limited liability company or partnership, the parties executing this Guaranty on behalf of a Guarantor are fully authorized and directed to execute the same to bind such Guarantor; (e) each Guarantor is not, and if a Guarantor is a "disregarded entity," the owner of such disregarded entity is not, a "nonresident alien," "foreign corporation," "foreign partnership," "foreign trust," "foreign estate," or any other "person" that is not a "United States Person" as those terms are defined in the U.S. Internal Revenue Code and the regulations promulgated thereunder.  Each Guarantor's Social Security Number or Federal Tax Identification Number is accurately set forth herein next to the signature of the applicable Guarantor; (f) each Guarantor has delivered to Lender either audited financial statements or, if a Guarantor does not have audited financial statements, certified financial statements.   Such financial statements and other information relating to Guarantors heretofore delivered to Lender are true, correct and complete in all material respects as of the date of this Guaranty. Each Guarantor understands that Lender is relying upon such information, and Guarantors represent that such reliance is reasonable. The financial statements of Guarantors delivered by Debtor to Lender pursuant to the Loan Agreement have been prepared in accordance with generally accepted accounting principles consistently applied and accurately reflect, as of the date of this Guaranty, the financial condition of Guarantors; (g) during the term of this Guaranty, Guarantors will not transfer or dispose of any material part of their assets except in the ordinary course of business for full and fair consideration and reasonably equivalent value. Furthermore, each Guarantor will furnish Lender (i) within forty-five (45) days of the end of each fiscal quarter of each Guarantor, and within ninety (90) days after the close of each calendar year of each Guarantor, a financial statement consisting of a balance sheet, profit and loss statement, statement of changes in financial condition, and all other related schedules for the fiscal period then ended, and (ii) such other financial information as Lender may reasonably request; and (h) the Documents are conclusively presumed signed in reliance on this Guaranty and the assumption by Guarantors of their obligations under this Guaranty results in direct financial benefit to Guarantors.

7.      This Guaranty shall commence upon execution and delivery of any of the Documents and shall continue in full force and effect until all of the Obligations are duly, finally and permanently paid, performed and discharged and are not subject to any right of reborrowing or extension by Debtor, and Lender gives Guarantors written notice of the full and final satisfaction of the Obligations. The Obligations shall not be considered fully paid, performed and

3

discharged unless and until all payments by Debtor to Lender are no longer subject to any right on the part of any person whomsoever, including but not limited to Debtor, Debtor as a debtor in possession and/or any trustee in bankruptcy, to disgorge such payments or seek to recoup the amount of such payments or any part thereof. The foregoing shall include, by way of example and not by way of limitation, all rights to recover preferences voidable under Title 11 of the United States Bankruptcy Code, 11 U.S.C. §§. 101 et seq., as amended (the "Code").  In the event that any such payments by Debtor to Lender are disgorged after the making thereof, in whole or in part, or settled without litigation, to the extent of such disgorgement or settlement, Guarantors shall be liable for the full amount Lender is required to repay plus interest, late charges, attorney's fees and any and all expenses paid or incurred by Lender in connection therewith.

8.     Each Guarantor shall neither have any right of subrogation, indemnity or reimbursement nor hold any other claim against Debtor, and each Guarantor does hereby release Debtor from any and all claims by Guarantors now or hereafter arising against Debtor. Furthermore, each Guarantor hereby unconditionally and irrevocably waives (a) any right to participate in any security now or hereafter held by Lender or in any claim or remedy of Lender or any other person against Debtor with respect to obligations guaranteed hereby; (b) any statute of limitations affecting Guarantors' liability hereunder; (c) all principles and provisions of law which conflict with the terms of this Guaranty; and (d) diligence, presentment, demand for performance, notice of nonperformance, notice of intent to accelerate and acceleration, notice of protest, notice of dishonor, notice of execution of any Documents, notice of extension, renewal, alteration or amendment, notice of acceptance of this Guaranty and all other notices whatsoever.

9.     Notwithstanding the preceding Paragraph 8, in the event that Guarantors shall have any claims against Debtor, any indebtedness of Debtor now or hereafter held by Guarantors is hereby subordinated to the indebtedness of Debtor to Lender. Any such indebtedness of Debtor to Guarantors, if Lender so requests, shall be collected, enforced and received by Guarantors as trustee for Lender and be paid over to Lender on account of the obligations guaranteed hereby, but without reducing or affecting in any manner the liability of Guarantors under the other provisions of this Guaranty.

10.     It is not necessary for Lender to inquire into the powers of Debtor or its officers, directors, partners or agents acting or purporting to act on its behalf, and Guarantors shall be liable for the obligations of Debtor in accordance with their terms notwithstanding any lack of authorization or defect in execution or delivery by Debtor.

11.     In addition to the amounts guaranteed under this Guaranty, Guarantors agree to pay (a) all of Lender's attorneys' fees and other costs and expenses which may be incurred by Lender in the enforcement of this Guaranty; and (b) interest (including post-petition interest to the extent a petition is filed by or against Debtor under the Code) at the Default Rate (as defined in the Note) on any Obligations not paid when due.

12.     This Guaranty shall apply to the parties hereto and their successors and assigns according to the context hereof and without regard to the number or gender of words or expressions used herein.

13.     Each Guarantor hereby agrees to indemnify and hold harmless Lender from any loss, cause of action, claim, cost, expense or fee, including but not limited to attorney's fees,

4

suffered or occasioned by the failure of Debtor to satisfy its obligations under the Documents. The obligations of Guarantors under this paragraph shall be independent, primary, joint and several obligations of Guarantors and all other Guarantors of the Obligations. The agreement to indemnify Lender contained in this paragraph shall be enforceable notwithstanding the invalidity or unenforceability of the Documents or any of them or the invalidity or unenforceability of any other paragraph contained in this Guaranty.

14.    All moneys available to Lender for application in payment or reduction of the liabilities of Debtor under the Documents may be applied by Lender to the payment or reduction of such liabilities of Debtor, in such manner, in such amounts and at such time or times as Lender may elect.

15.    All notices, consents, approvals or other instruments required or permitted to be given by either party pursuant to this Guaranty shall be in writing and given by (a) hand delivery; (b) express overnight delivery service; or (c) certified or registered mail, return receipt requested, and shall be deemed to have been delivered upon (i) receipt, if hand delivered; (ii) the next Business Day, if delivered by reputable express overnight delivery service; or (iii) the third Business Day following the day of deposit of such notice with the United States Postal Service, if sent by certified or registered mail, return receipt requested.  Notices shall be provided to the parties and addresses specified below:

5

| | |
|---|---|
| to Guarantor: | William Kane<br>Email: wtkane25@gmail.com |
| | Frank Kane<br>Email: francisjohnnykane@gmail.com |
| | Ron Linaburg<br>Email: dr.rglinaburg@lina4.com |
| to Lender: | STORE Capital Acquisitions, LLC<br>8377 E. Hartford Drive, Suite 100<br>Scottsdale, AZ  85255<br>Attention: Michael T. Bennett<br>        Executive Vice President – General Counsel<br>Email:  mbennett@storecapital.com |
| with a copy to: | Kutak Rock LLP<br>1801 California Street, Suite 3000<br>Denver, CO  80202<br>Attention: Nathan P. Humphrey, Esq.<br>Email:  nathan.humphrey@kutakrock.com |

or to such other address or such other person as either party may from time to time hereafter specify to the other party in a notice delivered in the manner provided above.  Whenever in this Guaranty the giving of notice is required, the giving thereof may be waived in writing at any time by the person or persons entitled to receive such notice.  A copy of any notice delivered pursuant to this Section shall also contemporaneously be delivered in the manner herein specified to any assignee of Lender's interest which shall have duly notified Guarantors in writing of its name and address.

16.    This Guaranty is made and delivered in the State of Arizona, and it is the intent of Guarantors and Lender that this Guaranty shall be deemed to be a contract made under and governed by the internal laws of the State of Arizona, without giving effect to its conflicts of laws principles. For purposes of any action or proceeding involving this Guaranty, each Guarantor submits to the jurisdiction of all federal and state courts located in the State of Arizona and consents that it may be served with any process or paper by registered mail or by personal service within or without the State of Arizona in accordance with applicable law.  Furthermore, each Guarantor waives and agrees not to assert in any such action, suit or proceeding that it is not personally subject to the jurisdiction of such courts, that the action, suit or proceeding is brought in an inconvenient forum or that venue of the action, suit or proceeding is improper. Nothing contained in this paragraph shall limit or restrict the right of Lender to commence any proceeding in the federal or state courts located in the states in which the Properties are located and/or where Guarantors reside to the extent Lender deems such proceeding necessary or advisable to exercise remedies available under the Documents.

17.    Guarantors intend that the business relationship created between Debtor and Lender by the Loan Agreement, the Note, the Mortgages and the other Loan Documents is solely that of creditor and debtor and has been entered into by such parties in reliance upon the

6

economic and legal bargains contained in the Documents. Furthermore, Guarantors shall support the intent of the parties that the loan evidenced by the Note, the Loan Agreement, the Mortgages and the other Loan Documents does not create a joint venture, partnership, trust, trust agreement or the like, if, and to the extent that, any challenge occurs, and Guarantors shall not assert that the loan evidenced by the Note, the Loan Agreement, the Mortgage and the other Loan Documents creates a joint venture, partnership, trust, trust agreement or the like.

18.     Each Guarantor acknowledges that Lender did not prepare or assist in the preparation of any of the projected financial figures used by Debtor in analyzing the economic viability and feasibility of the transaction contemplated in the Loan Agreement and other Loan Documents (the "Transaction"). Furthermore, each Guarantor acknowledges that Debtor has not relied upon, nor may it hereafter rely upon, the analysis undertaken by Lender in determining the Loan Amount and that such analysis will not be made available to Debtor.

19.     All of Lender's rights and remedies under the Documents and this Guaranty are intended to be distinct, separate and cumulative and no such right and remedy is intended to be in exclusion of or a waiver of any of the others.

20.     This Guaranty is solely for the benefit of Lender, its successors and assigns and is not intended to nor shall be deemed to be for the benefit of any third party, including, without limitation, Debtor.

21.     If any provision of this Guaranty is unenforceable, the enforceability of the other provisions shall not be affected and they shall remain in full force and effect.

22.     Guarantors agree to take such action and to sign such other documents as may be appropriate to carry out the intent of this Guaranty.

23.     This Guaranty may be executed in one or more counterparts, each of which shall be deemed an original.

24.     LENDER, BY ACCEPTING THIS GUARANTY, AND EACH GUARANTOR HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE THE RIGHT THEY MAY HAVE TO A TRIAL BY JURY WITH RESPECT TO ANY AND ALL ISSUES PRESENTED IN ANY ACTION, PROCEEDING, CLAIM OR COUNTERCLAIM BROUGHT BY LENDER OR GUARANTORS AGAINST THE OTHER OR THEIR SUCCESSORS WI1H RESPECT TO ANY MATTER ARISING OUT OF OR IN CONNECTION WITH THIS GUARANTY, THE RELATIONSHIP OF LENDER, DEBTOR AND/OR GUARANTORS, DEBTOR'S USE OR OCCUPANCY OF THE PROPERTIES, AND/OR ANY CLAIM FOR INJURY OR DAMAGE, OR ANY EMERGENCY OR STATUTORY REMEDY.   THIS WAIVER BY LENDER AND GUARANTORS OF ANY RIGHT THEY MAY HAVE TO A TRIAL BY JURY HAS BEEN NEGOTIATED AND IS A MATERIAL INDUCEMENT FOR LENDER ACCEPTING THIS GUARANTY. FURTHERMORE, EACH GUARANTOR HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES THE RIGHT THEY MAY HAVE TO SEEK PUNITIVE, CONSEQUENTIAL, SPECIAL AND INDIRECT DAMAGES FROM LENDER WITH RESPECT TO ANY AND ALL ISSUES PRESENTED IN ANY ACTION, PROCEEDING, CLAIM OR COUNTERCLAIM BROUGHT BY GUARANTORS AGAINST LENDER OR ITS SUCCESSORS WITH RESPECT TO ANY MATTER ARISING OUT OF OR IN CONNECTION WITH THIS

GUARANTY OR ANY DOCUMENTS CONTEMPLATED HEREIN OR RELATED HERETO. THE WAIVER BY GUARANTORS OF ANY RIGHT IT MAY HAVE TO SEEK PUNITIVE, CONSEQUENTIAL, SPECIAL AND INDIRECT DAMAGES HAS BEEN NEGOTIATED AND IS A MATERIAL INDUCEMENT FOR LENDER ACCEPTING THIS GUARANTY.

     25.    As a material inducement to Lender's willingness to complete the Transaction, each Guarantor hereby acknowledges and agrees that Lender may, from time to time and at any time, (a) advertise, issue press releases, send direct mail or otherwise disclose information regarding the Transaction for marketing purposes; and (b) engage in all or any combination of the following, or enter into agreements in connection with any of the following or in accordance with requirements that may be imposed by applicable securities, tax or other laws: (i) the sale, assignment, grant, conveyance, transfer, financing, re-financing, purchase or re-acquisition of the Note or any other Loan Document, Lender's right, title and interest in the Note or any other Loan Document, the servicing rights with respect to any of the foregoing, or participations in any of the foregoing; or (ii) a Securitization and related transactions. Guarantors agree to use all reasonable efforts and to cooperate fully with Lender with respect to all reasonable requests of Lender relating to the foregoing, which includes without limitation, with respect to the activities described in subsection (b), providing financial information, financial and other data, and other information and materials which would customarily be required by a purchaser, transferee, assignee, servicer, participant, investor or rating agency involved with respect to any of the foregoing. The provisions of this paragraph shall survive termination of this Guaranty

*[Remainder of page intentionally left blank; signature page(s) to follow]*

8

IN WITNESS WHEREOF, the undersigned Guarantor has executed this Guaranty effective as of the date set forth in the introductory paragraph of this Guaranty.

GUARANTOR:

_William T Kane_

**WILLIAM KANE**, an individual

STATE OF _Pennsylvania_ )
                                        ) ss.
COUNTY OF _Allegheny_ )

The foregoing instrument was acknowledged before me this _2rd_ day of ~~March~~ _April_, 2018, by William Kane, an individual.

COMMONWEALTH OF PENNSYLVANIA
NOTARIAL SEAL
Rosanne M. Penn, Notary Public
City of Pittsburgh, Allegheny County
My Commission Expires Sept. 13, 2020
MEMBER, PENNSYLVANIA ASSOCIATION OF NOTARIES

_Rosanne m Penn_
Notary Public

My Commission Expires: _9/13/20_

_____
**FRANK KANE**, an individual

STATE OF _____ )
                                   ) ss.
COUNTY OF _____ )

The foregoing instrument was acknowledged before me this _____ day of March, 2018, by Frank Kane, an individual.

_____
Notary Public

My Commission Expires: _____

IN WITNESS WHEREOF, the undersigned Guarantor has executed this Guaranty effective as of the date set forth in the introductory paragraph of this Guaranty.

**GUARANTOR:**

_____
**WILLIAM KANE**, an individual

STATE OF ___S. C.___ )
                                          ) ss.
COUNTY OF ___Horry___ )

The foregoing instrument was acknowledged before me this ___2___ day of ~~March~~ *April*, 2018, by William Kane, an individual.



_____
Notary Public

My Commission Expires: ___09-29-2027___

_____
**FRANK KANE**, an individual

STATE OF ___S. C___ )
                                          ) ss.
COUNTY OF ___Horry___ )

The foregoing instrument was acknowledged before me this ___02___ day of ~~March~~ *April*, 2018, by Frank Kane, an individual.

_____
Notary Public

My Commission Expires: ___09-29-2027___

4837-0918-5120.2
STORE/Campbells (Perkins)
Mortgage Loan Guaranty
3 Leasehold Properties
File No.: 7210/02-588

**RON LINABURG**, an individual

STATE OF _Pennsylvania_ )
                        ) ss.
COUNTY OF _Allegheny_ )

The foregoing instrument was acknowledged before me this _2nd_ day of ~~March~~ _April_, 2018, by Ron Linaburg, an individual.

_Rosanne m Penn_
Notary Public

My Commission Expires: _9/13/20_

COMMONWEALTH OF PENNSYLVANIA
NOTARIAL SEAL
Rosanne M. Penn, Notary Public
City of Pittsburgh, Allegheny County
My Commission Expires Sept. 13, 2020
MEMBER, PENNSYLVANIA ASSOCIATION OF NOTARIES

10

4837-0918-5120.2
STORE/Campbells (Perkins)
Mortgage Loan Guaranty
3 Leasehold Properties
File No.: 7210/02-588

# EXHIBIT D

# MASTER LEASE AGREEMENT

**THIS MASTER LEASE AGREEMENT** (this "Lease") is made as of February 12, 2018 (the "Effective Date"), by and between **STORE MASTER FUNDING XIII, LLC**, a Delaware limited liability company ("Lessor"), whose address is 8377 E. Hartford Drive, Suite 100, Scottsdale, Arizona 85255, and **5171 CAMPBELLS LAND CO., INC.**, a Pennsylvania corporation ("Lessee"), whose address is 6201 Steubenville Pike, Suite 100, McKees Rocks, Pennsylvania 15136. Capitalized terms not defined herein shall have the meanings set forth in Exhibit A hereto.

In consideration of the mutual covenants and agreements contained in this Lease, intending to be legally bound, Lessor and Lessee covenant and agree as follows:

## ARTICLE I

## BASIC LEASE TERMS

**Section 1.01. Properties**. The street addresses and legal descriptions of the Properties are set forth on Exhibit B attached hereto and incorporated herein.

**Section 1.02. Initial Term Expiration Date**. February 28, 2038.

**Section 1.03. Extension Options**. Four (4) extensions of five (5) years each, as described in Section 3.02.

**Section 1.04. Term Expiration Date (if fully extended)**. February 28, 2058.

**Section 1.05. Initial Base Annual Rental**. $1,719,362.22, as described in Article IV.

**Section 1.06. Rental Adjustment**. The lesser of (i) 2%, or (ii) 1.25 times the change in the Price Index, as described in Section 4.02.

**Section 1.07. Adjustment Date**. March 1, 2019 and annually on March 1st thereafter during the Lease Term (including any Extension Term).

**Section 1.08. Guarantors**. William Kane, Frank Kane and Ron Linaburg.

**Section 1.09. Credit Enhancement**. $5,000,000.00, subject to the terms of Section 4.09.

**Section 1.10. Lessee Tax Identification No**. 46-2488070.

**Section 1.11. Lessor Tax Identification No.** 81-4253941.

## ARTICLE II

## LEASE OF PROPERTIES

**Section 2.01.  Lease**.  In consideration of Lessee's payment of the Rental and other Monetary Obligations and Lessee's performance of all other obligations hereunder, Lessor hereby leases to Lessee, and Lessee hereby takes and hires, the Properties, "AS IS" and "WHERE IS" without representation or warranty by Lessor, and subject to the existing state of title, the parties in possession, any statement of facts which an accurate survey or physical inspection might reveal, and all Legal Requirements now or hereafter in effect.

**Section 2.02.  Quiet Enjoyment**.  So long as Lessee shall pay the Rental and other Monetary Obligations provided in this Lease and shall keep and perform all of the terms, covenants and conditions on its part contained herein and subject to the rights of Lessor under Section 12.02, Lessee shall have, subject to the terms and conditions set forth herein, the right to the peaceful and quiet enjoyment and occupancy of the Properties.

## ARTICLE III

## LEASE TERM; EXTENSION

**Section 3.01.  Initial Term**.   The initial term of this Lease ("Initial Term") shall commence as of the Effective Date and shall expire at midnight on February 28, 2038, unless terminated sooner as provided in this Lease and as may be extended as provided herein.  The time period during which this Lease shall actually be in effect, including any Extension Term, is referred to as the "Lease Term."

**Section 3.02.  Extensions**.   Unless this Lease has expired or has been sooner terminated, or an Event of Default has occurred and is continuing at the time any extension option is exercised, Lessee shall have the right and option (each, an "Extension Option") to extend the Initial Term for all and not less than all of the Properties for four (4) additional successive periods of five (5) years each (each, an "Extension Term"), pursuant to the terms and conditions of this Lease then in effect.

**Section 3.03.  Notice of Exercise**.  Lessee may only exercise the Extension Options by giving written notice thereof to Lessor of its election to do so no later than one hundred twenty (120) days prior to the expiration of the then-current Lease Term.  If written notice of the exercise of any Extension Option is not received by Lessor by the applicable dates described above, then this Lease shall terminate on the last day of the Initial Term or, if applicable, the last day of the Extension Term then in effect.  Upon the request of Lessor or Lessee, the parties hereto will, at the expense of Lessee, execute and exchange an instrument in recordable form setting forth the extension of the Lease Term in accordance with this Section 3.03.

**Section 3.04.  Removal of Personalty**.  Upon the expiration of the Lease Term, and if Lessee is not then in breach hereof, Lessee may remove from the Properties all personal property belonging to Lessee.  Lessee shall repair any damage caused by such removal and shall leave all of the Properties clean and in good and working condition and repair inside and

2

out, subject to normal wear and tear, casualty and condemnation. Any property of Lessee left on the Properties on the tenth day following the expiration of the Lease Term shall, at Lessor's option, automatically and immediately become the property of Lessor.

## ARTICLE IV

## RENTAL AND OTHER MONETARY OBLIGATIONS

**Section 4.01. Base Monthly Rental**. During the Lease Term, on or before the first day of each calendar month, Lessee shall pay in advance the Base Monthly Rental then in effect. If the Effective Date is a date other than the first day of the month, Lessee shall pay to Lessor on the Effective Date the Base Monthly Rental prorated by multiplying the Base Monthly Rental by a fraction, the numerator of which is the number of days remaining in the month (including the Effective Date) for which Rental is being paid, and the denominator of which is the total number of days in such month.

**Section 4.02. Adjustments**. During the Lease Term (including any Extension Term), on the first Adjustment Date and on each Adjustment Date thereafter, the Base Annual Rental shall increase by an amount equal to the Rental Adjustment; *provided, however*, that in no event shall Base Annual Rental be reduced as a result of the application of the Rental Adjustment.

**Section 4.03. Additional Rental**. Lessee shall pay and discharge, as additional rental ("Additional Rental"), all sums of money required to be paid by Lessee under this Lease which are not specifically referred to as Rental. Lessee shall pay and discharge any Additional Rental when the same shall become due, provided that amounts which are billed to Lessor or any third party, but not to Lessee, shall be paid within fifteen (15) days after Lessor's demand for payment thereof or, if earlier, when the same are due. In no event shall Lessee be required to pay to Lessor any item of Additional Rental that Lessee is obligated to pay and has paid to any third party pursuant to any provision of this Lease.

**Section 4.04. Rentals to be Net to Lessor**. The Base Annual Rental payable hereunder shall be net to Lessor, so that this Lease shall yield to Lessor the Rentals specified during the Lease Term, and all Costs and obligations of every kind and nature whatsoever relating to the Properties shall be performed and paid by Lessee. Lessee shall perform all of its obligations under this Lease at its sole cost and expense. All Rental and other Monetary Obligations which Lessee is required to pay hereunder shall be the unconditional obligation of Lessee and shall be payable in full when due and payable, without notice or demand, and without any setoff, abatement, deferment, deduction or counterclaim whatsoever.

**Section 4.05. ACH Authorization**. Upon execution of this Lease, Lessee shall deliver to Lessor a complete Authorization Agreement – Pre-Arranged Payments in the form of Exhibit C attached hereto and incorporated herein by this reference, together with a voided check for account verification, establishing arrangements whereby payments of the Base Monthly Rental are transferred by Automated Clearing House Debit initiated by Lessor from an account established by Lessee at a United States bank or other financial institution to such account as Lessor may designate. Lessee shall continue to pay all Rental by Automated Clearing House Debit unless otherwise directed by Lessor.

3

4832-6836-0282.2
STORE/Campbells (Perkins)
Master Lease Agreement
20 Properties
File No. 7210/02-588

**Section 4.06. Late Charges; Default Interest**.   Any delinquent payment shall, in addition to any other remedy of Lessor, incur a late charge of five percent (5%) (which late charge is intended to compensate Lessor for the cost of handling and processing such delinquent payment and should not be considered interest) and bear interest at the Default Rate, such interest to be computed from and including the date such payment was due through and including the date of the payment; *provided, however*, in no event shall Lessee be obligated to pay a sum of late charge and interest higher than the maximum legal rate then in effect.

**Section 4.07. Holdover**.   If Lessee remains in possession of the Properties after the expiration of the term hereof, Lessee, at Lessor's option and within Lessor's sole discretion, may be deemed a tenant on a month-to-month basis and shall continue to pay Rentals and other Monetary Obligations in the amounts herein provided, except that the Base Monthly Rental shall be automatically increased to one hundred fifty percent (150%) of the last Base Monthly Rental payable under this Lease, and Lessee shall comply with all the terms of this Lease; *provided that* nothing herein nor the acceptance of Rental by Lessor shall be deemed a consent to such holding over.   Lessee shall defend, indemnify, protect and hold the Indemnified Parties harmless from and against any and all Losses resulting from Lessee's failure to surrender possession upon the expiration of the Lease Term.

**Section 4.08. Guaranty**.   On or before the execution of this Lease, Lessee shall cause Guarantors to execute and deliver to Lessor the Guaranty.

**Section 4.09. Credit Enhancement**.

(a)   In connection with the execution of this Lease, Lessee shall deliver to Lessor, both:

(i)   a Letter of Credit (defined below) in an amount equal to $2,500,000.00 as security for the full and faithful performance by Lessee of the payment of the Base Monthly Rental required under this Lease.   Lessee agrees that Lessor and its Lender shall have the right, but not the obligation, to draw on the Letter of Credit and to apply all or any part thereof to or retain all or any part thereof for the payment of Base Monthly Rental in default beyond any applicable notice and cure period.   For purposes hereof, "<u>Letter of Credit</u>" means a transferable, clean, unconditional, irrevocable, evergreen letter of credit, in form and substance reasonably satisfactory to Lessor and its Lender in their reasonable discretion, issued or confirmed by a commercial bank with a long term debt obligation rating of "A" or better by either Moody's Investors Service or Standard & Poor's or otherwise reasonably acceptable to Lessor.   The Letter of Credit shall be payable upon presentation of a sight draft only to the order of Lessor or its Lender.   The Letter of Credit shall have an initial expiration date of not less than one (1) year, shall be automatically renewed for successive twelve (12) month periods for the Lease Term (subject to provisions of Section 4.09(b) below), and shall provide for multiple draws.   The Letter of Credit shall be transferable by Lessor and its Lender, and their successors and assigns; and

4

(ii)     a deposit in the sum of $2,500,000.00 (the "Security Deposit") as security for the full and faithful performance by Lessee of each and every term, provision, covenant and condition of this Lease.

(b)     If Lessee defaults in respect of any of the terms, provisions, covenants and conditions of this Lease, including but not limited to payment of any Monetary Obligation (including Rental) due under this Lease, Lessor may, but shall not be required to, use, apply or retain the whole or any part of the Security Deposit or draw on the Letter of Credit (collectively, the "Credit Enhancement") for the payment of any Monetary Obligation (including Rental) in default or for any other sum which Lessor may expend or be required to expend by reason of Lessee's default, including any damages or deficiency in the reletting of the Properties, whether such damages or deficiency accrue before or after summary proceedings or other re-entry by Lessor.  If Lessee shall fully and faithfully comply with all of the terms, provisions, covenants and conditions of this Lease, the Security Deposit, or any balance thereof, shall be returned to Lessee after the time fixed as the expiration of the Lease Term and after the removal of Lessee and surrender of possession of the Properties to Lessor.  Lessee shall not be entitled to any interest on the Security Deposit except as provided otherwise pursuant to applicable law.  In the absence of evidence satisfactory to Lessor of an assignment of the right to receive the Security Deposit, or the remaining balance thereof, Lessor may return the security to the original Lessee, regardless of one or more assignments of this Lease.  In case of a sale or transfer of the fee of the Properties, or any cessation of Lessor's interest therein, whether in whole or in part, Lessor may pay over any unapplied part of the Security Deposit to the succeeding owner of the Property and from and after such payment Lessor shall be relieved of all liability with respect thereto.  The provisions of the preceding sentence shall apply to every subsequent sale or transfer of the fee of the Property, and any successor of Lessor may, upon a sale, transfer or other cessation of the interest of such successor in the Property, whether in whole or in part, pay over any unapplied part of the Security Deposit to the successor owner of the Property and shall thereupon be relieved of all liability with respect thereto.

(c)     Notwithstanding the foregoing, the Credit Enhancement shall be returned to Lessee and the requirement to provide the Credit Enhancement under Section 4.09(a) above shall be of no further force or effect upon the occurrence of a "Termination" of the Guaranty (as such term is defined therein); *provided, however,* that the release and termination of the Credit Enhancement shall be conditioned upon no Event of Default having occurred and continuing, nor any event having occurred and continuing, which, with the delivery of notice and/or the passage of time, could result in an Event of Default.

## ARTICLE V

## REPRESENTATIONS AND WARRANTIES OF LESSEE

The representations and warranties of Lessee contained in this Article V are being made to induce Lessor to enter into this Lease, and Lessor has relied, and will continue to rely, upon such representations and warranties.  Lessee represents and warrants to Lessor as follows:

5

**Section 5.01.  Organization, Authority and Status of Lessee**.  Lessee has been duly organized or formed, is validly existing and in good standing under the laws of its state of formation and is qualified as a foreign corporation to do business in any jurisdiction where such qualification is required.  All necessary and appropriate action has been taken to authorize the execution, delivery and performance by Lessee of this Lease and of the other documents, instruments and agreements provided for herein.  Lessee is not, and if Lessee is a "disregarded entity," the owner of such disregarded entity is not, a "nonresident alien," "foreign corporation," "foreign partnership," "foreign trust," "foreign estate," or any other "person" that is not a "United States Person" as those terms are defined in the Code and the regulations promulgated thereunder.  The Person who has executed this Lease on behalf of Lessee is duly authorized to do so.

**Section 5.02.  Enforceability**.  This Lease constitutes the legal, valid and binding obligation of Lessee, enforceable against Lessee in accordance with its terms.

**Section 5.03.  Litigation**.  There are no suits, actions, proceedings or investigations pending, or to the best of its knowledge, threatened against or involving any Lessee Entity or the Properties before any arbitrator or Governmental Authority which might reasonably result in any Material Adverse Effect.

**Section 5.04.  Absence of Breaches or Defaults**.  Lessee is not in default under any document, instrument or agreement to which Lessee is a party or by which Lessee, the Properties or any of Lessee's property is subject or bound, which has had, or could reasonably be expected to result in, a Material Adverse Effect.  The authorization, execution, delivery and performance of this Lease and the documents, instruments and agreements provided for herein will not result in any breach of or default under any document, instrument or agreement to which Lessee is a party or by which Lessee, the Properties or any of Lessee's property is subject or bound.

**Section 5.05.  Compliance with OFAC Laws**.  None of the Lessee Entities, and no individual or entity owning directly or indirectly any interest in any of the Lessee Entities, is an individual or entity whose property or interests are subject to being blocked under any of the OFAC Laws or is otherwise in violation of any of the OFAC Laws; *provided, however*, that the representation contained in this sentence shall not apply to any Person to the extent such Person's interest is in or through a U.S. Publicly Traded Entity.

**Section 5.06.  Solvency**.  There is no contemplated, pending or threatened Insolvency Event or similar proceedings, whether voluntary or involuntary, affecting Lessee or any Lessee Entity.  Lessee does not have unreasonably small capital to conduct its business.

**Section 5.07.  Ownership**.  None of (i) Lessee, (ii) any Affiliate of Lessee, or (iii) any Person owning ten percent (10%) or more of Lessee, owns, directly or indirectly, ten percent (10%) or more of the total voting power or total value of capital stock in STORE Capital Corporation.

**Section 5.08.  Franchise Agreement**.  Lessee has entered into one or more franchise, license and/or area development agreements with Franchisor (each, a "Franchise Agreement") for conduct of the business at the Properties.  Each such Franchise Agreement is valid, binding

6

and in full force and effect, permits Lessee to operate Permitted Facilities on the Properties, and has a term which will not expire prior to the Lease Term.

## ARTICLE VI

## TAXES AND ASSESSMENTS; UTILITIES; INSURANCE

**Section 6.01.  Taxes**.

(a)     *Payment*.  Subject to the provisions of Section 6.01(b) below, Lessee shall pay, prior to the earlier of delinquency or the accrual of interest on the unpaid balance, all taxes and assessments of every type or nature assessed against or imposed upon the Properties, Lessee or Lessor during the Lease Term related to or arising out of this Lease and the activities of the parties hereunder, including without limitation, (i) all taxes or assessments upon the Properties or any part thereof and upon any personal property, trade fixtures and improvements located on the Properties, whether belonging to Lessor or Lessee, or any tax or charge levied in lieu of such taxes and assessments; (ii) all taxes, charges, license fees and or similar fees imposed by reason of the use of the Properties by Lessee; (iii) all excise, franchise, transaction, privilege, license, sales, use and other taxes upon the Rental or other Monetary Obligations hereunder, the leasehold estate of either party or the activities of either party pursuant to this Lease; and (iv) all franchise, privilege or similar taxes of Lessor calculated on the value of the Properties or on the amount of capital apportioned to the Properties.  Notwithstanding anything in clauses (i) through (iv) to the contrary, Lessee shall not be obligated to pay or reimburse Lessor for any taxes based on the net income of Lessor.

(b)     *Right to Contest*.  Within thirty (30) days after each tax and assessment payment is required by this Section 6.01 to be paid, Lessee shall provide Lessor with evidence reasonably satisfactory to Lessor that taxes and assessments have been timely paid by Lessee.  In the event Lessor receives a tax bill, Lessor shall use commercially reasonable efforts to forward said bill to Lessee within fifteen (15) days of Lessor's receipt thereof.  Lessee may, at its own expense, contest or cause to be contested (in the case of any item involving more than $10,000, after prior written notice to Lessor, which shall be given within fifteen (15) days of Lessee's determination to contest any matter as permitted herein), by appropriate legal proceedings conducted in good faith and with due diligence, any above-described item or lien with respect thereto, provided that (i) neither the Properties nor any interest therein would be in any danger of being sold, forfeited or lost by reason of such proceedings; (ii) no Event of Default has occurred and is continuing; (iii) if and to the extent required by the applicable taxing authority and/or Lessor, Lessee posts a bond or takes other steps acceptable to such taxing authority and/or Lessor that removes such lien or stays enforcement thereof; (iv) Lessee shall promptly provide Lessor with copies of all notices received or delivered by Lessee and filings made by Lessee in connection with such proceeding; and (v) upon termination of such proceedings, it shall be the obligation of Lessee to pay the amount of any such tax and assessment or part thereof as finally determined in such proceedings, the payment of which may have been deferred during the prosecution of such proceedings, together with any costs, fees (including attorneys' fees and

7

disbursements), interest, penalties or other liabilities in connection therewith.  Lessor shall at the request of Lessee, execute or join in the execution of any instruments or documents necessary in connection with such contest or proceedings, but Lessor shall incur no cost or obligation thereby.

**Section 6.02.  Utilities**.  Lessee shall contract, in its own name, for and pay when due all charges for the connection and use of water, gas, electricity, telephone, garbage collection, sewer use and other utility services supplied to the Properties during the Lease Term.  Under no circumstances shall Lessor be responsible for any interruption of any utility service.

**Section 6.03.  Insurance**.

(a)      *Coverage*.  Throughout the Lease Term, Lessee shall maintain, with respect to each of the Properties, at its sole expense, the following types and amounts of insurance, in addition to such other insurance as Lessor may reasonably require from time to time:

(i)      Insurance against loss or damage to real property and personal property under an "all risk" or "special form" insurance policy, which shall include coverage against all risks of direct physical loss, including but not limited to loss by fire, lightning, wind, terrorism, and other risks normally included in the standard ISO special form (and shall also include National Flood and Excess Flood insurance for any Property located in Flood Zone A or Flood Zone V, as designated by FEMA, or otherwise located in a flood zone area identified by FEMA as a 100-year flood zone or special hazard area, and earthquake insurance if any Property is located within a moderate to high earthquake hazard zone as determined by an approved insurance company set forth in Section 6.03(b)(x)  below).    Such policy shall also include soft costs, a joint loss agreement, coverage for ordinance or law covering the loss of value of the undamaged portion of the Properties, costs to demolish and the increased costs of construction if any of the improvements located on, or the use of, the Properties shall at any time constitute legal non-conforming structures or uses.  Ordinance or law limits shall be in an amount equal to the full replacement cost for the loss of value of the undamaged portion of the Properties and no less than 25% of the replacement cost for costs to demolish and the increased cost of construction, or in an amount otherwise specified by Lessor.  Such insurance shall be in amounts not less than 100% of the full insurable replacement cost values (without deduction for depreciation), with an agreed amount endorsement or without any coinsurance provision, and with sublimits satisfactory to Lessor, as determined from time to time at Lessor's request but not more frequently than once in any 12-month period.

(ii)      Commercial general liability insurance, including products and completed operation liability, covering Lessor and Lessee against bodily injury liability, property damage liability and personal and advertising injury, including without limitation any liability arising out of the ownership, maintenance, repair, condition or operation of every Property or adjoining ways, streets, parking lots or sidewalks.    Such insurance policy or policies shall contain a broad form

8

contractual liability endorsement under which the insurer agrees to insure Lessee's obligations under Article X hereof to the extent insurable, and a "severability of interest" clause or endorsement which precludes the insurer from denying the claim of Lessee or Lessor because of the negligence or other acts of the other, shall be in amounts of not less than $10,000,000 per occurrence for bodily injury and property damage, and $10,000,000 general aggregate per location, or such higher limits as Lessor may reasonably require from time to time, and shall be of form and substance satisfactory to Lessor.  Such limits of insurance can be acquired through Commercial General liability and Umbrella liability policies.

(iii)    Workers' compensation and Employers Liability insurance with statutorily mandated limits covering all persons employed by Lessee on the Properties in connection with any work done on or about any of the Properties for which claims for death or bodily injury could be asserted against Lessor, Lessee or the Properties.

(iv)    Business interruption insurance including Rental Value Insurance payable to Lessor at all locations for a period of not less than twelve (12) months.  Such insurance is to follow the form of the real property "all risk" or "special form" coverage and is not to contain a co-insurance clause.  Such insurance is to have a minimum of 180 days of extended period of indemnity.

(v)    Automobile liability insurance, including owned, non-owned and hired car liability insurance for combined limits of liability of $5,000,000 per occurrence.  The limits of liability can be provided in a combination of an automobile liability policy and an umbrella liability policy.

(vi)    Comprehensive Boiler and Machinery or Equipment Breakdown Insurance against loss or damage from explosion of any steam or pressure boilers or similar apparatus, if any, and other building equipment including HVAC units located in or about each Property and in an amount equal to the lesser of 25% of the 100% replacement cost of each Property or $5,000,000.

(vii)    Such additional and/or other insurance and in such amounts as at the time is customarily carried by prudent owners or tenants with respect to improvements and personal property similar in character, location and use and occupancy to each Property.

(b)    ***Insurance Provisions***.  All insurance policies shall:

(i)    provide for a waiver of subrogation by the insurer as to claims against Lessor, its employees and agents;

(ii)    be primary and provide that any "other insurance" clause in the insurance policy shall exclude any policies of insurance maintained by Lessor and the insurance policy shall not be brought into contribution with insurance maintained by Lessor;

9

(iii)     contain deductibles not to exceed $25,000;

(iv)     contain a standard non-contributory mortgagee clause or endorsement in favor of any Lender designated by Lessor;

(v)     provide that the policy of insurance shall not be terminated, cancelled or amended without at least thirty (30) days' prior written notice to Lessor and to any Lender covered by any standard mortgagee clause or endorsement;

(vi)     be in amounts sufficient at all times to satisfy any coinsurance requirements thereof;

(vii)     except for workers' compensation insurance referred to in Section 6.03(a)(iii) above, name Lessor and any Lessor Affiliate or Lender requested by Lessor, as an "additional insured" with respect to liability insurance, and as an "additional named insured" or "additional insured" with respect to real property and rental value insurance, as appropriate and as their interests may appear;

(viii)     be evidenced by delivery to Lessor and any Lender designated by Lessor of an Acord Form 28 for property, business interruption and boiler & machinery coverage (or any other form requested by Lessor) and an Acord Form 25 for commercial general liability, workers' compensation and umbrella coverage (or any other form requested by Lessor); provided that in the event that either such form is no longer available, such evidence of insurance shall be in a form reasonably satisfactory to Lessor and any Lender designated by Lessor; and

(ix)     be issued by insurance companies licensed to do business in the states where the Properties are located and which are rated no less than A-X by Best's Insurance Guide or are otherwise approved by Lessor.

(c)     **Additional Obligations**.  It is expressly understood and agreed that (i) if any insurance required hereunder, or any part thereof, shall expire, be withdrawn, become void by breach of any condition thereof by Lessee, or become void or in jeopardy by reason of the failure or impairment of the capital of any insurer, Lessee shall immediately obtain new or additional insurance reasonably satisfactory to Lessor and any Lender designated by Lessor; (ii) the minimum limits of insurance coverage set forth in this Section 6.03 shall not limit the liability of Lessee for its acts or omissions as provided in this Lease; (iii) Lessee shall procure policies for all insurance for periods of not less than one year and shall provide to Lessor and any servicer or Lender of Lessor certificates of insurance or, upon Lessor's request, duplicate originals of insurance policies evidencing that insurance satisfying the requirements of this Lease is in effect at all times; (iv) Lessee shall pay as they become due all premiums for the insurance required by this Section 6.03; (v) in the event that Lessee fails to comply with any of the requirements set forth in this Section 6.03, within ten (10) days of the giving of written notice by Lessor to Lessee, (A) Lessor shall be entitled to procure such insurance; and

10

(B) any sums expended by Lessor in procuring such insurance shall be Additional Rental and shall be repaid by Lessee, together with interest thereon at the Default Rate, from the time of payment by Lessor until fully paid by Lessee immediately upon written demand therefor by Lessor; and (vi) Lessee shall maintain all insurance policies required in this Section 6.03 not to be cancelled, invalidated or suspended on account of the conduct of Lessee, its officers, directors, managers, members, employees or agents, or anyone acting for Lessee or any subtenant or other occupant of the Properties, and shall comply with all policy conditions and warranties at all times to avoid a forfeiture of all or a part of any insurance payment.

(d)     ***Blanket Policies***.   Notwithstanding anything to the contrary in this Section 6.03, any insurance which Lessee is required to obtain pursuant to this Section 6.03 may be carried under a "blanket" policy or policies covering other properties or liabilities of Lessee provided that such "blanket" policy or policies otherwise comply with the provisions of this Section 6.03.

**Section 6.04. Environmental Insurance**.   Throughout the Lease Term, Lessee shall maintain, with respect to the Property located at 4334 Buffalo Road, Erie, PA 16510, at its sole cost and expense, the Environmental Policy in substantially similar form, substance, and coverage to the Environmental Policy in effect on the Effective Date (or otherwise be in form and substance satisfactory to Lessor in its sole discretion).   Lessor and Lessee each acknowledge and agree that (i) no party shall amend or terminate the Environmental Policy without the prior written consent of the other party; and (ii) this Lease shall be referenced as an "insured contract" under the Environmental Policy.   Notwithstanding the forgoing, in the event that Lessor shall be able to include such Property in the Master Environmental Policy, such inclusion shall satisfy Lessee's obligation to maintain the Environmental Policy, provided that Lessee reimburse Lessor for the Property's reasonable pro rata share of the premium paid by Lessor for the Master Environmental Policy.

**Section 6.05. Tax Impound**.   Upon the occurrence of an Event of Default and with respect to each Event of Default, in addition to any other remedies, Lessor may require Lessee to pay to Lessor on the first day of each month the amount that Lessor reasonably estimates will be necessary in order to accumulate with Lessor sufficient funds in an impound account (which shall not be deemed a trust fund) (the "Reserve") for Lessor to pay any and all real estate taxes ("Real Estate Taxes") for the Properties for the ensuing twelve (12) months, or, if due sooner, Lessee shall pay the required amount immediately upon Lessor's demand therefor.   Lessor shall, upon prior written request of Lessee, provide Lessee with evidence reasonably satisfactory to Lessee that payment of the Real Estate Taxes was made in a timely fashion.   In the event that the Reserve does not contain sufficient funds to timely pay any Real Estate Taxes, upon Lessor's written notification thereof, Lessee shall, within five (5) Business Days of such notice, provide funds to Lessor in the amount of such deficiency.   Lessor shall pay or cause to be paid directly to the applicable taxing authorities any Real Estate Taxes then due and payable for which there are funds in the Reserve; *provided, however,* that in no event shall Lessor be obligated to pay any Real Estate Taxes in excess of the funds held in the Reserve, and Lessee shall remain liable for any and all Real Estate Taxes, including fines, penalties, interest or additional costs imposed by any taxing authority (unless incurred as a result of Lessor's failure to timely pay Real Estate Taxes for which it had funds in the Reserve).   Lessee shall cooperate fully with Lessor in assuring that the Real Estate Taxes are timely paid.   Lessor

11

may deposit all Reserve funds in accounts insured by any federal or state agency and may commingle such funds with other funds and accounts of Lessor.  Interest or other gains from such funds, if any, shall be the sole property of Lessor. Upon an Event of Default, in addition to any other remedies, Lessor may apply all impounded funds in the Reserve against any sums due from Lessee to Lessor.   Lessor shall give to Lessee an annual accounting showing all credits and debits to and from such impounded funds received from Lessee.

## ARTICLE VII

## MAINTENANCE; ALTERATIONS

**Section 7.01. Condition of Property; Maintenance**.   Lessee hereby accepts the Properties "AS IS" and "WHERE IS" with no representation or warranty of Lessor as to the condition thereof.  Lessee shall, at its sole cost and expense, be responsible for (a) keeping all of the building, structures and improvements erected on each of the Properties in good order and repair, free from actual or constructive waste; (b) the repair or reconstruction of any building, structures or improvements erected on the Properties damaged or destroyed by a Casualty; (c) subject to Section 7.02, making all necessary structural, non-structural, exterior and interior repairs and replacements to any building, structures or improvements erected on the Properties; (d) operating, remodeling, updating and modernizing the Properties in accordance with those standards adopted from time to time on a system-wide basis for the Permitted Facilities; (e) (i) ensuring that no party encroaches upon any Property, (ii) protecting, defending, indemnifying, releasing and holding the Indemnified Parties harmless from and against any and all claims and Losses arising out of or in any way relating to any encroachments and/or activities upon any Property caused by any Person; and (iii) prosecuting any claims that Lessee seeks to bring against any Person relating to Lessee's use and possession of any Property; and (f) paying all operating costs of the Properties in the ordinary course of business.  Lessee waives any right to require Lessor to maintain, repair or rebuild all or any part of the Properties or make repairs at the expense of Lessor pursuant to any Legal Requirements at any time in effect.

**Section 7.02. Alterations and Improvements**.  During the Lease Term, Lessee shall not alter the exterior, structural, plumbing or electrical elements of the Properties in any manner without the consent of Lessor, which consent shall not be unreasonably withheld or conditioned; *provided, however*, Lessee may undertake nonstructural alterations to the Properties, individually, costing less than $25,000 without Lessor's prior written consent.   If Lessor's consent is required hereunder and Lessor consents to the making of any such alterations, the same shall be made by Lessee at Lessee's sole expense by a licensed contractor and according to plans and specifications approved by Lessor and subject to such other conditions as Lessor shall reasonably require.  Any work at any time commenced by Lessee on the Properties shall be prosecuted diligently to completion, shall be of good workmanship and materials and shall comply fully with all the terms of this Lease and all Legal Requirements. Upon completion of any alterations individually costing $25,000 or more, Lessee shall promptly provide Lessor with evidence of full payment to all laborers and materialmen contributing to the alterations.   Additionally, upon completion of any alterations, Lessee shall promptly provide Lessor with (a) an architect's certificate certifying the alterations to have been completed in conformity with the plans and specifications (if the alterations are of such a nature as would require the issuance of such a certificate from the architect); (b) a certificate of occupancy (if the

12

alterations are of such a nature as would require the issuance of a certificate of occupancy); and (c) any other documents or information reasonably requested by Lessor.  Lessee shall keep the Properties free from any liens arising out of any work performed on, or materials furnished to, the Properties.   Lessee shall execute and file or record, as appropriate, a "Notice of Non-Responsibility," or any equivalent notice permitted under applicable Law in the states where the Properties are located which provides that Lessor is not responsible for the payment of any costs or expenses relating to the additions or alterations.  Any addition to or alteration of the Properties shall be deemed a part of the Properties and belong to Lessor, and Lessee shall execute and deliver to Lessor such instruments as Lessor may require to evidence the ownership by Lessor of such addition or alteration.

**Section 7.03.  Encumbrances**.  During the Lease Term, Lessor shall have the right to grant easements on, over, under and above the Properties without the prior consent of Lessee, provided that such easements will not materially interfere with Lessee's use of the Properties. Lessee shall comply with and perform all obligations of Lessor under all easements, declarations, covenants, restrictions and other items of record now or hereafter encumbering the Properties.  Without Lessor's prior written consent, Lessee shall not grant any easements on, over, under or above the Properties.

**ARTICLE VIII**

**USE OF THE PROPERTIES; COMPLIANCE**

**Section 8.01.  Use**.  During the Lease Term, each of the Properties shall be used solely for the operation of a Permitted Facility.  Except during periods when a Property is untenantable due to Casualty or Condemnation (and provided that Lessee continues to strictly comply with the other terms and conditions of this Lease), Lessee shall at all times during the Lease Term occupy the Properties and shall diligently operate its business on the Properties.  In the event that Lessee shall change the use of the Properties or the concept or brand operated on the Properties, only as may be expressly permitted herein or consented to by Lessor in writing, Lessee shall provide Lessor with written notice of any such change and copies of the franchise agreement(s) related to such new concept or brand, if any.

**Section 8.02.  Compliance**.  Lessee's use and occupation of each of the Properties, and the condition thereof, shall, at Lessee's sole cost and expense, comply fully with all Legal Requirements and all restrictions, covenants and encumbrances of record, and any owner obligations under such Legal Requirements, or restrictions, covenants and encumbrances of record, with respect to the Properties, in either event, the failure with which to comply could have a Material Adverse Effect.  Without in any way limiting the foregoing provisions, Lessee shall comply with all Legal Requirements relating to anti-terrorism, trade embargos, economic sanctions, Anti-Money Laundering Laws, and the Americans with Disabilities Act of 1990, as such act may be amended from time to time, and all regulations promulgated thereunder, as it affects the Properties now or hereafter in effect.  Lessee shall obtain, maintain and comply with all required licenses and permits, both governmental and private, to use and operate the Properties as Permitted Facilities.  Upon Lessor's written request from time to time during the Lease Term, Lessee shall certify in writing to Lessor that Lessee's representations, warranties and obligations under Section 5.05 and this Section 8.02 remain true and correct and have not been breached.  Lessee shall immediately notify Lessor in writing if any of such representations,

13

warranties or covenants are no longer true or have been breached or if Lessee has a reasonable basis to believe that they may no longer be true or have been breached. In connection with such an event, Lessee shall comply with all Legal Requirements and directives of Governmental Authorities and, at Lessor's request, provide to Lessor copies of all notices, reports and other communications exchanged with, or received from, Governmental Authorities relating to such an event. Lessee shall also reimburse Lessor for all Costs incurred by Lessor in evaluating the effect of such an event on the Properties and this Lease, in obtaining any necessary license from Governmental Authorities as may be necessary for Lessor to enforce its rights under the Transaction Documents, and in complying with all Legal Requirements applicable to Lessor as the result of the existence of such an event and for any penalties or fines imposed upon Lessor as a result thereof. Lessee will use its best efforts to prevent any act or condition to exist on or about the Properties that will materially increase any insurance rate thereon, except when such acts are required in the normal course of its business and Lessee shall pay for such increase. Lessee agrees that it will defend, indemnify and hold harmless the Indemnified Parties from and against any and all Losses caused by, incurred or resulting from Lessee's failure to comply with its obligations under this Section.

> **Section 8.03.  Environmental**.
>
> > (a)      ***Covenants***.
> >
> > > (i)      Lessee covenants to Lessor during the Lease Term, subject to the limitations of subsection (ii) below, as follows:
> > >
> > > > (A)      All uses and operations on or of the Properties, whether by Lessee or any other Person, shall be in compliance with all Environmental Laws and permits issued pursuant thereto.
> > > >
> > > > (B)      There shall be no Releases in, on, under or from the Properties, except in Permitted Amounts.
> > > >
> > > > (C)      There shall be no Hazardous Materials or Regulated Substances in, on or under the Properties, except in Permitted Amounts. Above and below ground storage tanks shall be properly permitted and only used as permitted.
> > > >
> > > > (D)      Lessee shall keep the Properties or cause the Properties to be kept free and clear of all Environmental Liens, whether due to any act or omission of Lessee or any other Person.
> > > >
> > > > (E)      Lessee shall not act or fail to act or allow any other tenant, occupant, guest, customer or other user of the Properties to act or fail to act in any way that (1) materially increases a risk to human health or the environment, (2) poses an unreasonable or unacceptable risk of harm to any Person or the environment (whether on or off any of the Properties), (3) has a Material Adverse Effect, (4) is contrary to any material requirement set forth in the insurance policies maintained by Lessee or Lessor, (5) constitutes a public or private nuisance or constitutes waste,

14

4832-6836-0282.2
STORE/Campbells (Perkins)
Master Lease Agreement
20 Properties
File No. 7210/02-588

(6) violates any covenant, condition, agreement or easement applicable to the Properties, or (7) would result in any reopening or reconsideration of any prior investigation or causes a new investigation by a Governmental Authority having jurisdiction over any Property.

(F)     Lessee shall, at its sole cost and expense, fully and expeditiously cooperate in all activities pursuant to this Section 8.04, including but not limited to providing all relevant information and making knowledgeable persons available for interviews.

(ii)     Notwithstanding any provision of this Lease to the contrary, an Event of Default shall not be deemed to have occurred as a result of the failure of Lessee to satisfy any one or more of the covenants set forth in subsections (A) through (E) above provided that Lessee shall be in compliance with the requirements of any Governmental Authority with respect to the Remediation of any Release at the Properties.

(b)     ***Notification Requirements***.  Lessee shall immediately notify Lessor in writing upon Lessee obtaining actual knowledge of (i) any Releases or Threatened Releases in, on, under or from any of the Properties other than in Permitted Amounts, or migrating towards any of the Properties; (ii) any non-compliance with any Environmental Laws related in any way to any of the Properties; (iii) any actual or potential Environmental Lien or activity use limitation; (iv) any required or proposed Remediation of environmental conditions relating to any of the Properties required by applicable Governmental Authorities; and (v) any written or oral notice or other communication of which Lessee becomes aware from any source whatsoever (including but not limited to a Governmental Authority) relating in any way to Hazardous Materials, Regulated Substances or above or below ground storage tanks, or Remediation thereof at or on any of the Properties, other than in Permitted Amounts, possible liability of any Person relating to any of the Properties pursuant to any Environmental Law, other environmental conditions in connection with any of the Properties, or any actual or potential administrative or judicial proceedings in connection with anything referred to in this Section.  Lessee shall, upon Lessor's written request, deliver to Lessor a certificate stating that Lessee is and has been in full compliance with all of the environmental representations, warranties and covenants in this Lease.

(c)     ***Remediation***.  Lessee shall, at its sole cost and expense, and without limiting any other provision of this Lease, effectuate any Remediation required by any Governmental Authority of any condition (including, but not limited to, a Release or Threatened Release) in, on, under or from the Properties and take any other reasonable action deemed necessary by any Governmental Authority for protection of human health or the environment.  Should Lessee fail to undertake any required Remediation in accordance with the preceding sentence, Lessor, after written notice to Lessee and Lessee's failure to immediately undertake such Remediation, shall be permitted to complete such Remediation, and all Costs incurred in connection therewith shall be paid by Lessee.  Any Cost so paid by Lessor, together with interest at the Default Rate, shall be deemed to be Additional Rental hereunder and shall be immediately due from Lessee to Lessor.

15

(d)     *Indemnification*.  Lessee shall, at its sole cost and expense, protect, defend, indemnify, release and hold harmless each of the Indemnified Parties from and against any and all Losses, including, but not limited to, all Costs of Remediation (whether or not performed voluntarily), arising out of or in any way relating to any Environmental Laws, Hazardous Materials, Regulated Substances, above or below ground storage tanks, or other environmental matters concerning the Properties.  It is expressly understood and agreed that Lessee's obligations under this Section shall survive the expiration or earlier termination of this Lease for any reason.

(e)     *Right of Entry*.   In the event that Lessor has a reasonable basis to believe that a Release or a violation of any Environmental Law has occurred, Lessor and any other Person designated by Lessor, including but not limited to any receiver, any representative of a Governmental Authority, and any environmental consultant, shall have the right, but not the obligation, to enter upon the Properties at all reasonable times to assess any and all aspects of the environmental condition of any Property and its use, including but not limited to conducting any environmental assessment or audit (the scope of which shall be determined in Lessor's sole and absolute discretion) and taking samples of soil, groundwater or other water, air, or building materials, and conducting other invasive testing.  Lessee shall cooperate with and provide access to Lessor and any other Person designated by Lessor.  Any such assessment or investigation shall be at Lessee's sole cost and expense.

(f)     *Survival*.   The obligations of Lessee and the rights and remedies of Lessor under this Section 8.03 shall survive the termination, expiration and/or release of this Lease.

**Section 8.04. Franchisor Requirements**.  In addition to the requirements set forth in this Lease, Lessee, in its use, occupancy and maintenance of the Properties, shall comply with all requirements of its Franchise Agreement.  Lessee hereby consents to Lessor providing information it obtains to Franchisor, and to Lessor obtaining from Franchisor information which Franchisor receives relating to Lessee's operation of its business on the Properties.

**ARTICLE IX**

**ADDITIONAL COVENANTS**

**Section 9.01. Performance at Lessee's Expense**.    Lessee acknowledges and confirms that Lessor may impose reasonable administrative, processing or servicing fees, and collect its reasonable attorneys' fees, costs and expenses in connection with (a) any extension, renewal, modification, amendment and termination of this Lease requested by Lessee; (b) any release or substitution of Properties requested by Lessee; (c) the procurement of consents, waivers and approvals with respect to the Properties or any matter related to this Lease requested by Lessee; (d) the review of any assignment or sublease or proposed assignment or sublease or the preparation or review of any subordination or non-disturbance agreement requested by Lessee; (e) the collection, maintenance and/or disbursement of reserves created under this Lease or the other Transaction Documents (following an Event of Default); and (f) inspections required to make certain determinations under this Lease or the other Transaction

16

Documents following Lessor's reasonable belief of a breach under this Lease or any other Transaction Documents.

**Section 9.02. Inspection**.   Lessor and its authorized representatives shall have the right, at all reasonable times and upon giving reasonable prior notice (except in the event of an emergency, in which case no prior notice shall be required), to enter the Properties or any part thereof and inspect the same.  Lessee hereby waives any claim for damages for any injury or inconvenience to or interference with Lessee's business, any loss of occupancy or quiet enjoyment of the Properties and any other loss occasioned by such entry, but, subject to Section 10.01, excluding damages arising as a result of the gross negligence or willful misconduct of Lessor.

**Section 9.03. Financial Information**.

(a)     ***Financial Statements***.  Within forty five (45) days after the end of each fiscal quarter and within one hundred twenty (120) days after the end of each fiscal year of Lessee and Lessee Reporting Entities, Lessee shall deliver to Lessor (i) complete consolidated financial statements that consolidate Lessee and Lessee Reporting Entities, including a balance sheet, profit and loss statement, statement of stockholders' equity and statement of cash flows and all other related schedules for the fiscal period then ended, such statements to detail separately interest expense, income taxes, non-cash expenses, non-recurring expenses, operating lease expense and current portion of long-term debt – capital leases; (ii) income statements for the business at each of the Properties; and (iii) the supplemental financial information set forth on Schedule 9.03. All such financial statements shall be prepared in accordance with GAAP, and shall be certified to be accurate and complete by an officer or director of each Lessee Reporting Entity.  In the event that Lessee's business at the Properties is ordinarily consolidated with other business for financial statements purposes, a separate profit and loss statement shall be provided showing separately the sales, profits and losses pertaining to each Property with interest expense, income taxes, non-cash expenses, non-recurring expenses and operating lease expense (rent), with the basis for allocation of overhead or other charges being clearly set forth in accordance with Schedule 9.03.  The financial statements delivered to Lessor need not be audited, but Lessee shall deliver to Lessor copies of any audited financial statements of the Lessee Reporting Entities which may be prepared, as soon as they are available.

(b)     ***Other Information***.  Notwithstanding any provision contained herein, upon request at any time, Lessee will provide to Lessor, at no additional cost or expense to Lessee, any and all financial information and/or financial statements of Lessee Reporting Entities (and in the form or forms) as reasonably requested by Lessor including, but not limited to, as requested by Lessor in connection with Lessor's filings with or disclosures to the Securities and Exchange Commission or other Governmental Authority.

**Section 9.04. OFAC Laws**.  Upon receipt of notice or upon actual knowledge thereof, Lessee shall immediately notify Lessor in writing if any Person owning (directly or indirectly) any interest in any of the Lessee Entities, or any director, officer, shareholder, member, manager or partner of any of such holders is a Person whose property or interests are subject to being

17

blocked under any of the OFAC Laws, or is otherwise in violation of any of the OFAC Laws, or is under investigation by any Governmental Authority for, or has been charged with, or convicted of, drug trafficking, terrorist-related activities or any violation of the Anti-Money Laundering Laws, has been assessed civil penalties under these or related Laws, or has had funds seized or forfeited in an action under these or related Laws; *provided, however*, that the covenant in this Section 9.04 shall not apply to any Person to the extent such Person's interest is in or through a U.S. Publicly Traded Entity.

Section 9.05. **Estoppel Certificate**.  At any time, and from time to time, Lessee shall, promptly and in no event later than ten (10) days after a request from Lessor or any Lender or mortgagee of Lessor, execute, acknowledge and deliver to Lessor or such Lender or mortgagee, as the case may be, a certificate in the form supplied by Lessor, certifying: (a) that Lessee has accepted the Properties; (b) that this Lease is in full force and effect and has not been modified (or if modified, setting forth all modifications), or, if this Lease is not in full force and effect, the certificate shall so specify the reasons therefor; (c) the commencement and expiration dates of the Lease Term; (d) the date to which the Rentals have been paid under this Lease and the amount thereof then payable; (e) whether there are then any existing defaults by Lessor in the performance of its obligations under this Lease, and, if there are any such defaults, specifying the nature and extent thereof; (f) that no notice has been received by Lessee of any default under this Lease which has not been cured, except as to defaults specified in the certificate; (g) the capacity of the Person executing such certificate, and that such Person is duly authorized to execute the same on behalf of Lessee; (h) that neither Lessor nor any Lender or mortgagee has actual involvement in the management or control of decision making related to the operational aspects or the day-to-day operation of the Properties, including any handling or disposal of Hazardous Materials or Regulated Substances; and (i) any other information reasonably requested by Lessor or any Lender or mortgagee, as the case may be.  If Lessee shall fail or refuse to sign a certificate in accordance with the provisions of this Section within ten (10) days following a request by Lessor, Lessee irrevocably constitutes and appoints Lessor as its attorney-in-fact to execute and deliver the certificate to any such third party, it being stipulated that such power of attorney is coupled with an interest and is irrevocable and binding.

## ARTICLE X

## RELEASE AND INDEMNIFICATION

Section 10.01.  **RELEASE AND INDEMNIFICATION**.  LESSEE AGREES TO USE AND OCCUPY THE PROPERTIES AT ITS OWN RISK AND HEREBY RELEASES LESSOR AND LESSOR'S AGENTS AND EMPLOYEES FROM ALL CLAIMS FOR ANY DAMAGE OR INJURY TO THE FULL EXTENT PERMITTED BY LAW.  LESSEE AGREES THAT LESSOR SHALL NOT BE RESPONSIBLE OR LIABLE TO LESSEE OR LESSEE'S EMPLOYEES, AGENTS, CUSTOMERS, LICENSEES OR INVITEES FOR BODILY INJURY, PERSONAL INJURY OR PROPERTY DAMAGE OCCASIONED BY THE ACTS OR OMISSIONS OF ANY OTHER LESSEE OR ANY OTHER PERSON.  LESSEE AGREES THAT ANY EMPLOYEE OR AGENT TO WHOM THE PROPERTIES OR ANY PART THEREOF SHALL BE ENTRUSTED BY OR ON BEHALF OF LESSEE SHALL BE ACTING AS LESSEE'S AGENT WITH RESPECT TO THE PROPERTIES OR ANY PART THEREOF, AND NEITHER LESSOR NOR LESSOR'S AGENTS, EMPLOYEES OR CONTRACTORS SHALL BE LIABLE FOR ANY LOSS OF OR

18

DAMAGE TO THE PROPERTIES OR ANY PART THEREOF. LESSEE SHALL INDEMNIFY, PROTECT, DEFEND AND HOLD HARMLESS EACH OF THE INDEMNIFIED PARTIES FROM AND AGAINST ANY AND ALL LOSSES (EXCLUDING LOSSES SUFFERED BY AN INDEMNIFIED PARTY ARISING OUT OF THE WILLFUL MISCONDUCT OF SUCH INDEMNIFIED PARTY OCCURRING ON OR AFTER THE EFFECTIVE DATE) CAUSED BY, INCURRED OR RESULTING FROM LESSEE'S OPERATIONS OR BY LESSEE'S USE AND OCCUPANCY OF THE PROPERTIES, WHETHER RELATING TO ITS ORIGINAL DESIGN OR CONSTRUCTION, LATENT DEFECTS, ALTERATION, MAINTENANCE, USE BY LESSEE OR ANY PERSON THEREON, SUPERVISION OR OTHERWISE, OR FROM ANY BREACH OF, DEFAULT UNDER, OR FAILURE TO PERFORM, ANY TERM OR PROVISION OF THIS LEASE BY LESSEE, ITS OFFICERS, EMPLOYEES, AGENTS OR OTHER PERSONS. IT IS EXPRESSLY UNDERSTOOD AND AGREED THAT LESSEE'S OBLIGATIONS UNDER THIS SECTION SHALL SURVIVE THE EXPIRATION OR EARLIER TERMINATION OF THIS LEASE FOR ANY REASON WHATSOEVER.

## ARTICLE XI

## CONDEMNATION AND CASUALTY

**Section 11.01. Notification**. Lessee shall promptly give Lessor written notice of (a) any Condemnation of any of the Properties, (b) the commencement of any proceedings or negotiations which might result in a Condemnation of any of the Properties, and (c) any Casualty to any of the Properties or any part thereof. Such notice shall provide a general description of the nature and extent of such Condemnation, proceedings, negotiations or Casualty, and shall include copies of any documents or notices received in connection therewith. Thereafter, Lessee shall promptly send Lessor copies of all notices, correspondence and pleadings relating to any such Condemnation, proceedings, negotiations or Casualty.

**Section 11.02. Total Condemnation**. In the event of a Condemnation of all or substantially all of any of the Properties, and if as a result of such Condemnation: (i) access to the Property to and from the publicly dedicated roads adjacent to the Property as of the Effective Date is permanently and materially impaired such that Lessee no longer has access to such dedicated road; (ii) there is insufficient parking to operate the Property as a Permitted Facility under applicable Laws; or (iii) the Condemnation includes a portion of the building such that the remaining portion is unsuitable for use as a Permitted Facility, as determined by Lessee in the exercise of good faith business judgment (and Lessee provides to Lessor an officer's certificate executed by an officer of Lessee certifying to the same) (each such event, a "Total Condemnation"), then, in such event:

(a) ***Termination of Lease***. On the date of the Total Condemnation, all obligations of either party hereunder with respect to the applicable Property shall cease and the Base Annual Rental shall be reduced as set forth in Section 11.03(c) below; *provided, however*, that Lessee's obligations to the Indemnified Parties under any indemnification provisions of this Lease with respect to such Property and Lessee's obligation to pay Rental and all other Monetary Obligations (whether payable to Lessor or a third party) accruing under this Lease with respect to such Property prior to the date of termination shall survive such termination. If the date of such Total Condemnation is other than the first day of a month, the Base Monthly Rental for the month in which such

19

Total Condemnation occurs shall be apportioned based on the date of the Total Condemnation.

(b)    ***Net Award***.   Subject to Section 11.07 below, Lessor shall be entitled to receive the entire Net Award in connection with a Total Condemnation without deduction for any estate vested in Lessee by this Lease, and Lessee hereby expressly assigns to Lessor all of its right, title and interest in and to every such Net Award and agrees that Lessee shall not be entitled to any Net Award or other payment for the value of Lessee's leasehold interest in this Lease.

**Section 11.03.  Partial Condemnation or Casualty**.   In the event of a Condemnation which is not a Total Condemnation (each such event, a "Partial Condemnation"), or in the event of a Casualty:

(a)    ***Net Awards***.  All Net Awards shall be paid to Lessor.

(b)    ***Continuance of Lease***. This Lease shall continue in full force and effect upon the following terms:

(i)    All Rental and other Monetary Obligations due under this Lease shall continue unabated.

(ii)    Lessee shall promptly commence and diligently prosecute restoration of such Property to the same condition, as nearly as practicable, as prior to such Partial Condemnation or Casualty as approved by Lessor.  Subject to the terms and provisions of the Mortgages and upon the written request of Lessee (accompanied by evidence reasonably satisfactory to Lessor that such amount has been paid or is due and payable and is properly part of such costs, and that Lessee has complied with the terms of Section 7.02 in connection with the restoration), Lessor shall promptly make available in installments, subject to reasonable conditions for disbursement imposed by Lessor, an amount up to but not exceeding the amount of any Net Award received by Lessor with respect to such Partial Condemnation or Casualty.  Prior to the disbursement of any portion of the Net Award with respect to a Casualty, Lessee shall provide evidence reasonably satisfactory to Lessor of the payment of restoration expenses by Lessee up to the amount of the insurance deductible applicable to such Casualty. Lessor shall be entitled to keep any portion of the Net Award which may be in excess of the cost of restoration, and Lessee shall bear all additional Costs of such restoration in excess of the Net Award.

(c)    ***Rental***.  Upon removal of a Property pursuant to Section 11.02 or Section 11.03, the Base Annual Rental shall be reduced by an amount equal to the Lease Rate multiplied by the Net Award.

**Section 11.04.  Temporary Taking**.  In the event of a Condemnation of all or any part of any Property for a temporary use (a "Temporary Taking"), this Lease shall remain in full force and effect without any reduction of Base Annual Rental, Additional Rental or any other Monetary Obligation payable hereunder.  Except as provided below, Lessee shall be entitled to the entire

20

Net Award for a Temporary Taking, unless the period of occupation and use by the condemning authorities shall extend beyond the date of expiration of this Lease, in which event the Net Award made for such Temporary Taking shall be apportioned between Lessor and Lessee as of the date of such expiration.  At the termination of any such Temporary Taking, Lessee will, at its own cost and expense and pursuant to the provisions of Section 7.02, promptly commence and complete restoration of such Property.

Section 11.05. **Adjustment of Losses**.  Any loss under any property damage insurance required to be maintained by Lessee shall be adjusted by Lessor and Lessee.  Any Net Award relating to a Total Condemnation or a Partial Condemnation shall be adjusted by Lessor or, at Lessor's election, Lessee.  Notwithstanding the foregoing or any other provisions of this Section 11.05 to the contrary, if at the time of any Condemnation or any Casualty or at any time thereafter an Event of Default shall have occurred and be continuing, Lessor is hereby authorized and empowered but shall not be obligated, in the name and on behalf of Lessee and otherwise, to file and prosecute Lessee's claim, if any, for a Net Award on account of such Condemnation or such Casualty and to collect such Net Award and apply the same to the curing of such Event of Default and any other then existing Event of Default under this Lease and/or to the payment of any amounts owed by Lessee to Lessor under this Lease, in such order, priority and proportions as Lessor in its discretion shall deem proper.

Section 11.06. **Lessee Obligation in Event of Casualty**.  During all periods of time following a Casualty, Lessee shall take reasonable steps to ensure that the affected Property is secure and does not pose any risk of harm to any adjoining property and Persons (including owners or occupants of such adjoining property).

Section 11.07. **Lessee Awards and Payments**.  Notwithstanding any provision contained in this Article XI, Lessee shall be entitled to claim and receive any award or payment from the condemning authority expressly granted for the taking of any personal property owned by Lessee, any insurance proceeds with respect to any personal property owned by Lessee, the interruption of its business and moving expenses (subject, however, to the provisions of Section 6.03(a)(iv) above), but only if such claim or award does not adversely affect or interfere with the prosecution of Lessor's claim for the Condemnation or Casualty, or otherwise reduce the amount recoverable by Lessor for the Condemnation or Casualty.

## ARTICLE XII

### DEFAULT, CONDITIONAL LIMITATIONS, REMEDIES AND MEASURE OF DAMAGES

Section 12.01. **Event of Default**.  Each of the following shall be an event of default by Lessee under this Lease (each, an "Event of Default"):

(a)    if any representation or warranty of Lessee set forth in this Lease is false in any material respect when made, or if Lessee renders any materially false statement or account when made;

(b)    if any Rental or other Monetary Obligation due under this Lease is not paid when due if such failure continues for more than five (5) days after written notice

21

from Lessor; *provided, however*, Lessor shall only be required to provide such notice and cure period twice in any twelve (12) month period; and further provided that any technical error in the ACH Method of Payment process caused by Lessor's bank or servicer shall not constitute an Event of Default hereunder; *and further provided,* any delay in the payment of Rental as a result of a technical error in the wiring and/or automated clearinghouse process shall not constitute an Event of Default hereunder so long as the same is corrected within one (1) Business Day of the date Lessee receives notice thereof;

(c)     if Lessee fails to pay, prior to delinquency, any taxes, assessments or other charges the failure of which to pay will result in the imposition of a lien against any of the Properties;

(d)     if Lessee vacates or abandons any Property;

(e)     if there is an Insolvency Event affecting Lessee or any Guarantor;

(f)     if Lessee fails to observe or perform any of the other covenants, conditions or obligations of Lessee in this Lease; *provided, however*, if any such failure does not involve the payment of any Monetary Obligation, is not willful or intentional, does not place any Property or any rights or property of Lessor in immediate jeopardy, and is within the reasonable power of Lessee to promptly cure, all as determined by Lessor in its reasonable discretion, then such failure shall not constitute an Event of Default hereunder, unless otherwise expressly provided herein, unless and until Lessor shall have given Lessee notice thereof and a period of thirty (30) days shall have elapsed, during which period Lessee may correct or cure such failure, upon failure of which an Event of Default shall be deemed to have occurred hereunder without further notice or demand of any kind being required.  If such failure cannot reasonably be cured within such thirty (30)-day period, as determined by Lessor in its reasonable discretion, and Lessee is diligently pursuing a cure of such failure, then Lessee shall have a reasonable period to cure such failure beyond such thirty (30)-day period, which shall in no event exceed ninety (90) days after receiving notice of such failure from Lessor.  If Lessee shall fail to correct or cure such failure within such ninety (90)-day period, an Event of Default shall be deemed to have occurred hereunder without further notice or demand of any kind being required;

(g)     if a final, nonappealable judgment is rendered by a court against Lessee which has a Material Adverse Effect, and is not discharged or provision made for such discharge within ninety (90) days from the date of entry thereof;

(h)     if Lessee shall be liquidated or dissolved or shall begin proceedings towards its liquidation or dissolution;

(i)     if the estate or interest of Lessee in any of the Properties shall be levied upon or attached in any proceeding and such estate or interest is about to be sold or transferred or such process shall not be vacated or discharged within ninety (90) days after it is made;

22

(j)      if there is a breach or default under the Franchise Agreement with respect to the Properties or if such Franchise Agreement terminates or expires prior to the expiration of the Lease and a substitute agreement for the terminated or expired Franchise Agreement is not entered into prior to such expiration or termination, which substitute agreement shall be in form and substance reasonably satisfactory to Lessor; or

(k)      if there is an "Event of Default" or other breach or default by Lessee or any Guarantor under any of the other Transaction Documents or any Other Agreement , after the passage of all applicable notice and cure or grace periods; *provided, however*, in the event that this Lease has been the subject of a Securitization and any Other Agreement has not been the subject of the same Securitization or any series relating to such Securitization, an "Event of Default" under such Other Agreement shall not constitute an Event of Default under this Lease.

**Section 12.02.  Remedies**.  Upon the occurrence of an Event of Default, with or without notice or demand, except as otherwise expressly provided herein or such other notice as may be required by statute and cannot be waived by Lessee, Lessor shall be entitled to exercise, at its option, concurrently, successively, or in any combination, all remedies available at Law or in equity, including, without limitation, any one or more of the following:

(a)      to terminate this Lease, whereupon Lessee's right to possession of the Properties shall cease and this Lease, except as to Lessee's liability, shall be terminated;

(b)      to the extent not prohibited by applicable Law, to (i) re-enter and take possession of the Properties (or any part thereof), any or all personal property or fixtures of Lessee upon the Properties and, to the extent permissible, all Franchise Agreements, permits and other rights or privileges of Lessee pertaining to the use and operation of the Properties, and (ii) expel Lessee and those claiming under or through Lessee, without being deemed guilty in any manner of trespass or becoming liable for any loss or damage resulting therefrom, without resort to legal or judicial process, procedure or action.  No notice from Lessor hereunder or under a forcible entry and detainer statute or similar Law shall constitute an election by Lessor to terminate this Lease unless such notice specifically so states.  If Lessee shall, after default, voluntarily give up possession of the Properties to Lessor, deliver to Lessor or its agents the keys to the Properties, or both, such actions shall be deemed to be in compliance with Lessor's rights and the acceptance thereof by Lessor or its agents shall not be deemed to constitute a termination of the Lease.   Lessor reserves the right following any re-entry and/or reletting to exercise its right to terminate this Lease by giving Lessee written notice thereof, in which event this Lease will terminate;

(c)      to bring an action against Lessee for any damages sustained by Lessor or any equitable relief available to Lessor and to the extent not prohibited by applicable Law, to seize all personal property or fixtures upon the Properties which Lessee owns or in which it has an interest, in which Lessor shall have a landlord's lien and/or security interest, and to dispose thereof in accordance with the Laws prevailing at the time and place of such seizure or to remove all or any portion of such property and cause the

4832-6836-0282.2
STORE/Campbells (Perkins)
Master Lease Agreement
20 Properties
File No. 7210/02-588

same to be stored in a public warehouse or elsewhere at Lessee's sole expense, without becoming liable for any loss or damage resulting therefrom and without resorting to legal or judicial process, procedure or action;

(d) to relet the Properties or any part thereof for such term or terms (including a term which extends beyond the original Lease Term), at such rentals and upon such other terms as Lessor, in its sole discretion, may determine, with all proceeds received from such reletting being applied to the Rental and other Monetary Obligations due from Lessee in such order as Lessor may, in its sole discretion, determine, which other Monetary Obligations include, without limitation, all repossession costs, brokerage commissions, attorneys' fees and expenses, alteration, remodeling and repair costs and expenses of preparing for such reletting. Except to the extent required by applicable Law, Lessor shall have no obligation to relet the Properties or any part thereof and shall in no event be liable for refusal or failure to relet the Properties or any part thereof, or, in the event of any such reletting, for refusal or failure to collect any rent due upon such reletting, and no such refusal or failure shall operate to relieve Lessee of any liability under this Lease or otherwise to affect any such liability. Lessor reserves the right following any re-entry and/or reletting to exercise its right to terminate this Lease by giving Lessee written notice thereof, in which event this Lease will terminate as specified in said notice;

(e) except to the extent prohibited by applicable Law to accelerate and recover from Lessee all Rental and other Monetary Obligations due and owing and scheduled to become due and owing under this Lease both before and after the date of such breach for the entire original scheduled Lease Term;

(f) to recover from Lessee all Costs paid or incurred by Lessor as a result of such breach, regardless of whether or not legal proceedings are actually commenced;

(g) to immediately or at any time thereafter, and with or without notice, at Lessor's sole option but without any obligation to do so, correct such breach or default and charge Lessee all Costs incurred by Lessor therein. Any sum or sums so paid by Lessor, together with interest at the Default Rate, shall be deemed to be Additional Rental hereunder and shall be immediately due from Lessee to Lessor. Any such acts by Lessor in correcting Lessee's breaches or defaults hereunder shall not be deemed to cure said breaches or defaults or constitute any waiver of Lessor's right to exercise any or all remedies set forth herein;

(h) to immediately or at any time thereafter, and with or without notice, except as required herein, set off any money of Lessee held by Lessor under this Lease or any other Transaction Document or any Other Agreement against any sum owing by Lessee hereunder;

(i) to use the Credit Enhancement as described in Section 4.09 hereof;

(j) Without limiting the generality of the foregoing or limiting in any way the rights of Lessor under this Lease or otherwise under applicable Laws, at any time after the occurrence, and during the continuance, of an Event of Default, Lessor shall be

4832-6836-0282.2
STORE/Campbells (Perkins)
Master Lease Agreement
20 Properties
File No. 7210/02-588

entitled to apply for and have a receiver appointed under applicable Law by a court of competent jurisdiction (by ex parte motion for appointment without notice) in any action taken by Lessor to enforce its rights and remedies hereunder in order to protect and preserve Lessor's interest under this Lease or in the Properties and the Personalty, and in connection therewith, LESSEE HEREBY IRREVOCABLY CONSENTS TO AND WAIVES ANY RIGHT TO OBJECT TO OR OTHERWISE CONTEST THE APPOINTMENT OF A RECEIVER AFTER THE OCCURRENCE, AND DURING THE CONTINUANCE, OF AN EVENT OF DEFAULT; and/or

(k)     to seek any equitable relief available to Lessor, including, without limitation, the right of specific performance.

**Section 12.03. Cumulative Remedies**.  All powers and remedies given by Section 12.02 to Lessor, subject to applicable Law, shall be cumulative and not exclusive of one another or of any other right or remedy or of any other powers and remedies available to Lessor under this Lease, by judicial proceedings or otherwise, to enforce the performance or observance of the covenants and agreements of Lessee contained in this Lease, and no delay or omission of Lessor to exercise any right or power accruing upon the occurrence of any Event of Default shall impair any other or subsequent Event of Default or impair any rights or remedies consequent thereto.  Every power and remedy given by this Section or by Law to Lessor may be exercised from time to time, and as often as may be deemed expedient, by Lessor, subject at all times to Lessor's right in its sole judgment to discontinue any work commenced by Lessor or change any course of action undertaken by Lessor.

**Section 12.04. Lessee Waiver**.  Lessee hereby expressly waives, for itself and all Persons claiming by, through and under Lessee, including creditors of all kinds, (a) any right and privilege which Lessee has under any present or future Legal Requirements to redeem the Properties or to have a continuance of this Lease for the Lease Term after termination of Lessee's right of occupancy by order or judgment of any court or by any legal process or writ, or under the terms of this Lease; (b) the benefits of any present or future Legal Requirement that exempts property from liability for debt or for distress for rent; (c) any present or future Legal Requirement relating to notice or delay in levy of execution in case of eviction of a tenant for nonpayment of rent; and (d) any benefits and lien rights which may arise pursuant to any present or future Legal Requirement.

## ARTICLE XIII

## MORTGAGE, SUBORDINATION AND ATTORNMENT

**Section 13.01.  No Liens**.  Lessor's interest in this Lease and/or the Properties shall not be subordinate to any liens or encumbrances placed upon the Properties by or resulting from any act of Lessee, and nothing herein contained shall be construed to require such subordination by Lessor.  NOTICE IS HEREBY GIVEN THAT LESSEE IS NOT AUTHORIZED TO PLACE OR ALLOW TO BE PLACED ANY LIEN, MORTGAGE, DEED OF TRUST, DEED TO SECURE DEBT, SECURITY INTEREST OR ENCUMBRANCE OF ANY KIND UPON ALL OR ANY PART OF THE PROPERTIES OR LESSEE'S LEASEHOLD INTEREST THEREIN, AND ANY SUCH PURPORTED TRANSACTION SHALL BE VOID.

4832-6836-0282.2
STORE/Campbells (Perkins)
Master Lease Agreement
20 Properties
File No. 7210/02-588

**Section 13.02. Subordination**.   This Lease at all times shall automatically be subordinate to the lien of any and all ground leases and Mortgages now or hereafter placed upon any of the Properties by Lessor, and Lessee covenants and agrees to execute and deliver, upon demand, such further instruments subordinating this Lease to the lien of any or all such ground leases and Mortgages as shall be desired by Lessor, or any present or proposed mortgagees under trust deeds, upon the condition that Lessee shall have the right to remain in possession of the Properties under the terms of this Lease, notwithstanding any default in any or all such ground leases or Mortgages, or after the foreclosure of any such Mortgages, so long as no Event of Default shall have occurred and be continuing.

**Section 13.03. Attornment**.  In the event any purchaser or assignee of any Lender at a foreclosure sale acquires title to any of the  Properties, or in the event that any Lender or any purchaser or assignee otherwise succeeds to the rights of Lessor as landlord under this Lease, Lessee shall attorn to Lender or such purchaser or assignee, as the case may be (a "Successor Lessor"), and recognize the Successor Lessor as lessor under this Lease, and, subject to the provisions of this Article XIII, this Lease shall continue in full force and effect as a direct lease between the Successor Lessor and Lessee, provided that the Successor Lessor shall only be liable for any obligations of Lessor under this Lease which accrue after the date that such Successor Lessor acquires title.  The foregoing provision shall be self-operative and effective without the execution of any further instruments.

**Section 13.04. Execution of Additional Documents**.  Although the provisions in this Article XIII shall be self-operative and no future instrument of subordination shall be required, upon request by Lessor, Lessee shall execute and deliver such additional reasonable instruments as may be reasonably required for such purposes.

**Section 13.05. Notice to Lender**.  Lessee shall give written notice to any Lender having a recorded lien upon any of the Properties or any part thereof of which Lessee has been notified of any breach or default by Lessor of any of its obligations under this Lease and give such Lender at least sixty (60) days beyond any notice period to which Lessor might be entitled to cure such default before Lessee may exercise any remedy with respect thereto.

**ARTICLE XIV**

**ASSIGNMENT**

**Section 14.01. Assignment by Lessor**.   As a material inducement to Lessor's willingness to enter into the transactions contemplated by this Lease (the "Transaction") and the other Transaction Documents, Lessee hereby agrees that Lessor may, from time to time and at any time and without the consent of Lessee, engage in all or any combination of the following, or enter into agreements in connection with any of the following or in accordance with requirements that may be imposed by applicable securities, tax or other Laws: (a) the sale, assignment, grant, conveyance, transfer, financing, re-financing, purchase or re-acquisition of all, less than all or any portion of the Properties, this Lease or any other Transaction Document, Lessor's right, title and interest in this Lease or any other Transaction Document, the servicing rights with respect to any of the foregoing, or participations in any of the foregoing; or (b) a Securitization and related transactions.  Without in any way limiting the foregoing, the parties acknowledge and agree that Lessor, in its sole discretion, may assign this Lease or any interest

26

herein to another Person in order to maintain Lessor's or any of its Affiliates' status as a REIT. In the event of any such sale or assignment other than a security assignment, Lessee shall attorn to such purchaser or assignee (so long as Lessor and such purchaser or assignee notify Lessee in writing of such transfer and such purchaser or assignee expressly assumes in writing the obligations of Lessor hereunder from and after the date of such assignment).  At the request of Lessor, Lessee will execute such documents confirming the sale, assignment or other transfer and such other agreements as Lessor may reasonably request, provided that the same do not increase the liabilities and obligations of Lessee hereunder.  Lessor shall be relieved, from and after the date of such transfer or conveyance, of liability for the performance of any obligation of Lessor contained herein, except for obligations or liabilities accrued prior to such assignment or sale.

Section 14.02.  Assignment by Lessee.

(a)  **No Assignment by Lessee**.  Lessee acknowledges that Lessor has relied both on the business experience and creditworthiness of Lessee and upon the particular purposes for which Lessee intends to use the Properties in entering into this Lease.  Lessee shall not assign, transfer, convey, pledge or mortgage this Lease or any interest herein or any interest in Lessee, whether by operation of Law or otherwise, without the prior written consent of Lessor.  At the time of any assignment of this Lease which is approved by Lessor, the assignee shall assume all of the obligations of Lessee under this Lease pursuant to a written assumption agreement in form and substance reasonably acceptable to Lessor.  Such assignment of this Lease pursuant to this Section 14.02 shall not relieve Lessee of its obligations respecting this Lease unless otherwise agreed to by Lessor.  Any assignment, transfer, conveyance, pledge or mortgage in violation of this Section 14.02 shall be voidable at the sole option of Lessor. Any consent to an assignment given by Lessor hereunder shall not be deemed a consent to any subsequent assignment.

(b)  **Permitted Assignment**.  Notwithstanding anything to the contrary contained in this Section 14.02 and provided that no Event of Default has occurred and is continuing at the time of the proposed assignment or other transfer, and provided further that any assignee agrees to assume all of Lessee's obligations under this Lease by written agreement approved by Lessor, Lessee shall have the right to assign or otherwise transfer all, but not less than all, of its interest in, to and under this Lease without Lessor's consent to a Qualified Operator.  A "Qualified Operator" shall mean a Person who (x) for two (2) consecutive years immediately prior to the date of assignment or transfer and (y) on a proforma basis following the consummation of such assignment or transfer (all as determined by Lessor upon review of financial statements provided by the assignee prior to the proposed lease assignment and in a form reasonably satisfactory to Lessor), (A) has a CFCCR (defined below) of at least 1.50x; and (B) has a Lease Adjusted Leverage (defined below) of no more than 5.50x; *provided, however,* that Lessee may satisfy the foregoing conditions of a Qualified Operator by providing, or causing to be provided, a guaranty agreement, in form and substance reasonably acceptable to and approved by Lessor, in writing, which guaranty shall be from an entity that meets the requirements of (A), (B) and (C) set forth in this Section 14.02.  Lessee shall provide Lessor with at least thirty (30) days' prior written notice of the proposed assignment to a Qualified Operator, which notice must include financial information

4832-6836-0282.2
STORE/Campbells (Perkins)
Master Lease Agreement
20 Properties
File No. 7210/02-588

satisfying the Qualified Operator requirements set forth herein. In the event that Lessee effects an assignment to a Qualified Operator, Lessee shall be released from any liability arising under this Lease from and after the date of such assignment and Guarantor shall be released from any liability arising under the Guaranty from and after the date of such assignment.

For purposes hereof:

"*CFCCR*" means with respect to the twelve month period of time immediately preceding the date of determination, the ratio calculated for such period of time, each as determined in accordance with GAAP, of (i) the sum of Consolidated Net Income (excluding non-cash income), Depreciation and Amortization, Interest Expense, income taxes, Operating Lease Expense and non-cash expenses to (ii) the sum of Operating Lease Expense (excluding non-cash rent adjustments), scheduled principal payments of long term Debt, scheduled maturities of all Capital Leases, dividends and Interest Expense (excluding non-cash interest expense and amortization of non-cash financing expenses). For purposes of calculating the CFCCR, the following terms shall be defined as set forth below:

"*Capital Lease*" shall mean all leases of any property, whether real, personal or mixed, by a Person, which leases would, in conformity with GAAP, be required to be accounted for as a capital lease on the balance sheet of such Person. The term "Capital Lease" shall not include any operating lease.

"*Consolidated Net Income*" shall mean with respect to the period of determination, the net income or net loss of a Person. In determining the amount of Consolidated Net Income, (i) adjustments shall be made for nonrecurring gains and losses or non-cash items allocable to the period of determination, (ii) deductions shall be made for, among other things, Depreciation and Amortization, Interest Expense, Operating Lease Expense, and (iii) no deductions shall be made for income taxes or charges equivalent to income taxes allocable to the period of determination, as determined in accordance with GAAP.

"*Debt*" shall mean with respect to a Person, and for the period of determination (i) indebtedness for borrowed money, (ii) subject to the limitation set forth in sub item (iv) below, obligations evidenced by bonds, indentures, notes or similar instruments, (iii) obligations under leases which should be, in accordance with GAAP, recorded as Capital Leases, and (iv) obligations under direct or indirect guarantees in respect of, and obligations (contingent or otherwise) to purchase or otherwise acquire, or otherwise to assure a creditor against loss in respect of, indebtedness or obligations of others of the kinds referred to in clauses (i) through (iv) above, except for guaranty obligations of such Person, which, in conformity with GAAP, are not included on the balance sheet of such Person.

"*Depreciation and Amortization*" shall mean the depreciation and amortization accruing during any period of determination with respect to a Person, as determined in accordance with GAAP.

4832-6836-0282.2
STORE/Campbells (Perkins)
Master Lease Agreement
20 Properties
File No. 7210/02-588

"*Interest Expense*" shall mean for any period of determination, the sum of all interest accrued or which should be accrued in respect of all Debt of a Person, as determined in accordance with GAAP.

"*Operating Lease Expense*" shall mean the sum of all payments and expenses incurred by a Person, under any operating leases during the period of determination, as determined in accordance with GAAP.

"*EBITDA*" means for the twelve (12) month period ending on the date of determination, the sum of a Person's net income (loss) for such period plus, in each case to the extent previously deducted in calculating net income (loss): (i) income taxes, (ii) interest payments on all of its debt obligations (including any borrowings under short term credit facilities), (iii) all non-cash charges including depreciation and amortization, and (iv) Non-Recurring Items (defined below).

"*EBITDAR*" means the sum of a Person's EBITDA and its total land and building rent for the twelve (12) month period ending on the date of determination.

"*Lease Adjusted Leverage*" means with respect to a Person, as of any applicable date, the sum of (i) ten (10) times such Person's total land and building rent for the twelve (12) month period ending on the date of determination, and (ii) the total current balance of such Person's total debt obligations (including any borrowings under short term credit facilities) on such date, divided by EBITDAR.

"*Non-Recurring Items*" shall mean with respect to a Person, items of the sum (whether positive or negative) of revenue minus expenses that, in the judgment of Lessor, are unusual in nature, occur infrequently and are not representative of the ongoing or future earnings or expenses of such Person.

**Section 14.03. No Sale of Assets**. Without the prior written consent of Lessor, Lessee shall not sell all or substantially all of Lessee's assets. Any sale of Lessee's assets in violation of this Section 14.03, shall be voidable at the sole option of Lessor. Any consent to a sale of Lessee's assets given by Lessor hereunder shall not be deemed a consent to any subsequent sale of Lessee's assets.

**Section 14.04. No Subletting**. Lessee shall not sublet any or all of the Properties without the prior written consent of Lessor, which may be withheld by Lessor in its sole discretion and any such purported subletting shall be void.

## ARTICLE XV

## NOTICES

**Section 15.01. Notices**. All notices, demands, designations, certificates, requests, offers, consents, approvals, appointments and other instruments given pursuant to this Lease shall be in writing and given by any one of the following: (a) hand delivery; (b) express overnight delivery service; (c) certified or registered mail, return receipt requested; or (d) email transmission, and shall be deemed to have been delivered upon (i) receipt, if hand delivered;

29

(ii) the next Business Day, if delivered by a reputable express overnight delivery service; (iii) the third Business Day following the day of deposit of such notice with the United States Postal Service, if sent by certified or registered mail, return receipt requested; or (iv) transmission, if delivered by email transmission.  Notices shall be provided to the parties and addresses (or electronic mail addresses) specified below:

| | |
|---|---|
| If to Lessee: | 5171 Campbells Land Co., Inc. |
| | 6201 Steubenville Pike, Suite 100 |
| | McKees Rocks, PA  15136 |
| | Attention:  William Kane |
| | Email: wtkane25@gmail.com |
| | |
| If to Lessor: | STORE Master Funding XIII, LLC |
| | 8377 E. Hartford Drive, Suite 100 |
| | Scottsdale, AZ 85255 |
| | Attention:  Michael T. Bennett |
| | Executive Vice President – General Counsel |
| | Email: mbennett@storecapital.com |
| | |
| With a copy to: | Kutak Rock LLP |
| | 1801 California Street, Suite 3000 |
| | Denver, CO 80202 |
| | Attention:  Nathan Humphrey, Esq. and |
| | Kelly Reynoldson, Esq. |
| | Email: nathan.humphrey@kutakrock.com and |
| | kelly.reynoldson@kutakrock.com |

or to such other address or such other person as either party may from time to time hereafter specify to the other party in a notice delivered in the manner provided above.

## ARTICLE XVI

## LANDLORD'S LIEN / SECURITY INTEREST

**Section 16.01. Landlord's Lien and Security Interest**.  Lessee agrees that Lessor shall have a landlord's lien, and Lessee additionally hereby separately grants to Lessor a first and prior security interest, in, on and against all of Lessee's right, title and interest in, to and under all Personalty, which lien and security interest shall secure the payment of all Rental and other Monetary Obligations payable by Lessee to Lessor under the terms hereof and all other obligations of Lessee to Lessor under this Lease.  Lessee agrees that Lessor may file such documents as Lessor then deems appropriate or necessary to perfect and maintain said lien and security interest, and expressly acknowledges and agrees that, in addition to any and all other rights and remedies of Lessor whether hereunder or at Law or in equity, in the Event of Default of Lessee hereunder, Lessor shall have any and all rights and remedies granted a secured party under the Uniform Commercial Code then in effect in the states where the Properties are located.  Lessee covenants to promptly notify Lessor of any changes in Lessee's name and/or organizational structure which may necessitate the execution and filing of

30

additional financing statements; *provided, however*, the foregoing shall not be construed as Lessor's consent to such changes.

Lessee hereby ratifies its authorization for Lessor or any of its Affiliates to have filed in any Uniform Commercial Code jurisdiction any initial financing statement and any amendments thereto covering the Personalty pledged herein, if filed prior to the Effective Date.

## ARTICLE XVII

## MISCELLANEOUS

**Section 17.01. Force Majeure**.   Any prevention, delay or stoppage due to strikes, lockouts, acts of God, enemy or hostile governmental action, civil commotion, fire or other casualty beyond the control of the party obligated to perform (each, a "Force Majeure Event") shall excuse the performance by such party for a period equal to any such prevention, delay or stoppage, expressly excluding, however, the obligations imposed upon Lessee with respect to Rental and other Monetary Obligations to be paid hereunder.

**Section 17.02.  No Merger**.  There shall be no merger of this Lease nor of the leasehold estate created by this Lease with the fee estate in or ownership of any of the Properties by reason of the fact that the same person, corporation, firm or other entity may acquire or hold or own, directly or indirectly, (a) this Lease or the leasehold estate created by this Lease or any interest in this Lease or in such leasehold estate, and (b) the fee estate or ownership of any of the Properties or any interest in such fee estate or ownership.  No such merger shall occur unless and until all persons, corporations, firms and other entities having any interest in (i) this Lease or the leasehold estate created by this Lease, and (ii) the fee estate in or ownership of the Properties or any part thereof sought to be merged shall join in a written instrument effecting such merger and shall duly record the same.

**Section 17.03.  Interpretation**.  Lessor and Lessee acknowledge and warrant to each other that each has been represented by independent counsel and has executed this Lease after being fully advised by said counsel as to its effect and significance. This Lease shall be interpreted and construed in a fair and impartial manner without regard to such factors as the party which prepared the instrument, the relative bargaining powers of the parties or the domicile of any party.  Whenever in this Lease any words of obligation or duty are used, such words or expressions shall have the same force and effect as though made in the form of a covenant.

**Section 17.04.  Characterization.**  The following expressions of intent, representations, warranties, covenants, agreements, stipulations and waivers are a material inducement to Lessor entering into this Lease:

(a)     Lessor and Lessee intend that (i) this Lease constitutes an unseverable, unitary and single lease of all, but not less than all, of the Properties, and, if at any time this Lease covers other real property in addition to the Properties, neither this Lease, nor Lessee's obligations or rights hereunder may be allocated or otherwise divided among such properties by Lessee; (ii) this Lease is a "true lease," is not a financing lease, capital lease, mortgage, equitable mortgage, deed of trust, trust agreement, security

31

4832-6836-0282.2
STORE/Campbells (Perkins)
Master Lease Agreement
20 Properties
File No. 7210/02-588

agreement or other financing or trust arrangement, and the economic realities of this Lease are those of a true lease; and (iii) the business relationship created by this Lease and any related documents is solely that of a long-term commercial lease between Lessor and Lessee, the Lease has been entered into by both parties in reliance upon the economic and legal bargains contained herein, and none of the agreements contained herein is intended, nor shall the same be deemed or construed, to create a partnership (*de facto* or *de jure*) between Lessor and Lessee, to make them joint venturers, to make Lessee an agent, legal representative, partner, subsidiary or employee of Lessor, nor to make Lessor in any way responsible for the debts, obligations or losses of Lessee.

(b)     Lessor and Lessee covenant and agree that: (i) each will treat this Lease as an operating lease pursuant to Statement of Financial Accounting Standards No. 13, as amended, and as a true lease for state Law reporting purposes and for federal income tax purposes; (ii) each party will not, nor will it permit any Affiliate to, at any time, take any action or fail to take any action with respect to the preparation or filing of any statement or disclosure to Governmental Authority, including without limitation, any income tax return (including an amended income tax return), to the extent that such action or such failure to take action would be inconsistent with the intention of the parties expressed in this Section 17.04; (iii) with respect to the Properties, the Lease Term is less than seventy-five percent (75%) of the estimated remaining economic life of the Properties; and (iv) the Base Annual Rental is the fair market value for the use of the Properties and was agreed to by Lessor and Lessee on that basis, and the execution and delivery of, and the performance by Lessee of its obligations under, this Lease do not constitute a transfer of all or any part of the Properties.

(c)     Lessee waives any claim or defense based upon the characterization of this Lease as anything other than a true lease and as a master lease of all of the Properties.  Lessee stipulates and agrees (i) not to challenge the validity, enforceability or characterization of the lease of the Properties as a true lease and/or as a single, unitary, unseverable instrument pertaining to the lease of all, but not less than all, of the Properties; and (ii) not to assert or take or omit to take any action inconsistent with the agreements and understandings set forth in this Section 17.04.

**Section 17.05.  Disclosures**.

(a)     ***Securities Act or Exchange Act***.   The parties agree that, notwithstanding any provision contained in this Lease, any party (and each employee, representative or other agent of any party) may disclose to any and all persons, without limitation of any kind, any matter required under the Securities Act or the Exchange Act.

(b)     ***Lessor Advertising and Related Publications***.   Lessee hereby consents to the use by Lessor of, and Lessor is hereby expressly permitted to use, Lessee's name, trademarks, logos, pictures of stores and signage, and basic Transaction information (collectively "Lessee's Information") solely in connection with Lessor's sales, advertising, and press release materials, including on Lessor's website.  Lessee's consent shall be deemed authorization for the limited use of Lessee's Information by Lessor under all applicable copyright and trademark laws.

32

(c)    **Public Disclosures.**  Except as required by Law, Lessee shall not make any public disclosure, including press releases or any form of media release, of this Lease Agreement or any transactions relating hereto without the prior written consent of Lessor.

**Section 17.06. Attorneys' Fees**.  In the event of any judicial or other adversarial proceeding concerning this Lease, to the extent permitted by Law, the prevailing party shall be entitled to recover all of its reasonable attorneys' fees and other Costs in addition to any other relief to which it may be entitled.  In addition, the prevailing party shall, upon demand, be entitled to all attorneys' fees and all other Costs incurred in the preparation and service of any notice or demand hereunder, whether or not a legal action is subsequently commenced.

**Section 17.07. Memoranda of Lease**.  Concurrently with the execution of this Lease, Lessor and Lessee are executing Lessor's standard form memorandum of lease in recordable form, indicating the names and addresses of Lessor and Lessee, a description of the Properties, the Lease Term, but omitting Rentals and such other terms of this Lease as Lessor may not desire to disclose to the public.  Further, upon Lessor's request, Lessee agrees to execute and acknowledge a termination of lease and/or quitclaim deed in recordable form to be held by Lessor until the expiration or sooner termination of the Lease Term; *provided, however,* if Lessee shall fail or refuse to sign such a document in accordance with the provisions of this Section within ten (10) days following a request by Lessor, Lessee irrevocably constitutes and appoints Lessor as its attorney-in-fact to execute and record such document, it being stipulated that such power of attorney is coupled with an interest and is irrevocable and binding.

**Section 17.08.  No Brokerage**.  Lessor and Lessee represent and warrant to each other that they have had no conversation or negotiations with any broker concerning the leasing of the Properties.  Each of Lessor and Lessee agrees to protect, indemnify, save and keep harmless the other, against and from all liabilities, claims, losses, Costs, damages and expenses, including attorneys' fees, arising out of, resulting from or in connection with their breach of the foregoing warranty and representation.

**Section 17.09.  Waiver of Jury Trial and Certain Damages**.  LESSOR AND LESSEE HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE THE RIGHT EITHER MAY HAVE TO A TRIAL BY JURY WITH RESPECT TO ANY AND ALL ISSUES PRESENTED IN ANY ACTION, PROCEEDING, CLAIM OR COUNTERCLAIM BROUGHT BY EITHER OF THE PARTIES HERETO AGAINST THE OTHER OR ITS SUCCESSORS WITH RESPECT TO ANY MATTER ARISING OUT OF OR IN CONNECTION WITH THIS LEASE, THE RELATIONSHIP OF LESSOR AND LESSEE, LESSEE'S USE OR OCCUPANCY OF THE PROPERTIES, AND/OR ANY CLAIM FOR INJURY OR DAMAGE, OR ANY EMERGENCY OR STATUTORY REMEDY.  THIS WAIVER BY THE PARTIES HERETO OF ANY RIGHT EITHER MAY HAVE TO A TRIAL BY JURY HAS BEEN NEGOTIATED AND IS AN ESSENTIAL ASPECT OF THEIR BARGAIN.   FURTHERMORE, LESSOR AND LESSEE HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE THE RIGHT EITHER MAY HAVE TO SEEK PUNITIVE, CONSEQUENTIAL, SPECIAL AND INDIRECT DAMAGES FROM THE OTHER PARTY AND ANY OF THE AFFILIATES, OFFICERS, DIRECTORS, MEMBERS, MANAGERS OR EMPLOYEES OF LESSOR OR LESSEE, AS APPLICABLE, OR ANY OF THEIR SUCCESSORS WITH RESPECT TO ANY AND ALL ISSUES PRESENTED IN ANY ACTION, PROCEEDING, CLAIM OR COUNTERCLAIM BROUGHT WITH RESPECT TO ANY

4832-6836-0282.2
STORE/Campbells (Perkins)
Master Lease Agreement
20 Properties
File No. 7210/02-588

MATTER ARISING OUT OF OR IN CONNECTION WITH THIS LEASE OR ANY DOCUMENT CONTEMPLATED HEREIN OR RELATED HERETO.   THE WAIVER BY LESSOR AND LESSEE OF ANY RIGHT EITHER MAY HAVE TO SEEK PUNITIVE, CONSEQUENTIAL, SPECIAL AND INDIRECT DAMAGES HAS BEEN NEGOTIATED BY THE PARTIES HERETO AND IS AN ESSENTIAL ASPECT OF THEIR BARGAIN.

Section 17.10.  Securitizations.  As a material inducement to Lessor's willingness to enter into the Transactions contemplated by this Lease and the other Transaction Documents, Lessee hereby acknowledges and agrees that Lessor may, from time to time and at any time (a) advertise, issue press releases, send direct mail or otherwise disclose information regarding the Transaction for marketing purposes; and (b) (i) act or permit another Person to act as sponsor, settler, transferor or depositor of, or a holder of interests in, one or more Persons or other arrangements formed pursuant to a trust agreement, indenture, pooling agreement, participation agreement, sale and servicing agreement, limited liability company agreement, partnership agreement, articles of incorporation or similar agreement or document; and (ii) permit one or more of such Persons or arrangements to offer and sell stock, certificates, bonds, notes, other evidences of indebtedness or securities that are directly or indirectly secured, collateralized or otherwise backed by or represent a direct or indirect interest in whole or in part in any of the assets, rights or properties described in Section 14.01 of this Lease, in one or more Persons or arrangements holding such assets, rights or properties, or any of them (collectively, the "Securities") whether any such Securities are privately or publicly offered and sold, or rated or unrated (any combination of which actions and transactions described in both clauses (i) and (ii) in this paragraph, whether proposed or completed, are referred to in this Lease as a "Securitization").  Lessee shall cooperate fully with Lessor and any Affected Party with respect to all reasonable requests and due diligence procedures and use reasonable efforts to facilitate such Securitization, provided that such cooperation shall be at no additional cost or expense to Lessee so long as Lessee is not otherwise required to provide such information to Lessor pursuant to the other provisions of this Lease.

Section 17.11.  State-Specific Provisions.  The provisions and/or remedies which are set forth on the attached Exhibit D shall be deemed a part of and included within the terms and conditions of this Lease.

Section 17.12.  Time is of the Essence; Computation.  Time is of the essence with respect to each and every provision of this Lease.  If any deadline provided herein falls on a non-Business Day, such deadline shall be extended to the next day that is a Business Day.

Section 17.13.  Waiver and Amendment.  No provision of this Lease shall be deemed waived or amended except by a written instrument unambiguously setting forth the matter waived or amended and signed by the party against which enforcement of such waiver or amendment is sought.  Waiver of any matter shall not be deemed a waiver of the same or any other matter on any future occasion.  No acceptance by Lessor of an amount less than the Rental and other Monetary Obligations stipulated to be due under this Lease shall be deemed to be other than a payment on account of the earliest such Rental or other Monetary Obligations then due or in arrears nor shall any endorsement or statement on any check or letter accompanying any such payment be deemed a waiver of Lessor's right to collect any unpaid amounts or an accord and satisfaction.

4832-6836-0282.2
STORE/Campbells (Perkins)
Master Lease Agreement
20 Properties
File No. 7210/02-588

**Section 17.14.  Successors Bound**.  Except as otherwise specifically provided herein, the terms, covenants and conditions contained in this Lease shall bind and inure to the benefit of the respective heirs, successors, executors, administrators and assigns of each of the parties hereto.

**Section 17.15.  Captions**.  Captions are used throughout this Lease for convenience of reference only and shall not be considered in any manner in the construction or interpretation hereof.

**Section 17.16.  Other Documents**.  Each of the parties agrees to sign such other and further documents as may be necessary or appropriate to carry out the intentions expressed in this Lease.

**Section 17.17.  Entire  Agreement**.    This  Lease  and  any  other  instruments  or agreements referred to herein, constitute the entire agreement between the parties with respect to the subject matter hereof, and there are no other representations, warranties or agreements except as herein provided.

**Section 17.18.  Forum Selection; Jurisdiction; Venue; Choice of Law**.  For purposes of any action or proceeding arising out of this Lease, the parties hereto expressly submit to the jurisdiction of all federal and state courts located in the state or states where the Properties are located.  Lessee consents that it may be served with any process or paper by registered mail or by personal service within or without the state or states where the Properties are located in accordance with applicable Law.  Furthermore, Lessee waives and agrees not to assert in any such action, suit or proceeding that it is not personally subject to the jurisdiction of such courts, that the action, suit or proceeding is brought in an inconvenient forum or that venue of the action, suit or proceeding is improper.  This Lease shall be governed by, and construed with, the Laws of the applicable state or states in which the Properties are located, without giving effect to any state's conflict of Laws principles.

**Section 17.19.  Counterparts**.    This  Lease  may  be  executed  in  one  or  more counterparts, each of which shall be deemed an original.  Furthermore, the undersigned agree that transmission of this Lease via e-mail in a ".pdf" or other electronic format shall be deemed transmission of the original Lease for all purposes.

*[Remainder of page intentionally left blank; signature page(s) to follow]*

4832-6836-0282.2
STORE/Campbells (Perkins)
Master Lease Agreement
20 Properties
File No. 7210/02-588

**IN WITNESS WHEREOF**, Lessor and Lessee have entered into this Lease as of the date first above written.

**LESSOR:**

**STORE MASTER FUNDING XIII, LLC**, a Delaware limited liability company

By: _____

Printed Name: _____Michael T. Bennett_____

Title: _____Executive Vice President_____
_____General Counsel_____

STATE OF ARIZONA              )
                              ) ss.
COUNTY OF MARICOPA            )

     Before me, the undersigned, a Notary Public of the State and County aforesaid, personally appeared _____Michael T. Bennett_____, with whom I am personally acquainted (or proved to me to be on the basis of satisfactory evidence), and who, upon oath, acknowledged himself/herself to be the _____EVP_____ of **STORE MASTER FUNDING XIII, LLC**, a Delaware limited liability company, the within named Lessor, and that he/she as such officer, being authorized so to do, executed the within instrument for the purposes therein contained, by signing the name of _STORE Master Funding XIII, LLC_ by himself/herself as such officer.

WITNESS my hand and Official Seal at office, this _30th_ day of _January_, 2018.

_____
Notary Public

My Commission Expires _8/8/2019_

DONYA NANETTE DERUITER
Notary Public, State of Arizona
Maricopa County
My Commission Expires
August 08, 2019

4832-6836-0282.2
STORE/Campbells (Perkins)
Master Lease Agreement
20 Properties
File No. 7210/02-588

**IN WITNESS WHEREOF**, Lessor and Lessee have entered into this Lease as of the date first above written.

LESSEE:

**5171 CAMPBELLS LAND CO., INC.**, a
Pennsylvania corporation

By: _William T Kane_

Printed Name: _William T Kane_

Title: _President_

STATE OF _Pennsylvania_ )
                                            ) ss.
COUNTY OF _Allegheny_ )

Before me, the undersigned, a Notary Public of the State and County aforesaid, personally appeared _William Kane_, with whom I am personally acquainted (or proved to me to be on the basis of satisfactory evidence), and who, upon oath, acknowledged himself/herself to be the _President_ of **5171 CAMPBELLS LAND CO., INC.**, a Pennsylvania corporation, the within named Lessee, a _Corporation_, and that he/she as such officer, being authorized so to do, executed the within instrument for the purposes therein contained, by signing the name of _the Corporation_ by himself/herself as such officer.

WITNESS my hand and Official Seal at office, this _30th_ day of _January_, 2018.

_Rosanne M Penn_
Notary Public

My Commission Expires _9/13/20_

COMMONWEALTH OF PENNSYLVANIA
NOTARIAL SEAL
Rosanne M. Penn, Notary Public
City of Pittsburgh, Allegheny County
My Commission Expires Sept. 13, 2020
MEMBER, PENNSYLVANIA ASSOCIATION OF NOTARIES

4832-6836-0282.2
STORE/Campbells (Perkins)
Master Lease Agreement
17 Properties
File No. 7210/02-588

**EXHIBITS**

Exhibit A:                    Defined Terms

Exhibit B:                    Legal Descriptions and Street Addresses of the Properties

Exhibit C:                    Authorization Agreement – Pre-Arranged Payments

Exhibit D:                    State-Specific Provisions

Schedule 9.03             Supplemental Financial Information

**EXHIBIT A**

**DEFINED TERMS**

The following terms shall have the following meanings for all purposes of this Lease:

"*Additional Rental*" has the meaning set forth in Section 4.03.

"*Adjustment Date*" has the meaning set forth in Section 1.07.

"*Affected Party*" means each direct or indirect participant or investor in a proposed or completed Securitization, including, without limitation, any prospective owner, any rating agency or any party to any agreement executed in connection with the Securitization.

"*Affiliate*" means any Person which directly or indirectly controls, is under common control with or is controlled by any other Person.  For purposes of this definition, "controls," "under common control with," and "controlled by" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities or otherwise.

"*Anti-Money Laundering Laws*" means all applicable Laws, regulations and government guidance on the prevention and detection of money laundering, including, without limitation, (a) 18 U.S.C. §§ 1956 and 1957; and (b) the Bank Secrecy Act, 31 U.S.C. §§ 5311 et seq., and its implementing regulations, 31 CFR Part 103.

"*Base Annual Rental*" has the meaning set forth in Section 1.05.

"*Base Monthly Rental*" means an amount equal to 1/12 of the applicable Base Annual Rental.

"*Business Day*" means a day on which banks located in Scottsdale, Arizona are not required or authorized to remain closed.

"*Casualty*" means any loss of or damage to any property included within or related to the Properties or arising from an adjoining property caused by an Act of God, fire, flood or other catastrophe.

"*Code*" means the Internal Revenue Code of 1986, as the same may be amended from time to time.

"*Condemnation*" means a Taking and/or a Requisition.

"*Costs*" means all reasonable costs and expenses incurred by a Person, including, without limitation, reasonable attorneys' fees and expenses, court costs, expert witness fees, costs of tests and analyses, travel and accommodation expenses, deposition and trial transcripts, copies and other similar costs and fees, brokerage fees, escrow fees, title insurance

A-1

premises, appraisal fees, stamp taxes, recording fees and transfer taxes or fees, as the circumstances require.

*"Credit Enhancement"* has the meaning set forth in Section 4.09.

"*Default Rate*" means 18% per annum or the highest rate permitted by Law, whichever is less.

"*Effective Date*" has the meaning set forth in the introductory paragraph of this Lease.

"*Environmental Laws*" means federal, state and local Laws, ordinances, common law requirements and regulations and standards, rules, policies and other governmental requirements, administrative rulings and court judgments and decrees having the effect of Law in effect now or in the future and including all amendments, that relate to Hazardous Materials, Regulated Substances, USTs, and/or the protection of human health or the environment, or relating to liability for or Costs of Remediation or prevention of Releases, and apply to Lessee and/or the Properties.

"*Environmental Liens*" means any liens and other encumbrances imposed pursuant to any Environmental Law.

"*Environmental Policy*" means a pollution legal liability insurance policy issued by an environmental insurer reasonably acceptable to Lessor and Lessor's lender, which Environmental Policy shall be in form and substance satisfactory to Lessor and shall be in amounts of not less than $1,000,000.00 per occurrence and $2,000,000.00 annual aggregate for losses caused by known and unknown pollution conditions that arise from the operations of the tenant, their contractors, or their sub-contractors, with coverage to include: (a) bodily injury or death, (b) property damage, including physical injury to or destruction of tangible property, (c) clean-up costs, and (d) defense, including costs, charges and expenses incurred in the investigation, adjustment or defense of claims for damages.

"*Event of Default*" has the meaning set forth in Section 12.01.

"*Exchange Act*" means the Securities Exchange Act of 1934, as amended.

"*Extension Option*" has the meaning set forth in Section 3.02.

"*Extension Term*" has the meaning set forth in Section 3.02.

"*Force Majeure Event*" has the meaning set forth in Section 17.01.

"*Franchise Agreement*" has the meaning set forth in Section 5.08.

"*Franchisor*" means Perkins Restaurant and Bakery, a Delaware corporation, or its successors and permitted assigns.

"*GAAP*" means generally accepted accounting principles, consistently applied from period to period.

4832-6836-0282.2
STORE/Campbells (Perkins)
Master Lease Agreement
20 Properties
File No. 7210/02-588

"*Governmental Authority*" means any governmental authority, agency, department, commission, bureau, board, instrumentality, court or quasi-governmental authority of the United States, any state or any political subdivision thereof with authority to adopt, modify, amend, interpret, give effect to or enforce any federal, state and local Laws, statutes, ordinances, rules or regulations, including common law, or to issue court orders.

"*Guarantor*" means collectively, William Kane, Frank Kane and Ron Linaburg or any additional or replacement guarantor(s) approved by Lessor in its sole and absolute discretion.

"*Guaranty*" means that certain Unconditional Guaranty of Payment and Performance dated as of the date hereof given by Guarantor for the benefit of Lessor, as the same may be amended from time to time.

"*Hazardous Materials*" includes: (a) oil, petroleum products, flammable substances, explosives, radioactive materials, hazardous wastes or substances, toxic wastes or substances or any other materials, contaminants or pollutants, the presence of which causes any of the Properties to be in violation of any local, state or federal Law or regulation, or Environmental Law, or are defined as or included in the definition of "hazardous substances," "hazardous wastes," "hazardous materials," "toxic substances," "contaminants," "pollutants," or words of similar import under any applicable local, state or federal Law or under the regulations adopted, orders issued, or publications promulgated pursuant thereto, including, but not limited to: (i) the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, 42 U.S.C. § 9601, et seq.; (ii) the Hazardous Materials Transportation Act, as amended, 49 U.S.C. § 5101, et seq.; (iii) the Resource Conservation and Recovery Act, as amended, 42 U.S.C. § 6901, et seq.; and (iv) regulations adopted and publications promulgated pursuant to the aforesaid Laws; (b) asbestos in any form which is friable, urea formaldehyde foam insulation, transformers or other equipment which contain dielectric fluid containing levels of polychlorinated biphenyls in excess of fifty (50) parts per million; (c) underground storage tanks; and (d) any other chemical, material or substance, exposure to which is prohibited, limited or regulated by any Governmental Authority.

"*Indemnified Parties*" means Lessor, its members, managers, officers, directors, shareholders, partners, employees, affiliates, subsidiaries, successors and assigns, including, but not limited to, any successors by merger, consolidation or acquisition of all or a substantial portion of the assets and business of Lessor.

"*Initial Term*" has the meaning set forth in Section 3.01.

"*Insolvency Event*" means (a) a Person's (i) failure to generally pay its debts as such debts become due; (ii) admitting in writing its inability to pay its debts generally; or (iii) making a general assignment for the benefit of creditors; (b) any proceeding being instituted by or against any Person (i) seeking to adjudicate it bankrupt or insolvent; (ii) seeking liquidation, dissolution, winding up, reorganization, arrangement, adjustment, protection, relief, or composition of it or its debts under any Law relating to bankruptcy, insolvency, or reorganization or relief of debtors; or (iii) seeking the entry of an order for relief or the appointment of a receiver, trustee, or other similar official for it or for any substantial part of its property, and in the case of any such proceeding instituted against any Person, either such proceeding shall remain undismissed for a period of one hundred twenty (120) days or any of the actions sought in such proceeding shall

A-3

occur; or (c) any Person taking any corporate action to authorize any of the actions set forth above in this definition.

"*Insurance Premiums*" has the meaning in Section 6.05.

"*Law(s)*" means any constitution, statute, rule of law, code, ordinance, order, judgment, decree, injunction, rule, regulation, policy, requirement or administrative or judicial determination, even if unforeseen or extraordinary, of every duly constituted Governmental Authority, court or agency, now or hereafter enacted or in effect.

"*Leasehold Property*" or "*Leasehold Properties*" mean, individually and collectively, those Properties located at (i) 19 Greenville Plaza, Greenville, PA 16125; (ii) 3334 Wilmington Road, New Castle, PA 16105; and (iii) 3870 Elm Road NE, Warren, OH 44483.

"*Lease Rate*" means a percentage equal to (a) the then-current Base Monthly Rental multiplied by twelve (12), divided by (b) the aggregate purchase price of all of the Properties paid by Lessor (or Lessor's predecessor-in-interest).

"*Lease Term*" has the meaning described in Section 3.01.

"*Legal Requirements*" means the requirements of all present and future Laws (including, without limitation, Environmental Laws and Laws relating to accessibility to, usability by, and discrimination against, disabled individuals), all judicial and administrative interpretations thereof, including any judicial order, consent, decree or judgment, and all covenants, restrictions and conditions now or hereafter of record which may be applicable to Lessee or to any of the Properties, or to the use, manner of use, occupancy, possession, operation, maintenance, alteration, repair or restoration of any of the Properties, even if compliance therewith necessitates structural changes or improvements or results in interference with the use or enjoyment of any of the Properties.

"*Lender*" means any lender in connection with any loan secured by Lessor's interest in any or all of the Properties, and any servicer of any loan secured by Lessor's interest in any or all of the Properties.

"*Lessee Entity*" or "*Lessee Entities*" means individually or collectively, as the context may require, Lessee and Guarantor, and all Affiliates thereof.

"*Lessee Reporting Entities*" means Lessee.

"*Lessee's Information*" has the meaning set forth in Section 17.05(b).

"*Lessor Entity*" or "*Lessor Entities*" means individually or collectively, as the context may require, Lessor and all Affiliates of Lessor.

"*Letter of Credit*" has the meaning set forth in Section 4.09.

"*Losses*" means any and all claims, suits, liabilities (including, without limitation, strict liabilities), actions, proceedings, obligations, debts, damages, losses, Costs, diminutions in

value, fines, penalties, interest, charges, fees, judgments, awards, amounts paid in settlement and damages of whatever kind or nature, inclusive of bodily injury and property damage to third parties (including, without limitation, attorneys' fees and other Costs of defense).

"*Master Environmental Policy*" means a master environmental insurance policy maintained by Lessor (or any Affiliate thereof) that covers other real property owned by Lessor (or any Affiliate thereof).

"*Material Adverse Effect*" means a material adverse effect on (a) any Property, including without limitation, the operation of any Property as a Permitted Facility and/or the value of any Property; (b) the contemplated business, condition, worth or operations of any Lessee Entity; (c) Lessee's ability to perform its obligations under this Lease; (d) Lessor's interests in any of the Properties, this Lease or the other Transaction Documents; or (e) any Guarantor's ability to perform its obligations under the Guaranty.

"*Monetary Obligations*" means all Rental and all other sums payable or reimbursable by Lessee under this Lease to Lessor, to any third party on behalf of Lessor, or to any Indemnified Party.

"*Mortgages*" means, collectively, the mortgages, deeds of trust or deeds to secure debt, assignments of rents and leases, security agreements and fixture filings executed by Lessor for the benefit of Lender with respect to any or all of the Properties, as such instruments may be amended, modified, restated or supplemented from time to time and any and all replacements or substitutions.

"*Net Award*" means (a) the entire award payable with respect to a Property by reason of a Condemnation whether pursuant to a judgment or by agreement or otherwise; or (b) the entire proceeds of any insurance required under Section 6.03 payable with respect to a Property, as the case may be, and in either case, less any Costs incurred by Lessor in collecting such award or proceeds.

"*OFAC Laws*" means Executive Order 13224 issued by the President of the United States, and all regulations promulgated thereunder, including, without limitation, the Terrorism Sanctions Regulations (31 CFR Part 595), the Terrorism List Governments Sanctions Regulations (31 CFR Part 596), the Foreign Terrorist Organizations Sanctions Regulations (31 CFR Part 597), and the Cuban Assets Control Regulations (31 CFR Part 515), and all other present and future federal, state and local Laws, ordinances, regulations, policies, lists (including, without limitation, the Specially Designated Nationals and Blocked Persons List) and any other requirements of any Governmental Authority (including without limitation, the U.S. Department of the Treasury Office of Foreign Assets Control) addressing, relating to, or attempting to eliminate, terrorist acts and acts of war, each as supplemented, amended or modified from time to time after the Effective Date, and the present and future rules, regulations and guidance documents promulgated under any of the foregoing, or under similar Laws, ordinances, regulations, policies or requirements of other states or localities.

"*Other Agreements*" means, collectively, all agreements and instruments now or hereafter entered into between, among or by (a) any of the Lessee Entities; and, or for the benefit of, (b) any of the Lessor Entities, including, without limitation, leases, promissory notes

A-5

and guaranties, but excluding this Lease and all other Transaction Documents; including, (i) that certain Lease Agreement of even date herewith between STORE Capital Acquisitions, LLC, as lessor, and Lessee with respect to the real property located at 1601 W. Prospect Road, Ashtabula, OH 44004, (ii) that certain Lease Agreement of even date herewith between STORE Capital Acquisitions, LLC, as lessor, and Lessee with respect to the real property located at 587 E. Main Street, Canfield, OH 44406, (iii) that certain Lease Agreement of even date herewith between STORE Capital Acquisitions, LLC, as lessor, and Lessee with respect to the real property located at 115 Ludlow Street, Warren, PA 16365, (iv) that certain Lease Agreement of even date herewith between STORE Capital Acquisitions, LLC, as lessor, and Lessee with respect to the real property located at 4896 Everhard Road NW, Canton, OH 44718,and/or (v) that certain Lease Agreement of even date herewith between STORE Capital Acquisitions, LLC, as lessor, and Lessee with respect to the real property located at 2945 East State Street, Hermitage, PA 16148, as each may be amended from time to time.

"*Partial Condemnation*" has the meaning set forth in Section 11.03.

"*Permitted Amounts*" shall mean, with respect to any given level of Hazardous Materials or Regulated Substances, that level or quantity of Hazardous Materials or Regulated Substances in any form or combination of forms which does not constitute a violation of any Environmental Laws and is customarily employed in, or associated with, similar businesses located in the state or states where the Properties are located.

"*Permitted Facility*" or "*Permitted Facilities*" means a Perkins Restaurant and Bakery, all related purposes such as ingress, egress and parking, and uses incidental thereto.

"*Person*" means any individual, partnership, corporation, limited liability company, trust, unincorporated organization, Governmental Authority or any other form of entity.

"*Personalty*" means any and all "goods" (excluding "inventory," and including, without limitation, all "equipment," "fixtures," appliances and furniture (as "goods," "inventory," "equipment" and "fixtures" are defined in the applicable Uniform Commercial Code then in effect in the applicable jurisdiction)) from time to time situated on or used in connection with any of the Properties, whether now owned or held or hereafter arising or acquired, together with all replacements and substitutions therefore and all cash and non-cash proceeds (including insurance proceeds and any title and UCC insurance proceeds) and products thereof, and, in the case of tangible collateral, together with all additions, attachments, accessions, parts, equipment and repairs now or hereafter attached or affixed thereto or used in connection therewith.

"*Price Index*" means the Consumer Price Index which is designated for the applicable month of determination as the United States City Average for All Urban Consumers, All Items, Not Seasonally Adjusted, with a base period equaling 100 in 1982 - 1984, as published by the United States Department of Labor's Bureau of Labor Statistics or any successor agency.  In the event that the Price Index ceases to be published, its successor index measuring cost of living as published by the same Governmental Authority which published the Price Index shall be substituted and any necessary reasonable adjustments shall be made by Lessor and Lessee in order to carry out the intent of Section 4.02.  In the event there is no successor index

A-6

measuring cost of living, Lessor shall reasonably select an alternative price index measuring cost of living that will constitute a reasonable substitute for the Price Index.

"*Property*" *or* "*Properties*" means those parcels of real estate legally described on Exhibit B attached hereto, all rights, privileges, and appurtenances associated therewith, and all buildings, fixtures and other improvements now or hereafter located on such real estate (whether or not affixed to such real estate).

"*Real Estate Taxes*" has the meaning set forth in Section 6.05.

"*Regulated Substances*" means "petroleum" and "petroleum-based substances" or any similar terms described or defined in any of the Environmental Laws and any applicable federal, state, county or local Laws applicable to or regulating USTs.

"*REIT*" means a real estate investment trust as defined under Section 856 of the Code.

"*Release*" means any presence, release, deposit, discharge, emission, leaking, spilling, seeping, migrating, injecting, pumping, pouring, emptying, escaping, dumping, disposing or other movement of Hazardous Materials, Regulated Substances or USTs or any Threatened Release.

"*Remediation*" means any response, remedial, removal, or corrective action, any activity to cleanup, detoxify, decontaminate, contain or otherwise remediate any Hazardous Materials, Regulated Substances or USTs, any actions to prevent, cure or mitigate any Release, any action to comply with any Environmental Laws or with any permits issued pursuant thereto, any inspection, investigation, study, monitoring, assessment, audit, sampling and testing, laboratory or other analysis, or any evaluation relating to any Hazardous Materials, Regulated Substances or USTs.

"*Rental*" means, collectively, the Base Annual Rental and the Additional Rental.

"*Rental Adjustment*" means an amount equal to the lesser of (a) 2% of the Base Annual Rental in effect immediately prior to the applicable Adjustment Date, or (b) 1.25 multiplied by the product of (i) the percentage change between the Price Index for the month which is two months prior to the Effective Date or the Price Index used for the immediately preceding Adjustment Date, as applicable, and the Price Index for the month which is two months prior to the applicable Adjustment Date; and (ii) the then current Base Annual Rental.

"*Requisition*" means any temporary requisition or confiscation of the use or occupancy of any of the Properties by any Governmental Authority, civil or military, whether pursuant to an agreement with such Governmental Authority in settlement of or under threat of any such requisition or confiscation, or otherwise.

"*Reserve*" has the meaning in Section 6.04.

"*Securities*" has the meaning set forth in Section 17.10.

"*Securities Act*" means of the Securities Act of 1933, as amended.

A-7

"*Securitization*" has the meaning set forth in Section 17.10.

"*Security Deposit*" has the meaning set forth in Section 4.09.

"*Successor Lessor*" has the meaning set forth in Section 13.03.

"*Taking*" means (a) any taking or damaging of all or a portion of the Properties (i) in or by condemnation or other eminent domain proceedings pursuant to any Law, general or special; (ii) by reason of any agreement with any condemnor in settlement of or under threat of any such condemnation or other eminent domain proceeding; or (iii) by any other means; or (b) any de facto condemnation. The Taking shall be considered to have taken place as of the later of the date actual physical possession is taken by the condemnor, or the date on which the right to compensation and damages accrues under the Law applicable to the Properties.

"*Temporary Taking*" has the meaning set forth in Section 11.04.

"*Threatened Release*" means a substantial likelihood of a Release which requires action to prevent or mitigate damage to the soil, surface waters, groundwaters, land, stream sediments, surface or subsurface strata, ambient air or any other environmental medium comprising or surrounding any Property which may result from such Release.

"*Total Condemnation*" has the meaning set forth in Section 11.02.

"*Transaction*" has the meaning set forth in Section 14.01.

"*Transaction Documents*" means this Lease, the Guaranty and all documents related thereto.

"*U.S. Publicly Traded Entity*" means an entity whose securities are listed on a national securities exchange or quoted on an automated quotation system in the United States or a wholly-owned subsidiary of such an entity.

"*USTs*" means any one or combination of tanks and associated product piping systems used in connection with storage, dispensing and general use of Regulated Substances.

A-8

**EXHIBIT B**

**LEGAL DESCRIPTIONS AND
STREET ADDRESSES OF THE PROPERTIES**

**Street Addresses:**

| Address | City | ST | Zip | County |
|---------|------|-----|------|--------|
| 7175 Engle Road | Middleburg Heights | OH | 44130 | Cuyahoga |
| 4334 Buffalo Road | Erie | PA | 16510 | Erie |
| 1871 Oakland Avenue | Indiana | PA | 15701 | Indiana |
| 2714 West Lake Road | Erie | PA | 16505 | Erie |
| 915 W. Main Street | Grove City | PA | 16127 | Mercer |
| 78 Perkins Road | Clarion | PA | 16214 | Clarion |
| 18276 Conneaut Lake Road | Meadville | PA | 16335 | Crawford |
| 207 W. Plum Street | Edinboro | PA | 16412 | Erie |
| 1953 Niles-Cortland Road SE | Warren | OH | 44484 | Trumbull |
| 4403 Peach Street | Erie | PA | 16509 | Erie |
| 31-35 Bolivar Drive | Bradford | PA | 16701 | McKean |
| 2728 West State Street | Olean | NY | 14760 | Cattaraugus |
| 310 W. Columbus Avenue | Corry | PA | 16407 | Erie |
| 5550 Interstate Blvd. | Austintown | OH | 44515 | Mahoning |
| 804 Boardman-Poland Road | Youngstown | OH | 44512 | Mahoning |
| 219 E. Central Avenue | Titusville | PA | 16354 | Crawford |
| 658 US Route 250 E | Ashland | OH | 44805 | Ashland |

B-1

**Legal Descriptions**:

**721002-588.1 7175 Engle Road, Middleburg Heights, OH 44130**

Situated in the City of Middleburg Heights, County of Cuyahoga and State of Ohio and known as being part of Original Middleburgh Township Section No.7, and further bounded and described as follows:

Beginning at an iron pin monument at the intersection of the centerline of Engle Road with the centerline of Bagley Road, said centerline of Engle Road being the west line of said Section No. 7; Thence North 01° 43' 00" East along said centerline of Engle Road a distance of 180.00 feet to the Northerly line of a parcel of land conveyed to the Union Oil Company by deed recorded in Volume 13867, Page 643 of Cuyahoga County Deed Records;

Thence South 88° 22' 00" East along said Northerly line a distance of 40.00 feet to an iron pin found marking the Easterly right of way line of said Engle Road and the Principal Place of Beginning of the parcel of land intended herein to be described;

Thence North 01° 43' 00" East along said Easterly line of Engle Road a distance of 270.70 feet to an iron pin found in the Southerly line of land conveyed to the Standard Oil Company by deed recorded in Volume 13167, Page 911 of Cuyahoga County Deed Records;

Thence South 88° 17' 00" East along said Southerly line of the Standard Oil Company and along the Southerly line of land conveyed to A. J. Asher and G. M. Harriston by deed recorded in Volume 14683, Page 171 of Cuyahoga County Deed Records a distance of 389.40 feet to an iron pin found;

Thence South 01° 38' 00" West a distance of 178.71 feet to an iron pin found;

Thence North 88° 22' 00" West a distance of 150.00 feet to an iron pin found;

Thence South 01° 38' 00" West a distance of 231.42 feet to an iron pin found marking the Northerly line of said Bagley Road;

Thence North 88° 22' 00" West along said Northerly line of Bagley Road a distance of 100.00 feet to the Easterly line of Union Oil Company as aforesaid;

Thence North 01° 43' 00" East along said Easterly line a distance of 140.00 feet to an iron pin found at the Northeasterly corner thereof;

Thence North 88° 22' 00" West along said Northerly line a distance of 140.00 feet to the Principal Place of Beginning and containing 2.424 acres of land as surveyed by John E. Hoy Registered Ohio Professional Land Surveyor No. 4800 in April 1987 be the same more or less but subject to all legal highways.

A-2

NOW MORE PARTICULARLY KNOWN AS:

Land situated in the City of City of Middleburg Heights, County of Cuyahoga, State of Ohio and being a part of Original Middleburg Township Section No. 7, as described in deed to Spirit Master Funding III, LLC recorded in Instrument No. 200705080328, records of Cuyahoga County, described as follows:

COMMENCING at the intersection of the centerline of Bagley Road and Engle Road; thence, North 01°43'00" East, along the centerline of said Engle Road, a distance of 180.00 feet; thence, South 88°55'11" East, a distance of 45.00 feet to a 5/8" Capped Iron Rod "NCG PS 8460 8668" set along the easterly right-of-way line of Engle Road, being the POINT OF BEGINNING of the land being described;

Thence North 01°09'49" East, along the said easterly right-of-way line of Engle Road, a distance of 270.69 feet, witnessing a 5/8" Capped Iron Rod "BOHNING & ASSOC" found North 71°15'33" West, 2.04 feet from corner;

Thence South 88°50'11" East, along the southerly line of land described in deed to Jeffrey Clark & Linda Naomi Solomon in Instrument No. 201603020604 and in deed to HPT IHG-2 Properties Trust in Instrument No. 201602010460, a distance of 384.40 feet, to a 5/8" Capped Iron Rod "NCG PS 8460 8668" set;

Thence South 01°04'49" West, along the westerly line of land described in deed to FCPT Garden Properties, LLC in instrument No. 201601120288, a distance of 178.71 feet, to a 5/8" Capped Iron Rod "NCG PS 8460 8668" set;

Thence North 88°55'11" West, along the northerly line of land described in deed to Speedway SuperAmerica LLC in Instrument No. 199911170243, a distance of 150.00 feet, to a 5/8 Iron Rod found;

Thence South 01°04'49" West, along the westerly line of said land described in deed to Speedway SuperAmerica LLC, a distance of 221.42 feet, to a 5/8" Capped Iron Rod "NCG PS 8460 8668" set along the northerly right-of-way line of Bagley Road;

Thence North 88°55'11" West, along the said northerly right-of-way line of said Bagley Road, a distance of 99.99 feet, witnessing a 1" Iron Rod in Concrete found North 48°36'11" East, 1.67 feet from corner;

Thence North 01°09'49" East, along the easterly line of land described in deed to Gerald C. Forstner, Jr. & Robret R. Frost in Instrument No. 201603020104, a distance of 130.00 feet, to a 1/2" Iron Rod found;

Thence North 88°55'11" West, along the northerly line of said land described in deed to Gerald C. Forstner, Jr. & Robret R. Frost, a distance of 135.00 feet, to a 5/8" Capped Iron Rod "NCG PS 8460 8668" set at the POINT OF BEGINNING and containing 2.371 acres or 103,274 square feet of land, more or less, but subject to all legal highways and easement of record as determined by a survey performed by Eric S. Jackson, Ohio Professional Surveyor No. 8668, for and on behalf of North Coast Geomatics in January of 2018.

A-3

**721002-588.3 4334 Buffalo Road, Erie, PA 16510**

**721002-588.4 1871 Oakland Avenue, Indiana, PA 15701**

TRACT I

All those certain pieces, parcels or lots of ground situate in the Township of White, County of Indiana and State of Pennsylvania, bounded and described as follows:

Beginning at a point on the Southern line of Gompers Avenue at the Northeast corner of Lot No. 130 in the Getty Heights Plan of Lots; thence along Gompers Avenue, North 53° 50' East 150 feet to a point at the Northwest corner of Lot No. 134 in said plan, now the property of Reschini; then by the West line of Lot No. 134 in said plan, South 36° 10' East 140 feet to a point on the Northern line of an alley; thence by the Northern line of said alley, South 53° 50' West 150 feet to the Southeast corner of Lot No. 130 in said plan; thence by the East line of Lot No. 130, North 36° 10' West 140 feet to the place of beginning, and being Lots Nos. 131, 132 and 133 in the Getty Heights Plan of Lots of White Township, Indiana County, Pennsylvania, which plan is of record in Plan Book 2, Page 9.

TRACT II

All those certain pieces, parcels or lots of ground situate in the Township of White, County of Indiana and State of Pennsylvania, bounded and described as follows:

Beginning at a point on the Southern boundary line of State Highway Route 286 (formerly Route 80); said point being on a line projected from the Eastern boundary line of Lot No. 133 in the Getty Heights Plan of Lots; thence along the Southern right of way line of State Highway Route 286, South 43° 30' West 152 feet, more or less, to a point on the line projected from the West line of Lot No. 131 in the aforesaid plan; thence South 36° 10' East 18 feet, more or less, to Gompers Avenue; thence by the North line of Gompers Avenue, North 53° 50' East 150 feet to a point; then North 36° 10' West 45 feet to the place of beginning.

Excepting and reserving from this grant, all the coal of whatever kind in and under the said described lots of ground, together with the mining rights, privileges and release of damages, as contained in deed from Samuel J. Getty, et al., to B. M. Clark. Said deed being recorded in Deed Book Vol. 215, Page 571.

TRACT III

All that certain piece or parcel of land situate in the Township of White, County of Indiana, Commonwealth of Pennsylvania bounded and described as follows, to wit:

Beginning at a point in the South line of Gompers Avenue, said point being the Northwest corner of Parcel First above; then North 36° 10' West, 50 feet to a point in the North line of Gompers Avenue as shown in the Getty Heights Plan of Lots, said point being the Southwest corner of Parcel Second above; thence North 55° 50' East along the North line of Gompers

4832-6836-0282.2
STORE/Campbells (Perkins)
Master Lease Agreement
20 Properties
File No. 7210/02-588

Avenue, a distance of 150 feet to a point, the Southeast corner of Parcel Second above; thence South 36° 10' East, a distance of 50 feet to a point in the South line of Gompers Avenue, said point being the Northeast corner of Parcel First above; thence South 55° 50' West, 150 feet along the South line of Gompers Avenue. Being a portion of Gompers Avenue as laid out on the Getty Heights Plan of Lots as recorded in Plan Book 2, Page 9 of the records of Indiana County.

TRACTS I, II AND III ABOVE GEING THE SAME AS THAT PROPERTY AS SHOWN ON ALTA/NSPS LAND TITLE SURVEY PREPARED BY ROBIN L. KEARNS FOR THE BENEFIT OF AMERICAN NATIONAL, JOB NO. B-180114, MORE PARTICULARLY DESCRIBED AS FOLLOWS:

Situated in the Township of White, County of Indiana and State of Pennsylvania, being all of that tract of land conveyed to Spirit Master Funding III, LLC in Document No. 2007-172466, Indiana County Records and being more particularly described as follows:

BEGINNING at the northeast corner of Lot No. 130, same being the northwest corner of Lot 131 in the Getty Heights Plan of Lots, as recorded in Plan Book 2, Page 9, Indiana County Records THENCE North 36°10'00" West, a distance of 68.00 feet to a point on the southeasterly line of Oakland Avenue (State Highway Route 286) (formerly Route 80);

THENCE along the southeasterly line of said Oakland Avenue, North 43°37'46" East, a distance of 152.41 feet to a point being on a line projected from the easterly line of Lot No. 133 in the Getty Heights Plan of Lots;

THENCE along said line and continuing along the easterly line of said Lot 133, South 36°10'00" East, a distance of 235.00 feet to the southeast corner of said Lot 133;

THENCE along the southeasterly lines of Lots 133, 132 and 131, South 53°50'00" West, a distance of 150.00 feet;

THENCE along the westerly line of Lot 131, North 36°10'00" West, a distance of 140.00 feet to the point of beginning.


**721002-588.7 2714 West Lake Road, Erie, PA 16505**

ALL that certain piece or parcel of land situate in the Township of Millcreek, County of Erie and State of Pennsylvania, bounded and described as follows to wit:

BEGINNING at a point on the Northerly line of the West Lake Road 100 feet Westwardly of its intersection with the Westerly line of Lowell Avenue (the Westerly line of Lowell Avenue being also the West line of Algeria Farm Subdivision as recorded in Erie County Map Book 4 at pages 280 and 281); thence Westwardly along the Northerly line of the West Lake Road 105 feet to a point; thence Northwardly and parallel to the Westerly line of Lowell Avenue 200 feet to a point; thence Eastwardly and parallel to the Northerly line of the West Lake Road 205 feet to a point on the Westerly line of Lowell Avenue; thence Southwardly along the Westerly line of Lowell Avenue 80 feet to a point; thence Westwardly and parallel with the Northerly line of the West

A-5

Lake Road 100 feet to a point; thence Southwardly and parallel to the Westerly line of Lowell Avenue 120 feet to a point of the Northerly line of the West Lake Road to the place of beginning.

BEING THE SAME AS THAT PROPERTY AS SHOWN ON ALTA/NSPS LAND TITLE SURVEY PREPARED BY ROBIN L. KEARNS, ON BEHALF OF AMERICAN NATIONAL, , JOB NO. B-180116, MORE PARTICULARLY DESCRIBED AS FOLLOWS:

ALL that certain piece or parcel of land situate in the Township of Millcreek, County of Erie and State of Pennsylvania, bounded and described as follows to wit:

BEGINNING at a point on the Northerly line of West Lake Road (West 8th Street), 100 feet Westwardly of its intersection with the westerly line of Lowell Avenue (the westerly line of Lowell Avenue also being the west line of Algeria Farm Subdivision as recorded in Erie County Map Book 4 at pages 280 and 281);

THENCE along the northerly line of West Lake Road, North 90°00'00" West, a distance of 105.00 feet to a point;

THENCE North 00°00'00" East, parallel to the westerly line of Lowell Avenue, a distance of 200.00 feet to a point;

THENCE South 90°00'00" East, parallel to the Northerly line of West Lake Road, a distance of 205.00 feet to a point on the westerly line of Lowell Avenue;

THENCE along the westerly line of Lowell Avenue, South 00°00'00" West, a distance of 80.00 feet to a point;

THENCE North 90°00'00" West, parallel to the northerly line of West Lake Road, a distance of 100.00 feet to a point;

THENCE South 00°00'00" West , parallel to the Westerly line of Lowell Avenue, a distance of 120.00 feet to the POINT OF BEGINNING.

**721002-588.8 915 W. Main Street, Grove City, PA 16127**

## 721002-588.9 78 Perkins Road, Clarion, PA 16214

ALL that certain piece or parcel of land situate in Monroe Township, Clarion County, Pennsylvania, bounded and described as follows:

BEGINNING at an iron pin corner on North line of a 50 foot Access Right of Way, which forms the Southern boundary line of the herein described tract, said point being 260.00 feet measured in a Northwesterly direction along the center line of said Access Right of Way from the center line of Route 68, being a Southeast corner and common to land now of Selker Brothers and the herein described tract; thence along the North line of said Access Right of Way; North 86°09' West, a distance of 300.00 feet to an iron pin corner at other land of James A. Mays; thence

4832-6836-0282.2
STORE/Campbells (Perkins)
Master Lease Agreement
20 Properties
File No. 7210/02-588

leaving said Right of Way and through land of James A. Mays, of which this is a part, North 6°15' East, a distance of 403.53 feet to an iron pin corner; thence through land of same, South 86°09' East, a distance of 318.70 feet to an iron pin corner at land now of Selker Brothers; thence by land now of Selker Brothers, South 13°48' West, a distance of 206.00 feet to an iron pin corner; thence by same, South 3°51' West, a distance of 200.00 feet to an iron pin corner, the place of beginning. CONTAINING an area of 2.67 acres, more or less, as surveyed by E.J. Weibel, a registered surveyor, October 5, 1973.

LESS AND EXCEPT:

ALL that certain piece or parcel of land situate in Monroe Township, Clarion County, Pennsylvania, bounded and described as follows:

BEGINNING at a point at the Northeast corner of land of the Golfview Manor, Inc., (now Sanray Corporation), said point being also the Northwest corner of property conveyed to Morgan Guaranty Trust Company of New York in Deed Book 274, page 004 and being N. 85°26' W. 210.10 feet from the West line of Pa. Route 68, the Sligo Clarion Road; thence along said line of property of Morgan Guaranty Trust Company of New York S. 13°48' W. a distance of 206 feet to a point; thence through property of the grantor herein N. 1°38' E. a distance of 94.88 feet to a point; thence continuing through property of the grantor herein N. 13°48' E. a distance of 110.00 feet to a point; thence S. 85°26' E. a distance of 20.26 feet to a point at the place of beginning.

The above description was drawn from survey of Tait Engineering dated March 25, 1982.

LESS AND EXCEPT:

ALL that certain piece or parcel of land situate in Monroe Township, Clarion County, Pennsylvania, bounded and described as follows:

BEGINNING at a 1 inch iron pipe found on the Northwest corner of the tract herein described and also the Northwest corner of the larger parcel of which this was a part. Thence, by lands now or formerly of the Glimcher Group, South 86°09'00" East, 298.40 feet to a rebar to be set. Said point being located North 86°09'00" West, 20.30 feet from an existing 1 inch iron pipe. Thence, by lands now or formerly of Burger King Corp., South 13°48'00" West, 109.74 feet to a rebar to be set. Thence, by the same, South 01°38'00" West, 48.84 feet to a rebar to be set. Thence, through the lands of which this is a part, North 86°57'53" West, 203.23 feet to an existing rebar and cap. (Fike Associates). Thence, by the same South 04°29'39" West, 243.56 feet to a rebar to be set on the North right of way line of T-790, Perkins Road; Thence, by said right of way line, North 86°09'00" West, 92.29 feet to a cotton spike set. Thence, by lands now or formerly of the Glimcher Group, also being the Eastern line of Staples Road, North 06°15'05" East, 403.68 feet to the place of beginning.

Containing 67,532 square feet or 1.55 acres.

BEING TAX MAP NO. 19-030-065-000-00

BEING the same premises which Travaglini Enterprises, Inc., a Pennsylvania corporation, formerly Sanray Corporation, Successor by merger with Golfview Manor, Inc., by Special

A-7

Warranty Deed dated 02/01/2007 and recorded 04/26/2007 in Clarion County at Deed Book 729 Page 49, granted and conveyed unto Spirit Master Funding III, LLC, a Delaware limited liability company, in fee.

BEING THE SAME AS THAT PROPERTY AS SHOWN ON ALTA/NSPS LAND TITLE SURVEY PREPARED BY ROBIN L. KEARNS, ON BEHALF OF AMERICAN NATIONAL, JOB NO. B180118, MORE PARTICULARLY DESCRIBED AS FOLLOWS:

All that certain piece or parcel of land situated in the Township of Monroe, County of Clarion and State of Pennsylvania and being more particularly described as follows:

Beginning at a 5/8" capped rebar set on the north line of Perkins Road (50' Wide), said corner being 260.00 feet northwesterly from the intersection of the north line of Perkins Road, if extended, with the centerline of Route 68 (Variable Width);

Thence, along the north line of Perkins Road, North 86°09'00" West, 207.71 feet to a 5/8" capped rebar set;

Thence, North 04°29'39" East, 243.56 feet to a 5/8" capped rebar set;

Thence, South 86°57'53" East, 203.23 feet to a 5/8" capped rebar set;

Thence, South 01°38'00" West, 46.04 feet to a 5/8" capped rebar set;

Thence, South 03°51'00" West, 200.43 feet to the Point of Beginning and containing 1.160 acres (50,515 square feet) of land, more or less.

**721002-588.10          18276 Conneaut Lake Rd., Meadville, PA 16335**

ALL that certain piece or parcel of land situate in Vernon Township, Crawford County, Pennsylvania, bounded and described as follows:

BEGINNING at a point in the North line of Route 6-19-322, said point being the southwest corner of Lot Number 69 of the Shaw Subdivision Revised Plan recorded in Crawford County Plan Book 4, Page 16; thence Westerly along the North line of said Routes 6-19-322 a distance of 220.12 feet to a point, the Southeast corner of land formerly of Mark Figetakis, et ux; thence Northerly along the line of said Figetakis 297.60 feet to a point in the North line of said Shaw Subdivision; thence Easterly along the North line of said Shaw Subdivision a distance of 260.90 feet, more or less, to a point, said point being the Northwest corner of Lot Number 73; thence South along the West line of Lots Number 69, 70, 71, 72 and 73 a distance of 419.79 feet, more or less, to the point of beginning.

Said land further described in Property Survey of Sam J. Lovecchio, dated March 22, 1969, revised September 8, 1971, Drawing Number N-234, prepared by C.E. Stiles and Associates.

LESS AND EXCEPT

A-8

All that certain piece or parcel of land situate in Vernon Township, Crawford County, Pennsylvania, bounded and described as follows, to wit:

BEGINNING at an iron pipe in the North line of U.S. Route 322, said point being the Southeast corner of the parcel herein described and the Southwest corner of other land of Sun Refining and Marketing Company; thence North 70° 33' 40" West, a distance of 7.00 feet along the North line of U.S. Route 322 to an iron pin; thence North 18° 13' East a distance of 34.00 feet to an iron pin; thence South 70° 33' 40" East, a distance of 7.00 feet to an iron pin; thence 18° 13' West, a distance of 34.00 feet to an iron pipe, the point or place of beginning. 65-13 P. 60.

The above description was prepared from survey of Sun Oil Company property prepared by C.E. Stiles & Associates dated 5/4/83, Drawing No. J-582, N.B.

BEING PARCEL NO. 6507-022-70055

BEING the same premises which Travaglini Enterprises, Inc., a Pennsylvania corporation, formerly known as Sanray Corporation, by Special Warranty Deed dated 02/01/2007 and recorded 04/30/2007 in Crawford County at Deed Book 870 Page 780, granted and conveyed unto Spirit Master Funding III, LLC, a Delaware limited liability company, in fee.

BEING THE SAME AS THAT PROPERTY AS SHOWN ON ALTA/NSPS LAND TITLE SURVEY PREPARED BY ROBIN L. KEARNS, ON BEHALF OF AMERICAN NATIONAL, JOB NO. B180119, MORE PARTICULARLY DESCRIBED AS FOLLOWS:

Situated in the Township of Vernon, County of Crawford and State of Pennsylvania, known as being all of Lots 68 and 67 and a portion of Lot 66 of the Shaw Subdivision Revised Plan recorded in Crawford County Plan Book 4, Page 16, being bounded and described as follows:

COMMENCING at a point in the northerly line of State Route 322 (Conneaut Lake Road) for the southwest corner of Lot 69 of the Shaw Subdivision Revised Plan;

THENCE along the northerly line of S.R. 322, North 70°33'40" West, a distance of 7.00 feet to the POINT OF BEGINNING of the herein described parcel:

THENCE along the northerly line of S.R. 322, with a curve to the left, having a radius of 5789.58 feet, an arc length of 213.15 feet, a delta angle of 02°06'34", and a chord bearing and distance of North 71°36'57" West, 213.14 feet;

THENCE leaving S.R. 322, North 16°10'30" East, a distance of 297.60 feet to a point in the north line of Shaw Subdivision;

THENCE along the north line of Shaw Subdivision, North 80°24'00" East, a distance of 260.90 feet to the northwest corner of Lot 73 of said subdivision;

THENCE, along the westerly lines of Lots 73, 72, 71, 70 and 69, South 18°13'00" West, a distance of 385.79 feet to the POINT OF BEGINNING.

A-9

Together with non-exclusive easements for vehicular access, parking and stormwater drainage contained in Declaration of Restrictive Covenants as set forth in record Book 433, Page 516.

**721002-588.11        207 W. Plum Street, Edinboro, PA 16412**

PREMISES "A"

ALL THAT CERTAIN piece or parcel of land situate in the Borough of Edinboro, Erie County, Pennsylvania, bounded and described as follows, to wit:

BEGINNING at a point in the center line of Mill Street, at the point of intersection of center line of Mill Street with the North line of land, if projected, of the Erie County G.L.F. Cooperative, Inc., as per Deed Book 389, at page 533; thence Westwardly and along the North line of lands of the said Erie County G.L.P. Cooperative, Inc. property One Hundred Seventy-five (175) feet, more or less, to a stake in the East line of lands of Wayne Skelton; thence Northerly and along the East line of lands of the said Wayne Skelton One Hundred Twenty-five and one-half (125.5) feet, more or less, to a stake in the South line of lands of William Roberts; thence Eastwardly and along the South line of lands of said William Roberts One Hundred Seventy-five (175) feet, more or less to a point in the center line of Mill Street; thence Southwardly along the center line of Mill Street One Hundred Twenty-five and one-half (125.5) feet, more or less, to a point in the place of beginning.

PREMISES "B"

ALSO, ALL THAT CERTAIN piece or parcel of land situate in the Borough of Edinboro, Erie County, Pennsylvania, being more fully bounded and described as follows, to wit:

BEGINNING at a point on the South line of Plum Street, formerly Market Street, South 79 degrees 30 minutes East Sixty-six (66) feet from the point where the East line of land of Vernon Mathews intersects the South line of Plum Street, formerly Market Street, and which East line of land of Vernon Mathews is described in Erie County Deed Book 826, page 245; which point of beginning is also defined as the Northwest corner of the piece herein described; thence South 7 degrees 14 minutes West Two Hundred Eighty-one and Forty-five Hundredths (281.45) feet; thence South 70 degrees 34 minutes East Fifty-nine and Two Tenths (59.2) feet; thence North 18 degrees 54 minutes East Two Hundred Ninety-two and Thirty-seven Hundredths (292.37) feet to a point in the South line of Plum Street, formerly Market Street; thence North 79 degrees 30 minutes West along the South line of Plum Street, formerly Market Street, One Hundred Twenty (120) feet to the place of beginning.

BEING PARCEL NO(S). 11-011-037.0-024.00 (Premises A) and 11-011-037.0-020.00 (Premises B) BEING the same premises which Travaglini Enterprises, Inc., a Pennsylvania corporation, formerly known as Sanray Corporation, formerly known as Edinboro Pancake House, Inc., by Special Warranty Deed dated 02/01/2007 and recorded 04/30/2007 in Erie County at Deed Book 1412 Page 64, granted and conveyed unto Spirit Master Funding III, LLC, a Delaware limited liability company, in fee.

A-10

BEING THE SAME AS THAT PROPERTY AS SHOWN ON ALTA/NSPS LAND TITLE SURVEY PREPARED BY ROBIN L. KEARNS, ON BEHALF OF AMERICAN NATIONAL, JOB NO. B180120, MORE PARTICULARLY DESCRIBED AS FOLLOWS:

PREMISES "A"

ALL THAT CERTAIN piece or parcel of land situate in the Borough of Edinboro, Erie County, Pennsylvania, bounded and described as follows, to wit:

BEGINNING at a point in the center line of Mill Street (40' Wide Public Right-of-Way), at the point of intersection of center line of Mill Street with the North line of land, if projected, of the Erie County G.L.F. Cooperative, Inc., as per Deed Book 389, at page 533;

Thence, crossing through the right of way of Mill Street, North 72°43'16" West, 175.07 feet to an iron pin found;

Thence, North 18°54'00" East, 125.50 feet to an iron pin found;

Thence, South 72°43'16" East, 175.07 feet to a MAG nail set in the centerline of Mill Street;

Thence, along the centerline of Mill Street, South 18°54'00" West, 125.50 feet to the Point of Beginning and containing 0.504 acres (21,963 square feet) of land, more or less.

PREMISES "B"

ALSO, ALL THAT CERTAIN piece or parcel of land situate in the Borough of Edinboro, Erie County, Pennsylvania, being more fully bounded and described as follows, to wit:

BEGINNING at an iron pin found on the South line of Plum Street (50' Wide), formerly Market Street, South 79 degrees 30 minutes East Sixty-six (66) feet from the point where the East line of land of Vernon Mathews intersects the South line of Plum Street, formerly Market Street, and which East line of land of Vernon Mathews is described in Erie County Deed Book 826, page 245;

Thence, South 07°14'00" West, 280.50 feet to an iron pin found;

Thence, South 70°34'00" East, 59.20 feet to an iron pin found;

Thence, North 18°54'00" East, 292.37 feet to an iron pin found on the south line of Plum Street;

Thence, along the south line of Plum Street, North 79°30'00" West, 117.18 feet to the Point of Beginning and containing 0.575 acres (25,062 square feet) of land, more or less.

Together with an easement for driveway contained in Joint Driveway Agreement as set forth in Contract Book C-146 Page 302.

Together with an easement for sign installation contained in Easement Agreement for Sign as set forth in Contract Book C-149 Page 15.

4832-6836-0282.2
STORE/Campbells (Perkins)
Master Lease Agreement
20 Properties
File No. 7210/02-588

**721002-588.12          1953 Niles-Cortland Road SE, Warren, OH 44484**

Real property in the City of Warren, County of Trumbull, State of Ohio, described as follows:

Parcel 1:

Being situated in the Township of Howland, County of Trumbull, State of Ohio, and known as being Parcel 1B in Raysan Commercial Plat No. 1 as recorded in Volume 46, Page 56 and also known as being a parcel conveyed to Sanray Corporation, now by merger Travaglini Enterprises, Inc., as recorded in Official Record 993, Page 342 of the Trumbull County Recorders record of deeds, and being more fully bounded and described as follows:

Beginning at the northeast corner of said Parcel 1B, said point being the True Place of Beginning for the parcel hereinafter described:

Thence South 00° 15' 31" seconds East, a distance of 216.64 feet to a point in the northerly line of Highland Terrace Boulevard;

Thence with a curve turning to the left with an arc length of 16.46 feet, with a radius of 50.00 feet with a chord bearing of South 72° 42' 01" West, with a chord length of 16.46 feet to a point;

Thence South 71° 50' 34" West a distance of 56.70 feet to a point;

Thence with a curve turning to the left with an arc length of 57.04 feet, with a radius of 260.00 feet, with a chord bearing of South 65° 31' 55" West, with a chord length of 56.93 feet to a point;

Thence with a curve turning to the right with an arc length of 48.93 feet, with a radius of 90.00 feet, with a chord bearing of South 74° 49' 19" West, with a chord length of 48.33 feet to a point;

Thence North 89° 36' 11" West a distance of 33.25 feet to a point;

Thence with a curve turning to the right with an arc length of 45.24 feet, with a radius of 43.97 feet, with a chord bearing of North 60° 07' 56 " West, with a chord length of 43.27 feet to a point in the East line of Niles Cortland Road (R/W varies);

Thence North 00° 14' 28" West along said Niles Cortland Road, a distance of 226.57 feet to a point;

Thence North 89° 45' 32" East, a distance of 26.96 feet to a point;

Thence North 00° 14' 28" West, a distance of 26.03 feet to a point marking the northwest corner of said Parcel 1B;

Thence North 89° 45' 32" East, a distance of 211.95 feet to the True Place of Beginning and containing 1.375 acres of land, more or less, of which no acres lies within public right-of-way.

Parcel 2:

A-12

Non-exclusive appurtenant easements set forth in Vacation of Easement and Access and Parking Easement Agreement by and between Chick-Fil-A, Inc., a Georgia corporation and Spirit Master Funding III, LLC, a Delaware limited liability company as disclosed by the document recorded January 26, 2015 in/as Instrument No. 201501260001462 of Trumbull County Records.

Parcel 3:

Non-exclusive easement for access set forth in Plat Volume 46, Page 56, of Trumbull County Records.

**721002-588.13        4403 Peach Street, Erie, PA 16509**

ALL that certain piece or parcel of land situate in the City of Erie, County of Erie and State of Pennsylvania, being all of Lots Nos. 9 and 18 in the subdivision of Academy Lot No. 10 made by Doris Bagnoni, owner, a plat of which subdivision was recorded July 9, 1947 in the office of the Recorder of Deeds for Erie County, Pennsylvania in Map Book 4 at page 87, and additional land, being described as follows, to wit:

BEGINNING at a point in the Easterly line of Peach Street at the Northwest corner of the aforesaid Lot No. 9 of the Doris Bagnoni Subdivision, said beginning point being 334.16 feet Northwardly from the intersection of the Easterly line of Peach Street with the Northerly line of Miller Avenue; thence Northwardly, along the East line of Peach Street, 35 feet to a point; thence Eastwardly on a line parallel to the North line of said Academy Lot No. 10, 195 feet to a point; thence Northwardly, along a line parallel to the Easterly line of Peach Street, 85 feet to a point; thence Eastwardly on a line parallel to the North line of said Academy Lot No. 10, 333 feet to a point; thence Southwardly along a line parallel to the Easterly line of Peach Street 120 feet to a point; thence Westwardly, on a line parallel with the North line of said Academy Lot No. 10 and passing along the North line of Lots 9 and 18 of the Doris Bagnoni Subdivision, 528 feet to a point in the Easterly line of Peach Street, the place of beginning.

BEING THE SAME AS THAT PROPERTY AS SHOWN ON ALTA/NSPS LAND TITLE SURVEY PREPARED BY ROBIN L. KEARNS, ON BEHALF OF AMERICAN NATIONAL, JOB NO. B180121, MORE PARTICULARLY DESCRIBED AS FOLLOWS:

ALL that certain piece or parcel of land situate in the City of Erie, County of Erie and State of Pennsylvania. Known as being all of Lot Nos. 9 and 18 in the subdivision of Academy Lot No. 10 as recorded in Map Book 4, Page 87, Erie County Records and additional land, being more particularly described as follows:

Beginning at an iron pin found on the easterly line of Peach Street (75' Wide) at the southwest corner of said Lot No. 9;

Thence, along the easterly line of Peach Street, North 30°02'01" East, 94.16 feet to an iron pin found;

Thence, South 59°57'59" East, 195.00 feet to an iron pin found;

A-13

Thence, North 30°02'01" East, 85.00 feet to an iron pin found;

Thence, South 59°57'59" East, 333.00 feet to an iron pin found;

Thence, South 30°02'01" West, 120.00 feet to an iron pin found;

Thence, North 59°57'59" West, 128.40 feet to an iron pin found at the northeast corner of said Lot No. 18;

Thence, along said Lot No. 18, South 71°24'33" West, 271.71 feet to an iron pin found at the most southeast corner of Lot No. 18;

Thence, North 59°57'59" West, 60.00 feet to an iron pin at the southwest corner of Lot No. 18;

Thence, North 30°02'01" East, 144.73 feet to an iron pin found at the southeast corner of Lot No. 9;

Thence, along the south line of Lot No. 9, North 59°57'59" West, 160.00 feet to the Point of Beginning and containing 1.9925 acres (86,793 square feet) of land, more or less.

BEING PARCEL NO. 18-053-001.0-101.00

BEING the same premises which Travaglini Enterprises, Inc., a Pennsylvania corporation, formerly known as Sanray Corporation, formerly known as Erie Pancake House, Inc., by Special Warranty Deed dated 02/01/2007 and recorded 04/30/2007 in Erie County at Deed Book 1412 Page 126, granted and con veyed unto Spirit Master Funding III, LLC, a Delaware limited liability company, in fee.


**721002-588.14        31-35 Bolivar Drive, Bradford, PA 16701**

ALL THAT CERTAIN piece of land situate, lying and being in Warrant 3489, in the Township of Foster, County of McKean, and Commonwealth of Pennsylvania, bounded and described as follows, to wit:

BEGINNING at an iron pipe in the Southerly line of crossroad crossing the Tuna Valley from the Foster Brook Road to the Bolivar Run Road, said iron pipe being six hundred eighty-three (683) feet on a course of S. 87° 49' W. from the Westerly line of the highway on the Easterly side of Tuna Valley; said iron pipe also marking the Northeast corner of lot conveyed to Hugh B. Hamilton by Mary E. Clark, et al, by deed dated October 15th, 1918; thence S. 2° 11' E., at right angles to said line, two hundred thirty-eight (238) feet to an iron pipe; thence S. 87° 49' W., parallel with the South line of said crossroad, fifty (50) feet to a point; thence N. 2° 11' W., at right angles to said crossroad, two hundred thirty-eight (238) feet to a point in the Southerly line of said road; thence N. 87° 49' E. along the Southerly line of said road, fifty (50) feet to an iron pipe at the place of beginning.

A-14

ALSO, ALL THAT CERTAIN piece of land situate, lying and being in the Township of Foster, County of McKean, and Commonwealth of Pennsylvania, bounded and described as follows, to wit:

BEGINNING at a point in the South line of the Foster Brook Road ninety-one and five-tenths (91.5) feet from the Northwest corner of land now or formerly of Allen Guthrie; thence running West along the South line of said Foster Brook road ninety-one and five tenths (91.5) feet to an iron post in the Northeast corner of lands of Mary E. Clark and Ellen C. Hanna; thence running South along the East line of the lands of said Mary E. Clark and Ellen C. Hanna two hundred and thirty-eight and five-hundredths (238.05) feet to an iron post in the Southeast corner of said lands of Mary E. Clark and Ellen C. Hanna;

thence running East along the South line of lands of George Raynor ninety-one and five-tenths (91.5) feet to a point; thence running North along the parallel to the East line of lands of said Mary E. Clark and Ellen C. Hanna two hundred thirty-eight and five hundredths (238.05) feet to the place of beginning.

BEING THE SAME AS THAT PROPERTY AS SHOWN ON ALTA/NSPS LAND TITLE SURVEY PREPARED BY ROBIN L. KEARNS, ON BEHALF OF AMERICAN NATIONAL, JOB NO. B180122, MORE PARTICULARLY DESCRIBED AS FOLLOWS:

ALL THAT CERTAIN piece of land situate, lying and being in Warrant 3489, in the Township of Foster, County of McKean, and Commonwealth of Pennsylvania, bounded and described as follows, to wit:

BEGINNING at an iron pin found in the Southerly line of Bolivar Drive (State Route 346) for the northeast corner of that tract of land conveyed to Spirit Master Funding III, LLC in Book 560, Page 348 (second described tract), McKean County Records;

THENCE leaving S.R. 346, and along the east line of said Spirit Master Funding III, LLC tract, South 02°11'00" East, a distance of 238.05 feet to an iron pin found;

THENCE South 87°49'00" West, a distance of 141.50 feet to an iron pin found, pass at 91.50 feet an iron pin found;

THENCE North 02°11'00" West, a distance of 238.05 feet to an iron pin found in the southerly line of S.R. 346;

THENCE along said line, North 87°49'00" East, a distance of 141.50 feet to the POINT OF BEGINNING.

BEING PARCEL NO. 21-019. -332.00.

BEING the same premises which Travaglini Enterprises, Inc., a Pennsylvania corporation, by Deed dated 02/01/2007, effective 02/06/2007 and recorded 04/26/2007 in McKean County at Record Book 560 Page 348, granted and conveyed unto Spirit Master Funding III, LLC, a Delaware limited liability company, in fee.

A-15

**721002-588.15         2728 West State Street, Olean, NY 14760**

PARCEL 1:

ALL THAT TRACT OR PARCEL OF LAND, SITUATE IN THE CITY OF OLEAN, NEW YORK, BEING PART OF LOT NO. 16 ROLLIN PRATT'S RESURVEY OF THE ALLEGANY CITY TRACT, DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT IN THE NORTHERLY LINE OF WEST STATE STREET, SAID POINT BEING SOUTH 89 DEGREES 32 SECONDS 45 MINUTES EAST 340.46 FEET FROM THE WESTERLY LINE OF THE CITY OF OLEAN AS MEASURED ALONG THE NORTHERLY LINE OF THE WEST STATE STREET;

THENCE NORTH 0 DEGREES 28 MINUTES 17 SECONDS WEST ALONG A LINE PARALLEL WITH THE EASTERLY LINE OF THE PROPERTY OF THE BOWLEAN CORPORATION, 300 FEET TO A POINT;

THENCE SOUTH 89 DEGREES 32 MINUTES 45 SECONDS EAST 150 FEET TO A POINT;

THENCE SOUTH 0 DEGREES 28 MINUTES 17 SECONDS EAST A DISTANCE OF 300 FEET TO THE NORTHERLY LINE OF WEST STATE STREET;

THENCE NORTH 89 DEGREES 32 MINUTES 45 SECONDS, 150 FEET TO THE POINT OR PLACE OF BEGINNING.

EXCEPTING FROM THE PREMISES HEREIN CONVEYED A CERTAIN AREA LOCATED ALONG THE NORTH LINE OF SAID PREMISES, SAID ARE RUNNING 28 FEET ALONG THE NORTH LINE OF SAID PREMISES TO A DEPTH OF 8-½ FEET, WHICH AREA CONTAINS A CERTAIN PUMPHOUSE AND LIGHT STANDARD WHICH ARE PRESENTLY USED IN THE OPERATION OF THE GRANTOR'S ADJOINING PREMISES.

PARCEL 2:

ALL THAT TRACT OR PARCEL OF LAND, SITUATE IN THE CITY OF OLEAN, COUNTY OF CATARAUGUS AND STATE OF NEW YORK, BEING PART OF LOT 16 OF ROLLIN PRATT'S RESURVEY OF THE ALLEGANY CITY TRACT,

AND MORE PARTICULARLY BOUNDED AND DESCRIBED AS FOLLOWS:

COMMENCING AT A POINT IN THE NORTHERLY LINE OF WEST STATE STREET, SAID POINT BEING SOUTH 89 DEGREES 32 MINUTES 45 SECONDS EAST A DISTANCE OF 490.46 FEET FROM THE WESTERLY LINE OF THE CITY OF OLEAN AS MEASURED ALONG THE NORTHERLY LINE OF WEST STATE STREET, WHICH POINT IS THE POINT OR PLACE OF BEGINNING;

THENCE ALONG THE FOLLOWING COURSES AND DISTANCES, TO WIT:

A-16

1) NORTH 00 DEGREES 28 MINUTES 17 SECONDS WEST A DISTANCE OF 178.5 FEET ALONG THE EAST BOUNDS OF LANDS HERETOFORE CONVEYED BY GRANTOR TO GRANTEE TO A POINT; THENCE 2) SOUTH 89 DEGREES 32 MINUTES 45 SECONDS EAST A DISTANCE OF 3.5 FEET TO A POINT; THENCE 3) SOUTH 00 DEGREES 28 MINUTES 17 SECONDS EAST A DISTANCE OF 160 FEET AND PARALLEL WITH THE FIRST MENTIONED BOUNDARY IN ITEM (1) ABOVE; THENCE 4) SOUTH 89 DEGREES 32 MINUTES 45 SECONDS EAST A DISTANCE OF 8.5 FEET TO A POINT; THENCE 5) SOUTH 00 DEGREES 28 MINUTES 17 SECONDS EAST A DISTANCE OF 18.5 FEET TO A POINT IN THE NORTHERLY LINE OF WEST STATE STREET; THENCE 6) NORTH 89 DEGREES 32 MINUTES 45 SECONDS WEST A DISTANCE OF 12 FEET TO THE POINT OR PLACE OF BEGINNING.

**721002-588.16          310 W. Columbus Ave., Corry, PA 16407**

ALL THAT CERTAIN lot or piece of ground situate in the Third Ward of the City of Corry, County of Erie and Commonwealth of Pennsylvania, bounded and described as follows, to wit:

BEGINNING at a point at the intersection of the centerline of U.S. Rt. 6 with the centerline of Worth Street; thence proceeding along the centerline of U.S. Rt. 6 South 74 degrees 39' 34" West 222.55 feet along the chord distance to a point; thence South 0 degrees 31' East 191.0 feet from the centerline of U.S. Rt. 6 to a point; thence North 89 degrees 37' East 215.0 feet to a point in the centerline of Worth Street; thence proceeding along the centerline of Worth Street North 0 degrees 31' West 249.00 feet to the place of beginning.

TOGETHER with an easement in common with grantors, their respective heirs, executors, administrators and assigns, for ingress and egress of persons and vehicles to and from the above described property and the parking of vehicles, over, across and upon the following parcel of land:

ALL of that certain lot or piece of ground situate in the Third Ward of the City of Corry, County of Erie and commonwealth of Pennsylvania, bounded and described as follows, to wit:

BEGINNING at a point being South 74 degrees 30' 34" West 222.55 feet from the intersection of the centerline of U.S. Rt. 6 with the centerline of Worth Street; thence South 0 degrees 31 minutes East 191.0 feet from the centerline of U.S. Rt. 6 to a point; thence North 89 degrees 37' East 215.0 feet to a point in the centerline of Worth Street; thence South 00 degrees 31' east 50.00 feet along the centerline of Worth Street to a point; thence South 89 degrees 37' West 270.00 feet to a point; thence North 0 degrees 31 minutes West 225.23 feet to a point in the centerline of U.S. Rt. 6; and thence North 74 degrees 30' 34" East 57.21 feet along the centerline of U.S. Rt. 6 to the place of beginning.

TOGETHER with an easement in common with Grantors, their respective heirs, executors, administrators and assigns, for ingress and egress of persons and vehicles to and from the above described property, over, across and upon an existing driveway abutting the above described easement for access and parking purposes on the western side thereof and maintaining an equal width of 35 feet throughout from U.S. Rt. 6 along said easement and beyond to other lands of Grantors.

A-17

BEING PARCEL NO. 07-012-047.0-005.02

BEING the same premises which Travaglini Enterprises, Inc., a Pennsylvania corporation formerly known as Sanray Corporation, formerly known as Golfview Manor, Inc., by Special Warranty Deed dated 02/01/2007 and recorded 04/30/2007 in Erie County at Deed Book 1412 Page 32, granted and conveyed unto Spirit Master Funding III, LLC, a Delaware limited liability company, in fee.

**721002-588.17          5550 Interstate Blvd., Austintown, OH 44515**

**721002-588.19          804 Boardman-Poland Rd., Youngstown, OH 44512**

Real property in the City of Youngstown, County of Mahoning, State of Ohio, described as follows:

Situated in the Township of Boardman, County of Mahoning and State of Ohio and known as being Lot No. 7 in Mayo & Orvets Plat No. 5 as recorded in Volume 76 of plats, Page 120, Mahoning County Records

**721002-588.21          219 E. Central Avenue, Titusville, PA 16354**

ALL THAT CERTAIN piece or parcel of land situate in the Fourth Ward, City of Titusville, Crawford County, Pennsylvania, bounded and described as follows:

BEGINNING at a point in the South line of East Central Avenue, being the Northeast corner of land of the Titusville Housing Authority; thence North 83° 25' East along the South line of East Central Avenue, 166 feet, more or less, to its point of intersection with the West line of South Drake Street; thence South 02° West along the West line of South Drake Street 210.00 feet to its point of intersection with the North line of East Spring Street; thence along the North line of East Spring Street, South 83° 25' West, 51.82 feet to a point; thence continuing along the North line of East Spring Street, North 88° West 99.76 feet to an iron pin, the Southeast corner of land of Titusville Housing Authority; thence Northerly along the line of land of Titusville Housing Authority 97 feet, more or less, to an iron pin, thence Easterly along the line of land of the Titusville Housing Authority 15.69 feet to an iron pin; thence Northerly along the line of land of the Titusville Housing Authority 96 feet, more or less, to a point, the place of beginning.

BEING PARCEL NO. 5900-000-B-1-6

BEING the same premises which Spirit Finance Acquisitions, LLC, a Delaware limited liability company, by Deed dated 04/22/2011, effective 04/29/2011 and recorded 05/05/2011 in

A-18

Crawford County at Record Book 1044 Page 748, granted and conveyed unto Spirit Master Funding, LLC, a Delaware limited liability company, in fee.

**721002-588.24        658 US Route 250 E, Ashland, OH 44805**

Real property in the City of Ashland, County of Ashland, State of Ohio, described as follows:

Situated in the Township of Montgomery, County of Ashland and State of Ohio: and being a part of the Southwest Quarter of Section 14, Township 22, Range 16 and being more fully described as follows:

Beginning at the Southeast corner of the Southwest Quarter of Section 14;

Thence, North 89° 38' West along the South boundary of Section 14, also along the center of State Route 250, a distance of 200.61 feet to a railroad spike, to the true point of beginning;

Thence continuing North 89° 38' West, a distance of 200.05 feet to an iron pin;

Thence North 00° 22' East and passing through an iron pin set, 67.99 feet from said pin in the center of State Route 250, a distance of 382.82 feet to an iron pin;

Thence South 89° 10' East, a distance of 200.06 feet to an iron pin;

Thence South 00° 22' West and passing through an iron pin set 55.00 feet from a railroad spike in the center of State Route 250, a distance of 381.23 feet to said railroad spike, the true place of beginning,

Containing 1.75 acres of land, more or less.

The foregoing description was prepared by Robert O. Schneider, Jr. Registered No. 5054.

Together with an easement for right of pass and re-pass by foot and by vehicles as set forth in Easement recorded at Deed Book Volume 509, Page 565.

A-19

**EXHIBIT C**

**FORM OF AUTHORIZATION AGREEMENT – PRE-ARRANGED PAYMENTS**

| |
|---|
| Reference Number _____ |
| I (We) (Tenant) authorize /_____\, (Servicer) to initiate entries identified below as required. Tenant further authorizes the bank below to post such entries to the identified checking account beginning with the payment draft date of ____/____/____.  A minimum of thirty (30) days advance notice is required to process first payment by ACH. |
| Bank Name_____Branch_____ |
| City_____State_____Zip_____ |

— — — — — — — — —          — — — — — — — — — — — — — —

       ***Transit - ABA**                 **Account Number Information**

| |
|---|
| ACCOUNT TYPE*** Please specify checking or savings account (C/S) _____ |
| **PLEASE FILL IN BANK INFORMATION CAREFULLY**<br>**ATTACH VOIDED CHECK FOR ACCOUNT VERIFICATION** |

      Automatic debits will be made on the payment due date established by the relevant lease documents, or the next subsequent business day if such date is not a business day. This authority may be terminated upon thirty days prior written notification from the Tenant to the servicer. Tenant has the right to stop payment of any entry by notification to the bank prior to the scheduled debit date. If an erroneous entry is initiated by the servicer to the Tenant's account, Tenant shall have the right to have the amount of such entry reversed by the bank. To initiate a reversal, the Tenant must notify the bank in writing that an error has occurred and request a reversal. Such notice must be within 15 calendar days after the Tenant receives the statement of account or other written notice from the bank identifying the error. Tenant hereby authorizes the servicer to impose a $60.00 returned item processing fee, subject to change, via ACH debit against the above-referenced account of the Tenant if a non-sufficient funds or stop payment item is charged against the servicer's account.

| |
|---|
| **Tenant**                                      **Tax Identification** |
| **Name(**s) _____**Number** _____ |
| **Date**_____ |
| **Print Authorized Name**   _____ |
| **Authorized Signature** _____ |
| **Print Authorized Name**   _____ |
| **Authorized Signature** _____ |
| **Contact Phone Number** _____ **Fax Number** _____ |
| **Email Address**: _____ |

**Return Original to**:    /_____\
                          **Attn:** /_____\
                          /_____\
                          /_____\
                          **Fax Number:**/_____\

4832-6836-0282.2
STORE/Campbells (Perkins)
Master Lease Agreement
20 Properties
File No. 7210/02-588

**EXHIBIT D**

**STATE-SPECIFIC PROVISIONS**

**OHIO**:

Upon receipt of Lessor's invoice, Lessee shall pay its *pro rata* share of the installment of taxes for which Lessee is responsible pursuant to Section 6.01(a) (Taxes) which were a lien during the Lease Term but are due and payable following the expiration of this Lease.

Notwithstanding Section 7.02 (Alterations and Improvements), prior to commencing any alterations to the Properties, Lessee shall prepare, record, serve and post a Notice of Commencement in compliance with Ohio Revised Code Section 1311.04.  Upon completion of such improvements, Lessee shall prepare and record a termination of the Notice of Commencement.  Copies of all Notices of Commencement and terminations shall be delivered to Lessor within seven (7) days of recording.

**PENNSYLVANIA:**

Lessor and Lessee agree as follows:

1.      The following is added as a new Section 12.05 to the Lease:

12.05   **Proceedings**.  In any action of ejectment and/or for Rental, Lessor shall first cause to be filed in such action an affidavit made by it or someone acting for it, setting forth the facts necessary to authorize the entry of judgment, and, if a true copy of this Lease (and of the truth of the copy such affidavit shall be sufficient evidence) be filed in such action, it shall not be necessary to file the original as a warrant of attorney, any rule of Court, custom or practice to the contrary notwithstanding.

2.      The following is added as a new Section 12.06 to the Lease:

12.06   **Waiver of Notice to Quit**.  Lessee agrees to give up certain legal rights as provided by the Landlord and Tenant Act of 1951, as amended, 68 P.S. § 250.101, *et seq.*, including, but not limited to the ten (10) or thirty (30) day notice period which is contained in § 501 thereof, or any other notice period established by applicable law.  No notice will be required to be given by Lessor to Lessee to leave and give up the Properties.  Lessee will be asked to leave the Properties without notice under any of the following conditions:

(a)      Lessee does not leave any Property at the end of the Lease Term.

(b)      Lessee breaks any of the terms or conditions of this Lease.

(c)      Lessee fails, upon demand, to make all Rental payments and other payments when due.

D-1

**SCHEDULE 9.03**

**SUPPLEMENTAL FINANCIAL INFORMATION**

Lessee shall deliver the following information in connection with delivery of the corporate financial statements required in Section 9.03 of the Lease.

**Corporate Financial Reporting Certificate**

Company:

For the Qtr or FYE ending                                    _____

# of months represented                                    _____

Number of units operating at the end of reporting period    _____

**EBITDAR Calculation:**

Net Income                                                  _____

    Plus: Interest Expense                                 _____
    Plus: Taxes                                            _____
    Plus: Depreciation & Amortization                      _____
    Plus: Operating Lease Expense                          _____
    Plus: Any non-recurring expenses (please clarify below) _____
    Plus: Any other non-cash expenses (please clarify below) _____
      **EBITDAR**                                         _____

**Items required to be broken out of Balance Sheet:**
    Current Portion of Long-Term Debt                      _____
    Current Portion of any Capital Leases                  _____
    Senior Third-Party Debt Balances                       _____
    Subordinate/Related Party Debt Balances                _____

Explanations of non-recurring and non-cash items:

```



```

Lessee shall deliver the following information in connection with delivery of the unit-level financial statements required in Section 9.03 of the Lease.

**STORE Capital Unit-Level Financial Reporting Certificate**

| Unit ID: | 1 | 2 | 3 |
|---|---|---|---|
| For the Qtr or FYE ending | _____ | _____ | _____ |
| # of months represented | _____ | _____ | _____ |

**Store-Level pre-corporate overhead EBITDAR Calculation:**

| | 1 | 2 | 3 |
|---|---|---|---|
| Store-Level Net Income | _____ | _____ | _____ |
| Plus: Interest Expense | _____ | _____ | _____ |
| Plus: Taxes | _____ | _____ | _____ |
| Plus: Depreciation & Amortization | _____ | _____ | _____ |
| Plus: Property Rent Expense (base rent + any % rent) | _____ | _____ | _____ |
| Plus: Any corporate overhead allocations to the unit | _____ | _____ | _____ |
| Plus: Any non-recurring expenses (please clarify below) | _____ | _____ | _____ |
| Plus: Any other non-cash expenses (please clarify below) | _____ | _____ | _____ |
| **EBITDAR** | _____ | _____ | _____ |

**Items required to be broken out on unit-level profit and loss statement:**

| | 1 | 2 | 3 |
|---|---|---|---|
| Cost Goods Sold | _____ | _____ | _____ |
| Labor Expenses | _____ | _____ | _____ |

Explanations of non-recurring and non-cash items:

ii

# EXHIBIT E

## UNCONDITIONAL GUARANTY OF PAYMENT AND PERFORMANCE

**THIS UNCONDITIONAL GUARANTY OF PAYMENT AND PERFORMANCE** (this "Guaranty") is made as of February 12, 2018 by **WILLIAM KANE**, **FRANK KANE** and **RON LINABURG** (each, a "Guarantor" and collectively, "Guarantors"), for the benefit of **STORE CAPITAL ACQUISITIONS, LLC**, a Delaware limited liability company (together with its successors and assigns under the Lease (as defined below), "Lessor").

## RECITALS

A.      Lessor and 5171 Campbells Land Co., Inc., a Pennsylvania corporation ("Lessee"), have entered into that certain Master Lease Agreement of even date herewith (as the same may be amended from time to time, the "Lease"), pursuant to which Lessor leases to Lessee the real property described therein and the improvements located thereon (the "Properties").

B.      As a condition to Lessor entering into the Lease, Guarantors have agreed to execute and deliver this Guaranty for the benefit of Lessor.

C.      Each Guarantor owns a substantial direct and/or indirect interest in the Lessee and will derive substantial benefit from the Lease.

D.      All capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Lease.

In consideration of the premises and other good and valuable consideration, the receipt of and sufficiency of which are hereby acknowledged, and in order to induce the Lessor to enter into the Lease, each Guarantor hereby agrees as follows:

1.      **Guaranty**.      Each Guarantor unconditionally, absolutely and irrevocably guarantees the punctual and complete payment and performance when due to Lessor of all Monetary Obligations, including, without limitation, Rental, taxes, insurance premiums, impounds, reimbursements, late charges, default interest, damages, indemnity obligations and all other amounts, costs, fees, expenses and charges of any kind or type whatsoever, which may or at any time be due to Lessor under or pursuant to the documents listed on Schedule I attached hereto (collectively, the "Documents").      Each Guarantor also unconditionally guarantees the truthfulness and accuracy of all representations, warranties and certifications of Lessee, the satisfaction of all conditions by Lessee and the full and timely performance of all obligations to be performed by Lessee, under or pursuant to the Documents (the matters which are guaranteed pursuant to this section are hereinafter collectively referred to as the "Obligations"). The obligations of Guarantors under this Guaranty are primary, joint and several and independent of the obligations of Lessee and any and every other guarantor of the Obligations, and a separate action or actions may be brought and executed against each Guarantor or any other such guarantor, whether or not such action is brought against Lessee or any other such guarantor and whether or not Lessee or any other such guarantor be joined in such action or actions.  References in this Guaranty to Guarantor are to each Guarantor signing this Guaranty, and the liability of each such Guarantor is joint and several.  Notwithstanding the

forgoing, Guarantor shall be released from all obligations hereunder and this Guaranty shall terminate upon the release of Lessee from its obligations under the Lease after a permitted assignment of the Lease to a Qualified Operator pursuant to Section 14.02(b)(iii) of the Lease.

This Guaranty shall terminate and be of no further force or effect (the "Termination"), upon Guarantors' request, if at any time following the fifth (5th) anniversary of the Effective Date, Lessee shall have, for two (2) consecutive years immediately prior to the date of determination (all as determined by Lessor upon review of financial statements provided by the Guarantor prior to the determination), (A) maintained an aggregate FCCR (defined below) for the Properties and all other real property subject to an Other Agreement (as defined in the Lease) of at least 1.5x; and (B) have generated an Effective Debt to EBITDAR ratio of no more than 5.0x; *provided, however,* the Termination shall be conditioned upon no Event of Default having occurred, nor any event having occurred which, with the delivery of notice and/or the passage of time, could result in an Event of Default.

For purposes hereof:

"*FCCR*" means with respect to the twelve month period of time immediately preceding the date of determination, the ratio calculated for such period of time, each as determined in accordance with GAAP, of (1) the sum of Net Income (excluding non-cash income), Depreciation and Amortization, Interest Expense, Operating Lease Expense and non-cash expenses, minus a G&A allocation equal to the total net sales at the subject properties multiplied by four percent (4%), to (2) the sum of Operating Lease Expense (excluding non-cash rent adjustments), scheduled principal payments of long term Debt, scheduled maturities of all Capital Leases, dividends and Interest Expense (excluding non-cash interest expense and amortization of non-cash financing expenses). For purposes of calculating the FCCR, the following terms shall be defined as set forth below:

"*Capital Lease*" shall mean all leases of any property, whether real, personal or mixed, by a Person, which leases would, in conformity with GAAP, be required to be accounted for as a capital lease on the balance sheet of such Person.  The term "Capital Lease" shall not include any operating lease.

"*Debt*" shall mean with respect to a Person, and for the period of determination (i) indebtedness for borrowed money, (ii) subject to the limitation set forth in sub-item (iv) below, obligations evidenced by bonds, indentures, notes or similar instruments, (iii) obligations under leases which should be, in accordance with GAAP, recorded as Capital Leases, and (iv) obligations under direct or indirect guarantees in respect of, and obligations (contingent or otherwise) to purchase or otherwise acquire, or otherwise to assure a creditor against loss in respect of, indebtedness or obligations of others of the kinds referred to in clauses (i) through (iv) above, except for guaranty obligations of such Person, which, in conformity with GAAP, are not included on the balance sheet of such Person.

"*Depreciation and Amortization*" shall mean the depreciation and amortization accruing during any period of determination with respect to a Person, as determined in accordance with GAAP.

4814-5023-8042.3
STORE/Campbells (Perkins)
Master Lease Guaranty
26 Properties
File No. 7210/02-588

"*Interest Expense*" shall mean for any period of determination, the sum of all interest accrued or which should be accrued in respect of all Debt of a Person, as determined in accordance with GAAP.

"*Net Income*" shall mean with respect to the period of determination, the net income or net loss as determined in accordance with GAAP.

"*Operating Lease Expense*" shall mean the sum of all payments and expenses incurred by a Person under any operating leases during the period of determination, as determined in accordance with GAAP.

"*EBITDA*" means for the twelve (12) month period ending on the date of determination, the sum of a Person's net income (loss) for such period plus, in each case to the extent previously deducted in calculating net income (loss): (i) income taxes, (ii) interest payments on all of its debt obligations (including any borrowings under short term credit facilities), (iii) all non-cash charges including depreciation and amortization, and (iv) Non-Recurring Items (defined below).

"*EBITDAR*" means the sum of Lessee's EBITDA and its total land and building rent for the twelve (12) month period ending on the date of determination.

"*Effective Debt*" shall mean, for the period of determination, the sum of (i) Lessee's Debt and (ii) eight (8) multiplied by the annual rental payments due under leases which should not be, in accordance with GAAP, recorded as Capital Leases.

"*Non-Recurring Items*" shall mean with respect to a Person, items of the sum (whether positive or negative) of revenue minus expenses that, in the judgment of Lessor, are unusual in nature, occur infrequently and are not representative of the ongoing or future earnings or expenses of such Person.

2.   **Waivers**.   This is an absolute and unconditional guaranty of payment and performance and not of collection and each Guarantor unconditionally (a) waives any requirement that Lessor first make demand upon, or seek to enforce or exhaust remedies against, Lessee or any other Person (including any other guarantor) or any of the collateral or property of Lessee or such other Person before demanding payment from, or seeking to enforce this Guaranty against, Guarantor; (b) waives all rights of subrogation, all rights of indemnity and any other rights to collect reimbursement from Lessee; (c) waives any right to participate in any security now or hereafter held by Lessor or in any claim or remedy of Lessor or any other Person against Lessee with respect to the Obligations; (d) waives diligence, presentment, protest, demand for performance, notice of nonperformance, notice of intent to accelerate, notice of acceleration, notice of protest, notice of dishonor, notice of execution of any Documents, notice of extension, renewal, alteration or amendment, notice of acceptance of this Guaranty, notice of defaults under any of the Documents and all other notices whatsoever; (e) waives and agrees not to assert any and all rights, benefits and defenses which might otherwise be available under the provisions of Ariz. Rev. Stat. §12-1641 and §12–1642 et seq., §44-141, §44-142 or §47-3605, Arizona Rules of Civil Procedure Rule 17(f), or any other laws, statutes or rules (including any laws, statutes or rules amending, supplementing or supplanting same) which may conflict with the terms of this Guaranty or might operate, contrary to Guarantor's

3

agreements in this Guaranty, to limit Guarantor's liability under, or the enforcement of, this Guaranty; (f) covenants that this Guaranty will not be discharged until all of the Obligations are fully satisfied; and (g) agrees that this Guaranty shall remain in full effect without regard to, and shall not be affected or impaired by, any invalidity, irregularity or unenforceability in whole or in part of any of the Documents, or any limitation of the liability of Lessee or Guarantor thereunder, or any limitation on the method or terms of payment thereunder which may now or hereafter be caused or imposed in any manner whatsoever.

3.      **Continuing Guaranty**.   This Guaranty is a continuing guaranty, and the obligations, undertakings and conditions to be performed or observed by Guarantors under this Guaranty shall not be affected or impaired by reason of the happening from time to time of the following with respect to the Documents, all without notice to, or the further consent of, Guarantors: (a) the waiver by Lessor of the observance or performance by Lessee or Guarantor of any of the obligations, undertakings, conditions or other provisions contained in any of the Documents, except to the extent of such waiver; (b) the extension, in whole or in part, of the time for payment of any amount owing or payable under the Documents; (c) the modification or amendment (whether material or otherwise) of any of the obligations of Lessee under, or any other provisions of, any of the Documents, except to the extent of such modification or amendment; (d)  the taking or the omission of any of the actions referred to in any of the Documents (including, without limitation, the giving of any consent referred to therein); (e) any failure, omission, delay or lack on the part of Lessor to enforce, assert or exercise any provision of the Documents, including any right, power or remedy conferred on Lessor in any of the Documents or any action on the part of Lessor granting indulgence or extension in any form; (f) the assignment to or assumption by any third party of any or all of the rights or obligations of Lessee under all or any of the Documents; (g) the release or discharge of Lessee from the performance or observance of any obligation, undertaking or condition to be performed by Lessee under any of the Documents by operation of law, including any rejection or disaffirmance of any of the Documents in any bankruptcy or similar proceedings; (h) the receipt and acceptance by Lessor or any other Person of notes, checks or other instruments for the payment of money and extensions and renewals thereof; (i) any action, inaction or election of remedies by Lessor which results in any impairment or destruction of any subrogation rights of Guarantor, or any rights of Guarantor to proceed against any other Person for reimbursement; (j) any setoff, defense, counterclaim, abatement, recoupment, reduction, change in law or any other event or circumstance which might otherwise constitute a legal or equitable discharge or defense of a guarantor, indemnitor or surety under the laws of the State of Arizona, the states in which the Properties are located or any other jurisdiction; and (k) the termination or renewal of any of the Obligations or any other provision thereof.

4.      **Representations and Warranties**.  Each Guarantor represents and warrants to Lessor that: (a) neither the execution nor delivery of this Guaranty nor fulfillment of nor compliance with the terms and provisions hereof will conflict with, or result in a breach of the terms or conditions of, or constitute a default under, any agreement or instrument to which Guarantor is now a party or by which Guarantor may be bound, or result in the creation of any lien, charge or encumbrance upon any property or assets of Guarantor, which conflict, breach, default, lien, charge or encumbrance could result in a material adverse change in the financial condition of Guarantor; (b) no further consents, approvals or authorizations are required for the execution and delivery of this Guaranty by Guarantor or for Guarantor's compliance with the terms and provisions of this Guaranty; (c) this Guaranty is the legal, valid and binding

4

agreement of Guarantor and is enforceable against Guarantor in accordance with its terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, liquidation, reorganization and other laws affecting the rights of creditors generally and subject to general principles of equity; (d) Guarantor has the full power, authority, capacity and legal right to execute and deliver this Guaranty, and, to the extent Guarantor is a corporation, partnership, limited liability company or other form of entity, the parties executing this Guaranty on behalf of Guarantor are fully authorized and directed to execute the same to bind Guarantor; (e) Guarantor is not, and if Guarantor is a "disregarded entity," any owner of the disregarded entity is not, a "nonresident alien," "foreign corporation," "foreign partnership," "foreign trust," "foreign estate," or any other "person" that is not a "United States person," as those terms are defined in the U.S. Internal Revenue Code and the regulations promulgated thereunder; (f) Guarantor is not a party with whom a citizen of the United States is prohibited from engaging in transactions by any trade embargo, economic sanction or other prohibition of United States law, regulation or Executive Order of the President of the United States; (g) all financial statements and other information relating to Guarantor heretofore delivered to Lessor are true, correct and complete in all material respects as of the date of this Guaranty and Guarantor will furnish Lessor, within forty five (45) days after the end of each fiscal quarter of Guarantor and within one hundred twenty (120) days after the end of each fiscal year of Guarantor, complete financial statements of Guarantor, including a balance sheet, profit and loss statement, statement of changes in financial condition and all other related schedules for the fiscal period then ended; (h) during the term of this Guaranty, Guarantor will not transfer or dispose of any material part of Guarantor's assets except in the ordinary course of business for full and fair consideration and reasonably equivalent value; and (i) the Documents are conclusively presumed to have been signed in reliance on this Guaranty, and the assumption by Guarantor of Guarantor's obligations under this Guaranty results in direct financial benefit to Guarantor. Guarantor understands that Lessor is relying on the representations and warranties of Guarantor, and Guarantor represents that such reliance is reasonable.

5. **Nature of Guaranty**. This Guaranty shall commence upon execution and delivery of any of the Documents and shall continue in full force and effect until all of the Obligations are duly, finally and permanently paid, performed and discharged and are not subject to any right of extension by Lessee, and Lessor gives Guarantors written notice of the full and final satisfaction of the Obligations. The Obligations shall not be considered fully paid, performed and discharged unless and until all payments by Lessee to Lessor are no longer subject to any right on the part of any Person whomsoever, including but not limited to Lessee, Lessee as a debtor-in-possession and/or any trustee in bankruptcy, to disgorge such payments or seek to recoup the amount of such payments or any part thereof. This Guaranty shall remain in full force and effect and continue to be effective upon an Insolvency Event. This Guaranty shall continue to be effective or be reinstated, as applicable, if at any time payment and performance of the Obligations, or any part thereof, are, pursuant to applicable law, rescinded or reduced in amount, or must otherwise be restored or returned by Lessor, whether as a "voidable preference," "fraudulent conveyance" or otherwise, all as though such payment or performance had not been made. In the event that any payment of the Obligations, or any part thereof, is rescinded, reduced, restored or returned, the Obligations shall be reinstated and deemed reduced only by such amount paid to Lessor and not so rescinded, reduced, restored or returned.

5

6.      **Subordination**.  Notwithstanding any provision contained in this Guaranty, in the event that a Guarantor shall have any claims against Lessee, any indebtedness of Lessee now or hereafter held by a Guarantor is hereby subordinated to the indebtedness of Lessee to Lessor, including, without limitation, any and all amounts due to Lessor under the Lease.  Any such indebtedness of Lessee to a Guarantor, if Lessor so requests, shall be collected, enforced and received by such Guarantor as trustee for Lessor and be paid over to Lessor on account of the Obligations, but without reducing or affecting in any manner the liability of such Guarantor under the other provisions of this Guaranty.

7.      **Authority**.  It is not necessary for Lessor to inquire into the powers of Lessee or its officers, directors, partners or agents acting or purporting to act on its behalf, and Guarantors shall be liable for the Obligations in accordance with their terms notwithstanding any lack of authorization or defect in execution or delivery by Lessee.

8.      **Attorneys' Fees and Costs**.  In addition to the amounts guaranteed under this Guaranty, each Guarantor agrees to pay (a) all of Lessor's Costs, and (b) interest (including postpetition interest to the extent a petition is filed by or against Lessee under the Bankruptcy Code) at the Default Rate on any Obligations not paid when due.  Each Guarantor hereby agrees to indemnify and hold harmless Lessor for, from and against all Losses suffered or occasioned by the failure of Lessee to satisfy its obligations under the Documents.  The agreement to indemnify Lessor contained in this Section shall be enforceable notwithstanding the invalidity or unenforceability of the Documents or any of them or the invalidity or unenforceability of any other paragraph contained in this Guaranty.  All moneys available to Lessor for application in payment or reduction of the liabilities of Lessee under the Documents may be applied by Lessor to the payment or reduction of such liabilities of Lessee, in such manner, in such amounts and at such time or times as Lessor may elect.

9.      **Notice**.  All notices, demands, designations, certificates, requests, offers, consents, approvals, appointments and other instruments given pursuant to this Guaranty (collectively called "Notices") shall be in writing and given by any one of the following: (a) hand delivery; (b) express overnight delivery service; (c) certified or registered mail, return receipt requested; or (d) electronic mail message, and shall be deemed to have been delivered upon (i) receipt, if hand delivered, (ii) the next Business Day, if delivered by a reputable express overnight delivery service; (iii) the third Business Day following the day of deposit of such notice with the United States Postal Service, if sent by certified or registered mail, return receipt requested; or (iv) transmission, if delivered by electronic mail.  Notices shall be provided to the parties and addresses (or electronic mail addresses) specified below:

If to Guarantor:          William Kane
                          Email: wtkane25@gmail.com

                          Frank Kane
                          Email: francisjohnnykane@gmail.com

                          Ron Linaburg
                          Email: dr.rglinaburg@lina4.com

4814-5023-8042.3
STORE/Campbells (Perkins)
Master Lease Guaranty
26 Properties
File No. 7210/02-588

| If to Lessor: | STORE Capital Acquisitions, LLC |
|---|---|
| | 8377 E. Hartford Drive, Suite 100 |
| | Scottsdale, AZ  85255 |
| | Attention:  Michael T. Bennett |
| | Executive Vice President – General Counsel |
| | Email: mbennett@storecapital.com |
| | |
| With a copy to: | Kutak Rock LLP |
| | 1801 California Street, Suite 3000 |
| | Denver, CO  80202 |
| | Attention:  Nathan Humphrey, Esq. |
| | Telephone: (303) 297-2400 |
| | Email: nathan.humphrey@kutakrock.com |

or to such other address or such other Person as either party may from time to time hereafter specify to the other party in a notice delivered in the manner provided above.

10.     **Governing Law**.  This Guaranty is delivered in the State of Arizona, and it is the intent of Guarantor and Lessor that this Guaranty shall be deemed to be a contract made under and governed by the internal laws of the State of Arizona, without regard to its principles of conflicts of law.  For purposes of any action or proceeding involving this Guaranty, Guarantor submits to the jurisdiction of all federal and state courts located in the State of Arizona and consents that each Guarantor may be served with any process or paper by registered mail or by personal service within or without the State of Arizona in accordance with applicable law.  Each Guarantor waives and agrees not to assert in any such action, suit or proceeding that Guarantor is not personally subject to the jurisdiction of such courts, that the action, suit or proceeding is brought in an inconvenient forum or that venue of the action, suit or proceeding is improper. Nothing contained in this section shall limit or restrict the right of Lessor to commence any proceeding in the federal or state courts located in the states in which the Properties are located and/or where a Guarantor maintains its residence or chief executive office to the extent Lessor deems such proceeding necessary or advisable to exercise remedies available under the Documents.

11.     **Acknowledgement of Lease**.  Each Guarantor intends for the Lease to be a "true lease" and not a financing lease, capital lease, mortgage, equitable mortgage, deed of trust, security agreement or other financing or trust arrangement, and the economic realities of the Lease are those of a true lease.  Guarantors shall not challenge the validity, enforceability or characterization of the Transaction, and Guarantors shall support the intent of each Guarantor, Lessee and Lessor that the Lease is a "true lease" and does not create a joint venture, partnership, equitable mortgage, trust, financing device or arrangement, trust agreement, security interest or the like.  Each Guarantor acknowledges that Lessor did not prepare or assist in the preparation of any of the projected financial figures used by Lessee in analyzing the economic viability and feasibility of the Transaction.

12.     **Independent Rights**.  All of Lessor's rights and remedies under the Documents and this Guaranty are intended to be distinct, separate and cumulative and no such right and remedy is intended to be in exclusion of or a waiver of any of the others.

4814-5023-8042.3
STORE/Campbells (Perkins)
Master Lease Guaranty
26 Properties
File No. 7210/02-588

13.     **Assignment**.  Each Guarantor acknowledges and agrees that (a) Lessor may collaterally assign all of its right, title and interest under the Lease and this Guaranty to a lender; and (b) upon the exercise of any lender's remedies set forth in related loan documents, all of the rights, powers and privileges of Lessor shall be deemed the rights, powers and privileges of such lender and such lender shall be entitled to exercise all of the rights and remedies of "Lessor" under this Guaranty, the Lease and such loan documents.  Each Guarantor hereby consents to, and no further consent by a Guarantor shall be required for, any further assignment of rights of Lessor hereunder or in connection with any transfer by Lessor.  All notices, certificates, reports or other information required to be delivered to Lessor under this Guaranty shall be delivered simultaneously to such lender.  Notwithstanding any provision herein to the contrary, this Guaranty shall not be deemed to create any obligation of or liability for such lender. Each Guarantor intends that such lender shall be an intended third party beneficiary of this Guaranty but without any corresponding responsibility, liability or obligation to Guarantor.

14.     **Inurement**.  Except as otherwise expressly provided in Section 13 above, this Guaranty is solely for the benefit of Lessor, its successors and assigns and is not intended to nor shall it be deemed to be for the benefit of any third party, including, without limitation, Lessee.  This Guaranty and all obligations of Guarantors hereunder shall be binding upon the successors and assigns of Guarantors (including, a debtor-in-possession on behalf of Guarantor) and shall, together with the rights and remedies of Lessor hereunder, inure to the benefit of Lessor, all future holders of any instrument evidencing any of the Obligations and its successor and assigns.  No sales, participations, assignments, transfers or other dispositions of any agreement governing or instrument evidencing the Obligations or any portion thereof or interest therein shall in any manner affect the rights of Lessor or its successors and assigns hereunder.  Guarantors may not assign, sell, hypothecate or otherwise transfer any interest in or obligation under this Guaranty.

15.     **Severability**.   If any provision of this Guaranty is unenforceable, the enforceability of the other provisions shall not be affected and they shall remain in full force and effect.  Guarantor agrees to take such action and to sign such other documents as may be appropriate to carry out the intent of this Guaranty.  This Guaranty may be executed in one or more counterparts, each of which shall be deemed an original.

16.     **WAIVER OF JURY TRIAL**.  LESSOR, BY ACCEPTING THIS GUARANTY, AND EACH GUARANTOR HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE THE RIGHT THEY MAY HAVE TO A TRIAL BY JURY WITH RESPECT TO ANY AND ALL ISSUES PRESENTED IN ANY ACTION, PROCEEDING, CLAIM OR COUNTERCLAIM BROUGHT BY LESSOR OR A GUARANTOR AGAINST ANY PARTY OR THEIR SUCCESSORS WITH RESPECT TO ANY MATTER ARISING OUT OF OR IN CONNECTION WITH THIS GUARANTY, THE RELATIONSHIP OF LESSOR, LESSEE AND/OR GUARANTORS, LESSEE'S USE OR OCCUPANCY OF THE PROPERTIES, AND/OR ANY CLAIM FOR INJURY OR DAMAGE, OR ANY EMERGENCY OR STATUTORY REMEDY. THIS WAIVER BY LESSOR AND GUARANTOR OF ANY RIGHT THEY MAY HAVE TO A TRIAL BY JURY HAS BEEN NEGOTIATED AND IS A MATERIAL INDUCEMENT FOR LESSOR ACCEPTING THIS GUARANTY.   FURTHERMORE, EACH GUARANTOR HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES THE RIGHT IT MAY HAVE TO SEEK PUNITIVE, CONSEQUENTIAL, SPECIAL AND INDIRECT DAMAGES FROM LESSOR OR ANY OF LESSOR'S AFFILIATES, OFFICERS, DIRECTORS, MANAGERS, MEMBERS OR

8

EMPLOYEES OR ANY OF THEIR SUCCESSORS WITH RESPECT TO ANY AND ALL ISSUES PRESENTED IN ANY ACTION, PROCEEDING, CLAIM OR COUNTERCLAIM BROUGHT WITH RESPECT TO ANY MATTER ARISING OUT OF OR IN CONNECTION WITH THIS GUARANTY OR ANY DOCUMENTS CONTEMPLATED HEREIN OR RELATED HERETO.  THE WAIVER BY GUARANTORS OF ANY RIGHT IT MAY HAVE TO SEEK PUNITIVE, CONSEQUENTIAL, SPECIAL AND INDIRECT DAMAGES HAS BEEN NEGOTIATED BY THE PARTIES AND IS AN ESSENTIAL ASPECT OF THEIR BARGAIN.

17.    **Final Agreement**.  This Guaranty represents the final agreement between Lessor and Guarantors and may not be contradicted by evidence of prior, contemporaneous or subsequent oral agreements.  Each Guarantor covenants and agrees that there are no unwritten oral agreements between Lessor and Guarantor and all prior or contemporaneous agreements, understandings, representations, and statements, oral or written, are merged into this Guaranty.  Neither this Guaranty nor any provision hereof may be waived, modified, amended, discharged, or terminated except by an agreement in writing signed by the party against which the enforcement of such waiver, modification, amendment, discharge, or termination is sought, and then only to the extent set forth in such agreement.

18.    **Securitizations; Other**.  As a material inducement to Lessor's willingness to complete the Transaction contemplated by the Lease and the other Transaction Documents, each Guarantor hereby acknowledges and agrees that Lessor may, from time to time and at any time (a) advertise, issue press releases, send direct mail or otherwise disclose information regarding the Transaction for marketing purposes; and (b) (i) act or permit another Person to act as sponsor, settler, transferor or depositor of, or a holder of interests in, one or more Persons or other arrangements formed pursuant to a trust agreement, indenture, pooling agreement, participation agreement, sale and servicing agreement, limited liability company agreement, partnership agreement, articles of incorporation or similar agreement or document; and (ii) permit one or more of such Persons or arrangements to offer and sell stock, certificates, bonds, notes, other evidences of indebtedness or securities that are directly or indirectly secured, collateralized or otherwise backed by or represent a direct or indirect interest in whole or in part in any of the assets, rights or properties described in Section 14.01 of the Lease, in one or more Persons or arrangements holding such assets, rights or properties, or any of them (collectively, the "Securities"), whether any such Securities are privately or publicly offered and sold, or rated or unrated (any combination of which actions and transactions described in both clauses (i) and (ii) in this paragraph, whether proposed or completed, are referred to in the Lease as a "Securitization").  At no additional expense to Guarantors, Each Guarantor shall cooperate fully with Lessor and any Affected Party with respect to all reasonable requests and due diligence procedures and to use reasonable efforts to facilitate such Securitization.

*[Remainder of page intentionally left blank; signature page to follow]*

9

IN WITNESS WHEREOF, the undersigned Guarantor has executed this Guaranty effective as of the date set forth in the introductory paragraph of this Guaranty.

**GUARANTOR:**

**WILLIAM KANE**, an individual

STATE OF _Pennsylvania_
                                    ) ss.
COUNTY OF _Allegheny_ )

The foregoing instrument was acknowledged before me this _____ day of January, 2018, by William Kane, an individual.

COMMONWEALTH OF PENNSYLVANIA
NOTARIAL SEAL
Rosanne M. Penn, Notary Public
City of Pittsburgh, Allegheny County
My Commission Expires Sept. 13, 2020
MEMBER, PENNSYLVANIA ASSOCIATION OF NOTARIES

Notary Public

My Commission Expires: _9/13/20_

**FRANK KANE**, an individual

STATE OF _____          )
                                    ) ss.
COUNTY OF _____       )

The foregoing instrument was acknowledged before me this _____ day of January, 2018, by Frank Kane, an individual.

Notary Public

My Commission Expires: _____

IN WITNESS WHEREOF, the undersigned Guarantor has executed this Guaranty effective as of the date set forth in the introductory paragraph of this Guaranty.

**GUARANTOR:**

_____
**WILLIAM KANE**, an individual

STATE OF _____    )
                        ) ss.
COUNTY OF _____   )

The foregoing instrument was acknowledged before me this _____ day of January, 2018, by William Kane, an individual.

_____
Notary Public

My Commission Expires: _____

_____
**FRANK KANE**, an individual

STATE OF *Pennsylvania*  )
                         ) ss.
COUNTY OF *Butler*       )

The foregoing instrument was acknowledged before me this 30th day of January, 2018, by Frank Kane, an individual.

_____
Notary Public

My Commission Expires: July, 20, 20

COMMONWEALTH OF PENNSYLVANIA
NOTARIAL SEAL
Christopher Cole, Notary Public
Cranberry Twp., Butler County
My Commission Expires July 20, 2020
MEMBER, PENNSYLVANIA ASSOCIATION OF NOTARIES

4814-5023-8042.3
STORE/Campbells (Perkins)
Master Lease Guaranty
26 Properties
File No. 7210/02-588

**RON LINABURG**, an individual

STATE OF _Pennsylvania_ )
) ss.
COUNTY OF _Allegheny_ )

    The foregoing instrument was acknowledged before me this _____ day of January, 2018, by Ron Linaburg, an individual.

Notary Public

My Commission Expires: ___9/13/20___

COMMONWEALTH OF PENNSYLVANIA
NOTARIAL SEAL
Rosanne M. Penn, Notary Public
City of Pittsburgh, Allegheny County
My Commission Expires Sept. 13, 2020
MEMBER, PENNSYLVANIA ASSOCIATION OF NOTARIES

2

**SCHEDULE I**

**DOCUMENTS**

1.      Lease.

2.      Any other document, agreement, instrument or certificate contemplated by the Lease, or any other documents, agreements, instruments or certificates now or hereafter entered into between Lessor and Lessee with respect to the Lease.

3.      Any amendment of the foregoing documents, agreements, instruments or certificates now or hereafter entered into between Lessor and Lessee.

# EXHIBIT F

## LEASE AGREEMENT

**THIS LEASE AGREEMENT** (this "Lease") is made as of February 12, 2018 (the "Effective Date"), by and between **STORE CAPITAL ACQUISITIONS, LLC**, a Delaware limited liability company ("Lessor"), whose address is 8377 E. Hartford Drive, Suite 100, Scottsdale, Arizona 85255, and **5171 CAMPBELLS LAND CO., INC.**, a Pennsylvania corporation ("Lessee"), whose address is 6201 Steubenville Pike, Suite 100, McKees Rocks, Pennsylvania 15136.  Capitalized terms not defined herein shall have the meanings set forth in Exhibit A hereto.

In consideration of the mutual covenants and agreements contained in this Lease, intending to be legally bound, Lessor and Lessee covenant and agree as follows:

### ARTICLE I

### BASIC LEASE TERMS

**Section 1.01.  Property**.  The street address and legal description of the Property is set forth on Exhibit B attached hereto and incorporated herein.

**Section 1.02.  Initial Term Expiration Date**.  February 28, 2038.

**Section 1.03.  Extension Options**.  Four (4) extensions of five (5) years each, as described in Section 3.02.

**Section 1.04.  Term Expiration Date (if fully extended)**.  February 28, 2058.

**Section 1.05.  Initial Base Annual Rental**.  $108,297.84, as described in Article IV.

**Section 1.06.  Rental Adjustment**.  The lesser of (i) 2%, or (ii) 1.25 times the change in the Price Index, as described in Section 4.02.

**Section 1.07.  Adjustment Date**.  March 1, 2019 and annually on March 1st thereafter during the Lease Term (including any Extension Term).

**Section 1.08.  Guarantors**.  William Kane, Frank Kane and Ron Linaburg.

**Section 1.09.  Intentionally Deleted**.

**Section 1.10.  Lessee Tax Identification No**.  46-2488070.

**Section 1.11.  Lessor Tax Identification No.**  45-2674893.

### ARTICLE II

### LEASE OF PROPERTY

**Section 2.01.  Lease**.  In consideration of Lessee's payment of the Rental and other Monetary Obligations and Lessee's performance of all other obligations hereunder, Lessor

hereby leases to Lessee, and Lessee hereby takes and hires, the Property, "AS IS" and "WHERE IS" without representation or warranty by Lessor, and subject to the existing state of title, the parties in possession, any statement of facts which an accurate survey or physical inspection might reveal, and all Legal Requirements now or hereafter in effect.

**Section 2.02.  Quiet Enjoyment**.  So long as Lessee shall pay the Rental and other Monetary Obligations provided in this Lease and shall keep and perform all of the terms, covenants and conditions on its part contained herein and subject to the rights of Lessor under Section 12.02, Lessee shall have, subject to the terms and conditions set forth herein, the right to the peaceful and quiet enjoyment and occupancy of the Property.

## ARTICLE III

## LEASE TERM; EXTENSION

**Section 3.01.  Initial Term**.  The initial term of this Lease ("Initial Term") shall commence as of the Effective Date and shall expire at midnight on February 28, 2038, unless terminated sooner as provided in this Lease and as may be extended as provided herein.  The time period during which this Lease shall actually be in effect, including any Extension Term, is referred to as the "Lease Term."

**Section 3.02.  Extensions**.  Unless this Lease has expired or has been sooner terminated, or an Event of Default has occurred and is continuing at the time any extension option is exercised, Lessee shall have the right and option (each, an "Extension Option") to extend the Initial Term for all and not less than the Property for four (4) additional successive periods of five (5) years each (each, an "Extension Term"), pursuant to the terms and conditions of this Lease then in effect.

**Section 3.03.  Notice of Exercise**.  Lessee may only exercise the Extension Options by giving written notice thereof to Lessor of its election to do so no later than one hundred twenty (120) days prior to the expiration of the then-current Lease Term.  If written notice of the exercise of any Extension Option is not received by Lessor by the applicable dates described above, then this Lease shall terminate on the last day of the Initial Term or, if applicable, the last day of the Extension Term then in effect.  Upon the request of Lessor or Lessee, the parties hereto will, at the expense of Lessee, execute and exchange an instrument in recordable form setting forth the extension of the Lease Term in accordance with this Section 3.03.

**Section 3.04.  Removal of Personalty**.  Upon the expiration of the Lease Term, and if Lessee is not then in breach hereof, Lessee may remove from the Property all personal property belonging to Lessee.  Lessee shall repair any damage caused by such removal and shall leave the Property clean and in good and working condition and repair inside and out, subject to normal wear and tear, casualty and condemnation.  Any property of Lessee left on the Property on the tenth day following the expiration of the Lease Term shall, at Lessor's option, automatically and immediately become the property of Lessor.

4813-8322-9019.1
STORE/Campbells (Perkins)
Lease Agreement
2945 East State Street, Hermitage, PA 16148
File No. 7210/02-588.23

## ARTICLE IV

## RENTAL AND OTHER MONETARY OBLIGATIONS

**Section 4.01.  Base Monthly Rental**.  During the Lease Term, on or before the first day of each calendar month, Lessee shall pay in advance the Base Monthly Rental then in effect.  If the Effective Date is a date other than the first day of the month, Lessee shall pay to Lessor on the Effective Date the Base Monthly Rental prorated by multiplying the Base Monthly Rental by a fraction, the numerator of which is the number of days remaining in the month (including the Effective Date) for which Rental is being paid, and the denominator of which is the total number of days in such month.

**Section 4.02.  Adjustments**.  During the Lease Term (including any Extension Term), on the first Adjustment Date and on each Adjustment Date thereafter, the Base Annual Rental shall increase by an amount equal to the Rental Adjustment; *provided, however*, that in no event shall Base Annual Rental be reduced as a result of the application of the Rental Adjustment.

**Section 4.03.  Additional Rental**.  Lessee shall pay and discharge, as additional rental ("Additional Rental"), all sums of money required to be paid by Lessee under this Lease which are not specifically referred to as Rental.  Lessee shall pay and discharge any Additional Rental when the same shall become due, provided that amounts which are billed to Lessor or any third party, but not to Lessee, shall be paid within fifteen (15) days after Lessor's demand for payment thereof or, if earlier, when the same are due.  In no event shall Lessee be required to pay to Lessor any item of Additional Rental that Lessee is obligated to pay and has paid to any third party pursuant to any provision of this Lease.

**Section 4.04.  Rentals to be Net to Lessor**.   The Base Annual Rental payable hereunder shall be net to Lessor, so that this Lease shall yield to Lessor the Rentals specified during the Lease Term, and all Costs and obligations of every kind and nature whatsoever relating to the Property shall be performed and paid by Lessee.  Lessee shall perform all of its obligations under this Lease at its sole cost and expense. All Rental and other Monetary Obligations which Lessee is required to pay hereunder shall be the unconditional obligation of Lessee and shall be payable in full when due and payable, without notice or demand, and without any setoff, abatement, deferment, deduction or counterclaim whatsoever.

**Section 4.05.  ACH Authorization**.  Upon execution of this Lease, Lessee shall deliver to Lessor a complete Authorization Agreement – Pre-Arranged Payments in the form of Exhibit C attached hereto and incorporated herein by this reference, together with a voided check for account verification, establishing arrangements whereby payments of the Base Monthly Rental are transferred by Automated Clearing House Debit initiated by Lessor from an account established by Lessee at a United States bank or other financial institution to such account as Lessor may designate.  Lessee shall continue to pay all Rental by Automated Clearing House Debit unless otherwise directed by Lessor.

**Section 4.06.  Late Charges; Default Interest**.   Any delinquent payment shall, in addition to any other remedy of Lessor, incur a late charge of five percent (5%) (which late charge is intended to compensate Lessor for the cost of handling and processing such delinquent payment and should not be considered interest) and bear interest at the Default

3

Rate, such interest to be computed from and including the date such payment was due through and including the date of the payment; *provided, however*, in no event shall Lessee be obligated to pay a sum of late charge and interest higher than the maximum legal rate then in effect.

**Section 4.07.  Holdover**.  If Lessee remains in possession of the Property after the expiration of the term hereof, Lessee, at Lessor's option and within Lessor's sole discretion, may be deemed a tenant on a month-to-month basis and shall continue to pay Rentals and other Monetary Obligations in the amounts herein provided, except that the Base Monthly Rental shall be automatically increased to one hundred fifty percent (150%) of the last Base Monthly Rental payable under this Lease, and Lessee shall comply with all the terms of this Lease; *provided that* nothing herein nor the acceptance of Rental by Lessor shall be deemed a consent to such holding over.  Lessee shall defend, indemnify, protect and hold the Indemnified Parties harmless from and against any and all Losses resulting from Lessee's failure to surrender possession upon the expiration of the Lease Term.

**Section 4.08.  Guaranty**.  On or before the execution of this Lease, Lessee shall cause Guarantors to execute and deliver to Lessor the Guaranty.


# ARTICLE V

# REPRESENTATIONS AND WARRANTIES OF LESSEE

The representations and warranties of Lessee contained in this Article V are being made to induce Lessor to enter into this Lease, and Lessor has relied, and will continue to rely, upon such representations and warranties.  Lessee represents and warrants to Lessor as follows:

**Section 5.01.  Organization, Authority and Status of Lessee**.  Lessee has been duly organized or formed, is validly existing and in good standing under the laws of its state of formation and is qualified as a foreign corporation to do business in any jurisdiction where such qualification is required.  All necessary and appropriate action has been taken to authorize the execution, delivery and performance by Lessee of this Lease and of the other documents, instruments and agreements provided for herein.  Lessee is not, and if Lessee is a "disregarded entity," the owner of such disregarded entity is not, a "nonresident alien," "foreign corporation," "foreign partnership," "foreign trust," "foreign estate," or any other "person" that is not a "United States Person" as those terms are defined in the Code and the regulations promulgated thereunder.  The Person who has executed this Lease on behalf of Lessee is duly authorized to do so.

**Section 5.02.  Enforceability**.  This Lease constitutes the legal, valid and binding obligation of Lessee, enforceable against Lessee in accordance with its terms.

**Section 5.03.  Litigation**.  There are no suits, actions, proceedings or investigations pending, or to the best of its knowledge, threatened against or involving any Lessee Entity or the Property before any arbitrator or Governmental Authority which might reasonably result in any Material Adverse Effect.

4813-8322-9019.1
STORE/Campbells (Perkins)
Lease Agreement
2945 East State Street, Hermitage, PA 16148
File No. 7210/02-588.23

**Section 5.04.  Absence of Breaches or Defaults**.  Lessee is not in default under any document, instrument or agreement to which Lessee is a party or by which Lessee, the Property or any of Lessee's property is subject or bound, which has had, or could reasonably be expected to result in, a Material Adverse Effect.  The authorization, execution, delivery and performance of this Lease and the documents, instruments and agreements provided for herein will not result in any breach of or default under any document, instrument or agreement to which Lessee is a party or by which Lessee, the Property or any of Lessee's property is subject or bound.

**Section 5.05.  Compliance with OFAC Laws**.  None of the Lessee Entities, and no individual or entity owning directly or indirectly any interest in any of the Lessee Entities, is an individual or entity whose property or interests are subject to being blocked under any of the OFAC Laws or is otherwise in violation of any of the OFAC Laws; *provided, however*, that the representation contained in this sentence shall not apply to any Person to the extent such Person's interest is in or through a U.S. Publicly Traded Entity.

**Section 5.06.  Solvency**.  There is no contemplated, pending or threatened Insolvency Event or similar proceedings, whether voluntary or involuntary, affecting Lessee or any Lessee Entity.  Lessee does not have unreasonably small capital to conduct its business.

**Section 5.07.  Ownership**.  None of (i) Lessee, (ii) any Affiliate of Lessee, or (iii) any Person owning ten percent (10%) or more of Lessee, owns, directly or indirectly, ten percent (10%) or more of the total voting power or total value of capital stock in STORE Capital Corporation.

**Section 5.08.  Franchise Agreement**.  Lessee has entered into one or more franchise, license and/or area development agreements with Franchisor (each, a "Franchise Agreement") for conduct of the business at the Property.  Each such Franchise Agreement is valid, binding and in full force and effect, permits Lessee to operate Permitted Facilities on the Property, and has a term which will not expire prior to the Lease Term.

# ARTICLE VI

## TAXES AND ASSESSMENTS; UTILITIES; INSURANCE

**Section 6.01.  Taxes**.

(a)  **_Payment_**.  Subject to the provisions of Section 6.01(b) below, Lessee shall pay, prior to the earlier of delinquency or the accrual of interest on the unpaid balance, all taxes and assessments of every type or nature assessed against or imposed upon the Property, Lessee or Lessor during the Lease Term related to or arising out of this Lease and the activities of the parties hereunder, including without limitation, (i) all taxes or assessments upon the Property or any part thereof and upon any personal property, trade fixtures and improvements located on the Property, whether belonging to Lessor or Lessee, or any tax or charge levied in lieu of such taxes and assessments; (ii) all taxes, charges, license fees and or similar fees imposed by reason of the use of the Property by Lessee; (iii) all excise, franchise, transaction, privilege, license, sales, use and other taxes upon the Rental or other Monetary Obligations

5

hereunder, the leasehold estate of either party or the activities of either party pursuant to this Lease; and (iv) all franchise, privilege or similar taxes of Lessor calculated on the value of the Property or on the amount of capital apportioned to the Property. Notwithstanding anything in clauses (i) through (iv) to the contrary, Lessee shall not be obligated to pay or reimburse Lessor for any taxes based on the net income of Lessor.

(b)     ***Right to Contest***.  Within thirty (30) days after each tax and assessment payment is required by this Section 6.01 to be paid, Lessee shall provide Lessor with evidence reasonably satisfactory to Lessor that taxes and assessments have been timely paid by Lessee.   In the event Lessor receives a tax bill, Lessor shall use commercially reasonable efforts to forward said bill to Lessee within fifteen (15) days of Lessor's receipt thereof.   Lessee may, at its own expense, contest or cause to be contested (in the case of any item involving more than $10,000, after prior written notice to Lessor, which shall be given within fifteen (15) days of Lessee's determination to contest any matter as permitted herein), by appropriate legal proceedings conducted in good faith and with due diligence, any above-described item or lien with respect thereto, provided that (i) neither the Property nor any interest therein would be in any danger of being sold, forfeited or lost by reason of such proceedings; (ii) no Event of Default has occurred and is continuing; (iii) if and to the extent required by the applicable taxing authority and/or Lessor, Lessee posts a bond or takes other steps acceptable to such taxing authority and/or Lessor that removes such lien or stays enforcement thereof; (iv) Lessee shall promptly provide Lessor with copies of all notices received or delivered by Lessee and filings made by Lessee in connection with such proceeding; and (v) upon termination of such proceedings, it shall be the obligation of Lessee to pay the amount of any such tax and assessment or part thereof as finally determined in such proceedings, the payment of which may have been deferred during the prosecution of such proceedings, together with any costs, fees (including attorneys' fees and disbursements), interest, penalties or other liabilities in connection therewith.   Lessor shall at the request of Lessee, execute or join in the execution of any instruments or documents necessary in connection with such contest or proceedings, but Lessor shall incur no cost or obligation thereby.

**Section 6.02.  Utilities**.  Lessee shall contract, in its own name, for and pay when due all charges for the connection and use of water, gas, electricity, telephone, garbage collection, sewer use and other utility services supplied to the Property during the Lease Term.  Under no circumstances shall Lessor be responsible for any interruption of any utility service.

**Section 6.03.  Insurance**.

(a)     ***Coverage***.  Throughout the Lease Term, Lessee shall maintain, with respect to the Property, at its sole expense, the following types and amounts of insurance, in addition to such other insurance as Lessor may reasonably require from time to time:

(i)     Insurance against loss or damage to real property and personal property under an "all risk" or "special form" insurance policy, which shall include coverage against all risks of direct physical loss, including but not limited to loss by fire, lightning, wind, terrorism, and other risks normally included in the

6

standard ISO special form (and shall also include National Flood and Excess Flood insurance for the Property located in Flood Zone A or Flood Zone V, as designated by FEMA, or otherwise located in a flood zone area identified by FEMA as a 100-year flood zone or special hazard area, and earthquake insurance if the Property is located within a moderate to high earthquake hazard zone as determined by an approved insurance company set forth in Section 6.03(b)(x) below. Such policy shall also include soft costs, a joint loss agreement, coverage for ordinance or law covering the loss of value of the undamaged portion of the Property, costs to demolish and the increased costs of construction if any of the improvements located on, or the use of, the Property shall at any time constitute legal non-conforming structures or uses. Ordinance or law limits shall be in an amount equal to the full replacement cost for the loss of value of the undamaged portion of the Property and no less than 25% of the replacement cost for costs to demolish and the increased cost of construction, or in an amount otherwise specified by Lessor. Such insurance shall be in amounts not less than 100% of the full insurable replacement cost values (without deduction for depreciation), with an agreed amount endorsement or without any coinsurance provision, and with sublimits satisfactory to Lessor, as determined from time to time at Lessor's request but not more frequently than once in any 12-month period.

(ii)    Commercial general liability insurance, including products and completed operation liability, covering Lessor and Lessee against bodily injury liability, property damage liability and personal and advertising injury, including without limitation any liability arising out of the ownership, maintenance, repair, condition or operation of every Property or adjoining ways, streets, parking lots or sidewalks. Such insurance policy or policies shall contain a broad form contractual liability endorsement under which the insurer agrees to insure Lessee's obligations under Article X hereof to the extent insurable, and a "severability of interest" clause or endorsement which precludes the insurer from denying the claim of Lessee or Lessor because of the negligence or other acts of the other, shall be in amounts of not less than $10,000,000 per occurrence for bodily injury and property damage, and $10,000,000 general aggregate per location, or such higher limits as Lessor may reasonably require from time to time, and shall be of form and substance satisfactory to Lessor. Such limits of insurance can be acquired through Commercial General liability and Umbrella liability policies.

(iii)    Workers' compensation and Employers Liability insurance with statutorily mandated limits covering all persons employed by Lessee on the Property in connection with any work done on or about the Property for which claims for death or bodily injury could be asserted against Lessor, Lessee or the Property.

(iv)    Business interruption insurance including Rental Value Insurance payable to Lessor at all locations for a period of not less than twelve (12) months. Such insurance is to follow the form of the real property "all risk" or "special form"

4813-8322-9019.1
STORE/Campbells (Perkins)
Lease Agreement
2945 East State Street, Hermitage, PA 16148
File No. 7210/02-588.23

coverage and is not to contain a co-insurance clause.  Such insurance is to have a minimum of 180 days of extended period of indemnity.

(v)     Automobile liability insurance, including owned, non-owned and hired car liability insurance for combined limits of liability of $5,000,000 per occurrence.  The limits of liability can be provided in a combination of an automobile liability policy and an umbrella liability policy.

(vi)     Comprehensive Boiler and Machinery or Equipment Breakdown Insurance against loss or damage from explosion of any steam or pressure boilers or similar apparatus, if any, and other building equipment including HVAC units located in or about the Property and in an amount equal to the lesser of 25% of the 100% replacement cost of the Property or $5,000,000.

(vii)     Such additional and/or other insurance and in such amounts as at the time is customarily carried by prudent owners or tenants with respect to improvements and personal property similar in character, location and use and occupancy to the Property.

(b)     ***Insurance Provisions***.  All insurance policies shall:

(i)     provide for a waiver of subrogation by the insurer as to claims against Lessor, its employees and agents;

(ii)     be primary and provide that any "other insurance" clause in the insurance policy shall exclude any policies of insurance maintained by Lessor and the insurance policy shall not be brought into contribution with insurance maintained by Lessor;

(iii)     contain deductibles not to exceed $25,000;

(iv)     contain a standard non-contributory mortgagee clause or endorsement in favor of any Lender designated by Lessor;

(v)     provide that the policy of insurance shall not be terminated, cancelled or amended without at least thirty (30) days' prior written notice to Lessor and to any Lender covered by any standard mortgagee clause or endorsement;

(vi)     be in amounts sufficient at all times to satisfy any coinsurance requirements thereof;

(vii)     except for workers' compensation insurance referred to in Section 6.03(a)(iii) above, name Lessor and any Lessor Affiliate or Lender requested by Lessor, as an "additional insured" with respect to liability insurance, and as an "additional named insured" or "additional insured" with respect to real property and rental value insurance, as appropriate and as their interests may appear;

8

(viii)    be evidenced by delivery to Lessor and any Lender designated by Lessor of an Acord Form 28 for property, business interruption and boiler & machinery coverage (or any other form requested by Lessor) and an Acord Form 25 for commercial general liability, workers' compensation and umbrella coverage (or any other form requested by Lessor); provided that in the event that either such form is no longer available, such evidence of insurance shall be in a form reasonably satisfactory to Lessor and any Lender designated by Lessor; and

(ix)    be issued by insurance companies licensed to do business in the state where the Property is located and which are rated no less than A-X by Best's Insurance Guide or are otherwise approved by Lessor.

(c)    ***Additional Obligations***.  It is expressly understood and agreed that (i) if any insurance required hereunder, or any part thereof, shall expire, be withdrawn, become void by breach of any condition thereof by Lessee, or become void or in jeopardy by reason of the failure or impairment of the capital of any insurer, Lessee shall immediately obtain new or additional insurance reasonably satisfactory to Lessor and any Lender designated by Lessor; (ii) the minimum limits of insurance coverage set forth in this Section 6.03 shall not limit the liability of Lessee for its acts or omissions as provided in this Lease; (iii) Lessee shall procure policies for all insurance for periods of not less than one year and shall provide to Lessor and any servicer or Lender of Lessor certificates of insurance or, upon Lessor's request, duplicate originals of insurance policies evidencing that insurance satisfying the requirements of this Lease is in effect at all times; (iv) Lessee shall pay as they become due all premiums for the insurance required by this Section 6.03; (v) in the event that Lessee fails to comply with any of the requirements set forth in this Section 6.03, within ten (10) days of the giving of written notice by Lessor to Lessee, (A) Lessor shall be entitled to procure such insurance; and (B) any sums expended by Lessor in procuring such insurance shall be Additional Rental and shall be repaid by Lessee, together with interest thereon at the Default Rate, from the time of payment by Lessor until fully paid by Lessee immediately upon written demand therefor by Lessor; and (vi) Lessee shall maintain all insurance policies required in this Section 6.03 not to be cancelled, invalidated or suspended on account of the conduct of Lessee, its officers, directors, managers, members, employees or agents, or anyone acting for Lessee or any subtenant or other occupant of the Property, and shall comply with all policy conditions and warranties at all times to avoid a forfeiture of all or a part of any insurance payment.

(d)    ***Blanket Policies***.    Notwithstanding anything to the contrary in this Section 6.03, any insurance which Lessee is required to obtain pursuant to this Section 6.03 may be carried under a "blanket" policy or policies covering other properties or liabilities of Lessee provided that such "blanket" policy or policies otherwise comply with the provisions of this Section 6.03.

**Section 6.04.  Intentionally Deleted**.

**Section 6.05.  Tax Impound**.  Upon the occurrence of an Event of Default and with respect to each Event of Default, in addition to any other remedies, Lessor may require Lessee

9

to pay to Lessor on the first day of each month the amount that Lessor reasonably estimates will be necessary in order to accumulate with Lessor sufficient funds in an impound account (which shall not be deemed a trust fund) (the "Reserve") for Lessor to pay any and all real estate taxes ("Real Estate Taxes") for the Property for the ensuing twelve (12) months, or, if due sooner, Lessee shall pay the required amount immediately upon Lessor's demand therefor.  Lessor shall, upon prior written request of Lessee, provide Lessee with evidence reasonably satisfactory to Lessee that payment of the Real Estate Taxes was made in a timely fashion.  In the event that the Reserve does not contain sufficient funds to timely pay any Real Estate Taxes, upon Lessor's written notification thereof, Lessee shall, within five (5) Business Days of such notice, provide funds to Lessor in the amount of such deficiency.  Lessor shall pay or cause to be paid directly to the applicable taxing authorities any Real Estate Taxes then due and payable for which there are funds in the Reserve; *provided, however,* that in no event shall Lessor be obligated to pay any Real Estate Taxes in excess of the funds held in the Reserve, and Lessee shall remain liable for any and all Real Estate Taxes, including fines, penalties, interest or additional costs imposed by any taxing authority (unless incurred as a result of Lessor's failure to timely pay Real Estate Taxes for which it had funds in the Reserve).  Lessee shall cooperate fully with Lessor in assuring that the Real Estate Taxes are timely paid.  Lessor may deposit all Reserve funds in accounts insured by any federal or state agency and may commingle such funds with other funds and accounts of Lessor.  Interest or other gains from such funds, if any, shall be the sole property of Lessor. Upon an Event of Default, in addition to any other remedies, Lessor may apply all impounded funds in the Reserve against any sums due from Lessee to Lessor.  Lessor shall give to Lessee an annual accounting showing all credits and debits to and from such impounded funds received from Lessee.

## ARTICLE VII

## MAINTENANCE; ALTERATIONS

**Section 7.01. Condition of Property; Maintenance**.  Lessee hereby accepts the Property "AS IS" and "WHERE IS" with no representation or warranty of Lessor as to the condition thereof.  Lessee shall, at its sole cost and expense, be responsible for (a) keeping all of the building, structures and improvements erected on the Property in good order and repair, free from actual or constructive waste; (b) the repair or reconstruction of any building, structures or improvements erected on the Property damaged or destroyed by a Casualty; (c) subject to Section 7.02, making all necessary structural, non-structural, exterior and interior repairs and replacements to any building, structures or improvements erected on the Property; (d) operating, remodeling, updating and modernizing the Property in accordance with those standards adopted from time to time on a system-wide basis for the Permitted Facilities; (e) (i) ensuring that no party encroaches upon the Property, (ii) protecting, defending, indemnifying, releasing and holding the Indemnified Parties harmless from and against any and all claims and Losses arising out of or in any way relating to any encroachments and/or activities upon the Property caused by any Person; and (iii) prosecuting any claims that Lessee seeks to bring against any Person relating to Lessee's use and possession of the Property; and (f) paying all operating costs of the Property in the ordinary course of business.  Lessee waives any right to require Lessor to maintain, repair or rebuild all or any part of the Property or make repairs at the expense of Lessor pursuant to any Legal Requirements at any time in effect.

**Section 7.02.  Alterations and Improvements**.  During the Lease Term, Lessee shall not alter the exterior, structural, plumbing or electrical elements of the Property in any manner without the consent of Lessor, which consent shall not be unreasonably withheld or conditioned; *provided, however*, Lessee may undertake nonstructural alterations to the Property, individually, costing less than $25,000 without Lessor's prior written consent.  If Lessor's consent is required hereunder and Lessor consents to the making of any such alterations, the same shall be made by Lessee at Lessee's sole expense by a licensed contractor and according to plans and specifications approved by Lessor and subject to such other conditions as Lessor shall reasonably require.  Any work at any time commenced by Lessee on the Property shall be prosecuted diligently to completion, shall be of good workmanship and materials and shall comply fully with all the terms of this Lease and all Legal Requirements.  Upon completion of any alterations individually costing $25,000 or more, Lessee shall promptly provide Lessor with evidence of full payment to all laborers and materialmen contributing to the alterations.  Additionally, upon completion of any alterations, Lessee shall promptly provide Lessor with (a) an architect's certificate certifying the alterations to have been completed in conformity with the plans and specifications (if the alterations are of such a nature as would require the issuance of such a certificate from the architect); (b) a certificate of occupancy (if the alterations are of such a nature as would require the issuance of a certificate of occupancy); and (c) any other documents or information reasonably requested by Lessor.  Lessee shall keep the Property free from any liens arising out of any work performed on, or materials furnished to, the Property.  Lessee shall execute and file or record, as appropriate, a "Notice of Non-Responsibility," or any equivalent notice permitted under applicable Law in the state where the Property is located which provides that Lessor is not responsible for the payment of any costs or expenses relating to the additions or alterations.  Any addition to or alteration of the Property shall be deemed a part of the Property and belong to Lessor, and Lessee shall execute and deliver to Lessor such instruments as Lessor may require to evidence the ownership by Lessor of such addition or alteration.

**Section 7.03.  Encumbrances**.  During the Lease Term, Lessor shall have the right to grant easements on, over, under and above the Property without the prior consent of Lessee, provided that such easements will not materially interfere with Lessee's use of the Property.  Lessee shall comply with and perform all obligations of Lessor under all easements, declarations, covenants, restrictions and other items of record now or hereafter encumbering the Property.  Without Lessor's prior written consent, Lessee shall not grant any easements on, over, under or above the Property.

**ARTICLE VIII**

**USE OF THE PROPERTY; COMPLIANCE**

**Section 8.01.  Use**.  During the Lease Term, the Property shall be used solely for the operation of a Permitted Facility.  Except during periods when a Property is untenantable due to Casualty or Condemnation (and provided that Lessee continues to strictly comply with the other terms and conditions of this Lease), Lessee shall at all times during the Lease Term occupy the Property and shall diligently operate its business on the Property.  In the event that Lessee shall change the use of the Property or the concept or brand operated on the Property, only as may be expressly permitted herein or consented to by Lessor in writing, Lessee shall provide Lessor

11

with written notice of any such change and copies of the franchise agreement(s) related to such new concept or brand, if any.

**Section 8.02. Compliance**.    Lessee's use and occupation of the Property, and the condition thereof, shall, at Lessee's sole cost and expense, comply fully with all Legal Requirements and all restrictions, covenants and encumbrances of record, and any owner obligations under such Legal Requirements, or restrictions, covenants and encumbrances of record, with respect to the Property, in either event, the failure with which to comply could have a Material Adverse Effect.    Without in any way limiting the foregoing provisions, Lessee shall comply with all Legal Requirements relating to anti-terrorism, trade embargos, economic sanctions, Anti-Money Laundering Laws, and the Americans with Disabilities Act of 1990, as such act may be amended from time to time, and all regulations promulgated thereunder, as it affects the Property now or hereafter in effect.    Lessee shall obtain, maintain and comply with all required licenses and permits, both governmental and private, to use and operate the Property as Permitted Facilities.    Upon Lessor's written request from time to time during the Lease Term, Lessee shall certify in writing to Lessor that Lessee's representations, warranties and obligations under Section 5.05 and this Section 8.02 remain true and correct and have not been breached.    Lessee shall immediately notify Lessor in writing if any of such representations, warranties or covenants are no longer true or have been breached or if Lessee has a reasonable basis to believe that they may no longer be true or have been breached.    In connection with such an event, Lessee shall comply with all Legal Requirements and directives of Governmental Authorities and, at Lessor's request, provide to Lessor copies of all notices, reports and other communications exchanged with, or received from, Governmental Authorities relating to such an event.    Lessee shall also reimburse Lessor for all Costs incurred by Lessor in evaluating the effect of such an event on the Property and this Lease, in obtaining any necessary license from Governmental Authorities as may be necessary for Lessor to enforce its rights under the Transaction Documents, and in complying with all Legal Requirements applicable to Lessor as the result of the existence of such an event and for any penalties or fines imposed upon Lessor as a result thereof.    Lessee will use its best efforts to prevent any act or condition to exist on or about the Property that will materially increase any insurance rate thereon, except when such acts are required in the normal course of its business and Lessee shall pay for such increase. Lessee agrees that it will defend, indemnify and hold harmless the Indemnified Parties from and against any and all Losses caused by, incurred or resulting from Lessee's failure to comply with its obligations under this Section.

**Section 8.03. Environmental**.

(a)    ***Covenants***.

(i)    Lessee covenants to Lessor during the Lease Term, subject to the limitations of subsection (ii) below, as follows:

(A)    All uses and operations on or of the Property, whether by Lessee or any other Person, shall be in compliance with all Environmental Laws and permits issued pursuant thereto.

(B)    There shall be no Releases in, on, under or from the Property, except in Permitted Amounts.

12

4813-8322-9019.1
STORE/Campbells (Perkins)
Lease Agreement
2945 East State Street, Hermitage, PA 16148
File No. 7210/02-588.23

(C)     There shall be no Hazardous Materials or Regulated Substances in, on or under the Property, except in Permitted Amounts. Above and below ground storage tanks shall be properly permitted and only used as permitted.

(D)     Lessee shall keep the Property or cause the Property to be kept free and clear of all Environmental Liens, whether due to any act or omission of Lessee or any other Person.

(E)     Lessee shall not act or fail to act or allow any other tenant, occupant, guest, customer or other user of the Property to act or fail to act in any way that (1) materially increases a risk to human health or the environment, (2) poses an unreasonable or unacceptable risk of harm to any Person or the environment (whether on or off the Property), (3) has a Material Adverse Effect, (4) is contrary to any material requirement set forth in the insurance policies maintained by Lessee or Lessor, (5) constitutes a public or private nuisance or constitutes waste, (6) violates any covenant, condition, agreement or easement applicable to the Property, or (7) would result in any reopening or reconsideration of any prior investigation or causes a new investigation by a Governmental Authority having jurisdiction over the Property.

(F)     Lessee shall, at its sole cost and expense, fully and expeditiously cooperate in all activities pursuant to this Section 8.04, including but not limited to providing all relevant information and making knowledgeable persons available for interviews.

(ii)     Notwithstanding any provision of this Lease to the contrary, an Event of Default shall not be deemed to have occurred as a result of the failure of Lessee to satisfy any one or more of the covenants set forth in subsections (A) through (E) above provided that Lessee shall be in compliance with the requirements of any Governmental Authority with respect to the Remediation of any Release at the Property.

(b)     ***Notification Requirements***.  Lessee shall immediately notify Lessor in writing upon Lessee obtaining actual knowledge of (i) any Releases or Threatened Releases in, on, under or from the Property other than in Permitted Amounts, or migrating towards the Property; (ii) any non-compliance with any Environmental Laws related in any way to the Property; (iii) any actual or potential Environmental Lien or activity use limitation; (iv) any required or proposed Remediation of environmental conditions relating to the Property required by applicable Governmental Authorities; and (v) any written or oral notice or other communication of which Lessee becomes aware from any source whatsoever (including but not limited to a Governmental Authority) relating in any way to Hazardous Materials, Regulated Substances or above or below ground storage tanks, or Remediation thereof at or on the Property, other than in Permitted Amounts, possible liability of any Person relating to the Property pursuant to any Environmental Law, other environmental conditions in connection with the Property, or any actual or potential administrative or judicial proceedings in connection with

13

anything referred to in this Section.  Lessee shall, upon Lessor's written request, deliver to Lessor a certificate stating that Lessee is and has been in full compliance with all of the environmental representations, warranties and covenants in this Lease.

(c)    *Remediation*.  Lessee shall, at its sole cost and expense, and without limiting any other provision of this Lease, effectuate any Remediation required by any Governmental Authority of any condition (including, but not limited to, a Release or Threatened Release) in, on, under or from the Property and take any other reasonable action deemed necessary by any Governmental Authority for protection of human health or the environment.  Should Lessee fail to undertake any required Remediation in accordance with the preceding sentence, Lessor, after written notice to Lessee and Lessee's failure to immediately undertake such Remediation, shall be permitted to complete such Remediation, and all Costs incurred in connection therewith shall be paid by Lessee.  Any Cost so paid by Lessor, together with interest at the Default Rate, shall be deemed to be Additional Rental hereunder and shall be immediately due from Lessee to Lessor.

(d)    *Indemnification*.  Lessee shall, at its sole cost and expense, protect, defend, indemnify, release and hold harmless each of the Indemnified Parties from and against any and all Losses, including, but not limited to, all Costs of Remediation (whether or not performed voluntarily), arising out of or in any way relating to any Environmental Laws, Hazardous Materials, Regulated Substances, above or below ground storage tanks, or other environmental matters concerning the Property.  It is expressly understood and agreed that Lessee's obligations under this Section shall survive the expiration or earlier termination of this Lease for any reason.

(e)    *Right of Entry*.  In the event that Lessor has a reasonable basis to believe that a Release or a violation of any Environmental Law has occurred, Lessor and any other Person designated by Lessor, including but not limited to any receiver, any representative of a Governmental Authority, and any environmental consultant, shall have the right, but not the obligation, to enter upon the Property at all reasonable times to assess any and all aspects of the environmental condition of the Property and its use, including but not limited to conducting any environmental assessment or audit (the scope of which shall be determined in Lessor's sole and absolute discretion) and taking samples of soil, groundwater or other water, air, or building materials, and conducting other invasive testing.  Lessee shall cooperate with and provide access to Lessor and any other Person designated by Lessor.  Any such assessment or investigation shall be at Lessee's sole cost and expense.

(f)    *Survival*.  The obligations of Lessee and the rights and remedies of Lessor under this Section 8.03 shall survive the termination, expiration and/or release of this Lease.

**Section 8.04. Franchisor Requirements**.  In addition to the requirements set forth in this Lease, Lessee, in its use, occupancy and maintenance of the Property, shall comply with all requirements of its Franchise Agreement.  Lessee hereby consents to Lessor providing information it obtains to Franchisor, and to Lessor obtaining from Franchisor information which Franchisor receives relating to Lessee's operation of its business on the Property.

14

## ARTICLE IX

## ADDITIONAL COVENANTS

**Section 9.01. Performance at Lessee's Expense**.   Lessee acknowledges and confirms that Lessor may impose reasonable administrative, processing or servicing fees, and collect its reasonable attorneys' fees, costs and expenses in connection with (a) any extension, renewal, modification, amendment and termination of this Lease requested by Lessee; (b) any release or substitution of Property requested by Lessee; (c) the procurement of consents, waivers and approvals with respect to the Property or any matter related to this Lease requested by Lessee; (d) the review of any assignment or sublease or proposed assignment or sublease or the preparation or review of any subordination or non-disturbance agreement requested by Lessee; (e) the collection, maintenance and/or disbursement of reserves created under this Lease or the other Transaction Documents (following an Event of Default); and (f) inspections required to make certain determinations under this Lease or the other Transaction Documents following Lessor's reasonable belief of a breach under this Lease or any other Transaction Documents.

**Section 9.02. Inspection**.   Lessor and its authorized representatives shall have the right, at all reasonable times and upon giving reasonable prior notice (except in the event of an emergency, in which case no prior notice shall be required), to enter the Property or any part thereof and inspect the same.   Lessee hereby waives any claim for damages for any injury or inconvenience to or interference with Lessee's business, any loss of occupancy or quiet enjoyment of the Property and any other loss occasioned by such entry, but, subject to Section 10.01, excluding damages arising as a result of the gross negligence or willful misconduct of Lessor.

**Section 9.03. Financial Information**.

(a)     *Financial Statements*.   Within forty five (45) days after the end of each fiscal quarter and within one hundred twenty (120) days after the end of each fiscal year of Lessee and Lessee Reporting Entities, Lessee shall deliver to Lessor (i) complete consolidated financial statements that consolidate Lessee and Lessee Reporting Entities, including a balance sheet, profit and loss statement, statement of stockholders' equity and statement of cash flows and all other related schedules for the fiscal period then ended, such statements to detail separately interest expense, income taxes, non-cash expenses, non-recurring expenses, operating lease expense and current portion of long-term debt – capital leases; (ii) income statements for the business at the Property; and (iii) the supplemental financial information set forth on Schedule 9.03.   All such financial statements shall be prepared in accordance with GAAP, and shall be certified to be accurate and complete by an officer or director of each Lessee Reporting Entity.   In the event that Lessee's business at the Property is ordinarily consolidated with other business for financial statements purposes, a separate profit and loss statement shall be provided showing separately the sales, profits and losses pertaining to the Property with interest expense, income taxes, non-cash expenses, non-recurring expenses and operating lease expense (rent), with the basis for allocation of overhead or other charges being clearly set forth in accordance with Schedule 9.03.   The financial statements delivered to Lessor need not be audited, but Lessee shall deliver to Lessor copies of any

15

audited financial statements of the Lessee Reporting Entities which may be prepared, as soon as they are available.

(b)  ***Other Information***.  Notwithstanding any provision contained herein, upon request at any time, Lessee will provide to Lessor, at no additional cost or expense to Lessee, any and all financial information and/or financial statements of Lessee Reporting Entities (and in the form or forms) as reasonably requested by Lessor including, but not limited to, as requested by Lessor in connection with Lessor's filings with or disclosures to the Securities and Exchange Commission or other Governmental Authority.

**Section 9.04.  OFAC Laws**.  Upon receipt of notice or upon actual knowledge thereof, Lessee shall immediately notify Lessor in writing if any Person owning (directly or indirectly) any interest in any of the Lessee Entities, or any director, officer, shareholder, member, manager or partner of any of such holders is a Person whose property or interests are subject to being blocked under any of the OFAC Laws, or is otherwise in violation of any of the OFAC Laws, or is under investigation by any Governmental Authority for, or has been charged with, or convicted of, drug trafficking, terrorist-related activities or any violation of the Anti-Money Laundering Laws, has been assessed civil penalties under these or related Laws, or has had funds seized or forfeited in an action under these or related Laws; *provided, however*, that the covenant in this Section 9.04 shall not apply to any Person to the extent such Person's interest is in or through a U.S. Publicly Traded Entity.

**Section 9.05.  Estoppel Certificate**.  At any time, and from time to time, Lessee shall, promptly and in no event later than ten (10) days after a request from Lessor or any Lender or mortgagee of Lessor, execute, acknowledge and deliver to Lessor or such Lender or mortgagee, as the case may be, a certificate in the form supplied by Lessor, certifying: (a) that Lessee has accepted the Property; (b) that this Lease is in full force and effect and has not been modified (or if modified, setting forth all modifications), or, if this Lease is not in full force and effect, the certificate shall so specify the reasons therefor; (c) the commencement and expiration dates of the Lease Term; (d) the date to which the Rentals have been paid under this Lease and the amount thereof then payable; (e) whether there are then any existing defaults by Lessor in the performance of its obligations under this Lease, and, if there are any such defaults, specifying the nature and extent thereof; (f) that no notice has been received by Lessee of any default under this Lease which has not been cured, except as to defaults specified in the certificate; (g) the capacity of the Person executing such certificate, and that such Person is duly authorized to execute the same on behalf of Lessee; (h) that neither Lessor nor any Lender or mortgagee has actual involvement in the management or control of decision making related to the operational aspects or the day-to-day operation of the Property, including any handling or disposal of Hazardous Materials or Regulated Substances; and (i) any other information reasonably requested by Lessor or any Lender or mortgagee, as the case may be. If Lessee shall fail or refuse to sign a certificate in accordance with the provisions of this Section within ten (10) days following a request by Lessor, Lessee irrevocably constitutes and appoints Lessor as its attorney-in-fact to execute and deliver the certificate to any such third party, it being stipulated that such power of attorney is coupled with an interest and is irrevocable and binding.

16

## ARTICLE X

### RELEASE AND INDEMNIFICATION

**Section 10.01.  RELEASE AND INDEMNIFICATION**.  LESSEE AGREES TO USE AND OCCUPY THE PROPERTY AT ITS OWN RISK AND HEREBY RELEASES LESSOR AND LESSOR'S AGENTS AND EMPLOYEES FROM ALL CLAIMS FOR ANY DAMAGE OR INJURY TO THE FULL EXTENT PERMITTED BY LAW.  LESSEE AGREES THAT LESSOR SHALL NOT BE RESPONSIBLE OR LIABLE TO LESSEE OR LESSEE'S EMPLOYEES, AGENTS, CUSTOMERS, LICENSEES OR INVITEES FOR BODILY INJURY, PERSONAL INJURY OR PROPERTY DAMAGE OCCASIONED BY THE ACTS OR OMISSIONS OF ANY OTHER LESSEE OR ANY OTHER PERSON.  LESSEE AGREES THAT ANY EMPLOYEE OR AGENT TO WHOM THE PROPERTY OR ANY PART THEREOF SHALL BE ENTRUSTED BY OR ON BEHALF OF LESSEE SHALL BE ACTING AS LESSEE'S AGENT WITH RESPECT TO THE PROPERTY OR ANY PART THEREOF, AND NEITHER LESSOR NOR LESSOR'S AGENTS, EMPLOYEES OR CONTRACTORS SHALL BE LIABLE FOR ANY LOSS OF OR DAMAGE TO THE PROPERTY OR ANY PART THEREOF.  LESSEE SHALL INDEMNIFY, PROTECT, DEFEND AND HOLD HARMLESS EACH OF THE INDEMNIFIED PARTIES FROM AND AGAINST ANY AND ALL LOSSES (EXCLUDING LOSSES SUFFERED BY AN INDEMNIFIED PARTY ARISING OUT OF THE WILLFUL MISCONDUCT OF SUCH INDEMNIFIED PARTY OCCURRING ON OR AFTER THE EFFECTIVE DATE) CAUSED BY, INCURRED OR RESULTING FROM LESSEE'S OPERATIONS OR BY LESSEE'S USE AND OCCUPANCY OF THE PROPERTY, WHETHER RELATING TO ITS ORIGINAL DESIGN OR CONSTRUCTION, LATENT DEFECTS, ALTERATION, MAINTENANCE, USE BY LESSEE OR ANY PERSON THEREON, SUPERVISION OR OTHERWISE, OR FROM ANY BREACH OF, DEFAULT UNDER, OR FAILURE TO PERFORM, ANY TERM OR PROVISION OF THIS LEASE BY LESSEE, ITS OFFICERS, EMPLOYEES, AGENTS OR OTHER PERSONS.   IT IS EXPRESSLY UNDERSTOOD AND AGREED THAT LESSEE'S OBLIGATIONS UNDER THIS SECTION SHALL SURVIVE THE EXPIRATION OR EARLIER TERMINATION OF THIS LEASE FOR ANY REASON WHATSOEVER.

## ARTICLE XI

### CONDEMNATION AND CASUALTY

**Section 11.01.  Notification**.   Lessee shall promptly give Lessor written notice of (a) any Condemnation of the Property, (b) the commencement of any proceedings or negotiations which might result in a Condemnation of the Property, and (c) any Casualty to the Property or any part thereof.  Such notice shall provide a general description of the nature and extent of such Condemnation, proceedings, negotiations or Casualty, and shall include copies of any documents or notices received in connection therewith. Thereafter, Lessee shall promptly send Lessor copies of all notices, correspondence and pleadings relating to any such Condemnation, proceedings, negotiations or Casualty.

**Section 11.02.  Total Condemnation**.   In the event of a Condemnation of all or substantially all of the Property, and if as a result of such Condemnation: (i) access to the Property to and from the publicly dedicated roads adjacent to the Property as of the Effective Date is permanently and materially impaired such that Lessee no longer has access to such

17

dedicated road; (ii) there is insufficient parking to operate the Property as a Permitted Facility under applicable Laws; or (iii) the Condemnation includes a portion of the building such that the remaining portion is unsuitable for use as a Permitted Facility, as determined by Lessee in the exercise of good faith business judgment (and Lessee provides to Lessor an officer's certificate executed by an officer of Lessee certifying to the same) (each such event, a "Total Condemnation"), then, in such event:

(a) **Termination of Lease**.  On the date of the Total Condemnation, all obligations of either party hereunder shall cease; *provided, however*, that Lessee's obligations to the Indemnified Parties under any indemnification provisions of this Lease and Lessee's obligation to pay Rental and all other Monetary Obligations (whether payable to Lessor or a third party) accruing under this Lease prior to the date of termination shall survive such termination.  If the date of such Total Condemnation is other than the first day of a month, the Base Monthly Rental for the month in which such Total Condemnation occurs shall be apportioned based on the date of the Total Condemnation.

(b) **Net Award**.  Subject to Section 11.07 below, Lessor shall be entitled to receive the entire Net Award in connection with a Total Condemnation without deduction for any estate vested in Lessee by this Lease, and Lessee hereby expressly assigns to Lessor all of its right, title and interest in and to every such Net Award and agrees that Lessee shall not be entitled to any Net Award or other payment for the value of Lessee's leasehold interest in this Lease.

**Section 11.03. Partial Condemnation or Casualty**.  In the event of a Condemnation which is not a Total Condemnation (each such event, a "Partial Condemnation"), or in the event of a Casualty:

(a) **Net Awards**.  All Net Awards shall be paid to Lessor.

(b) **Continuance of Lease**. This Lease shall continue in full force and effect upon the following terms:

(i) All Rental and other Monetary Obligations due under this Lease shall continue unabated.

(ii) Lessee shall promptly commence and diligently prosecute restoration of the Property to the same condition, as nearly as practicable, as prior to such Partial Condemnation or Casualty as approved by Lessor.  Subject to the terms and provisions of the Mortgages and upon the written request of Lessee (accompanied by evidence reasonably satisfactory to Lessor that such amount has been paid or is due and payable and is properly part of such costs, and that Lessee has complied with the terms of Section 7.02 in connection with the restoration), Lessor shall promptly make available in installments, subject to reasonable conditions for disbursement imposed by Lessor, an amount up to but not exceeding the amount of any Net Award received by Lessor with respect to such Partial Condemnation or Casualty.  Prior to the disbursement of any portion of the Net Award with respect to a Casualty, Lessee shall provide evidence

18

reasonably satisfactory to Lessor of the payment of restoration expenses by Lessee up to the amount of the insurance deductible applicable to such Casualty. Lessor shall be entitled to keep any portion of the Net Award which may be in excess of the cost of restoration, and Lessee shall bear all additional Costs of such restoration in excess of the Net Award.

Section 11.04.  Temporary Taking.  In the event of a Condemnation of all or any part of the Property for a temporary use (a "Temporary Taking"), this Lease shall remain in full force and effect without any reduction of Base Annual Rental, Additional Rental or any other Monetary Obligation payable hereunder.  Except as provided below, Lessee shall be entitled to the entire Net Award for a Temporary Taking, unless the period of occupation and use by the condemning authorities shall extend beyond the date of expiration of this Lease, in which event the Net Award made for such Temporary Taking shall be apportioned between Lessor and Lessee as of the date of such expiration.  At the termination of any such Temporary Taking, Lessee will, at its own cost and expense and pursuant to the provisions of Section 7.02, promptly commence and complete restoration of the Property.

Section 11.05. Adjustment of Losses.  Any loss under any property damage insurance required to be maintained by Lessee shall be adjusted by Lessor and Lessee.  Any Net Award relating to a Total Condemnation or a Partial Condemnation shall be adjusted by Lessor or, at Lessor's election, Lessee.  Notwithstanding the foregoing or any other provisions of this Section 11.05 to the contrary, if at the time of any Condemnation or any Casualty or at any time thereafter an Event of Default shall have occurred and be continuing, Lessor is hereby authorized and empowered but shall not be obligated, in the name and on behalf of Lessee and otherwise, to file and prosecute Lessee's claim, if any, for a Net Award on account of such Condemnation or such Casualty and to collect such Net Award and apply the same to the curing of such Event of Default and any other then existing Event of Default under this Lease and/or to the payment of any amounts owed by Lessee to Lessor under this Lease, in such order, priority and proportions as Lessor in its discretion shall deem proper.

Section 11.06. Lessee Obligation in Event of Casualty.  During all periods of time following a Casualty, Lessee shall take reasonable steps to ensure that the affected Property is secure and does not pose any risk of harm to any adjoining property and Persons (including owners or occupants of such adjoining property).

Section 11.07. Lessee Awards and Payments.  Notwithstanding any provision contained in this Article XI, Lessee shall be entitled to claim and receive any award or payment from the condemning authority expressly granted for the taking of any personal property owned by Lessee, any insurance proceeds with respect to any personal property owned by Lessee, the interruption of its business and moving expenses (subject, however, to the provisions of Section 6.03(a)(iv) above), but only if such claim or award does not adversely affect or interfere with the prosecution of Lessor's claim for the Condemnation or Casualty, or otherwise reduce the amount recoverable by Lessor for the Condemnation or Casualty.

19

## ARTICLE XII

## DEFAULT, CONDITIONAL LIMITATIONS,
## REMEDIES AND MEASURE OF DAMAGES

**Section 12.01. Event of Default**.  Each of the following shall be an event of default by Lessee under this Lease (each, an "Event of Default"):

(a)      if any representation or warranty of Lessee set forth in this Lease is false in any material respect when made, or if Lessee renders any materially false statement or account when made;

(b)      if any Rental or other Monetary Obligation due under this Lease is not paid when due if such failure continues for more than five (5) days after written notice from Lessor; *provided, however*, Lessor shall only be required to provide such notice and cure period twice in any twelve (12) month period; and further provided that any technical error in the ACH Method of Payment process caused by Lessor's bank or servicer shall not constitute an Event of Default hereunder; *and further provided*, any delay in the payment of Rental as a result of a technical error in the wiring and/or automated clearinghouse process shall not constitute an Event of Default hereunder so long as the same is corrected within one (1) Business Day of the date Lessee receives notice thereof;

(c)      if Lessee fails to pay, prior to delinquency, any taxes, assessments or other charges the failure of which to pay will result in the imposition of a lien against the Property;

(d)      if Lessee vacates or abandons the Property;

(e)      if there is an Insolvency Event affecting Lessee or any Guarantor;

(f)      if Lessee fails to observe or perform any of the other covenants, conditions or obligations of Lessee in this Lease; *provided, however*, if any such failure does not involve the payment of any Monetary Obligation, is not willful or intentional, does not place the Property or any rights or property of Lessor in immediate jeopardy, and is within the reasonable power of Lessee to promptly cure, all as determined by Lessor in its reasonable discretion, then such failure shall not constitute an Event of Default hereunder, unless otherwise expressly provided herein, unless and until Lessor shall have given Lessee notice thereof and a period of thirty (30) days shall have elapsed, during which period Lessee may correct or cure such failure, upon failure of which an Event of Default shall be deemed to have occurred hereunder without further notice or demand of any kind being required.  If such failure cannot reasonably be cured within such thirty (30)-day period, as determined by Lessor in its reasonable discretion, and Lessee is diligently pursuing a cure of such failure, then Lessee shall have a reasonable period to cure such failure beyond such thirty (30)-day period, which shall in no event exceed ninety (90) days after receiving notice of such failure from Lessor.  If Lessee shall fail to correct or cure such failure within such ninety (90)-day period, an

4813-8322-9019.1
STORE/Campbells (Perkins)
Lease Agreement
2945 East State Street, Hermitage, PA 16148
File No. 7210/02-588.23

Event of Default shall be deemed to have occurred hereunder without further notice or demand of any kind being required;

(g)      if a final, nonappealable judgment is rendered by a court against Lessee which has a Material Adverse Effect, and is not discharged or provision made for such discharge within ninety (90) days from the date of entry thereof;

(h)      if Lessee shall be liquidated or dissolved or shall begin proceedings towards its liquidation or dissolution;

(i)      if the estate or interest of Lessee in the Property shall be levied upon or attached in any proceeding and such estate or interest is about to be sold or transferred or such process shall not be vacated or discharged within ninety (90) days after it is made;

(j)      if there is a breach or default under the Franchise Agreement with respect to the Property or if such Franchise Agreement terminates or expires prior to the expiration of the Lease and a substitute agreement for the terminated or expired Franchise Agreement is not entered into prior to such expiration or termination, which substitute agreement shall be in form and substance reasonably satisfactory to Lessor; or

(k)      if there is an "Event of Default" or other breach or default by Lessee or any Guarantor under any of the other Transaction Documents or any Other Agreement , after the passage of all applicable notice and cure or grace periods; *provided, however*, in the event that this Lease has been the subject of a Securitization and any Other Agreement has not been the subject of the same Securitization or any series relating to such Securitization, an "Event of Default" under such Other Agreement shall not constitute an Event of Default under this Lease.

**Section 12.02.   Remedies**.   Upon the occurrence of an Event of Default, with or without notice or demand, except as otherwise expressly provided herein or such other notice as may be required by statute and cannot be waived by Lessee, Lessor shall be entitled to exercise, at its option, concurrently, successively, or in any combination, all remedies available at Law or in equity, including, without limitation, any one or more of the following:

(a)      to terminate this Lease, whereupon Lessee's right to possession of the Property shall cease and this Lease, except as to Lessee's liability, shall be terminated;

(b)      to the extent not prohibited by applicable Law, to (i) re-enter and take possession of the Property (or any part thereof), any or all personal property or fixtures of Lessee upon the Property and, to the extent permissible, all Franchise Agreements, permits and other rights or privileges of Lessee pertaining to the use and operation of the Property, and (ii) expel Lessee and those claiming under or through Lessee, without being deemed guilty in any manner of trespass or becoming liable for any loss or damage resulting therefrom, without resort to legal or judicial process, procedure or action.   No notice from Lessor hereunder or under a forcible entry and detainer statute or similar Law shall constitute an election by Lessor to terminate this Lease unless such

21

notice specifically so states.  If Lessee shall, after default, voluntarily give up possession of the Property to Lessor, deliver to Lessor or its agents the keys to the Property, or both, such actions shall be deemed to be in compliance with Lessor's rights and the acceptance thereof by Lessor or its agents shall not be deemed to constitute a termination of the Lease.   Lessor reserves the right following any re-entry and/or reletting to exercise its right to terminate this Lease by giving Lessee written notice thereof, in which event this Lease will terminate;

(c)     to bring an action against Lessee for any damages sustained by Lessor or any equitable relief available to Lessor and to the extent not prohibited by applicable Law, to seize all personal property or fixtures upon the Property which Lessee owns or in which it has an interest, in which Lessor shall have a landlord's lien and/or security interest, and to dispose thereof in accordance with the Laws prevailing at the time and place of such seizure or to remove all or any portion of such property and cause the same to be stored in a public warehouse or elsewhere at Lessee's sole expense, without becoming liable for any loss or damage resulting therefrom and without resorting to legal or judicial process, procedure or action;

(d)     to relet the Property or any part thereof for such term or terms (including a term which extends beyond the original Lease Term), at such rentals and upon such other terms as Lessor, in its sole discretion, may determine, with all proceeds received from such reletting being applied to the Rental and other Monetary Obligations due from Lessee in such order as Lessor may, in its sole discretion, determine, which other Monetary Obligations include, without limitation, all repossession costs, brokerage commissions, attorneys' fees and expenses, alteration, remodeling and repair costs and expenses of preparing for such reletting.  Except to the extent required by applicable Law, Lessor shall have no obligation to relet the Property or any part thereof and shall in no event be liable for refusal or failure to relet the Property or any part thereof, or, in the event of any such reletting, for refusal or failure to collect any rent due upon such reletting, and no such refusal or failure shall operate to relieve Lessee of any liability under this Lease or otherwise to affect any such liability.  Lessor reserves the right following any re-entry and/or reletting to exercise its right to terminate this Lease by giving Lessee written notice thereof, in which event this Lease will terminate as specified in said notice;

(e)     except to the extent prohibited by applicable Law to accelerate and recover from Lessee all Rental and other Monetary Obligations due and owing and scheduled to become due and owing under this Lease both before and after the date of such breach for the entire original scheduled Lease Term;

(f)     to recover from Lessee all Costs paid or incurred by Lessor as a result of such breach, regardless of whether or not legal proceedings are actually commenced;

(g)     to immediately or at any time thereafter, and with or without notice, at Lessor's sole option but without any obligation to do so, correct such breach or default and charge Lessee all Costs incurred by Lessor therein.  Any sum or sums so paid by Lessor, together with interest at the Default Rate, shall be deemed to be Additional Rental hereunder and shall be immediately due from Lessee to Lessor.  Any such acts

22

by Lessor in correcting Lessee's breaches or defaults hereunder shall not be deemed to cure said breaches or defaults or constitute any waiver of Lessor's right to exercise any or all remedies set forth herein;

(h)    to immediately or at any time thereafter, and with or without notice, except as required herein, set off any money of Lessee held by Lessor under this Lease or any other Transaction Document or any Other Agreement against any sum owing by Lessee hereunder;

(i)    Without limiting the generality of the foregoing or limiting in any way the rights of Lessor under this Lease or otherwise under applicable Laws, at any time after the occurrence, and during the continuance, of an Event of Default, Lessor shall be entitled to apply for and have a receiver appointed under applicable Law by a court of competent jurisdiction (by ex parte motion for appointment without notice) in any action taken by Lessor to enforce its rights and remedies hereunder in order to protect and preserve Lessor's interest under this Lease or in the Property and the Personalty, and in connection therewith, LESSEE HEREBY IRREVOCABLY CONSENTS TO AND WAIVES ANY RIGHT TO OBJECT TO OR OTHERWISE CONTEST THE APPOINTMENT OF A RECEIVER AFTER THE OCCURRENCE, AND DURING THE CONTINUANCE, OF AN EVENT OF DEFAULT; and/or

(j)    to seek any equitable relief available to Lessor, including, without limitation, the right of specific performance.

**Section 12.03.  Cumulative Remedies**.  All powers and remedies given by Section 12.02 to Lessor, subject to applicable Law, shall be cumulative and not exclusive of one another or of any other right or remedy or of any other powers and remedies available to Lessor under this Lease, by judicial proceedings or otherwise, to enforce the performance or observance of the covenants and agreements of Lessee contained in this Lease, and no delay or omission of Lessor to exercise any right or power accruing upon the occurrence of any Event of Default shall impair any other or subsequent Event of Default or impair any rights or remedies consequent thereto.  Every power and remedy given by this Section or by Law to Lessor may be exercised from time to time, and as often as may be deemed expedient, by Lessor, subject at all times to Lessor's right in its sole judgment to discontinue any work commenced by Lessor or change any course of action undertaken by Lessor.

**Section 12.04.  Lessee Waiver**.  Lessee hereby expressly waives, for itself and all Persons claiming by, through and under Lessee, including creditors of all kinds, (a) any right and privilege which Lessee has under any present or future Legal Requirements to redeem the Property or to have a continuance of this Lease for the Lease Term after termination of Lessee's right of occupancy by order or judgment of any court or by any legal process or writ, or under the terms of this Lease; (b) the benefits of any present or future Legal Requirement that exempts property from liability for debt or for distress for rent; (c) any present or future Legal Requirement relating to notice or delay in levy of execution in case of eviction of a tenant for nonpayment of rent; and (d) any benefits and lien rights which may arise pursuant to any present or future Legal Requirement.

4813-8322-9019.1
STORE/Campbells (Perkins)
Lease Agreement
2945 East State Street, Hermitage, PA 16148
File No. 7210/02-588.23

## ARTICLE XIII

## MORTGAGE, SUBORDINATION AND ATTORNMENT

**Section 13.01.  No Liens**.  Lessor's interest in this Lease and/or the Property shall not be subordinate to any liens or encumbrances placed upon the Property by or resulting from any act of Lessee, and nothing herein contained shall be construed to require such subordination by Lessor.  NOTICE IS HEREBY GIVEN THAT LESSEE IS NOT AUTHORIZED TO PLACE OR ALLOW TO BE PLACED ANY LIEN, MORTGAGE, DEED OF TRUST, DEED TO SECURE DEBT, SECURITY INTEREST OR ENCUMBRANCE OF ANY KIND UPON ALL OR ANY PART OF THE PROPERTY OR LESSEE'S LEASEHOLD INTEREST THEREIN, AND ANY SUCH PURPORTED TRANSACTION SHALL BE VOID.

**Section 13.02.  Subordination**.    This Lease at all times shall automatically be subordinate to the lien of any and all ground leases and Mortgages now or hereafter placed upon the Property by Lessor, and Lessee covenants and agrees to execute and deliver, upon demand, such further instruments subordinating this Lease to the lien of any or all such ground leases and Mortgages as shall be desired by Lessor, or any present or proposed mortgagees under trust deeds, upon the condition that Lessee shall have the right to remain in possession of the Property under the terms of this Lease, notwithstanding any default in any or all such ground leases or Mortgages, or after the foreclosure of any such Mortgages, so long as no Event of Default shall have occurred and be continuing.

**Section 13.03.  Attornment**.  In the event any purchaser or assignee of any Lender at a foreclosure sale acquires title to any of the  Property, or in the event that any Lender or any purchaser or assignee otherwise succeeds to the rights of Lessor as landlord under this Lease, Lessee shall attorn to Lender or such purchaser or assignee, as the case may be (a "Successor Lessor"), and recognize the Successor Lessor as lessor under this Lease, and, subject to the provisions of this Article XIII, this Lease shall continue in full force and effect as a direct lease between the Successor Lessor and Lessee, provided that the Successor Lessor shall only be liable for any obligations of Lessor under this Lease which accrue after the date that such Successor Lessor acquires title.  The foregoing provision shall be self-operative and effective without the execution of any further instruments.

**Section 13.04.  Execution of Additional Documents**.  Although the provisions in this Article XIII shall be self-operative and no future instrument of subordination shall be required, upon request by Lessor, Lessee shall execute and deliver such additional reasonable instruments as may be reasonably required for such purposes.

**Section 13.05.  Notice to Lender**.   Lessee shall give written notice to any Lender having a recorded lien upon the Property or any part thereof of which Lessee has been notified of any breach or default by Lessor of any of its obligations under this Lease and give such Lender at least sixty (60) days beyond any notice period to which Lessor might be entitled to cure such default before Lessee may exercise any remedy with respect thereto.

24

## ARTICLE XIV

## ASSIGNMENT

**Section 14.01. Assignment by Lessor**.   As a material inducement to Lessor's willingness to enter into the transactions contemplated by this Lease (the "Transaction") and the other Transaction Documents, Lessee hereby agrees that Lessor may, from time to time and at any time and without the consent of Lessee, engage in all or any combination of the following, or enter into agreements in connection with any of the following or in accordance with requirements that may be imposed by applicable securities, tax or other Laws: (a) the sale, assignment, grant, conveyance, transfer, financing, re-financing, purchase or re-acquisition of all, less than all or any portion of the Property, this Lease or any other Transaction Document, Lessor's right, title and interest in this Lease or any other Transaction Document, the servicing rights with respect to any of the foregoing, or participations in any of the foregoing; or (b) a Securitization and related transactions.  Without in any way limiting the foregoing, the parties acknowledge and agree that Lessor, in its sole discretion, may assign this Lease or any interest herein to another Person in order to maintain Lessor's or any of its Affiliates' status as a REIT. In the event of any such sale or assignment other than a security assignment, Lessee shall attorn to such purchaser or assignee (so long as Lessor and such purchaser or assignee notify Lessee in writing of such transfer and such purchaser or assignee expressly assumes in writing the obligations of Lessor hereunder from and after the date of such assignment).  At the request of Lessor, Lessee will execute such documents confirming the sale, assignment or other transfer and such other agreements as Lessor may reasonably request, provided that the same do not increase the liabilities and obligations of Lessee hereunder.  Lessor shall be relieved, from and after the date of such transfer or conveyance, of liability for the performance of any obligation of Lessor contained herein, except for obligations or liabilities accrued prior to such assignment or sale.

**Section 14.02.  Assignment by Lessee**.

(a)  ***No Assignment by Lessee***.  Lessee acknowledges that Lessor has relied both on the business experience and creditworthiness of Lessee and upon the particular purposes for which Lessee intends to use the Property in entering into this Lease.  Lessee shall not assign, transfer, convey, pledge or mortgage this Lease or any interest herein or any interest in Lessee, whether by operation of Law or otherwise, without the prior written consent of Lessor.  At the time of any assignment of this Lease which is approved by Lessor, the assignee shall assume all of the obligations of Lessee under this Lease pursuant to a written assumption agreement in form and substance reasonably acceptable to Lessor.  Such assignment of this Lease pursuant to this Section 14.02 shall not relieve Lessee of its obligations respecting this Lease unless otherwise agreed to by Lessor.  Any assignment, transfer, conveyance, pledge or mortgage in violation of this Section 14.02 shall be voidable at the sole option of Lessor. Any consent to an assignment given by Lessor hereunder shall not be deemed a consent to any subsequent assignment.

(b)  ***Permitted Assignment***.  Notwithstanding anything to the contrary contained in this Section 14.02 and provided that no Event of Default has occurred and is continuing at the time of the proposed assignment or other transfer, and provided

25

further that any assignee agrees to assume all of Lessee's obligations under this Lease by written agreement approved by Lessor, Lessee shall have the right to assign or otherwise transfer all, but not less than all, of its interest in, to and under this Lease without Lessor's consent to a Qualified Operator.  A "<u>Qualified Operator</u>" shall mean a Person who (x) for two (2) consecutive years immediately prior to the date of assignment or transfer and (y) on a proforma basis following the consummation of such assignment or transfer (all as determined by Lessor upon review of financial statements provided by the assignee prior to the proposed lease assignment and in a form reasonably satisfactory to Lessor), (A) has a CFCCR (defined below) of at least 1.50x; and (B) has a Lease Adjusted Leverage (defined below) of no more than 5.50x; *provided, however,* that Lessee may satisfy the foregoing conditions of a Qualified Operator by providing, or causing to be provided, a guaranty agreement, in form and substance reasonably acceptable to and approved by Lessor, in writing, which guaranty shall be from an entity that meets the requirements of (A), (B) and (C) set forth in this Section 14.02.  Lessee shall provide Lessor with at least thirty (30) days' prior written notice of the proposed assignment to a Qualified Operator, which notice must include financial information satisfying the Qualified Operator requirements set forth herein. In the event that Lessee effects an assignment to a Qualified Operator, Lessee shall be released from any liability arising under this Lease from and after the date of such assignment and Guarantor shall be released from any liability arising under the Guaranty from and after the date of such assignment.

For purposes hereof:

"*CFCCR*" means with respect to the twelve month period of time immediately preceding the date of determination, the ratio calculated for such period of time, each as determined in accordance with GAAP, of (i) the sum of Consolidated Net Income (excluding non-cash income), Depreciation and Amortization, Interest Expense, income taxes, Operating Lease Expense and non-cash expenses to (ii) the sum of Operating Lease Expense (excluding non-cash rent adjustments), scheduled principal payments of long term Debt, scheduled maturities of all Capital Leases, dividends and Interest Expense (excluding non-cash interest expense and amortization of non-cash financing expenses). For purposes of calculating the CFCCR, the following terms shall be defined as set forth below:

"*Capital Lease*" shall mean all leases of any property, whether real, personal or mixed, by a Person, which leases would, in conformity with GAAP, be required to be accounted for as a capital lease on the balance sheet of such Person.  The term "Capital Lease" shall not include any operating lease.

"*Consolidated Net Income*" shall mean with respect to the period of determination, the net income or net loss of a Person.  In determining the amount of Consolidated Net Income, (i) adjustments shall be made for nonrecurring gains and losses or non-cash items allocable to the period of determination, (ii) deductions shall be made for, among other things, Depreciation and Amortization, Interest Expense, Operating Lease Expense, and (iii) no deductions shall be made for income taxes or charges equivalent to income taxes allocable to the period of determination, as determined in accordance with GAAP.

26

"*Debt*" shall mean with respect to a Person, and for the period of determination (i) indebtedness for borrowed money, (ii) subject to the limitation set forth in sub item (iv) below, obligations evidenced by bonds, indentures, notes or similar instruments, (iii) obligations under leases which should be, in accordance with GAAP, recorded as Capital Leases, and (iv) obligations under direct or indirect guarantees in respect of, and obligations (contingent or otherwise) to purchase or otherwise acquire, or otherwise to assure a creditor against loss in respect of, indebtedness or obligations of others of the kinds referred to in clauses (i) through (iv) above, except for guaranty obligations of such Person, which, in conformity with GAAP, are not included on the balance sheet of such Person.

"*Depreciation and Amortization*" shall mean the depreciation and amortization accruing during any period of determination with respect to a Person, as determined in accordance with GAAP.

"*Interest Expense*" shall mean for any period of determination, the sum of all interest accrued or which should be accrued in respect of all Debt of a Person, as determined in accordance with GAAP.

"*Operating Lease Expense*" shall mean the sum of all payments and expenses incurred by a Person, under any operating leases during the period of determination, as determined in accordance with GAAP.

"*EBITDA*" means for the twelve (12) month period ending on the date of determination, the sum of a Person's net income (loss) for such period plus, in each case to the extent previously deducted in calculating net income (loss): (i) income taxes, (ii) interest payments on all of its debt obligations (including any borrowings under short term credit facilities), (iii) all non-cash charges including depreciation and amortization, and (iv) Non-Recurring Items (defined below).

"*EBITDAR*" means the sum of a Person's EBITDA and its total land and building rent for the twelve (12) month period ending on the date of determination.

"*Lease Adjusted Leverage*" means with respect to a Person, as of any applicable date, the sum of (i) ten (10) times such Person's total land and building rent for the twelve (12) month period ending on the date of determination, and (ii) the total current balance of such Person's total debt obligations (including any borrowings under short term credit facilities) on such date, divided by EBITDAR.

"*Non-Recurring Items*" shall mean with respect to a Person, items of the sum (whether positive or negative) of revenue minus expenses that, in the judgment of Lessor, are unusual in nature, occur infrequently and are not representative of the ongoing or future earnings or expenses of such Person.

**Section 14.03.  No Sale of Assets**.  Without the prior written consent of Lessor, Lessee shall not sell all or substantially all of Lessee's assets.  Any sale of Lessee's assets in violation of this Section 14.03, shall be voidable at the sole option of Lessor.  Any consent to a sale of

4813-8322-9019.1
STORE/Campbells (Perkins)
Lease Agreement
2945 East State Street, Hermitage, PA 16148
File No. 7210/02-588.23

Lessee's assets given by Lessor hereunder shall not be deemed a consent to any subsequent sale of Lessee's assets.

**Section 14.04.  No Subletting**.  Lessee shall not sublet the Property without the prior written consent of Lessor, which may be withheld by Lessor in its sole discretion and any such purported subletting shall be void.

**Section 14.05.  Lease Consolidation**.  Notwithstanding any provision contained herein, at any time during the Lease Term where STORE Capital Acquisitions, LLC (or an Affiliate thereof) is the "Lessor" hereunder, upon written notification to Lessee, Lessor may elect, in its sole discretion, to amend and restate the Master Lease Agreement to include the Property in the Master Lease Agreement.  In such event, Lessee shall execute an amendment and restatement of the Master Lease Agreement, in form and substance identical to the Master Lease Agreement, and any other related documents reasonably requested by Lessor, solely to (a) modify the definition of "Properties" as defined in the Master Lease Agreement to include the Property; (b) increase the Base Annual Rental as defined in the Master Lease Agreement to reflect the inclusion of the Property; and (c) make such other changes reasonably deemed necessary by Lessor in its sole discretion to reflect the addition of the Property to the Master Lease Agreement.  In no event shall Lessee have the right to request any further modifications to the amended and restated Master Lease Agreement.  Lessee shall execute any such amended and restated Master Lease Agreement within five (5) Business Days after delivery to Lessee of an execution version thereof.

## ARTICLE XV

## NOTICES

**Section 15.01. Notices**.   All notices, demands, designations, certificates, requests, offers, consents, approvals, appointments and other instruments given pursuant to this Lease shall be in writing and given by any one of the following: (a) hand delivery; (b) express overnight delivery service;  (c) certified or registered mail, return receipt requested;  or (d) email transmission, and shall be deemed to have been delivered upon (i) receipt, if hand delivered; (ii) the next Business Day, if delivered by a reputable express overnight delivery service; (iii) the third Business Day following the day of deposit of such notice with the United States Postal Service, if sent by certified or registered mail, return receipt requested; or (iv) transmission, if delivered by email transmission.  Notices shall be provided to the parties and addresses (or electronic mail addresses) specified below:

If to Lessee:                    5171 Campbells Land Co., Inc.
                                 6201 Steubenville Pike, Suite 100
                                 McKees Rocks, PA  15136
                                 Attention:  William Kane
                                 Email: wtkane25@gmail.com

If to Lessor:                    STORE Capital Acquisitions, LLC
                                 8377 E. Hartford Drive, Suite 100
                                 Scottsdale, AZ 85255
                                 Attention:   Michael T. Bennett

28

Executive Vice President – General Counsel
Email: mbennett@storecapital.com

With a copy to:            Kutak Rock LLP
                          1801 California Street, Suite 3000
                          Denver, CO 80202
                          Attention:  Nathan Humphrey, Esq. and
                                      Kelly Reynoldson, Esq.
                          Email: nathan.humphrey@kutakrock.com and
                                 kelly.reynoldson@kutakrock.com

or to such other address or such other person as either party may from time to time hereafter specify to the other party in a notice delivered in the manner provided above.

## ARTICLE XVI

## LANDLORD'S LIEN / SECURITY INTEREST

**Section 16.01. Landlord's Lien and Security Interest**.  Lessee agrees that Lessor shall have a landlord's lien, and Lessee additionally hereby separately grants to Lessor a first and prior security interest, in, on and against all of Lessee's right, title and interest in, to and under all Personalty, which lien and security interest shall secure the payment of all Rental and other Monetary Obligations payable by Lessee to Lessor under the terms hereof and all other obligations of Lessee to Lessor under this Lease.  Lessee agrees that Lessor may file such documents as Lessor then deems appropriate or necessary to perfect and maintain said lien and security interest, and expressly acknowledges and agrees that, in addition to any and all other rights and remedies of Lessor whether hereunder or at Law or in equity, in the Event of Default of Lessee hereunder, Lessor shall have any and all rights and remedies granted a secured party under the Uniform Commercial Code then in effect in the state where the Property is located.  Lessee covenants to promptly notify Lessor of any changes in Lessee's name and/or organizational structure which may necessitate the execution and filing of additional financing statements; *provided, however*, the foregoing shall not be construed as Lessor's consent to such changes.

Lessee hereby ratifies its authorization for Lessor or any of its Affiliates to have filed in any Uniform Commercial Code jurisdiction any initial financing statement and any amendments thereto covering the Personalty pledged herein, if filed prior to the Effective Date.

## ARTICLE XVII

## MISCELLANEOUS

**Section 17.01. Force Majeure**.  Any prevention, delay or stoppage due to strikes, lockouts, acts of God, enemy or hostile governmental action, civil commotion, fire or other casualty beyond the control of the party obligated to perform (each, a "Force Majeure Event") shall excuse the performance by such party for a period equal to any such prevention, delay or

29

stoppage, expressly excluding, however, the obligations imposed upon Lessee with respect to Rental and other Monetary Obligations to be paid hereunder.

**Section 17.02.  No Merger**.  There shall be no merger of this Lease nor of the leasehold estate created by this Lease with the fee estate in or ownership of the Property by reason of the fact that the same person, corporation, firm or other entity may acquire or hold or own, directly or indirectly, (a) this Lease or the leasehold estate created by this Lease or any interest in this Lease or in such leasehold estate, and (b) the fee estate or ownership of the Property or any interest in such fee estate or ownership.  No such merger shall occur unless and until all persons, corporations, firms and other entities having any interest in (i) this Lease or the leasehold estate created by this Lease, and (ii) the fee estate in or ownership of the Property or any part thereof sought to be merged shall join in a written instrument effecting such merger and shall duly record the same.

**Section 17.03.  Interpretation**.  Lessor and Lessee acknowledge and warrant to each other that each has been represented by independent counsel and has executed this Lease after being fully advised by said counsel as to its effect and significance. This Lease shall be interpreted and construed in a fair and impartial manner without regard to such factors as the party which prepared the instrument, the relative bargaining powers of the parties or the domicile of any party.  Whenever in this Lease any words of obligation or duty are used, such words or expressions shall have the same force and effect as though made in the form of a covenant.

**Section 17.04.  Characterization.**  The following expressions of intent, representations, warranties, covenants, agreements, stipulations and waivers are a material inducement to Lessor entering into this Lease:

(a)     Lessor and Lessee intend that (i) this Lease constitutes an unseverable, unitary and single lease of all, but not less than all, of the Property, and, if at any time this Lease covers other real property in addition to the Property, neither this Lease, nor Lessee's obligations or rights hereunder may be allocated or otherwise divided among such properties by Lessee; (ii) this Lease is a "true lease," is not a financing lease, capital lease, mortgage, equitable mortgage, deed of trust, trust agreement, security agreement or other financing or trust arrangement, and the economic realities of this Lease are those of a true lease; and (iii) the business relationship created by this Lease and any related documents is solely that of a long-term commercial lease between Lessor and Lessee, the Lease has been entered into by both parties in reliance upon the economic and legal bargains contained herein, and none of the agreements contained herein is intended, nor shall the same be deemed or construed, to create a partnership (*de facto* or *de jure*) between Lessor and Lessee, to make them joint venturers, to make Lessee an agent, legal representative, partner, subsidiary or employee of Lessor, nor to make Lessor in any way responsible for the debts, obligations or losses of Lessee.

(b)     Lessor and Lessee covenant and agree that: (i) each will treat this Lease as an operating lease pursuant to Statement of Financial Accounting Standards No. 13, as amended, and as a true lease for state Law reporting purposes and for federal income tax purposes; (ii) each party will not, nor will it permit any Affiliate to, at any time, take any action or fail to take any action with respect to the preparation or filing of any

30

statement or disclosure to Governmental Authority, including without limitation, any income tax return (including an amended income tax return), to the extent that such action or such failure to take action would be inconsistent with the intention of the parties expressed in this Section 17.04; (iii) with respect to the Property, the Lease Term is less than seventy-five percent (75%) of the estimated remaining economic life of the Property; and (iv) the Base Annual Rental is the fair market value for the use of the Property and was agreed to by Lessor and Lessee on that basis, and the execution and delivery of, and the performance by Lessee of its obligations under, this Lease do not constitute a transfer of all or any part of the Property.

(c)     Lessee waives any claim or defense based upon the characterization of this Lease as anything other than a true lease and as a master lease of the Property. Lessee stipulates and agrees (i) not to challenge the validity, enforceability or characterization of the lease of the Property as a true lease and/or as a single, unitary, unseverable instrument pertaining to the lease of all, but not less than all, of the Property; and (ii) not to assert or take or omit to take any action inconsistent with the agreements and understandings set forth in this Section 17.04.

**Section 17.05.  Disclosures**.

(a)     ***Securities Act or Exchange Act***.     The parties agree that, notwithstanding any provision contained in this Lease, any party (and each employee, representative or other agent of any party) may disclose to any and all persons, without limitation of any kind, any matter required under the Securities Act or the Exchange Act.

(b)     ***Lessor Advertising and Related Publications***.     Lessee hereby consents to the use by Lessor of, and Lessor is hereby expressly permitted to use, Lessee's name, trademarks, logos, pictures of stores and signage, and basic Transaction information (collectively "Lessee's Information") solely in connection with Lessor's sales, advertising, and press release materials, including on Lessor's website.  Lessee's consent shall be deemed authorization for the limited use of Lessee's Information by Lessor under all applicable copyright and trademark laws.

(c)     ***Public Disclosures***.  Except as required by Law, Lessee shall not make any public disclosure, including press releases or any form of media release, of this Lease Agreement or any transactions relating hereto without the prior written consent of Lessor.

**Section 17.06. Attorneys' Fees**.  In the event of any judicial or other adversarial proceeding concerning this Lease, to the extent permitted by Law, the prevailing party shall be entitled to recover all of its reasonable attorneys' fees and other Costs in addition to any other relief to which it may be entitled.  In addition, the prevailing party shall, upon demand, be entitled to all attorneys' fees and all other Costs incurred in the preparation and service of any notice or demand hereunder, whether or not a legal action is subsequently commenced.

**Section 17.07. Memoranda of Lease**.  Concurrently with the execution of this Lease, Lessor and Lessee are executing Lessor's standard form memorandum of lease in recordable form, indicating the names and addresses of Lessor and Lessee, a description of the Property,

4813-8322-9019.1
STORE/Campbells (Perkins)
Lease Agreement
2945 East State Street, Hermitage, PA 16148
File No. 7210/02-588.23

the Lease Term, but omitting Rentals and such other terms of this Lease as Lessor may not desire to disclose to the public.  Further, upon Lessor's request, Lessee agrees to execute and acknowledge a termination of lease and/or quitclaim deed in recordable form to be held by Lessor until the expiration or sooner termination of the Lease Term; *provided, however,* if Lessee shall fail or refuse to sign such a document in accordance with the provisions of this Section within ten (10) days following a request by Lessor, Lessee irrevocably constitutes and appoints Lessor as its attorney-in-fact to execute and record such document, it being stipulated that such power of attorney is coupled with an interest and is irrevocable and binding.

**Section 17.08.  No Brokerage**.  Lessor and Lessee represent and warrant to each other that they have had no conversation or negotiations with any broker concerning the leasing of the Property.  Each of Lessor and Lessee agrees to protect, indemnify, save and keep harmless the other, against and from all liabilities, claims, losses, Costs, damages and expenses, including attorneys' fees, arising out of, resulting from or in connection with their breach of the foregoing warranty and representation.

**Section 17.09.  Waiver of Jury Trial and Certain Damages**.  LESSOR AND LESSEE HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE THE RIGHT EITHER MAY HAVE TO A TRIAL BY JURY WITH RESPECT TO ANY AND ALL ISSUES PRESENTED IN ANY ACTION, PROCEEDING, CLAIM OR COUNTERCLAIM BROUGHT BY EITHER OF THE PARTIES HERETO AGAINST THE OTHER OR ITS SUCCESSORS WITH RESPECT TO ANY MATTER ARISING OUT OF OR IN CONNECTION WITH THIS LEASE, THE RELATIONSHIP OF LESSOR AND LESSEE, LESSEE'S USE OR OCCUPANCY OF THE PROPERTY, AND/OR ANY CLAIM FOR INJURY OR DAMAGE, OR ANY EMERGENCY OR STATUTORY REMEDY.  THIS WAIVER BY THE PARTIES HERETO OF ANY RIGHT EITHER MAY HAVE TO A TRIAL BY JURY HAS BEEN NEGOTIATED AND IS AN ESSENTIAL ASPECT OF THEIR BARGAIN.   FURTHERMORE, LESSOR AND LESSEE HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE THE RIGHT EITHER MAY HAVE TO SEEK PUNITIVE, CONSEQUENTIAL, SPECIAL AND INDIRECT DAMAGES FROM THE OTHER PARTY AND ANY OF THE AFFILIATES, OFFICERS, DIRECTORS, MEMBERS, MANAGERS OR EMPLOYEES OF LESSOR OR LESSEE, AS APPLICABLE, OR ANY OF THEIR SUCCESSORS WITH RESPECT TO ANY AND ALL ISSUES PRESENTED IN ANY ACTION, PROCEEDING, CLAIM OR COUNTERCLAIM BROUGHT WITH RESPECT TO ANY MATTER ARISING OUT OF OR IN CONNECTION WITH THIS LEASE OR ANY DOCUMENT CONTEMPLATED HEREIN OR RELATED HERETO.   THE WAIVER BY LESSOR AND LESSEE OF ANY RIGHT EITHER MAY HAVE TO SEEK PUNITIVE, CONSEQUENTIAL, SPECIAL AND INDIRECT DAMAGES HAS BEEN NEGOTIATED BY THE PARTIES HERETO AND IS AN ESSENTIAL ASPECT OF THEIR BARGAIN.

**Section 17.10.  Securitizations**.  As a material inducement to Lessor's willingness to enter into the Transactions contemplated by this Lease and the other Transaction Documents, Lessee hereby acknowledges and agrees that Lessor may, from time to time and at any time (a) advertise, issue press releases, send direct mail or otherwise disclose information regarding the Transaction for marketing purposes; and (b) (i) act or permit another Person to act as sponsor, settler, transferor or depositor of, or a holder of interests in, one or more Persons or other arrangements formed pursuant to a trust agreement, indenture, pooling agreement, participation agreement, sale and servicing agreement, limited liability company agreement, partnership agreement, articles of incorporation or similar agreement or document; and

4813-8322-9019.1
STORE/Campbells (Perkins)
Lease Agreement
2945 East State Street, Hermitage, PA 16148
File No. 7210/02-588.23

(ii) permit one or more of such Persons or arrangements to offer and sell stock, certificates, bonds, notes, other evidences of indebtedness or securities that are directly or indirectly secured, collateralized or otherwise backed by or represent a direct or indirect interest in whole or in part in any of the assets, rights or properties described in Section 14.01 of this Lease, in one or more Persons or arrangements holding such assets, rights or properties, or any of them (collectively, the "Securities"), whether any such Securities are privately or publicly offered and sold, or rated or unrated (any combination of which actions and transactions described in both clauses (i) and (ii) in this paragraph, whether proposed or completed, are referred to in this Lease as a "Securitization").  Lessee shall cooperate fully with Lessor and any Affected Party with respect to all reasonable requests and due diligence procedures and use reasonable efforts to facilitate such Securitization, provided that such cooperation shall be at no additional cost or expense to Lessee so long as Lessee is not otherwise required to provide such information to Lessor pursuant to the other provisions of this Lease.

Section 17.11.  State-Specific Provisions.  The provisions and/or remedies which are set forth on the attached Exhibit D shall be deemed a part of and included within the terms and conditions of this Lease.

Section 17.12.  Time is of the Essence; Computation.  Time is of the essence with respect to each and every provision of this Lease.  If any deadline provided herein falls on a non-Business Day, such deadline shall be extended to the next day that is a Business Day.

Section 17.13.  Waiver and Amendment.  No provision of this Lease shall be deemed waived or amended except by a written instrument unambiguously setting forth the matter waived or amended and signed by the party against which enforcement of such waiver or amendment is sought.  Waiver of any matter shall not be deemed a waiver of the same or any other matter on any future occasion.  No acceptance by Lessor of an amount less than the Rental and other Monetary Obligations stipulated to be due under this Lease shall be deemed to be other than a payment on account of the earliest such Rental or other Monetary Obligations then due or in arrears nor shall any endorsement or statement on any check or letter accompanying any such payment be deemed a waiver of Lessor's right to collect any unpaid amounts or an accord and satisfaction.

Section 17.14.  Successors Bound.  Except as otherwise specifically provided herein, the terms, covenants and conditions contained in this Lease shall bind and inure to the benefit of the respective heirs, successors, executors, administrators and assigns of each of the parties hereto.

Section 17.15.  Captions.  Captions are used throughout this Lease for convenience of reference only and shall not be considered in any manner in the construction or interpretation hereof.

Section 17.16.  Other Documents.  Each of the parties agrees to sign such other and further documents as may be necessary or appropriate to carry out the intentions expressed in this Lease.

Section 17.17.  Entire Agreement.  This Lease and any other instruments or agreements referred to herein, constitute the entire agreement between the parties with respect

33

to the subject matter hereof, and there are no other representations, warranties or agreements except as herein provided.

      **Section 17.18.  Forum Selection; Jurisdiction; Venue; Choice of Law**.  For purposes of any action or proceeding arising out of this Lease, the parties hereto expressly submit to the jurisdiction of all federal and state courts located in the state where the Property is located. Lessee consents that it may be served with any process or paper by registered mail or by personal service within or without the state where the Property is located in accordance with applicable Law.  Furthermore, Lessee waives and agrees not to assert in any such action, suit or proceeding that it is not personally subject to the jurisdiction of such courts, that the action, suit or proceeding is brought in an inconvenient forum or that venue of the action, suit or proceeding is improper.  This Lease shall be governed by, and construed with, the Laws of the applicable state in which the Property is located, without giving effect to any state's conflict of Laws principles.

      **Section 17.19. Counterparts**.   This Lease may be executed in one or more counterparts, each of which shall be deemed an original.  Furthermore, the undersigned agree that transmission of this Lease via e-mail in a ".pdf" or other electronic format shall be deemed transmission of the original Lease for all purposes.

      *[Remainder of page intentionally left blank; signature page(s) to follow]*

4813-8322-9019.1
STORE/Campbells (Perkins)
Lease Agreement
2945 East State Street, Hermitage, PA 16148
File No. 7210/02-588.23

**IN WITNESS WHEREOF**, Lessor and Lessee have entered into this Lease as of the date first above written.

**LESSOR:**

**STORE CAPITAL ACQUISITIONS, LLC**, a Delaware limited liability company

By: _____

Printed Name: _Michael T. Bennett_

Title: _Executive Vice President_
_General Counsel_

STATE OF ARIZONA              )
                                 ) ss.

COUNTY OF MARICOPA      )

Before me, the undersigned, a Notary Public of the State and County aforesaid, personally appeared _Michael T. Bennett_, with whom I am personally acquainted (or proved to me to be on the basis of satisfactory evidence), and who, upon oath, acknowledged himself/herself to be the ___EVP___ of **STORE CAPITAL ACQUISITIONS, LLC**, a Delaware limited liability company, the within named Lessor, and that he/she as such officer, being authorized so to do, executed the within instrument for the purposes therein contained, by signing the name of _STORE Capital Acquisitions, LLC_ by himself/herself as such officer.

WITNESS my hand and Official Seal at office, this _29_ day of _January_, 2018.

_____
Notary Public

My Commission Expires _8/6/2019_

DONYA NANETTE DERUITER
Notary Public, State of Arizona
Maricopa County
My Commission Expires
August 08, 2019

4813-8322-9019.1
STORE/Campbells (Perkins)
Lease Agreement
2945 East State Street, Hermitage, PA 16148
File No. 7210/02-588.23

**IN WITNESS WHEREOF**, Lessor and Lessee have entered into this Lease as of the date first above written.

**LESSEE:**

**5171 CAMPBELLS LAND CO., INC.**, a ~~Delaware~~ Pennsylvania

By: _William T. Kane_ (signature)

Printed Name: _William T. Kane_

Title: _President_

STATE OF _Pennsylvania_ )
                                        ) ss.
COUNTY OF _Allegheny_ )

    Before me, the undersigned, a Notary Public of the State and County aforesaid, personally appeared _William Kane_, with whom I am personally acquainted (or proved to me to be on the basis of satisfactory evidence), and who, upon oath, acknowledged himself/herself to be the _President_ of **5171 CAMPBELLS LAND CO., INC.**, a ~~Delaware~~ Pennsylvania, the within named Lessee, a _Corporation_, and that he/she as such officer, being authorized so to do, executed the within instrument for the purposes therein contained, by signing the name of _the Corporation_ by himself/herself as such officer.

WITNESS my hand and Official Seal at office, this _30th_ day of _January_, 2018.

_Rosanne M Penn_ (signature)
Notary Public

My Commission Expires _9/13/20_

COMMONWEALTH OF PENNSYLVANIA
NOTARIAL SEAL
Rosanne M. Penn, Notary Public
City of Pittsburgh, Allegheny County
My Commission Expires Sept. 13, 2020
MEMBER, PENNSYLVANIA ASSOCIATION OF NOTARIES

**EXHIBITS**

Exhibit A:                  Defined Terms

Exhibit B:                  Legal Description and Street Address of the Property

Exhibit C:                  Authorization Agreement – Pre-Arranged Payments

Exhibit D:                  State-Specific Provisions

Schedule 9.03            Supplemental Financial Information

4813-8322-9019.1
STORE/Campbells (Perkins)
Lease Agreement
2945 East State Street, Hermitage, PA 16148
File No. 7210/02-588.23

**EXHIBIT A**

**DEFINED TERMS**

The following terms shall have the following meanings for all purposes of this Lease:

"*Additional Rental*" has the meaning set forth in Section 4.03.

"*Adjustment Date*" has the meaning set forth in Section 1.07.

"*Affected Party*" means each direct or indirect participant or investor in a proposed or completed Securitization, including, without limitation, any prospective owner, any rating agency or any party to any agreement executed in connection with the Securitization.

"*Affiliate*" means any Person which directly or indirectly controls, is under common control with or is controlled by any other Person.  For purposes of this definition, "controls," "under common control with," and "controlled by" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities or otherwise.

"*Anti-Money Laundering Laws*" means all applicable Laws, regulations and government guidance on the prevention and detection of money laundering, including, without limitation, (a) 18 U.S.C. §§ 1956 and 1957; and (b) the Bank Secrecy Act, 31 U.S.C. §§ 5311 et seq., and its implementing regulations, 31 CFR Part 103.

"*Base Annual Rental*" has the meaning set forth in Section 1.05.

"*Base Monthly Rental*" means an amount equal to 1/12 of the applicable Base Annual Rental.

"*Business Day*" means a day on which banks located in Scottsdale, Arizona are not required or authorized to remain closed.

"*Casualty*" means any loss of or damage to any property included within or related to the Property or arising from an adjoining property caused by an Act of God, fire, flood or other catastrophe.

"*Code*" means the Internal Revenue Code of 1986, as the same may be amended from time to time.

"*Condemnation*" means a Taking and/or a Requisition.

"*Costs*" means all reasonable costs and expenses incurred by a Person, including, without limitation, reasonable attorneys' fees and expenses, court costs, expert witness fees, costs of tests and analyses, travel and accommodation expenses, deposition and trial transcripts, copies and other similar costs and fees, brokerage fees, escrow fees, title insurance

A-1

premises, appraisal fees, stamp taxes, recording fees and transfer taxes or fees, as the circumstances require.

"*Default Rate*" means 18% per annum or the highest rate permitted by Law, whichever is less.

"*Effective Date*" has the meaning set forth in the introductory paragraph of this Lease.

"*Environmental Laws*" means federal, state and local Laws, ordinances, common law requirements and regulations and standards, rules, policies and other governmental requirements, administrative rulings and court judgments and decrees having the effect of Law in effect now or in the future and including all amendments, that relate to Hazardous Materials, Regulated Substances, USTs, and/or the protection of human health or the environment, or relating to liability for or Costs of Remediation or prevention of Releases, and apply to Lessee and/or the Property.

"*Environmental Liens*" means any liens and other encumbrances imposed pursuant to any Environmental Law.

"*Event of Default*" has the meaning set forth in Section 12.01.

"*Exchange Act*" means the Securities Exchange Act of 1934, as amended.

"*Extension Option*" has the meaning set forth in Section 3.02.

"*Extension Term*" has the meaning set forth in Section 3.02.

"*Force Majeure Event*" has the meaning set forth in Section 17.01.

"*Franchise Agreement*" has the meaning set forth in Section 5.08.

"*Franchisor*" means Perkins Restaurant and Bakery, a Delaware corporation, or its successors and permitted assigns.

"*GAAP*" means generally accepted accounting principles, consistently applied from period to period.

"*Governmental Authority*" means any governmental authority, agency, department, commission, bureau, board, instrumentality, court or quasi-governmental authority of the United States, any state or any political subdivision thereof with authority to adopt, modify, amend, interpret, give effect to or enforce any federal, state and local Laws, statutes, ordinances, rules or regulations, including common law, or to issue court orders.

"*Guarantor*" means collectively, William Kane, Frank Kane and Ron Linaburg or any additional or replacement guarantor(s) approved by Lessor in its sole and absolute discretion.

4813-8322-9019.1
STORE/Campbells (Perkins)
Lease Agreement
2945 East State Street, Hermitage, PA 16148
File No. 7210/02-588.23

"*Guaranty*" means that certain Unconditional Guaranty of Payment and Performance dated as of the date hereof given by Guarantor for the benefit of Lessor, as the same may be amended from time to time.

"*Hazardous Materials*" includes: (a) oil, petroleum products, flammable substances, explosives, radioactive materials, hazardous wastes or substances, toxic wastes or substances or any other materials, contaminants or pollutants, the presence of which causes the Property to be in violation of any local, state or federal Law or regulation, or Environmental Law, or are defined as or included in the definition of "hazardous substances," "hazardous wastes," "hazardous materials," "toxic substances," "contaminants," "pollutants," or words of similar import under any applicable local, state or federal Law or under the regulations adopted, orders issued, or publications promulgated pursuant thereto, including, but not limited to: (i) the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, 42 U.S.C. § 9601, et seq.; (ii) the Hazardous Materials Transportation Act, as amended, 49 U.S.C. § 5101, et seq.; (iii) the Resource Conservation and Recovery Act, as amended, 42 U.S.C. § 6901, et seq.; and (iv) regulations adopted and publications promulgated pursuant to the aforesaid Laws; (b) asbestos in any form which is friable, urea formaldehyde foam insulation, transformers or other equipment which contain dielectric fluid containing levels of polychlorinated biphenyls in excess of fifty (50) parts per million; (c) underground storage tanks; and (d) any other chemical, material or substance, exposure to which is prohibited, limited or regulated by any Governmental Authority.

"*Indemnified Parties*" means Lessor, its members, managers, officers, directors, shareholders, partners, employees, affiliates, subsidiaries, successors and assigns, including, but not limited to, any successors by merger, consolidation or acquisition of all or a substantial portion of the assets and business of Lessor.

"*Initial Term*" has the meaning set forth in Section 3.01.

"*Insolvency Event*" means (a) a Person's (i) failure to generally pay its debts as such debts become due; (ii) admitting in writing its inability to pay its debts generally; or (iii) making a general assignment for the benefit of creditors; (b) any proceeding being instituted by or against any Person (i) seeking to adjudicate it bankrupt or insolvent; (ii) seeking liquidation, dissolution, winding up, reorganization, arrangement, adjustment, protection, relief, or composition of it or its debts under any Law relating to bankruptcy, insolvency, or reorganization or relief of debtors; or (iii) seeking the entry of an order for relief or the appointment of a receiver, trustee, or other similar official for it or for any substantial part of its property, and in the case of any such proceeding instituted against any Person, either such proceeding shall remain undismissed for a period of one hundred twenty (120) days or any of the actions sought in such proceeding shall occur; or (c) any Person taking any corporate action to authorize any of the actions set forth above in this definition.

"*Insurance Premiums*" has the meaning in Section 6.05.

"*Law(s)*" means any constitution, statute, rule of law, code, ordinance, order, judgment, decree, injunction, rule, regulation, policy, requirement or administrative or judicial determination, even if unforeseen or extraordinary, of every duly constituted Governmental Authority, court or agency, now or hereafter enacted or in effect.

A-3

"*Lease Rate*" means a percentage equal to (a) the then-current Base Monthly Rental multiplied by twelve (12), divided by (b) the aggregate purchase price of the Property paid by Lessor (or Lessor's predecessor-in-interest).

"*Lease Term*" has the meaning described in Section 3.01.

"*Legal Requirements*" means the requirements of all present and future Laws (including, without limitation, Environmental Laws and Laws relating to accessibility to, usability by, and discrimination against, disabled individuals), all judicial and administrative interpretations thereof, including any judicial order, consent, decree or judgment, and all covenants, restrictions and conditions now or hereafter of record which may be applicable to Lessee or to the Property, or to the use, manner of use, occupancy, possession, operation, maintenance, alteration, repair or restoration of the Property, even if compliance therewith necessitates structural changes or improvements or results in interference with the use or enjoyment of the Property.

"*Lender*" means any lender in connection with any loan secured by Lessor's interest in the Property, and any servicer of any loan secured by Lessor's interest in the Property.

"*Lessee Entity*" or "*Lessee Entities*" means individually or collectively, as the context may require, Lessee and Guarantor, and all Affiliates thereof.

"*Lessee Reporting Entities*" means Lessee.

"*Lessee's Information*" has the meaning set forth in Section 17.05(b).

"*Lessor Entity*" or "*Lessor Entities*" means individually or collectively, as the context may require, Lessor and all Affiliates of Lessor.

"*Losses*" means any and all claims, suits, liabilities (including, without limitation, strict liabilities), actions, proceedings, obligations, debts, damages, losses, Costs, diminutions in value, fines, penalties, interest, charges, fees, judgments, awards, amounts paid in settlement and damages of whatever kind or nature, inclusive of bodily injury and property damage to third parties (including, without limitation, attorneys' fees and other Costs of defense).

"*Master Lease Agreement*" that certain Master Lease Agreement of even date herewith between STORE Master Funding XIII, LLC, as lessor, and Lessee with respect to 17 parcels of real property.

"*Material Adverse Effect*" means a material adverse effect on (a) the Property, including without limitation, the operation of the Property as a Permitted Facility and/or the value of the Property; (b) the contemplated business, condition, worth or operations of any Lessee Entity; (c) Lessee's ability to perform its obligations under this Lease; (d) Lessor's interests in the Property, this Lease or the other Transaction Documents; or (e) any Guarantor's ability to perform its obligations under the Guaranty.

"*Monetary Obligations*" means all Rental and all other sums payable or reimbursable by Lessee under this Lease to Lessor, to any third party on behalf of Lessor, or to any Indemnified Party.

A-4

"*Mortgages*" means, collectively, the mortgages, deeds of trust or deeds to secure debt, assignments of rents and leases, security agreements and fixture filings executed by Lessor for the benefit of Lender with respect to the Property, as such instruments may be amended, modified, restated or supplemented from time to time and any and all replacements or substitutions.

"*Net Award*" means (a) the entire award payable with respect to a Property by reason of a Condemnation whether pursuant to a judgment or by agreement or otherwise; or (b) the entire proceeds of any insurance required under Section 6.03 payable with respect to a Property, as the case may be, and in either case, less any Costs incurred by Lessor in collecting such award or proceeds.

"*OFAC Laws*" means Executive Order 13224 issued by the President of the United States, and all regulations promulgated thereunder, including, without limitation, the Terrorism Sanctions Regulations (31 CFR Part 595), the Terrorism List Governments Sanctions Regulations (31 CFR Part 596), the Foreign Terrorist Organizations Sanctions Regulations (31 CFR Part 597), and the Cuban Assets Control Regulations (31 CFR Part 515), and all other present and future federal, state and local Laws, ordinances, regulations, policies, lists (including, without limitation, the Specially Designated Nationals and Blocked Persons List) and any other requirements of any Governmental Authority (including without limitation, the U.S. Department of the Treasury Office of Foreign Assets Control) addressing, relating to, or attempting to eliminate, terrorist acts and acts of war, each as supplemented, amended or modified from time to time after the Effective Date, and the present and future rules, regulations and guidance documents promulgated under any of the foregoing, or under similar Laws, ordinances, regulations, policies or requirements of other states or localities.

"*Other Agreements*" means, collectively, all agreements and instruments now or hereafter entered into between, among or by (a) any of the Lessee Entities; and, or for the benefit of, (b) any of the Lessor Entities, including, without limitation, leases, promissory notes and guaranties, but excluding this Lease and all other Transaction Documents; including, (i) the Master Lease Agreement; (ii) that certain Lease Agreement of even date herewith between Lessor, as lessor, and Lessee with respect to the real property located at 1601 W. Prospect Road, Ashtabula, OH 44004, (iii) that certain Lease Agreement of even date herewith between Lessor, as lessor, and Lessee with respect to the real property located at 587 E. Main Street, Canfield, OH 44406, (iv) that certain Lease Agreement of even date herewith between Lessor, as lessor, and Lessee with respect to the real property located at 115 Ludlow Street, Warren, PA 16365, (v) that certain Lease Agreement of even date herewith between Lessor, as lessor, and Lessee with respect to the real property located at 4896 Everhard Road NW, Canton, OH 44718, as each may be amended from time to time.

"*Partial Condemnation*" has the meaning set forth in Section 11.03.

"*Permitted Amounts*" shall mean, with respect to any given level of Hazardous Materials or Regulated Substances, that level or quantity of Hazardous Materials or Regulated Substances in any form or combination of forms which does not constitute a violation of any Environmental Laws and is customarily employed in, or associated with, similar businesses located in the state where the Property is located.

A-5

"*Permitted Facility*" means a Perkins Restaurant and Bakery, all related purposes such as ingress, egress and parking, and uses incidental thereto.

"*Person*" means any individual, partnership, corporation, limited liability company, trust, unincorporated organization, Governmental Authority or any other form of entity.

"*Personalty*" means any and all "goods" (excluding "inventory," and including, without limitation, all "equipment," "fixtures," appliances and furniture (as "goods," "inventory," "equipment" and "fixtures" are defined in the applicable Uniform Commercial Code then in effect in the applicable jurisdiction)) from time to time situated on or used in connection with the Property, whether now owned or held or hereafter arising or acquired, together with all replacements and substitutions therefore and all cash and non-cash proceeds (including insurance proceeds and any title and UCC insurance proceeds) and products thereof, and, in the case of tangible collateral, together with all additions, attachments, accessions, parts, equipment and repairs now or hereafter attached or affixed thereto or used in connection therewith.

"*Price Index*" means the Consumer Price Index which is designated for the applicable month of determination as the United States City Average for All Urban Consumers, All Items, Not Seasonally Adjusted, with a base period equaling 100 in 1982 - 1984, as published by the United States Department of Labor's Bureau of Labor Statistics or any successor agency.  In the event that the Price Index ceases to be published, its successor index measuring cost of living as published by the same Governmental Authority which published the Price Index shall be substituted and any necessary reasonable adjustments shall be made by Lessor and Lessee in order to carry out the intent of Section 4.02.  In the event there is no successor index measuring cost of living, Lessor shall reasonably select an alternative price index measuring cost of living that will constitute a reasonable substitute for the Price Index.

"Property" means the parcel of real estate legally described on <u>Exhibit B</u> attached hereto, all rights, privileges, and appurtenances associated therewith, and all buildings, fixtures and other improvements now or hereafter located on such real estate (whether or not affixed to such real estate).

"*Real Estate Taxes*" has the meaning set forth in Section 6.05.

"*Regulated Substances*" means "petroleum" and "petroleum-based substances" or any similar terms described or defined in any of the Environmental Laws and any applicable federal, state, county or local Laws applicable to or regulating USTs.

"*REIT*" means a real estate investment trust as defined under Section 856 of the Code.

"*Release*" means any presence, release, deposit, discharge, emission, leaking, spilling, seeping, migrating, injecting, pumping, pouring, emptying, escaping, dumping, disposing or other movement of Hazardous Materials, Regulated Substances or USTs or any Threatened Release.

"*Remediation*" means any response, remedial, removal, or corrective action, any activity to cleanup, detoxify, decontaminate, contain or otherwise remediate any Hazardous Materials,

A-6

Regulated Substances or USTs, any actions to prevent, cure or mitigate any Release, any action to comply with any Environmental Laws or with any permits issued pursuant thereto, any inspection, investigation, study, monitoring, assessment, audit, sampling and testing, laboratory or other analysis, or any evaluation relating to any Hazardous Materials, Regulated Substances or USTs.

"*Rental*" means, collectively, the Base Annual Rental and the Additional Rental.

"*Rental Adjustment*" means an amount equal to the lesser of (a) 2% of the Base Annual Rental in effect immediately prior to the applicable Adjustment Date, or (b) 1.25 multiplied by the product of (i) the percentage change between the Price Index for the month which is two months prior to the Effective Date or the Price Index used for the immediately preceding Adjustment Date, as applicable, and the Price Index for the month which is two months prior to the applicable Adjustment Date; and (ii) the then current Base Annual Rental.

"*Requisition*" means any temporary requisition or confiscation of the use or occupancy of the Property by any Governmental Authority, civil or military, whether pursuant to an agreement with such Governmental Authority in settlement of or under threat of any such requisition or confiscation, or otherwise.

"*Reserve*" has the meaning in Section 6.04.

"*Securities*" has the meaning set forth in Section 17.10.

"*Securities Act*" means of the Securities Act of 1933, as amended.

"*Securitization*" has the meaning set forth in Section 17.10.

"*Successor Lessor*" has the meaning set forth in Section 13.03.

"*Taking*" means (a) any taking or damaging of all or a portion of the Property (i) in or by condemnation or other eminent domain proceedings pursuant to any Law, general or special; (ii) by reason of any agreement with any condemnor in settlement of or under threat of any such condemnation or other eminent domain proceeding; or (iii) by any other means; or (b) any de facto condemnation.  The Taking shall be considered to have taken place as of the later of the date actual physical possession is taken by the condemnor, or the date on which the right to compensation and damages accrues under the Law applicable to the Property.

"*Temporary Taking*" has the meaning set forth in Section 11.04.

"*Threatened Release*" means a substantial likelihood of a Release which requires action to prevent or mitigate damage to the soil, surface waters, groundwaters, land, stream sediments, surface or subsurface strata, ambient air or any other environmental medium comprising or surrounding the Property which may result from such Release.

"*Total Condemnation*" has the meaning set forth in Section 11.02.

"*Transaction*" has the meaning set forth in Section 14.01.

A-7

"*Transaction Documents*" means this Lease, the Guaranty and all documents related thereto.

"*U.S. Publicly Traded Entity*" means an entity whose securities are listed on a national securities exchange or quoted on an automated quotation system in the United States or a wholly-owned subsidiary of such an entity.

"*USTs*" means any one or combination of tanks and associated product piping systems used in connection with storage, dispensing and general use of Regulated Substances.

A-8

**EXHIBIT B**

**LEGAL DESCRIPTION AND
STREET ADDRESS OF THE PROPERTY**

**Street Address:**

| Address | City | ST | Zip | County |
|---|---|---|---|---|
| 2945 East State Street | Hermitage | PA | 16148 | Mercer |

**Legal Description**:

**721002-588.23        2945 East State Street, Hermitage, PA 16148**

PARCEL ONE:

ALL THAT CERTAIN piece or parcel of land situate in the City of Hermitage, formerly Township of Hermitage (formerly Hickory), County of Mercer and State of Pennsylvania, being known as Lot "A" in a Replat of Lots No. 2, 3, and 4 of the Hitchcock Plan, said Replat being recorded in the Records of Mercer County, Pennsylvania, in Plan Book 7, page 40, and the original Hitchcock Plan being recorded in Plan Book 5, page 27, and said lot being further bounded and described as follows:

ON the North by Lot No 9 in the Hitchcock Plan, a distance of 150 feet;

ON the East by Lot "B" in said Replat, a distance of 300 feet;

ON the South by the Sharon-Mercer Road, being U.S. Business Route No 62, a distance of 150 feet; and

ON the West by Lot No 1 in the Hitchcock Plan of Lots, a distance of 300 feet.

PARCEL TWO:

ALL THAT CERTAIN piece or parcel of land situate in the City of Hermitage, formerly Township of Hermitage (formerly Hickory), County of Mercer and State of Pennsylvania, being Lot No. 9 in the Hitchcock Plan of Lots, as recorded in the Records of Mercer County, Pennsylvania, in Plan Book 5, page 27 and said lot being further bounded and described as follows:

B-1

BOUNDED on the North by Lot No. 10 in said Plan, a distance of three hundred (300) feet;

ON the East by part of Lot No. 12 in said Plan, a distance of one hundred (100) feet;

ON the South by Lots No. 1, 2, and 3 in said Plan, a distance of three hundred (300) feet; and

ON the West by Highway Route No. 43091, known as Dutch Lane, a distance of one hundred (100) feet.

BEING THE SAME AS THAT PROPERTY AS SHOWN ON ALTA/NSPS LAND TITLE SURVEY PREPARED BY ROBIN L. KEARNS, ON BEHALF OF AMERICAN NATIONAL, JOB NO. B180128, MORE PARTICULARLY DESCRIBED AS FOLLOWS:

ALL THAT CERTAIN piece or parcel of land situate in the City of Hermitage, formerly Township of Hermitage (formerly Hickory), County of Mercer and Commonwealth of Pennsylvania, being known as Lot "A" in a Replat of Lots No. 2, 3, and 4 of the Hitchcock Plan, said Replat being recorded in the Records of Mercer County, Pennsylvania, in Plan Book 7, page 40 and also Lot No. 9 in the Hitchcock Plan of Lots, as recorded in the Records of Mercer County, Pennsylvania, in Plan Book 5, page 27, being more particularly described as follows:

BEGINNING in the north line of East State Street (U.S. Business Route 62) (Sharon Mercer Road) for the southwest corner of the aforesaid Lot A of Plan Book 7, page 40;

THENCE along the west line of Lot A, North 00°00'00" East, a distance of 300.00 feet to a point in the south line of Lot No. 9 of said Hitchcock Plan of Lots;

THENCE along said line, North 90°00'00" West, a distance of 100.00 feet to the east line of Dutch Lane (S.R. 3035) (Route 43091);

THENCE along the east line of Dutch Lane, North 00°00'00" East, a distance of 100.00 feet to the northwest corner of said Lot 9;

THENCE along said line, South 90°00'00" East, a distance of 300.00 feet to the northeast corner of Lot 9;

THENCE South 00°00'00" East, a distance of 100.00 feet to a point in the north line of Lot B of said Plan Book 7, Page 40;

THENCE along said line, North 90°00'00" West, a distance of 50.00 feet to a point to the northwest corner of Lot B;

THENCE along the west line of Lot B, South 00°00'00" West, a distance of 300.00 feet to a point to the northerly line of West State Street;

THENCE along said line, North 90°00'00" West, a distance of 150.00 feet to point of beginning.

Having an area of 75.000 square feet; 1.722 acres.

A-2

BEING PARCEL NOS. 11-145-355 (Parcel One), and 11-145-330 (Parcel Two)

BEING the same premises which Spirit Finance Acquisitions, LLC, a Delaware limited liability company, by Deed dated 07/27/2012 and recorded 08/22/2012 in Mercer County at Instrument No. 2012-00011750, granted and conveyed unto Spirit Master Funding IV, LLC, a Delaware limited liability company, in fee.

A-3

**EXHIBIT C**

**FORM OF AUTHORIZATION AGREEMENT – PRE-ARRANGED PAYMENTS**

Reference Number _____

I (We) (Tenant) authorize /_____\, (Servicer) to initiate entries identified below as required. Tenant further authorizes the bank below to post such entries to the identified checking account beginning with the payment draft date of _____/_____/_____.  A minimum of thirty (30) days advance notice is required to process first payment by ACH.

Bank Name_____Branch_____

City_____State_____Zip_____

— — — — — — — —          — — — — — — — — — — — — —

      **\*\*\*Transit - ABA**                    **Account Number Information**

ACCOUNT TYPE\*\*\* Please specify checking or savings account (C/S) _____

**PLEASE FILL IN BANK INFORMATION CAREFULLY**
**ATTACH VOIDED CHECK FOR ACCOUNT VERIFICATION**

     Automatic debits will be made on the payment due date established by the relevant lease documents, or the next subsequent business day if such date is not a business day. This authority may be terminated upon thirty days prior written notification from the Tenant to the servicer. Tenant has the right to stop payment of any entry by notification to the bank prior to the scheduled debit date. If an erroneous entry is initiated by the servicer to the Tenant's account, Tenant shall have the right to have the amount of such entry reversed by the bank. To initiate a reversal, the Tenant must notify the bank in writing that an error has occurred and request a reversal. Such notice must be within 15 calendar days after the Tenant receives the statement of account or other written notice from the bank identifying the error. Tenant hereby authorizes the servicer to impose a $60.00 returned item processing fee, subject to change, via ACH debit against the above-referenced account of the Tenant if a non-sufficient funds or stop payment item is charged against the servicer's account.

**Tenant**                                    **Tax Identification**

**Name(**s**)** _____**Number** _____

**Date**_____

**Print Authorized Name**    _____

**Authorized Signature** _____

**Print Authorized Name**    _____

**Authorized Signature** _____

**Contact Phone Number** _____ **Fax Number** _____

**Email Address**: _____

**Return Original to**:    /_____\
                      **Attn:** /_____\
                      /_____\
                      /_____\
                      **Fax Number:**/_____\

C-1

## EXHIBIT D

## STATE-SPECIFIC PROVISIONS

### PENNSYLVANIA:

Lessor and Lessee agree as follows:

1.      The following is added as a new Section 12.05 to the Lease:

      12.05   **Proceedings**.  In any action of ejectment and/or for Rental, Lessor shall first cause to be filed in such action an affidavit made by it or someone acting for it, setting forth the facts necessary to authorize the entry of judgment, and, if a true copy of this Lease (and of the truth of the copy such affidavit shall be sufficient evidence) be filed in such action, it shall not be necessary to file the original as a warrant of attorney, any rule of Court, custom or practice to the contrary notwithstanding.

2.      The following is added as a new Section 12.06 to the Lease:

      12.06   **Waiver of Notice to Quit**.  Lessee agrees to give up certain legal rights as provided by the Landlord and Tenant Act of 1951, as amended, 68 P.S. § 250.101, *et seq.*, including, but not limited to the ten (10) or thirty (30) day notice period which is contained in § 501 thereof, or any other notice period established by applicable law.  No notice will be required to be given by Lessor to Lessee to leave and give up the Property.  Lessee will be asked to leave the Property without notice under any of the following conditions:

      (a)      Lessee does not leave the Property at the end of the Lease Term.

      (b)      Lessee breaks any of the terms or conditions of this Lease.

      (c)      Lessee fails, upon demand, to make all Rental payments and other payments when due.

D-1

**SCHEDULE 9.03**

**SUPPLEMENTAL FINANCIAL INFORMATION**

Lessee shall deliver the following information in connection with delivery of the corporate financial statements required in Section 9.03 of the Lease.

**Corporate Financial Reporting Certificate**

Company:

For the Qtr or FYE ending                                        _____

# of months represented                                         _____

Number of units operating at the end of reporting period        _____

**EBITDAR Calculation:**

Net Income                                                      _____

    Plus: Interest Expense                                   _____
    Plus: Taxes                                              _____
    Plus: Depreciation & Amortization                        _____
    Plus: Operating Lease Expense                            _____
    Plus: Any non-recurring expenses (please clarify below)  _____
    Plus: Any other non-cash expenses (please clarify below) _____
      **EBITDAR**                                          _____

**Items required to be broken out of Balance Sheet:**
    Current Portion of Long-Term Debt                        _____
    Current Portion of any Capital Leases                    _____
    Senior Third-Party Debt Balances                         _____
    Subordinate/Related Party Debt Balances                  _____

Explanations of non-recurring and non-cash items:

```



```

4813-8322-9019.1
STORE/Campbells (Perkins)
Lease Agreement
2945 East State Street, Hermitage, PA 16148
File No. 7210/02-588.23

Lessee shall deliver the following information in connection with delivery of the unit-level financial statements required in Section 9.03 of the Lease.

**STORE Capital Unit-Level Financial Reporting Certificate**

| Unit ID: | 1 | 2 | 3 |
|---|---|---|---|
| For the Qtr or FYE ending | _____ | _____ | _____ |
| # of months represented | _____ | _____ | _____ |

**Store-Level pre-corporate overhead EBITDAR Calculation:**

| | 1 | 2 | 3 |
|---|---|---|---|
| Store-Level Net Income | _____ | _____ | _____ |
| Plus: Interest Expense | _____ | _____ | _____ |
| Plus: Taxes | _____ | _____ | _____ |
| Plus: Depreciation & Amortization | _____ | _____ | _____ |
| Plus: Property Rent Expense (base rent + any % rent) | _____ | _____ | _____ |
| Plus: Any corporate overhead allocations to the unit | _____ | _____ | _____ |
| Plus: Any non-recurring expenses (please clarify below) | _____ | _____ | _____ |
| Plus: Any other non-cash expenses (please clarify below) | _____ | _____ | _____ |
| **EBITDAR** | _____ | _____ | _____ |

**Items required to be broken out on unit-level profit and loss statement:**

| | 1 | 2 | 3 |
|---|---|---|---|
| Cost Goods Sold | _____ | _____ | _____ |
| Labor Expenses | _____ | _____ | _____ |

Explanations of non-recurring and non-cash items:

ii

# EXHIBIT G

# LEASE AGREEMENT

**THIS LEASE AGREEMENT** (this "Lease") is made as of February 12, 2018 (the "Effective Date"), by and between **STORE CAPITAL ACQUISITIONS, LLC**, a Delaware limited liability company ("Lessor"), whose address is 8377 E. Hartford Drive, Suite 100, Scottsdale, Arizona 85255, and **5171 CAMPBELLS LAND CO., INC.**, a Pennsylvania corporation ("Lessee"), whose address is 6201 Steubenville Pike, Suite 100, McKees Rocks, Pennsylvania 15136.  Capitalized terms not defined herein shall have the meanings set forth in Exhibit A hereto.

In consideration of the mutual covenants and agreements contained in this Lease, intending to be legally bound, Lessor and Lessee covenant and agree as follows:

## ARTICLE I

## BASIC LEASE TERMS

**Section 1.01.  Property**.  The street address and legal description of the Property is set forth on Exhibit B attached hereto and incorporated herein.

**Section 1.02.  Initial Term Expiration Date**.  February 28, 2038.

**Section 1.03.  Extension Options**.   Four (4) extensions of five (5) years each, as described in Section 3.02.

**Section 1.04.  Term Expiration Date (if fully extended)**.  February 28, 2058.

**Section 1.05.  Initial Base Annual Rental**.  $133,885.72, as described in Article IV.

**Section 1.06.  Rental Adjustment**.  The lesser of (i) 2%, or (ii) 1.25 times the change in the Price Index, as described in Section 4.02.

**Section 1.07.  Adjustment Date**. March 1, 2019 and annually on March 1st thereafter during the Lease Term (including any Extension Term).

**Section 1.08.  Guarantors**.  William Kane, Frank Kane and Ron Linaburg.

**Section 1.09.  Intentionally Deleted**.

**Section 1.10.  Lessee Tax Identification No**.  46-2488070.

**Section 1.11.  Lessor Tax Identification No.**  45-2674893.

## ARTICLE II

## LEASE OF PROPERTY

**Section 2.01.  Lease**.  In consideration of Lessee's payment of the Rental and other Monetary Obligations and Lessee's performance of all other obligations hereunder, Lessor

hereby leases to Lessee, and Lessee hereby takes and hires, the Property, "AS IS" and "WHERE IS" without representation or warranty by Lessor, and subject to the existing state of title, the parties in possession, any statement of facts which an accurate survey or physical inspection might reveal, and all Legal Requirements now or hereafter in effect.

**Section 2.02.  Quiet Enjoyment**.  So long as Lessee shall pay the Rental and other Monetary Obligations provided in this Lease and shall keep and perform all of the terms, covenants and conditions on its part contained herein and subject to the rights of Lessor under Section 12.02, Lessee shall have, subject to the terms and conditions set forth herein, the right to the peaceful and quiet enjoyment and occupancy of the Property.

## ARTICLE III

## LEASE TERM; EXTENSION

**Section 3.01. Initial Term**.   The initial term of this Lease ("Initial Term") shall commence as of the Effective Date and shall expire at midnight on February 28, 2038, unless terminated sooner as provided in this Lease and as may be extended as provided herein.  The time period during which this Lease shall actually be in effect, including any Extension Term, is referred to as the "Lease Term."

**Section 3.02.  Extensions**.   Unless this Lease has expired or has been sooner terminated, or an Event of Default has occurred and is continuing at the time any extension option is exercised, Lessee shall have the right and option (each, an "Extension Option") to extend the Initial Term for all and not less than the Property for four (4) additional successive periods of five (5) years each (each, an "Extension Term"), pursuant to the terms and conditions of this Lease then in effect.

**Section 3.03.  Notice of Exercise**.  Lessee may only exercise the Extension Options by giving written notice thereof to Lessor of its election to do so no later than one hundred twenty (120) days prior to the expiration of the then-current Lease Term.  If written notice of the exercise of any Extension Option is not received by Lessor by the applicable dates described above, then this Lease shall terminate on the last day of the Initial Term or, if applicable, the last day of the Extension Term then in effect.  Upon the request of Lessor or Lessee, the parties hereto will, at the expense of Lessee, execute and exchange an instrument in recordable form setting forth the extension of the Lease Term in accordance with this Section 3.03.

**Section 3.04.  Removal of Personalty**.  Upon the expiration of the Lease Term, and if Lessee is not then in breach hereof, Lessee may remove from the Property all personal property belonging to Lessee.  Lessee shall repair any damage caused by such removal and shall leave the Property clean and in good and working condition and repair inside and out, subject to normal wear and tear, casualty and condemnation.  Any property of Lessee left on the Property on the tenth day following the expiration of the Lease Term shall, at Lessor's option, automatically and immediately become the property of Lessor.

4829-5995-9643.1
STORE/Campbells (Perkins)
Lease Agreement
4896 Everhard Road NW, Canton, OH 44718
File No. 7210/02-588.18

## ARTICLE IV

## RENTAL AND OTHER MONETARY OBLIGATIONS

**Section 4.01.  Base Monthly Rental**.  During the Lease Term, on or before the first day of each calendar month, Lessee shall pay in advance the Base Monthly Rental then in effect.  If the Effective Date is a date other than the first day of the month, Lessee shall pay to Lessor on the Effective Date the Base Monthly Rental prorated by multiplying the Base Monthly Rental by a fraction, the numerator of which is the number of days remaining in the month (including the Effective Date) for which Rental is being paid, and the denominator of which is the total number of days in such month.

**Section 4.02.  Adjustments**.  During the Lease Term (including any Extension Term), on the first Adjustment Date and on each Adjustment Date thereafter, the Base Annual Rental shall increase by an amount equal to the Rental Adjustment; *provided, however*, that in no event shall Base Annual Rental be reduced as a result of the application of the Rental Adjustment.

**Section 4.03.  Additional Rental**.  Lessee shall pay and discharge, as additional rental ("Additional Rental"), all sums of money required to be paid by Lessee under this Lease which are not specifically referred to as Rental.  Lessee shall pay and discharge any Additional Rental when the same shall become due, provided that amounts which are billed to Lessor or any third party, but not to Lessee, shall be paid within fifteen (15) days after Lessor's demand for payment thereof or, if earlier, when the same are due.  In no event shall Lessee be required to pay to Lessor any item of Additional Rental that Lessee is obligated to pay and has paid to any third party pursuant to any provision of this Lease.

**Section 4.04.  Rentals to be Net to Lessor**.  The Base Annual Rental payable hereunder shall be net to Lessor, so that this Lease shall yield to Lessor the Rentals specified during the Lease Term, and all Costs and obligations of every kind and nature whatsoever relating to the Property shall be performed and paid by Lessee.  Lessee shall perform all of its obligations under this Lease at its sole cost and expense. All Rental and other Monetary Obligations which Lessee is required to pay hereunder shall be the unconditional obligation of Lessee and shall be payable in full when due and payable, without notice or demand, and without any setoff, abatement, deferment, deduction or counterclaim whatsoever.

**Section 4.05.  ACH Authorization**.  Upon execution of this Lease, Lessee shall deliver to Lessor a complete Authorization Agreement – Pre-Arranged Payments in the form of Exhibit C attached hereto and incorporated herein by this reference, together with a voided check for account verification, establishing arrangements whereby payments of the Base Monthly Rental are transferred by Automated Clearing House Debit initiated by Lessor from an account established by Lessee at a United States bank or other financial institution to such account as Lessor may designate.  Lessee shall continue to pay all Rental by Automated Clearing House Debit unless otherwise directed by Lessor.

**Section 4.06.  Late Charges; Default Interest**.  Any delinquent payment shall, in addition to any other remedy of Lessor, incur a late charge of five percent (5%) (which late charge is intended to compensate Lessor for the cost of handling and processing such delinquent payment and should not be considered interest) and bear interest at the Default

3

Rate, such interest to be computed from and including the date such payment was due through and including the date of the payment; *provided, however*, in no event shall Lessee be obligated to pay a sum of late charge and interest higher than the maximum legal rate then in effect.

**Section 4.07. Holdover**.  If Lessee remains in possession of the Property after the expiration of the term hereof, Lessee, at Lessor's option and within Lessor's sole discretion, may be deemed a tenant on a month-to-month basis and shall continue to pay Rentals and other Monetary Obligations in the amounts herein provided, except that the Base Monthly Rental shall be automatically increased to one hundred fifty percent (150%) of the last Base Monthly Rental payable under this Lease, and Lessee shall comply with all the terms of this Lease; *provided that* nothing herein nor the acceptance of Rental by Lessor shall be deemed a consent to such holding over.  Lessee shall defend, indemnify, protect and hold the Indemnified Parties harmless from and against any and all Losses resulting from Lessee's failure to surrender possession upon the expiration of the Lease Term.

**Section 4.08. Guaranty**.  On or before the execution of this Lease, Lessee shall cause Guarantors to execute and deliver to Lessor the Guaranty.

**ARTICLE V**

**REPRESENTATIONS AND WARRANTIES OF LESSEE**

The representations and warranties of Lessee contained in this Article V are being made to induce Lessor to enter into this Lease, and Lessor has relied, and will continue to rely, upon such representations and warranties.  Lessee represents and warrants to Lessor as follows:

**Section 5.01. Organization, Authority and Status of Lessee**.  Lessee has been duly organized or formed, is validly existing and in good standing under the laws of its state of formation and is qualified as a foreign corporation to do business in any jurisdiction where such qualification is required.  All necessary and appropriate action has been taken to authorize the execution, delivery and performance by Lessee of this Lease and of the other documents, instruments and agreements provided for herein.  Lessee is not, and if Lessee is a "disregarded entity," the owner of such disregarded entity is not, a "nonresident alien," "foreign corporation," "foreign partnership," "foreign trust," "foreign estate," or any other "person" that is not a "United States Person" as those terms are defined in the Code and the regulations promulgated thereunder.  The Person who has executed this Lease on behalf of Lessee is duly authorized to do so.

**Section 5.02. Enforceability**.   This Lease constitutes the legal, valid and binding obligation of Lessee, enforceable against Lessee in accordance with its terms.

**Section 5.03. Litigation**.   There are no suits, actions, proceedings or investigations pending, or to the best of its knowledge, threatened against or involving any Lessee Entity or the Property before any arbitrator or Governmental Authority which might reasonably result in any Material Adverse Effect.

**Section 5.04. Absence of Breaches or Defaults**.  Lessee is not in default under any document, instrument or agreement to which Lessee is a party or by which Lessee, the Property

4

or any of Lessee's property is subject or bound, which has had, or could reasonably be expected to result in, a Material Adverse Effect.  The authorization, execution, delivery and performance of this Lease and the documents, instruments and agreements provided for herein will not result in any breach of or default under any document, instrument or agreement to which Lessee is a party or by which Lessee, the Property or any of Lessee's property is subject or bound.

**Section 5.05.  Compliance with OFAC Laws**.  None of the Lessee Entities, and no individual or entity owning directly or indirectly any interest in any of the Lessee Entities, is an individual or entity whose property or interests are subject to being blocked under any of the OFAC Laws or is otherwise in violation of any of the OFAC Laws; *provided, however*, that the representation contained in this sentence shall not apply to any Person to the extent such Person's interest is in or through a U.S. Publicly Traded Entity.

**Section 5.06.  Solvency**.  There is no contemplated, pending or threatened Insolvency Event or similar proceedings, whether voluntary or involuntary, affecting Lessee or any Lessee Entity.  Lessee does not have unreasonably small capital to conduct its business.

**Section 5.07.  Ownership**.  None of (i) Lessee, (ii) any Affiliate of Lessee, or (iii) any Person owning ten percent (10%) or more of Lessee, owns, directly or indirectly, ten percent (10%) or more of the total voting power or total value of capital stock in STORE Capital Corporation.

**Section 5.08.  Franchise Agreement**.  Lessee has entered into one or more franchise, license and/or area development agreements with Franchisor (each, a "Franchise Agreement") for conduct of the business at the Property.  Each such Franchise Agreement is valid, binding and in full force and effect, permits Lessee to operate Permitted Facilities on the Property, and has a term which will not expire prior to the Lease Term.

**ARTICLE VI**

**TAXES AND ASSESSMENTS; UTILITIES; INSURANCE**

**Section 6.01.  Taxes**.

(a)  ***Payment***.  Subject to the provisions of Section 6.01(b) below, Lessee shall pay, prior to the earlier of delinquency or the accrual of interest on the unpaid balance, all taxes and assessments of every type or nature assessed against or imposed upon the Property, Lessee or Lessor during the Lease Term related to or arising out of this Lease and the activities of the parties hereunder, including without limitation, (i) all taxes or assessments upon the Property or any part thereof and upon any personal property, trade fixtures and improvements located on the Property, whether belonging to Lessor or Lessee, or any tax or charge levied in lieu of such taxes and assessments; (ii) all taxes, charges, license fees and or similar fees imposed by reason of the use of the Property by Lessee; (iii) all excise, franchise, transaction, privilege, license, sales, use and other taxes upon the Rental or other Monetary Obligations hereunder, the leasehold estate of either party or the activities of either party pursuant to this Lease; and (iv) all franchise, privilege or similar taxes of Lessor calculated on the

5

value of the Property or on the amount of capital apportioned to the Property. Notwithstanding anything in clauses (i) through (iv) to the contrary, Lessee shall not be obligated to pay or reimburse Lessor for any taxes based on the net income of Lessor.

(b)      ***Right to Contest***.  Within thirty (30) days after each tax and assessment payment is required by this Section 6.01 to be paid, Lessee shall provide Lessor with evidence reasonably satisfactory to Lessor that taxes and assessments have been timely paid by Lessee.   In the event Lessor receives a tax bill, Lessor shall use commercially reasonable efforts to forward said bill to Lessee within fifteen (15) days of Lessor's receipt thereof.   Lessee may, at its own expense, contest or cause to be contested (in the case of any item involving more than $10,000, after prior written notice to Lessor, which shall be given within fifteen (15) days of Lessee's determination to contest any matter as permitted herein), by appropriate legal proceedings conducted in good faith and with due diligence, any above-described item or lien with respect thereto, provided that (i) neither the Property nor any interest therein would be in any danger of being sold, forfeited or lost by reason of such proceedings; (ii) no Event of Default has occurred and is continuing; (iii) if and to the extent required by the applicable taxing authority and/or Lessor, Lessee posts a bond or takes other steps acceptable to such taxing authority and/or Lessor that removes such lien or stays enforcement thereof; (iv) Lessee shall promptly provide Lessor with copies of all notices received or delivered by Lessee and filings made by Lessee in connection with such proceeding; and (v) upon termination of such proceedings, it shall be the obligation of Lessee to pay the amount of any such tax and assessment or part thereof as finally determined in such proceedings, the payment of which may have been deferred during the prosecution of such proceedings, together with any costs, fees (including attorneys' fees and disbursements), interest, penalties or other liabilities in connection therewith.   Lessor shall at the request of Lessee, execute or join in the execution of any instruments or documents necessary in connection with such contest or proceedings, but Lessor shall incur no cost or obligation thereby.

**Section 6.02.  Utilities**.   Lessee shall contract, in its own name, for and pay when due all charges for the connection and use of water, gas, electricity, telephone, garbage collection, sewer use and other utility services supplied to the Property during the Lease Term.   Under no circumstances shall Lessor be responsible for any interruption of any utility service.

**Section 6.03.  Insurance**.

(a)      ***Coverage***.   Throughout the Lease Term, Lessee shall maintain, with respect to the Property, at its sole expense, the following types and amounts of insurance, in addition to such other insurance as Lessor may reasonably require from time to time:

(i)      Insurance against loss or damage to real property and personal property under an "all risk" or "special form" insurance policy, which shall include coverage against all risks of direct physical loss, including but not limited to loss by fire, lightning, wind, terrorism, and other risks normally included in the standard ISO special form (and shall also include National Flood and Excess Flood insurance for the Property located in Flood Zone A or Flood Zone V, as

6

designated by FEMA, or otherwise located in a flood zone area identified by FEMA as a 100-year flood zone or special hazard area, and earthquake insurance if the Property is located within a moderate to high earthquake hazard zone as determined by an approved insurance company set forth in Section 6.03(b)(x) below).  Such policy shall also include soft costs, a joint loss agreement, coverage for ordinance or law covering the loss of value of the undamaged portion of the Property, costs to demolish and the increased costs of construction if any of the improvements located on, or the use of, the Property shall at any time constitute legal non-conforming structures or uses.  Ordinance or law limits shall be in an amount equal to the full replacement cost for the loss of value of the undamaged portion of the Property and no less than 25% of the replacement cost for costs to demolish and the increased cost of construction, or in an amount otherwise specified by Lessor.  Such insurance shall be in amounts not less than 100% of the full insurable replacement cost values (without deduction for depreciation), with an agreed amount endorsement or without any coinsurance provision, and with sublimits satisfactory to Lessor, as determined from time to time at Lessor's request but not more frequently than once in any 12-month period.

(ii)     Commercial general liability insurance, including products and completed operation liability, covering Lessor and Lessee against bodily injury liability, property damage liability and personal and advertising injury, including without limitation any liability arising out of the ownership, maintenance, repair, condition or operation of every Property or adjoining ways, streets, parking lots or sidewalks.  Such insurance policy or policies shall contain a broad form contractual liability endorsement under which the insurer agrees to insure Lessee's obligations under Article X hereof to the extent insurable, and a "severability of interest" clause or endorsement which precludes the insurer from denying the claim of Lessee or Lessor because of the negligence or other acts of the other, shall be in amounts of not less than $10,000,000 per occurrence for bodily injury and property damage, and $10,000,000 general aggregate per location, or such higher limits as Lessor may reasonably require from time to time, and shall be of form and substance satisfactory to Lessor.  Such limits of insurance can be acquired through Commercial General liability and Umbrella liability policies.

(iii)    Workers' compensation and Employers Liability insurance with statutorily mandated limits covering all persons employed by Lessee on the Property in connection with any work done on or about the Property for which claims for death or bodily injury could be asserted against Lessor, Lessee or the Property.

(iv)    Business interruption insurance including Rental Value Insurance payable to Lessor at all locations for a period of not less than twelve (12) months. Such insurance is to follow the form of the real property "all risk" or "special form" coverage and is not to contain a co-insurance clause.  Such insurance is to have a minimum of 180 days of extended period of indemnity.

7

(v)     Automobile liability insurance, including owned, non-owned and hired car liability insurance for combined limits of liability of $5,000,000 per occurrence.  The limits of liability can be provided in a combination of an automobile liability policy and an umbrella liability policy.

(vi)    Comprehensive Boiler and Machinery or Equipment Breakdown Insurance against loss or damage from explosion of any steam or pressure boilers or similar apparatus, if any, and other building equipment including HVAC units located in or about the Property and in an amount equal to the lesser of 25% of the 100% replacement cost of the Property or $5,000,000.

(vii)   Such additional and/or other insurance and in such amounts as at the time is customarily carried by prudent owners or tenants with respect to improvements and personal property similar in character, location and use and occupancy to the Property.

(b)     ***Insurance Provisions***.  All insurance policies shall:

(i)     provide for a waiver of subrogation by the insurer as to claims against Lessor, its employees and agents;

(ii)    be primary and provide that any "other insurance" clause in the insurance policy shall exclude any policies of insurance maintained by Lessor and the insurance policy shall not be brought into contribution with insurance maintained by Lessor;

(iii)   contain deductibles not to exceed $25,000;

(iv)    contain a standard non-contributory mortgagee clause or endorsement in favor of any Lender designated by Lessor;

(v)     provide that the policy of insurance shall not be terminated, cancelled or amended without at least thirty (30) days' prior written notice to Lessor and to any Lender covered by any standard mortgagee clause or endorsement;

(vi)    be in amounts sufficient at all times to satisfy any coinsurance requirements thereof;

(vii)   except for workers' compensation insurance referred to in Section 6.03(a)(iii) above, name Lessor and any Lessor Affiliate or Lender requested by Lessor, as an "additional insured" with respect to liability insurance, and as an "additional named insured" or "additional insured" with respect to real property and rental value insurance, as appropriate and as their interests may appear;

(viii)  be evidenced by delivery to Lessor and any Lender designated by Lessor of an Acord Form 28 for property, business interruption and boiler &

8

machinery coverage (or any other form requested by Lessor) and an Acord Form 25 for commercial general liability, workers' compensation and umbrella coverage (or any other form requested by Lessor); provided that in the event that either such form is no longer available, such evidence of insurance shall be in a form reasonably satisfactory to Lessor and any Lender designated by Lessor; and

(ix)    be issued by insurance companies licensed to do business in the state where the Property is located and which are rated no less than A-X by Best's Insurance Guide or are otherwise approved by Lessor.

(c)    ***Additional Obligations***.  It is expressly understood and agreed that (i) if any insurance required hereunder, or any part thereof, shall expire, be withdrawn, become void by breach of any condition thereof by Lessee, or become void or in jeopardy by reason of the failure or impairment of the capital of any insurer, Lessee shall immediately obtain new or additional insurance reasonably satisfactory to Lessor and any Lender designated by Lessor; (ii) the minimum limits of insurance coverage set forth in this Section 6.03 shall not limit the liability of Lessee for its acts or omissions as provided in this Lease; (iii) Lessee shall procure policies for all insurance for periods of not less than one year and shall provide to Lessor and any servicer or Lender of Lessor certificates of insurance or, upon Lessor's request, duplicate originals of insurance policies evidencing that insurance satisfying the requirements of this Lease is in effect at all times; (iv) Lessee shall pay as they become due all premiums for the insurance required by this Section 6.03; (v) in the event that Lessee fails to comply with any of the requirements set forth in this Section 6.03, within ten (10) days of the giving of written notice by Lessor to Lessee, (A) Lessor shall be entitled to procure such insurance; and (B) any sums expended by Lessor in procuring such insurance shall be Additional Rental and shall be repaid by Lessee, together with interest thereon at the Default Rate, from the time of payment by Lessor until fully paid by Lessee immediately upon written demand therefor by Lessor; and (vi) Lessee shall maintain all insurance policies required in this Section 6.03 not to be cancelled, invalidated or suspended on account of the conduct of Lessee, its officers, directors, managers, members, employees or agents, or anyone acting for Lessee or any subtenant or other occupant of the Property, and shall comply with all policy conditions and warranties at all times to avoid a forfeiture of all or a part of any insurance payment.

(d)    ***Blanket Policies***.    Notwithstanding anything to the contrary in this Section 6.03, any insurance which Lessee is required to obtain pursuant to this Section 6.03 may be carried under a "blanket" policy or policies covering other properties or liabilities of Lessee provided that such "blanket" policy or policies otherwise comply with the provisions of this Section 6.03.

**Section 6.04.  Intentionally Deleted**.

**Section 6.05. Tax Impound**.   Upon the occurrence of an Event of Default and with respect to each Event of Default, in addition to any other remedies, Lessor may require Lessee to pay to Lessor on the first day of each month the amount that Lessor reasonably estimates will be necessary in order to accumulate with Lessor sufficient funds in an impound account (which

9

shall not be deemed a trust fund) (the "Reserve") for Lessor to pay any and all real estate taxes ("Real Estate Taxes") for the Property for the ensuing twelve (12) months, or, if due sooner, Lessee shall pay the required amount immediately upon Lessor's demand therefor.  Lessor shall, upon prior written request of Lessee, provide Lessee with evidence reasonably satisfactory to Lessee that payment of the Real Estate Taxes was made in a timely fashion.  In the event that the Reserve does not contain sufficient funds to timely pay any Real Estate Taxes, upon Lessor's written notification thereof, Lessee shall, within five (5) Business Days of such notice, provide funds to Lessor in the amount of such deficiency.  Lessor shall pay or cause to be paid directly to the applicable taxing authorities any Real Estate Taxes then due and payable for which there are funds in the Reserve; *provided, however,* that in no event shall Lessor be obligated to pay any Real Estate Taxes in excess of the funds held in the Reserve, and Lessee shall remain liable for any and all Real Estate Taxes, including fines, penalties, interest or additional costs imposed by any taxing authority (unless incurred as a result of Lessor's failure to timely pay Real Estate Taxes for which it had funds in the Reserve).  Lessee shall cooperate fully with Lessor in assuring that the Real Estate Taxes are timely paid.  Lessor may deposit all Reserve funds in accounts insured by any federal or state agency and may commingle such funds with other funds and accounts of Lessor.  Interest or other gains from such funds, if any, shall be the sole property of Lessor. Upon an Event of Default, in addition to any other remedies, Lessor may apply all impounded funds in the Reserve against any sums due from Lessee to Lessor.  Lessor shall give to Lessee an annual accounting showing all credits and debits to and from such impounded funds received from Lessee.

## ARTICLE VII

### MAINTENANCE; ALTERATIONS

**Section 7.01. Condition of Property; Maintenance**.  Lessee hereby accepts the Property "AS IS" and "WHERE IS" with no representation or warranty of Lessor as to the condition thereof.  Lessee shall, at its sole cost and expense, be responsible for (a) keeping all of the building, structures and improvements erected on the Property in good order and repair, free from actual or constructive waste; (b) the repair or reconstruction of any building, structures or improvements erected on the Property damaged or destroyed by a Casualty; (c) subject to Section 7.02, making all necessary structural, non-structural, exterior and interior repairs and replacements to any building, structures or improvements erected on the Property; (d) operating, remodeling, updating and modernizing the Property in accordance with those standards adopted from time to time on a system-wide basis for the Permitted Facilities; (e) (i) ensuring that no party encroaches upon the Property, (ii) protecting, defending, indemnifying, releasing and holding the Indemnified Parties harmless from and against any and all claims and Losses arising out of or in any way relating to any encroachments and/or activities upon the Property caused by any Person; and (iii) prosecuting any claims that Lessee seeks to bring against any Person relating to Lessee's use and possession of the Property; and (f) paying all operating costs of the Property in the ordinary course of business.  Lessee waives any right to require Lessor to maintain, repair or rebuild all or any part of the Property or make repairs at the expense of Lessor pursuant to any Legal Requirements at any time in effect.

**Section 7.02. Alterations and Improvements**.  During the Lease Term, Lessee shall not alter the exterior, structural, plumbing or electrical elements of the Property in any manner without the consent of Lessor, which consent shall not be unreasonably withheld or conditioned;

10

*provided, however*, Lessee may undertake nonstructural alterations to the Property, individually, costing less than $25,000 without Lessor's prior written consent.  If Lessor's consent is required hereunder and Lessor consents to the making of any such alterations, the same shall be made by Lessee at Lessee's sole expense by a licensed contractor and according to plans and specifications approved by Lessor and subject to such other conditions as Lessor shall reasonably require.  Any work at any time commenced by Lessee on the Property shall be prosecuted diligently to completion, shall be of good workmanship and materials and shall comply fully with all the terms of this Lease and all Legal Requirements.  Upon completion of any alterations individually costing $25,000 or more, Lessee shall promptly provide Lessor with evidence of full payment to all laborers and materialmen contributing to the alterations.  Additionally, upon completion of any alterations, Lessee shall promptly provide Lessor with (a) an architect's certificate certifying the alterations to have been completed in conformity with the plans and specifications (if the alterations are of such a nature as would require the issuance of such a certificate from the architect); (b) a certificate of occupancy (if the alterations are of such a nature as would require the issuance of a certificate of occupancy); and (c) any other documents or information reasonably requested by Lessor.  Lessee shall keep the Property free from any liens arising out of any work performed on, or materials furnished to, the Property.  Lessee shall execute and file or record, as appropriate, a "Notice of Non-Responsibility," or any equivalent notice permitted under applicable Law in the state where the Property is located which provides that Lessor is not responsible for the payment of any costs or expenses relating to the additions or alterations.  Any addition to or alteration of the Property shall be deemed a part of the Property and belong to Lessor, and Lessee shall execute and deliver to Lessor such instruments as Lessor may require to evidence the ownership by Lessor of such addition or alteration.

**Section 7.03.  Encumbrances**.  During the Lease Term, Lessor shall have the right to grant easements on, over, under and above the Property without the prior consent of Lessee, provided that such easements will not materially interfere with Lessee's use of the Property.  Lessee shall comply with and perform all obligations of Lessor under all easements, declarations, covenants, restrictions and other items of record now or hereafter encumbering the Property.  Without Lessor's prior written consent, Lessee shall not grant any easements on, over, under or above the Property.

**ARTICLE VIII**

**USE OF THE PROPERTY; COMPLIANCE**

**Section 8.01.  Use**.  During the Lease Term, the Property shall be used solely for the operation of a Permitted Facility.  Except during periods when a Property is untenantable due to Casualty or Condemnation (and provided that Lessee continues to strictly comply with the other terms and conditions of this Lease), Lessee shall at all times during the Lease Term occupy the Property and shall diligently operate its business on the Property.  In the event that Lessee shall change the use of the Property or the concept or brand operated on the Property, only as may be expressly permitted herein or consented to by Lessor in writing, Lessee shall provide Lessor with written notice of any such change and copies of the franchise agreement(s) related to such new concept or brand, if any.

11

**Section 8.02. Compliance**.   Lessee's use and occupation of the Property, and the condition thereof, shall, at Lessee's sole cost and expense, comply fully with all Legal Requirements and all restrictions, covenants and encumbrances of record, and any owner obligations under such Legal Requirements, or restrictions, covenants and encumbrances of record, with respect to the Property, in either event, the failure with which to comply could have a Material Adverse Effect.   Without in any way limiting the foregoing provisions, Lessee shall comply with all Legal Requirements relating to anti-terrorism, trade embargos, economic sanctions, Anti-Money Laundering Laws, and the Americans with Disabilities Act of 1990, as such act may be amended from time to time, and all regulations promulgated thereunder, as it affects the Property now or hereafter in effect.   Lessee shall obtain, maintain and comply with all required licenses and permits, both governmental and private, to use and operate the Property as Permitted Facilities.   Upon Lessor's written request from time to time during the Lease Term, Lessee shall certify in writing to Lessor that Lessee's representations, warranties and obligations under Section 5.05 and this Section 8.02 remain true and correct and have not been breached.   Lessee shall immediately notify Lessor in writing if any of such representations, warranties or covenants are no longer true or have been breached or if Lessee has a reasonable basis to believe that they may no longer be true or have been breached.   In connection with such an event, Lessee shall comply with all Legal Requirements and directives of Governmental Authorities and, at Lessor's request, provide to Lessor copies of all notices, reports and other communications exchanged with, or received from, Governmental Authorities relating to such an event.   Lessee shall also reimburse Lessor for all Costs incurred by Lessor in evaluating the effect of such an event on the Property and this Lease, in obtaining any necessary license from Governmental Authorities as may be necessary for Lessor to enforce its rights under the Transaction Documents, and in complying with all Legal Requirements applicable to Lessor as the result of the existence of such an event and for any penalties or fines imposed upon Lessor as a result thereof.   Lessee will use its best efforts to prevent any act or condition to exist on or about the Property that will materially increase any insurance rate thereon, except when such acts are required in the normal course of its business and Lessee shall pay for such increase. Lessee agrees that it will defend, indemnify and hold harmless the Indemnified Parties from and against any and all Losses caused by, incurred or resulting from Lessee's failure to comply with its obligations under this Section.

**Section 8.03.  Environmental**.

(a)    ***Covenants***.

(i)    Lessee covenants to Lessor during the Lease Term, subject to the limitations of subsection (ii) below, as follows:

(A)    All uses and operations on or of the Property, whether by Lessee or any other Person, shall be in compliance with all Environmental Laws and permits issued pursuant thereto.

(B)    There shall be no Releases in, on, under or from the Property, except in Permitted Amounts.

(C)    There shall be no Hazardous Materials or Regulated Substances in, on or under the Property, except in Permitted Amounts.

12

Above and below ground storage tanks shall be properly permitted and only used as permitted.

(D)     Lessee shall keep the Property or cause the Property to be kept free and clear of all Environmental Liens, whether due to any act or omission of Lessee or any other Person.

(E)     Lessee shall not act or fail to act or allow any other tenant, occupant, guest, customer or other user of the Property to act or fail to act in any way that (1) materially increases a risk to human health or the environment, (2)  poses an unreasonable or unacceptable risk of harm to any Person or the environment (whether on or off the Property), (3) has a Material Adverse Effect, (4) is contrary to any material requirement set forth in the insurance policies maintained by Lessee or Lessor, (5) constitutes a public or private nuisance or constitutes waste, (6) violates any covenant, condition, agreement or easement applicable to the Property, or (7) would result in any reopening or reconsideration of any prior investigation or causes a new investigation by a Governmental Authority having jurisdiction over the Property.

(F)     Lessee shall, at its sole cost and expense, fully and expeditiously cooperate in all activities pursuant to this Section 8.04, including but not limited to providing all relevant information and making knowledgeable persons available for interviews.

(ii)     Notwithstanding any provision of this Lease to the contrary, an Event of Default shall not be deemed to have occurred as a result of the failure of Lessee to satisfy any one or more of the covenants set forth in subsections (A) through (E) above provided that Lessee shall be in compliance with the requirements of any Governmental Authority with respect to the Remediation of any Release at the Property.

(b)     ***Notification Requirements***.  Lessee shall immediately notify Lessor in writing upon Lessee obtaining actual knowledge of (i) any Releases or Threatened Releases in, on, under or from the Property other than in Permitted Amounts, or migrating towards the Property; (ii) any non-compliance with any Environmental Laws related in any way to the Property; (iii) any actual or potential Environmental Lien or activity use limitation; (iv) any required or proposed Remediation of environmental conditions relating to the Property required by applicable Governmental Authorities; and (v) any written or oral notice or other communication of which Lessee becomes aware from any source whatsoever (including but not limited to a Governmental Authority) relating in any way to Hazardous Materials, Regulated Substances or above or below ground storage tanks, or Remediation thereof at or on the Property, other than in Permitted Amounts, possible liability of any Person relating to the Property pursuant to any Environmental Law, other environmental conditions in connection with the Property, or any actual or potential administrative or judicial proceedings in connection with anything referred to in this Section.  Lessee shall, upon Lessor's written request, deliver

13

to Lessor a certificate stating that Lessee is and has been in full compliance with all of the environmental representations, warranties and covenants in this Lease.

(c) *Remediation*.  Lessee shall, at its sole cost and expense, and without limiting any other provision of this Lease, effectuate any Remediation required by any Governmental Authority of any condition (including, but not limited to, a Release or Threatened Release) in, on, under or from the Property and take any other reasonable action deemed necessary by any Governmental Authority for protection of human health or the environment.  Should Lessee fail to undertake any required Remediation in accordance with the preceding sentence, Lessor, after written notice to Lessee and Lessee's failure to immediately undertake such Remediation, shall be permitted to complete such Remediation, and all Costs incurred in connection therewith shall be paid by Lessee.  Any Cost so paid by Lessor, together with interest at the Default Rate, shall be deemed to be Additional Rental hereunder and shall be immediately due from Lessee to Lessor.

(d) *Indemnification*.  Lessee shall, at its sole cost and expense, protect, defend, indemnify, release and hold harmless each of the Indemnified Parties from and against any and all Losses, including, but not limited to, all Costs of Remediation (whether or not performed voluntarily), arising out of or in any way relating to any Environmental Laws, Hazardous Materials, Regulated Substances, above or below ground storage tanks, or other environmental matters concerning the Property.  It is expressly understood and agreed that Lessee's obligations under this Section shall survive the expiration or earlier termination of this Lease for any reason.

(e) *Right of Entry*.  In the event that Lessor has a reasonable basis to believe that a Release or a violation of any Environmental Law has occurred, Lessor and any other Person designated by Lessor, including but not limited to any receiver, any representative of a Governmental Authority, and any environmental consultant, shall have the right, but not the obligation, to enter upon the Property at all reasonable times to assess any and all aspects of the environmental condition of the Property and its use, including but not limited to conducting any environmental assessment or audit (the scope of which shall be determined in Lessor's sole and absolute discretion) and taking samples of soil, groundwater or other water, air, or building materials, and conducting other invasive testing.  Lessee shall cooperate with and provide access to Lessor and any other Person designated by Lessor.  Any such assessment or investigation shall be at Lessee's sole cost and expense.

(f) *Survival*.  The obligations of Lessee and the rights and remedies of Lessor under this Section 8.03 shall survive the termination, expiration and/or release of this Lease.

**Section 8.04. Franchisor Requirements**.  In addition to the requirements set forth in this Lease, Lessee, in its use, occupancy and maintenance of the Property, shall comply with all requirements of its Franchise Agreement.  Lessee hereby consents to Lessor providing information it obtains to Franchisor, and to Lessor obtaining from Franchisor information which Franchisor receives relating to Lessee's operation of its business on the Property.

4829-5995-9643.1
STORE/Campbells (Perkins)
Lease Agreement
4896 Everhard Road NW, Canton, OH 44718
File No. 7210/02-588.18

## ARTICLE IX

## ADDITIONAL COVENANTS

**Section 9.01. Performance at Lessee's Expense**.   Lessee acknowledges and confirms that Lessor may impose reasonable administrative, processing or servicing fees, and collect its reasonable attorneys' fees, costs and expenses in connection with (a) any extension, renewal, modification, amendment and termination of this Lease requested by Lessee; (b) any release or substitution of Property requested by Lessee; (c) the procurement of consents, waivers and approvals with respect to the Property or any matter related to this Lease requested by Lessee; (d) the review of any assignment or sublease or proposed assignment or sublease or the preparation or review of any subordination or non-disturbance agreement requested by Lessee; (e) the collection, maintenance and/or disbursement of reserves created under this Lease or the other Transaction Documents (following an Event of Default); and (f) inspections required to make certain determinations under this Lease or the other Transaction Documents following Lessor's reasonable belief of a breach under this Lease or any other Transaction Documents.

**Section 9.02. Inspection**.   Lessor and its authorized representatives shall have the right, at all reasonable times and upon giving reasonable prior notice (except in the event of an emergency, in which case no prior notice shall be required), to enter the Property or any part thereof and inspect the same.   Lessee hereby waives any claim for damages for any injury or inconvenience to or interference with Lessee's business, any loss of occupancy or quiet enjoyment of the Property and any other loss occasioned by such entry, but, subject to Section 10.01, excluding damages arising as a result of the gross negligence or willful misconduct of Lessor.

**Section 9.03.  Financial Information**.

(a) ***Financial Statements***.  Within forty five (45) days after the end of each fiscal quarter and within one hundred twenty (120) days after the end of each fiscal year of Lessee and Lessee Reporting Entities, Lessee shall deliver to Lessor (i) complete consolidated financial statements that consolidate Lessee and Lessee Reporting Entities, including a balance sheet, profit and loss statement, statement of stockholders' equity and statement of cash flows and all other related schedules for the fiscal period then ended, such statements to detail separately interest expense, income taxes, non-cash expenses, non-recurring expenses, operating lease expense and current portion of long-term debt – capital leases; (ii) income statements for the business at the Property; and (iii) the supplemental financial information set forth on Schedule 9.03.  All such financial statements shall be prepared in accordance with GAAP, and shall be certified to be accurate and complete by an officer or director of each Lessee Reporting Entity.  In the event that Lessee's business at the Property is ordinarily consolidated with other business for financial statements purposes, a separate profit and loss statement shall be provided showing separately the sales, profits and losses pertaining to the Property with interest expense, income taxes, non-cash expenses, non-recurring expenses and operating lease expense (rent), with the basis for allocation of overhead or other charges being clearly set forth in accordance with Schedule 9.03.  The financial statements delivered to Lessor need not be audited, but Lessee shall deliver to Lessor copies of any

15

audited financial statements of the Lessee Reporting Entities which may be prepared, as soon as they are available.

(b)   ***Other Information***.   Notwithstanding any provision contained herein, upon request at any time, Lessee will provide to Lessor, at no additional cost or expense to Lessee, any and all financial information and/or financial statements of Lessee Reporting Entities (and in the form or forms) as reasonably requested by Lessor including, but not limited to, as requested by Lessor in connection with Lessor's filings with or disclosures to the Securities and Exchange Commission or other Governmental Authority.

**Section 9.04.  OFAC Laws**.  Upon receipt of notice or upon actual knowledge thereof, Lessee shall immediately notify Lessor in writing if any Person owning (directly or indirectly) any interest in any of the Lessee Entities, or any director, officer, shareholder, member, manager or partner of any of such holders is a Person whose property or interests are subject to being blocked under any of the OFAC Laws, or is otherwise in violation of any of the OFAC Laws, or is under investigation by any Governmental Authority for, or has been charged with, or convicted of, drug trafficking, terrorist-related activities or any violation of the Anti-Money Laundering Laws, has been assessed civil penalties under these or related Laws, or has had funds seized or forfeited in an action under these or related Laws; *provided, however*, that the covenant in this Section 9.04 shall not apply to any Person to the extent such Person's interest is in or through a U.S. Publicly Traded Entity.

**Section 9.05.  Estoppel Certificate**.  At any time, and from time to time, Lessee shall, promptly and in no event later than ten (10) days after a request from Lessor or any Lender or mortgagee of Lessor, execute, acknowledge and deliver to Lessor or such Lender or mortgagee, as the case may be, a certificate in the form supplied by Lessor, certifying: (a) that Lessee has accepted the Property; (b) that this Lease is in full force and effect and has not been modified (or if modified, setting forth all modifications), or, if this Lease is not in full force and effect, the certificate shall so specify the reasons therefor; (c) the commencement and expiration dates of the Lease Term; (d) the date to which the Rentals have been paid under this Lease and the amount thereof then payable; (e) whether there are then any existing defaults by Lessor in the performance of its obligations under this Lease, and, if there are any such defaults, specifying the nature and extent thereof; (f) that no notice has been received by Lessee of any default under this Lease which has not been cured, except as to defaults specified in the certificate; (g) the capacity of the Person executing such certificate, and that such Person is duly authorized to execute the same on behalf of Lessee; (h) that neither Lessor nor any Lender or mortgagee has actual involvement in the management or control of decision making related to the operational aspects or the day-to-day operation of the Property, including any handling or disposal of Hazardous Materials or Regulated Substances; and (i) any other information reasonably requested by Lessor or any Lender or mortgagee, as the case may be. If Lessee shall fail or refuse to sign a certificate in accordance with the provisions of this Section within ten (10) days following a request by Lessor, Lessee irrevocably constitutes and appoints Lessor as its attorney-in-fact to execute and deliver the certificate to any such third party, it being stipulated that such power of attorney is coupled with an interest and is irrevocable and binding.

4829-5995-9643.1
STORE/Campbells (Perkins)
Lease Agreement
4896 Everhard Road NW, Canton, OH 44718
File No. 7210/02-588.18

## ARTICLE X

## RELEASE AND INDEMNIFICATION

**Section 10.01.  RELEASE AND INDEMNIFICATION**.  LESSEE AGREES TO USE AND OCCUPY THE PROPERTY AT ITS OWN RISK AND HEREBY RELEASES LESSOR AND LESSOR'S AGENTS AND EMPLOYEES FROM ALL CLAIMS FOR ANY DAMAGE OR INJURY TO THE FULL EXTENT PERMITTED BY LAW.  LESSEE AGREES THAT LESSOR SHALL NOT BE RESPONSIBLE OR LIABLE TO LESSEE OR LESSEE'S EMPLOYEES, AGENTS, CUSTOMERS, LICENSEES OR INVITEES FOR BODILY INJURY, PERSONAL INJURY OR PROPERTY DAMAGE OCCASIONED BY THE ACTS OR OMISSIONS OF ANY OTHER LESSEE OR ANY OTHER PERSON.  LESSEE AGREES THAT ANY EMPLOYEE OR AGENT TO WHOM THE PROPERTY OR ANY PART THEREOF SHALL BE ENTRUSTED BY OR ON BEHALF OF LESSEE SHALL BE ACTING AS LESSEE'S AGENT WITH RESPECT TO THE PROPERTY OR ANY PART THEREOF, AND NEITHER LESSOR NOR LESSOR'S AGENTS, EMPLOYEES OR CONTRACTORS SHALL BE LIABLE FOR ANY LOSS OF OR DAMAGE TO THE PROPERTY OR ANY PART THEREOF.  LESSEE SHALL INDEMNIFY, PROTECT, DEFEND AND HOLD HARMLESS EACH OF THE INDEMNIFIED PARTIES FROM AND AGAINST ANY AND ALL LOSSES (EXCLUDING LOSSES SUFFERED BY AN INDEMNIFIED PARTY ARISING OUT OF THE WILLFUL MISCONDUCT OF SUCH INDEMNIFIED PARTY OCCURRING ON OR AFTER THE EFFECTIVE DATE) CAUSED BY, INCURRED OR RESULTING FROM LESSEE'S OPERATIONS OR BY LESSEE'S USE AND OCCUPANCY OF THE PROPERTY, WHETHER RELATING TO ITS ORIGINAL DESIGN OR CONSTRUCTION, LATENT DEFECTS, ALTERATION, MAINTENANCE, USE BY LESSEE OR ANY PERSON THEREON, SUPERVISION OR OTHERWISE, OR FROM ANY BREACH OF, DEFAULT UNDER, OR FAILURE TO PERFORM, ANY TERM OR PROVISION OF THIS LEASE BY LESSEE, ITS OFFICERS, EMPLOYEES, AGENTS OR OTHER PERSONS.  IT IS EXPRESSLY UNDERSTOOD AND AGREED THAT LESSEE'S OBLIGATIONS UNDER THIS SECTION SHALL SURVIVE THE EXPIRATION OR EARLIER TERMINATION OF THIS LEASE FOR ANY REASON WHATSOEVER.

## ARTICLE XI

## CONDEMNATION AND CASUALTY

**Section 11.01. Notification**.  Lessee shall promptly give Lessor written notice of (a) any Condemnation of the Property, (b) the commencement of any proceedings or negotiations which might result in a Condemnation of the Property, and (c) any Casualty to the Property or any part thereof.  Such notice shall provide a general description of the nature and extent of such Condemnation, proceedings, negotiations or Casualty, and shall include copies of any documents or notices received in connection therewith. Thereafter, Lessee shall promptly send Lessor copies of all notices, correspondence and pleadings relating to any such Condemnation, proceedings, negotiations or Casualty.

**Section 11.02. Total Condemnation**.  In the event of a Condemnation of all or substantially all of the Property, and if as a result of such Condemnation: (i) access to the Property to and from the publicly dedicated roads adjacent to the Property as of the Effective Date is permanently and materially impaired such that Lessee no longer has access to such

17

dedicated road; (ii) there is insufficient parking to operate the Property as a Permitted Facility under applicable Laws; or (iii) the Condemnation includes a portion of the building such that the remaining portion is unsuitable for use as a Permitted Facility, as determined by Lessee in the exercise of good faith business judgment (and Lessee provides to Lessor an officer's certificate executed by an officer of Lessee certifying to the same) (each such event, a "Total Condemnation"), then, in such event:

(a)      **Termination of Lease**.   On the date of the Total Condemnation, all obligations of either party hereunder shall cease; *provided, however*, that Lessee's obligations to the Indemnified Parties under any indemnification provisions of this Lease and Lessee's obligation to pay Rental and all other Monetary Obligations (whether payable to Lessor or a third party) accruing under this Lease prior to the date of termination shall survive such termination.   If the date of such Total Condemnation is other than the first day of a month, the Base Monthly Rental for the month in which such Total Condemnation occurs shall be apportioned based on the date of the Total Condemnation.

(b)      **Net Award**.   Subject to Section 11.07 below, Lessor shall be entitled to receive the entire Net Award in connection with a Total Condemnation without deduction for any estate vested in Lessee by this Lease, and Lessee hereby expressly assigns to Lessor all of its right, title and interest in and to every such Net Award and agrees that Lessee shall not be entitled to any Net Award or other payment for the value of Lessee's leasehold interest in this Lease.

**Section 11.03. Partial Condemnation or Casualty**.   In the event of a Condemnation which is not a Total Condemnation (each such event, a "Partial Condemnation"), or in the event of a Casualty:

(a)      **Net Awards**.  All Net Awards shall be paid to Lessor.

(b)      **Continuance of Lease**. This Lease shall continue in full force and effect upon the following terms:

(i)      All Rental and other Monetary Obligations due under this Lease shall continue unabated.

(ii)      Lessee shall promptly commence and diligently prosecute restoration of the Property to the same condition, as nearly as practicable, as prior to such Partial Condemnation or Casualty as approved by Lessor.   Subject to the terms and provisions of the Mortgages and upon the written request of Lessee (accompanied by evidence reasonably satisfactory to Lessor that such amount has been paid or is due and payable and is properly part of such costs, and that Lessee has complied with the terms of Section 7.02 in connection with the restoration), Lessor shall promptly make available in installments, subject to reasonable conditions for disbursement imposed by Lessor, an amount up to but not exceeding the amount of any Net Award received by Lessor with respect to such Partial Condemnation or Casualty.   Prior to the disbursement of any portion of the Net Award with respect to a Casualty, Lessee shall provide evidence

18

4829-5995-9643.1
STORE/Campbells (Perkins)
Lease Agreement
4896 Everhard Road NW, Canton, OH 44718
File No. 7210/02-588.18

reasonably satisfactory to Lessor of the payment of restoration expenses by Lessee up to the amount of the insurance deductible applicable to such Casualty. Lessor shall be entitled to keep any portion of the Net Award which may be in excess of the cost of restoration, and Lessee shall bear all additional Costs of such restoration in excess of the Net Award.

**Section 11.04.  Temporary Taking**.  In the event of a Condemnation of all or any part of the Property for a temporary use (a "<u>Temporary Taking</u>"), this Lease shall remain in full force and effect without any reduction of Base Annual Rental, Additional Rental or any other Monetary Obligation payable hereunder.  Except as provided below, Lessee shall be entitled to the entire Net Award for a Temporary Taking, unless the period of occupation and use by the condemning authorities shall extend beyond the date of expiration of this Lease, in which event the Net Award made for such Temporary Taking shall be apportioned between Lessor and Lessee as of the date of such expiration.  At the termination of any such Temporary Taking, Lessee will, at its own cost and expense and pursuant to the provisions of Section 7.02, promptly commence and complete restoration of the Property.

**Section 11.05. Adjustment of Losses**.   Any loss under any property damage insurance required to be maintained by Lessee shall be adjusted by Lessor and Lessee.  Any Net Award relating to a Total Condemnation or a Partial Condemnation shall be adjusted by Lessor or, at Lessor's election, Lessee.  Notwithstanding the foregoing or any other provisions of this Section 11.05 to the contrary, if at the time of any Condemnation or any Casualty or at any time thereafter an Event of Default shall have occurred and be continuing, Lessor is hereby authorized and empowered but shall not be obligated, in the name and on behalf of Lessee and otherwise, to file and prosecute Lessee's claim, if any, for a Net Award on account of such Condemnation or such Casualty and to collect such Net Award and apply the same to the curing of such Event of Default and any other then existing Event of Default under this Lease and/or to the payment of any amounts owed by Lessee to Lessor under this Lease, in such order, priority and proportions as Lessor in its discretion shall deem proper.

**Section 11.06.  Lessee Obligation in Event of Casualty**.  During all periods of time following a Casualty, Lessee shall take reasonable steps to ensure that the affected Property is secure and does not pose any risk of harm to any adjoining property and Persons (including owners or occupants of such adjoining property).

**Section 11.07.  Lessee Awards and Payments**.   Notwithstanding any provision contained in this Article XI, Lessee shall be entitled to claim and receive any award or payment from the condemning authority expressly granted for the taking of any personal property owned by Lessee, any insurance proceeds with respect to any personal property owned by Lessee, the interruption of its business and moving expenses (subject, however, to the provisions of Section 6.03(a)(iv) above), but only if such claim or award does not adversely affect or interfere with the prosecution of Lessor's claim for the Condemnation or Casualty, or otherwise reduce the amount recoverable by Lessor for the Condemnation or Casualty.

19

## ARTICLE XII

## DEFAULT, CONDITIONAL LIMITATIONS,
## REMEDIES AND MEASURE OF DAMAGES

**Section 12.01.  Event of Default**.  Each of the following shall be an event of default by Lessee under this Lease (each, an "<u>Event of Default</u>"):

(a)     if any representation or warranty of Lessee set forth in this Lease is false in any material respect when made, or if Lessee renders any materially false statement or account when made;

(b)     if any Rental or other Monetary Obligation due under this Lease is not paid when due if such failure continues for more than five (5) days after written notice from Lessor; *provided, however*, Lessor shall only be required to provide such notice and cure period twice in any twelve (12) month period; and further provided that any technical error in the ACH Method of Payment process caused by Lessor's bank or servicer shall not constitute an Event of Default hereunder; *and further provided*, any delay in the payment of Rental as a result of a technical error in the wiring and/or automated clearinghouse process shall not constitute an Event of Default hereunder so long as the same is corrected within one (1) Business Day of the date Lessee receives notice thereof;

(c)     if Lessee fails to pay, prior to delinquency, any taxes, assessments or other charges the failure of which to pay will result in the imposition of a lien against the Property;

(d)     if Lessee vacates or abandons the Property;

(e)     if there is an Insolvency Event affecting Lessee or any Guarantor;

(f)     if Lessee fails to observe or perform any of the other covenants, conditions or obligations of Lessee in this Lease; *provided, however*, if any such failure does not involve the payment of any Monetary Obligation, is not willful or intentional, does not place the Property or any rights or property of Lessor in immediate jeopardy, and is within the reasonable power of Lessee to promptly cure, all as determined by Lessor in its reasonable discretion, then such failure shall not constitute an Event of Default hereunder, unless otherwise expressly provided herein, unless and until Lessor shall have given Lessee notice thereof and a period of thirty (30) days shall have elapsed, during which period Lessee may correct or cure such failure, upon failure of which an Event of Default shall be deemed to have occurred hereunder without further notice or demand of any kind being required.  If such failure cannot reasonably be cured within such thirty (30)-day period, as determined by Lessor in its reasonable discretion, and Lessee is diligently pursuing a cure of such failure, then Lessee shall have a reasonable period to cure such failure beyond such thirty (30)-day period, which shall in no event exceed ninety (90) days after receiving notice of such failure from Lessor.  If Lessee shall fail to correct or cure such failure within such ninety (90)-day period, an

20

Event of Default shall be deemed to have occurred hereunder without further notice or demand of any kind being required;

(g)     if a final, nonappealable judgment is rendered by a court against Lessee which has a Material Adverse Effect, and is not discharged or provision made for such discharge within ninety (90) days from the date of entry thereof;

(h)     if Lessee shall be liquidated or dissolved or shall begin proceedings towards its liquidation or dissolution;

(i)     if the estate or interest of Lessee in the Property shall be levied upon or attached in any proceeding and such estate or interest is about to be sold or transferred or such process shall not be vacated or discharged within ninety (90) days after it is made;

(j)     if there is a breach or default under the Franchise Agreement with respect to the Property or if such Franchise Agreement terminates or expires prior to the expiration of the Lease and a substitute agreement for the terminated or expired Franchise Agreement is not entered into prior to such expiration or termination, which substitute agreement shall be in form and substance reasonably satisfactory to Lessor; or

(k)     if there is an "Event of Default" or other breach or default by Lessee or any Guarantor under any of the other Transaction Documents or any Other Agreement , after the passage of all applicable notice and cure or grace periods; *provided, however*, in the event that this Lease has been the subject of a Securitization and any Other Agreement has not been the subject of the same Securitization or any series relating to such Securitization, an "Event of Default" under such Other Agreement shall not constitute an Event of Default under this Lease.

**Section 12.02.  Remedies**.  Upon the occurrence of an Event of Default, with or without notice or demand, except as otherwise expressly provided herein or such other notice as may be required by statute and cannot be waived by Lessee, Lessor shall be entitled to exercise, at its option, concurrently, successively, or in any combination, all remedies available at Law or in equity, including, without limitation, any one or more of the following:

(a)     to terminate this Lease, whereupon Lessee's right to possession of the Property shall cease and this Lease, except as to Lessee's liability, shall be terminated;

(b)     to the extent not prohibited by applicable Law, to (i) re-enter and take possession of the Property (or any part thereof), any or all personal property or fixtures of Lessee upon the Property and, to the extent permissible, all Franchise Agreements, permits and other rights or privileges of Lessee pertaining to the use and operation of the Property, and (ii) expel Lessee and those claiming under or through Lessee, without being deemed guilty in any manner of trespass or becoming liable for any loss or damage resulting therefrom, without resort to legal or judicial process, procedure or action.  No notice from Lessor hereunder or under a forcible entry and detainer statute or similar Law shall constitute an election by Lessor to terminate this Lease unless such

21

notice specifically so states.  If Lessee shall, after default, voluntarily give up possession of the Property to Lessor, deliver to Lessor or its agents the keys to the Property, or both, such actions shall be deemed to be in compliance with Lessor's rights and the acceptance thereof by Lessor or its agents shall not be deemed to constitute a termination of the Lease.  Lessor reserves the right following any re-entry and/or reletting to exercise its right to terminate this Lease by giving Lessee written notice thereof, in which event this Lease will terminate;

(c)     to bring an action against Lessee for any damages sustained by Lessor or any equitable relief available to Lessor and to the extent not prohibited by applicable Law, to seize all personal property or fixtures upon the Property which Lessee owns or in which it has an interest, in which Lessor shall have a landlord's lien and/or security interest, and to dispose thereof in accordance with the Laws prevailing at the time and place of such seizure or to remove all or any portion of such property and cause the same to be stored in a public warehouse or elsewhere at Lessee's sole expense, without becoming liable for any loss or damage resulting therefrom and without resorting to legal or judicial process, procedure or action;

(d)     to relet the Property or any part thereof for such term or terms (including a term which extends beyond the original Lease Term), at such rentals and upon such other terms as Lessor, in its sole discretion, may determine, with all proceeds received from such reletting being applied to the Rental and other Monetary Obligations due from Lessee in such order as Lessor may, in its sole discretion, determine, which other Monetary Obligations include, without limitation, all repossession costs, brokerage commissions, attorneys' fees and expenses, alteration, remodeling and repair costs and expenses of preparing for such reletting.  Except to the extent required by applicable Law, Lessor shall have no obligation to relet the Property or any part thereof and shall in no event be liable for refusal or failure to relet the Property or any part thereof, or, in the event of any such reletting, for refusal or failure to collect any rent due upon such reletting, and no such refusal or failure shall operate to relieve Lessee of any liability under this Lease or otherwise to affect any such liability.  Lessor reserves the right following any re-entry and/or reletting to exercise its right to terminate this Lease by giving Lessee written notice thereof, in which event this Lease will terminate as specified in said notice;

(e)     except to the extent prohibited by applicable Law to accelerate and recover from Lessee all Rental and other Monetary Obligations due and owing and scheduled to become due and owing under this Lease both before and after the date of such breach for the entire original scheduled Lease Term;

(f)     to recover from Lessee all Costs paid or incurred by Lessor as a result of such breach, regardless of whether or not legal proceedings are actually commenced;

(g)     to immediately or at any time thereafter, and with or without notice, at Lessor's sole option but without any obligation to do so, correct such breach or default and charge Lessee all Costs incurred by Lessor therein.  Any sum or sums so paid by Lessor, together with interest at the Default Rate, shall be deemed to be Additional Rental hereunder and shall be immediately due from Lessee to Lessor.  Any such acts

22

by Lessor in correcting Lessee's breaches or defaults hereunder shall not be deemed to cure said breaches or defaults or constitute any waiver of Lessor's right to exercise any or all remedies set forth herein;

(h)     to immediately or at any time thereafter, and with or without notice, except as required herein, set off any money of Lessee held by Lessor under this Lease or any other Transaction Document or any Other Agreement against any sum owing by Lessee hereunder;

(i)     Without limiting the generality of the foregoing or limiting in any way the rights of Lessor under this Lease or otherwise under applicable Laws, at any time after the occurrence, and during the continuance, of an Event of Default, Lessor shall be entitled to apply for and have a receiver appointed under applicable Law by a court of competent jurisdiction (by ex parte motion for appointment without notice) in any action taken by Lessor to enforce its rights and remedies hereunder in order to protect and preserve Lessor's interest under this Lease or in the Property and the Personalty, and in connection therewith, LESSEE HEREBY IRREVOCABLY CONSENTS TO AND WAIVES ANY RIGHT TO OBJECT TO OR OTHERWISE CONTEST THE APPOINTMENT OF A RECEIVER AFTER THE OCCURRENCE, AND DURING THE CONTINUANCE, OF AN EVENT OF DEFAULT; and/or

(j)     to seek any equitable relief available to Lessor, including, without limitation, the right of specific performance.

**Section 12.03. Cumulative Remedies**.   All powers and remedies given by Section 12.02 to Lessor, subject to applicable Law, shall be cumulative and not exclusive of one another or of any other right or remedy or of any other powers and remedies available to Lessor under this Lease, by judicial proceedings or otherwise, to enforce the performance or observance of the covenants and agreements of Lessee contained in this Lease, and no delay or omission of Lessor to exercise any right or power accruing upon the occurrence of any Event of Default shall impair any other or subsequent Event of Default or impair any rights or remedies consequent thereto.  Every power and remedy given by this Section or by Law to Lessor may be exercised from time to time, and as often as may be deemed expedient, by Lessor, subject at all times to Lessor's right in its sole judgment to discontinue any work commenced by Lessor or change any course of action undertaken by Lessor.

**Section 12.04. Lessee Waiver**.   Lessee hereby expressly waives, for itself and all Persons claiming by, through and under Lessee, including creditors of all kinds, (a) any right and privilege which Lessee has under any present or future Legal Requirements to redeem the Property or to have a continuance of this Lease for the Lease Term after termination of Lessee's right of occupancy by order or judgment of any court or by any legal process or writ, or under the terms of this Lease; (b) the benefits of any present or future Legal Requirement that exempts property from liability for debt or for distress for rent; (c) any present or future Legal Requirement relating to notice or delay in levy of execution in case of eviction of a tenant for nonpayment of rent; and (d) any benefits and lien rights which may arise pursuant to any present or future Legal Requirement.

4829-5995-9643.1
STORE/Campbells (Perkins)
Lease Agreement
4896 Everhard Road NW, Canton, OH 44718
File No. 7210/02-588.18

## ARTICLE XIII

## MORTGAGE, SUBORDINATION AND ATTORNMENT

**Section 13.01.  No Liens**.  Lessor's interest in this Lease and/or the Property shall not be subordinate to any liens or encumbrances placed upon the Property by or resulting from any act of Lessee, and nothing herein contained shall be construed to require such subordination by Lessor.  NOTICE IS HEREBY GIVEN THAT LESSEE IS NOT AUTHORIZED TO PLACE OR ALLOW TO BE PLACED ANY LIEN, MORTGAGE, DEED OF TRUST, DEED TO SECURE DEBT, SECURITY INTEREST OR ENCUMBRANCE OF ANY KIND UPON ALL OR ANY PART OF THE PROPERTY OR LESSEE'S LEASEHOLD INTEREST THEREIN, AND ANY SUCH PURPORTED TRANSACTION SHALL BE VOID.

**Section 13.02.  Subordination**.    This Lease at all times shall automatically be subordinate to the lien of any and all ground leases and Mortgages now or hereafter placed upon the Property by Lessor, and Lessee covenants and agrees to execute and deliver, upon demand, such further instruments subordinating this Lease to the lien of any or all such ground leases and Mortgages as shall be desired by Lessor, or any present or proposed mortgagees under trust deeds, upon the condition that Lessee shall have the right to remain in possession of the Property under the terms of this Lease, notwithstanding any default in any or all such ground leases or Mortgages, or after the foreclosure of any such Mortgages, so long as no Event of Default shall have occurred and be continuing.

**Section 13.03.  Attornment**.  In the event any purchaser or assignee of any Lender at a foreclosure sale acquires title to any of the  Property, or in the event that any Lender or any purchaser or assignee otherwise succeeds to the rights of Lessor as landlord under this Lease, Lessee shall attorn to Lender or such purchaser or assignee, as the case may be (a "<u>Successor Lessor</u>"), and recognize the Successor Lessor as lessor under this Lease, and, subject to the provisions of this Article XIII, this Lease shall continue in full force and effect as a direct lease between the Successor Lessor and Lessee, provided that the Successor Lessor shall only be liable for any obligations of Lessor under this Lease which accrue after the date that such Successor Lessor acquires title.  The foregoing provision shall be self-operative and effective without the execution of any further instruments.

**Section 13.04.  Execution of Additional Documents**.  Although the provisions in this Article XIII shall be self-operative and no future instrument of subordination shall be required, upon request by Lessor, Lessee shall execute and deliver such additional reasonable instruments as may be reasonably required for such purposes.

**Section 13.05.  Notice to Lender**.   Lessee shall give written notice to any Lender having a recorded lien upon the Property or any part thereof of which Lessee has been notified of any breach or default by Lessor of any of its obligations under this Lease and give such Lender at least sixty (60) days beyond any notice period to which Lessor might be entitled to cure such default before Lessee may exercise any remedy with respect thereto.

24

page 219 of 481

**ARTICLE XIV**

**ASSIGNMENT**

**Section 14.01. Assignment by Lessor**.   As a material inducement to Lessor's willingness to enter into the transactions contemplated by this Lease (the "Transaction") and the other Transaction Documents, Lessee hereby agrees that Lessor may, from time to time and at any time and without the consent of Lessee, engage in all or any combination of the following, or enter into agreements in connection with any of the following or in accordance with requirements that may be imposed by applicable securities, tax or other Laws: (a) the sale, assignment, grant, conveyance, transfer, financing, re-financing, purchase or re-acquisition of all, less than all or any portion of the Property, this Lease or any other Transaction Document, Lessor's right, title and interest in this Lease or any other Transaction Document, the servicing rights with respect to any of the foregoing, or participations in any of the foregoing; or (b) a Securitization and related transactions.  Without in any way limiting the foregoing, the parties acknowledge and agree that Lessor, in its sole discretion, may assign this Lease or any interest herein to another Person in order to maintain Lessor's or any of its Affiliates' status as a REIT. In the event of any such sale or assignment other than a security assignment, Lessee shall attorn to such purchaser or assignee (so long as Lessor and such purchaser or assignee notify Lessee in writing of such transfer and such purchaser or assignee expressly assumes in writing the obligations of Lessor hereunder from and after the date of such assignment).  At the request of Lessor, Lessee will execute such documents confirming the sale, assignment or other transfer and such other agreements as Lessor may reasonably request, provided that the same do not increase the liabilities and obligations of Lessee hereunder.  Lessor shall be relieved, from and after the date of such transfer or conveyance, of liability for the performance of any obligation of Lessor contained herein, except for obligations or liabilities accrued prior to such assignment or sale.

**Section 14.02.  Assignment by Lessee**.

(a)    ***No Assignment by Lessee***.  Lessee acknowledges that Lessor has relied both on the business experience and creditworthiness of Lessee and upon the particular purposes for which Lessee intends to use the Property in entering into this Lease.  Lessee shall not assign, transfer, convey, pledge or mortgage this Lease or any interest herein or any interest in Lessee, whether by operation of Law or otherwise, without the prior written consent of Lessor.  At the time of any assignment of this Lease which is approved by Lessor, the assignee shall assume all of the obligations of Lessee under this Lease pursuant to a written assumption agreement in form and substance reasonably acceptable to Lessor.   Such assignment of this Lease pursuant to this Section 14.02 shall not relieve Lessee of its obligations respecting this Lease unless otherwise agreed to by Lessor.   Any assignment, transfer, conveyance, pledge or mortgage in violation of this Section 14.02 shall be voidable at the sole option of Lessor. Any consent to an assignment given by Lessor hereunder shall not be deemed a consent to any subsequent assignment.

(b)    ***Permitted Assignment***.  Notwithstanding anything to the contrary contained in this Section 14.02 and provided that no Event of Default has occurred and is continuing at the time of the proposed assignment or other transfer, and provided

25

further that any assignee agrees to assume all of Lessee's obligations under this Lease by written agreement approved by Lessor, Lessee shall have the right to assign or otherwise transfer all, but not less than all, of its interest in, to and under this Lease without Lessor's consent to a Qualified Operator.  A "Qualified Operator" shall mean a Person who (x) for two (2) consecutive years immediately prior to the date of assignment or transfer and (y) on a proforma basis following the consummation of such assignment or transfer (all as determined by Lessor upon review of financial statements provided by the assignee prior to the proposed lease assignment and in a form reasonably satisfactory to Lessor), (A) has a CFCCR (defined below) of at least 1.50x; and (B) has a Lease Adjusted Leverage (defined below) of no more than 5.50x; *provided, however,* that Lessee may satisfy the foregoing conditions of a Qualified Operator by providing, or causing to be provided, a guaranty agreement, in form and substance reasonably acceptable to and approved by Lessor, in writing, which guaranty shall be from an entity that meets the requirements of (A), (B) and (C) set forth in this Section 14.02.  Lessee shall provide Lessor with at least thirty (30) days' prior written notice of the proposed assignment to a Qualified Operator, which notice must include financial information satisfying the Qualified Operator requirements set forth herein. In the event that Lessee effects an assignment to a Qualified Operator, Lessee shall be released from any liability arising under this Lease from and after the date of such assignment and Guarantor shall be released from any liability arising under the Guaranty from and after the date of such assignment.

For purposes hereof:

"*CFCCR*" means with respect to the twelve month period of time immediately preceding the date of determination, the ratio calculated for such period of time, each as determined in accordance with GAAP, of (i) the sum of Consolidated Net Income (excluding non-cash income), Depreciation and Amortization, Interest Expense, income taxes, Operating Lease Expense and non-cash expenses to (ii) the sum of Operating Lease Expense (excluding non-cash rent adjustments), scheduled principal payments of long term Debt, scheduled maturities of all Capital Leases, dividends and Interest Expense (excluding non-cash interest expense and amortization of non-cash financing expenses). For purposes of calculating the CFCCR, the following terms shall be defined as set forth below:

"*Capital Lease*" shall mean all leases of any property, whether real, personal or mixed, by a Person, which leases would, in conformity with GAAP, be required to be accounted for as a capital lease on the balance sheet of such Person.  The term "Capital Lease" shall not include any operating lease.

"*Consolidated Net Income*" shall mean with respect to the period of determination, the net income or net loss of a Person.  In determining the amount of Consolidated Net Income, (i) adjustments shall be made for nonrecurring gains and losses or non-cash items allocable to the period of determination, (ii) deductions shall be made for, among other things, Depreciation and Amortization, Interest Expense, Operating Lease Expense, and (iii) no deductions shall be made for income taxes or charges equivalent to income taxes allocable to the period of determination, as determined in accordance with GAAP.

4829-5995-9643.1
STORE/Campbells (Perkins)
Lease Agreement
4896 Everhard Road NW, Canton, OH 44718
File No. 7210/02-588.18

"*Debt*" shall mean with respect to a Person, and for the period of determination (i) indebtedness for borrowed money, (ii) subject to the limitation set forth in sub item (iv) below, obligations evidenced by bonds, indentures, notes or similar instruments, (iii) obligations under leases which should be, in accordance with GAAP, recorded as Capital Leases, and (iv) obligations under direct or indirect guarantees in respect of, and obligations (contingent or otherwise) to purchase or otherwise acquire, or otherwise to assure a creditor against loss in respect of, indebtedness or obligations of others of the kinds referred to in clauses (i) through (iv) above, except for guaranty obligations of such Person, which, in conformity with GAAP, are not included on the balance sheet of such Person.

"*Depreciation and Amortization*" shall mean the depreciation and amortization accruing during any period of determination with respect to a Person, as determined in accordance with GAAP.

"*Interest Expense*" shall mean for any period of determination, the sum of all interest accrued or which should be accrued in respect of all Debt of a Person, as determined in accordance with GAAP.

"*Operating Lease Expense*" shall mean the sum of all payments and expenses incurred by a Person, under any operating leases during the period of determination, as determined in accordance with GAAP.

"*EBITDA*" means for the twelve (12) month period ending on the date of determination, the sum of a Person's net income (loss) for such period plus, in each case to the extent previously deducted in calculating net income (loss): (i) income taxes, (ii) interest payments on all of its debt obligations (including any borrowings under short term credit facilities), (iii) all non-cash charges including depreciation and amortization, and (iv) Non-Recurring Items (defined below).

"*EBITDAR*" means the sum of a Person's EBITDA and its total land and building rent for the twelve (12) month period ending on the date of determination.

"*Lease Adjusted Leverage*" means with respect to a Person, as of any applicable date, the sum of (i) ten (10) times such Person's total land and building rent for the twelve (12) month period ending on the date of determination, and (ii) the total current balance of such Person's total debt obligations (including any borrowings under short term credit facilities) on such date, divided by EBITDAR.

"*Non-Recurring Items*" shall mean with respect to a Person, items of the sum (whether positive or negative) of revenue minus expenses that, in the judgment of Lessor, are unusual in nature, occur infrequently and are not representative of the ongoing or future earnings or expenses of such Person.

**Section 14.03.  No Sale of Assets**.  Without the prior written consent of Lessor, Lessee shall not sell all or substantially all of Lessee's assets.  Any sale of Lessee's assets in violation of this Section 14.03, shall be voidable at the sole option of Lessor.  Any consent to a sale of

4829-5995-9643.1
STORE/Campbells (Perkins)
Lease Agreement
4896 Everhard Road NW, Canton, OH 44718
File No. 7210/02-588.18

Lessee's assets given by Lessor hereunder shall not be deemed a consent to any subsequent sale of Lessee's assets.

**Section 14.04.  No Subletting**.  Lessee shall not sublet the Property without the prior written consent of Lessor, which may be withheld by Lessor in its sole discretion and any such purported subletting shall be void.

**Section 14.05.  Lease Consolidation**. Notwithstanding any provision contained herein, at any time during the Lease Term where STORE Capital Acquisitions, LLC (or an Affiliate thereof) is the "Lessor" hereunder, upon written notification to Lessee, Lessor may elect, in its sole discretion, to amend and restate the Master Lease Agreement to include the Property in the Master Lease Agreement.  In such event, Lessee shall execute an amendment and restatement of the Master Lease Agreement, in form and substance identical to the Master Lease Agreement, and any other related documents reasonably requested by Lessor, solely to (a) modify the definition of "Properties" as defined in the Master Lease Agreement to include the Property; (b) increase the Base Annual Rental as defined in the Master Lease Agreement to reflect the inclusion of the Property; and (c) make such other changes reasonably deemed necessary by Lessor in its sole discretion to reflect the addition of the Property to the Master Lease Agreement.  In no event shall Lessee have the right to request any further modifications to the amended and restated Master Lease Agreement.  Lessee shall execute any such amended and restated Master Lease Agreement within five (5) Business Days after delivery to Lessee of an execution version thereof.

## ARTICLE XV

## NOTICES

**Section 15.01. Notices**.   All notices, demands, designations, certificates, requests, offers, consents, approvals, appointments and other instruments given pursuant to this Lease shall be in writing and given by any one of the following: (a) hand delivery; (b) express overnight delivery service;  (c) certified  or  registered  mail,  return  receipt  requested;  or  (d) email transmission, and shall be deemed to have been delivered upon (i) receipt, if hand delivered; (ii) the next Business Day, if delivered by a reputable express overnight delivery service; (iii) the third Business Day following the day of deposit of such notice with the United States Postal Service, if sent by certified or registered mail, return receipt requested; or (iv) transmission, if delivered by email transmission.  Notices shall be provided to the parties and addresses (or electronic mail addresses) specified below:

If to Lessee:          5171 Campbells Land Co., Inc.
6201 Steubenville Pike, Suite 100
McKees Rocks, PA  15136
Attention:  William Kane
Email: wtkane25@gmail.com

If to Lessor:          STORE Capital Acquisitions, LLC
8377 E. Hartford Drive, Suite 100
Scottsdale, AZ 85255
Attention:  Michael T. Bennett

4829-5995-9643.1
STORE/Campbells (Perkins)
Lease Agreement
4896 Everhard Road NW, Canton, OH 44718
File No. 7210/02-588.18

Executive Vice President – General Counsel
Email: mbennett@storecapital.com

With a copy to:        Kutak Rock LLP
                       1801 California Street, Suite 3000
                       Denver, CO 80202
                       Attention:  Nathan Humphrey, Esq. and
                           Kelly Reynoldson, Esq.
                       Email: nathan.humphrey@kutakrock.com and
                           kelly.reynoldson@kutakrock.com

or to such other address or such other person as either party may from time to time hereafter specify to the other party in a notice delivered in the manner provided above.

## ARTICLE XVI

### LANDLORD'S LIEN / SECURITY INTEREST

**Section 16.01. Landlord's Lien and Security Interest**.  Lessee agrees that Lessor shall have a landlord's lien, and Lessee additionally hereby separately grants to Lessor a first and prior security interest, in, on and against all of Lessee's right, title and interest in, to and under all Personalty, which lien and security interest shall secure the payment of all Rental and other Monetary Obligations payable by Lessee to Lessor under the terms hereof and all other obligations of Lessee to Lessor under this Lease.  Lessee agrees that Lessor may file such documents as Lessor then deems appropriate or necessary to perfect and maintain said lien and security interest, and expressly acknowledges and agrees that, in addition to any and all other rights and remedies of Lessor whether hereunder or at Law or in equity, in the Event of Default of Lessee hereunder, Lessor shall have any and all rights and remedies granted a secured party under the Uniform Commercial Code then in effect in the state where the Property is located.  Lessee covenants to promptly notify Lessor of any changes in Lessee's name and/or organizational structure which may necessitate the execution and filing of additional financing statements; *provided, however*, the foregoing shall not be construed as Lessor's consent to such changes.

Lessee hereby ratifies its authorization for Lessor or any of its Affiliates to have filed in any Uniform Commercial Code jurisdiction any initial financing statement and any amendments thereto covering the Personalty pledged herein, if filed prior to the Effective Date.

## ARTICLE XVII

### MISCELLANEOUS

**Section 17.01. Force Majeure**.  Any prevention, delay or stoppage due to strikes, lockouts, acts of God, enemy or hostile governmental action, civil commotion, fire or other casualty beyond the control of the party obligated to perform (each, a "Force Majeure Event") shall excuse the performance by such party for a period equal to any such prevention, delay or

29

stoppage, expressly excluding, however, the obligations imposed upon Lessee with respect to Rental and other Monetary Obligations to be paid hereunder.

**Section 17.02.  No Merger**.  There shall be no merger of this Lease nor of the leasehold estate created by this Lease with the fee estate in or ownership of the Property by reason of the fact that the same person, corporation, firm or other entity may acquire or hold or own, directly or indirectly, (a) this Lease or the leasehold estate created by this Lease or any interest in this Lease or in such leasehold estate, and (b) the fee estate or ownership of the Property or any interest in such fee estate or ownership.  No such merger shall occur unless and until all persons, corporations, firms and other entities having any interest in (i) this Lease or the leasehold estate created by this Lease, and (ii) the fee estate in or ownership of the Property or any part thereof sought to be merged shall join in a written instrument effecting such merger and shall duly record the same.

**Section 17.03.  Interpretation**.  Lessor and Lessee acknowledge and warrant to each other that each has been represented by independent counsel and has executed this Lease after being fully advised by said counsel as to its effect and significance. This Lease shall be interpreted and construed in a fair and impartial manner without regard to such factors as the party which prepared the instrument, the relative bargaining powers of the parties or the domicile of any party.  Whenever in this Lease any words of obligation or duty are used, such words or expressions shall have the same force and effect as though made in the form of a covenant.

**Section 17.04.  Characterization.**  The following expressions of intent, representations, warranties, covenants, agreements, stipulations and waivers are a material inducement to Lessor entering into this Lease:

(a)      Lessor and Lessee intend that (i) this Lease constitutes an unseverable, unitary and single lease of all, but not less than all, of the Property, and, if at any time this Lease covers other real property in addition to the Property, neither this Lease, nor Lessee's obligations or rights hereunder may be allocated or otherwise divided among such properties by Lessee; (ii) this Lease is a "true lease," is not a financing lease, capital lease, mortgage, equitable mortgage, deed of trust, trust agreement, security agreement or other financing or trust arrangement, and the economic realities of this Lease are those of a true lease; and (iii) the business relationship created by this Lease and any related documents is solely that of a long-term commercial lease between Lessor and Lessee, the Lease has been entered into by both parties in reliance upon the economic and legal bargains contained herein, and none of the agreements contained herein is intended, nor shall the same be deemed or construed, to create a partnership (*de facto* or *de jure*) between Lessor and Lessee, to make them joint venturers, to make Lessee an agent, legal representative, partner, subsidiary or employee of Lessor, nor to make Lessor in any way responsible for the debts, obligations or losses of Lessee.

(b)      Lessor and Lessee covenant and agree that: (i) each will treat this Lease as an operating lease pursuant to Statement of Financial Accounting Standards No. 13, as amended, and as a true lease for state Law reporting purposes and for federal income tax purposes; (ii) each party will not, nor will it permit any Affiliate to, at any time, take any action or fail to take any action with respect to the preparation or filing of any

4829-5995-9643.1
STORE/Campbells (Perkins)
Lease Agreement
4896 Everhard Road NW, Canton, OH 44718
File No. 7210/02-588.18

statement or disclosure to Governmental Authority, including without limitation, any income tax return (including an amended income tax return), to the extent that such action or such failure to take action would be inconsistent with the intention of the parties expressed in this Section 17.04; (iii) with respect to the Property, the Lease Term is less than seventy-five percent (75%) of the estimated remaining economic life of the Property; and (iv) the Base Annual Rental is the fair market value for the use of the Property and was agreed to by Lessor and Lessee on that basis, and the execution and delivery of, and the performance by Lessee of its obligations under, this Lease do not constitute a transfer of all or any part of the Property.

(c)      Lessee waives any claim or defense based upon the characterization of this Lease as anything other than a true lease and as a master lease of the Property. Lessee stipulates and agrees (i) not to challenge the validity, enforceability or characterization of the lease of the Property as a true lease and/or as a single, unitary, unseverable instrument pertaining to the lease of all, but not less than all, of the Property; and (ii) not to assert or take or omit to take any action inconsistent with the agreements and understandings set forth in this Section 17.04.

**Section 17.05.  Disclosures**.

(a)      ***Securities Act or Exchange Act***.      The parties agree that, notwithstanding any provision contained in this Lease, any party (and each employee, representative or other agent of any party) may disclose to any and all persons, without limitation of any kind, any matter required under the Securities Act or the Exchange Act.

(b)      ***Lessor Advertising and Related Publications***.      Lessee hereby consents to the use by Lessor of, and Lessor is hereby expressly permitted to use, Lessee's name, trademarks, logos, pictures of stores and signage, and basic Transaction information (collectively "Lessee's Information") solely in connection with Lessor's sales, advertising, and press release materials, including on Lessor's website.  Lessee's consent shall be deemed authorization for the limited use of Lessee's Information by Lessor under all applicable copyright and trademark laws.

(c)      ***Public Disclosures.***  Except as required by Law, Lessee shall not make any public disclosure, including press releases or any form of media release, of this Lease Agreement or any transactions relating hereto without the prior written consent of Lessor.

**Section 17.06. Attorneys' Fees**.  In the event of any judicial or other adversarial proceeding concerning this Lease, to the extent permitted by Law, the prevailing party shall be entitled to recover all of its reasonable attorneys' fees and other Costs in addition to any other relief to which it may be entitled.  In addition, the prevailing party shall, upon demand, be entitled to all attorneys' fees and all other Costs incurred in the preparation and service of any notice or demand hereunder, whether or not a legal action is subsequently commenced.

**Section 17.07. Memoranda of Lease**.  Concurrently with the execution of this Lease, Lessor and Lessee are executing Lessor's standard form memorandum of lease in recordable form, indicating the names and addresses of Lessor and Lessee, a description of the Property,

the Lease Term, but omitting Rentals and such other terms of this Lease as Lessor may not desire to disclose to the public.  Further, upon Lessor's request, Lessee agrees to execute and acknowledge a termination of lease and/or quitclaim deed in recordable form to be held by Lessor until the expiration or sooner termination of the Lease Term; *provided, however,* if Lessee shall fail or refuse to sign such a document in accordance with the provisions of this Section within ten (10) days following a request by Lessor, Lessee irrevocably constitutes and appoints Lessor as its attorney-in-fact to execute and record such document, it being stipulated that such power of attorney is coupled with an interest and is irrevocable and binding.

**Section 17.08.  No Brokerage**.  Lessor and Lessee represent and warrant to each other that they have had no conversation or negotiations with any broker concerning the leasing of the Property.  Each of Lessor and Lessee agrees to protect, indemnify, save and keep harmless the other, against and from all liabilities, claims, losses, Costs, damages and expenses, including attorneys' fees, arising out of, resulting from or in connection with their breach of the foregoing warranty and representation.

**Section 17.09.  Waiver of Jury Trial and Certain Damages**.  LESSOR AND LESSEE HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE THE RIGHT EITHER MAY HAVE TO A TRIAL BY JURY WITH RESPECT TO ANY AND ALL ISSUES PRESENTED IN ANY ACTION, PROCEEDING, CLAIM OR COUNTERCLAIM BROUGHT BY EITHER OF THE PARTIES HERETO AGAINST THE OTHER OR ITS SUCCESSORS WITH RESPECT TO ANY MATTER ARISING OUT OF OR IN CONNECTION WITH THIS LEASE, THE RELATIONSHIP OF LESSOR AND LESSEE, LESSEE'S USE OR OCCUPANCY OF THE PROPERTY, AND/OR ANY CLAIM FOR INJURY OR DAMAGE, OR ANY EMERGENCY OR STATUTORY REMEDY.  THIS WAIVER BY THE PARTIES HERETO OF ANY RIGHT EITHER MAY HAVE TO A TRIAL BY JURY HAS BEEN NEGOTIATED AND IS AN ESSENTIAL ASPECT OF THEIR BARGAIN.   FURTHERMORE, LESSOR AND LESSEE HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE THE RIGHT EITHER MAY HAVE TO SEEK PUNITIVE, CONSEQUENTIAL, SPECIAL AND INDIRECT DAMAGES FROM THE OTHER PARTY AND ANY OF THE AFFILIATES, OFFICERS, DIRECTORS, MEMBERS, MANAGERS OR EMPLOYEES OF LESSOR OR LESSEE, AS APPLICABLE, OR ANY OF THEIR SUCCESSORS WITH RESPECT TO ANY AND ALL ISSUES PRESENTED IN ANY ACTION, PROCEEDING, CLAIM OR COUNTERCLAIM BROUGHT WITH RESPECT TO ANY MATTER ARISING OUT OF OR IN CONNECTION WITH THIS LEASE OR ANY DOCUMENT CONTEMPLATED HEREIN OR RELATED HERETO.   THE WAIVER BY LESSOR AND LESSEE OF ANY RIGHT EITHER MAY HAVE TO SEEK PUNITIVE, CONSEQUENTIAL, SPECIAL AND INDIRECT DAMAGES HAS BEEN NEGOTIATED BY THE PARTIES HERETO AND IS AN ESSENTIAL ASPECT OF THEIR BARGAIN.

**Section 17.10.  Securitizations**.  As a material inducement to Lessor's willingness to enter into the Transactions contemplated by this Lease and the other Transaction Documents, Lessee hereby acknowledges and agrees that Lessor may, from time to time and at any time (a) advertise, issue press releases, send direct mail or otherwise disclose information regarding the Transaction for marketing purposes; and (b) (i) act or permit another Person to act as sponsor, settler, transferor or depositor of, or a holder of interests in, one or more Persons or other arrangements formed pursuant to a trust agreement, indenture, pooling agreement, participation agreement, sale and servicing agreement, limited liability company agreement, partnership agreement, articles of incorporation or similar agreement or document; and

32

(ii) permit one or more of such Persons or arrangements to offer and sell stock, certificates, bonds, notes, other evidences of indebtedness or securities that are directly or indirectly secured, collateralized or otherwise backed by or represent a direct or indirect interest in whole or in part in any of the assets, rights or properties described in Section 14.01 of this Lease, in one or more Persons or arrangements holding such assets, rights or properties, or any of them (collectively, the "Securities"), whether any such Securities are privately or publicly offered and sold, or rated or unrated (any combination of which actions and transactions described in both clauses (i) and (ii) in this paragraph, whether proposed or completed, are referred to in this Lease as a "Securitization").  Lessee shall cooperate fully with Lessor and any Affected Party with respect to all reasonable requests and due diligence procedures and use reasonable efforts to facilitate such Securitization, provided that such cooperation shall be at no additional cost or expense to Lessee so long as Lessee is not otherwise required to provide such information to Lessor pursuant to the other provisions of this Lease.

**Section 17.11.  State-Specific Provisions**.  The provisions and/or remedies which are set forth on the attached Exhibit D shall be deemed a part of and included within the terms and conditions of this Lease.

**Section 17.12.  Time is of the Essence; Computation**.  Time is of the essence with respect to each and every provision of this Lease.  If any deadline provided herein falls on a non-Business Day, such deadline shall be extended to the next day that is a Business Day.

**Section 17.13.  Waiver and Amendment**.  No provision of this Lease shall be deemed waived or amended except by a written instrument unambiguously setting forth the matter waived or amended and signed by the party against which enforcement of such waiver or amendment is sought.  Waiver of any matter shall not be deemed a waiver of the same or any other matter on any future occasion.  No acceptance by Lessor of an amount less than the Rental and other Monetary Obligations stipulated to be due under this Lease shall be deemed to be other than a payment on account of the earliest such Rental or other Monetary Obligations then due or in arrears nor shall any endorsement or statement on any check or letter accompanying any such payment be deemed a waiver of Lessor's right to collect any unpaid amounts or an accord and satisfaction.

**Section 17.14.  Successors Bound**.  Except as otherwise specifically provided herein, the terms, covenants and conditions contained in this Lease shall bind and inure to the benefit of the respective heirs, successors, executors, administrators and assigns of each of the parties hereto.

**Section 17.15.  Captions**.  Captions are used throughout this Lease for convenience of reference only and shall not be considered in any manner in the construction or interpretation hereof.

**Section 17.16.  Other Documents**.  Each of the parties agrees to sign such other and further documents as may be necessary or appropriate to carry out the intentions expressed in this Lease.

**Section 17.17.  Entire Agreement**.   This Lease and any other instruments or agreements referred to herein, constitute the entire agreement between the parties with respect

4829-5995-9643.1
STORE/Campbells (Perkins)
Lease Agreement
4896 Everhard Road NW, Canton, OH 44718
File No. 7210/02-588.18

to the subject matter hereof, and there are no other representations, warranties or agreements except as herein provided.

**Section 17.18.  Forum Selection; Jurisdiction; Venue; Choice of Law**.  For purposes of any action or proceeding arising out of this Lease, the parties hereto expressly submit to the jurisdiction of all federal and state courts located in the state where the Property is located. Lessee consents that it may be served with any process or paper by registered mail or by personal service within or without the state where the Property is located in accordance with applicable Law.  Furthermore, Lessee waives and agrees not to assert in any such action, suit or proceeding that it is not personally subject to the jurisdiction of such courts, that the action, suit or proceeding is brought in an inconvenient forum or that venue of the action, suit or proceeding is improper.  This Lease shall be governed by, and construed with, the Laws of the applicable state in which the Property is located, without giving effect to any state's conflict of Laws principles.

**Section 17.19. Counterparts**.   This Lease may be executed in one or more counterparts, each of which shall be deemed an original.  Furthermore, the undersigned agree that transmission of this Lease via e-mail in a ".pdf" or other electronic format shall be deemed transmission of the original Lease for all purposes.

*[Remainder of page intentionally left blank; signature page(s) to follow]*

34

**IN WITNESS WHEREOF**, Lessor and Lessee have entered into this Lease as of the date first above written.

**LESSOR:**

**STORE CAPITAL ACQUISITIONS, LLC**, a Delaware limited liability company

By: _____

Printed Name: ___Michael T. Bennett___

Title: ___Executive Vice President General Counsel___

STATE OF ARIZONA          )
                                    ) ss.

COUNTY OF MARICOPA    )

Before me, the undersigned, a Notary Public of the State and County aforesaid, personally appeared _Michael T. Bennett_, with whom I am personally acquainted (or proved to me to be on the basis of satisfactory evidence), and who, upon oath, acknowledged himself/herself to be the ___EVP___ of **STORE CAPITAL ACQUISITIONS, LLC**, a Delaware limited liability company, the within named Lessor, and that he/she as such officer, being authorized so to do, executed the within instrument for the purposes therein contained, by signing the name of _STORE Capital Acquisitions, LLC_ by himself/herself as such officer.

WITNESS my hand and Official Seal at office, this _29th_ day of _January_, 2018.

_____
Notary Public

My Commission Expires _8/8/2019_

**DONYA NANETTE DERUITER**
Notary Public, State of Arizona
Maricopa County
My Commission Expires
**August 08, 2019**

**IN WITNESS WHEREOF**, Lessor and Lessee have entered into this Lease as of the date first above written.

LESSEE:

**5171 CAMPBELLS LAND CO., INC.**, a Pennsylvania corporation

By: _William T Kane_

Printed Name: _William T Kane_

Title: _President_

STATE OF _Pennsylvania_ )
                                        ) ss.
COUNTY OF _Allegheny_ )

     Before me, the undersigned, a Notary Public of the State and County aforesaid, personally appeared ___William Kane___, with whom I am personally acquainted (or proved to me to be on the basis of satisfactory evidence), and who, upon oath, acknowledged himself/herself to be the ___President___ of **5171 CAMPBELLS LAND CO., INC.**, a ~~Delaware~~ Pennsylvania, the within named Lessee, a ___Corporation___, and that he/she as such officer, being authorized so to do, executed the within instrument for the purposes therein contained, by signing the name of _the Corporation_ by himself/herself as such officer.

     WITNESS my hand and Official Seal at office, this _30th_ day of _January_, 2018.

_Rosanne M Penn_
Notary Public

My Commission Expires ___9/13/20___

COMMONWEALTH OF PENNSYLVANIA
NOTARIAL SEAL
Rosanne M. Penn, Notary Public
City of Pittsburgh, Allegheny County
My Commission Expires Sept. 13, 2020
MEMBER, PENNSYLVANIA ASSOCIATION OF NOTARIES

4829-5995-9643.1
STORE/Campbells (Perkins)
Lease Agreement
4896 Everhard Road NW, Canton, OH 44718
File No. 7210/02-588.18

**EXHIBITS**

| | |
|---|---|
| Exhibit A: | Defined Terms |
| Exhibit B: | Legal Description and Street Address of the Property |
| Exhibit C: | Authorization Agreement – Pre-Arranged Payments |
| Exhibit D: | State-Specific Provisions |
| Schedule 9.03 | Supplemental Financial Information |

**EXHIBIT A**

**DEFINED TERMS**

The following terms shall have the following meanings for all purposes of this Lease:

"*Additional Rental*" has the meaning set forth in Section 4.03.

"*Adjustment Date*" has the meaning set forth in Section 1.07.

"*Affected Party*" means each direct or indirect participant or investor in a proposed or completed Securitization, including, without limitation, any prospective owner, any rating agency or any party to any agreement executed in connection with the Securitization.

"*Affiliate*" means any Person which directly or indirectly controls, is under common control with or is controlled by any other Person. For purposes of this definition, "controls," "under common control with," and "controlled by" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities or otherwise.

"*Anti-Money Laundering Laws*" means all applicable Laws, regulations and government guidance on the prevention and detection of money laundering, including, without limitation, (a) 18 U.S.C. §§ 1956 and 1957; and (b) the Bank Secrecy Act, 31 U.S.C. §§ 5311 et seq., and its implementing regulations, 31 CFR Part 103.

"*Base Annual Rental*" has the meaning set forth in Section 1.05.

"*Base Monthly Rental*" means an amount equal to 1/12 of the applicable Base Annual Rental.

"*Business Day*" means a day on which banks located in Scottsdale, Arizona are not required or authorized to remain closed.

"*Casualty*" means any loss of or damage to any property included within or related to the Property or arising from an adjoining property caused by an Act of God, fire, flood or other catastrophe.

"*Code*" means the Internal Revenue Code of 1986, as the same may be amended from time to time.

"*Condemnation*" means a Taking and/or a Requisition.

"*Costs*" means all reasonable costs and expenses incurred by a Person, including, without limitation, reasonable attorneys' fees and expenses, court costs, expert witness fees, costs of tests and analyses, travel and accommodation expenses, deposition and trial transcripts, copies and other similar costs and fees, brokerage fees, escrow fees, title insurance

A-1

premiums, appraisal fees, stamp taxes, recording fees and transfer taxes or fees, as the circumstances require.

"*Default Rate*" means 18% per annum or the highest rate permitted by Law, whichever is less.

"*Effective Date*" has the meaning set forth in the introductory paragraph of this Lease.

"*Environmental Laws*" means federal, state and local Laws, ordinances, common law requirements and regulations and standards, rules, policies and other governmental requirements, administrative rulings and court judgments and decrees having the effect of Law in effect now or in the future and including all amendments, that relate to Hazardous Materials, Regulated Substances, USTs, and/or the protection of human health or the environment, or relating to liability for or Costs of Remediation or prevention of Releases, and apply to Lessee and/or the Property.

"*Environmental Liens*" means any liens and other encumbrances imposed pursuant to any Environmental Law.

"*Event of Default*" has the meaning set forth in Section 12.01.

"*Exchange Act*" means the Securities Exchange Act of 1934, as amended.

"*Extension Option*" has the meaning set forth in Section 3.02.

"*Extension Term*" has the meaning set forth in Section 3.02.

"*Force Majeure Event*" has the meaning set forth in Section 17.01.

"*Franchise Agreement*" has the meaning set forth in Section 5.08.

"*Franchisor*" means Perkins Restaurant and Bakery, a Delaware corporation, or its successors and permitted assigns.

"*GAAP*" means generally accepted accounting principles, consistently applied from period to period.

"*Governmental Authority*" means any governmental authority, agency, department, commission, bureau, board, instrumentality, court or quasi-governmental authority of the United States, any state or any political subdivision thereof with authority to adopt, modify, amend, interpret, give effect to or enforce any federal, state and local Laws, statutes, ordinances, rules or regulations, including common law, or to issue court orders.

"*Guarantor*" means collectively, William Kane, Frank Kane and Ron Linaburg or any additional or replacement guarantor(s) approved by Lessor in its sole and absolute discretion.

A-2

"*Guaranty*" means that certain Unconditional Guaranty of Payment and Performance dated as of the date hereof given by Guarantor for the benefit of Lessor, as the same may be amended from time to time.

"*Hazardous Materials*" includes: (a) oil, petroleum products, flammable substances, explosives, radioactive materials, hazardous wastes or substances, toxic wastes or substances or any other materials, contaminants or pollutants, the presence of which causes the Property to be in violation of any local, state or federal Law or regulation, or Environmental Law, or are defined as or included in the definition of "hazardous substances," "hazardous wastes," "hazardous materials," "toxic substances," "contaminants," "pollutants," or words of similar import under any applicable local, state or federal Law or under the regulations adopted, orders issued, or publications promulgated pursuant thereto, including, but not limited to: (i) the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, 42 U.S.C. § 9601, et seq.; (ii) the Hazardous Materials Transportation Act, as amended, 49 U.S.C. § 5101, et seq.; (iii) the Resource Conservation and Recovery Act, as amended, 42 U.S.C. § 6901, et seq.; and (iv) regulations adopted and publications promulgated pursuant to the aforesaid Laws; (b) asbestos in any form which is friable, urea formaldehyde foam insulation, transformers or other equipment which contain dielectric fluid containing levels of polychlorinated biphenyls in excess of fifty (50) parts per million; (c) underground storage tanks; and (d) any other chemical, material or substance, exposure to which is prohibited, limited or regulated by any Governmental Authority.

"*Indemnified Parties*" means Lessor, its members, managers, officers, directors, shareholders, partners, employees, affiliates, subsidiaries, successors and assigns, including, but not limited to, any successors by merger, consolidation or acquisition of all or a substantial portion of the assets and business of Lessor.

"*Initial Term*" has the meaning set forth in Section 3.01.

"*Insolvency Event*" means (a) a Person's (i) failure to generally pay its debts as such debts become due; (ii) admitting in writing its inability to pay its debts generally; or (iii) making a general assignment for the benefit of creditors; (b) any proceeding being instituted by or against any Person (i) seeking to adjudicate it bankrupt or insolvent; (ii) seeking liquidation, dissolution, winding up, reorganization, arrangement, adjustment, protection, relief, or composition of it or its debts under any Law relating to bankruptcy, insolvency, or reorganization or relief of debtors; or (iii) seeking the entry of an order for relief or the appointment of a receiver, trustee, or other similar official for it or for any substantial part of its property, and in the case of any such proceeding instituted against any Person, either such proceeding shall remain undismissed for a period of one hundred twenty (120) days or any of the actions sought in such proceeding shall occur; or (c) any Person taking any corporate action to authorize any of the actions set forth above in this definition.

"*Insurance Premiums*" has the meaning in Section 6.05.

"*Law(s)*" means any constitution, statute, rule of law, code, ordinance, order, judgment, decree, injunction, rule, regulation, policy, requirement or administrative or judicial determination, even if unforeseen or extraordinary, of every duly constituted Governmental Authority, court or agency, now or hereafter enacted or in effect.

A-3

"*Lease Rate*" means a percentage equal to (a) the then-current Base Monthly Rental multiplied by twelve (12), divided by (b) the aggregate purchase price of the Property paid by Lessor (or Lessor's predecessor-in-interest).

"*Lease Term*" has the meaning described in Section 3.01.

"*Legal Requirements*" means the requirements of all present and future Laws (including, without limitation, Environmental Laws and Laws relating to accessibility to, usability by, and discrimination against, disabled individuals), all judicial and administrative interpretations thereof, including any judicial order, consent, decree or judgment, and all covenants, restrictions and conditions now or hereafter of record which may be applicable to Lessee or to the Property, or to the use, manner of use, occupancy, possession, operation, maintenance, alteration, repair or restoration of the Property, even if compliance therewith necessitates structural changes or improvements or results in interference with the use or enjoyment of the Property.

"*Lender*" means any lender in connection with any loan secured by Lessor's interest in the Property, and any servicer of any loan secured by Lessor's interest in the Property.

"*Lessee Entity*" or "*Lessee Entities*" means individually or collectively, as the context may require, Lessee and Guarantor, and all Affiliates thereof.

"*Lessee Reporting Entities*" means Lessee.

"*Lessee's Information*" has the meaning set forth in Section 17.05(b).

"*Lessor Entity*" or "*Lessor Entities*" means individually or collectively, as the context may require, Lessor and all Affiliates of Lessor.

"*Losses*" means any and all claims, suits, liabilities (including, without limitation, strict liabilities), actions, proceedings, obligations, debts, damages, losses, Costs, diminutions in value, fines, penalties, interest, charges, fees, judgments, awards, amounts paid in settlement and damages of whatever kind or nature, inclusive of bodily injury and property damage to third parties (including, without limitation, attorneys' fees and other Costs of defense).

"*Master Lease Agreement*" that certain Master Lease Agreement of even date herewith between STORE Master Funding XIII, LLC, as lessor, and Lessee with respect to 17 parcels of real property.

"*Material Adverse Effect*" means a material adverse effect on (a) the Property, including without limitation, the operation of the Property as a Permitted Facility and/or the value of the Property; (b) the contemplated business, condition, worth or operations of any Lessee Entity; (c) Lessee's ability to perform its obligations under this Lease; (d) Lessor's interests in the Property, this Lease or the other Transaction Documents; or (e) any Guarantor's ability to perform its obligations under the Guaranty.

"*Monetary Obligations*" means all Rental and all other sums payable or reimbursable by Lessee under this Lease to Lessor, to any third party on behalf of Lessor, or to any Indemnified Party.

A-4

"*Mortgages*" means, collectively, the mortgages, deeds of trust or deeds to secure debt, assignments of rents and leases, security agreements and fixture filings executed by Lessor for the benefit of Lender with respect to the Property, as such instruments may be amended, modified, restated or supplemented from time to time and any and all replacements or substitutions.

"*Net Award*" means (a) the entire award payable with respect to a Property by reason of a Condemnation whether pursuant to a judgment or by agreement or otherwise; or (b) the entire proceeds of any insurance required under Section 6.03 payable with respect to a Property, as the case may be, and in either case, less any Costs incurred by Lessor in collecting such award or proceeds.

"*OFAC Laws*" means Executive Order 13224 issued by the President of the United States, and all regulations promulgated thereunder, including, without limitation, the Terrorism Sanctions Regulations (31 CFR Part 595), the Terrorism List Governments Sanctions Regulations (31 CFR Part 596), the Foreign Terrorist Organizations Sanctions Regulations (31 CFR Part 597), and the Cuban Assets Control Regulations (31 CFR Part 515), and all other present and future federal, state and local Laws, ordinances, regulations, policies, lists (including, without limitation, the Specially Designated Nationals and Blocked Persons List) and any other requirements of any Governmental Authority (including without limitation, the U.S. Department of the Treasury Office of Foreign Assets Control) addressing, relating to, or attempting to eliminate, terrorist acts and acts of war, each as supplemented, amended or modified from time to time after the Effective Date, and the present and future rules, regulations and guidance documents promulgated under any of the foregoing, or under similar Laws, ordinances, regulations, policies or requirements of other states or localities.

"*Other Agreements*" means, collectively, all agreements and instruments now or hereafter entered into between, among or by (a) any of the Lessee Entities; and, or for the benefit of, (b) any of the Lessor Entities, including, without limitation, leases, promissory notes and guaranties, but excluding this Lease and all other Transaction Documents; including, (i) the Master Lease Agreement; (ii) that certain Lease Agreement of even date herewith between Lessor, as lessor, and Lessee with respect to the real property located at 1601 W. Prospect Road, Ashtabula, OH 44004, (ii) that certain Lease Agreement of even date herewith between Lessor, as lessor, and Lessee with respect to the real property located at 587 E. Main Street, Canfield, OH 44406, (iii) that certain Lease Agreement of even date herewith between Lessor, as lessor, and Lessee with respect to the real property located at 115 Ludlow Street, Warren, PA 16365, and/or (iv) that certain Lease Agreement of even date herewith between Lessor, as lessor, and Lessee with respect to the real property located at 2945 East State Street, Hermitage, PA 16148, as each may be amended from time to time.

"*Partial Condemnation*" has the meaning set forth in Section 11.03.

"*Permitted Amounts*" shall mean, with respect to any given level of Hazardous Materials or Regulated Substances, that level or quantity of Hazardous Materials or Regulated Substances in any form or combination of forms which does not constitute a violation of any Environmental Laws and is customarily employed in, or associated with, similar businesses located in the state where the Property is located.

A-5

*"Permitted Facility"* means a Perkins Restaurant and Bakery, all related purposes such as ingress, egress and parking, and uses incidental thereto.

"*Person*" means any individual, partnership, corporation, limited liability company, trust, unincorporated organization, Governmental Authority or any other form of entity.

"*Personalty*" means any and all "goods" (excluding "inventory," and including, without limitation, all "equipment," "fixtures," appliances and furniture (as "goods," "inventory," "equipment" and "fixtures" are defined in the applicable Uniform Commercial Code then in effect in the applicable jurisdiction)) from time to time situated on or used in connection with the Property, whether now owned or held or hereafter arising or acquired, together with all replacements and substitutions therefore and all cash and non-cash proceeds (including insurance proceeds and any title and UCC insurance proceeds) and products thereof, and, in the case of tangible collateral, together with all additions, attachments, accessions, parts, equipment and repairs now or hereafter attached or affixed thereto or used in connection therewith.

"*Price Index*" means the Consumer Price Index which is designated for the applicable month of determination as the United States City Average for All Urban Consumers, All Items, Not Seasonally Adjusted, with a base period equaling 100 in 1982 - 1984, as published by the United States Department of Labor's Bureau of Labor Statistics or any successor agency. In the event that the Price Index ceases to be published, its successor index measuring cost of living as published by the same Governmental Authority which published the Price Index shall be substituted and any necessary reasonable adjustments shall be made by Lessor and Lessee in order to carry out the intent of Section 4.02. In the event there is no successor index measuring cost of living, Lessor shall reasonably select an alternative price index measuring cost of living that will constitute a reasonable substitute for the Price Index.

"Property" means the parcel of real estate legally described on Exhibit B attached hereto, all rights, privileges, and appurtenances associated therewith, and all buildings, fixtures and other improvements now or hereafter located on such real estate (whether or not affixed to such real estate).

*"Real Estate Taxes"* has the meaning set forth in Section 6.05.

"*Regulated Substances*" means "petroleum" and "petroleum-based substances" or any similar terms described or defined in any of the Environmental Laws and any applicable federal, state, county or local Laws applicable to or regulating USTs.

"*REIT*" means a real estate investment trust as defined under Section 856 of the Code.

"*Release*" means any presence, release, deposit, discharge, emission, leaking, spilling, seeping, migrating, injecting, pumping, pouring, emptying, escaping, dumping, disposing or other movement of Hazardous Materials, Regulated Substances or USTs or any Threatened Release.

"*Remediation*" means any response, remedial, removal, or corrective action, any activity to cleanup, detoxify, decontaminate, contain or otherwise remediate any Hazardous Materials,

Regulated Substances or USTs, any actions to prevent, cure or mitigate any Release, any action to comply with any Environmental Laws or with any permits issued pursuant thereto, any inspection, investigation, study, monitoring, assessment, audit, sampling and testing, laboratory or other analysis, or any evaluation relating to any Hazardous Materials, Regulated Substances or USTs.

"*Rental*" means, collectively, the Base Annual Rental and the Additional Rental.

"*Rental Adjustment*" means an amount equal to the lesser of (a) 2% of the Base Annual Rental in effect immediately prior to the applicable Adjustment Date, or (b) 1.25 multiplied by the product of (i) the percentage change between the Price Index for the month which is two months prior to the Effective Date or the Price Index used for the immediately preceding Adjustment Date, as applicable, and the Price Index for the month which is two months prior to the applicable Adjustment Date; and (ii) the then current Base Annual Rental.

"*Requisition*" means any temporary requisition or confiscation of the use or occupancy of the Property by any Governmental Authority, civil or military, whether pursuant to an agreement with such Governmental Authority in settlement of or under threat of any such requisition or confiscation, or otherwise.

*"Reserve"* has the meaning in Section 6.04.

"*Securities*" has the meaning set forth in Section 17.10.

"*Securities Act*" means of the Securities Act of 1933, as amended.

"*Securitization*" has the meaning set forth in Section 17.10.

"*Successor Lessor*" has the meaning set forth in Section 13.03.

"*Taking*" means (a) any taking or damaging of all or a portion of the Property (i) in or by condemnation or other eminent domain proceedings pursuant to any Law, general or special; (ii) by reason of any agreement with any condemnor in settlement of or under threat of any such condemnation or other eminent domain proceeding; or (iii) by any other means; or (b) any de facto condemnation. The Taking shall be considered to have taken place as of the later of the date actual physical possession is taken by the condemnor, or the date on which the right to compensation and damages accrues under the Law applicable to the Property.

"*Temporary Taking*" has the meaning set forth in Section 11.04.

"*Threatened Release*" means a substantial likelihood of a Release which requires action to prevent or mitigate damage to the soil, surface waters, groundwaters, land, stream sediments, surface or subsurface strata, ambient air or any other environmental medium comprising or surrounding the Property which may result from such Release.

"*Total Condemnation*" has the meaning set forth in Section 11.02.

"*Transaction*" has the meaning set forth in Section 14.01.

"*Transaction Documents*" means this Lease, the Guaranty and all documents related thereto.

"*U.S. Publicly Traded Entity*" means an entity whose securities are listed on a national securities exchange or quoted on an automated quotation system in the United States or a wholly-owned subsidiary of such an entity.

"*USTs*" means any one or combination of tanks and associated product piping systems used in connection with storage, dispensing and general use of Regulated Substances.

A-8

**EXHIBIT B**

**LEGAL DESCRIPTION AND
STREET ADDRESS OF THE PROPERTY**

**Street Address:**

| Address | City | ST | Zip | County |
|---|---|---|---|---|
| 4896 Everhard Road NW | Canton | OH | 44718 | Stark |

**Legal Description**:

**721002-588.18          4896 Everhard Rd. NW, Canton, OH 44718**

Real property in the City of Canton, County of Stark, State of Ohio, described as follows:

Known as and being part of Lot 34 in Belpar No. 2, as recorded in Plat Book 48, Pages 147-149, in the Stark County Records of Plats and part of Lot 47 in Belpar No. 3, as recorded in Plat Book 49, Pages 70 & 71, in said plat records, situated in part of the Southwest Quarter Section 24, Township 11 (Jackson Township) Range 9, Stark County, Ohio and being more particularly bounded and described as follows:

Beginning for the same at a point marked by an iron pin found at the Northeast corner of Lot 33 in said Belpar No. 2;

Thence N. 78°37'59" W. along a portion of the south line of Belpar Street N.W. (80 feet wide), a distance of 292.72 feet to a point marked by an iron pin set and being the true place of beginning for the tract of land herein described;

Thence S. 34°29'51" W., a distance of 213.77 feet to a point marked by an iron pin set;

Thence S. 64°07'51" E., a distance of 66.83 feet to a point marked by an iron pin set on the east line of said Lot 34;

Thence S. 34°29'51" W., along a portion of the east line of said Lot 34, a distance of 250.66 feet to a point marked by an iron pin set on the north line of a 6.480 acre tract of land now or formerly owned by Society Bank of Eastern Ohio, as recorded in Official Record Volume 272, Page 503, in the Stark County Records of Deeds;

B-1

Thence N. 64° 07' 51" W. along a portion of the north line of said 6.480 acre tract of land, a distance of 303.43 feet to a point marked by an iron pin found on the east line of Everhard Road N.W. (80 feet wide);

Thence N. 34° 29' 51" E. along a portion of the east line of said Everhard Road N.W., a distance of 200.00 feet to a point marked by an iron pin found at the Southwest corner of an 0.841 acre tract of land now or formerly owned by Firestone Tire and Rubber Co., as recorded in Official Record Volume 446, Page 171, in said deed records;

Thence S. 78° 37' 59" E. along the south line of said 0.841 acre tract of land, a distance of 200.00 feet to a point marked by an iron pin found;

Thence N. 34° 29' 51" E. along the east line of said 0.841 acre tract of land, a distance of 200.00 feet to a point marked by an iron pin found on the south line of said Belpar Street N.W.;

Thence S 78° 37' 59" E. along a portion of the south line of said Belpar Street N.W., a distance of 54.37 feet to a point marked by an iron pin set and being the true place of beginning and containing 1.857 acre of land, more or less, of which 1.745 acre is in Lot 34, and 0.112 acre is in Lot 47.

BEING ALSO DESCRIBED AS:

Land situated in the Township of Jackson, County of Stark, State of Ohio and being a part of the Southeast Quarter of Section 24, Township 11 North, Range 9 West, a part of Lot 34 of Belpar No. 2 as shown on map on file in Plat Book 48, Pages 147-149, records of Stark County, a part of Lot 47 of Belpar No. 3, as shown on map on file in Plat Book 49, Pages 70 & 71, and being the same as described in deed to Spirit Master Funding III, LLC in Instrument No. 200705090025423, records of Stark County, described as follows:

COMMENCING at the northeast corner of Lot 33 of said Belpar No. 2; Thence North 79°23'20" West, along the southerly right-of-way of Belpar Street NW (an 80-foot-wide public right-of-way), a distance of 292.72 feet to a 3/8-inch iron rod found at the POINT OF BEGINNING of the land being described;

THENCE the following three (3) courses and distances along the westerly line of land described in deed to OMNI Realty Canton, Ltd. in Instrument No. 199702130007212:

1) South 33°44'30" West, a distance of 213.77 feet to a 1/2-inch iron rod found;

2) South 64°54'12" East, a distance of 66.83 feet to a 1/2-inch iron rod with cap labeled "COOPER & ASSOC." found;

3) South 33°44'30" West, a distance of 250.66 feet to a 1/2-inch iron rod with cap labeled "COOPER & ASSOC." found;

Thence North 64°50'31" West, along the northerly line of land described in deed to North Canton Hospitality Corp. in Instrument No. 200204300034670 a distance of 303.43 to a point which falls on a telephone pedestal;

A-2

Thence North 33°44'30" East, along the easterly right-of-way of Everhard Road NW (an 80-footwide public right-of-way), a distance of 200.00 feet to a 1/2-inch iron rod found;

Thence South 79°23'20" East, along the southerly line of land described in deed to BFS Retail & Commercial Operations, LLC in Instrument No. 200112070090266, a distance of 200.00 feet to a 1/2-inch iron rod with cap labeled "COOPER & ASSOC." found;

Thence North 33°44'30" East, along the easterly line of said BFS Retail & Commercial Operations, LLC land, a distance of 200.00 feet to a 1/2-inch iron rod with cap labeled "H&A LTD." found;

Thence South 79°23'20" East, along the southerly right-of-way of said Belpar Street NW, a distance of 54.37 feet to the 3/8-inch iron rod found at the POINT OF BEGINNING.

A-3

**EXHIBIT C**

**FORM OF AUTHORIZATION AGREEMENT – PRE-ARRANGED PAYMENTS**

| |
|---|
| Reference Number _____<br>I (We) (Tenant) authorize /_____\, (Servicer) to initiate entries identified below as required. Tenant further authorizes the bank below to post such entries to the identified checking account beginning with the payment draft date of _____/____/_____. A minimum of thirty (30) days advance notice is required to process first payment by ACH. |
| Bank Name_____Branch_____ |
| City_____State_____Zip_____ |

— — — — — — — — —        — — — — — — — — — — — — — —

**\*\*\*Transit - ABA**                        **Account Number Information**

| |
|---|
| ACCOUNT TYPE\*\*\* Please specify checking or savings account (C/S) _____ |
| **PLEASE FILL IN BANK INFORMATION CAREFULLY**<br>**ATTACH VOIDED CHECK FOR ACCOUNT VERIFICATION** |

Automatic debits will be made on the payment due date established by the relevant lease documents, or the next subsequent business day if such date is not a business day. This authority may be terminated upon thirty days prior written notification from the Tenant to the servicer. Tenant has the right to stop payment of any entry by notification to the bank prior to the scheduled debit date. If an erroneous entry is initiated by the servicer to the Tenant's account, Tenant shall have the right to have the amount of such entry reversed by the bank. To initiate a reversal, the Tenant must notify the bank in writing that an error has occurred and request a reversal. Such notice must be within 15 calendar days after the Tenant receives the statement of account or other written notice from the bank identifying the error. Tenant hereby authorizes the servicer to impose a $60.00 returned item processing fee, subject to change, via ACH debit against the above-referenced account of the Tenant if a non-sufficient funds or stop payment item is charged against the servicer's account.

| |
|---|
| **Tenant**                                    **Tax Identification**<br>**Name(**s) _____**Number** _____<br>**Date**_____<br>**Print Authorized Name**     _____<br>**Authorized Signature** _____<br>**Print Authorized Name**     _____<br>**Authorized Signature** _____<br>**Contact Phone Number** _____ **Fax Number**  _____<br>**Email Address**: _____ |

**Return Original to**:     /_____\
                        **Attn: /_____\**
                        /_____\
                        /_____\
                        **Fax Number:/_____\**

C-1

**EXHIBIT D**

**STATE-SPECIFIC PROVISIONS**


<u>**OHIO**</u>:

Upon receipt of Lessor's invoice, Lessee shall pay its *pro rata* share of the installment of taxes for which Lessee is responsible pursuant to Section 6.01(a) (Taxes) which were a lien during the Lease Term but are due and payable following the expiration of this Lease.

Notwithstanding Section 7.02 (Alterations and Improvements), prior to commencing any alterations to the Property, Lessee shall prepare, record, serve and post a Notice of Commencement in compliance with Ohio Revised Code Section 1311.04.  Upon completion of such improvements, Lessee shall prepare and record a termination of the Notice of Commencement.  Copies of all Notices of Commencement and terminations shall be delivered to Lessor within seven (7) days of recording.

D-1

**SCHEDULE 9.03**

**SUPPLEMENTAL FINANCIAL INFORMATION**

Lessee shall deliver the following information in connection with delivery of the corporate financial statements required in Section 9.03 of the Lease.

**Corporate Financial Reporting Certificate**

Company:

For the Qtr or FYE ending                                             _____

# of months represented                                             _____

Number of units operating at the end of reporting period            _____

**EBITDAR Calculation:**

Net Income                                                           _____

    Plus: Interest Expense                                       _____
    Plus: Taxes                                                  _____
    Plus: Depreciation & Amortization                            _____
    Plus: Operating Lease Expense                                _____
    Plus: Any non-recurring expenses (please clarify below)      _____
    Plus: Any other non-cash expenses (please clarify below)     _____
      **EBITDAR**                                            _____

**Items required to be broken out of Balance Sheet:**
    Current Portion of Long-Term Debt                            _____
    Current Portion of any Capital Leases                        _____
    Senior Third-Party Debt Balances                             _____
    Subordinate/Related Party Debt Balances                      _____

Explanations of non-recurring and non-cash items:

```



```

Lessee shall deliver the following information in connection with delivery of the unit-level financial statements required in Section 9.03 of the Lease.

**STORE Capital Unit-Level Financial Reporting Certificate**

| Unit ID: | 1 | 2 | 3 |
|---|---|---|---|
| For the Qtr or FYE ending | _____ | _____ | _____ |
| # of months represented | _____ | _____ | _____ |

**Store-Level pre-corporate overhead EBITDAR Calculation:**

| | 1 | 2 | 3 |
|---|---|---|---|
| Store-Level Net Income | _____ | _____ | _____ |
| Plus: Interest Expense | _____ | _____ | _____ |
| Plus: Taxes | _____ | _____ | _____ |
| Plus: Depreciation & Amortization | _____ | _____ | _____ |
| Plus: Property Rent Expense (base rent + any % rent) | _____ | _____ | _____ |
| Plus: Any corporate overhead allocations to the unit | _____ | _____ | _____ |
| Plus: Any non-recurring expenses (please clarify below) | _____ | _____ | _____ |
| Plus: Any other non-cash expenses (please clarify below) | _____ | _____ | _____ |
| **EBITDAR** | _____ | _____ | _____ |

**Items required to be broken out on unit-level profit and loss statement:**

| | 1 | 2 | 3 |
|---|---|---|---|
| Cost Goods Sold | _____ | _____ | _____ |
| Labor Expenses | _____ | _____ | _____ |

Explanations of non-recurring and non-cash items:

ii

# EXHIBIT H

## LEASE AGREEMENT

**THIS LEASE AGREEMENT** (this "Lease") is made as of February 12, 2018 (the "Effective Date"), by and between **STORE CAPITAL ACQUISITIONS, LLC**, a Delaware limited liability company ("Lessor"), whose address is 8377 E. Hartford Drive, Suite 100, Scottsdale, Arizona 85255, and **5171 CAMPBELLS LAND CO., INC.**, a Pennsylvania corporation ("Lessee"), whose address is 6201 Steubenville Pike, Suite 100, McKees Rocks, Pennsylvania 15136.   Capitalized terms not defined herein shall have the meanings set forth in Exhibit A hereto.

In consideration of the mutual covenants and agreements contained in this Lease, intending to be legally bound, Lessor and Lessee covenant and agree as follows:

## ARTICLE I

## BASIC LEASE TERMS

**Section 1.01.  Property**.  The street address and legal description of the Property is set forth on Exhibit B attached hereto and incorporated herein.

**Section 1.02.  Initial Term Expiration Date**.  February 28, 2038.

**Section 1.03.  Extension Options**.   Four (4) extensions of five (5) years each, as described in Section 3.02.

**Section 1.04.  Term Expiration Date (if fully extended)**.  February 28, 2058.

**Section 1.05.  Initial Base Annual Rental**.  $93,934.43 , as described in Article IV.

**Section 1.06.  Rental Adjustment**.  The lesser of (i) 2%, or (ii) 1.25 times the change in the Price Index, as described in Section 4.02.

**Section 1.07.  Adjustment Date**. March 1, 2019 and annually on March 1st thereafter during the Lease Term (including any Extension Term).

**Section 1.08.  Guarantors**.  William Kane, Frank Kane and Ron Linaburg.

**Section 1.09.  Intentionally Deleted**.

**Section 1.10.  Lessee Tax Identification No**.  46-2488070.

**Section 1.11.  Lessor Tax Identification No.**  45-2674893.

## ARTICLE II

## LEASE OF PROPERTY

**Section 2.01.  Lease**.  In consideration of Lessee's payment of the Rental and other Monetary Obligations and Lessee's performance of all other obligations hereunder, Lessor

hereby leases to Lessee, and Lessee hereby takes and hires, the Property, "AS IS" and "WHERE IS" without representation or warranty by Lessor, and subject to the existing state of title, the parties in possession, any statement of facts which an accurate survey or physical inspection might reveal, and all Legal Requirements now or hereafter in effect.

**Section 2.02.  Quiet Enjoyment**.  So long as Lessee shall pay the Rental and other Monetary Obligations provided in this Lease and shall keep and perform all of the terms, covenants and conditions on its part contained herein and subject to the rights of Lessor under Section 12.02, Lessee shall have, subject to the terms and conditions set forth herein, the right to the peaceful and quiet enjoyment and occupancy of the Property.

## ARTICLE III

## LEASE TERM; EXTENSION

**Section 3.01. Initial Term**.   The initial term of this Lease ("Initial Term") shall commence as of the Effective Date and shall expire at midnight on February 28, 2038, unless terminated sooner as provided in this Lease and as may be extended as provided herein.  The time period during which this Lease shall actually be in effect, including any Extension Term, is referred to as the "Lease Term."

**Section 3.02.  Extensions**.   Unless this Lease has expired or has been sooner terminated, or an Event of Default has occurred and is continuing at the time any extension option is exercised, Lessee shall have the right and option (each, an "Extension Option") to extend the Initial Term for all and not less than the Property for four (4) additional successive periods of five (5) years each (each, an "Extension Term"), pursuant to the terms and conditions of this Lease then in effect.

**Section 3.03.  Notice of Exercise**.  Lessee may only exercise the Extension Options by giving written notice thereof to Lessor of its election to do so no later than one hundred twenty (120) days prior to the expiration of the then-current Lease Term.  If written notice of the exercise of any Extension Option is not received by Lessor by the applicable dates described above, then this Lease shall terminate on the last day of the Initial Term or, if applicable, the last day of the Extension Term then in effect.  Upon the request of Lessor or Lessee, the parties hereto will, at the expense of Lessee, execute and exchange an instrument in recordable form setting forth the extension of the Lease Term in accordance with this Section 3.03.

**Section 3.04.  Removal of Personalty**.  Upon the expiration of the Lease Term, and if Lessee is not then in breach hereof, Lessee may remove from the Property all personal property belonging to Lessee.  Lessee shall repair any damage caused by such removal and shall leave the Property clean and in good and working condition and repair inside and out, subject to normal wear and tear, casualty and condemnation.  Any property of Lessee left on the Property on the tenth day following the expiration of the Lease Term shall, at Lessor's option, automatically and immediately become the property of Lessor.

4840-6699-3755.1
STORE/Campbells (Perkins)
Lease Agreement
115 Ludlow Street, Warren, PA 16365
File No. 7210/02-588.6

## ARTICLE IV

## RENTAL AND OTHER MONETARY OBLIGATIONS

**Section 4.01.  Base Monthly Rental**.  During the Lease Term, on or before the first day of each calendar month, Lessee shall pay in advance the Base Monthly Rental then in effect.  If the Effective Date is a date other than the first day of the month, Lessee shall pay to Lessor on the Effective Date the Base Monthly Rental prorated by multiplying the Base Monthly Rental by a fraction, the numerator of which is the number of days remaining in the month (including the Effective Date) for which Rental is being paid, and the denominator of which is the total number of days in such month.

**Section 4.02.  Adjustments**.  During the Lease Term (including any Extension Term), on the first Adjustment Date and on each Adjustment Date thereafter, the Base Annual Rental shall increase by an amount equal to the Rental Adjustment; *provided, however*, that in no event shall Base Annual Rental be reduced as a result of the application of the Rental Adjustment.

**Section 4.03.  Additional Rental**.  Lessee shall pay and discharge, as additional rental ("Additional Rental"), all sums of money required to be paid by Lessee under this Lease which are not specifically referred to as Rental.  Lessee shall pay and discharge any Additional Rental when the same shall become due, provided that amounts which are billed to Lessor or any third party, but not to Lessee, shall be paid within fifteen (15) days after Lessor's demand for payment thereof or, if earlier, when the same are due.  In no event shall Lessee be required to pay to Lessor any item of Additional Rental that Lessee is obligated to pay and has paid to any third party pursuant to any provision of this Lease.

**Section 4.04.  Rentals to be Net to Lessor**.  The Base Annual Rental payable hereunder shall be net to Lessor, so that this Lease shall yield to Lessor the Rentals specified during the Lease Term, and all Costs and obligations of every kind and nature whatsoever relating to the Property shall be performed and paid by Lessee.  Lessee shall perform all of its obligations under this Lease at its sole cost and expense. All Rental and other Monetary Obligations which Lessee is required to pay hereunder shall be the unconditional obligation of Lessee and shall be payable in full when due and payable, without notice or demand, and without any setoff, abatement, deferment, deduction or counterclaim whatsoever.

**Section 4.05.  ACH Authorization**.  Upon execution of this Lease, Lessee shall deliver to Lessor a complete Authorization Agreement – Pre-Arranged Payments in the form of Exhibit C attached hereto and incorporated herein by this reference, together with a voided check for account verification, establishing arrangements whereby payments of the Base Monthly Rental are transferred by Automated Clearing House Debit initiated by Lessor from an account established by Lessee at a United States bank or other financial institution to such account as Lessor may designate.  Lessee shall continue to pay all Rental by Automated Clearing House Debit unless otherwise directed by Lessor.

**Section 4.06.  Late Charges; Default Interest**.  Any delinquent payment shall, in addition to any other remedy of Lessor, incur a late charge of five percent (5%) (which late charge is intended to compensate Lessor for the cost of handling and processing such delinquent payment and should not be considered interest) and bear interest at the Default

3

Rate, such interest to be computed from and including the date such payment was due through and including the date of the payment; *provided, however*, in no event shall Lessee be obligated to pay a sum of late charge and interest higher than the maximum legal rate then in effect.

**Section 4.07.  Holdover**.  If Lessee remains in possession of the Property after the expiration of the term hereof, Lessee, at Lessor's option and within Lessor's sole discretion, may be deemed a tenant on a month-to-month basis and shall continue to pay Rentals and other Monetary Obligations in the amounts herein provided, except that the Base Monthly Rental shall be automatically increased to one hundred fifty percent (150%) of the last Base Monthly Rental payable under this Lease, and Lessee shall comply with all the terms of this Lease; *provided that* nothing herein nor the acceptance of Rental by Lessor shall be deemed a consent to such holding over.  Lessee shall defend, indemnify, protect and hold the Indemnified Parties harmless from and against any and all Losses resulting from Lessee's failure to surrender possession upon the expiration of the Lease Term.

**Section 4.08.  Guaranty**.  On or before the execution of this Lease, Lessee shall cause Guarantors to execute and deliver to Lessor the Guaranty.

# ARTICLE V

## REPRESENTATIONS AND WARRANTIES OF LESSEE

The representations and warranties of Lessee contained in this Article V are being made to induce Lessor to enter into this Lease, and Lessor has relied, and will continue to rely, upon such representations and warranties.  Lessee represents and warrants to Lessor as follows:

**Section 5.01.  Organization, Authority and Status of Lessee**.  Lessee has been duly organized or formed, is validly existing and in good standing under the laws of its state of formation and is qualified as a foreign corporation to do business in any jurisdiction where such qualification is required.  All necessary and appropriate action has been taken to authorize the execution, delivery and performance by Lessee of this Lease and of the other documents, instruments and agreements provided for herein.  Lessee is not, and if Lessee is a "disregarded entity," the owner of such disregarded entity is not, a "nonresident alien," "foreign corporation," "foreign partnership," "foreign trust," "foreign estate," or any other "person" that is not a "United States Person" as those terms are defined in the Code and the regulations promulgated thereunder.  The Person who has executed this Lease on behalf of Lessee is duly authorized to do so.

**Section 5.02.  Enforceability**.   This Lease constitutes the legal, valid and binding obligation of Lessee, enforceable against Lessee in accordance with its terms.

**Section 5.03.  Litigation**.   There are no suits, actions, proceedings or investigations pending, or to the best of its knowledge, threatened against or involving any Lessee Entity or the Property before any arbitrator or Governmental Authority which might reasonably result in any Material Adverse Effect.

4

**Section 5.04.  Absence of Breaches or Defaults**.  Lessee is not in default under any document, instrument or agreement to which Lessee is a party or by which Lessee, the Property or any of Lessee's property is subject or bound, which has had, or could reasonably be expected to result in, a Material Adverse Effect.  The authorization, execution, delivery and performance of this Lease and the documents, instruments and agreements provided for herein will not result in any breach of or default under any document, instrument or agreement to which Lessee is a party or by which Lessee, the Property or any of Lessee's property is subject or bound.

**Section 5.05.  Compliance with OFAC Laws**.  None of the Lessee Entities, and no individual or entity owning directly or indirectly any interest in any of the Lessee Entities, is an individual or entity whose property or interests are subject to being blocked under any of the OFAC Laws or is otherwise in violation of any of the OFAC Laws; *provided, however*, that the representation contained in this sentence shall not apply to any Person to the extent such Person's interest is in or through a U.S. Publicly Traded Entity.

**Section 5.06.  Solvency**.  There is no contemplated, pending or threatened Insolvency Event or similar proceedings, whether voluntary or involuntary, affecting Lessee or any Lessee Entity.  Lessee does not have unreasonably small capital to conduct its business.

**Section 5.07.  Ownership**.  None of (i) Lessee, (ii) any Affiliate of Lessee, or (iii) any Person owning ten percent (10%) or more of Lessee, owns, directly or indirectly, ten percent (10%) or more of the total voting power or total value of capital stock in STORE Capital Corporation.

**Section 5.08.  Franchise Agreement**.  Lessee has entered into one or more franchise, license and/or area development agreements with Franchisor (each, a "Franchise Agreement") for conduct of the business at the Property.  Each such Franchise Agreement is valid, binding and in full force and effect, permits Lessee to operate Permitted Facilities on the Property, and has a term which will not expire prior to the Lease Term.

**ARTICLE VI**

**TAXES AND ASSESSMENTS; UTILITIES; INSURANCE**

**Section 6.01.  Taxes**.

(a)      ***Payment***.  Subject to the provisions of Section 6.01(b) below, Lessee shall pay, prior to the earlier of delinquency or the accrual of interest on the unpaid balance, all taxes and assessments of every type or nature assessed against or imposed upon the Property, Lessee or Lessor during the Lease Term related to or arising out of this Lease and the activities of the parties hereunder, including without limitation, (i) all taxes or assessments upon the Property or any part thereof and upon any personal property, trade fixtures and improvements located on the Property, whether belonging to Lessor or Lessee, or any tax or charge levied in lieu of such taxes and assessments; (ii) all taxes, charges, license fees and or similar fees imposed by reason of the use of the Property by Lessee; (iii) all excise, franchise, transaction, privilege, license, sales, use and other taxes upon the Rental or other Monetary Obligations

5

hereunder, the leasehold estate of either party or the activities of either party pursuant to this Lease; and (iv) all franchise, privilege or similar taxes of Lessor calculated on the value of the Property or on the amount of capital apportioned to the Property. Notwithstanding anything in clauses (i) through (iv) to the contrary, Lessee shall not be obligated to pay or reimburse Lessor for any taxes based on the net income of Lessor.

(b)     ***Right to Contest***.  Within thirty (30) days after each tax and assessment payment is required by this Section 6.01 to be paid, Lessee shall provide Lessor with evidence reasonably satisfactory to Lessor that taxes and assessments have been timely paid by Lessee.   In the event Lessor receives a tax bill, Lessor shall use commercially reasonable efforts to forward said bill to Lessee within fifteen (15) days of Lessor's receipt thereof.   Lessee may, at its own expense, contest or cause to be contested (in the case of any item involving more than $10,000, after prior written notice to Lessor, which shall be given within fifteen (15) days of Lessee's determination to contest any matter as permitted herein), by appropriate legal proceedings conducted in good faith and with due diligence, any above-described item or lien with respect thereto, provided that (i) neither the Property nor any interest therein would be in any danger of being sold, forfeited or lost by reason of such proceedings; (ii) no Event of Default has occurred and is continuing; (iii) if and to the extent required by the applicable taxing authority and/or Lessor, Lessee posts a bond or takes other steps acceptable to such taxing authority and/or Lessor that removes such lien or stays enforcement thereof; (iv) Lessee shall promptly provide Lessor with copies of all notices received or delivered by Lessee and filings made by Lessee in connection with such proceeding; and (v) upon termination of such proceedings, it shall be the obligation of Lessee to pay the amount of any such tax and assessment or part thereof as finally determined in such proceedings, the payment of which may have been deferred during the prosecution of such proceedings, together with any costs, fees (including attorneys' fees and disbursements), interest, penalties or other liabilities in connection therewith.   Lessor shall at the request of Lessee, execute or join in the execution of any instruments or documents necessary in connection with such contest or proceedings, but Lessor shall incur no cost or obligation thereby.

**Section 6.02. Utilities**.  Lessee shall contract, in its own name, for and pay when due all charges for the connection and use of water, gas, electricity, telephone, garbage collection, sewer use and other utility services supplied to the Property during the Lease Term.  Under no circumstances shall Lessor be responsible for any interruption of any utility service.

**Section 6.03. Insurance**.

(a)     ***Coverage***.  Throughout the Lease Term, Lessee shall maintain, with respect to the Property, at its sole expense, the following types and amounts of insurance, in addition to such other insurance as Lessor may reasonably require from time to time:

(i)     Insurance against loss or damage to real property and personal property under an "all risk" or "special form" insurance policy, which shall include coverage against all risks of direct physical loss, including but not limited to loss by fire, lightning, wind, terrorism, and other risks normally included in the

4840-6699-3755.1
STORE/Campbells (Perkins)
Lease Agreement
115 Ludlow Street, Warren, PA 16365
File No. 7210/02-588.6

standard ISO special form (and shall also include National Flood and Excess Flood insurance for the Property located in Flood Zone A or Flood Zone V, as designated by FEMA, or otherwise located in a flood zone area identified by FEMA as a 100-year flood zone or special hazard area, and earthquake insurance if the Property is located within a moderate to high earthquake hazard zone as determined by an approved insurance company set forth in Section 6.03(b)(x) below). Such policy shall also include soft costs, a joint loss agreement, coverage for ordinance or law covering the loss of value of the undamaged portion of the Property, costs to demolish and the increased costs of construction if any of the improvements located on, or the use of, the Property shall at any time constitute legal non-conforming structures or uses. Ordinance or law limits shall be in an amount equal to the full replacement cost for the loss of value of the undamaged portion of the Property and no less than 25% of the replacement cost for costs to demolish and the increased cost of construction, or in an amount otherwise specified by Lessor. Such insurance shall be in amounts not less than 100% of the full insurable replacement cost values (without deduction for depreciation), with an agreed amount endorsement or without any coinsurance provision, and with sublimits satisfactory to Lessor, as determined from time to time at Lessor's request but not more frequently than once in any 12-month period.

(ii)     Commercial general liability insurance, including products and completed operation liability, covering Lessor and Lessee against bodily injury liability, property damage liability and personal and advertising injury, including without limitation any liability arising out of the ownership, maintenance, repair, condition or operation of every Property or adjoining ways, streets, parking lots or sidewalks. Such insurance policy or policies shall contain a broad form contractual liability endorsement under which the insurer agrees to insure Lessee's obligations under Article X hereof to the extent insurable, and a "severability of interest" clause or endorsement which precludes the insurer from denying the claim of Lessee or Lessor because of the negligence or other acts of the other, shall be in amounts of not less than $10,000,000 per occurrence for bodily injury and property damage, and $10,000,000 general aggregate per location, or such higher limits as Lessor may reasonably require from time to time, and shall be of form and substance satisfactory to Lessor. Such limits of insurance can be acquired through Commercial General liability and Umbrella liability policies.

(iii)     Workers' compensation and Employers Liability insurance with statutorily mandated limits covering all persons employed by Lessee on the Property in connection with any work done on or about the Property for which claims for death or bodily injury could be asserted against Lessor, Lessee or the Property.

(iv)     Business interruption insurance including Rental Value Insurance payable to Lessor at all locations for a period of not less than twelve (12) months. Such insurance is to follow the form of the real property "all risk" or "special form"

7

coverage and is not to contain a co-insurance clause.  Such insurance is to have a minimum of 180 days of extended period of indemnity.

(v)     Automobile liability insurance, including owned, non-owned and hired car liability insurance for combined limits of liability of $5,000,000 per occurrence.  The limits of liability can be provided in a combination of an automobile liability policy and an umbrella liability policy.

(vi)     Comprehensive Boiler and Machinery or Equipment Breakdown Insurance against loss or damage from explosion of any steam or pressure boilers or similar apparatus, if any, and other building equipment including HVAC units located in or about the Property and in an amount equal to the lesser of 25% of the 100% replacement cost of the Property or $5,000,000.

(vii)     Such additional and/or other insurance and in such amounts as at the time is customarily carried by prudent owners or tenants with respect to improvements and personal property similar in character, location and use and occupancy to the Property.

(b)     *Insurance Provisions*.  All insurance policies shall:

(i)     provide for a waiver of subrogation by the insurer as to claims against Lessor, its employees and agents;

(ii)     be primary and provide that any "other insurance" clause in the insurance policy shall exclude any policies of insurance maintained by Lessor and the insurance policy shall not be brought into contribution with insurance maintained by Lessor;

(iii)     contain deductibles not to exceed $25,000;

(iv)     contain a standard non-contributory mortgagee clause or endorsement in favor of any Lender designated by Lessor;

(v)     provide that the policy of insurance shall not be terminated, cancelled or amended without at least thirty (30) days' prior written notice to Lessor and to any Lender covered by any standard mortgagee clause or endorsement;

(vi)     be in amounts sufficient at all times to satisfy any coinsurance requirements thereof;

(vii)     except for workers' compensation insurance referred to in Section 6.03(a)(iii) above, name Lessor and any Lessor Affiliate or Lender requested by Lessor, as an "additional insured" with respect to liability insurance, and as an "additional named insured" or "additional insured" with respect to real property and rental value insurance, as appropriate and as their interests may appear;

8

(viii)    be evidenced by delivery to Lessor and any Lender designated by Lessor of an Acord Form 28 for property, business interruption and boiler & machinery coverage (or any other form requested by Lessor) and an Acord Form 25 for commercial general liability, workers' compensation and umbrella coverage (or any other form requested by Lessor); provided that in the event that either such form is no longer available, such evidence of insurance shall be in a form reasonably satisfactory to Lessor and any Lender designated by Lessor; and

(ix)    be issued by insurance companies licensed to do business in the state where the Property is located and which are rated no less than A-X by Best's Insurance Guide or are otherwise approved by Lessor.

(c)    ***Additional Obligations***.  It is expressly understood and agreed that (i) if any insurance required hereunder, or any part thereof, shall expire, be withdrawn, become void by breach of any condition thereof by Lessee, or become void or in jeopardy by reason of the failure or impairment of the capital of any insurer, Lessee shall immediately obtain new or additional insurance reasonably satisfactory to Lessor and any Lender designated by Lessor; (ii) the minimum limits of insurance coverage set forth in this Section 6.03 shall not limit the liability of Lessee for its acts or omissions as provided in this Lease; (iii) Lessee shall procure policies for all insurance for periods of not less than one year and shall provide to Lessor and any servicer or Lender of Lessor certificates of insurance or, upon Lessor's request, duplicate originals of insurance policies evidencing that insurance satisfying the requirements of this Lease is in effect at all times; (iv) Lessee shall pay as they become due all premiums for the insurance required by this Section 6.03; (v) in the event that Lessee fails to comply with any of the requirements set forth in this Section 6.03, within ten (10) days of the giving of written notice by Lessor to Lessee, (A) Lessor shall be entitled to procure such insurance; and (B) any sums expended by Lessor in procuring such insurance shall be Additional Rental and shall be repaid by Lessee, together with interest thereon at the Default Rate, from the time of payment by Lessor until fully paid by Lessee immediately upon written demand therefor by Lessor; and (vi) Lessee shall maintain all insurance policies required in this Section 6.03 not to be cancelled, invalidated or suspended on account of the conduct of Lessee, its officers, directors, managers, members, employees or agents, or anyone acting for Lessee or any subtenant or other occupant of the Property, and shall comply with all policy conditions and warranties at all times to avoid a forfeiture of all or a part of any insurance payment.

(d)    ***Blanket Policies***.  Notwithstanding anything to the contrary in this Section 6.03, any insurance which Lessee is required to obtain pursuant to this Section 6.03 may be carried under a "blanket" policy or policies covering other properties or liabilities of Lessee provided that such "blanket" policy or policies otherwise comply with the provisions of this Section 6.03.

**Section 6.04.  Intentionally Deleted**.

**Section 6.05.  Tax Impound**.  Upon the occurrence of an Event of Default and with respect to each Event of Default, in addition to any other remedies, Lessor may require Lessee

4840-6699-3755.1
STORE/Campbells (Perkins)
Lease Agreement
115 Ludlow Street, Warren, PA 16365
File No. 7210/02-588.6

to pay to Lessor on the first day of each month the amount that Lessor reasonably estimates will be necessary in order to accumulate with Lessor sufficient funds in an impound account (which shall not be deemed a trust fund) (the "Reserve") for Lessor to pay any and all real estate taxes ("Real Estate Taxes") for the Property for the ensuing twelve (12) months, or, if due sooner, Lessee shall pay the required amount immediately upon Lessor's demand therefor.  Lessor shall, upon prior written request of Lessee, provide Lessee with evidence reasonably satisfactory to Lessee that payment of the Real Estate Taxes was made in a timely fashion.  In the event that the Reserve does not contain sufficient funds to timely pay any Real Estate Taxes, upon Lessor's written notification thereof, Lessee shall, within five (5) Business Days of such notice, provide funds to Lessor in the amount of such deficiency.  Lessor shall pay or cause to be paid directly to the applicable taxing authorities any Real Estate Taxes then due and payable for which there are funds in the Reserve; *provided, however,* that in no event shall Lessor be obligated to pay any Real Estate Taxes in excess of the funds held in the Reserve, and Lessee shall remain liable for any and all Real Estate Taxes, including fines, penalties, interest or additional costs imposed by any taxing authority (unless incurred as a result of Lessor's failure to timely pay Real Estate Taxes for which it had funds in the Reserve).  Lessee shall cooperate fully with Lessor in assuring that the Real Estate Taxes are timely paid.  Lessor may deposit all Reserve funds in accounts insured by any federal or state agency and may commingle such funds with other funds and accounts of Lessor.  Interest or other gains from such funds, if any, shall be the sole property of Lessor. Upon an Event of Default, in addition to any other remedies, Lessor may apply all impounded funds in the Reserve against any sums due from Lessee to Lessor.  Lessor shall give to Lessee an annual accounting showing all credits and debits to and from such impounded funds received from Lessee.

## ARTICLE VII

## MAINTENANCE; ALTERATIONS

**Section 7.01. Condition of Property; Maintenance**.  Lessee hereby accepts the Property "AS IS" and "WHERE IS" with no representation or warranty of Lessor as to the condition thereof.  Lessee shall, at its sole cost and expense, be responsible for (a) keeping all of the building, structures and improvements erected on the Property in good order and repair, free from actual or constructive waste; (b) the repair or reconstruction of any building, structures or improvements erected on the Property damaged or destroyed by a Casualty; (c) subject to Section 7.02, making all necessary structural, non-structural, exterior and interior repairs and replacements to any building, structures or improvements erected on the Property; (d) operating, remodeling, updating and modernizing the Property in accordance with those standards adopted from time to time on a system-wide basis for the Permitted Facilities; (e) (i) ensuring that no party encroaches upon the Property, (ii) protecting, defending, indemnifying, releasing and holding the Indemnified Parties harmless from and against any and all claims and Losses arising out of or in any way relating to any encroachments and/or activities upon the Property caused by any Person; and (iii) prosecuting any claims that Lessee seeks to bring against any Person relating to Lessee's use and possession of the Property; and (f) paying all operating costs of the Property in the ordinary course of business.  Lessee waives any right to require Lessor to maintain, repair or rebuild all or any part of the Property or make repairs at the expense of Lessor pursuant to any Legal Requirements at any time in effect.

4840-6699-3755.1
STORE/Campbells (Perkins)
Lease Agreement
115 Ludlow Street, Warren, PA 16365
File No. 7210/02-588.6

**Section 7.02. Alterations and Improvements**.  During the Lease Term, Lessee shall not alter the exterior, structural, plumbing or electrical elements of the Property in any manner without the consent of Lessor, which consent shall not be unreasonably withheld or conditioned; *provided, however*, Lessee may undertake nonstructural alterations to the Property, individually, costing less than $25,000 without Lessor's prior written consent.  If Lessor's consent is required hereunder and Lessor consents to the making of any such alterations, the same shall be made by Lessee at Lessee's sole expense by a licensed contractor and according to plans and specifications approved by Lessor and subject to such other conditions as Lessor shall reasonably require.  Any work at any time commenced by Lessee on the Property shall be prosecuted diligently to completion, shall be of good workmanship and materials and shall comply fully with all the terms of this Lease and all Legal Requirements.  Upon completion of any alterations individually costing $25,000 or more, Lessee shall promptly provide Lessor with evidence of full payment to all laborers and materialmen contributing to the alterations.  Additionally, upon completion of any alterations, Lessee shall promptly provide Lessor with (a) an architect's certificate certifying the alterations to have been completed in conformity with the plans and specifications (if the alterations are of such a nature as would require the issuance of such a certificate from the architect); (b) a certificate of occupancy (if the alterations are of such a nature as would require the issuance of a certificate of occupancy); and (c) any other documents or information reasonably requested by Lessor.  Lessee shall keep the Property free from any liens arising out of any work performed on, or materials furnished to, the Property.  Lessee shall execute and file or record, as appropriate, a "Notice of Non-Responsibility," or any equivalent notice permitted under applicable Law in the state where the Property is located which provides that Lessor is not responsible for the payment of any costs or expenses relating to the additions or alterations.  Any addition to or alteration of the Property shall be deemed a part of the Property and belong to Lessor, and Lessee shall execute and deliver to Lessor such instruments as Lessor may require to evidence the ownership by Lessor of such addition or alteration.

**Section 7.03. Encumbrances**.  During the Lease Term, Lessor shall have the right to grant easements on, over, under and above the Property without the prior consent of Lessee, provided that such easements will not materially interfere with Lessee's use of the Property.  Lessee shall comply with and perform all obligations of Lessor under all easements, declarations, covenants, restrictions and other items of record now or hereafter encumbering the Property.  Without Lessor's prior written consent, Lessee shall not grant any easements on, over, under or above the Property.

**ARTICLE VIII**

**USE OF THE PROPERTY; COMPLIANCE**

**Section 8.01. Use**.  During the Lease Term, the Property shall be used solely for the operation of a Permitted Facility.  Except during periods when a Property is untenantable due to Casualty or Condemnation (and provided that Lessee continues to strictly comply with the other terms and conditions of this Lease), Lessee shall at all times during the Lease Term occupy the Property and shall diligently operate its business on the Property.  In the event that Lessee shall change the use of the Property or the concept or brand operated on the Property, only as may be expressly permitted herein or consented to by Lessor in writing, Lessee shall provide Lessor

11

with written notice of any such change and copies of the franchise agreement(s) related to such new concept or brand, if any.

**Section 8.02.  Compliance**.   Lessee's use and occupation of the Property, and the condition thereof, shall, at Lessee's sole cost and expense, comply fully with all Legal Requirements and all restrictions, covenants and encumbrances of record, and any owner obligations under such Legal Requirements, or restrictions, covenants and encumbrances of record, with respect to the Property, in either event, the failure with which to comply could have a Material Adverse Effect.   Without in any way limiting the foregoing provisions, Lessee shall comply with all Legal Requirements relating to anti-terrorism, trade embargos, economic sanctions, Anti-Money Laundering Laws, and the Americans with Disabilities Act of 1990, as such act may be amended from time to time, and all regulations promulgated thereunder, as it affects the Property now or hereafter in effect.   Lessee shall obtain, maintain and comply with all required licenses and permits, both governmental and private, to use and operate the Property as Permitted Facilities.   Upon Lessor's written request from time to time during the Lease Term, Lessee shall certify in writing to Lessor that Lessee's representations, warranties and obligations under Section 5.05 and this Section 8.02 remain true and correct and have not been breached.   Lessee shall immediately notify Lessor in writing if any of such representations, warranties or covenants are no longer true or have been breached or if Lessee has a reasonable basis to believe that they may no longer be true or have been breached.    In connection with such an event, Lessee shall comply with all Legal Requirements and directives of Governmental Authorities and, at Lessor's request, provide to Lessor copies of all notices, reports and other communications exchanged with, or received from, Governmental Authorities relating to such an event.   Lessee shall also reimburse Lessor for all Costs incurred by Lessor in evaluating the effect of such an event on the Property and this Lease, in obtaining any necessary license from Governmental Authorities as may be necessary for Lessor to enforce its rights under the Transaction Documents, and in complying with all Legal Requirements applicable to Lessor as the result of the existence of such an event and for any penalties or fines imposed upon Lessor as a result thereof.   Lessee will use its best efforts to prevent any act or condition to exist on or about the Property that will materially increase any insurance rate thereon, except when such acts are required in the normal course of its business and Lessee shall pay for such increase. Lessee agrees that it will defend, indemnify and hold harmless the Indemnified Parties from and against any and all Losses caused by, incurred or resulting from Lessee's failure to comply with its obligations under this Section.

**Section 8.03.  Environmental**.

(a)    ***Covenants***.

(i)    Lessee covenants to Lessor during the Lease Term, subject to the limitations of subsection (ii) below, as follows:

(A)    All uses and operations on or of the Property, whether by Lessee or any other Person, shall be in compliance with all Environmental Laws and permits issued pursuant thereto.

(B)    There shall be no Releases in, on, under or from the Property, except in Permitted Amounts.

12

(C)     There shall be no Hazardous Materials or Regulated Substances in, on or under the Property, except in Permitted Amounts. Above and below ground storage tanks shall be properly permitted and only used as permitted.

(D)     Lessee shall keep the Property or cause the Property to be kept free and clear of all Environmental Liens, whether due to any act or omission of Lessee or any other Person.

(E)     Lessee shall not act or fail to act or allow any other tenant, occupant, guest, customer or other user of the Property to act or fail to act in any way that (1) materially increases a risk to human health or the environment, (2) poses an unreasonable or unacceptable risk of harm to any Person or the environment (whether on or off the Property), (3) has a Material Adverse Effect, (4) is contrary to any material requirement set forth in the insurance policies maintained by Lessee or Lessor, (5) constitutes a public or private nuisance or constitutes waste, (6) violates any covenant, condition, agreement or easement applicable to the Property, or (7) would result in any reopening or reconsideration of any prior investigation or causes a new investigation by a Governmental Authority having jurisdiction over the Property.

(F)     Lessee shall, at its sole cost and expense, fully and expeditiously cooperate in all activities pursuant to this Section 8.04, including but not limited to providing all relevant information and making knowledgeable persons available for interviews.

(ii)     Notwithstanding any provision of this Lease to the contrary, an Event of Default shall not be deemed to have occurred as a result of the failure of Lessee to satisfy any one or more of the covenants set forth in subsections (A) through (E) above provided that Lessee shall be in compliance with the requirements of any Governmental Authority with respect to the Remediation of any Release at the Property.

(b)     *Notification Requirements*.  Lessee shall immediately notify Lessor in writing upon Lessee obtaining actual knowledge of (i) any Releases or Threatened Releases in, on, under or from the Property other than in Permitted Amounts, or migrating towards the Property; (ii) any non-compliance with any Environmental Laws related in any way to the Property; (iii) any actual or potential Environmental Lien or activity use limitation; (iv) any required or proposed Remediation of environmental conditions relating to the Property required by applicable Governmental Authorities; and (v) any written or oral notice or other communication of which Lessee becomes aware from any source whatsoever (including but not limited to a Governmental Authority) relating in any way to Hazardous Materials, Regulated Substances or above or below ground storage tanks, or Remediation thereof at or on the Property, other than in Permitted Amounts, possible liability of any Person relating to the Property pursuant to any Environmental Law, other environmental conditions in connection with the Property, or any actual or potential administrative or judicial proceedings in connection with

13

anything referred to in this Section.  Lessee shall, upon Lessor's written request, deliver to Lessor a certificate stating that Lessee is and has been in full compliance with all of the environmental representations, warranties and covenants in this Lease.

(c)  *Remediation*.  Lessee shall, at its sole cost and expense, and without limiting any other provision of this Lease, effectuate any Remediation required by any Governmental Authority of any condition (including, but not limited to, a Release or Threatened Release) in, on, under or from the Property and take any other reasonable action deemed necessary by any Governmental Authority for protection of human health or the environment.  Should Lessee fail to undertake any required Remediation in accordance with the preceding sentence, Lessor, after written notice to Lessee and Lessee's failure to immediately undertake such Remediation, shall be permitted to complete such Remediation, and all Costs incurred in connection therewith shall be paid by Lessee.  Any Cost so paid by Lessor, together with interest at the Default Rate, shall be deemed to be Additional Rental hereunder and shall be immediately due from Lessee to Lessor.

(d)  *Indemnification*.  Lessee shall, at its sole cost and expense, protect, defend, indemnify, release and hold harmless each of the Indemnified Parties from and against any and all Losses, including, but not limited to, all Costs of Remediation (whether or not performed voluntarily), arising out of or in any way relating to any Environmental Laws, Hazardous Materials, Regulated Substances, above or below ground storage tanks, or other environmental matters concerning the Property.  It is expressly understood and agreed that Lessee's obligations under this Section shall survive the expiration or earlier termination of this Lease for any reason.

(e)  *Right of Entry*.  In the event that Lessor has a reasonable basis to believe that a Release or a violation of any Environmental Law has occurred, Lessor and any other Person designated by Lessor, including but not limited to any receiver, any representative of a Governmental Authority, and any environmental consultant, shall have the right, but not the obligation, to enter upon the Property at all reasonable times to assess any and all aspects of the environmental condition of the Property and its use, including but not limited to conducting any environmental assessment or audit (the scope of which shall be determined in Lessor's sole and absolute discretion) and taking samples of soil, groundwater or other water, air, or building materials, and conducting other invasive testing.  Lessee shall cooperate with and provide access to Lessor and any other Person designated by Lessor.  Any such assessment or investigation shall be at Lessee's sole cost and expense.

(f)  *Survival*.  The obligations of Lessee and the rights and remedies of Lessor under this Section 8.03 shall survive the termination, expiration and/or release of this Lease.

**Section 8.04. Franchisor Requirements**.  In addition to the requirements set forth in this Lease, Lessee, in its use, occupancy and maintenance of the Property, shall comply with all requirements of its Franchise Agreement.  Lessee hereby consents to Lessor providing information it obtains to Franchisor, and to Lessor obtaining from Franchisor information which Franchisor receives relating to Lessee's operation of its business on the Property.

4840-6699-3755.1
STORE/Campbells (Perkins)
Lease Agreement
115 Ludlow Street, Warren, PA 16365
File No. 7210/02-588.6

## ARTICLE IX

## ADDITIONAL COVENANTS

**Section 9.01. Performance at Lessee's Expense**.   Lessee acknowledges and confirms that Lessor may impose reasonable administrative, processing or servicing fees, and collect its reasonable attorneys' fees, costs and expenses in connection with (a) any extension, renewal, modification, amendment and termination of this Lease requested by Lessee; (b) any release or substitution of Property requested by Lessee; (c) the procurement of consents, waivers and approvals with respect to the Property or any matter related to this Lease requested by Lessee; (d) the review of any assignment or sublease or proposed assignment or sublease or the preparation or review of any subordination or non-disturbance agreement requested by Lessee; (e) the collection, maintenance and/or disbursement of reserves created under this Lease or the other Transaction Documents (following an Event of Default); and (f) inspections required to make certain determinations under this Lease or the other Transaction Documents following Lessor's reasonable belief of a breach under this Lease or any other Transaction Documents.

**Section 9.02. Inspection**.   Lessor and its authorized representatives shall have the right, at all reasonable times and upon giving reasonable prior notice (except in the event of an emergency, in which case no prior notice shall be required), to enter the Property or any part thereof and inspect the same.   Lessee hereby waives any claim for damages for any injury or inconvenience to or interference with Lessee's business, any loss of occupancy or quiet enjoyment of the Property and any other loss occasioned by such entry, but, subject to Section 10.01, excluding damages arising as a result of the gross negligence or willful misconduct of Lessor.

**Section 9.03. Financial Information**.

(a)   *Financial Statements*.   Within forty five (45) days after the end of each fiscal quarter and within one hundred twenty (120) days after the end of each fiscal year of Lessee and Lessee Reporting Entities, Lessee shall deliver to Lessor (i) complete consolidated financial statements that consolidate Lessee and Lessee Reporting Entities, including a balance sheet, profit and loss statement, statement of stockholders' equity and statement of cash flows and all other related schedules for the fiscal period then ended, such statements to detail separately interest expense, income taxes, non-cash expenses, non-recurring expenses, operating lease expense and current portion of long-term debt – capital leases; (ii) income statements for the business at the Property; and (iii) the supplemental financial information set forth on Schedule 9.03.   All such financial statements shall be prepared in accordance with GAAP, and shall be certified to be accurate and complete by an officer or director of each Lessee Reporting Entity.   In the event that Lessee's business at the Property is ordinarily consolidated with other business for financial statements purposes, a separate profit and loss statement shall be provided showing separately the sales, profits and losses pertaining to the Property with interest expense, income taxes, non-cash expenses, non-recurring expenses and operating lease expense (rent), with the basis for allocation of overhead or other charges being clearly set forth in accordance with Schedule 9.03.   The financial statements delivered to Lessor need not be audited, but Lessee shall deliver to Lessor copies of any

15

audited financial statements of the Lessee Reporting Entities which may be prepared, as soon as they are available.

(b)    ***Other Information***.   Notwithstanding any provision contained herein, upon request at any time, Lessee will provide to Lessor, at no additional cost or expense to Lessee, any and all financial information and/or financial statements of Lessee Reporting Entities (and in the form or forms) as reasonably requested by Lessor including, but not limited to, as requested by Lessor in connection with Lessor's filings with or disclosures to the Securities and Exchange Commission or other Governmental Authority.

**Section 9.04.  OFAC Laws**.  Upon receipt of notice or upon actual knowledge thereof, Lessee shall immediately notify Lessor in writing if any Person owning (directly or indirectly) any interest in any of the Lessee Entities, or any director, officer, shareholder, member, manager or partner of any of such holders is a Person whose property or interests are subject to being blocked under any of the OFAC Laws, or is otherwise in violation of any of the OFAC Laws, or is under investigation by any Governmental Authority for, or has been charged with, or convicted of, drug trafficking, terrorist-related activities or any violation of the Anti-Money Laundering Laws, has been assessed civil penalties under these or related Laws, or has had funds seized or forfeited in an action under these or related Laws; *provided, however*, that the covenant in this Section 9.04 shall not apply to any Person to the extent such Person's interest is in or through a U.S. Publicly Traded Entity.

**Section 9.05.  Estoppel Certificate**.  At any time, and from time to time, Lessee shall, promptly and in no event later than ten (10) days after a request from Lessor or any Lender or mortgagee of Lessor, execute, acknowledge and deliver to Lessor or such Lender or mortgagee, as the case may be, a certificate in the form supplied by Lessor, certifying: (a) that Lessee has accepted the Property; (b) that this Lease is in full force and effect and has not been modified (or if modified, setting forth all modifications), or, if this Lease is not in full force and effect, the certificate shall so specify the reasons therefor; (c) the commencement and expiration dates of the Lease Term; (d) the date to which the Rentals have been paid under this Lease and the amount thereof then payable; (e) whether there are then any existing defaults by Lessor in the performance of its obligations under this Lease, and, if there are any such defaults, specifying the nature and extent thereof; (f) that no notice has been received by Lessee of any default under this Lease which has not been cured, except as to defaults specified in the certificate; (g) the capacity of the Person executing such certificate, and that such Person is duly authorized to execute the same on behalf of Lessee; (h) that neither Lessor nor any Lender or mortgagee has actual involvement in the management or control of decision making related to the operational aspects or the day-to-day operation of the Property, including any handling or disposal of Hazardous Materials or Regulated Substances; and (i) any other information reasonably requested by Lessor or any Lender or mortgagee, as the case may be. If Lessee shall fail or refuse to sign a certificate in accordance with the provisions of this Section within ten (10) days following a request by Lessor, Lessee irrevocably constitutes and appoints Lessor as its attorney-in-fact to execute and deliver the certificate to any such third party, it being stipulated that such power of attorney is coupled with an interest and is irrevocable and binding.

16

## ARTICLE X

## RELEASE AND INDEMNIFICATION

**Section 10.01.  RELEASE AND INDEMNIFICATION**.  LESSEE AGREES TO USE AND OCCUPY THE PROPERTY AT ITS OWN RISK AND HEREBY RELEASES LESSOR AND LESSOR'S AGENTS AND EMPLOYEES FROM ALL CLAIMS FOR ANY DAMAGE OR INJURY TO THE FULL EXTENT PERMITTED BY LAW.  LESSEE AGREES THAT LESSOR SHALL NOT BE RESPONSIBLE OR LIABLE TO LESSEE OR LESSEE'S EMPLOYEES, AGENTS, CUSTOMERS, LICENSEES OR INVITEES FOR BODILY INJURY, PERSONAL INJURY OR PROPERTY DAMAGE OCCASIONED BY THE ACTS OR OMISSIONS OF ANY OTHER LESSEE OR ANY OTHER PERSON.  LESSEE AGREES THAT ANY EMPLOYEE OR AGENT TO WHOM THE PROPERTY OR ANY PART THEREOF SHALL BE ENTRUSTED BY OR ON BEHALF OF LESSEE SHALL BE ACTING AS LESSEE'S AGENT WITH RESPECT TO THE PROPERTY OR ANY PART THEREOF, AND NEITHER LESSOR NOR LESSOR'S AGENTS, EMPLOYEES OR CONTRACTORS SHALL BE LIABLE FOR ANY LOSS OF OR DAMAGE TO THE PROPERTY OR ANY PART THEREOF.  LESSEE SHALL INDEMNIFY, PROTECT, DEFEND AND HOLD HARMLESS EACH OF THE INDEMNIFIED PARTIES FROM AND AGAINST ANY AND ALL LOSSES (EXCLUDING LOSSES SUFFERED BY AN INDEMNIFIED PARTY ARISING OUT OF THE WILLFUL MISCONDUCT OF SUCH INDEMNIFIED PARTY OCCURRING ON OR AFTER THE EFFECTIVE DATE) CAUSED BY, INCURRED OR RESULTING FROM LESSEE'S OPERATIONS OR BY LESSEE'S USE AND OCCUPANCY OF THE PROPERTY, WHETHER RELATING TO ITS ORIGINAL DESIGN OR CONSTRUCTION, LATENT DEFECTS, ALTERATION, MAINTENANCE, USE BY LESSEE OR ANY PERSON THEREON, SUPERVISION OR OTHERWISE, OR FROM ANY BREACH OF, DEFAULT UNDER, OR FAILURE TO PERFORM, ANY TERM OR PROVISION OF THIS LEASE BY LESSEE, ITS OFFICERS, EMPLOYEES, AGENTS OR OTHER PERSONS.   IT IS EXPRESSLY UNDERSTOOD AND AGREED THAT LESSEE'S OBLIGATIONS UNDER THIS SECTION SHALL SURVIVE THE EXPIRATION OR EARLIER TERMINATION OF THIS LEASE FOR ANY REASON WHATSOEVER.

## ARTICLE XI

## CONDEMNATION AND CASUALTY

**Section 11.01. Notification**.   Lessee shall promptly give Lessor written notice of (a) any Condemnation of the Property, (b) the commencement of any proceedings or negotiations which might result in a Condemnation of the Property, and (c) any Casualty to the Property or any part thereof.  Such notice shall provide a general description of the nature and extent of such Condemnation, proceedings, negotiations or Casualty, and shall include copies of any documents or notices received in connection therewith. Thereafter, Lessee shall promptly send Lessor copies of all notices, correspondence and pleadings relating to any such Condemnation, proceedings, negotiations or Casualty.

**Section 11.02. Total Condemnation**.   In the event of a Condemnation of all or substantially all of the Property, and if as a result of such Condemnation: (i) access to the Property to and from the publicly dedicated roads adjacent to the Property as of the Effective Date is permanently and materially impaired such that Lessee no longer has access to such

17

dedicated road; (ii) there is insufficient parking to operate the Property as a Permitted Facility under applicable Laws; or (iii) the Condemnation includes a portion of the building such that the remaining portion is unsuitable for use as a Permitted Facility, as determined by Lessee in the exercise of good faith business judgment (and Lessee provides to Lessor an officer's certificate executed by an officer of Lessee certifying to the same) (each such event, a "Total Condemnation"), then, in such event:

(a)    **Termination of Lease**.  On the date of the Total Condemnation, all obligations of either party hereunder shall cease; *provided, however*, that Lessee's obligations to the Indemnified Parties under any indemnification provisions of this Lease and Lessee's obligation to pay Rental and all other Monetary Obligations (whether payable to Lessor or a third party) accruing under this Lease prior to the date of termination shall survive such termination.  If the date of such Total Condemnation is other than the first day of a month, the Base Monthly Rental for the month in which such Total Condemnation occurs shall be apportioned based on the date of the Total Condemnation.

(b)    **Net Award**.  Subject to Section 11.07 below, Lessor shall be entitled to receive the entire Net Award in connection with a Total Condemnation without deduction for any estate vested in Lessee by this Lease, and Lessee hereby expressly assigns to Lessor all of its right, title and interest in and to every such Net Award and agrees that Lessee shall not be entitled to any Net Award or other payment for the value of Lessee's leasehold interest in this Lease.

**Section 11.03. Partial Condemnation or Casualty**.  In the event of a Condemnation which is not a Total Condemnation (each such event, a "Partial Condemnation"), or in the event of a Casualty:

(a)    **Net Awards**.  All Net Awards shall be paid to Lessor.

(b)    **Continuance of Lease**. This Lease shall continue in full force and effect upon the following terms:

(i)    All Rental and other Monetary Obligations due under this Lease shall continue unabated.

(ii)    Lessee shall promptly commence and diligently prosecute restoration of the Property to the same condition, as nearly as practicable, as prior to such Partial Condemnation or Casualty as approved by Lessor.  Subject to the terms and provisions of the Mortgages and upon the written request of Lessee (accompanied by evidence reasonably satisfactory to Lessor that such amount has been paid or is due and payable and is properly part of such costs, and that Lessee has complied with the terms of Section 7.02 in connection with the restoration), Lessor shall promptly make available in installments, subject to reasonable conditions for disbursement imposed by Lessor, an amount up to but not exceeding the amount of any Net Award received by Lessor with respect to such Partial Condemnation or Casualty.  Prior to the disbursement of any portion of the Net Award with respect to a Casualty, Lessee shall provide evidence

18

reasonably satisfactory to Lessor of the payment of restoration expenses by Lessee up to the amount of the insurance deductible applicable to such Casualty. Lessor shall be entitled to keep any portion of the Net Award which may be in excess of the cost of restoration, and Lessee shall bear all additional Costs of such restoration in excess of the Net Award.

**Section 11.04.  Temporary Taking**.  In the event of a Condemnation of all or any part of the Property for a temporary use (a "Temporary Taking"), this Lease shall remain in full force and effect without any reduction of Base Annual Rental, Additional Rental or any other Monetary Obligation payable hereunder.  Except as provided below, Lessee shall be entitled to the entire Net Award for a Temporary Taking, unless the period of occupation and use by the condemning authorities shall extend beyond the date of expiration of this Lease, in which event the Net Award made for such Temporary Taking shall be apportioned between Lessor and Lessee as of the date of such expiration.  At the termination of any such Temporary Taking, Lessee will, at its own cost and expense and pursuant to the provisions of Section 7.02, promptly commence and complete restoration of the Property.

**Section 11.05. Adjustment of Losses**.  Any loss under any property damage insurance required to be maintained by Lessee shall be adjusted by Lessor and Lessee.  Any Net Award relating to a Total Condemnation or a Partial Condemnation shall be adjusted by Lessor or, at Lessor's election, Lessee.  Notwithstanding the foregoing or any other provisions of this Section 11.05 to the contrary, if at the time of any Condemnation or any Casualty or at any time thereafter an Event of Default shall have occurred and be continuing, Lessor is hereby authorized and empowered but shall not be obligated, in the name and on behalf of Lessee and otherwise, to file and prosecute Lessee's claim, if any, for a Net Award on account of such Condemnation or such Casualty and to collect such Net Award and apply the same to the curing of such Event of Default and any other then existing Event of Default under this Lease and/or to the payment of any amounts owed by Lessee to Lessor under this Lease, in such order, priority and proportions as Lessor in its discretion shall deem proper.

**Section 11.06. Lessee Obligation in Event of Casualty**.  During all periods of time following a Casualty, Lessee shall take reasonable steps to ensure that the affected Property is secure and does not pose any risk of harm to any adjoining property and Persons (including owners or occupants of such adjoining property).

**Section 11.07. Lessee Awards and Payments**.  Notwithstanding any provision contained in this Article XI, Lessee shall be entitled to claim and receive any award or payment from the condemning authority expressly granted for the taking of any personal property owned by Lessee, any insurance proceeds with respect to any personal property owned by Lessee, the interruption of its business and moving expenses (subject, however, to the provisions of Section 6.03(a)(iv) above), but only if such claim or award does not adversely affect or interfere with the prosecution of Lessor's claim for the Condemnation or Casualty, or otherwise reduce the amount recoverable by Lessor for the Condemnation or Casualty.

4840-6699-3755.1
STORE/Campbells (Perkins)
Lease Agreement
115 Ludlow Street, Warren, PA 16365
File No. 7210/02-588.6

## ARTICLE XII

## DEFAULT, CONDITIONAL LIMITATIONS,
## REMEDIES AND MEASURE OF DAMAGES

**Section 12.01.  Event of Default**.  Each of the following shall be an event of default by Lessee under this Lease (each, an "<u>Event of Default</u>"):

(a)      if any representation or warranty of Lessee set forth in this Lease is false in any material respect when made, or if Lessee renders any materially false statement or account when made;

(b)      if any Rental or other Monetary Obligation due under this Lease is not paid when due if such failure continues for more than five (5) days after written notice from Lessor; *provided, however*, Lessor shall only be required to provide such notice and cure period twice in any twelve (12) month period; and further provided that any technical error in the ACH Method of Payment process caused by Lessor's bank or servicer shall not constitute an Event of Default hereunder; *and further provided*, any delay in the payment of Rental as a result of a technical error in the wiring and/or automated clearinghouse process shall not constitute an Event of Default hereunder so long as the same is corrected within one (1) Business Day of the date Lessee receives notice thereof;

(c)      if Lessee fails to pay, prior to delinquency, any taxes, assessments or other charges the failure of which to pay will result in the imposition of a lien against the Property;

(d)      if Lessee vacates or abandons the Property;

(e)      if there is an Insolvency Event affecting Lessee or any Guarantor;

(f)      if Lessee fails to observe or perform any of the other covenants, conditions or obligations of Lessee in this Lease; *provided, however*, if any such failure does not involve the payment of any Monetary Obligation, is not willful or intentional, does not place the Property or any rights or property of Lessor in immediate jeopardy, and is within the reasonable power of Lessee to promptly cure, all as determined by Lessor in its reasonable discretion, then such failure shall not constitute an Event of Default hereunder, unless otherwise expressly provided herein, unless and until Lessor shall have given Lessee notice thereof and a period of thirty (30) days shall have elapsed, during which period Lessee may correct or cure such failure, upon failure of which an Event of Default shall be deemed to have occurred hereunder without further notice or demand of any kind being required.  If such failure cannot reasonably be cured within such thirty (30)-day period, as determined by Lessor in its reasonable discretion, and Lessee is diligently pursuing a cure of such failure, then Lessee shall have a reasonable period to cure such failure beyond such thirty (30)-day period, which shall in no event exceed ninety (90) days after receiving notice of such failure from Lessor.  If Lessee shall fail to correct or cure such failure within such ninety (90)-day period, an

20

Event of Default shall be deemed to have occurred hereunder without further notice or demand of any kind being required;

(g)      if a final, nonappealable judgment is rendered by a court against Lessee which has a Material Adverse Effect, and is not discharged or provision made for such discharge within ninety (90) days from the date of entry thereof;

(h)      if Lessee shall be liquidated or dissolved or shall begin proceedings towards its liquidation or dissolution;

(i)      if the estate or interest of Lessee in the Property shall be levied upon or attached in any proceeding and such estate or interest is about to be sold or transferred or such process shall not be vacated or discharged within ninety (90) days after it is made;

(j)      if there is a breach or default under the Franchise Agreement with respect to the Property or if such Franchise Agreement terminates or expires prior to the expiration of the Lease and a substitute agreement for the terminated or expired Franchise Agreement is not entered into prior to such expiration or termination, which substitute agreement shall be in form and substance reasonably satisfactory to Lessor; or

(k)      if there is an "Event of Default" or other breach or default by Lessee or any Guarantor under any of the other Transaction Documents or any Other Agreement , after the passage of all applicable notice and cure or grace periods; *provided, however*, in the event that this Lease has been the subject of a Securitization and any Other Agreement has not been the subject of the same Securitization or any series relating to such Securitization, an "Event of Default" under such Other Agreement shall not constitute an Event of Default under this Lease.

**Section 12.02.  Remedies**.  Upon the occurrence of an Event of Default, with or without notice or demand, except as otherwise expressly provided herein or such other notice as may be required by statute and cannot be waived by Lessee, Lessor shall be entitled to exercise, at its option, concurrently, successively, or in any combination, all remedies available at Law or in equity, including, without limitation, any one or more of the following:

(a)      to terminate this Lease, whereupon Lessee's right to possession of the Property shall cease and this Lease, except as to Lessee's liability, shall be terminated;

(b)      to the extent not prohibited by applicable Law, to (i) re-enter and take possession of the Property (or any part thereof), any or all personal property or fixtures of Lessee upon the Property and, to the extent permissible, all Franchise Agreements, permits and other rights or privileges of Lessee pertaining to the use and operation of the Property, and (ii) expel Lessee and those claiming under or through Lessee, without being deemed guilty in any manner of trespass or becoming liable for any loss or damage resulting therefrom, without resort to legal or judicial process, procedure or action.  No notice from Lessor hereunder or under a forcible entry and detainer statute or similar Law shall constitute an election by Lessor to terminate this Lease unless such

4840-6699-3755.1
STORE/Campbells (Perkins)
Lease Agreement
115 Ludlow Street, Warren, PA 16365
File No. 7210/02-588.6

notice specifically so states.  If Lessee shall, after default, voluntarily give up possession of the Property to Lessor, deliver to Lessor or its agents the keys to the Property, or both, such actions shall be deemed to be in compliance with Lessor's rights and the acceptance thereof by Lessor or its agents shall not be deemed to constitute a termination of the Lease.   Lessor reserves the right following any re-entry and/or reletting to exercise its right to terminate this Lease by giving Lessee written notice thereof, in which event this Lease will terminate;

(c)       to bring an action against Lessee for any damages sustained by Lessor or any equitable relief available to Lessor and to the extent not prohibited by applicable Law, to seize all personal property or fixtures upon the Property which Lessee owns or in which it has an interest, in which Lessor shall have a landlord's lien and/or security interest, and to dispose thereof in accordance with the Laws prevailing at the time and place of such seizure or to remove all or any portion of such property and cause the same to be stored in a public warehouse or elsewhere at Lessee's sole expense, without becoming liable for any loss or damage resulting therefrom and without resorting to legal or judicial process, procedure or action;

(d)       to relet the Property or any part thereof for such term or terms (including a term which extends beyond the original Lease Term), at such rentals and upon such other terms as Lessor, in its sole discretion, may determine, with all proceeds received from such reletting being applied to the Rental and other Monetary Obligations due from Lessee in such order as Lessor may, in its sole discretion, determine, which other Monetary Obligations include, without limitation, all repossession costs, brokerage commissions, attorneys' fees and expenses, alteration, remodeling and repair costs and expenses of preparing for such reletting.  Except to the extent required by applicable Law, Lessor shall have no obligation to relet the Property or any part thereof and shall in no event be liable for refusal or failure to relet the Property or any part thereof, or, in the event of any such reletting, for refusal or failure to collect any rent due upon such reletting, and no such refusal or failure shall operate to relieve Lessee of any liability under this Lease or otherwise to affect any such liability.  Lessor reserves the right following any re-entry and/or reletting to exercise its right to terminate this Lease by giving Lessee written notice thereof, in which event this Lease will terminate as specified in said notice;

(e)       except to the extent prohibited by applicable Law to accelerate and recover from Lessee all Rental and other Monetary Obligations due and owing and scheduled to become due and owing under this Lease both before and after the date of such breach for the entire original scheduled Lease Term;

(f)       to recover from Lessee all Costs paid or incurred by Lessor as a result of such breach, regardless of whether or not legal proceedings are actually commenced;

(g)       to immediately or at any time thereafter, and with or without notice, at Lessor's sole option but without any obligation to do so, correct such breach or default and charge Lessee all Costs incurred by Lessor therein.  Any sum or sums so paid by Lessor, together with interest at the Default Rate, shall be deemed to be Additional Rental hereunder and shall be immediately due from Lessee to Lessor.  Any such acts

22

by Lessor in correcting Lessee's breaches or defaults hereunder shall not be deemed to cure said breaches or defaults or constitute any waiver of Lessor's right to exercise any or all remedies set forth herein;

(h)     to immediately or at any time thereafter, and with or without notice, except as required herein, set off any money of Lessee held by Lessor under this Lease or any other Transaction Document or any Other Agreement against any sum owing by Lessee hereunder;

(i)     Without limiting the generality of the foregoing or limiting in any way the rights of Lessor under this Lease or otherwise under applicable Laws, at any time after the occurrence, and during the continuance, of an Event of Default, Lessor shall be entitled to apply for and have a receiver appointed under applicable Law by a court of competent jurisdiction (by ex parte motion for appointment without notice) in any action taken by Lessor to enforce its rights and remedies hereunder in order to protect and preserve Lessor's interest under this Lease or in the Property and the Personalty, and in connection therewith, LESSEE HEREBY IRREVOCABLY CONSENTS TO AND WAIVES ANY RIGHT TO OBJECT TO OR OTHERWISE CONTEST THE APPOINTMENT OF A RECEIVER AFTER THE OCCURRENCE, AND DURING THE CONTINUANCE, OF AN EVENT OF DEFAULT; and/or

(j)     to seek any equitable relief available to Lessor, including, without limitation, the right of specific performance.

**Section 12.03. Cumulative Remedies**.   All powers and remedies given by Section 12.02 to Lessor, subject to applicable Law, shall be cumulative and not exclusive of one another or of any other right or remedy or of any other powers and remedies available to Lessor under this Lease, by judicial proceedings or otherwise, to enforce the performance or observance of the covenants and agreements of Lessee contained in this Lease, and no delay or omission of Lessor to exercise any right or power accruing upon the occurrence of any Event of Default shall impair any other or subsequent Event of Default or impair any rights or remedies consequent thereto.   Every power and remedy given by this Section or by Law to Lessor may be exercised from time to time, and as often as may be deemed expedient, by Lessor, subject at all times to Lessor's right in its sole judgment to discontinue any work commenced by Lessor or change any course of action undertaken by Lessor.

**Section 12.04. Lessee Waiver**.   Lessee hereby expressly waives, for itself and all Persons claiming by, through and under Lessee, including creditors of all kinds, (a) any right and privilege which Lessee has under any present or future Legal Requirements to redeem the Property or to have a continuance of this Lease for the Lease Term after termination of Lessee's right of occupancy by order or judgment of any court or by any legal process or writ, or under the terms of this Lease; (b) the benefits of any present or future Legal Requirement that exempts property from liability for debt or for distress for rent; (c) any present or future Legal Requirement relating to notice or delay in levy of execution in case of eviction of a tenant for nonpayment of rent; and (d) any benefits and lien rights which may arise pursuant to any present or future Legal Requirement.

4840-6699-3755.1
STORE/Campbells (Perkins)
Lease Agreement
115 Ludlow Street, Warren, PA 16365
File No. 7210/02-588.6

## ARTICLE XIII

## MORTGAGE, SUBORDINATION AND ATTORNMENT

**Section 13.01.  No Liens**.  Lessor's interest in this Lease and/or the Property shall not be subordinate to any liens or encumbrances placed upon the Property by or resulting from any act of Lessee, and nothing herein contained shall be construed to require such subordination by Lessor.  NOTICE IS HEREBY GIVEN THAT LESSEE IS NOT AUTHORIZED TO PLACE OR ALLOW TO BE PLACED ANY LIEN, MORTGAGE, DEED OF TRUST, DEED TO SECURE DEBT, SECURITY INTEREST OR ENCUMBRANCE OF ANY KIND UPON ALL OR ANY PART OF THE PROPERTY OR LESSEE'S LEASEHOLD INTEREST THEREIN, AND ANY SUCH PURPORTED TRANSACTION SHALL BE VOID.

**Section 13.02.  Subordination**.    This Lease at all times shall automatically be subordinate to the lien of any and all ground leases and Mortgages now or hereafter placed upon the Property by Lessor, and Lessee covenants and agrees to execute and deliver, upon demand, such further instruments subordinating this Lease to the lien of any or all such ground leases and Mortgages as shall be desired by Lessor, or any present or proposed mortgagees under trust deeds, upon the condition that Lessee shall have the right to remain in possession of the Property under the terms of this Lease, notwithstanding any default in any or all such ground leases or Mortgages, or after the foreclosure of any such Mortgages, so long as no Event of Default shall have occurred and be continuing.

**Section 13.03.  Attornment**.  In the event any purchaser or assignee of any Lender at a foreclosure sale acquires title to any of the  Property, or in the event that any Lender or any purchaser or assignee otherwise succeeds to the rights of Lessor as landlord under this Lease, Lessee shall attorn to Lender or such purchaser or assignee, as the case may be (a "Successor Lessor"), and recognize the Successor Lessor as lessor under this Lease, and, subject to the provisions of this Article XIII, this Lease shall continue in full force and effect as a direct lease between the Successor Lessor and Lessee, provided that the Successor Lessor shall only be liable for any obligations of Lessor under this Lease which accrue after the date that such Successor Lessor acquires title.  The foregoing provision shall be self-operative and effective without the execution of any further instruments.

**Section 13.04.  Execution of Additional Documents**.  Although the provisions in this Article XIII shall be self-operative and no future instrument of subordination shall be required, upon request by Lessor, Lessee shall execute and deliver such additional reasonable instruments as may be reasonably required for such purposes.

**Section 13.05.  Notice to Lender**.   Lessee shall give written notice to any Lender having a recorded lien upon the Property or any part thereof of which Lessee has been notified of any breach or default by Lessor of any of its obligations under this Lease and give such Lender at least sixty (60) days beyond any notice period to which Lessor might be entitled to cure such default before Lessee may exercise any remedy with respect thereto.

4840-6699-3755.1
STORE/Campbells (Perkins)
Lease Agreement
115 Ludlow Street, Warren, PA 16365
File No. 7210/02-588.6

## ARTICLE XIV

## ASSIGNMENT

**Section 14.01. Assignment by Lessor**.   As a material inducement to Lessor's willingness to enter into the transactions contemplated by this Lease (the "Transaction") and the other Transaction Documents, Lessee hereby agrees that Lessor may, from time to time and at any time and without the consent of Lessee, engage in all or any combination of the following, or enter into agreements in connection with any of the following or in accordance with requirements that may be imposed by applicable securities, tax or other Laws: (a) the sale, assignment, grant, conveyance, transfer, financing, re-financing, purchase or re-acquisition of all, less than all or any portion of the Property, this Lease or any other Transaction Document, Lessor's right, title and interest in this Lease or any other Transaction Document, the servicing rights with respect to any of the foregoing, or participations in any of the foregoing; or (b) a Securitization and related transactions.  Without in any way limiting the foregoing, the parties acknowledge and agree that Lessor, in its sole discretion, may assign this Lease or any interest herein to another Person in order to maintain Lessor's or any of its Affiliates' status as a REIT. In the event of any such sale or assignment other than a security assignment, Lessee shall attorn to such purchaser or assignee (so long as Lessor and such purchaser or assignee notify Lessee in writing of such transfer and such purchaser or assignee expressly assumes in writing the obligations of Lessor hereunder from and after the date of such assignment).  At the request of Lessor, Lessee will execute such documents confirming the sale, assignment or other transfer and such other agreements as Lessor may reasonably request, provided that the same do not increase the liabilities and obligations of Lessee hereunder.  Lessor shall be relieved, from and after the date of such transfer or conveyance, of liability for the performance of any obligation of Lessor contained herein, except for obligations or liabilities accrued prior to such assignment or sale.

**Section 14.02.  Assignment by Lessee**.

(a)    ***No Assignment by Lessee***.   Lessee acknowledges that Lessor has relied both on the business experience and creditworthiness of Lessee and upon the particular purposes for which Lessee intends to use the Property in entering into this Lease.  Lessee shall not assign, transfer, convey, pledge or mortgage this Lease or any interest herein or any interest in Lessee, whether by operation of Law or otherwise, without the prior written consent of Lessor.  At the time of any assignment of this Lease which is approved by Lessor, the assignee shall assume all of the obligations of Lessee under this Lease pursuant to a written assumption agreement in form and substance reasonably acceptable to Lessor.   Such assignment of this Lease pursuant to this Section 14.02 shall not relieve Lessee of its obligations respecting this Lease unless otherwise agreed to by Lessor.   Any assignment, transfer, conveyance, pledge or mortgage in violation of this Section 14.02 shall be voidable at the sole option of Lessor. Any consent to an assignment given by Lessor hereunder shall not be deemed a consent to any subsequent assignment.

(b)    ***Permitted Assignment***.   Notwithstanding anything to the contrary contained in this Section 14.02 and provided that no Event of Default has occurred and is continuing at the time of the proposed assignment or other transfer, and provided

4840-6699-3755.1
STORE/Campbells (Perkins)
Lease Agreement
115 Ludlow Street, Warren, PA 16365
File No. 7210/02-588.6

further that any assignee agrees to assume all of Lessee's obligations under this Lease by written agreement approved by Lessor, Lessee shall have the right to assign or otherwise transfer all, but not less than all, of its interest in, to and under this Lease without Lessor's consent to a Qualified Operator.  A "Qualified Operator" shall mean a Person who (x) for two (2) consecutive years immediately prior to the date of assignment or transfer and (y) on a proforma basis following the consummation of such assignment or transfer (all as determined by Lessor upon review of financial statements provided by the assignee prior to the proposed lease assignment and in a form reasonably satisfactory to Lessor), (A) has a CFCCR (defined below) of at least 1.50x; and (B) has a Lease Adjusted Leverage (defined below) of no more than 5.50x; *provided, however,* that Lessee may satisfy the foregoing conditions of a Qualified Operator by providing, or causing to be provided, a guaranty agreement, in form and substance reasonably acceptable to and approved by Lessor, in writing, which guaranty shall be from an entity that meets the requirements of (A), (B) and (C) set forth in this Section 14.02.  Lessee shall provide Lessor with at least thirty (30) days' prior written notice of the proposed assignment to a Qualified Operator, which notice must include financial information satisfying the Qualified Operator requirements set forth herein. In the event that Lessee effects an assignment to a Qualified Operator, Lessee shall be released from any liability arising under this Lease from and after the date of such assignment and Guarantor shall be released from any liability arising under the Guaranty from and after the date of such assignment.

For purposes hereof:

"*CFCCR*" means with respect to the twelve month period of time immediately preceding the date of determination, the ratio calculated for such period of time, each as determined in accordance with GAAP, of (i) the sum of Consolidated Net Income (excluding non-cash income), Depreciation and Amortization, Interest Expense, income taxes, Operating Lease Expense and non-cash expenses to (ii) the sum of Operating Lease Expense (excluding non-cash rent adjustments), scheduled principal payments of long term Debt, scheduled maturities of all Capital Leases, dividends and Interest Expense (excluding non-cash interest expense and amortization of non-cash financing expenses). For purposes of calculating the CFCCR, the following terms shall be defined as set forth below:

"*Capital Lease*" shall mean all leases of any property, whether real, personal or mixed, by a Person, which leases would, in conformity with GAAP, be required to be accounted for as a capital lease on the balance sheet of such Person.  The term "Capital Lease" shall not include any operating lease.

"*Consolidated Net Income*" shall mean with respect to the period of determination, the net income or net loss of a Person.  In determining the amount of Consolidated Net Income, (i) adjustments shall be made for nonrecurring gains and losses or non-cash items allocable to the period of determination, (ii) deductions shall be made for, among other things, Depreciation and Amortization, Interest Expense, Operating Lease Expense, and (iii) no deductions shall be made for income taxes or charges equivalent to income taxes allocable to the period of determination, as determined in accordance with GAAP.

26

"*Debt*" shall mean with respect to a Person, and for the period of determination (i) indebtedness for borrowed money, (ii) subject to the limitation set forth in sub item (iv) below, obligations evidenced by bonds, indentures, notes or similar instruments, (iii) obligations under leases which should be, in accordance with GAAP, recorded as Capital Leases, and (iv) obligations under direct or indirect guarantees in respect of, and obligations (contingent or otherwise) to purchase or otherwise acquire, or otherwise to assure a creditor against loss in respect of, indebtedness or obligations of others of the kinds referred to in clauses (i) through (iv) above, except for guaranty obligations of such Person, which, in conformity with GAAP, are not included on the balance sheet of such Person.

"*Depreciation and Amortization*" shall mean the depreciation and amortization accruing during any period of determination with respect to a Person, as determined in accordance with GAAP.

"*Interest Expense*" shall mean for any period of determination, the sum of all interest accrued or which should be accrued in respect of all Debt of a Person, as determined in accordance with GAAP.

"*Operating Lease Expense*" shall mean the sum of all payments and expenses incurred by a Person, under any operating leases during the period of determination, as determined in accordance with GAAP.

"*EBITDA*" means for the twelve (12) month period ending on the date of determination, the sum of a Person's net income (loss) for such period plus, in each case to the extent previously deducted in calculating net income (loss): (i) income taxes, (ii) interest payments on all of its debt obligations (including any borrowings under short term credit facilities), (iii) all non-cash charges including depreciation and amortization, and (iv) Non-Recurring Items (defined below).

"*EBITDAR*" means the sum of a Person's EBITDA and its total land and building rent for the twelve (12) month period ending on the date of determination.

"*Lease Adjusted Leverage*" means with respect to a Person, as of any applicable date, the sum of (i) ten (10) times such Person's total land and building rent for the twelve (12) month period ending on the date of determination, and (ii) the total current balance of such Person's total debt obligations (including any borrowings under short term credit facilities) on such date, divided by EBITDAR.

"*Non-Recurring Items*" shall mean with respect to a Person, items of the sum (whether positive or negative) of revenue minus expenses that, in the judgment of Lessor, are unusual in nature, occur infrequently and are not representative of the ongoing or future earnings or expenses of such Person.

**Section 14.03.  No Sale of Assets**.  Without the prior written consent of Lessor, Lessee shall not sell all or substantially all of Lessee's assets.  Any sale of Lessee's assets in violation of this Section 14.03, shall be voidable at the sole option of Lessor.  Any consent to a sale of

4840-6699-3755.1
STORE/Campbells (Perkins)
Lease Agreement
115 Ludlow Street, Warren, PA 16365
File No. 7210/02-588.6

Lessee's assets given by Lessor hereunder shall not be deemed a consent to any subsequent sale of Lessee's assets.

**Section 14.04.  No Subletting**.  Lessee shall not sublet the Property without the prior written consent of Lessor, which may be withheld by Lessor in its sole discretion and any such purported subletting shall be void.

**Section 14.05.  Lease Consolidation**. Notwithstanding any provision contained herein, at any time during the Lease Term where STORE Capital Acquisitions, LLC (or an Affiliate thereof) is the "Lessor" hereunder, upon written notification to Lessee, Lessor may elect, in its sole discretion, to amend and restate the Master Lease Agreement to include the Property in the Master Lease Agreement.  In such event, Lessee shall execute an amendment and restatement of the Master Lease Agreement, in form and substance identical to the Master Lease Agreement, and any other related documents reasonably requested by Lessor, solely to (a) modify the definition of "Properties" as defined in the Master Lease Agreement to include the Property; (b) increase the Base Annual Rental as defined in the Master Lease Agreement to reflect the inclusion of the Property; and (c) make such other changes reasonably deemed necessary by Lessor in its sole discretion to reflect the addition of the Property to the Master Lease Agreement.  In no event shall Lessee have the right to request any further modifications to the amended and restated Master Lease Agreement.  Lessee shall execute any such amended and restated Master Lease Agreement within five (5) Business Days after delivery to Lessee of an execution version thereof.

**ARTICLE XV**

**NOTICES**

**Section 15.01. Notices**.  All notices, demands, designations, certificates, requests, offers, consents, approvals, appointments and other instruments given pursuant to this Lease shall be in writing and given by any one of the following: (a) hand delivery; (b) express overnight delivery service;  (c) certified or registered mail, return receipt requested;  or (d) email transmission, and shall be deemed to have been delivered upon (i) receipt, if hand delivered; (ii) the next Business Day, if delivered by a reputable express overnight delivery service; (iii) the third Business Day following the day of deposit of such notice with the United States Postal Service, if sent by certified or registered mail, return receipt requested; or (iv) transmission, if delivered by email transmission.  Notices shall be provided to the parties and addresses (or electronic mail addresses) specified below:

If to Lessee:              5171 Campbells Land Co., Inc.
                           6201 Steubenville Pike, Suite 100
                           McKees Rocks, PA  15136
                           Attention:  William Kane
                           Email: wtkane25@gmail.com

If to Lessor:              STORE Capital Acquisitions, LLC
                           8377 E. Hartford Drive, Suite 100
                           Scottsdale, AZ 85255
                           Attention:   Michael T. Bennett

28

Executive Vice President – General Counsel
Email: mbennett@storecapital.com


With a copy to:          Kutak Rock LLP
                         1801 California Street, Suite 3000
                         Denver, CO 80202
                         Attention:  Nathan Humphrey, Esq. and
                               Kelly Reynoldson, Esq.
                         Email: nathan.humphrey@kutakrock.com and
                               kelly.reynoldson@kutakrock.com

or to such other address or such other person as either party may from time to time hereafter specify to the other party in a notice delivered in the manner provided above.

## ARTICLE XVI

### LANDLORD'S LIEN / SECURITY INTEREST

**Section 16.01. Landlord's Lien and Security Interest**.  Lessee agrees that Lessor shall have a landlord's lien, and Lessee additionally hereby separately grants to Lessor a first and prior security interest, in, on and against all of Lessee's right, title and interest in, to and under all Personalty, which lien and security interest shall secure the payment of all Rental and other Monetary Obligations payable by Lessee to Lessor under the terms hereof and all other obligations of Lessee to Lessor under this Lease.  Lessee agrees that Lessor may file such documents as Lessor then deems appropriate or necessary to perfect and maintain said lien and security interest, and expressly acknowledges and agrees that, in addition to any and all other rights and remedies of Lessor whether hereunder or at Law or in equity, in the Event of Default of Lessee hereunder, Lessor shall have any and all rights and remedies granted a secured party under the Uniform Commercial Code then in effect in the state where the Property is located.  Lessee covenants to promptly notify Lessor of any changes in Lessee's name and/or organizational structure which may necessitate the execution and filing of additional financing statements; *provided, however*, the foregoing shall not be construed as Lessor's consent to such changes.

Lessee hereby ratifies its authorization for Lessor or any of its Affiliates to have filed in any Uniform Commercial Code jurisdiction any initial financing statement and any amendments thereto covering the Personalty pledged herein, if filed prior to the Effective Date.

## ARTICLE XVII

### MISCELLANEOUS

**Section 17.01. Force Majeure**.  Any prevention, delay or stoppage due to strikes, lockouts, acts of God, enemy or hostile governmental action, civil commotion, fire or other casualty beyond the control of the party obligated to perform (each, a "Force Majeure Event") shall excuse the performance by such party for a period equal to any such prevention, delay or

29

stoppage, expressly excluding, however, the obligations imposed upon Lessee with respect to Rental and other Monetary Obligations to be paid hereunder.

**Section 17.02.  No Merger**.  There shall be no merger of this Lease nor of the leasehold estate created by this Lease with the fee estate in or ownership of the Property by reason of the fact that the same person, corporation, firm or other entity may acquire or hold or own, directly or indirectly, (a) this Lease or the leasehold estate created by this Lease or any interest in this Lease or in such leasehold estate, and (b) the fee estate or ownership of the Property or any interest in such fee estate or ownership.  No such merger shall occur unless and until all persons, corporations, firms and other entities having any interest in (i) this Lease or the leasehold estate created by this Lease, and (ii) the fee estate in or ownership of the Property or any part thereof sought to be merged shall join in a written instrument effecting such merger and shall duly record the same.

**Section 17.03.  Interpretation**.  Lessor and Lessee acknowledge and warrant to each other that each has been represented by independent counsel and has executed this Lease after being fully advised by said counsel as to its effect and significance. This Lease shall be interpreted and construed in a fair and impartial manner without regard to such factors as the party which prepared the instrument, the relative bargaining powers of the parties or the domicile of any party.  Whenever in this Lease any words of obligation or duty are used, such words or expressions shall have the same force and effect as though made in the form of a covenant.

**Section 17.04.  Characterization.**  The following expressions of intent, representations, warranties, covenants, agreements, stipulations and waivers are a material inducement to Lessor entering into this Lease:

(a)     Lessor and Lessee intend that (i) this Lease constitutes an unseverable, unitary and single lease of all, but not less than all, of the Property, and, if at any time this Lease covers other real property in addition to the Property, neither this Lease, nor Lessee's obligations or rights hereunder may be allocated or otherwise divided among such properties by Lessee; (ii) this Lease is a "true lease," is not a financing lease, capital lease, mortgage, equitable mortgage, deed of trust, trust agreement, security agreement or other financing or trust arrangement, and the economic realities of this Lease are those of a true lease; and (iii) the business relationship created by this Lease and any related documents is solely that of a long-term commercial lease between Lessor and Lessee, the Lease has been entered into by both parties in reliance upon the economic and legal bargains contained herein, and none of the agreements contained herein is intended, nor shall the same be deemed or construed, to create a partnership (*de facto* or *de jure*) between Lessor and Lessee, to make them joint venturers, to make Lessee an agent, legal representative, partner, subsidiary or employee of Lessor, nor to make Lessor in any way responsible for the debts, obligations or losses of Lessee.

(b)     Lessor and Lessee covenant and agree that: (i) each will treat this Lease as an operating lease pursuant to Statement of Financial Accounting Standards No. 13, as amended, and as a true lease for state Law reporting purposes and for federal income tax purposes; (ii) each party will not, nor will it permit any Affiliate to, at any time, take any action or fail to take any action with respect to the preparation or filing of any

30

statement or disclosure to Governmental Authority, including without limitation, any income tax return (including an amended income tax return), to the extent that such action or such failure to take action would be inconsistent with the intention of the parties expressed in this Section 17.04; (iii) with respect to the Property, the Lease Term is less than seventy-five percent (75%) of the estimated remaining economic life of the Property; and (iv) the Base Annual Rental is the fair market value for the use of the Property and was agreed to by Lessor and Lessee on that basis, and the execution and delivery of, and the performance by Lessee of its obligations under, this Lease do not constitute a transfer of all or any part of the Property.

(c)    Lessee waives any claim or defense based upon the characterization of this Lease as anything other than a true lease and as a master lease of the Property. Lessee stipulates and agrees (i) not to challenge the validity, enforceability or characterization of the lease of the Property as a true lease and/or as a single, unitary, unseverable instrument pertaining to the lease of all, but not less than all, of the Property; and (ii) not to assert or take or omit to take any action inconsistent with the agreements and understandings set forth in this Section 17.04.

**Section 17.05.  Disclosures**.

(a)    ***Securities Act or Exchange Act***.  The parties agree that, notwithstanding any provision contained in this Lease, any party (and each employee, representative or other agent of any party) may disclose to any and all persons, without limitation of any kind, any matter required under the Securities Act or the Exchange Act.

(b)    ***Lessor Advertising and Related Publications***.  Lessee hereby consents to the use by Lessor of, and Lessor is hereby expressly permitted to use, Lessee's name, trademarks, logos, pictures of stores and signage, and basic Transaction information (collectively "Lessee's Information") solely in connection with Lessor's sales, advertising, and press release materials, including on Lessor's website.  Lessee's consent shall be deemed authorization for the limited use of Lessee's Information by Lessor under all applicable copyright and trademark laws.

(c)    ***Public Disclosures.***  Except as required by Law, Lessee shall not make any public disclosure, including press releases or any form of media release, of this Lease Agreement or any transactions relating hereto without the prior written consent of Lessor.

**Section 17.06. Attorneys' Fees**.  In the event of any judicial or other adversarial proceeding concerning this Lease, to the extent permitted by Law, the prevailing party shall be entitled to recover all of its reasonable attorneys' fees and other Costs in addition to any other relief to which it may be entitled.  In addition, the prevailing party shall, upon demand, be entitled to all attorneys' fees and all other Costs incurred in the preparation and service of any notice or demand hereunder, whether or not a legal action is subsequently commenced.

**Section 17.07. Memoranda of Lease**.  Concurrently with the execution of this Lease, Lessor and Lessee are executing Lessor's standard form memorandum of lease in recordable form, indicating the names and addresses of Lessor and Lessee, a description of the Property,

4840-6699-3755.1
STORE/Campbells (Perkins)
Lease Agreement
115 Ludlow Street, Warren, PA 16365
File No. 7210/02-588.6

the Lease Term, but omitting Rentals and such other terms of this Lease as Lessor may not desire to disclose to the public.  Further, upon Lessor's request, Lessee agrees to execute and acknowledge a termination of lease and/or quitclaim deed in recordable form to be held by Lessor until the expiration or sooner termination of the Lease Term; *provided, however, if* Lessee shall fail or refuse to sign such a document in accordance with the provisions of this Section within ten (10) days following a request by Lessor, Lessee irrevocably constitutes and appoints Lessor as its attorney-in-fact to execute and record such document, it being stipulated that such power of attorney is coupled with an interest and is irrevocable and binding.

**Section 17.08.  No Brokerage**.  Lessor and Lessee represent and warrant to each other that they have had no conversation or negotiations with any broker concerning the leasing of the Property.  Each of Lessor and Lessee agrees to protect, indemnify, save and keep harmless the other, against and from all liabilities, claims, losses, Costs, damages and expenses, including attorneys' fees, arising out of, resulting from or in connection with their breach of the foregoing warranty and representation.

**Section 17.09.  Waiver of Jury Trial and Certain Damages**.  LESSOR AND LESSEE HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE THE RIGHT EITHER MAY HAVE TO A TRIAL BY JURY WITH RESPECT TO ANY AND ALL ISSUES PRESENTED IN ANY ACTION, PROCEEDING, CLAIM OR COUNTERCLAIM BROUGHT BY EITHER OF THE PARTIES HERETO AGAINST THE OTHER OR ITS SUCCESSORS WITH RESPECT TO ANY MATTER ARISING OUT OF OR IN CONNECTION WITH THIS LEASE, THE RELATIONSHIP OF LESSOR AND LESSEE, LESSEE'S USE OR OCCUPANCY OF THE PROPERTY, AND/OR ANY CLAIM FOR INJURY OR DAMAGE, OR ANY EMERGENCY OR STATUTORY REMEDY.  THIS WAIVER BY THE PARTIES HERETO OF ANY RIGHT EITHER MAY HAVE TO A TRIAL BY JURY HAS BEEN NEGOTIATED AND IS AN ESSENTIAL ASPECT OF THEIR BARGAIN.   FURTHERMORE, LESSOR AND LESSEE HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE THE RIGHT EITHER MAY HAVE TO SEEK PUNITIVE, CONSEQUENTIAL, SPECIAL AND INDIRECT DAMAGES FROM THE OTHER PARTY AND ANY OF THE AFFILIATES, OFFICERS, DIRECTORS, MEMBERS, MANAGERS OR EMPLOYEES OF LESSOR OR LESSEE, AS APPLICABLE, OR ANY OF THEIR SUCCESSORS WITH RESPECT TO ANY AND ALL ISSUES PRESENTED IN ANY ACTION, PROCEEDING, CLAIM OR COUNTERCLAIM BROUGHT WITH RESPECT TO ANY MATTER ARISING OUT OF OR IN CONNECTION WITH THIS LEASE OR ANY DOCUMENT CONTEMPLATED HEREIN OR RELATED HERETO.   THE WAIVER BY LESSOR AND LESSEE OF ANY RIGHT EITHER MAY HAVE TO SEEK PUNITIVE, CONSEQUENTIAL, SPECIAL AND INDIRECT DAMAGES HAS BEEN NEGOTIATED BY THE PARTIES HERETO AND IS AN ESSENTIAL ASPECT OF THEIR BARGAIN.

**Section 17.10.  Securitizations**.  As a material inducement to Lessor's willingness to enter into the Transactions contemplated by this Lease and the other Transaction Documents, Lessee hereby acknowledges and agrees that Lessor may, from time to time and at any time (a) advertise, issue press releases, send direct mail or otherwise disclose information regarding the Transaction for marketing purposes; and (b) (i) act or permit another Person to act as sponsor, settler, transferor or depositor of, or a holder of interests in, one or more Persons or other arrangements formed pursuant to a trust agreement, indenture, pooling agreement, participation agreement, sale and servicing agreement, limited liability company agreement, partnership agreement, articles of incorporation or similar agreement or document; and

4840-6699-3755.1
STORE/Campbells (Perkins)
Lease Agreement
115 Ludlow Street, Warren, PA 16365
File No. 7210/02-588.6

(ii) permit one or more of such Persons or arrangements to offer and sell stock, certificates, bonds, notes, other evidences of indebtedness or securities that are directly or indirectly secured, collateralized or otherwise backed by or represent a direct or indirect interest in whole or in part in any of the assets, rights or properties described in Section 14.01 of this Lease, in one or more Persons or arrangements holding such assets, rights or properties, or any of them (collectively, the "Securities"), whether any such Securities are privately or publicly offered and sold, or rated or unrated (any combination of which actions and transactions described in both clauses (i) and (ii) in this paragraph, whether proposed or completed, are referred to in this Lease as a "Securitization").  Lessee shall cooperate fully with Lessor and any Affected Party with respect to all reasonable requests and due diligence procedures and use reasonable efforts to facilitate such Securitization, provided that such cooperation shall be at no additional cost or expense to Lessee so long as Lessee is not otherwise required to provide such information to Lessor pursuant to the other provisions of this Lease.

Section 17.11. **State-Specific Provisions**.  The provisions and/or remedies which are set forth on the attached Exhibit D shall be deemed a part of and included within the terms and conditions of this Lease.

Section 17.12. **Time is of the Essence; Computation**.  Time is of the essence with respect to each and every provision of this Lease.  If any deadline provided herein falls on a non-Business Day, such deadline shall be extended to the next day that is a Business Day.

Section 17.13. **Waiver and Amendment**.  No provision of this Lease shall be deemed waived or amended except by a written instrument unambiguously setting forth the matter waived or amended and signed by the party against which enforcement of such waiver or amendment is sought.  Waiver of any matter shall not be deemed a waiver of the same or any other matter on any future occasion.  No acceptance by Lessor of an amount less than the Rental and other Monetary Obligations stipulated to be due under this Lease shall be deemed to be other than a payment on account of the earliest such Rental or other Monetary Obligations then due or in arrears nor shall any endorsement or statement on any check or letter accompanying any such payment be deemed a waiver of Lessor's right to collect any unpaid amounts or an accord and satisfaction.

Section 17.14. **Successors Bound**.  Except as otherwise specifically provided herein, the terms, covenants and conditions contained in this Lease shall bind and inure to the benefit of the respective heirs, successors, executors, administrators and assigns of each of the parties hereto.

Section 17.15. **Captions**.  Captions are used throughout this Lease for convenience of reference only and shall not be considered in any manner in the construction or interpretation hereof.

Section 17.16. **Other Documents**.  Each of the parties agrees to sign such other and further documents as may be necessary or appropriate to carry out the intentions expressed in this Lease.

Section 17.17. **Entire Agreement**.   This Lease and any other instruments or agreements referred to herein, constitute the entire agreement between the parties with respect

4840-6699-3755.1
STORE/Campbells (Perkins)
Lease Agreement
115 Ludlow Street, Warren, PA 16365
File No. 7210/02-588.6

to the subject matter hereof, and there are no other representations, warranties or agreements except as herein provided.

       **Section 17.18.  Forum Selection; Jurisdiction; Venue; Choice of Law**.  For purposes of any action or proceeding arising out of this Lease, the parties hereto expressly submit to the jurisdiction of all federal and state courts located in the state where the Property is located. Lessee consents that it may be served with any process or paper by registered mail or by personal service within or without the state where the Property is located in accordance with applicable Law.  Furthermore, Lessee waives and agrees not to assert in any such action, suit or proceeding that it is not personally subject to the jurisdiction of such courts, that the action, suit or proceeding is brought in an inconvenient forum or that venue of the action, suit or proceeding is improper.  This Lease shall be governed by, and construed with, the Laws of the applicable state in which the Property is located, without giving effect to any state's conflict of Laws principles.

       **Section 17.19. Counterparts**.   This Lease may be executed in one or more counterparts, each of which shall be deemed an original.  Furthermore, the undersigned agree that transmission of this Lease via e-mail in a ".pdf" or other electronic format shall be deemed transmission of the original Lease for all purposes.

       *[Remainder of page intentionally left blank; signature page(s) to follow]*

34

**IN WITNESS WHEREOF**, Lessor and Lessee have entered into this Lease as of the date first above written.

**LESSOR:**

**STORE CAPITAL ACQUISITIONS, LLC**, a
Delaware limited liability company

By: _____

Printed Name: _____
Michael T. Bennett
~~Executive Vice President~~
General Counsel

Title: _____

STATE OF ARIZONA                )
                                ) ss.
COUNTY OF MARICOPA              )

Before me, the undersigned, a Notary Public of the State and County aforesaid, personally appeared _Michael T Bennett_, with whom I am personally acquainted (or proved to me to be on the basis of satisfactory evidence), and who, upon oath, acknowledged himself/herself to be the _____EVP_____ of **STORE CAPITAL ACQUISITIONS, LLC**, a Delaware limited liability company, the within named Lessor, and that he/she as such officer, being authorized so to do, executed the within instrument for the purposes therein contained, by signing the name of _STORE Capital Acquisitions, LLC_ by himself/herself as such officer.

WITNESS my hand and Official Seal at office, this ___29___ day of _January_, 2018.

_____
Notary Public

My Commission Expires ___8/8/209___



DONYA NANETTE DERUITER
Notary Public, State of Arizona
Maricopa County
My Commission Expires
**August 08, 2019**

4840-6699-3755.1
STORE/Campbells (Perkins)
Lease Agreement
115 Ludlow Street, Warren, PA 16365
File No. 7210/02-588.6

**IN WITNESS WHEREOF**, Lessor and Lessee have entered into this Lease as of the date first above written.

**LESSEE:**

**5171 CAMPBELLS LAND CO., INC.**, a Pennsylvania corporation

By: _____

Printed Name: _William TKANE_

Title: _President_

STATE OF _Pennsylvania_ )
                                            ) ss.
COUNTY OF _Allegheny_ )

Before me, the undersigned, a Notary Public of the State and County aforesaid, personally appeared _William Kane_, with whom I am personally acquainted (or proved to me to be on the basis of satisfactory evidence), and who, upon oath, acknowledged himself/herself to be the _President_ of **5171 CAMPBELLS LAND CO., INC.**, a Pennsylvania corporation, the within named Lessee, a _Corporation_, and that he/she as such officer, being authorized so to do, executed the within instrument for the purposes therein contained, by signing the name of _the corporation_ by himself/herself as such officer.

WITNESS my hand and Official Seal at office, this _30th_ day of _January_, 2018.

_Rosanne M Penn_
Notary Public

My Commission Expires _9/13/20_

COMMONWEALTH OF PENNSYLVANIA
NOTARIAL SEAL
Rosanne M. Penn, Notary Public
City of Pittsburgh, Allegheny County
My Commission Expires Sept. 13, 2020
MEMBER, PENNSYLVANIA ASSOCIATION OF NOTARIES

**EXHIBITS**

Exhibit A:                    Defined Terms

Exhibit B:                    Legal Description and Street Address of the Property

Exhibit C:                    Authorization Agreement – Pre-Arranged Payments

Exhibit D:                    State-Specific Provisions

Schedule 9.03                 Supplemental Financial Information

**EXHIBIT A**

**DEFINED TERMS**

The following terms shall have the following meanings for all purposes of this Lease:

"*Additional Rental*" has the meaning set forth in Section 4.03.

"*Adjustment Date*" has the meaning set forth in Section 1.07.

"*Affected Party*" means each direct or indirect participant or investor in a proposed or completed Securitization, including, without limitation, any prospective owner, any rating agency or any party to any agreement executed in connection with the Securitization.

"*Affiliate*" means any Person which directly or indirectly controls, is under common control with or is controlled by any other Person.  For purposes of this definition, "controls," "under common control with," and "controlled by" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities or otherwise.

"*Anti-Money Laundering Laws*" means all applicable Laws, regulations and government guidance on the prevention and detection of money laundering, including, without limitation, (a) 18 U.S.C. §§ 1956 and 1957; and (b) the Bank Secrecy Act, 31 U.S.C. §§ 5311 et seq., and its implementing regulations, 31 CFR Part 103.

"*Base Annual Rental*" has the meaning set forth in Section 1.05.

"*Base Monthly Rental*" means an amount equal to 1/12 of the applicable Base Annual Rental.

"*Business Day*" means a day on which banks located in Scottsdale, Arizona are not required or authorized to remain closed.

"*Casualty*" means any loss of or damage to any property included within or related to the Property or arising from an adjoining property caused by an Act of God, fire, flood or other catastrophe.

"*Code*" means the Internal Revenue Code of 1986, as the same may be amended from time to time.

"*Condemnation*" means a Taking and/or a Requisition.

"*Costs*" means all reasonable costs and expenses incurred by a Person, including, without limitation, reasonable attorneys' fees and expenses, court costs, expert witness fees, costs of tests and analyses, travel and accommodation expenses, deposition and trial transcripts, copies and other similar costs and fees, brokerage fees, escrow fees, title insurance

A-1

premiums, appraisal fees, stamp taxes, recording fees and transfer taxes or fees, as the circumstances require.

"*Default Rate*" means 18% per annum or the highest rate permitted by Law, whichever is less.

"*Effective Date*" has the meaning set forth in the introductory paragraph of this Lease.

"*Environmental Laws*" means federal, state and local Laws, ordinances, common law requirements and regulations and standards, rules, policies and other governmental requirements, administrative rulings and court judgments and decrees having the effect of Law in effect now or in the future and including all amendments, that relate to Hazardous Materials, Regulated Substances, USTs, and/or the protection of human health or the environment, or relating to liability for or Costs of Remediation or prevention of Releases, and apply to Lessee and/or the Property.

"*Environmental Liens*" means any liens and other encumbrances imposed pursuant to any Environmental Law.

"*Event of Default*" has the meaning set forth in Section 12.01.

"*Exchange Act*" means the Securities Exchange Act of 1934, as amended.

"*Extension Option*" has the meaning set forth in Section 3.02.

"*Extension Term*" has the meaning set forth in Section 3.02.

"*Force Majeure Event*" has the meaning set forth in Section 17.01.

"*Franchise Agreement*" has the meaning set forth in Section 5.08.

"*Franchisor*" means Perkins Restaurant and Bakery, a Delaware corporation, or its successors and permitted assigns.

"*GAAP*" means generally accepted accounting principles, consistently applied from period to period.

"*Governmental Authority*" means any governmental authority, agency, department, commission, bureau, board, instrumentality, court or quasi-governmental authority of the United States, any state or any political subdivision thereof with authority to adopt, modify, amend, interpret, give effect to or enforce any federal, state and local Laws, statutes, ordinances, rules or regulations, including common law, or to issue court orders.

"*Guarantor*" means collectively, William Kane, Frank Kane and Ron Linaburg or any additional or replacement guarantor(s) approved by Lessor in its sole and absolute discretion.

4840-6699-3755.1
STORE/Campbells (Perkins)
Lease Agreement
115 Ludlow Street, Warren, PA 16365
File No. 7210/02-588.6

"*Guaranty*" means that certain Unconditional Guaranty of Payment and Performance dated as of the date hereof given by Guarantor for the benefit of Lessor, as the same may be amended from time to time.

"*Hazardous Materials*" includes: (a) oil, petroleum products, flammable substances, explosives, radioactive materials, hazardous wastes or substances, toxic wastes or substances or any other materials, contaminants or pollutants, the presence of which causes the Property to be in violation of any local, state or federal Law or regulation, or Environmental Law, or are defined as or included in the definition of "hazardous substances," "hazardous wastes," "hazardous materials," "toxic substances," "contaminants," "pollutants," or words of similar import under any applicable local, state or federal Law or under the regulations adopted, orders issued, or publications promulgated pursuant thereto, including, but not limited to: (i) the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, 42 U.S.C. § 9601, et seq.; (ii) the Hazardous Materials Transportation Act, as amended, 49 U.S.C. § 5101, et seq.; (iii) the Resource Conservation and Recovery Act, as amended, 42 U.S.C. § 6901, et seq.; and (iv) regulations adopted and publications promulgated pursuant to the aforesaid Laws; (b) asbestos in any form which is friable, urea formaldehyde foam insulation, transformers or other equipment which contain dielectric fluid containing levels of polychlorinated biphenyls in excess of fifty (50) parts per million; (c) underground storage tanks; and (d) any other chemical, material or substance, exposure to which is prohibited, limited or regulated by any Governmental Authority.

"*Indemnified Parties*" means Lessor, its members, managers, officers, directors, shareholders, partners, employees, affiliates, subsidiaries, successors and assigns, including, but not limited to, any successors by merger, consolidation or acquisition of all or a substantial portion of the assets and business of Lessor.

"*Initial Term*" has the meaning set forth in Section 3.01.

"*Insolvency Event*" means (a) a Person's (i) failure to generally pay its debts as such debts become due; (ii) admitting in writing its inability to pay its debts generally; or (iii) making a general assignment for the benefit of creditors; (b) any proceeding being instituted by or against any Person (i) seeking to adjudicate it bankrupt or insolvent; (ii) seeking liquidation, dissolution, winding up, reorganization, arrangement, adjustment, protection, relief, or composition of it or its debts under any Law relating to bankruptcy, insolvency, or reorganization or relief of debtors; or (iii) seeking the entry of an order for relief or the appointment of a receiver, trustee, or other similar official for it or for any substantial part of its property, and in the case of any such proceeding instituted against any Person, either such proceeding shall remain undismissed for a period of one hundred twenty (120) days or any of the actions sought in such proceeding shall occur; or (c) any Person taking any corporate action to authorize any of the actions set forth above in this definition.

"*Insurance Premiums*" has the meaning in Section 6.05.

"*Law(s)*" means any constitution, statute, rule of law, code, ordinance, order, judgment, decree, injunction, rule, regulation, policy, requirement or administrative or judicial determination, even if unforeseen or extraordinary, of every duly constituted Governmental Authority, court or agency, now or hereafter enacted or in effect.

A-3

"*Lease Rate*" means a percentage equal to (a) the then-current Base Monthly Rental multiplied by twelve (12), divided by (b) the aggregate purchase price of the Property paid by Lessor (or Lessor's predecessor-in-interest).

"*Lease Term*" has the meaning described in Section 3.01.

"*Legal Requirements*" means the requirements of all present and future Laws (including, without limitation, Environmental Laws and Laws relating to accessibility to, usability by, and discrimination against, disabled individuals), all judicial and administrative interpretations thereof, including any judicial order, consent, decree or judgment, and all covenants, restrictions and conditions now or hereafter of record which may be applicable to Lessee or to the Property, or to the use, manner of use, occupancy, possession, operation, maintenance, alteration, repair or restoration of the Property, even if compliance therewith necessitates structural changes or improvements or results in interference with the use or enjoyment of the Property.

"*Lender*" means any lender in connection with any loan secured by Lessor's interest in the Property, and any servicer of any loan secured by Lessor's interest in the Property.

"*Lessee Entity*" or "*Lessee Entities*" means individually or collectively, as the context may require, Lessee and Guarantor, and all Affiliates thereof.

"*Lessee Reporting Entities*" means Lessee.

"*Lessee's Information*" has the meaning set forth in Section 17.05(b).

"*Lessor Entity*" or "*Lessor Entities*" means individually or collectively, as the context may require, Lessor and all Affiliates of Lessor.

"*Losses*" means any and all claims, suits, liabilities (including, without limitation, strict liabilities), actions, proceedings, obligations, debts, damages, losses, Costs, diminutions in value, fines, penalties, interest, charges, fees, judgments, awards, amounts paid in settlement and damages of whatever kind or nature, inclusive of bodily injury and property damage to third parties (including, without limitation, attorneys' fees and other Costs of defense).

"*Master Lease Agreement*" that certain Master Lease Agreement of even date herewith between STORE Master Funding XIII, LLC, as lessor, and Lessee with respect to 17 parcels of real property.

"*Material Adverse Effect*" means a material adverse effect on (a) the Property, including without limitation, the operation of the Property as a Permitted Facility and/or the value of the Property; (b) the contemplated business, condition, worth or operations of any Lessee Entity; (c) Lessee's ability to perform its obligations under this Lease; (d) Lessor's interests in the Property, this Lease or the other Transaction Documents; or (e) any Guarantor's ability to perform its obligations under the Guaranty.

"*Monetary Obligations*" means all Rental and all other sums payable or reimbursable by Lessee under this Lease to Lessor, to any third party on behalf of Lessor, or to any Indemnified Party.

A-4

"*Mortgages*" means, collectively, the mortgages, deeds of trust or deeds to secure debt, assignments of rents and leases, security agreements and fixture filings executed by Lessor for the benefit of Lender with respect to the Property, as such instruments may be amended, modified, restated or supplemented from time to time and any and all replacements or substitutions.

"*Net Award*" means (a) the entire award payable with respect to a Property by reason of a Condemnation whether pursuant to a judgment or by agreement or otherwise; or (b) the entire proceeds of any insurance required under Section 6.03 payable with respect to a Property, as the case may be, and in either case, less any Costs incurred by Lessor in collecting such award or proceeds.

"*OFAC Laws*" means Executive Order 13224 issued by the President of the United States, and all regulations promulgated thereunder, including, without limitation, the Terrorism Sanctions Regulations (31 CFR Part 595), the Terrorism List Governments Sanctions Regulations (31 CFR Part 596), the Foreign Terrorist Organizations Sanctions Regulations (31 CFR Part 597), and the Cuban Assets Control Regulations (31 CFR Part 515), and all other present and future federal, state and local Laws, ordinances, regulations, policies, lists (including, without limitation, the Specially Designated Nationals and Blocked Persons List) and any other requirements of any Governmental Authority (including without limitation, the U.S. Department of the Treasury Office of Foreign Assets Control) addressing, relating to, or attempting to eliminate, terrorist acts and acts of war, each as supplemented, amended or modified from time to time after the Effective Date, and the present and future rules, regulations and guidance documents promulgated under any of the foregoing, or under similar Laws, ordinances, regulations, policies or requirements of other states or localities.

"*Other Agreements*" means, collectively, all agreements and instruments now or hereafter entered into between, among or by (a) any of the Lessee Entities; and, or for the benefit of, (b) any of the Lessor Entities, including, without limitation, leases, promissory notes and guaranties, but excluding this Lease and all other Transaction Documents; including, (i) the Master Lease Agreement; (ii) that certain Lease Agreement of even date herewith between Lessor, as lessor, and Lessee with respect to the real property located at 1601 W. Prospect Road, Ashtabula, OH 44004, (iii) that certain Lease Agreement of even date herewith between Lessor, as lessor, and Lessee with respect to the real property located at 587 E. Main Street, Canfield, OH 44406, (iv) that certain Lease Agreement of even date herewith between Lessor, as lessor, and Lessee with respect to the real property located at 4896 Everhard Road NW, Canton, OH 44718,and/or (v) that certain Lease Agreement of even date herewith between Lessor, as lessor, and Lessee with respect to the real property located at 2945 East State Street, Hermitage, PA 16148, as each may be amended from time to time.

"*Partial Condemnation*" has the meaning set forth in Section 11.03.

"*Permitted Amounts*" shall mean, with respect to any given level of Hazardous Materials or Regulated Substances, that level or quantity of Hazardous Materials or Regulated Substances in any form or combination of forms which does not constitute a violation of any Environmental Laws and is customarily employed in, or associated with, similar businesses located in the state where the Property is located.

A-5

"*Permitted Facility*" means a Perkins Restaurant and Bakery, all related purposes such as ingress, egress and parking, and uses incidental thereto.

"*Person*" means any individual, partnership, corporation, limited liability company, trust, unincorporated organization, Governmental Authority or any other form of entity.

"*Personalty*" means any and all "goods" (excluding "inventory," and including, without limitation, all "equipment," "fixtures," appliances and furniture (as "goods," "inventory," "equipment" and "fixtures" are defined in the applicable Uniform Commercial Code then in effect in the applicable jurisdiction)) from time to time situated on or used in connection with the Property, whether now owned or held or hereafter arising or acquired, together with all replacements and substitutions therefore and all cash and non-cash proceeds (including insurance proceeds and any title and UCC insurance proceeds) and products thereof, and, in the case of tangible collateral, together with all additions, attachments, accessions, parts, equipment and repairs now or hereafter attached or affixed thereto or used in connection therewith.

"*Price Index*" means the Consumer Price Index which is designated for the applicable month of determination as the United States City Average for All Urban Consumers, All Items, Not Seasonally Adjusted, with a base period equaling 100 in 1982 - 1984, as published by the United States Department of Labor's Bureau of Labor Statistics or any successor agency.  In the event that the Price Index ceases to be published, its successor index measuring cost of living as published by the same Governmental Authority which published the Price Index shall be substituted and any necessary reasonable adjustments shall be made by Lessor and Lessee in order to carry out the intent of Section 4.02.  In the event there is no successor index measuring cost of living, Lessor shall reasonably select an alternative price index measuring cost of living that will constitute a reasonable substitute for the Price Index.

"Property" means the parcel of real estate legally described on <u>Exhibit B</u> attached hereto, all rights, privileges, and appurtenances associated therewith, and all buildings, fixtures and other improvements now or hereafter located on such real estate (whether or not affixed to such real estate).

"*Real Estate Taxes*" has the meaning set forth in Section 6.05.

"*Regulated Substances*" means "petroleum" and "petroleum-based substances" or any similar terms described or defined in any of the Environmental Laws and any applicable federal, state, county or local Laws applicable to or regulating USTs.

"*REIT*" means a real estate investment trust as defined under Section 856 of the Code.

"*Release*" means any presence, release, deposit, discharge, emission, leaking, spilling, seeping, migrating, injecting, pumping, pouring, emptying, escaping, dumping, disposing or other movement of Hazardous Materials, Regulated Substances or USTs or any Threatened Release.

"*Remediation*" means any response, remedial, removal, or corrective action, any activity to cleanup, detoxify, decontaminate, contain or otherwise remediate any Hazardous Materials,

4840-6699-3755.1
STORE/Campbells (Perkins)
Lease Agreement
115 Ludlow Street, Warren, PA 16365
File No. 7210/02-588.6

Regulated Substances or USTs, any actions to prevent, cure or mitigate any Release, any action to comply with any Environmental Laws or with any permits issued pursuant thereto, any inspection, investigation, study, monitoring, assessment, audit, sampling and testing, laboratory or other analysis, or any evaluation relating to any Hazardous Materials, Regulated Substances or USTs.

"*Rental*" means, collectively, the Base Annual Rental and the Additional Rental.

"*Rental Adjustment*" means an amount equal to the lesser of (a) 2% of the Base Annual Rental in effect immediately prior to the applicable Adjustment Date, or (b) 1.25 multiplied by the product of (i) the percentage change between the Price Index for the month which is two months prior to the Effective Date or the Price Index used for the immediately preceding Adjustment Date, as applicable, and the Price Index for the month which is two months prior to the applicable Adjustment Date; and (ii) the then current Base Annual Rental.

"*Requisition*" means any temporary requisition or confiscation of the use or occupancy of the Property by any Governmental Authority, civil or military, whether pursuant to an agreement with such Governmental Authority in settlement of or under threat of any such requisition or confiscation, or otherwise.

"*Reserve*" has the meaning in Section 6.04.

"*Securities*" has the meaning set forth in Section 17.10.

"*Securities Act*" means of the Securities Act of 1933, as amended.

"*Securitization*" has the meaning set forth in Section 17.10.

"*Successor Lessor*" has the meaning set forth in Section 13.03.

"*Taking*" means (a) any taking or damaging of all or a portion of the Property (i) in or by condemnation or other eminent domain proceedings pursuant to any Law, general or special; (ii) by reason of any agreement with any condemnor in settlement of or under threat of any such condemnation or other eminent domain proceeding; or (iii) by any other means; or (b) any de facto condemnation.  The Taking shall be considered to have taken place as of the later of the date actual physical possession is taken by the condemnor, or the date on which the right to compensation and damages accrues under the Law applicable to the Property.

"*Temporary Taking*" has the meaning set forth in Section 11.04.

"*Threatened Release*" means a substantial likelihood of a Release which requires action to prevent or mitigate damage to the soil, surface waters, groundwaters, land, stream sediments, surface or subsurface strata, ambient air or any other environmental medium comprising or surrounding the Property which may result from such Release.

"*Total Condemnation*" has the meaning set forth in Section 11.02.

"*Transaction*" has the meaning set forth in Section 14.01.

A-7

"*Transaction Documents*" means this Lease, the Guaranty and all documents related thereto.

"*U.S. Publicly Traded Entity*" means an entity whose securities are listed on a national securities exchange or quoted on an automated quotation system in the United States or a wholly-owned subsidiary of such an entity.

"*USTs*" means any one or combination of tanks and associated product piping systems used in connection with storage, dispensing and general use of Regulated Substances.

A-8

**EXHIBIT B**

**LEGAL DESCRIPTION AND
STREET ADDRESS OF THE PROPERTY**

**Street Address:**

| Address | City | ST | Zip | County |
|---|---|---|---|---|
| 115 Ludlow Street | Warren | PA | 16365 | Warren |

**Legal Description**:

**721002-588.6 115 Ludlow Street, Warren, PA 16365**

PARCEL NO. 1:

ALL THOSE CERTAIN pieces or parcels of land situate and being in the Borough of Warren (now City of Warren), County of Warren, and Commonwealth of Pennsylvania, and being Lots known and designated as numbers 295, 296, 297, 298, and 299 on the map or plot of lands of the West Warren Real Estate Company, which map or plot was duly recorded in Deed Book 88 at page 796 and Deed Book 115 at page 797 of the records of the Recorder of Deeds of Warren County, Pennsylvania, each lot having a frontage of about fifty (50) feet on the east side of Ludlow Street and extending back about One Hundred Fifty (150) feet.

PARCEL NO. 2:

ALL THAT CERTAIN piece or parcel of land situate in the Borough of Warren (now City of Warren), County of Warren and State of Pennsylvania, bounded and described as follows:

BEING Lots Nos. 244, 245, and 246 of the West Warren Real Estate Company Plat as numbered and described on a certain map recorded in Warren County Deed Book 115, at page 797.

PARCEL NO. 3:

ALL THAT CERTAIN piece or parcel of land lying and being in the City of Warren (formerly Borough of Warren), County of Warren and Commonwealth of Pennsylvania, being Lot Number Two hundred forty two (242) as laid down and numbered on the plan of Lots of the West Warren Real Estate Company, which said plan is recorded in the Recorder's Office of Warren County, Pennsylvania in Deed Book 88, page 796.

B-1

ALSO, ALL THAT CERTAIN piece or parcel of land situate, lying and being in the Borough of Warren (now City of Warren), County of Warren and Commonwealth of Pennsylvania, and being Lot Number 243 as laid down and numbered on the plan of Lots of the West Warren Real Estate Company, which plan is recorded in the Recorder's Office of Warren County in Deed Book 115, page 797.

BEING TAX MAP NO. WN-499-670000-000

BEING the same premises which Travaglini Enterprises, Inc., a Pennsylvania corporation, formerly Sanray Corporation, Successor by Merger with Golfview Manor, Inc., by Deed dated 02/01/2007, effective 02/06/2007 and recorded 04/26/2007 in Warren County at Record Book Volume 1693 Page 124, granted and conveyed unto Spirit Master Funding III, LLC, a Delaware limited liability company, in fee.

A-2

**EXHIBIT C**

**FORM OF AUTHORIZATION AGREEMENT – PRE-ARRANGED PAYMENTS**

Reference Number _____
I (We) (Tenant) authorize /_____\, (Servicer) to initiate entries identified below as required. Tenant further authorizes the bank below to post such entries to the identified checking account beginning with the payment draft date of ____/____/_____. A minimum of thirty (30) days advance notice is required to process first payment by ACH.

Bank Name_____Branch_____

City_____State_____Zip_____

— — — — — — — — —          — — — — — — — — — — — — — —

**\*\*\*Transit - ABA**                          **Account Number Information**

ACCOUNT TYPE\*\*\* Please specify checking or savings account (C/S) _____

**PLEASE FILL IN BANK INFORMATION CAREFULLY**
**ATTACH VOIDED CHECK FOR ACCOUNT VERIFICATION**

Automatic debits will be made on the payment due date established by the relevant lease documents, or the next subsequent business day if such date is not a business day. This authority may be terminated upon thirty days prior written notification from the Tenant to the servicer. Tenant has the right to stop payment of any entry by notification to the bank prior to the scheduled debit date. If an erroneous entry is initiated by the servicer to the Tenant's account, Tenant shall have the right to have the amount of such entry reversed by the bank. To initiate a reversal, the Tenant must notify the bank in writing that an error has occurred and request a reversal. Such notice must be within 15 calendar days after the Tenant receives the statement of account or other written notice from the bank identifying the error. Tenant hereby authorizes the servicer to impose a $60.00 returned item processing fee, subject to change, via ACH debit against the above-referenced account of the Tenant if a non-sufficient funds or stop payment item is charged against the servicer's account.

**Tenant**                                    **Tax Identification**

**Name**(s) _____**Number**  _____

**Date**_____

**Print Authorized Name**   _____

**Authorized Signature** _____

**Print Authorized Name**   _____

**Authorized Signature** _____

**Contact Phone Number** _____ **Fax Number**  _____

**Email Address**: _____

**Return Original to**:   /_____\
                         **Attn:** /_____\
                         /_____\
                         /_____\
                         **Fax Number:**/_____\

C-1

**EXHIBIT D**

**STATE-SPECIFIC PROVISIONS**

<u>**PENNSYLVANIA**</u>:

Lessor and Lessee agree as follows:

1.      The following is added as a new Section 12.05 to the Lease:

      12.05   **<u>Proceedings</u>**.  In any action of ejectment and/or for Rental, Lessor shall first cause to be filed in such action an affidavit made by it or someone acting for it, setting forth the facts necessary to authorize the entry of judgment, and, if a true copy of this Lease (and of the truth of the copy such affidavit shall be sufficient evidence) be filed in such action, it shall not be necessary to file the original as a warrant of attorney, any rule of Court, custom or practice to the contrary notwithstanding.

2.      The following is added as a new Section 12.06 to the Lease:

      12.06   **Waiver of Notice to Quit**.  Lessee agrees to give up certain legal rights as provided by the Landlord and Tenant Act of 1951, as amended, 68 P.S. § 250.101, *et seq*., including, but not limited to the ten (10) or thirty (30) day notice period which is contained in § 501 thereof, or any other notice period established by applicable law.  No notice will be required to be given by Lessor to Lessee to leave and give up the Property.  Lessee will be asked to leave the Property without notice under any of the following conditions:

      (a)      Lessee does not leave the Property at the end of the Lease Term.

      (b)      Lessee breaks any of the terms or conditions of this Lease.

      (c)      Lessee fails, upon demand, to make all Rental payments and other payments when due.

D-1

**SCHEDULE 9.03**

**SUPPLEMENTAL FINANCIAL INFORMATION**

Lessee shall deliver the following information in connection with delivery of the corporate financial statements required in Section 9.03 of the Lease.

**Corporate Financial Reporting Certificate**

Company:

For the Qtr or FYE ending                                            _____

# of months represented                                            _____

Number of units operating at the end of reporting period          _____

**EBITDAR Calculation:**

Net Income                                                         _____

   Plus: Interest Expense                                       _____
   Plus: Taxes                                                  _____
   Plus: Depreciation & Amortization                            _____
   Plus: Operating Lease Expense                                _____
   Plus: Any non-recurring expenses (please clarify below)      _____
   Plus: Any other non-cash expenses (please clarify below)     _____
     **EBITDAR**                                            _____

**Items required to be broken out of Balance Sheet:**
   Current Portion of Long-Term Debt                            _____
   Current Portion of any Capital Leases                        _____
   Senior Third-Party Debt Balances                             _____
   Subordinate/Related Party Debt Balances                      _____

Explanations of non-recurring and non-cash items:

```
┌─────────────────────────────────────────────────┐
│                                                   │
│                                                   │
│                                                   │
│                                                   │
└─────────────────────────────────────────────────┘
```

Lessee shall deliver the following information in connection with delivery of the unit-level financial statements required in Section 9.03 of the Lease.

**STORE Capital Unit-Level Financial
Reporting Certificate**

| | 1 | 2 | 3 |
|---|---|---|---|
| Unit ID: | | | |
| For the Qtr or FYE ending | _____ | _____ | _____ |
| # of months represented | _____ | _____ | _____ |

**Store-Level pre-corporate overhead
EBITDAR Calculation:**

| | 1 | 2 | 3 |
|---|---|---|---|
| Store-Level Net Income | _____ | _____ | _____ |
| Plus: Interest Expense | _____ | _____ | _____ |
| Plus: Taxes | _____ | _____ | _____ |
| Plus: Depreciation & Amortization | _____ | _____ | _____ |
| Plus: Property Rent Expense (base rent + any % rent) | _____ | _____ | _____ |
| Plus: Any corporate overhead allocations to the unit | _____ | _____ | _____ |
| Plus: Any non-recurring expenses (please clarify below) | _____ | _____ | _____ |
| Plus: Any other non-cash expenses (please clarify below) | _____ | _____ | _____ |
| **EBITDAR** | _____ | _____ | _____ |

**Items required to be broken out on unit-level
profit and loss statement:**

| | 1 | 2 | 3 |
|---|---|---|---|
| Cost Goods Sold | _____ | _____ | _____ |
| Labor Expenses | _____ | _____ | _____ |

Explanations of non-recurring and non-cash items:

ii

# EXHIBIT I

**LEASE AGREEMENT**

**THIS LEASE AGREEMENT** (this "Lease") is made as of February 12, 2018 (the "Effective Date"), by and between **STORE CAPITAL ACQUISITIONS, LLC**, a Delaware limited liability company ("Lessor"), whose address is 8377 E. Hartford Drive, Suite 100, Scottsdale, Arizona 85255, and **5171 CAMPBELLS LAND CO., INC.**, a Pennsylvania corporation ("Lessee"), whose address is 6201 Steubenville Pike, Suite 100, McKees Rocks, Pennsylvania 15136.  Capitalized terms not defined herein shall have the meanings set forth in Exhibit A hereto.

In consideration of the mutual covenants and agreements contained in this Lease, intending to be legally bound, Lessor and Lessee covenant and agree as follows:

**ARTICLE I**

**BASIC LEASE TERMS**

**Section 1.01.  Property**.  The street address and legal description of the Property is set forth on Exhibit B attached hereto and incorporated herein.

**Section 1.02.  Initial Term Expiration Date**.  February 28, 2038.

**Section 1.03.  Extension Options**.   Four (4) extensions of five (5) years each, as described in Section 3.02.

**Section 1.04.  Term Expiration Date (if fully extended)**.  February 28, 2058.

**Section 1.05.  Initial Base Annual Rental**.  $86,318.05, as described in Article IV.

**Section 1.06.  Rental Adjustment**.  The lesser of (i) 2%, or (ii) 1.25 times the change in the Price Index, as described in Section 4.02.

**Section 1.07.  Adjustment Date**. March 1, 2019 and annually on March 1st thereafter during the Lease Term (including any Extension Term).

**Section 1.08.  Guarantors**.  William Kane, Frank Kane and Ron Linaburg.

**Section 1.09.  Intentionally Deleted**.

**Section 1.10.  Lessee Tax Identification No**.  46-2488070.

**Section 1.11.  Lessor Tax Identification No.**  45-2674893.

**ARTICLE II**

**LEASE OF PROPERTY**

**Section 2.01.  Lease**.  In consideration of Lessee's payment of the Rental and other Monetary Obligations and Lessee's performance of all other obligations hereunder, Lessor

hereby leases to Lessee, and Lessee hereby takes and hires, the Property, "AS IS" and "WHERE IS" without representation or warranty by Lessor, and subject to the existing state of title, the parties in possession, any statement of facts which an accurate survey or physical inspection might reveal, and all Legal Requirements now or hereafter in effect.

**Section 2.02.  Quiet Enjoyment**.  So long as Lessee shall pay the Rental and other Monetary Obligations provided in this Lease and shall keep and perform all of the terms, covenants and conditions on its part contained herein and subject to the rights of Lessor under Section 12.02, Lessee shall have, subject to the terms and conditions set forth herein, the right to the peaceful and quiet enjoyment and occupancy of the Property.

**ARTICLE III**

**LEASE TERM; EXTENSION**

**Section 3.01. Initial Term**.   The initial term of this Lease ("Initial Term") shall commence as of the Effective Date and shall expire at midnight on February 28, 2038, unless terminated sooner as provided in this Lease and as may be extended as provided herein.  The time period during which this Lease shall actually be in effect, including any Extension Term, is referred to as the "Lease Term."

**Section 3.02.  Extensions**.   Unless this Lease has expired or has been sooner terminated, or an Event of Default has occurred and is continuing at the time any extension option is exercised, Lessee shall have the right and option (each, an "Extension Option") to extend the Initial Term for all and not less than the Property for four (4) additional successive periods of five (5) years each (each, an "Extension Term"), pursuant to the terms and conditions of this Lease then in effect.

**Section 3.03.  Notice of Exercise**.  Lessee may only exercise the Extension Options by giving written notice thereof to Lessor of its election to do so no later than one hundred twenty (120) days prior to the expiration of the then-current Lease Term.  If written notice of the exercise of any Extension Option is not received by Lessor by the applicable dates described above, then this Lease shall terminate on the last day of the Initial Term or, if applicable, the last day of the Extension Term then in effect.  Upon the request of Lessor or Lessee, the parties hereto will, at the expense of Lessee, execute and exchange an instrument in recordable form setting forth the extension of the Lease Term in accordance with this Section 3.03.

**Section 3.04.  Removal of Personalty**.  Upon the expiration of the Lease Term, and if Lessee is not then in breach hereof, Lessee may remove from the Property all personal property belonging to Lessee.  Lessee shall repair any damage caused by such removal and shall leave the Property clean and in good and working condition and repair inside and out, subject to normal wear and tear, casualty and condemnation.  Any property of Lessee left on the Property on the tenth day following the expiration of the Lease Term shall, at Lessor's option, automatically and immediately become the property of Lessor.

2

## ARTICLE IV

## RENTAL AND OTHER MONETARY OBLIGATIONS

**Section 4.01.  Base Monthly Rental**.  During the Lease Term, on or before the first day of each calendar month, Lessee shall pay in advance the Base Monthly Rental then in effect.  If the Effective Date is a date other than the first day of the month, Lessee shall pay to Lessor on the Effective Date the Base Monthly Rental prorated by multiplying the Base Monthly Rental by a fraction, the numerator of which is the number of days remaining in the month (including the Effective Date) for which Rental is being paid, and the denominator of which is the total number of days in such month.

**Section 4.02.  Adjustments**.  During the Lease Term (including any Extension Term), on the first Adjustment Date and on each Adjustment Date thereafter, the Base Annual Rental shall increase by an amount equal to the Rental Adjustment; *provided, however*, that in no event shall Base Annual Rental be reduced as a result of the application of the Rental Adjustment.

**Section 4.03.  Additional Rental**.  Lessee shall pay and discharge, as additional rental ("Additional Rental"), all sums of money required to be paid by Lessee under this Lease which are not specifically referred to as Rental.  Lessee shall pay and discharge any Additional Rental when the same shall become due, provided that amounts which are billed to Lessor or any third party, but not to Lessee, shall be paid within fifteen (15) days after Lessor's demand for payment thereof or, if earlier, when the same are due.  In no event shall Lessee be required to pay to Lessor any item of Additional Rental that Lessee is obligated to pay and has paid to any third party pursuant to any provision of this Lease.

**Section 4.04.  Rentals to be Net to Lessor**.   The Base Annual Rental payable hereunder shall be net to Lessor, so that this Lease shall yield to Lessor the Rentals specified during the Lease Term, and all Costs and obligations of every kind and nature whatsoever relating to the Property shall be performed and paid by Lessee.  Lessee shall perform all of its obligations under this Lease at its sole cost and expense. All Rental and other Monetary Obligations which Lessee is required to pay hereunder shall be the unconditional obligation of Lessee and shall be payable in full when due and payable, without notice or demand, and without any setoff, abatement, deferment, deduction or counterclaim whatsoever.

**Section 4.05.  ACH Authorization**.  Upon execution of this Lease, Lessee shall deliver to Lessor a complete Authorization Agreement – Pre-Arranged Payments in the form of Exhibit C attached hereto and incorporated herein by this reference, together with a voided check for account verification, establishing arrangements whereby payments of the Base Monthly Rental are transferred by Automated Clearing House Debit initiated by Lessor from an account established by Lessee at a United States bank or other financial institution to such account as Lessor may designate.  Lessee shall continue to pay all Rental by Automated Clearing House Debit unless otherwise directed by Lessor.

**Section 4.06.  Late Charges; Default Interest**.   Any delinquent payment shall, in addition to any other remedy of Lessor, incur a late charge of five percent (5%) (which late charge is intended to compensate Lessor for the cost of handling and processing such delinquent payment and should not be considered interest) and bear interest at the Default

4814-6639-4203.1
STORE/Campbells (Perkins)
Lease Agreement
587 E. Main Street, Canfield, OH 44406
File No. 7210/02-588.5

Rate, such interest to be computed from and including the date such payment was due through and including the date of the payment; *provided, however*, in no event shall Lessee be obligated to pay a sum of late charge and interest higher than the maximum legal rate then in effect.

**Section 4.07.  Holdover**.  If Lessee remains in possession of the Property after the expiration of the term hereof, Lessee, at Lessor's option and within Lessor's sole discretion, may be deemed a tenant on a month-to-month basis and shall continue to pay Rentals and other Monetary Obligations in the amounts herein provided, except that the Base Monthly Rental shall be automatically increased to one hundred fifty percent (150%) of the last Base Monthly Rental payable under this Lease, and Lessee shall comply with all the terms of this Lease; *provided that* nothing herein nor the acceptance of Rental by Lessor shall be deemed a consent to such holding over.  Lessee shall defend, indemnify, protect and hold the Indemnified Parties harmless from and against any and all Losses resulting from Lessee's failure to surrender possession upon the expiration of the Lease Term.

**Section 4.08.  Guaranty**.  On or before the execution of this Lease, Lessee shall cause Guarantors to execute and deliver to Lessor the Guaranty.


# ARTICLE V

# REPRESENTATIONS AND WARRANTIES OF LESSEE

The representations and warranties of Lessee contained in this Article V are being made to induce Lessor to enter into this Lease, and Lessor has relied, and will continue to rely, upon such representations and warranties.  Lessee represents and warrants to Lessor as follows:

**Section 5.01.  Organization, Authority and Status of Lessee**.  Lessee has been duly organized or formed, is validly existing and in good standing under the laws of its state of formation and is qualified as a foreign corporation to do business in any jurisdiction where such qualification is required.  All necessary and appropriate action has been taken to authorize the execution, delivery and performance by Lessee of this Lease and of the other documents, instruments and agreements provided for herein.  Lessee is not, and if Lessee is a "disregarded entity," the owner of such disregarded entity is not, a "nonresident alien," "foreign corporation," "foreign partnership," "foreign trust," "foreign estate," or any other "person" that is not a "United States Person" as those terms are defined in the Code and the regulations promulgated thereunder.  The Person who has executed this Lease on behalf of Lessee is duly authorized to do so.

**Section 5.02.  Enforceability**.   This Lease constitutes the legal, valid and binding obligation of Lessee, enforceable against Lessee in accordance with its terms.

**Section 5.03.  Litigation**.   There are no suits, actions, proceedings or investigations pending, or to the best of its knowledge, threatened against or involving any Lessee Entity or the Property before any arbitrator or Governmental Authority which might reasonably result in any Material Adverse Effect.

4814-6639-4203.1
STORE/Campbells (Perkins)
Lease Agreement
587 E. Main Street, Canfield, OH 44406
File No. 7210/02-588.5

**Section 5.04. Absence of Breaches or Defaults**.  Lessee is not in default under any document, instrument or agreement to which Lessee is a party or by which Lessee, the Property or any of Lessee's property is subject or bound, which has had, or could reasonably be expected to result in, a Material Adverse Effect.  The authorization, execution, delivery and performance of this Lease and the documents, instruments and agreements provided for herein will not result in any breach of or default under any document, instrument or agreement to which Lessee is a party or by which Lessee, the Property or any of Lessee's property is subject or bound.

**Section 5.05. Compliance with OFAC Laws**.  None of the Lessee Entities, and no individual or entity owning directly or indirectly any interest in any of the Lessee Entities, is an individual or entity whose property or interests are subject to being blocked under any of the OFAC Laws or is otherwise in violation of any of the OFAC Laws; *provided, however*, that the representation contained in this sentence shall not apply to any Person to the extent such Person's interest is in or through a U.S. Publicly Traded Entity.

**Section 5.06. Solvency**.  There is no contemplated, pending or threatened Insolvency Event or similar proceedings, whether voluntary or involuntary, affecting Lessee or any Lessee Entity.  Lessee does not have unreasonably small capital to conduct its business.

**Section 5.07. Ownership**.  None of (i) Lessee, (ii) any Affiliate of Lessee, or (iii) any Person owning ten percent (10%) or more of Lessee, owns, directly or indirectly, ten percent (10%) or more of the total voting power or total value of capital stock in STORE Capital Corporation.

**Section 5.08. Franchise Agreement**.  Lessee has entered into one or more franchise, license and/or area development agreements with Franchisor (each, a "Franchise Agreement") for conduct of the business at the Property.  Each such Franchise Agreement is valid, binding and in full force and effect, permits Lessee to operate Permitted Facilities on the Property, and has a term which will not expire prior to the Lease Term.

## ARTICLE VI

## TAXES AND ASSESSMENTS; UTILITIES; INSURANCE

**Section 6.01. Taxes**.

(a)   ***Payment***.  Subject to the provisions of Section 6.01(b) below, Lessee shall pay, prior to the earlier of delinquency or the accrual of interest on the unpaid balance, all taxes and assessments of every type or nature assessed against or imposed upon the Property, Lessee or Lessor during the Lease Term related to or arising out of this Lease and the activities of the parties hereunder, including without limitation, (i) all taxes or assessments upon the Property or any part thereof and upon any personal property, trade fixtures and improvements located on the Property, whether belonging to Lessor or Lessee, or any tax or charge levied in lieu of such taxes and assessments; (ii) all taxes, charges, license fees and or similar fees imposed by reason of the use of the Property by Lessee; (iii) all excise, franchise, transaction, privilege, license, sales, use and other taxes upon the Rental or other Monetary Obligations

5

hereunder, the leasehold estate of either party or the activities of either party pursuant to this Lease; and (iv) all franchise, privilege or similar taxes of Lessor calculated on the value of the Property or on the amount of capital apportioned to the Property. Notwithstanding anything in clauses (i) through (iv) to the contrary, Lessee shall not be obligated to pay or reimburse Lessor for any taxes based on the net income of Lessor.

(b)     ***Right to Contest***.  Within thirty (30) days after each tax and assessment payment is required by this Section 6.01 to be paid, Lessee shall provide Lessor with evidence reasonably satisfactory to Lessor that taxes and assessments have been timely paid by Lessee.   In the event Lessor receives a tax bill, Lessor shall use commercially reasonable efforts to forward said bill to Lessee within fifteen (15) days of Lessor's receipt thereof.   Lessee may, at its own expense, contest or cause to be contested (in the case of any item involving more than $10,000, after prior written notice to Lessor, which shall be given within fifteen (15) days of Lessee's determination to contest any matter as permitted herein), by appropriate legal proceedings conducted in good faith and with due diligence, any above-described item or lien with respect thereto, provided that (i) neither the Property nor any interest therein would be in any danger of being sold, forfeited or lost by reason of such proceedings; (ii) no Event of Default has occurred and is continuing; (iii) if and to the extent required by the applicable taxing authority and/or Lessor, Lessee posts a bond or takes other steps acceptable to such taxing authority and/or Lessor that removes such lien or stays enforcement thereof; (iv) Lessee shall promptly provide Lessor with copies of all notices received or delivered by Lessee and filings made by Lessee in connection with such proceeding; and (v) upon termination of such proceedings, it shall be the obligation of Lessee to pay the amount of any such tax and assessment or part thereof as finally determined in such proceedings, the payment of which may have been deferred during the prosecution of such proceedings, together with any costs, fees (including attorneys' fees and disbursements), interest, penalties or other liabilities in connection therewith.   Lessor shall at the request of Lessee, execute or join in the execution of any instruments or documents necessary in connection with such contest or proceedings, but Lessor shall incur no cost or obligation thereby.

**Section 6.02.  Utilities**.  Lessee shall contract, in its own name, for and pay when due all charges for the connection and use of water, gas, electricity, telephone, garbage collection, sewer use and other utility services supplied to the Property during the Lease Term.  Under no circumstances shall Lessor be responsible for any interruption of any utility service.

**Section 6.03.  Insurance**.

(a)     ***Coverage***.  Throughout the Lease Term, Lessee shall maintain, with respect to the Property, at its sole expense, the following types and amounts of insurance, in addition to such other insurance as Lessor may reasonably require from time to time:

(i)     Insurance against loss or damage to real property and personal property under an "all risk" or "special form" insurance policy, which shall include coverage against all risks of direct physical loss, including but not limited to loss by fire, lightning, wind, terrorism, and other risks normally included in the

4814-6639-4203.1
STORE/Campbells (Perkins)
Lease Agreement
587 E. Main Street, Canfield, OH 44406
File No. 7210/02-588.5

standard ISO special form (and shall also include National Flood and Excess Flood insurance for the Property located in Flood Zone A or Flood Zone V, as designated by FEMA, or otherwise located in a flood zone area identified by FEMA as a 100-year flood zone or special hazard area, and earthquake insurance if the Property is located within a moderate to high earthquake hazard zone as determined by an approved insurance company set forth in Section 6.03(b)(x) below).   Such policy shall also include soft costs, a joint loss agreement, coverage for ordinance or law covering the loss of value of the undamaged portion of the Property, costs to demolish and the increased costs of construction if any of the improvements located on, or the use of, the Property shall at any time constitute legal non-conforming structures or uses.  Ordinance or law limits shall be in an amount equal to the full replacement cost for the loss of value of the undamaged portion of the Property and no less than 25% of the replacement cost for costs to demolish and the increased cost of construction, or in an amount otherwise specified by Lessor.  Such insurance shall be in amounts not less than 100% of the full insurable replacement cost values (without deduction for depreciation), with an agreed amount endorsement or without any coinsurance provision, and with sublimits satisfactory to Lessor, as determined from time to time at Lessor's request but not more frequently than once in any 12-month period.

(ii)    Commercial general liability insurance, including products and completed operation liability, covering Lessor and Lessee against bodily injury liability, property damage liability and personal and advertising injury, including without limitation any liability arising out of the ownership, maintenance, repair, condition or operation of every Property or adjoining ways, streets, parking lots or sidewalks.   Such insurance policy or policies shall contain a broad form contractual liability endorsement under which the insurer agrees to insure Lessee's obligations under Article X hereof to the extent insurable, and a "severability of interest" clause or endorsement which precludes the insurer from denying the claim of Lessee or Lessor because of the negligence or other acts of the other, shall be in amounts of not less than $10,000,000 per occurrence for bodily injury and property damage, and $10,000,000 general aggregate per location, or such higher limits as Lessor may reasonably require from time to time, and shall be of form and substance satisfactory to Lessor.  Such limits of insurance can be acquired through Commercial General liability and Umbrella liability policies.

(iii)    Workers' compensation and Employers Liability insurance with statutorily mandated limits covering all persons employed by Lessee on the Property in connection with any work done on or about the Property for which claims for death or bodily injury could be asserted against Lessor, Lessee or the Property.

(iv)    Business interruption insurance including Rental Value Insurance payable to Lessor at all locations for a period of not less than twelve (12) months. Such insurance is to follow the form of the real property "all risk" or "special form"

4814-6639-4203.1
STORE/Campbells (Perkins)
Lease Agreement
587 E. Main Street, Canfield, OH 44406
File No. 7210/02-588.5

coverage and is not to contain a co-insurance clause.  Such insurance is to have a minimum of 180 days of extended period of indemnity.

(v)     Automobile liability insurance, including owned, non-owned and hired car liability insurance for combined limits of liability of $5,000,000 per occurrence.  The limits of liability can be provided in a combination of an automobile liability policy and an umbrella liability policy.

(vi)    Comprehensive Boiler and Machinery or Equipment Breakdown Insurance against loss or damage from explosion of any steam or pressure boilers or similar apparatus, if any, and other building equipment including HVAC units located in or about the Property and in an amount equal to the lesser of 25% of the 100% replacement cost of the Property or $5,000,000.

(vii)   Such additional and/or other insurance and in such amounts as at the time is customarily carried by prudent owners or tenants with respect to improvements and personal property similar in character, location and use and occupancy to the Property.

(b)     ***Insurance Provisions***.  All insurance policies shall:

(i)     provide for a waiver of subrogation by the insurer as to claims against Lessor, its employees and agents;

(ii)    be primary and provide that any "other insurance" clause in the insurance policy shall exclude any policies of insurance maintained by Lessor and the insurance policy shall not be brought into contribution with insurance maintained by Lessor;

(iii)   contain deductibles not to exceed $25,000;

(iv)    contain a standard non-contributory mortgagee clause or endorsement in favor of any Lender designated by Lessor;

(v)     provide that the policy of insurance shall not be terminated, cancelled or amended without at least thirty (30) days' prior written notice to Lessor and to any Lender covered by any standard mortgagee clause or endorsement;

(vi)    be in amounts sufficient at all times to satisfy any coinsurance requirements thereof;

(vii)   except for workers' compensation insurance referred to in Section 6.03(a)(iii) above, name Lessor and any Lessor Affiliate or Lender requested by Lessor, as an "additional insured" with respect to liability insurance, and as an "additional named insured" or "additional insured" with respect to real property and rental value insurance, as appropriate and as their interests may appear;

8

(viii)     be evidenced by delivery to Lessor and any Lender designated by Lessor of an Acord Form 28 for property, business interruption and boiler & machinery coverage (or any other form requested by Lessor) and an Acord Form 25 for commercial general liability, workers' compensation and umbrella coverage (or any other form requested by Lessor); provided that in the event that either such form is no longer available, such evidence of insurance shall be in a form reasonably satisfactory to Lessor and any Lender designated by Lessor; and

(ix)     be issued by insurance companies licensed to do business in the state where the Property is located and which are rated no less than A-X by Best's Insurance Guide or are otherwise approved by Lessor.

(c)     **Additional Obligations**.  It is expressly understood and agreed that (i) if any insurance required hereunder, or any part thereof, shall expire, be withdrawn, become void by breach of any condition thereof by Lessee, or become void or in jeopardy by reason of the failure or impairment of the capital of any insurer, Lessee shall immediately obtain new or additional insurance reasonably satisfactory to Lessor and any Lender designated by Lessor; (ii) the minimum limits of insurance coverage set forth in this Section 6.03 shall not limit the liability of Lessee for its acts or omissions as provided in this Lease; (iii) Lessee shall procure policies for all insurance for periods of not less than one year and shall provide to Lessor and any servicer or Lender of Lessor certificates of insurance or, upon Lessor's request, duplicate originals of insurance policies evidencing that insurance satisfying the requirements of this Lease is in effect at all times; (iv) Lessee shall pay as they become due all premiums for the insurance required by this Section 6.03; (v) in the event that Lessee fails to comply with any of the requirements set forth in this Section 6.03, within ten (10) days of the giving of written notice by Lessor to Lessee, (A) Lessor shall be entitled to procure such insurance; and (B) any sums expended by Lessor in procuring such insurance shall be Additional Rental and shall be repaid by Lessee, together with interest thereon at the Default Rate, from the time of payment by Lessor until fully paid by Lessee immediately upon written demand therefor by Lessor; and (vi) Lessee shall maintain all insurance policies required in this Section 6.03 not to be cancelled, invalidated or suspended on account of the conduct of Lessee, its officers, directors, managers, members, employees or agents, or anyone acting for Lessee or any subtenant or other occupant of the Property, and shall comply with all policy conditions and warranties at all times to avoid a forfeiture of all or a part of any insurance payment.

(d)     **Blanket Policies**.  Notwithstanding anything to the contrary in this Section 6.03, any insurance which Lessee is required to obtain pursuant to this Section 6.03 may be carried under a "blanket" policy or policies covering other properties or liabilities of Lessee provided that such "blanket" policy or policies otherwise comply with the provisions of this Section 6.03.

**Section 6.04. Environmental Insurance**.  Throughout the Lease Term, Lessee shall maintain, with respect to the Property, at its sole cost and expense, the Environmental Policy in substantially similar form, substance, and coverage to the Environmental Policy in effect on the Effective Date (or otherwise be in form and substance satisfactory to Lessor in its sole

4814-6639-4203.1
STORE/Campbells (Perkins)
Lease Agreement
587 E. Main Street, Canfield, OH 44406
File No. 7210/02-588.5

discretion).  Lessor and Lessee each acknowledge and agree that (i) no party shall amend or terminate the Environmental Policy without the prior written consent of the other party; and (ii) this Lease shall be referenced as an "insured contract" under the Environmental Policy. Notwithstanding the forgoing, in the event that Lessor shall be able to include such Property in the Master Environmental Policy, such inclusion shall satisfy Lessee's obligation to maintain the Environmental Policy, provided that Lessee reimburse Lessor for the Property's reasonable pro rata share of the premium paid by Lessor for the Master Environmental Policy.

**Section 6.05. Tax Impound**.  Upon the occurrence of an Event of Default and with respect to each Event of Default, in addition to any other remedies, Lessor may require Lessee to pay to Lessor on the first day of each month the amount that Lessor reasonably estimates will be necessary in order to accumulate with Lessor sufficient funds in an impound account (which shall not be deemed a trust fund) (the "Reserve") for Lessor to pay any and all real estate taxes ("Real Estate Taxes") for the Property for the ensuing twelve (12) months, or, if due sooner, Lessee shall pay the required amount immediately upon Lessor's demand therefor.  Lessor shall, upon prior written request of Lessee, provide Lessee with evidence reasonably satisfactory to Lessee that payment of the Real Estate Taxes was made in a timely fashion.  In the event that the Reserve does not contain sufficient funds to timely pay any Real Estate Taxes, upon Lessor's written notification thereof, Lessee shall, within five (5) Business Days of such notice, provide funds to Lessor in the amount of such deficiency.  Lessor shall pay or cause to be paid directly to the applicable taxing authorities any Real Estate Taxes then due and payable for which there are funds in the Reserve; *provided, however,* that in no event shall Lessor be obligated to pay any Real Estate Taxes in excess of the funds held in the Reserve, and Lessee shall remain liable for any and all Real Estate Taxes, including fines, penalties, interest or additional costs imposed by any taxing authority (unless incurred as a result of Lessor's failure to timely pay Real Estate Taxes for which it had funds in the Reserve).  Lessee shall cooperate fully with Lessor in assuring that the Real Estate Taxes are timely paid.  Lessor may deposit all Reserve funds in accounts insured by any federal or state agency and may commingle such funds with other funds and accounts of Lessor.  Interest or other gains from such funds, if any, shall be the sole property of Lessor. Upon an Event of Default, in addition to any other remedies, Lessor may apply all impounded funds in the Reserve against any sums due from Lessee to Lessor.  Lessor shall give to Lessee an annual accounting showing all credits and debits to and from such impounded funds received from Lessee.

## ARTICLE VII

## MAINTENANCE; ALTERATIONS

**Section 7.01. Condition of Property; Maintenance**.  Lessee hereby accepts the Property "AS IS" and "WHERE IS" with no representation or warranty of Lessor as to the condition thereof.  Lessee shall, at its sole cost and expense, be responsible for (a) keeping all of the building, structures and improvements erected on the Property in good order and repair, free from actual or constructive waste; (b) the repair or reconstruction of any building, structures or improvements erected on the Property damaged or destroyed by a Casualty; (c) subject to Section 7.02, making all necessary structural, non-structural, exterior and interior repairs and replacements to any building, structures or improvements erected on the Property; (d) operating, remodeling, updating and modernizing the Property in accordance with those standards adopted from time to time on a system-wide basis for the Permitted Facilities; (e)

10

(i) ensuring that no party encroaches upon the Property, (ii) protecting, defending, indemnifying, releasing and holding the Indemnified Parties harmless from and against any and all claims and Losses arising out of or in any way relating to any encroachments and/or activities upon the Property caused by any Person; and (iii) prosecuting any claims that Lessee seeks to bring against any Person relating to Lessee's use and possession of the Property; and (f) paying all operating costs of the Property in the ordinary course of business.  Lessee waives any right to require Lessor to maintain, repair or rebuild all or any part of the Property or make repairs at the expense of Lessor pursuant to any Legal Requirements at any time in effect.

Section 7.02.  Alterations and Improvements.  During the Lease Term, Lessee shall not alter the exterior, structural, plumbing or electrical elements of the Property in any manner without the consent of Lessor, which consent shall not be unreasonably withheld or conditioned; *provided, however*, Lessee may undertake nonstructural alterations to the Property, individually, costing less than $25,000 without Lessor's prior written consent.  If Lessor's consent is required hereunder and Lessor consents to the making of any such alterations, the same shall be made by Lessee at Lessee's sole expense by a licensed contractor and according to plans and specifications approved by Lessor and subject to such other conditions as Lessor shall reasonably require.  Any work at any time commenced by Lessee on the Property shall be prosecuted diligently to completion, shall be of good workmanship and materials and shall comply fully with all the terms of this Lease and all Legal Requirements.  Upon completion of any alterations individually costing $25,000 or more, Lessee shall promptly provide Lessor with evidence of full payment to all laborers and materialmen contributing to the alterations.  Additionally, upon completion of any alterations, Lessee shall promptly provide Lessor with (a) an architect's certificate certifying the alterations to have been completed in conformity with the plans and specifications (if the alterations are of such a nature as would require the issuance of such a certificate from the architect); (b) a certificate of occupancy (if the alterations are of such a nature as would require the issuance of a certificate of occupancy); and (c) any other documents or information reasonably requested by Lessor.  Lessee shall keep the Property free from any liens arising out of any work performed on, or materials furnished to, the Property.  Lessee shall execute and file or record, as appropriate, a "Notice of Non-Responsibility," or any equivalent notice permitted under applicable Law in the state where the Property is located which provides that Lessor is not responsible for the payment of any costs or expenses relating to the additions or alterations.  Any addition to or alteration of the Property shall be deemed a part of the Property and belong to Lessor, and Lessee shall execute and deliver to Lessor such instruments as Lessor may require to evidence the ownership by Lessor of such addition or alteration.

Section 7.03.  Encumbrances.  During the Lease Term, Lessor shall have the right to grant easements on, over, under and above the Property without the prior consent of Lessee, provided that such easements will not materially interfere with Lessee's use of the Property.  Lessee shall comply with and perform all obligations of Lessor under all easements, declarations, covenants, restrictions and other items of record now or hereafter encumbering the Property.  Without Lessor's prior written consent, Lessee shall not grant any easements on, over, under or above the Property.

4814-6639-4203.1
STORE/Campbells (Perkins)
Lease Agreement
587 E. Main Street, Canfield, OH 44406
File No. 7210/02-588.5

# ARTICLE VIII

## USE OF THE PROPERTY; COMPLIANCE

**Section 8.01.  Use**.   During the Lease Term, the Property shall be used solely for the operation of a Permitted Facility.  Except during periods when a Property is untenantable due to Casualty or Condemnation (and provided that Lessee continues to strictly comply with the other terms and conditions of this Lease), Lessee shall at all times during the Lease Term occupy the Property and shall diligently operate its business on the Property.  In the event that Lessee shall change the use of the Property or the concept or brand operated on the Property, only as may be expressly permitted herein or consented to by Lessor in writing, Lessee shall provide Lessor with written notice of any such change and copies of the franchise agreement(s) related to such new concept or brand, if any.

**Section 8.02.  Compliance**.   Lessee's use and occupation of the Property, and the condition thereof, shall, at Lessee's sole cost and expense, comply fully with all Legal Requirements and all restrictions, covenants and encumbrances of record, and any owner obligations under such Legal Requirements, or restrictions, covenants and encumbrances of record, with respect to the Property, in either event, the failure with which to comply could have a Material Adverse Effect.  Without in any way limiting the foregoing provisions, Lessee shall comply with all Legal Requirements relating to anti-terrorism, trade embargos, economic sanctions, Anti-Money Laundering Laws, and the Americans with Disabilities Act of 1990, as such act may be amended from time to time, and all regulations promulgated thereunder, as it affects the Property now or hereafter in effect.  Lessee shall obtain, maintain and comply with all required licenses and permits, both governmental and private, to use and operate the Property as Permitted Facilities.  Upon Lessor's written request from time to time during the Lease Term, Lessee shall certify in writing to Lessor that Lessee's representations, warranties and obligations under Section 5.05 and this Section 8.02 remain true and correct and have not been breached.   Lessee shall immediately notify Lessor in writing if any of such representations, warranties or covenants are no longer true or have been breached or if Lessee has a reasonable basis to believe that they may no longer be true or have been breached.   In connection with such an event, Lessee shall comply with all Legal Requirements and directives of Governmental Authorities and, at Lessor's request, provide to Lessor copies of all notices, reports and other communications exchanged with, or received from, Governmental Authorities relating to such an event.  Lessee shall also reimburse Lessor for all Costs incurred by Lessor in evaluating the effect of such an event on the Property and this Lease, in obtaining any necessary license from Governmental Authorities as may be necessary for Lessor to enforce its rights under the Transaction Documents, and in complying with all Legal Requirements applicable to Lessor as the result of the existence of such an event and for any penalties or fines imposed upon Lessor as a result thereof.  Lessee will use its best efforts to prevent any act or condition to exist on or about the Property that will materially increase any insurance rate thereon, except when such acts are required in the normal course of its business and Lessee shall pay for such increase. Lessee agrees that it will defend, indemnify and hold harmless the Indemnified Parties from and against any and all Losses caused by, incurred or resulting from Lessee's failure to comply with its obligations under this Section.

4814-6639-4203.1
STORE/Campbells (Perkins)
Lease Agreement
587 E. Main Street, Canfield, OH 44406
File No. 7210/02-588.5

**Section 8.03.  Environmental**.

(a)      *Covenants*.

(i)      Lessee covenants to Lessor during the Lease Term, subject to the limitations of subsection (ii) below, as follows:

(A)      All uses and operations on or of the Property, whether by Lessee or any other Person, shall be in compliance with all Environmental Laws and permits issued pursuant thereto.

(B)      There shall be no Releases in, on, under or from the Property, except in Permitted Amounts.

(C)      There shall be no Hazardous Materials or Regulated Substances in, on or under the Property, except in Permitted Amounts. Above and below ground storage tanks shall be properly permitted and only used as permitted.

(D)      Lessee shall keep the Property or cause the Property to be kept free and clear of all Environmental Liens, whether due to any act or omission of Lessee or any other Person.

(E)      Lessee shall not act or fail to act or allow any other tenant, occupant, guest, customer or other user of the Property to act or fail to act in any way that (1) materially increases a risk to human health or the environment, (2) poses an unreasonable or unacceptable risk of harm to any Person or the environment (whether on or off the Property), (3) has a Material Adverse Effect, (4) is contrary to any material requirement set forth in the insurance policies maintained by Lessee or Lessor, (5) constitutes a public or private nuisance or constitutes waste, (6) violates any covenant, condition, agreement or easement applicable to the Property, or (7) would result in any reopening or reconsideration of any prior investigation or causes a new investigation by a Governmental Authority having jurisdiction over the Property.

(F)      Lessee shall, at its sole cost and expense, fully and expeditiously cooperate in all activities pursuant to this Section 8.04, including but not limited to providing all relevant information and making knowledgeable persons available for interviews.

(ii)      Notwithstanding any provision of this Lease to the contrary, an Event of Default shall not be deemed to have occurred as a result of the failure of Lessee to satisfy any one or more of the covenants set forth in subsections (A) through (E) above provided that Lessee shall be in compliance with the requirements of any Governmental Authority with respect to the Remediation of any Release at the Property.

13

(b)     ***Notification Requirements***.  Lessee shall immediately notify Lessor in writing upon Lessee obtaining actual knowledge of (i) any Releases or Threatened Releases in, on, under or from the Property other than in Permitted Amounts, or migrating towards the Property; (ii) any non-compliance with any Environmental Laws related in any way to the Property; (iii) any actual or potential Environmental Lien or activity use limitation; (iv) any required or proposed Remediation of environmental conditions relating to the Property required by applicable Governmental Authorities; and (v) any written or oral notice or other communication of which Lessee becomes aware from any source whatsoever (including but not limited to a Governmental Authority) relating in any way to Hazardous Materials, Regulated Substances or above or below ground storage tanks, or Remediation thereof at or on the Property, other than in Permitted Amounts, possible liability of any Person relating to the Property pursuant to any Environmental Law, other environmental conditions in connection with the Property, or any actual or potential administrative or judicial proceedings in connection with anything referred to in this Section.  Lessee shall, upon Lessor's written request, deliver to Lessor a certificate stating that Lessee is and has been in full compliance with all of the environmental representations, warranties and covenants in this Lease.

(c)     ***Remediation***.  Lessee shall, at its sole cost and expense, and without limiting any other provision of this Lease, effectuate any Remediation required by any Governmental Authority of any condition (including, but not limited to, a Release or Threatened Release) in, on, under or from the Property and take any other reasonable action deemed necessary by any Governmental Authority for protection of human health or the environment.  Should Lessee fail to undertake any required Remediation in accordance with the preceding sentence, Lessor, after written notice to Lessee and Lessee's failure to immediately undertake such Remediation, shall be permitted to complete such Remediation, and all Costs incurred in connection therewith shall be paid by Lessee.  Any Cost so paid by Lessor, together with interest at the Default Rate, shall be deemed to be Additional Rental hereunder and shall be immediately due from Lessee to Lessor.

(d)     ***Indemnification***.  Lessee shall, at its sole cost and expense, protect, defend, indemnify, release and hold harmless each of the Indemnified Parties from and against any and all Losses, including, but not limited to, all Costs of Remediation (whether or not performed voluntarily), arising out of or in any way relating to any Environmental Laws, Hazardous Materials, Regulated Substances, above or below ground storage tanks, or other environmental matters concerning the Property.  It is expressly understood and agreed that Lessee's obligations under this Section shall survive the expiration or earlier termination of this Lease for any reason.

(e)     ***Right of Entry***.  In the event that Lessor has a reasonable basis to believe that a Release or a violation of any Environmental Law has occurred, Lessor and any other Person designated by Lessor, including but not limited to any receiver, any representative of a Governmental Authority, and any environmental consultant, shall have the right, but not the obligation, to enter upon the Property at all reasonable times to assess any and all aspects of the environmental condition of the Property and its use, including but not limited to conducting any environmental assessment or audit (the scope of which shall be determined in Lessor's sole and absolute discretion) and taking

14

samples of soil, groundwater or other water, air, or building materials, and conducting other invasive testing.  Lessee shall cooperate with and provide access to Lessor and any other Person designated by Lessor.  Any such assessment or investigation shall be at Lessee's sole cost and expense.

(f)     *Survival*.  The obligations of Lessee and the rights and remedies of Lessor under this Section 8.03 shall survive the termination, expiration and/or release of this Lease.

**Section 8.04.  Franchisor Requirements**.  In addition to the requirements set forth in this Lease, Lessee, in its use, occupancy and maintenance of the Property, shall comply with all requirements of its Franchise Agreement.  Lessee hereby consents to Lessor providing information it obtains to Franchisor, and to Lessor obtaining from Franchisor information which Franchisor receives relating to Lessee's operation of its business on the Property.

## ARTICLE IX

## ADDITIONAL COVENANTS

**Section 9.01.  Performance at Lessee's Expense**.    Lessee acknowledges and confirms that Lessor may impose reasonable administrative, processing or servicing fees, and collect its reasonable attorneys' fees, costs and expenses in connection with (a) any extension, renewal, modification, amendment and termination of this Lease requested by Lessee; (b) any release or substitution of Property requested by Lessee; (c) the procurement of consents, waivers and approvals with respect to the Property or any matter related to this Lease requested by Lessee; (d) the review of any assignment or sublease or proposed assignment or sublease or the preparation or review of any subordination or non-disturbance agreement requested by Lessee; (e) the collection, maintenance and/or disbursement of reserves created under this Lease or the other Transaction Documents (following an Event of Default); and (f) inspections required to make certain determinations under this Lease or the other Transaction Documents following Lessor's reasonable belief of a breach under this Lease or any other Transaction Documents.

**Section 9.02.  Inspection**.  Lessor and its authorized representatives shall have the right, at all reasonable times and upon giving reasonable prior notice (except in the event of an emergency, in which case no prior notice shall be required), to enter the Property or any part thereof and inspect the same.  Lessee hereby waives any claim for damages for any injury or inconvenience to or interference with Lessee's business, any loss of occupancy or quiet enjoyment of the Property and any other loss occasioned by such entry, but, subject to Section 10.01, excluding damages arising as a result of the gross negligence or willful misconduct of Lessor.

**Section 9.03.  Financial Information**.

(a)     *Financial Statements*.  Within forty five (45) days after the end of each fiscal quarter and within one hundred twenty (120) days after the end of each fiscal year of Lessee and Lessee Reporting Entities, Lessee shall deliver to Lessor (i) complete consolidated financial statements that consolidate Lessee and Lessee Reporting

15

Entities, including a balance sheet, profit and loss statement, statement of stockholders' equity and statement of cash flows and all other related schedules for the fiscal period then ended, such statements to detail separately interest expense, income taxes, non-cash expenses, non-recurring expenses, operating lease expense and current portion of long-term debt – capital leases; (ii) income statements for the business at the Property; and (iii) the supplemental financial information set forth on Schedule 9.03.  All such financial statements shall be prepared in accordance with GAAP, and shall be certified to be accurate and complete by an officer or director of each Lessee Reporting Entity.  In the event that Lessee's business at the Property is ordinarily consolidated with other business for financial statements purposes, a separate profit and loss statement shall be provided showing separately the sales, profits and losses pertaining to the Property with interest expense, income taxes, non-cash expenses, non-recurring expenses and operating lease expense (rent), with the basis for allocation of overhead or other charges being clearly set forth in accordance with Schedule 9.03.  The financial statements delivered to Lessor need not be audited, but Lessee shall deliver to Lessor copies of any audited financial statements of the Lessee Reporting Entities which may be prepared, as soon as they are available.

(b)     ***Other Information***.  Notwithstanding any provision contained herein, upon request at any time, Lessee will provide to Lessor, at no additional cost or expense to Lessee, any and all financial information and/or financial statements of Lessee Reporting Entities (and in the form or forms) as reasonably requested by Lessor including, but not limited to, as requested by Lessor in connection with Lessor's filings with or disclosures to the Securities and Exchange Commission or other Governmental Authority.

**Section 9.04.  OFAC Laws**.  Upon receipt of notice or upon actual knowledge thereof, Lessee shall immediately notify Lessor in writing if any Person owning (directly or indirectly) any interest in any of the Lessee Entities, or any director, officer, shareholder, member, manager or partner of any of such holders is a Person whose property or interests are subject to being blocked under any of the OFAC Laws, or is otherwise in violation of any of the OFAC Laws, or is under investigation by any Governmental Authority for, or has been charged with, or convicted of, drug trafficking, terrorist-related activities or any violation of the Anti-Money Laundering Laws, has been assessed civil penalties under these or related Laws, or has had funds seized or forfeited in an action under these or related Laws; *provided, however*, that the covenant in this Section 9.04 shall not apply to any Person to the extent such Person's interest is in or through a U.S. Publicly Traded Entity.

**Section 9.05.  Estoppel Certificate**.  At any time, and from time to time, Lessee shall, promptly and in no event later than ten (10) days after a request from Lessor or any Lender or mortgagee of Lessor, execute, acknowledge and deliver to Lessor or such Lender or mortgagee, as the case may be, a certificate in the form supplied by Lessor, certifying: (a) that Lessee has accepted the Property; (b) that this Lease is in full force and effect and has not been modified (or if modified, setting forth all modifications), or, if this Lease is not in full force and effect, the certificate shall so specify the reasons therefor; (c) the commencement and expiration dates of the Lease Term; (d) the date to which the Rentals have been paid under this Lease and the amount thereof then payable; (e) whether there are then any existing defaults by Lessor in the performance of its obligations under this Lease, and, if there are any such

16

defaults, specifying the nature and extent thereof; (f) that no notice has been received by Lessee of any default under this Lease which has not been cured, except as to defaults specified in the certificate; (g) the capacity of the Person executing such certificate, and that such Person is duly authorized to execute the same on behalf of Lessee; (h) that neither Lessor nor any Lender or mortgagee has actual involvement in the management or control of decision making related to the operational aspects or the day-to-day operation of the Property, including any handling or disposal of Hazardous Materials or Regulated Substances; and (i) any other information reasonably requested by Lessor or any Lender or mortgagee, as the case may be. If Lessee shall fail or refuse to sign a certificate in accordance with the provisions of this Section within ten (10) days following a request by Lessor, Lessee irrevocably constitutes and appoints Lessor as its attorney-in-fact to execute and deliver the certificate to any such third party, it being stipulated that such power of attorney is coupled with an interest and is irrevocable and binding.

## ARTICLE X

### RELEASE AND INDEMNIFICATION

**Section 10.01.  RELEASE AND INDEMNIFICATION**.  LESSEE AGREES TO USE AND OCCUPY THE PROPERTY AT ITS OWN RISK AND HEREBY RELEASES LESSOR AND LESSOR'S AGENTS AND EMPLOYEES FROM ALL CLAIMS FOR ANY DAMAGE OR INJURY TO THE FULL EXTENT PERMITTED BY LAW.  LESSEE AGREES THAT LESSOR SHALL NOT BE RESPONSIBLE OR LIABLE TO LESSEE OR LESSEE'S EMPLOYEES, AGENTS, CUSTOMERS, LICENSEES OR INVITEES FOR BODILY INJURY, PERSONAL INJURY OR PROPERTY DAMAGE OCCASIONED BY THE ACTS OR OMISSIONS OF ANY OTHER LESSEE OR ANY OTHER PERSON.  LESSEE AGREES THAT ANY EMPLOYEE OR AGENT TO WHOM THE PROPERTY OR ANY PART THEREOF SHALL BE ENTRUSTED BY OR ON BEHALF OF LESSEE SHALL BE ACTING AS LESSEE'S AGENT WITH RESPECT TO THE PROPERTY OR ANY PART THEREOF, AND NEITHER LESSOR NOR LESSOR'S AGENTS, EMPLOYEES OR CONTRACTORS SHALL BE LIABLE FOR ANY LOSS OF OR DAMAGE TO THE PROPERTY OR ANY PART THEREOF.  LESSEE SHALL INDEMNIFY, PROTECT, DEFEND AND HOLD HARMLESS EACH OF THE INDEMNIFIED PARTIES FROM AND AGAINST ANY AND ALL LOSSES (EXCLUDING LOSSES SUFFERED BY AN INDEMNIFIED PARTY ARISING OUT OF THE WILLFUL MISCONDUCT OF SUCH INDEMNIFIED PARTY OCCURRING ON OR AFTER THE EFFECTIVE DATE) CAUSED BY, INCURRED OR RESULTING FROM LESSEE'S OPERATIONS OR BY LESSEE'S USE AND OCCUPANCY OF THE PROPERTY, WHETHER RELATING TO ITS ORIGINAL DESIGN OR CONSTRUCTION, LATENT DEFECTS, ALTERATION, MAINTENANCE, USE BY LESSEE OR ANY PERSON THEREON, SUPERVISION OR OTHERWISE, OR FROM ANY BREACH OF, DEFAULT UNDER, OR FAILURE TO PERFORM, ANY TERM OR PROVISION OF THIS LEASE BY LESSEE, ITS OFFICERS, EMPLOYEES, AGENTS OR OTHER PERSONS.  IT IS EXPRESSLY UNDERSTOOD AND AGREED THAT LESSEE'S OBLIGATIONS UNDER THIS SECTION SHALL SURVIVE THE EXPIRATION OR EARLIER TERMINATION OF THIS LEASE FOR ANY REASON WHATSOEVER.

4814-6639-4203.1
STORE/Campbells (Perkins)
Lease Agreement
587 E. Main Street, Canfield, OH 44406
File No. 7210/02-588.5

## ARTICLE XI

## CONDEMNATION AND CASUALTY

**Section 11.01. Notification**.  Lessee shall promptly give Lessor written notice of (a) any Condemnation of the Property, (b) the commencement of any proceedings or negotiations which might result in a Condemnation of the Property, and (c) any Casualty to the Property or any part thereof.  Such notice shall provide a general description of the nature and extent of such Condemnation, proceedings, negotiations or Casualty, and shall include copies of any documents or notices received in connection therewith. Thereafter, Lessee shall promptly send Lessor copies of all notices, correspondence and pleadings relating to any such Condemnation, proceedings, negotiations or Casualty.

**Section 11.02. Total Condemnation**.  In the event of a Condemnation of all or substantially all of the Property, and if as a result of such Condemnation: (i) access to the Property to and from the publicly dedicated roads adjacent to the Property as of the Effective Date is permanently and materially impaired such that Lessee no longer has access to such dedicated road; (ii) there is insufficient parking to operate the Property as a Permitted Facility under applicable Laws; or (iii) the Condemnation includes a portion of the building such that the remaining portion is unsuitable for use as a Permitted Facility, as determined by Lessee in the exercise of good faith business judgment (and Lessee provides to Lessor an officer's certificate executed by an officer of Lessee certifying to the same) (each such event, a "Total Condemnation"), then, in such event:

(a)    ***Termination of Lease***.  On the date of the Total Condemnation, all obligations of either party hereunder shall cease; *provided, however*, that Lessee's obligations to the Indemnified Parties under any indemnification provisions of this Lease and Lessee's obligation to pay Rental and all other Monetary Obligations (whether payable to Lessor or a third party) accruing under this Lease prior to the date of termination shall survive such termination.  If the date of such Total Condemnation is other than the first day of a month, the Base Monthly Rental for the month in which such Total Condemnation occurs shall be apportioned based on the date of the Total Condemnation.

(b)    ***Net Award***.  Subject to Section 11.07 below, Lessor shall be entitled to receive the entire Net Award in connection with a Total Condemnation without deduction for any estate vested in Lessee by this Lease, and Lessee hereby expressly assigns to Lessor all of its right, title and interest in and to every such Net Award and agrees that Lessee shall not be entitled to any Net Award or other payment for the value of Lessee's leasehold interest in this Lease.

**Section 11.03. Partial Condemnation or Casualty**.  In the event of a Condemnation which is not a Total Condemnation (each such event, a "Partial Condemnation"), or in the event of a Casualty:

(a)    ***Net Awards***.  All Net Awards shall be paid to Lessor.

18

(b)      *Continuance of Lease*. This Lease shall continue in full force and effect upon the following terms:

(i)      All Rental and other Monetary Obligations due under this Lease shall continue unabated.

(ii)      Lessee shall promptly commence and diligently prosecute restoration of the Property to the same condition, as nearly as practicable, as prior to such Partial Condemnation or Casualty as approved by Lessor.  Subject to the terms and provisions of the Mortgages and upon the written request of Lessee (accompanied by evidence reasonably satisfactory to Lessor that such amount has been paid or is due and payable and is properly part of such costs, and that Lessee has complied with the terms of Section 7.02 in connection with the restoration), Lessor shall promptly make available in installments, subject to reasonable conditions for disbursement imposed by Lessor, an amount up to but not exceeding the amount of any Net Award received by Lessor with respect to such Partial Condemnation or Casualty.  Prior to the disbursement of any portion of the Net Award with respect to a Casualty, Lessee shall provide evidence reasonably satisfactory to Lessor of the payment of restoration expenses by Lessee up to the amount of the insurance deductible applicable to such Casualty. Lessor shall be entitled to keep any portion of the Net Award which may be in excess of the cost of restoration, and Lessee shall bear all additional Costs of such restoration in excess of the Net Award.

Section 11.04.  **Temporary Taking**.  In the event of a Condemnation of all or any part of the Property for a temporary use (a "Temporary Taking"), this Lease shall remain in full force and effect without any reduction of Base Annual Rental, Additional Rental or any other Monetary Obligation payable hereunder.  Except as provided below, Lessee shall be entitled to the entire Net Award for a Temporary Taking, unless the period of occupation and use by the condemning authorities shall extend beyond the date of expiration of this Lease, in which event the Net Award made for such Temporary Taking shall be apportioned between Lessor and Lessee as of the date of such expiration.  At the termination of any such Temporary Taking, Lessee will, at its own cost and expense and pursuant to the provisions of Section 7.02, promptly commence and complete restoration of the Property.

Section 11.05.  **Adjustment of Losses**.   Any loss under any property damage insurance required to be maintained by Lessee shall be adjusted by Lessor and Lessee.  Any Net Award relating to a Total Condemnation or a Partial Condemnation shall be adjusted by Lessor or, at Lessor's election, Lessee.  Notwithstanding the foregoing or any other provisions of this Section 11.05 to the contrary, if at the time of any Condemnation or any Casualty or at any time thereafter an Event of Default shall have occurred and be continuing, Lessor is hereby authorized and empowered but shall not be obligated, in the name and on behalf of Lessee and otherwise, to file and prosecute Lessee's claim, if any, for a Net Award on account of such Condemnation or such Casualty and to collect such Net Award and apply the same to the curing of such Event of Default and any other then existing Event of Default under this Lease and/or to the payment of any amounts owed by Lessee to Lessor under this Lease, in such order, priority and proportions as Lessor in its discretion shall deem proper.

19

**Section 11.06. Lessee Obligation in Event of Casualty**.  During all periods of time following a Casualty, Lessee shall take reasonable steps to ensure that the affected Property is secure and does not pose any risk of harm to any adjoining property and Persons (including owners or occupants of such adjoining property).

**Section 11.07. Lessee Awards and Payments**.  Notwithstanding any provision contained in this Article XI, Lessee shall be entitled to claim and receive any award or payment from the condemning authority expressly granted for the taking of any personal property owned by Lessee, any insurance proceeds with respect to any personal property owned by Lessee, the interruption of its business and moving expenses (subject, however, to the provisions of Section 6.03(a)(iv) above), but only if such claim or award does not adversely affect or interfere with the prosecution of Lessor's claim for the Condemnation or Casualty, or otherwise reduce the amount recoverable by Lessor for the Condemnation or Casualty.

## ARTICLE XII

### DEFAULT, CONDITIONAL LIMITATIONS,
### REMEDIES AND MEASURE OF DAMAGES

**Section 12.01.  Event of Default**.  Each of the following shall be an event of default by Lessee under this Lease (each, an "Event of Default"):

(a)     if any representation or warranty of Lessee set forth in this Lease is false in any material respect when made, or if Lessee renders any materially false statement or account when made;

(b)     if any Rental or other Monetary Obligation due under this Lease is not paid when due if such failure continues for more than five (5) days after written notice from Lessor; *provided, however*, Lessor shall only be required to provide such notice and cure period twice in any twelve (12) month period; and further provided that any technical error in the ACH Method of Payment process caused by Lessor's bank or servicer shall not constitute an Event of Default hereunder; *and further provided*, any delay in the payment of Rental as a result of a technical error in the wiring and/or automated clearinghouse process shall not constitute an Event of Default hereunder so long as the same is corrected within one (1) Business Day of the date Lessee receives notice thereof;

(c)     if Lessee fails to pay, prior to delinquency, any taxes, assessments or other charges the failure of which to pay will result in the imposition of a lien against the Property;

(d)     if Lessee vacates or abandons the Property;

(e)     if there is an Insolvency Event affecting Lessee or any Guarantor;

(f)     if Lessee fails to observe or perform any of the other covenants, conditions or obligations of Lessee in this Lease; *provided, however*, if any such failure does not involve the payment of any Monetary Obligation, is not willful or intentional,

20

does not place the Property or any rights or property of Lessor in immediate jeopardy, and is within the reasonable power of Lessee to promptly cure, all as determined by Lessor in its reasonable discretion, then such failure shall not constitute an Event of Default hereunder, unless otherwise expressly provided herein, unless and until Lessor shall have given Lessee notice thereof and a period of thirty (30) days shall have elapsed, during which period Lessee may correct or cure such failure, upon failure of which an Event of Default shall be deemed to have occurred hereunder without further notice or demand of any kind being required.  If such failure cannot reasonably be cured within such thirty (30)-day period, as determined by Lessor in its reasonable discretion, and Lessee is diligently pursuing a cure of such failure, then Lessee shall have a reasonable period to cure such failure beyond such thirty (30)-day period, which shall in no event exceed ninety (90) days after receiving notice of such failure from Lessor.  If Lessee shall fail to correct or cure such failure within such ninety (90)-day period, an Event of Default shall be deemed to have occurred hereunder without further notice or demand of any kind being required;

(g)     if a final, nonappealable judgment is rendered by a court against Lessee which has a Material Adverse Effect, and is not discharged or provision made for such discharge within ninety (90) days from the date of entry thereof;

(h)     if Lessee shall be liquidated or dissolved or shall begin proceedings towards its liquidation or dissolution;

(i)     if the estate or interest of Lessee in the Property shall be levied upon or attached in any proceeding and such estate or interest is about to be sold or transferred or such process shall not be vacated or discharged within ninety (90) days after it is made;

(j)     if there is a breach or default under the Franchise Agreement with respect to the Property or if such Franchise Agreement terminates or expires prior to the expiration of the Lease and a substitute agreement for the terminated or expired Franchise Agreement is not entered into prior to such expiration or termination, which substitute agreement shall be in form and substance reasonably satisfactory to Lessor; or

(k)     if there is an "Event of Default" or other breach or default by Lessee or any Guarantor under any of the other Transaction Documents or any Other Agreement , after the passage of all applicable notice and cure or grace periods; *provided, however*, in the event that this Lease has been the subject of a Securitization and any Other Agreement has not been the subject of the same Securitization or any series relating to such Securitization, an "Event of Default" under such Other Agreement shall not constitute an Event of Default under this Lease.

**Section 12.02.  Remedies**.  Upon the occurrence of an Event of Default, with or without notice or demand, except as otherwise expressly provided herein or such other notice as may be required by statute and cannot be waived by Lessee, Lessor shall be entitled to exercise, at its option, concurrently, successively, or in any combination, all remedies available at Law or in equity, including, without limitation, any one or more of the following:

21

(a)        to terminate this Lease, whereupon Lessee's right to possession of the Property shall cease and this Lease, except as to Lessee's liability, shall be terminated;

(b)        to the extent not prohibited by applicable Law, to (i) re-enter and take possession of the Property (or any part thereof), any or all personal property or fixtures of Lessee upon the Property and, to the extent permissible, all Franchise Agreements, permits and other rights or privileges of Lessee pertaining to the use and operation of the Property, and (ii) expel Lessee and those claiming under or through Lessee, without being deemed guilty in any manner of trespass or becoming liable for any loss or damage resulting therefrom, without resort to legal or judicial process, procedure or action.   No notice from Lessor hereunder or under a forcible entry and detainer statute or similar Law shall constitute an election by Lessor to terminate this Lease unless such notice specifically so states.  If Lessee shall, after default, voluntarily give up possession of the Property to Lessor, deliver to Lessor or its agents the keys to the Property, or both, such actions shall be deemed to be in compliance with Lessor's rights and the acceptance thereof by Lessor or its agents shall not be deemed to constitute a termination of the Lease.   Lessor reserves the right following any re-entry and/or reletting to exercise its right to terminate this Lease by giving Lessee written notice thereof, in which event this Lease will terminate;

(c)        to bring an action against Lessee for any damages sustained by Lessor or any equitable relief available to Lessor and to the extent not prohibited by applicable Law, to seize all personal property or fixtures upon the Property which Lessee owns or in which it has an interest, in which Lessor shall have a landlord's lien and/or security interest, and to dispose thereof in accordance with the Laws prevailing at the time and place of such seizure or to remove all or any portion of such property and cause the same to be stored in a public warehouse or elsewhere at Lessee's sole expense, without becoming liable for any loss or damage resulting therefrom and without resorting to legal or judicial process, procedure or action;

(d)        to relet the Property or any part thereof for such term or terms (including a term which extends beyond the original Lease Term), at such rentals and upon such other terms as Lessor, in its sole discretion, may determine, with all proceeds received from such reletting being applied to the Rental and other Monetary Obligations due from Lessee in such order as Lessor may, in its sole discretion, determine, which other Monetary Obligations include, without limitation, all repossession costs, brokerage commissions, attorneys' fees and expenses,  alteration, remodeling and repair costs and expenses of preparing for such reletting.  Except to the extent required by applicable Law, Lessor shall have no obligation to relet the Property or any part thereof and shall in no event be liable for refusal or failure to relet the Property or any part thereof, or, in the event of any such reletting, for refusal or failure to collect any rent due upon such reletting, and no such refusal or failure shall operate to relieve Lessee of any liability under this Lease or otherwise to affect any such liability.   Lessor reserves the right following any re-entry and/or reletting to exercise its right to terminate this Lease by giving Lessee written notice thereof, in which event this Lease will terminate as specified in said notice;

22

(e)     except to the extent prohibited by applicable Law to accelerate and recover from Lessee all Rental and other Monetary Obligations due and owing and scheduled to become due and owing under this Lease both before and after the date of such breach for the entire original scheduled Lease Term;

(f)     to recover from Lessee all Costs paid or incurred by Lessor as a result of such breach, regardless of whether or not legal proceedings are actually commenced;

(g)     to immediately or at any time thereafter, and with or without notice, at Lessor's sole option but without any obligation to do so, correct such breach or default and charge Lessee all Costs incurred by Lessor therein.  Any sum or sums so paid by Lessor, together with interest at the Default Rate, shall be deemed to be Additional Rental hereunder and shall be immediately due from Lessee to Lessor.  Any such acts by Lessor in correcting Lessee's breaches or defaults hereunder shall not be deemed to cure said breaches or defaults or constitute any waiver of Lessor's right to exercise any or all remedies set forth herein;

(h)     to immediately or at any time thereafter, and with or without notice, except as required herein, set off any money of Lessee held by Lessor under this Lease or any other Transaction Document or any Other Agreement against any sum owing by Lessee hereunder;

(i)     Without limiting the generality of the foregoing or limiting in any way the rights of Lessor under this Lease or otherwise under applicable Laws, at any time after the occurrence, and during the continuance, of an Event of Default, Lessor shall be entitled to apply for and have a receiver appointed under applicable Law by a court of competent jurisdiction (by ex parte motion for appointment without notice) in any action taken by Lessor to enforce its rights and remedies hereunder in order to protect and preserve Lessor's interest under this Lease or in the Property and the Personalty, and in connection therewith, LESSEE HEREBY IRREVOCABLY CONSENTS TO AND WAIVES ANY RIGHT TO OBJECT TO OR OTHERWISE CONTEST THE APPOINTMENT OF A RECEIVER AFTER THE OCCURRENCE, AND DURING THE CONTINUANCE, OF AN EVENT OF DEFAULT; and/or

(j)     to seek any equitable relief available to Lessor, including, without limitation, the right of specific performance.

**Section 12.03. Cumulative Remedies**.  All powers and remedies given by Section 12.02 to Lessor, subject to applicable Law, shall be cumulative and not exclusive of one another or of any other right or remedy or of any other powers and remedies available to Lessor under this Lease, by judicial proceedings or otherwise, to enforce the performance or observance of the covenants and agreements of Lessee contained in this Lease, and no delay or omission of Lessor to exercise any right or power accruing upon the occurrence of any Event of Default shall impair any other or subsequent Event of Default or impair any rights or remedies consequent thereto.  Every power and remedy given by this Section or by Law to Lessor may be exercised from time to time, and as often as may be deemed expedient, by Lessor, subject at all times to Lessor's right in its sole judgment to discontinue any work commenced by Lessor or change any course of action undertaken by Lessor.

4814-6639-4203.1
STORE/Campbells (Perkins)
Lease Agreement
587 E. Main Street, Canfield, OH 44406
File No. 7210/02-588.5

**Section 12.04. Lessee Waiver**.  Lessee hereby expressly waives, for itself and all Persons claiming by, through and under Lessee, including creditors of all kinds, (a) any right and privilege which Lessee has under any present or future Legal Requirements to redeem the Property or to have a continuance of this Lease for the Lease Term after termination of Lessee's right of occupancy by order or judgment of any court or by any legal process or writ, or under the terms of this Lease; (b) the benefits of any present or future Legal Requirement that exempts property from liability for debt or for distress for rent; (c) any present or future Legal Requirement relating to notice or delay in levy of execution in case of eviction of a tenant for nonpayment of rent; and (d) any benefits and lien rights which may arise pursuant to any present or future Legal Requirement.

## ARTICLE XIII

## MORTGAGE, SUBORDINATION AND ATTORNMENT

**Section 13.01.  No Liens**.  Lessor's interest in this Lease and/or the Property shall not be subordinate to any liens or encumbrances placed upon the Property by or resulting from any act of Lessee, and nothing herein contained shall be construed to require such subordination by Lessor.  NOTICE IS HEREBY GIVEN THAT LESSEE IS NOT AUTHORIZED TO PLACE OR ALLOW TO BE PLACED ANY LIEN, MORTGAGE, DEED OF TRUST, DEED TO SECURE DEBT, SECURITY INTEREST OR ENCUMBRANCE OF ANY KIND UPON ALL OR ANY PART OF THE PROPERTY OR LESSEE'S LEASEHOLD INTEREST THEREIN, AND ANY SUCH PURPORTED TRANSACTION SHALL BE VOID.

**Section 13.02. Subordination**.  This Lease at all times shall automatically be subordinate to the lien of any and all ground leases and Mortgages now or hereafter placed upon the Property by Lessor, and Lessee covenants and agrees to execute and deliver, upon demand, such further instruments subordinating this Lease to the lien of any or all such ground leases and Mortgages as shall be desired by Lessor, or any present or proposed mortgagees under trust deeds, upon the condition that Lessee shall have the right to remain in possession of the Property under the terms of this Lease, notwithstanding any default in any or all such ground leases or Mortgages, or after the foreclosure of any such Mortgages, so long as no Event of Default shall have occurred and be continuing.

**Section 13.03.  Attornment**.  In the event any purchaser or assignee of any Lender at a foreclosure sale acquires title to any of the  Property, or in the event that any Lender or any purchaser or assignee otherwise succeeds to the rights of Lessor as landlord under this Lease, Lessee shall attorn to Lender or such purchaser or assignee, as the case may be (a "Successor Lessor"), and recognize the Successor Lessor as lessor under this Lease, and, subject to the provisions of this Article XIII, this Lease shall continue in full force and effect as a direct lease between the Successor Lessor and Lessee, provided that the Successor Lessor shall only be liable for any obligations of Lessor under this Lease which accrue after the date that such Successor Lessor acquires title.  The foregoing provision shall be self-operative and effective without the execution of any further instruments.

**Section 13.04. Execution of Additional Documents**.  Although the provisions in this Article XIII shall be self-operative and no future instrument of subordination shall be required,

24

upon request by Lessor, Lessee shall execute and deliver such additional reasonable instruments as may be reasonably required for such purposes.

Section 13.05. **Notice to Lender**.  Lessee shall give written notice to any Lender having a recorded lien upon the Property or any part thereof of which Lessee has been notified of any breach or default by Lessor of any of its obligations under this Lease and give such Lender at least sixty (60) days beyond any notice period to which Lessor might be entitled to cure such default before Lessee may exercise any remedy with respect thereto.

## ARTICLE XIV

## ASSIGNMENT

Section 14.01. **Assignment by Lessor**.  As a material inducement to Lessor's willingness to enter into the transactions contemplated by this Lease (the "Transaction") and the other Transaction Documents, Lessee hereby agrees that Lessor may, from time to time and at any time and without the consent of Lessee, engage in all or any combination of the following, or enter into agreements in connection with any of the following or in accordance with requirements that may be imposed by applicable securities, tax or other Laws: (a) the sale, assignment, grant, conveyance, transfer, financing, re-financing, purchase or re-acquisition of all, less than all or any portion of the Property, this Lease or any other Transaction Document, Lessor's right, title and interest in this Lease or any other Transaction Document, the servicing rights with respect to any of the foregoing, or participations in any of the foregoing; or (b) a Securitization and related transactions.  Without in any way limiting the foregoing, the parties acknowledge and agree that Lessor, in its sole discretion, may assign this Lease or any interest herein to another Person in order to maintain Lessor's or any of its Affiliates' status as a REIT. In the event of any such sale or assignment other than a security assignment, Lessee shall attorn to such purchaser or assignee (so long as Lessor and such purchaser or assignee notify Lessee in writing of such transfer and such purchaser or assignee expressly assumes in writing the obligations of Lessor hereunder from and after the date of such assignment).  At the request of Lessor, Lessee will execute such documents confirming the sale, assignment or other transfer and such other agreements as Lessor may reasonably request, provided that the same do not increase the liabilities and obligations of Lessee hereunder.  Lessor shall be relieved, from and after the date of such transfer or conveyance, of liability for the performance of any obligation of Lessor contained herein, except for obligations or liabilities accrued prior to such assignment or sale.

Section 14.02. **Assignment by Lessee**.

(a)    ***No Assignment by Lessee***.  Lessee acknowledges that Lessor has relied both on the business experience and creditworthiness of Lessee and upon the particular purposes for which Lessee intends to use the Property in entering into this Lease.  Lessee shall not assign, transfer, convey, pledge or mortgage this Lease or any interest herein or any interest in Lessee, whether by operation of Law or otherwise, without the prior written consent of Lessor.  At the time of any assignment of this Lease which is approved by Lessor, the assignee shall assume all of the obligations of Lessee under this Lease pursuant to a written assumption agreement in form and substance reasonably acceptable to Lessor.  Such assignment of this Lease pursuant to this

25

Section 14.02 shall not relieve Lessee of its obligations respecting this Lease unless otherwise agreed to by Lessor.  Any assignment, transfer, conveyance, pledge or mortgage in violation of this Section 14.02 shall be voidable at the sole option of Lessor. Any consent to an assignment given by Lessor hereunder shall not be deemed a consent to any subsequent assignment.

(b)     ***Permitted Assignment***.     Notwithstanding anything to the contrary contained in this Section 14.02 and provided that no Event of Default has occurred and is continuing at the time of the proposed assignment or other transfer, and provided further that any assignee agrees to assume all of Lessee's obligations under this Lease by written agreement approved by Lessor, Lessee shall have the right to assign or otherwise transfer all, but not less than all, of its interest in, to and under this Lease without Lessor's consent to a Qualified Operator.  A "Qualified Operator" shall mean a Person who (x) for two (2) consecutive years immediately prior to the date of assignment or transfer and (y) on a proforma basis following the consummation of such assignment or transfer (all as determined by Lessor upon review of financial statements provided by the assignee prior to the proposed lease assignment and in a form reasonably satisfactory to Lessor), (A) has a CFCCR (defined below) of at least 1.50x; and (B) has a Lease Adjusted Leverage (defined below) of no more than 5.50x; *provided, however,* that Lessee may satisfy the foregoing conditions of a Qualified Operator by providing, or causing to be provided, a guaranty agreement, in form and substance reasonably acceptable to and approved by Lessor, in writing, which guaranty shall be from an entity that meets the requirements of (A), (B) and (C) set forth in this Section 14.02.  Lessee shall provide Lessor with at least thirty (30) days' prior written notice of the proposed assignment to a Qualified Operator, which notice must include financial information satisfying the Qualified Operator requirements set forth herein. In the event that Lessee effects an assignment to a Qualified Operator, Lessee shall be released from any liability arising under this Lease from and after the date of such assignment and Guarantor shall be released from any liability arising under the Guaranty from and after the date of such assignment.

For purposes hereof:

"*CFCCR*" means with respect to the twelve month period of time immediately preceding the date of determination, the ratio calculated for such period of time, each as determined in accordance with GAAP, of (i) the sum of Consolidated Net Income (excluding non-cash income), Depreciation and Amortization, Interest Expense, income taxes, Operating Lease Expense and non-cash expenses to (ii) the sum of Operating Lease Expense (excluding non-cash rent adjustments), scheduled principal payments of long term Debt, scheduled maturities of all Capital Leases, dividends and Interest Expense (excluding non-cash interest expense and amortization of non-cash financing expenses). For purposes of calculating the CFCCR, the following terms shall be defined as set forth below:

"*Capital Lease*" shall mean all leases of any property, whether real, personal or mixed, by a Person, which leases would, in conformity with GAAP, be required to be accounted for as a capital lease on the balance sheet of such Person.  The term "Capital Lease" shall not include any operating lease.

26

"*Consolidated Net Income*" shall mean with respect to the period of determination, the net income or net loss of a Person.  In determining the amount of Consolidated Net Income, (i) adjustments shall be made for nonrecurring gains and losses or non-cash items allocable to the period of determination, (ii) deductions shall be made for, among other things, Depreciation and Amortization, Interest Expense, Operating Lease Expense, and (iii) no deductions shall be made for income taxes or charges equivalent to income taxes allocable to the period of determination, as determined in accordance with GAAP.

"*Debt*" shall mean with respect to a Person, and for the period of determination (i) indebtedness for borrowed money, (ii) subject to the limitation set forth in sub item (iv) below, obligations evidenced by bonds, indentures, notes or similar instruments, (iii) obligations under leases which should be, in accordance with GAAP, recorded as Capital Leases, and (iv) obligations under direct or indirect guarantees in respect of, and obligations (contingent or otherwise) to purchase or otherwise acquire, or otherwise to assure a creditor against loss in respect of, indebtedness or obligations of others of the kinds referred to in clauses (i) through (iv) above, except for guaranty obligations of such Person, which, in conformity with GAAP, are not included on the balance sheet of such Person.

"*Depreciation and Amortization*" shall mean the depreciation and amortization accruing during any period of determination with respect to a Person, as determined in accordance with GAAP.

"*Interest Expense*" shall mean for any period of determination, the sum of all interest accrued or which should be accrued in respect of all Debt of a Person, as determined in accordance with GAAP.

"*Operating Lease Expense*" shall mean the sum of all payments and expenses incurred by a Person, under any operating leases during the period of determination, as determined in accordance with GAAP.

"*EBITDA*" means for the twelve (12) month period ending on the date of determination, the sum of a Person's net income (loss) for such period plus, in each case to the extent previously deducted in calculating net income (loss): (i) income taxes, (ii) interest payments on all of its debt obligations (including any borrowings under short term credit facilities), (iii) all non-cash charges including depreciation and amortization, and (iv) Non-Recurring Items (defined below).

"*EBITDAR*" means the sum of a Person's EBITDA and its total land and building rent for the twelve (12) month period ending on the date of determination.

"*Lease Adjusted Leverage*" means with respect to a Person, as of any applicable date, the sum of (i) ten (10) times such Person's total land and building rent for the twelve (12) month period ending on the date of determination, and (ii) the total current balance of such Person's total debt obligations (including any borrowings under short term credit facilities) on such date, divided by EBITDAR.

27

"*Non-Recurring Items*" shall mean with respect to a Person, items of the sum (whether positive or negative) of revenue minus expenses that, in the judgment of Lessor, are unusual in nature, occur infrequently and are not representative of the ongoing or future earnings or expenses of such Person.

**Section 14.03.  No Sale of Assets**.  Without the prior written consent of Lessor, Lessee shall not sell all or substantially all of Lessee's assets.  Any sale of Lessee's assets in violation of this Section 14.03, shall be voidable at the sole option of Lessor.  Any consent to a sale of Lessee's assets given by Lessor hereunder shall not be deemed a consent to any subsequent sale of Lessee's assets.

**Section 14.04.  No Subletting**.  Lessee shall not sublet the Property without the prior written consent of Lessor, which may be withheld by Lessor in its sole discretion and any such purported subletting shall be void.

**Section 14.05.  Lease Consolidation**. Notwithstanding any provision contained herein, at any time during the Lease Term where STORE Capital Acquisitions, LLC (or an Affiliate thereof) is the "Lessor" hereunder, upon written notification to Lessee, Lessor may elect, in its sole discretion, to amend and restate the Master Lease Agreement to include the Property in the Master Lease Agreement.  In such event, Lessee shall execute an amendment and restatement of the Master Lease Agreement, in form and substance identical to the Master Lease Agreement, and any other related documents reasonably requested by Lessor, solely to (a) modify the definition of "Properties" as defined in the Master Lease Agreement to include the Property; (b) increase the Base Annual Rental as defined in the Master Lease Agreement to reflect the inclusion of the Property; and (c) make such other changes reasonably deemed necessary by Lessor in its sole discretion to reflect the addition of the Property to the Master Lease Agreement.  In no event shall Lessee have the right to request any further modifications to the amended and restated Master Lease Agreement.  Lessee shall execute any such amended and restated Master Lease Agreement within five (5) Business Days after delivery to Lessee of an execution version thereof.

## ARTICLE XV

## NOTICES

**Section 15.01.  Notices**.  All notices, demands, designations, certificates, requests, offers, consents, approvals, appointments and other instruments given pursuant to this Lease shall be in writing and given by any one of the following: (a) hand delivery; (b) express overnight delivery service; (c) certified or registered mail, return receipt requested; or (d) email transmission, and shall be deemed to have been delivered upon (i) receipt, if hand delivered; (ii) the next Business Day, if delivered by a reputable express overnight delivery service; (iii) the third Business Day following the day of deposit of such notice with the United States Postal Service, if sent by certified or registered mail, return receipt requested; or (iv) transmission, if delivered by email transmission.  Notices shall be provided to the parties and addresses (or electronic mail addresses) specified below:

If to Lessee:          5171 Campbells Land Co., Inc.
                       6201 Steubenville Pike, Suite 100

28

McKees Rocks, PA  15136
Attention:  William Kane
Email: wtkane25@gmail.com

If to Lessor:          STORE Capital Acquisitions, LLC
                       8377 E. Hartford Drive, Suite 100
                       Scottsdale, AZ 85255
                       Attention:  Michael T. Bennett
                                   Executive Vice President – General Counsel
                       Email: mbennett@storecapital.com

With a copy to:        Kutak Rock LLP
                       1801 California Street, Suite 3000
                       Denver, CO 80202
                       Attention:  Nathan Humphrey, Esq. and
                                   Kelly Reynoldson, Esq.
                       Email: nathan.humphrey@kutakrock.com and
                              kelly.reynoldson@kutakrock.com

or to such other address or such other person as either party may from time to time hereafter specify to the other party in a notice delivered in the manner provided above.

## ARTICLE XVI

### LANDLORD'S LIEN / SECURITY INTEREST

**Section 16.01.  Landlord's Lien and Security Interest**.  Lessee agrees that Lessor shall have a landlord's lien, and Lessee additionally hereby separately grants to Lessor a first and prior security interest, in, on and against all of Lessee's right, title and interest in, to and under all Personalty, which lien and security interest shall secure the payment of all Rental and other Monetary Obligations payable by Lessee to Lessor under the terms hereof and all other obligations of Lessee to Lessor under this Lease.  Lessee agrees that Lessor may file such documents as Lessor then deems appropriate or necessary to perfect and maintain said lien and security interest, and expressly acknowledges and agrees that, in addition to any and all other rights and remedies of Lessor whether hereunder or at Law or in equity, in the Event of Default of Lessee hereunder, Lessor shall have any and all rights and remedies granted a secured party under the Uniform Commercial Code then in effect in the state where the Property is located.  Lessee covenants to promptly notify Lessor of any changes in Lessee's name and/or organizational structure which may necessitate the execution and filing of additional financing statements; *provided, however*, the foregoing shall not be construed as Lessor's consent to such changes.

Lessee hereby ratifies its authorization for Lessor or any of its Affiliates to have filed in any Uniform Commercial Code jurisdiction any initial financing statement and any amendments thereto covering the Personalty pledged herein, if filed prior to the Effective Date.

29

**ARTICLE XVII**

**MISCELLANEOUS**

**Section 17.01. Force Majeure**.  Any prevention, delay or stoppage due to strikes, lockouts, acts of God, enemy or hostile governmental action, civil commotion, fire or other casualty beyond the control of the party obligated to perform (each, a "Force Majeure Event") shall excuse the performance by such party for a period equal to any such prevention, delay or stoppage, expressly excluding, however, the obligations imposed upon Lessee with respect to Rental and other Monetary Obligations to be paid hereunder.

**Section 17.02.  No Merger**.  There shall be no merger of this Lease nor of the leasehold estate created by this Lease with the fee estate in or ownership of the Property by reason of the fact that the same person, corporation, firm or other entity may acquire or hold or own, directly or indirectly, (a) this Lease or the leasehold estate created by this Lease or any interest in this Lease or in such leasehold estate, and (b) the fee estate or ownership of the Property or any interest in such fee estate or ownership.  No such merger shall occur unless and until all persons, corporations, firms and other entities having any interest in (i) this Lease or the leasehold estate created by this Lease, and (ii) the fee estate in or ownership of the Property or any part thereof sought to be merged shall join in a written instrument effecting such merger and shall duly record the same.

**Section 17.03.  Interpretation**.  Lessor and Lessee acknowledge and warrant to each other that each has been represented by independent counsel and has executed this Lease after being fully advised by said counsel as to its effect and significance. This Lease shall be interpreted and construed in a fair and impartial manner without regard to such factors as the party which prepared the instrument, the relative bargaining powers of the parties or the domicile of any party.  Whenever in this Lease any words of obligation or duty are used, such words or expressions shall have the same force and effect as though made in the form of a covenant.

**Section 17.04.  Characterization.**  The following expressions of intent, representations, warranties, covenants, agreements, stipulations and waivers are a material inducement to Lessor entering into this Lease:

(a)       Lessor and Lessee intend that (i) this Lease constitutes an unseverable, unitary and single lease of all, but not less than all, of the Property, and, if at any time this Lease covers other real property in addition to the Property, neither this Lease, nor Lessee's obligations or rights hereunder may be allocated or otherwise divided among such properties by Lessee; (ii) this Lease is a "true lease," is not a financing lease, capital lease, mortgage, equitable mortgage, deed of trust, trust agreement, security agreement or other financing or trust arrangement, and the economic realities of this Lease are those of a true lease; and (iii) the business relationship created by this Lease and any related documents is solely that of a long-term commercial lease between Lessor and Lessee, the Lease has been entered into by both parties in reliance upon the economic and legal bargains contained herein, and none of the agreements contained herein is intended, nor shall the same be deemed or construed, to create a partnership (*de facto* or *de jure*) between Lessor and Lessee, to make them joint venturers, to make

30

Lessee an agent, legal representative, partner, subsidiary or employee of Lessor, nor to make Lessor in any way responsible for the debts, obligations or losses of Lessee.

(b)     Lessor and Lessee covenant and agree that: (i) each will treat this Lease as an operating lease pursuant to Statement of Financial Accounting Standards No. 13, as amended, and as a true lease for state Law reporting purposes and for federal income tax purposes; (ii) each party will not, nor will it permit any Affiliate to, at any time, take any action or take any action with respect to the preparation or filing of any statement or disclosure to Governmental Authority, including without limitation, any income tax return (including an amended income tax return), to the extent that such action or such failure to take action would be inconsistent with the intention of the parties expressed in this Section 17.04; (iii) with respect to the Property, the Lease Term is less than seventy-five percent (75%) of the estimated remaining economic life of the Property; and (iv) the Base Annual Rental is the fair market value for the use of the Property and was agreed to by Lessor and Lessee on that basis, and the execution and delivery of, and the performance by Lessee of its obligations under, this Lease do not constitute a transfer of all or any part of the Property.

(c)     Lessee waives any claim or defense based upon the characterization of this Lease as anything other than a true lease and as a master lease of the Property. Lessee stipulates and agrees (i) not to challenge the validity, enforceability or characterization of the lease of the Property as a true lease and/or as a single, unitary, unseverable instrument pertaining to the lease of all, but not less than all, of the Property; and (ii) not to assert or take or omit to take any action inconsistent with the agreements and understandings set forth in this Section 17.04.

**Section 17.05.  Disclosures**.

(a)     ***Securities Act or Exchange Act***.   The parties agree that, notwithstanding any provision contained in this Lease, any party (and each employee, representative or other agent of any party) may disclose to any and all persons, without limitation of any kind, any matter required under the Securities Act or the Exchange Act.

(b)     ***Lessor Advertising and Related Publications***.   Lessee hereby consents to the use by Lessor of, and Lessor is hereby expressly permitted to use, Lessee's name, trademarks, logos, pictures of stores and signage, and basic Transaction information (collectively "Lessee's Information") solely in connection with Lessor's sales, advertising, and press release materials, including on Lessor's website.  Lessee's consent shall be deemed authorization for the limited use of Lessee's Information by Lessor under all applicable copyright and trademark laws.

(c)     ***Public Disclosures.***  Except as required by Law, Lessee shall not make any public disclosure, including press releases or any form of media release, of this Lease Agreement or any transactions relating hereto without the prior written consent of Lessor.

**Section 17.06. Attorneys' Fees**.   In the event of any judicial or other adversarial proceeding concerning this Lease, to the extent permitted by Law, the prevailing party shall be

31

entitled to recover all of its reasonable attorneys' fees and other Costs in addition to any other relief to which it may be entitled.   In addition, the prevailing party shall, upon demand, be entitled to all attorneys' fees and all other Costs incurred in the preparation and service of any notice or demand hereunder, whether or not a legal action is subsequently commenced.

**Section 17.07.  Memoranda of Lease**.  Concurrently with the execution of this Lease, Lessor and Lessee are executing Lessor's standard form memorandum of lease in recordable form, indicating the names and addresses of Lessor and Lessee, a description of the Property, the Lease Term, but omitting Rentals and such other terms of this Lease as Lessor may not desire to disclose to the public.  Further, upon Lessor's request, Lessee agrees to execute and acknowledge a termination of lease and/or quitclaim deed in recordable form to be held by Lessor until the expiration or sooner termination of the Lease Term; *provided, however,* if Lessee shall fail or refuse to sign such a document in accordance with the provisions of this Section within ten (10) days following a request by Lessor, Lessee irrevocably constitutes and appoints Lessor as its attorney-in-fact to execute and record such document, it being stipulated that such power of attorney is coupled with an interest and is irrevocable and binding.

**Section 17.08.  No Brokerage**.  Lessor and Lessee represent and warrant to each other that they have had no conversation or negotiations with any broker concerning the leasing of the Property.  Each of Lessor and Lessee agrees to protect, indemnify, save and keep harmless the other, against and from all liabilities, claims, losses, Costs, damages and expenses, including attorneys' fees, arising out of, resulting from or in connection with their breach of the foregoing warranty and representation.

**Section 17.09.  Waiver of Jury Trial and Certain Damages**.  LESSOR AND LESSEE HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE THE RIGHT EITHER MAY HAVE TO A TRIAL BY JURY WITH RESPECT TO ANY AND ALL ISSUES PRESENTED IN ANY ACTION, PROCEEDING, CLAIM OR COUNTERCLAIM BROUGHT BY EITHER OF THE PARTIES HERETO AGAINST THE OTHER OR ITS SUCCESSORS WITH RESPECT TO ANY MATTER ARISING OUT OF OR IN CONNECTION WITH THIS LEASE, THE RELATIONSHIP OF LESSOR AND LESSEE, LESSEE'S USE OR OCCUPANCY OF THE PROPERTY, AND/OR ANY CLAIM FOR INJURY OR DAMAGE, OR ANY EMERGENCY OR STATUTORY REMEDY.  THIS WAIVER BY THE PARTIES HERETO OF ANY RIGHT EITHER MAY HAVE TO A TRIAL BY JURY HAS BEEN NEGOTIATED AND IS AN ESSENTIAL ASPECT OF THEIR BARGAIN.   FURTHERMORE, LESSOR AND LESSEE HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE THE RIGHT EITHER MAY HAVE TO SEEK PUNITIVE, CONSEQUENTIAL, SPECIAL AND INDIRECT DAMAGES FROM THE OTHER PARTY AND ANY OF THE AFFILIATES, OFFICERS, DIRECTORS, MEMBERS, MANAGERS OR EMPLOYEES OF LESSOR OR LESSEE, AS APPLICABLE, OR ANY OF THEIR SUCCESSORS WITH RESPECT TO ANY AND ALL ISSUES PRESENTED IN ANY ACTION, PROCEEDING, CLAIM OR COUNTERCLAIM BROUGHT WITH RESPECT TO ANY MATTER ARISING OUT OF OR IN CONNECTION WITH THIS LEASE OR ANY DOCUMENT CONTEMPLATED HEREIN OR RELATED HERETO.   THE WAIVER BY LESSOR AND LESSEE OF ANY RIGHT EITHER MAY HAVE TO SEEK PUNITIVE, CONSEQUENTIAL, SPECIAL AND INDIRECT DAMAGES HAS BEEN NEGOTIATED BY THE PARTIES HERETO AND IS AN ESSENTIAL ASPECT OF THEIR BARGAIN.

4814-6639-4203.1
STORE/Campbells (Perkins)
Lease Agreement
587 E. Main Street, Canfield, OH 44406
File No. 7210/02-588.5

**Section 17.10. Securitizations**.  As a material inducement to Lessor's willingness to enter into the Transactions contemplated by this Lease and the other Transaction Documents, Lessee hereby acknowledges and agrees that Lessor may, from time to time and at any time (a) advertise, issue press releases, send direct mail or otherwise disclose information regarding the Transaction for marketing purposes; and (b) (i) act or permit another Person to act as sponsor, settler, transferor or depositor of, or a holder of interests in, one or more Persons or other arrangements formed pursuant to a trust agreement, indenture, pooling agreement, participation agreement, sale and servicing agreement, limited liability company agreement, partnership agreement, articles of incorporation or similar agreement or document; and (ii) permit one or more of such Persons or arrangements to offer and sell stock, certificates, bonds, notes, other evidences of indebtedness or securities that are directly or indirectly secured, collateralized or otherwise backed by or represent a direct or indirect interest in whole or in part in any of the assets, rights or properties described in Section 14.01 of this Lease, in one or more Persons or arrangements holding such assets, rights or properties, or any of them (collectively, the "Securities"), whether any such Securities are privately or publicly offered and sold, or rated or unrated (any combination of which actions and transactions described in both clauses (i) and (ii) in this paragraph, whether proposed or completed, are referred to in this Lease as a "Securitization").  Lessee shall cooperate fully with Lessor and any Affected Party with respect to all reasonable requests and due diligence procedures and use reasonable efforts to facilitate such Securitization, provided that such cooperation shall be at no additional cost or expense to Lessee so long as Lessee is not otherwise required to provide such information to Lessor pursuant to the other provisions of this Lease.

**Section 17.11. State-Specific Provisions**.  The provisions and/or remedies which are set forth on the attached Exhibit D shall be deemed a part of and included within the terms and conditions of this Lease.

**Section 17.12. Time is of the Essence; Computation**.  Time is of the essence with respect to each and every provision of this Lease.  If any deadline provided herein falls on a non-Business Day, such deadline shall be extended to the next day that is a Business Day.

**Section 17.13. Waiver and Amendment**.  No provision of this Lease shall be deemed waived or amended except by a written instrument unambiguously setting forth the matter waived or amended and signed by the party against which enforcement of such waiver or amendment is sought.  Waiver of any matter shall not be deemed a waiver of the same or any other matter on any future occasion.  No acceptance by Lessor of an amount less than the Rental and other Monetary Obligations stipulated to be due under this Lease shall be deemed to be other than a payment on account of the earliest such Rental or other Monetary Obligations then due or in arrears nor shall any endorsement or statement on any check or letter accompanying any such payment be deemed a waiver of Lessor's right to collect any unpaid amounts or an accord and satisfaction.

**Section 17.14. Successors Bound**.  Except as otherwise specifically provided herein, the terms, covenants and conditions contained in this Lease shall bind and inure to the benefit of the respective heirs, successors, executors, administrators and assigns of each of the parties hereto.

4814-6639-4203.1
STORE/Campbells (Perkins)
Lease Agreement
587 E. Main Street, Canfield, OH 44406
File No. 7210/02-588.5

**Section 17.15.  Captions**.  Captions are used throughout this Lease for convenience of reference only and shall not be considered in any manner in the construction or interpretation hereof.

**Section 17.16.  Other Documents**.  Each of the parties agrees to sign such other and further documents as may be necessary or appropriate to carry out the intentions expressed in this Lease.

**Section 17.17.  Entire Agreement**.    This Lease and any other instruments or agreements referred to herein, constitute the entire agreement between the parties with respect to the subject matter hereof, and there are no other representations, warranties or agreements except as herein provided.

**Section 17.18.  Forum Selection; Jurisdiction; Venue; Choice of Law**.  For purposes of any action or proceeding arising out of this Lease, the parties hereto expressly submit to the jurisdiction of all federal and state courts located in the state where the Property is located. Lessee consents that it may be served with any process or paper by registered mail or by personal service within or without the state where the Property is located in accordance with applicable Law.  Furthermore, Lessee waives and agrees not to assert in any such action, suit or proceeding that it is not personally subject to the jurisdiction of such courts, that the action, suit or proceeding is brought in an inconvenient forum or that venue of the action, suit or proceeding is improper.  This Lease shall be governed by, and construed with, the Laws of the applicable state in which the Property is located, without giving effect to any state's conflict of Laws principles.

**Section 17.19.  Counterparts**.    This Lease may be executed in one or more counterparts, each of which shall be deemed an original.  Furthermore, the undersigned agree that transmission of this Lease via e-mail in a ".pdf" or other electronic format shall be deemed transmission of the original Lease for all purposes.

*[Remainder of page intentionally left blank; signature page(s) to follow]*

34

4814-6639-4203.1
STORE/Campbells (Perkins)
Lease Agreement
587 E. Main Street, Canfield, OH 44406
File No. 7210/02-588.5

**IN WITNESS WHEREOF**, Lessor and Lessee have entered into this Lease as of the date first above written.

**LESSOR:**

**STORE CAPITAL ACQUISITIONS, LLC**, a Delaware limited liability company

By_____

Printed Name:_____
Michael T. Bennett
Executive Vice President
General Counsel

Title:_____

STATE OF ARIZONA                           )
                                           ) ss.
COUNTY OF MARICOPA                         )

Before me, the undersigned, a Notary Public of the State and County aforesaid, personally appeared _Michael T. Bennett_, with whom I am personally acquainted (or proved to me to be on the basis of satisfactory evidence), and who, upon oath, acknowledged himself/herself to be the _EVP_ of **STORE CAPITAL ACQUISITIONS, LLC**, a Delaware limited liability company, the within named Lessor, and that he/she as such officer, being authorized so to do, executed the within instrument for the purposes therein contained, by signing the name of _Store Capital Acquisitions, LLC_ by himself/herself as such officer.

WITNESS my hand and Official Seal at office, this _29_ day of _Jan_, 2018.

_____
Notary Public

My Commission Expires _8/8/2019_

DONYA NANETTE DERUITER
Notary Public, State of Arizona
Maricopa County
My Commission Expires
August 08, 2019

**IN WITNESS WHEREOF**, Lessor and Lessee have entered into this Lease as of the date first above written.

**LESSEE:**

**5171 CAMPBELLS LAND CO., INC.**, a
Pennsylvania corporation

By: _~~Willie T. Kane~~_

Printed Name: _William T Kane_

Title: _President_

STATE OF _Pennsylvania_        )
                              ) ss.
COUNTY OF _Allegheny_          )

    Before me, the undersigned, a Notary Public of the State and County aforesaid, personally appeared ___William Kane___, with whom I am personally acquainted (or proved to me to be on the basis of satisfactory evidence), and who, upon oath, acknowledged himself/herself to be the ___President___ of **5171 CAMPBELLS LAND CO., INC.**, a Pennsylvania corporation, the within named Lessee, a ___Corporation___, and that he/she as such officer, being authorized so to do, executed the within instrument for the purposes therein contained, by signing the name of _the corporation_ by himself/herself as such officer.

WITNESS my hand and Official Seal at office, this _30th_ day of _January_, 2018.

_Rosanne M Penn_
Notary Public

My Commission Expires _9/13/20_

COMMONWEALTH OF PENNSYLVANIA
NOTARIAL SEAL
Rosanne M. Penn, Notary Public
City of Pittsburgh, Allegheny County
My Commission Expires Sept. 13, 2020
MEMBER, PENNSYLVANIA ASSOCIATION OF NOTARIES

4814-6639-4203.1
STORE/Campbells (Perkins)
Lease Agreement
587 E. Main Street, Canfield, OH 44406
File No. 7210/02-588.5

**EXHIBITS**

Exhibit A:             Defined Terms

Exhibit B:             Legal Description and Street Address of the Property

Exhibit C:             Authorization Agreement – Pre-Arranged Payments

Exhibit D:             State-Specific Provisions

Schedule 9.03          Supplemental Financial Information

**EXHIBIT A**

**DEFINED TERMS**

The following terms shall have the following meanings for all purposes of this Lease:

"*Additional Rental*" has the meaning set forth in Section 4.03.

"*Adjustment Date*" has the meaning set forth in Section 1.07.

"*Affected Party*" means each direct or indirect participant or investor in a proposed or completed Securitization, including, without limitation, any prospective owner, any rating agency or any party to any agreement executed in connection with the Securitization.

"*Affiliate*" means any Person which directly or indirectly controls, is under common control with or is controlled by any other Person.  For purposes of this definition, "controls," "under common control with," and "controlled by" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities or otherwise.

"*Anti-Money Laundering Laws*" means all applicable Laws, regulations and government guidance on the prevention and detection of money laundering, including, without limitation, (a) 18 U.S.C. §§ 1956 and 1957; and (b) the Bank Secrecy Act, 31 U.S.C. §§ 5311 et seq., and its implementing regulations, 31 CFR Part 103.

"*Base Annual Rental*" has the meaning set forth in Section 1.05.

"*Base Monthly Rental*" means an amount equal to 1/12 of the applicable Base Annual Rental.

"*Business Day*" means a day on which banks located in Scottsdale, Arizona are not required or authorized to remain closed.

"*Casualty*" means any loss of or damage to any property included within or related to the Property or arising from an adjoining property caused by an Act of God, fire, flood or other catastrophe.

"*Code*" means the Internal Revenue Code of 1986, as the same may be amended from time to time.

"*Condemnation*" means a Taking and/or a Requisition.

"*Costs*" means all reasonable costs and expenses incurred by a Person, including, without limitation, reasonable attorneys' fees and expenses, court costs, expert witness fees, costs of tests and analyses, travel and accommodation expenses, deposition and trial transcripts, copies and other similar costs and fees, brokerage fees, escrow fees, title insurance

A-1

premiums, appraisal fees, stamp taxes, recording fees and transfer taxes or fees, as the circumstances require.

"*Default Rate*" means 18% per annum or the highest rate permitted by Law, whichever is less.

"*Effective Date*" has the meaning set forth in the introductory paragraph of this Lease.

"*Environmental Laws*" means federal, state and local Laws, ordinances, common law requirements and regulations and standards, rules, policies and other governmental requirements, administrative rulings and court judgments and decrees having the effect of Law in effect now or in the future and including all amendments, that relate to Hazardous Materials, Regulated Substances, USTs, and/or the protection of human health or the environment, or relating to liability for or Costs of Remediation or prevention of Releases, and apply to Lessee and/or the Property.

"*Environmental Liens*" means any liens and other encumbrances imposed pursuant to any Environmental Law.

"*Environmental Policy*" means a pollution legal liability insurance policy issued by an environmental insurer reasonably acceptable to Lessor and Lessor's lender, which Environmental Policy shall be in form and substance satisfactory to Lessor and shall be in amounts of not less than $1,000,000.00 per occurrence and $2,000,000.00 annual aggregate for losses caused by known and unknown pollution conditions that arise from the operations of the tenant, their contractors, or their sub-contractors, with coverage to include: (a) bodily injury or death, (b) property damage, including physical injury to or destruction of tangible property, (c) clean-up costs, and (d) defense, including costs, charges and expenses incurred in the investigation, adjustment or defense of claims for damages.

"*Event of Default*" has the meaning set forth in Section 12.01.

"*Exchange Act*" means the Securities Exchange Act of 1934, as amended.

"*Extension Option*" has the meaning set forth in Section 3.02.

"*Extension Term*" has the meaning set forth in Section 3.02.

"*Force Majeure Event*" has the meaning set forth in Section 17.01.

"*Franchise Agreement*" has the meaning set forth in Section 5.08.

"*Franchisor*" means Perkins Restaurant and Bakery, a Delaware corporation, or its successors and permitted assigns.

"*GAAP*" means generally accepted accounting principles, consistently applied from period to period.

4814-6639-4203.1
STORE/Campbells (Perkins)
Lease Agreement
587 E. Main Street, Canfield, OH 44406
File No. 7210/02-588.5

"*Governmental Authority*" means any governmental authority, agency, department, commission, bureau, board, instrumentality, court or quasi-governmental authority of the United States, any state or any political subdivision thereof with authority to adopt, modify, amend, interpret, give effect to or enforce any federal, state and local Laws, statutes, ordinances, rules or regulations, including common law, or to issue court orders.

"*Guarantor*" means collectively, William Kane, Frank Kane and Ron Linaburg or any additional or replacement guarantor(s) approved by Lessor in its sole and absolute discretion.

"*Guaranty*" means that certain Unconditional Guaranty of Payment and Performance dated as of the date hereof given by Guarantor for the benefit of Lessor, as the same may be amended from time to time.

"*Hazardous Materials*" includes: (a) oil, petroleum products, flammable substances, explosives, radioactive materials, hazardous wastes or substances, toxic wastes or substances or any other materials, contaminants or pollutants, the presence of which causes the Property to be in violation of any local, state or federal Law or regulation, or Environmental Law, or are defined as or included in the definition of "hazardous substances," "hazardous wastes," "hazardous materials," "toxic substances," "contaminants," "pollutants," or words of similar import under any applicable local, state or federal Law or under the regulations adopted, orders issued, or publications promulgated pursuant thereto, including, but not limited to: (i) the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, 42 U.S.C. § 9601, et seq.; (ii) the Hazardous Materials Transportation Act, as amended, 49 U.S.C. § 5101, et seq.; (iii) the Resource Conservation and Recovery Act, as amended, 42 U.S.C. § 6901, et seq.; and (iv) regulations adopted and publications promulgated pursuant to the aforesaid Laws; (b) asbestos in any form which is friable, urea formaldehyde foam insulation, transformers or other equipment which contain dielectric fluid containing levels of polychlorinated biphenyls in excess of fifty (50) parts per million; (c) underground storage tanks; and (d) any other chemical, material or substance, exposure to which is prohibited, limited or regulated by any Governmental Authority.

"*Indemnified Parties*" means Lessor, its members, managers, officers, directors, shareholders, partners, employees, affiliates, subsidiaries, successors and assigns, including, but not limited to, any successors by merger, consolidation or acquisition of all or a substantial portion of the assets and business of Lessor.

"*Initial Term*" has the meaning set forth in Section 3.01.

"*Insolvency Event*" means (a) a Person's (i) failure to generally pay its debts as such debts become due; (ii) admitting in writing its inability to pay its debts generally; or (iii) making a general assignment for the benefit of creditors; (b) any proceeding being instituted by or against any Person (i) seeking to adjudicate it bankrupt or insolvent; (ii) seeking liquidation, dissolution, winding up, reorganization, arrangement, adjustment, protection, relief, or composition of it or its debts under any Law relating to bankruptcy, insolvency, or reorganization or relief of debtors; or (iii) seeking the entry of an order for relief or the appointment of a receiver, trustee, or other similar official for it or for any substantial part of its property, and in the case of any such proceeding instituted against any Person, either such proceeding shall remain undismissed for a period of one hundred twenty (120) days or any of the actions sought in such proceeding shall

A-3

occur; or (c) any Person taking any corporate action to authorize any of the actions set forth above in this definition.

*"Insurance Premiums"* has the meaning in Section 6.05.

"*Law(s)*" means any constitution, statute, rule of law, code, ordinance, order, judgment, decree, injunction, rule, regulation, policy, requirement or administrative or judicial determination, even if unforeseen or extraordinary, of every duly constituted Governmental Authority, court or agency, now or hereafter enacted or in effect.

"*Lease Rate*" means a percentage equal to (a) the then-current Base Monthly Rental multiplied by twelve (12), divided by (b) the aggregate purchase price of the Property paid by Lessor (or Lessor's predecessor-in-interest).

"*Lease Term*" has the meaning described in Section 3.01.

"*Legal Requirements*" means the requirements of all present and future Laws (including, without limitation, Environmental Laws and Laws relating to accessibility to, usability by, and discrimination against, disabled individuals), all judicial and administrative interpretations thereof, including any judicial order, consent, decree or judgment, and all covenants, restrictions and conditions now or hereafter of record which may be applicable to Lessee or to the Property, or to the use, manner of use, occupancy, possession, operation, maintenance, alteration, repair or restoration of the Property, even if compliance therewith necessitates structural changes or improvements or results in interference with the use or enjoyment of the Property.

"*Lender*" means any lender in connection with any loan secured by Lessor's interest in the Property, and any servicer of any loan secured by Lessor's interest in the Property.

*"Lessee Entity"* or "*Lessee Entities*" means individually or collectively, as the context may require, Lessee and Guarantor, and all Affiliates thereof.

*"Lessee Reporting Entities"* means Lessee.

*"Lessee's Information"* has the meaning set forth in Section 17.05(b).

*"Lessor Entity"* or "*Lessor Entities*" means individually or collectively, as the context may require, Lessor and all Affiliates of Lessor.

"*Losses*" means any and all claims, suits, liabilities (including, without limitation, strict liabilities), actions, proceedings, obligations, debts, damages, losses, Costs, diminutions in value, fines, penalties, interest, charges, fees, judgments, awards, amounts paid in settlement and damages of whatever kind or nature, inclusive of bodily injury and property damage to third parties (including, without limitation, attorneys' fees and other Costs of defense).

"*Master Environmental Policy*" means a master environmental insurance policy maintained by Lessor (or any Affiliate thereof) that covers other real property owned by Lessor (or any Affiliate thereof).

A-4

"*Master Lease Agreement*" that certain Master Lease Agreement of even date herewith between STORE Master Funding XIII, LLC, as lessor, and Lessee with respect to 17 parcels of real property.

"*Material Adverse Effect*" means a material adverse effect on (a) the Property, including without limitation, the operation of the Property as a Permitted Facility and/or the value of the Property; (b) the contemplated business, condition, worth or operations of any Lessee Entity; (c) Lessee's ability to perform its obligations under this Lease; (d) Lessor's interests in the Property, this Lease or the other Transaction Documents; or (e) any Guarantor's ability to perform its obligations under the Guaranty.

"*Monetary Obligations*" means all Rental and all other sums payable or reimbursable by Lessee under this Lease to Lessor, to any third party on behalf of Lessor, or to any Indemnified Party.

"*Mortgages*" means, collectively, the mortgages, deeds of trust or deeds to secure debt, assignments of rents and leases, security agreements and fixture filings executed by Lessor for the benefit of Lender with respect to the Property, as such instruments may be amended, modified, restated or supplemented from time to time and any and all replacements or substitutions.

"*Net Award*" means (a) the entire award payable with respect to a Property by reason of a Condemnation whether pursuant to a judgment or by agreement or otherwise; or (b) the entire proceeds of any insurance required under Section 6.03 payable with respect to a Property, as the case may be, and in either case, less any Costs incurred by Lessor in collecting such award or proceeds.

"*OFAC Laws*" means Executive Order 13224 issued by the President of the United States, and all regulations promulgated thereunder, including, without limitation, the Terrorism Sanctions Regulations (31 CFR Part 595), the Terrorism List Governments Sanctions Regulations (31 CFR Part 596), the Foreign Terrorist Organizations Sanctions Regulations (31 CFR Part 597), and the Cuban Assets Control Regulations (31 CFR Part 515), and all other present and future federal, state and local Laws, ordinances, regulations, policies, lists (including, without limitation, the Specially Designated Nationals and Blocked Persons List) and any other requirements of any Governmental Authority (including without limitation, the U.S. Department of the Treasury Office of Foreign Assets Control) addressing, relating to, or attempting to eliminate, terrorist acts and acts of war, each as supplemented, amended or modified from time to time after the Effective Date, and the present and future rules, regulations and guidance documents promulgated under any of the foregoing, or under similar Laws, ordinances, regulations, policies or requirements of other states or localities.

"*Other Agreements*" means, collectively, all agreements and instruments now or hereafter entered into between, among or by (a) any of the Lessee Entities; and, or for the benefit of, (b) any of the Lessor Entities, including, without limitation, leases, promissory notes and guaranties, but excluding this Lease and all other Transaction Documents; including, (i) the Master Lease Agreement; (ii) that certain Lease Agreement of even date herewith between Lessor, as lessor, and Lessee with respect to the real property located at 1601 W. Prospect Road, Ashtabula, OH 44004, (iii) that certain Lease Agreement of even date herewith between

4814-6639-4203.1
STORE/Campbells (Perkins)
Lease Agreement
587 E. Main Street, Canfield, OH 44406
File No. 7210/02-588.5

Lessor, as lessor, and Lessee with respect to the real property located at 115 Ludlow Street, Warren, PA 16365, (iv) that certain Lease Agreement of even date herewith between Lessor, as lessor, and Lessee with respect to the real property located at 4896 Everhard Road NW, Canton, OH 44718, and/or (v) that certain Lease Agreement of even date herewith between Lessor, as lessor, and Lessee with respect to the real property located at 2945 East State Street, Hermitage, PA 16148, as each may be amended from time to time.

"*Partial Condemnation*" has the meaning set forth in Section 11.03.

"*Permitted Amounts*" shall mean, with respect to any given level of Hazardous Materials or Regulated Substances, that level or quantity of Hazardous Materials or Regulated Substances in any form or combination of forms which does not constitute a violation of any Environmental Laws and is customarily employed in, or associated with, similar businesses located in the state where the Property is located.

"*Permitted Facility*" means a Perkins Restaurant and Bakery, all related purposes such as ingress, egress and parking, and uses incidental thereto.

"*Person*" means any individual, partnership, corporation, limited liability company, trust, unincorporated organization, Governmental Authority or any other form of entity.

"*Personalty*" means any and all "goods" (excluding "inventory," and including, without limitation, all "equipment," "fixtures," appliances and furniture (as "goods," "inventory," "equipment" and "fixtures" are defined in the applicable Uniform Commercial Code then in effect in the applicable jurisdiction)) from time to time situated on or used in connection with the Property, whether now owned or held or hereafter arising or acquired, together with all replacements and substitutions therefore and all cash and non-cash proceeds (including insurance proceeds and any title and UCC insurance proceeds) and products thereof, and, in the case of tangible collateral, together with all additions, attachments, accessions, parts, equipment and repairs now or hereafter attached or affixed thereto or used in connection therewith.

"*Price Index*" means the Consumer Price Index which is designated for the applicable month of determination as the United States City Average for All Urban Consumers, All Items, Not Seasonally Adjusted, with a base period equaling 100 in 1982 - 1984, as published by the United States Department of Labor's Bureau of Labor Statistics or any successor agency.  In the event that the Price Index ceases to be published, its successor index measuring cost of living as published by the same Governmental Authority which published the Price Index shall be substituted and any necessary reasonable adjustments shall be made by Lessor and Lessee in order to carry out the intent of Section 4.02.  In the event there is no successor index measuring cost of living, Lessor shall reasonably select an alternative price index measuring cost of living that will constitute a reasonable substitute for the Price Index.

"Property" means the parcel of real estate legally described on Exhibit B attached hereto, all rights, privileges, and appurtenances associated therewith, and all buildings, fixtures and other improvements now or hereafter located on such real estate (whether or not affixed to such real estate).

4814-6639-4203.1
STORE/Campbells (Perkins)
Lease Agreement
587 E. Main Street, Canfield, OH 44406
File No. 7210/02-588.5

"*Real Estate Taxes*" has the meaning set forth in Section 6.05.

"*Regulated Substances*" means "petroleum" and "petroleum-based substances" or any similar terms described or defined in any of the Environmental Laws and any applicable federal, state, county or local Laws applicable to or regulating USTs.

"*REIT*" means a real estate investment trust as defined under Section 856 of the Code.

"*Release*" means any presence, release, deposit, discharge, emission, leaking, spilling, seeping, migrating, injecting, pumping, pouring, emptying, escaping, dumping, disposing or other movement of Hazardous Materials, Regulated Substances or USTs or any Threatened Release.

"*Remediation*" means any response, remedial, removal, or corrective action, any activity to cleanup, detoxify, decontaminate, contain or otherwise remediate any Hazardous Materials, Regulated Substances or USTs, any actions to prevent, cure or mitigate any Release, any action to comply with any Environmental Laws or with any permits issued pursuant thereto, any inspection, investigation, study, monitoring, assessment, audit, sampling and testing, laboratory or other analysis, or any evaluation relating to any Hazardous Materials, Regulated Substances or USTs.

"*Rental*" means, collectively, the Base Annual Rental and the Additional Rental.

"*Rental Adjustment*" means an amount equal to the lesser of (a) 2% of the Base Annual Rental in effect immediately prior to the applicable Adjustment Date, or (b) 1.25 multiplied by the product of (i) the percentage change between the Price Index for the month which is two months prior to the Effective Date or the Price Index used for the immediately preceding Adjustment Date, as applicable, and the Price Index for the month which is two months prior to the applicable Adjustment Date; and (ii) the then current Base Annual Rental.

"*Requisition*" means any temporary requisition or confiscation of the use or occupancy of the Property by any Governmental Authority, civil or military, whether pursuant to an agreement with such Governmental Authority in settlement of or under threat of any such requisition or confiscation, or otherwise.

"*Reserve*" has the meaning in Section 6.04.

"*Securities*" has the meaning set forth in Section 17.10.

"*Securities Act*" means of the Securities Act of 1933, as amended.

"*Securitization*" has the meaning set forth in Section 17.10.

"*Successor Lessor*" has the meaning set forth in Section 13.03.

"*Taking*" means (a) any taking or damaging of all or a portion of the Property (i) in or by condemnation or other eminent domain proceedings pursuant to any Law, general or special; (ii) by reason of any agreement with any condemnor in settlement of or under threat of any such

4814-6639-4203.1
STORE/Campbells (Perkins)
Lease Agreement
587 E. Main Street, Canfield, OH 44406
File No. 7210/02-588.5

condemnation or other eminent domain proceeding; or (iii) by any other means; or (b) any de facto condemnation.  The Taking shall be considered to have taken place as of the later of the date actual physical possession is taken by the condemnor, or the date on which the right to compensation and damages accrues under the Law applicable to the Property.

"*Temporary Taking*" has the meaning set forth in Section 11.04.

"*Threatened Release*" means a substantial likelihood of a Release which requires action to prevent or mitigate damage to the soil, surface waters, groundwaters, land, stream sediments, surface or subsurface strata, ambient air or any other environmental medium comprising or surrounding the Property which may result from such Release.

"*Total Condemnation*" has the meaning set forth in Section 11.02.

"*Transaction*" has the meaning set forth in Section 14.01.

"*Transaction Documents*" means this Lease, the Guaranty and all documents related thereto.

"*U.S. Publicly Traded Entity*" means an entity whose securities are listed on a national securities exchange or quoted on an automated quotation system in the United States or a wholly-owned subsidiary of such an entity.

"*USTs*" means any one or combination of tanks and associated product piping systems used in connection with storage, dispensing and general use of Regulated Substances.

A-8

**EXHIBIT B**

**LEGAL DESCRIPTION AND
STREET ADDRESS OF THE PROPERTY**

**Street Address:**

| Address | City | ST | Zip | County |
|---|---|---|---|---|
| 587 E. Main Street | Canfield | OH | 44406 | Mahoning |

**Legal Description**:

**721002-588.5 587 E. Main Street, Canfield, OH 44406**

Real property in the City of Canfield, County of Mahoning, State of Ohio, described as follows:

Parcel No. 1:

And known as being Lot Number 1696 according to the latest enumeration of lots in said City as shown in a Plat thereof recorded in Volume 63, Page 297, Mahoning County Records of Plats.

Said Canfield City Lot No. 1696 has a frontage of 124 feet on the South line of Boardman-Canfield Road, and extends back on its East line 268 feet and extends back on its west line 268 feet, and having a rear line of 124 feet as appears by said plat.

Parcel Number(s): 28-028-0-026.00-0

Known for Street numbering purposes as: 587 East Main Street, City of Canfield 44406.

Parcel No. 2:

Situated in the City of Canfield, County of Mahoning and State of Ohio, and known as being Canfield City Lot No. 1491 according to the latest enumeration of lots in said City as shown in a Plat thereof recorded in Volume 63, Page 297, Mahoning County Records of Plats.

Parcel No. 3:

Non-exclusive easement for access as set forth in Easement Agreement dated June 22, 1973, filed for record on December 11, 1973 in Lease Volume 168, Page 851, in Mahoning County Records.

B-1

**EXHIBIT C**

**FORM OF AUTHORIZATION AGREEMENT – PRE-ARRANGED PAYMENTS**

Reference Number _____

I (We) (Tenant) authorize /_____\, (Servicer) to initiate entries identified below as required. Tenant further authorizes the bank below to post such entries to the identified checking account beginning with the payment draft date of ____/___/_____. A minimum of thirty (30) days advance notice is required to process first payment by ACH.

Bank Name_____Branch_____

City_____State_____Zip_____

— — — — — — — — —        — — — — — — — — — — — — —

| ***Transit - ABA** | **Account Number Information** |

ACCOUNT TYPE*** Please specify checking or savings account (C/S) _____

**PLEASE FILL IN BANK INFORMATION CAREFULLY**
**ATTACH VOIDED CHECK FOR ACCOUNT VERIFICATION**

Automatic debits will be made on the payment due date established by the relevant lease documents, or the next subsequent business day if such date is not a business day. This authority may be terminated upon thirty days prior written notification from the Tenant to the servicer. Tenant has the right to stop payment of any entry by notification to the bank prior to the scheduled debit date. If an erroneous entry is initiated by the servicer to the Tenant's account, Tenant shall have the right to have the amount of such entry reversed by the bank. To initiate a reversal, the Tenant must notify the bank in writing that an error has occurred and request a reversal. Such notice must be within 15 calendar days after the Tenant receives the statement of account or other written notice from the bank identifying the error. Tenant hereby authorizes the servicer to impose a $60.00 returned item processing fee, subject to change, via ACH debit against the above-referenced account of the Tenant if a non-sufficient funds or stop payment item is charged against the servicer's account.

**Tenant**                                          **Tax Identification**

**Name(**s) _____**Number** _____

**Date**_____

**Print Authorized Name** _____

**Authorized Signature** _____

**Print Authorized Name** _____

**Authorized Signature** _____

**Contact Phone Number** _____ **Fax Number** _____

**Email Address**: _____

**Return Original to**:        /_____\
                           **Attn: /_____\**
                           /_____\
                           /_____\
                           **Fax Number:/_____\**

C-1

4814-6639-4203.1
STORE/Campbells (Perkins)
Lease Agreement
587 E. Main Street, Canfield, OH 44406
File No. 7210/02-588.5

**EXHIBIT D**

**STATE-SPECIFIC PROVISIONS**

<u>**OHIO**</u>:

Upon receipt of Lessor's invoice, Lessee shall pay its *pro rata* share of the installment of taxes for which Lessee is responsible pursuant to Section 6.01(a) (Taxes) which were a lien during the Lease Term but are due and payable following the expiration of this Lease.

Notwithstanding Section 7.02 (Alterations and Improvements), prior to commencing any alterations to the Property, Lessee shall prepare, record, serve and post a Notice of Commencement in compliance with Ohio Revised Code Section 1311.04.  Upon completion of such improvements, Lessee shall prepare and record a termination of the Notice of Commencement.  Copies of all Notices of Commencement and terminations shall be delivered to Lessor within seven (7) days of recording.

D-1

**SCHEDULE 9.03**

**SUPPLEMENTAL FINANCIAL INFORMATION**

Lessee shall deliver the following information in connection with delivery of the corporate financial statements required in Section 9.03 of the Lease.

**Corporate Financial Reporting Certificate**

Company:

For the Qtr or FYE ending                                        _____

# of months represented                                          _____

Number of units operating at the end of reporting period         _____

**EBITDAR Calculation:**

Net Income                                                       _____

    Plus: Interest Expense                                       _____
    Plus: Taxes                                                  _____
    Plus: Depreciation & Amortization                            _____
    Plus: Operating Lease Expense                                _____
    Plus: Any non-recurring expenses (please clarify below)      _____
    Plus: Any other non-cash expenses (please clarify below)     _____
       **EBITDAR**                                            _____

**Items required to be broken out of Balance Sheet:**
    Current Portion of Long-Term Debt                            _____
    Current Portion of any Capital Leases                        _____
    Senior Third-Party Debt Balances                             _____
    Subordinate/Related Party Debt Balances                      _____

Explanations of non-recurring and non-cash items:

```



```

Lessee shall deliver the following information in connection with delivery of the unit-level financial statements required in Section 9.03 of the Lease.

**STORE Capital Unit-Level Financial Reporting Certificate**

| | 1 | 2 | 3 |
|---|---|---|---|
| Unit ID: | | | |
| For the Qtr or FYE ending | _____ | _____ | _____ |
| # of months represented | _____ | _____ | _____ |

**Store-Level pre-corporate overhead EBITDAR Calculation:**

| | 1 | 2 | 3 |
|---|---|---|---|
| Store-Level Net Income | _____ | _____ | _____ |
| Plus: Interest Expense | _____ | _____ | _____ |
| Plus: Taxes | _____ | _____ | _____ |
| Plus: Depreciation & Amortization | _____ | _____ | _____ |
| Plus: Property Rent Expense (base rent + any % rent) | _____ | _____ | _____ |
| Plus: Any corporate overhead allocations to the unit | _____ | _____ | _____ |
| Plus: Any non-recurring expenses (please clarify below) | _____ | _____ | _____ |
| Plus: Any other non-cash expenses (please clarify below) | _____ | _____ | _____ |
| **EBITDAR** | _____ | _____ | _____ |

**Items required to be broken out on unit-level profit and loss statement:**

| | 1 | 2 | 3 |
|---|---|---|---|
| Cost Goods Sold | _____ | _____ | _____ |
| Labor Expenses | _____ | _____ | _____ |

Explanations of non-recurring and non-cash items:

ii

# EXHIBIT J

## LEASE AGREEMENT

**THIS LEASE AGREEMENT** (this "Lease") is made as of February 12, 2018 (the "Effective Date"), by and between **STORE CAPITAL ACQUISITIONS, LLC**, a Delaware limited liability company ("Lessor"), whose address is 8377 E. Hartford Drive, Suite 100, Scottsdale, Arizona 85255, and **5171 CAMPBELLS LAND CO., INC.**, a Pennsylvania corporation ("Lessee"), whose address is 6201 Steubenville Pike, Suite 100, McKees Rocks, Pennsylvania 15136.  Capitalized terms not defined herein shall have the meanings set forth in Exhibit A hereto.

In consideration of the mutual covenants and agreements contained in this Lease, intending to be legally bound, Lessor and Lessee covenant and agree as follows:

### ARTICLE I

### BASIC LEASE TERMS

**Section 1.01.  Property**.  The street address and legal description of the Property is set forth on Exhibit B attached hereto and incorporated herein.

**Section 1.02.  Initial Term Expiration Date**.  February 28, 2038.

**Section 1.03.  Extension Options**.  Four (4) extensions of five (5) years each, as described in Section 3.02.

**Section 1.04.  Term Expiration Date (if fully extended)**.  February 28, 2058.

**Section 1.05.  Initial Base Annual Rental**.  $91,151.74, as described in Article IV.

**Section 1.06.  Rental Adjustment**.  The lesser of (i) 2%, or (ii) 1.25 times the change in the Price Index, as described in Section 4.02.

**Section 1.07.  Adjustment Date**. March 1, 2019 and annually on March 1st thereafter during the Lease Term (including any Extension Term).

**Section 1.08.  Guarantors**.  William Kane, Frank Kane and Ron Linaburg.

**Section 1.09.  Intentionally Deleted**.

**Section 1.10.  Lessee Tax Identification No**.  46-2488070.

**Section 1.11.  Lessor Tax Identification No.**  45-2674893.

### ARTICLE II

### LEASE OF PROPERTY

**Section 2.01.  Lease**.  In consideration of Lessee's payment of the Rental and other Monetary Obligations and Lessee's performance of all other obligations hereunder, Lessor

hereby leases to Lessee, and Lessee hereby takes and hires, the Property, "AS IS" and "WHERE IS" without representation or warranty by Lessor, and subject to the existing state of title, the parties in possession, any statement of facts which an accurate survey or physical inspection might reveal, and all Legal Requirements now or hereafter in effect.

**Section 2.02.  Quiet Enjoyment**.  So long as Lessee shall pay the Rental and other Monetary Obligations provided in this Lease and shall keep and perform all of the terms, covenants and conditions on its part contained herein and subject to the rights of Lessor under Section 12.02, Lessee shall have, subject to the terms and conditions set forth herein, the right to the peaceful and quiet enjoyment and occupancy of the Property.

## ARTICLE III

## LEASE TERM; EXTENSION

**Section 3.01. Initial Term**.   The initial term of this Lease ("Initial Term") shall commence as of the Effective Date and shall expire at midnight on February 28, 2038, unless terminated sooner as provided in this Lease and as may be extended as provided herein.  The time period during which this Lease shall actually be in effect, including any Extension Term, is referred to as the "Lease Term."

**Section 3.02.  Extensions**.   Unless this Lease has expired or has been sooner terminated, or an Event of Default has occurred and is continuing at the time any extension option is exercised, Lessee shall have the right and option (each, an "Extension Option") to extend the Initial Term for all and not less than the Property for four (4) additional successive periods of five (5) years each (each, an "Extension Term"), pursuant to the terms and conditions of this Lease then in effect.

**Section 3.03.  Notice of Exercise**.  Lessee may only exercise the Extension Options by giving written notice thereof to Lessor of its election to do so no later than one hundred twenty (120) days prior to the expiration of the then-current Lease Term.  If written notice of the exercise of any Extension Option is not received by Lessor by the applicable dates described above, then this Lease shall terminate on the last day of the Initial Term or, if applicable, the last day of the Extension Term then in effect.  Upon the request of Lessor or Lessee, the parties hereto will, at the expense of Lessee, execute and exchange an instrument in recordable form setting forth the extension of the Lease Term in accordance with this Section 3.03.

**Section 3.04.  Removal of Personalty**.  Upon the expiration of the Lease Term, and if Lessee is not then in breach hereof, Lessee may remove from the Property all personal property belonging to Lessee.  Lessee shall repair any damage caused by such removal and shall leave the Property clean and in good and working condition and repair inside and out, subject to normal wear and tear, casualty and condemnation.  Any property of Lessee left on the Property on the tenth day following the expiration of the Lease Term shall, at Lessor's option, automatically and immediately become the property of Lessor.

4844-5241-0971.1
STORE/Campbells (Perkins)
Lease Agreement
1601 W. Prospect Road, Ashtabula, OH 44004
File No. 7210/02-588.2

## ARTICLE IV

## RENTAL AND OTHER MONETARY OBLIGATIONS

**Section 4.01.  Base Monthly Rental**.  During the Lease Term, on or before the first day of each calendar month, Lessee shall pay in advance the Base Monthly Rental then in effect.  If the Effective Date is a date other than the first day of the month, Lessee shall pay to Lessor on the Effective Date the Base Monthly Rental prorated by multiplying the Base Monthly Rental by a fraction, the numerator of which is the number of days remaining in the month (including the Effective Date) for which Rental is being paid, and the denominator of which is the total number of days in such month.

**Section 4.02.  Adjustments**.  During the Lease Term (including any Extension Term), on the first Adjustment Date and on each Adjustment Date thereafter, the Base Annual Rental shall increase by an amount equal to the Rental Adjustment; *provided, however*, that in no event shall Base Annual Rental be reduced as a result of the application of the Rental Adjustment.

**Section 4.03.  Additional Rental**.  Lessee shall pay and discharge, as additional rental ("Additional Rental"), all sums of money required to be paid by Lessee under this Lease which are not specifically referred to as Rental.  Lessee shall pay and discharge any Additional Rental when the same shall become due, provided that amounts which are billed to Lessor or any third party, but not to Lessee, shall be paid within fifteen (15) days after Lessor's demand for payment thereof or, if earlier, when the same are due.  In no event shall Lessee be required to pay to Lessor any item of Additional Rental that Lessee is obligated to pay and has paid to any third party pursuant to any provision of this Lease.

**Section 4.04.  Rentals to be Net to Lessor**.  The Base Annual Rental payable hereunder shall be net to Lessor, so that this Lease shall yield to Lessor the Rentals specified during the Lease Term, and all Costs and obligations of every kind and nature whatsoever relating to the Property shall be performed and paid by Lessee.  Lessee shall perform all of its obligations under this Lease at its sole cost and expense. All Rental and other Monetary Obligations which Lessee is required to pay hereunder shall be the unconditional obligation of Lessee and shall be payable in full when due and payable, without notice or demand, and without any setoff, abatement, deferment, deduction or counterclaim whatsoever.

**Section 4.05.  ACH Authorization**.  Upon execution of this Lease, Lessee shall deliver to Lessor a complete Authorization Agreement – Pre-Arranged Payments in the form of Exhibit C attached hereto and incorporated herein by this reference, together with a voided check for account verification, establishing arrangements whereby payments of the Base Monthly Rental are transferred by Automated Clearing House Debit initiated by Lessor from an account established by Lessee at a United States bank or other financial institution to such account as Lessor may designate.  Lessee shall continue to pay all Rental by Automated Clearing House Debit unless otherwise directed by Lessor.

**Section 4.06.  Late Charges; Default Interest**.  Any delinquent payment shall, in addition to any other remedy of Lessor, incur a late charge of five percent (5%) (which late charge is intended to compensate Lessor for the cost of handling and processing such delinquent payment and should not be considered interest) and bear interest at the Default

3

Rate, such interest to be computed from and including the date such payment was due through and including the date of the payment; *provided, however*, in no event shall Lessee be obligated to pay a sum of late charge and interest higher than the maximum legal rate then in effect.

**Section 4.07.  Holdover**.  If Lessee remains in possession of the Property after the expiration of the term hereof, Lessee, at Lessor's option and within Lessor's sole discretion, may be deemed a tenant on a month-to-month basis and shall continue to pay Rentals and other Monetary Obligations in the amounts herein provided, except that the Base Monthly Rental shall be automatically increased to one hundred fifty percent (150%) of the last Base Monthly Rental payable under this Lease, and Lessee shall comply with all the terms of this Lease; *provided that* nothing herein nor the acceptance of Rental by Lessor shall be deemed a consent to such holding over.  Lessee shall defend, indemnify, protect and hold the Indemnified Parties harmless from and against any and all Losses resulting from Lessee's failure to surrender possession upon the expiration of the Lease Term.

**Section 4.08.  Guaranty**.  On or before the execution of this Lease, Lessee shall cause Guarantors to execute and deliver to Lessor the Guaranty.

## ARTICLE V

## REPRESENTATIONS AND WARRANTIES OF LESSEE

The representations and warranties of Lessee contained in this Article V are being made to induce Lessor to enter into this Lease, and Lessor has relied, and will continue to rely, upon such representations and warranties.  Lessee represents and warrants to Lessor as follows:

**Section 5.01.  Organization, Authority and Status of Lessee**.  Lessee has been duly organized or formed, is validly existing and in good standing under the laws of its state of formation and is qualified as a foreign corporation to do business in any jurisdiction where such qualification is required.  All necessary and appropriate action has been taken to authorize the execution, delivery and performance by Lessee of this Lease and of the other documents, instruments and agreements provided for herein.  Lessee is not, and if Lessee is a "disregarded entity," the owner of such disregarded entity is not, a "nonresident alien," "foreign corporation," "foreign partnership," "foreign trust," "foreign estate," or any other "person" that is not a "United States Person" as those terms are defined in the Code and the regulations promulgated thereunder.  The Person who has executed this Lease on behalf of Lessee is duly authorized to do so.

**Section 5.02.  Enforceability**.  This Lease constitutes the legal, valid and binding obligation of Lessee, enforceable against Lessee in accordance with its terms.

**Section 5.03.  Litigation**.  There are no suits, actions, proceedings or investigations pending, or to the best of its knowledge, threatened against or involving any Lessee Entity or the Property before any arbitrator or Governmental Authority which might reasonably result in any Material Adverse Effect.

4844-5241-0971.1
STORE/Campbells (Perkins)
Lease Agreement
1601 W. Prospect Road, Ashtabula, OH 44004
File No. 7210/02-588.2

**Section 5.04.  Absence of Breaches or Defaults**.  Lessee is not in default under any document, instrument or agreement to which Lessee is a party or by which Lessee, the Property or any of Lessee's property is subject or bound, which has had, or could reasonably be expected to result in, a Material Adverse Effect.  The authorization, execution, delivery and performance of this Lease and the documents, instruments and agreements provided for herein will not result in any breach of or default under any document, instrument or agreement to which Lessee is a party or by which Lessee, the Property or any of Lessee's property is subject or bound.

**Section 5.05.  Compliance with OFAC Laws**.  None of the Lessee Entities, and no individual or entity owning directly or indirectly any interest in any of the Lessee Entities, is an individual or entity whose property or interests are subject to being blocked under any of the OFAC Laws or is otherwise in violation of any of the OFAC Laws; *provided, however*, that the representation contained in this sentence shall not apply to any Person to the extent such Person's interest is in or through a U.S. Publicly Traded Entity.

**Section 5.06.  Solvency**.  There is no contemplated, pending or threatened Insolvency Event or similar proceedings, whether voluntary or involuntary, affecting Lessee or any Lessee Entity.  Lessee does not have unreasonably small capital to conduct its business.

**Section 5.07.  Ownership**.  None of (i) Lessee, (ii) any Affiliate of Lessee, or (iii) any Person owning ten percent (10%) or more of Lessee, owns, directly or indirectly, ten percent (10%) or more of the total voting power or total value of capital stock in STORE Capital Corporation.

**Section 5.08.  Franchise Agreement**.  Lessee has entered into one or more franchise, license and/or area development agreements with Franchisor (each, a "Franchise Agreement") for conduct of the business at the Property.  Each such Franchise Agreement is valid, binding and in full force and effect, permits Lessee to operate Permitted Facilities on the Property, and has a term which will not expire prior to the Lease Term.

## ARTICLE VI

## TAXES AND ASSESSMENTS; UTILITIES; INSURANCE

**Section 6.01.  Taxes**.

(a)      ***Payment***.  Subject to the provisions of Section 6.01(b) below, Lessee shall pay, prior to the earlier of delinquency or the accrual of interest on the unpaid balance, all taxes and assessments of every type or nature assessed against or imposed upon the Property, Lessee or Lessor during the Lease Term related to or arising out of this Lease and the activities of the parties hereunder, including without limitation, (i) all taxes or assessments upon the Property or any part thereof and upon any personal property, trade fixtures and improvements located on the Property, whether belonging to Lessor or Lessee, or any tax or charge levied in lieu of such taxes and assessments; (ii) all taxes, charges, license fees and or similar fees imposed by reason of the use of the Property by Lessee; (iii) all excise, franchise, transaction, privilege, license, sales, use and other taxes upon the Rental or other Monetary Obligations

5

hereunder, the leasehold estate of either party or the activities of either party pursuant to this Lease; and (iv) all franchise, privilege or similar taxes of Lessor calculated on the value of the Property or on the amount of capital apportioned to the Property. Notwithstanding anything in clauses (i) through (iv) to the contrary, Lessee shall not be obligated to pay or reimburse Lessor for any taxes based on the net income of Lessor.

(b)     ***Right to Contest***.  Within thirty (30) days after each tax and assessment payment is required by this Section 6.01 to be paid, Lessee shall provide Lessor with evidence reasonably satisfactory to Lessor that taxes and assessments have been timely paid by Lessee.   In the event Lessor receives a tax bill, Lessor shall use commercially reasonable efforts to forward said bill to Lessee within fifteen (15) days of Lessor's receipt thereof.   Lessee may, at its own expense, contest or cause to be contested (in the case of any item involving more than $10,000, after prior written notice to Lessor, which shall be given within fifteen (15) days of Lessee's determination to contest any matter as permitted herein), by appropriate legal proceedings conducted in good faith and with due diligence, any above-described item or lien with respect thereto, provided that (i) neither the Property nor any interest therein would be in any danger of being sold, forfeited or lost by reason of such proceedings; (ii) no Event of Default has occurred and is continuing; (iii) if and to the extent required by the applicable taxing authority and/or Lessor, Lessee posts a bond or takes other steps acceptable to such taxing authority and/or Lessor that removes such lien or stays enforcement thereof; (iv) Lessee shall promptly provide Lessor with copies of all notices received or delivered by Lessee and filings made by Lessee in connection with such proceeding; and (v) upon termination of such proceedings, it shall be the obligation of Lessee to pay the amount of any such tax and assessment or part thereof as finally determined in such proceedings, the payment of which may have been deferred during the prosecution of such proceedings, together with any costs, fees (including attorneys' fees and disbursements), interest, penalties or other liabilities in connection therewith.   Lessor shall at the request of Lessee, execute or join in the execution of any instruments or documents necessary in connection with such contest or proceedings, but Lessor shall incur no cost or obligation thereby.

**Section 6.02.  Utilities**.  Lessee shall contract, in its own name, for and pay when due all charges for the connection and use of water, gas, electricity, telephone, garbage collection, sewer use and other utility services supplied to the Property during the Lease Term.  Under no circumstances shall Lessor be responsible for any interruption of any utility service.

**Section 6.03.  Insurance**.

(a)     ***Coverage***.  Throughout the Lease Term, Lessee shall maintain, with respect to the Property, at its sole expense, the following types and amounts of insurance, in addition to such other insurance as Lessor may reasonably require from time to time:

(i)     Insurance against loss or damage to real property and personal property under an "all risk" or "special form" insurance policy, which shall include coverage against all risks of direct physical loss, including but not limited to loss by fire, lightning, wind, terrorism, and other risks normally included in the

6

standard ISO special form (and shall also include National Flood and Excess Flood insurance for the Property located in Flood Zone A or Flood Zone V, as designated by FEMA, or otherwise located in a flood zone area identified by FEMA as a 100-year flood zone or special hazard area, and earthquake insurance if the Property is located within a moderate to high earthquake hazard zone as determined by an approved insurance company set forth in Section 6.03(b)(x) below).   Such policy shall also include soft costs, a joint loss agreement, coverage for ordinance or law covering the loss of value of the undamaged portion of the Property, costs to demolish and the increased costs of construction if any of the improvements located on, or the use of, the Property shall at any time constitute legal non-conforming structures or uses.  Ordinance or law limits shall be in an amount equal to the full replacement cost for the loss of value of the undamaged portion of the Property and no less than 25% of the replacement cost for costs to demolish and the increased cost of construction, or in an amount otherwise specified by Lessor.  Such insurance shall be in amounts not less than 100% of the full insurable replacement cost values (without deduction for depreciation), with an agreed amount endorsement or without any coinsurance provision, and with sublimits satisfactory to Lessor, as determined from time to time at Lessor's request but not more frequently than once in any 12-month period.

(ii)     Commercial general liability insurance, including products and completed operation liability, covering Lessor and Lessee against bodily injury liability, property damage liability and personal and advertising injury, including without limitation any liability arising out of the ownership, maintenance, repair, condition or operation of every Property or adjoining ways, streets, parking lots or sidewalks.   Such insurance policy or policies shall contain a broad form contractual liability endorsement under which the insurer agrees to insure Lessee's obligations under Article X hereof to the extent insurable, and a "severability of interest" clause or endorsement which precludes the insurer from denying the claim of Lessee or Lessor because of the negligence or other acts of the other, shall be in amounts of not less than $10,000,000 per occurrence for bodily injury and property damage, and $10,000,000 general aggregate per location, or such higher limits as Lessor may reasonably require from time to time, and shall be of form and substance satisfactory to Lessor.  Such limits of insurance can be acquired through Commercial General liability and Umbrella liability policies.

(iii)     Workers' compensation and Employers Liability insurance with statutorily mandated limits covering all persons employed by Lessee on the Property in connection with any work done on or about the Property for which claims for death or bodily injury could be asserted against Lessor, Lessee or the Property.

(iv)     Business interruption insurance including Rental Value Insurance payable to Lessor at all locations for a period of not less than twelve (12) months. Such insurance is to follow the form of the real property "all risk" or "special form"

7

coverage and is not to contain a co-insurance clause.  Such insurance is to have a minimum of 180 days of extended period of indemnity.

(v)        Automobile liability insurance, including owned, non-owned and hired car liability insurance for combined limits of liability of $5,000,000 per occurrence.  The limits of liability can be provided in a combination of an automobile liability policy and an umbrella liability policy.

(vi)        Comprehensive Boiler and Machinery or Equipment Breakdown Insurance against loss or damage from explosion of any steam or pressure boilers or similar apparatus, if any, and other building equipment including HVAC units located in or about the Property and in an amount equal to the lesser of 25% of the 100% replacement cost of the Property or $5,000,000.

(vii)        Such additional and/or other insurance and in such amounts as at the time is customarily carried by prudent owners or tenants with respect to improvements and personal property similar in character, location and use and occupancy to the Property.

(b)        ***Insurance Provisions***.  All insurance policies shall:

(i)        provide for a waiver of subrogation by the insurer as to claims against Lessor, its employees and agents;

(ii)        be primary and provide that any "other insurance" clause in the insurance policy shall exclude any policies of insurance maintained by Lessor and the insurance policy shall not be brought into contribution with insurance maintained by Lessor;

(iii)        contain deductibles not to exceed $25,000;

(iv)        contain a standard non-contributory mortgagee clause or endorsement in favor of any Lender designated by Lessor;

(v)        provide that the policy of insurance shall not be terminated, cancelled or amended without at least thirty (30) days' prior written notice to Lessor and to any Lender covered by any standard mortgagee clause or endorsement;

(vi)        be in amounts sufficient at all times to satisfy any coinsurance requirements thereof;

(vii)        except for workers' compensation insurance referred to in Section 6.03(a)(iii) above, name Lessor and any Lessor Affiliate or Lender requested by Lessor, as an "additional insured" with respect to liability insurance, and as an "additional named insured" or "additional insured" with respect to real property and rental value insurance, as appropriate and as their interests may appear;

8

(viii)    be evidenced by delivery to Lessor and any Lender designated by Lessor of an Acord Form 28 for property, business interruption and boiler & machinery coverage (or any other form requested by Lessor) and an Acord Form 25 for commercial general liability, workers' compensation and umbrella coverage (or any other form requested by Lessor); provided that in the event that either such form is no longer available, such evidence of insurance shall be in a form reasonably satisfactory to Lessor and any Lender designated by Lessor; and

(ix)    be issued by insurance companies licensed to do business in the state where the Property is located and which are rated no less than A-X by Best's Insurance Guide or are otherwise approved by Lessor.

(c)    ***Additional Obligations***.  It is expressly understood and agreed that (i) if any insurance required hereunder, or any part thereof, shall expire, be withdrawn, become void by breach of any condition thereof by Lessee, or become void or in jeopardy by reason of the failure or impairment of the capital of any insurer, Lessee shall immediately obtain new or additional insurance reasonably satisfactory to Lessor and any Lender designated by Lessor; (ii) the minimum limits of insurance coverage set forth in this Section 6.03 shall not limit the liability of Lessee for its acts or omissions as provided in this Lease; (iii) Lessee shall procure policies for all insurance for periods of not less than one year and shall provide to Lessor and any servicer or Lender of Lessor certificates of insurance or, upon Lessor's request, duplicate originals of insurance policies evidencing that insurance satisfying the requirements of this Lease is in effect at all times; (iv) Lessee shall pay as they become due all premiums for the insurance required by this Section 6.03; (v) in the event that Lessee fails to comply with any of the requirements set forth in this Section 6.03, within ten (10) days of the giving of written notice by Lessor to Lessee, (A) Lessor shall be entitled to procure such insurance; and (B) any sums expended by Lessor in procuring such insurance shall be Additional Rental and shall be repaid by Lessee, together with interest thereon at the Default Rate, from the time of payment by Lessor until fully paid by Lessee immediately upon written demand therefor by Lessor; and (vi) Lessee shall maintain all insurance policies required in this Section 6.03 not to be cancelled, invalidated or suspended on account of the conduct of Lessee, its officers, directors, managers, members, employees or agents, or anyone acting for Lessee or any subtenant or other occupant of the Property, and shall comply with all policy conditions and warranties at all times to avoid a forfeiture of all or a part of any insurance payment.

(d)    ***Blanket Policies***.  Notwithstanding anything to the contrary in this Section 6.03, any insurance which Lessee is required to obtain pursuant to this Section 6.03 may be carried under a "blanket" policy or policies covering other properties or liabilities of Lessee provided that such "blanket" policy or policies otherwise comply with the provisions of this Section 6.03.

**Section 6.04.  Intentionally Deleted**.

**Section 6.05.  Tax Impound**.  Upon the occurrence of an Event of Default and with respect to each Event of Default, in addition to any other remedies, Lessor may require Lessee

9

to pay to Lessor on the first day of each month the amount that Lessor reasonably estimates will be necessary in order to accumulate with Lessor sufficient funds in an impound account (which shall not be deemed a trust fund) (the "Reserve") for Lessor to pay any and all real estate taxes ("Real Estate Taxes") for the Property for the ensuing twelve (12) months, or, if due sooner, Lessee shall pay the required amount immediately upon Lessor's demand therefor.  Lessor shall, upon prior written request of Lessee, provide Lessee with evidence reasonably satisfactory to Lessee that payment of the Real Estate Taxes was made in a timely fashion.  In the event that the Reserve does not contain sufficient funds to timely pay any Real Estate Taxes, upon Lessor's written notification thereof, Lessee shall, within five (5) Business Days of such notice, provide funds to Lessor in the amount of such deficiency.  Lessor shall pay or cause to be paid directly to the applicable taxing authorities any Real Estate Taxes then due and payable for which there are funds in the Reserve; *provided, however,* that in no event shall Lessor be obligated to pay any Real Estate Taxes in excess of the funds held in the Reserve, and Lessee shall remain liable for any and all Real Estate Taxes, including fines, penalties, interest or additional costs imposed by any taxing authority (unless incurred as a result of Lessor's failure to timely pay Real Estate Taxes for which it had funds in the Reserve).  Lessee shall cooperate fully with Lessor in assuring that the Real Estate Taxes are timely paid.  Lessor may deposit all Reserve funds in accounts insured by any federal or state agency and may commingle such funds with other funds and accounts of Lessor.  Interest or other gains from such funds, if any, shall be the sole property of Lessor. Upon an Event of Default, in addition to any other remedies, Lessor may apply all impounded funds in the Reserve against any sums due from Lessee to Lessor.  Lessor shall give to Lessee an annual accounting showing all credits and debits to and from such impounded funds received from Lessee.

## ARTICLE VII

## MAINTENANCE; ALTERATIONS

**Section 7.01. Condition of Property; Maintenance**.  Lessee hereby accepts the Property "AS IS" and "WHERE IS" with no representation or warranty of Lessor as to the condition thereof.  Lessee shall, at its sole cost and expense, be responsible for (a) keeping all of the building, structures and improvements erected on the Property in good order and repair, free from actual or constructive waste; (b) the repair or reconstruction of any building, structures or improvements erected on the Property damaged or destroyed by a Casualty; (c) subject to Section 7.02, making all necessary structural, non-structural, exterior and interior repairs and replacements to any building, structures or improvements erected on the Property; (d) operating, remodeling, updating and modernizing the Property in accordance with those standards adopted from time to time on a system-wide basis for the Permitted Facilities; (e) (i) ensuring that no party encroaches upon the Property, (ii) protecting, defending, indemnifying, releasing and holding the Indemnified Parties harmless from and against any and all claims and Losses arising out of or in any way relating to any encroachments and/or activities upon the Property caused by any Person; and (iii) prosecuting any claims that Lessee seeks to bring against any Person relating to Lessee's use and possession of the Property; and (f) paying all operating costs of the Property in the ordinary course of business.  Lessee waives any right to require Lessor to maintain, repair or rebuild all or any part of the Property or make repairs at the expense of Lessor pursuant to any Legal Requirements at any time in effect.

4844-5241-0971.1
STORE/Campbells (Perkins)
Lease Agreement
1601 W. Prospect Road, Ashtabula, OH 44004
File No. 7210/02-588.2

**Section 7.02.  Alterations and Improvements**.  During the Lease Term, Lessee shall not alter the exterior, structural, plumbing or electrical elements of the Property in any manner without the consent of Lessor, which consent shall not be unreasonably withheld or conditioned; *provided, however*, Lessee may undertake nonstructural alterations to the Property, individually, costing less than $25,000 without Lessor's prior written consent.  If Lessor's consent is required hereunder and Lessor consents to the making of any such alterations, the same shall be made by Lessee at Lessee's sole expense by a licensed contractor and according to plans and specifications approved by Lessor and subject to such other conditions as Lessor shall reasonably require.  Any work at any time commenced by Lessee on the Property shall be prosecuted diligently to completion, shall be of good workmanship and materials and shall comply fully with all the terms of this Lease and all Legal Requirements.  Upon completion of any alterations individually costing $25,000 or more, Lessee shall promptly provide Lessor with evidence of full payment to all laborers and materialmen contributing to the alterations.  Additionally, upon completion of any alterations, Lessee shall promptly provide Lessor with (a) an architect's certificate certifying the alterations to have been completed in conformity with the plans and specifications (if the alterations are of such a nature as would require the issuance of such a certificate from the architect); (b) a certificate of occupancy (if the alterations are of such a nature as would require the issuance of a certificate of occupancy); and (c) any other documents or information reasonably requested by Lessor.  Lessee shall keep the Property free from any liens arising out of any work performed on, or materials furnished to, the Property.  Lessee shall execute and file or record, as appropriate, a "Notice of Non-Responsibility," or any equivalent notice permitted under applicable Law in the state where the Property is located which provides that Lessor is not responsible for the payment of any costs or expenses relating to the additions or alterations.  Any addition to or alteration of the Property shall be deemed a part of the Property and belong to Lessor, and Lessee shall execute and deliver to Lessor such instruments as Lessor may require to evidence the ownership by Lessor of such addition or alteration.

**Section 7.03.  Encumbrances**.  During the Lease Term, Lessor shall have the right to grant easements on, over, under and above the Property without the prior consent of Lessee, provided that such easements will not materially interfere with Lessee's use of the Property.  Lessee shall comply with and perform all obligations of Lessor under all easements, declarations, covenants, restrictions and other items of record now or hereafter encumbering the Property.  Without Lessor's prior written consent, Lessee shall not grant any easements on, over, under or above the Property.

**ARTICLE VIII**

**USE OF THE PROPERTY; COMPLIANCE**

**Section 8.01.  Use**.  During the Lease Term, the Property shall be used solely for the operation of a Permitted Facility.  Except during periods when a Property is untenantable due to Casualty or Condemnation (and provided that Lessee continues to strictly comply with the other terms and conditions of this Lease), Lessee shall at all times during the Lease Term occupy the Property and shall diligently operate its business on the Property.  In the event that Lessee shall change the use of the Property or the concept or brand operated on the Property, only as may be expressly permitted herein or consented to by Lessor in writing, Lessee shall provide Lessor

11

with written notice of any such change and copies of the franchise agreement(s) related to such new concept or brand, if any.

**Section 8.02.  Compliance**.   Lessee's use and occupation of the Property, and the condition thereof, shall, at Lessee's sole cost and expense, comply fully with all Legal Requirements and all restrictions, covenants and encumbrances of record, and any owner obligations under such Legal Requirements, or restrictions, covenants and encumbrances of record, with respect to the Property, in either event, the failure with which to comply could have a Material Adverse Effect.   Without in any way limiting the foregoing provisions, Lessee shall comply with all Legal Requirements relating to anti-terrorism, trade embargos, economic sanctions, Anti-Money Laundering Laws, and the Americans with Disabilities Act of 1990, as such act may be amended from time to time, and all regulations promulgated thereunder, as it affects the Property now or hereafter in effect.   Lessee shall obtain, maintain and comply with all required licenses and permits, both governmental and private, to use and operate the Property as Permitted Facilities.   Upon Lessor's written request from time to time during the Lease Term, Lessee shall certify in writing to Lessor that Lessee's representations, warranties and obligations under Section 5.05 and this Section 8.02 remain true and correct and have not been breached.   Lessee shall immediately notify Lessor in writing if any of such representations, warranties or covenants are no longer true or have been breached or if Lessee has a reasonable basis to believe that they may no longer be true or have been breached.   In connection with such an event, Lessee shall comply with all Legal Requirements and directives of Governmental Authorities and, at Lessor's request, provide to Lessor copies of all notices, reports and other communications exchanged with, or received from, Governmental Authorities relating to such an event.   Lessee shall also reimburse Lessor for all Costs incurred by Lessor in evaluating the effect of such an event on the Property and this Lease, in obtaining any necessary license from Governmental Authorities as may be necessary for Lessor to enforce its rights under the Transaction Documents, and in complying with all Legal Requirements applicable to Lessor as the result of the existence of such an event and for any penalties or fines imposed upon Lessor as a result thereof.   Lessee will use its best efforts to prevent any act or condition to exist on or about the Property that will materially increase any insurance rate thereon, except when such acts are required in the normal course of its business and Lessee shall pay for such increase. Lessee agrees that it will defend, indemnify and hold harmless the Indemnified Parties from and against any and all Losses caused by, incurred or resulting from Lessee's failure to comply with its obligations under this Section.

**Section 8.03.  Environmental**.

(a)    ***Covenants***.

(i)    Lessee covenants to Lessor during the Lease Term, subject to the limitations of subsection (ii) below, as follows:

(A)    All uses and operations on or of the Property, whether by Lessee or any other Person, shall be in compliance with all Environmental Laws and permits issued pursuant thereto.

(B)    There shall be no Releases in, on, under or from the Property, except in Permitted Amounts.

12

(C)     There shall be no Hazardous Materials or Regulated Substances in, on or under the Property, except in Permitted Amounts. Above and below ground storage tanks shall be properly permitted and only used as permitted.

(D)     Lessee shall keep the Property or cause the Property to be kept free and clear of all Environmental Liens, whether due to any act or omission of Lessee or any other Person.

(E)     Lessee shall not act or fail to act or allow any other tenant, occupant, guest, customer or other user of the Property to act or fail to act in any way that (1) materially increases a risk to human health or the environment, (2) poses an unreasonable or unacceptable risk of harm to any Person or the environment (whether on or off the Property), (3) has a Material Adverse Effect, (4) is contrary to any material requirement set forth in the insurance policies maintained by Lessee or Lessor, (5) constitutes a public or private nuisance or constitutes waste, (6) violates any covenant, condition, agreement or easement applicable to the Property, or (7) would result in any reopening or reconsideration of any prior investigation or causes a new investigation by a Governmental Authority having jurisdiction over the Property.

(F)     Lessee shall, at its sole cost and expense, fully and expeditiously cooperate in all activities pursuant to this Section 8.04, including but not limited to providing all relevant information and making knowledgeable persons available for interviews.

(ii)     Notwithstanding any provision of this Lease to the contrary, an Event of Default shall not be deemed to have occurred as a result of the failure of Lessee to satisfy any one or more of the covenants set forth in subsections (A) through (E) above provided that Lessee shall be in compliance with the requirements of any Governmental Authority with respect to the Remediation of any Release at the Property.

(b)     ***Notification Requirements***.  Lessee shall immediately notify Lessor in writing upon Lessee obtaining actual knowledge of (i) any Releases or Threatened Releases in, on, under or from the Property other than in Permitted Amounts, or migrating towards the Property; (ii) any non-compliance with any Environmental Laws related in any way to the Property; (iii) any actual or potential Environmental Lien or activity use limitation; (iv) any required or proposed Remediation of environmental conditions relating to the Property required by applicable Governmental Authorities; and (v) any written or oral notice or other communication of which Lessee becomes aware from any source whatsoever (including but not limited to a Governmental Authority) relating in any way to Hazardous Materials, Regulated Substances or above or below ground storage tanks, or Remediation thereof at or on the Property, other than in Permitted Amounts, possible liability of any Person relating to the Property pursuant to any Environmental Law, other environmental conditions in connection with the Property, or any actual or potential administrative or judicial proceedings in connection with

13

anything referred to in this Section.  Lessee shall, upon Lessor's written request, deliver to Lessor a certificate stating that Lessee is and has been in full compliance with all of the environmental representations, warranties and covenants in this Lease.

(c)     *Remediation*.  Lessee shall, at its sole cost and expense, and without limiting any other provision of this Lease, effectuate any Remediation required by any Governmental Authority of any condition (including, but not limited to, a Release or Threatened Release) in, on, under or from the Property and take any other reasonable action deemed necessary by any Governmental Authority for protection of human health or the environment.  Should Lessee fail to undertake any required Remediation in accordance with the preceding sentence, Lessor, after written notice to Lessee and Lessee's failure to immediately undertake such Remediation, shall be permitted to complete such Remediation, and all Costs incurred in connection therewith shall be paid by Lessee.  Any Cost so paid by Lessor, together with interest at the Default Rate, shall be deemed to be Additional Rental hereunder and shall be immediately due from Lessee to Lessor.

(d)     *Indemnification*.  Lessee shall, at its sole cost and expense, protect, defend, indemnify, release and hold harmless each of the Indemnified Parties from and against any and all Losses, including, but not limited to, all Costs of Remediation (whether or not performed voluntarily), arising out of or in any way relating to any Environmental Laws, Hazardous Materials, Regulated Substances, above or below ground storage tanks, or other environmental matters concerning the Property.  It is expressly understood and agreed that Lessee's obligations under this Section shall survive the expiration or earlier termination of this Lease for any reason.

(e)     *Right of Entry*.  In the event that Lessor has a reasonable basis to believe that a Release or a violation of any Environmental Law has occurred, Lessor and any other Person designated by Lessor, including but not limited to any receiver, any representative of a Governmental Authority, and any environmental consultant, shall have the right, but not the obligation, to enter upon the Property at all reasonable times to assess any and all aspects of the environmental condition of the Property and its use, including but not limited to conducting any environmental assessment or audit (the scope of which shall be determined in Lessor's sole and absolute discretion) and taking samples of soil, groundwater or other water, air, or building materials, and conducting other invasive testing.  Lessee shall cooperate with and provide access to Lessor and any other Person designated by Lessor.  Any such assessment or investigation shall be at Lessee's sole cost and expense.

(f)     *Survival*.  The obligations of Lessee and the rights and remedies of Lessor under this Section 8.03 shall survive the termination, expiration and/or release of this Lease.

**Section 8.04.  Franchisor Requirements**.  In addition to the requirements set forth in this Lease, Lessee, in its use, occupancy and maintenance of the Property, shall comply with all requirements of its Franchise Agreement.  Lessee hereby consents to Lessor providing information it obtains to Franchisor, and to Lessor obtaining from Franchisor information which Franchisor receives relating to Lessee's operation of its business on the Property.

4844-5241-0971.1
STORE/Campbells (Perkins)
Lease Agreement
1601 W. Prospect Road, Ashtabula, OH 44004
File No. 7210/02-588.2

## ARTICLE IX

## ADDITIONAL COVENANTS

**Section 9.01. Performance at Lessee's Expense**.   Lessee acknowledges and confirms that Lessor may impose reasonable administrative, processing or servicing fees, and collect its reasonable attorneys' fees, costs and expenses in connection with (a) any extension, renewal, modification, amendment and termination of this Lease requested by Lessee; (b) any release or substitution of Property requested by Lessee; (c) the procurement of consents, waivers and approvals with respect to the Property or any matter related to this Lease requested by Lessee; (d) the review of any assignment or sublease or proposed assignment or sublease or the preparation or review of any subordination or non-disturbance agreement requested by Lessee; (e) the collection, maintenance and/or disbursement of reserves created under this Lease or the other Transaction Documents (following an Event of Default); and (f) inspections required to make certain determinations under this Lease or the other Transaction Documents following Lessor's reasonable belief of a breach under this Lease or any other Transaction Documents.

**Section 9.02. Inspection**.   Lessor and its authorized representatives shall have the right, at all reasonable times and upon giving reasonable prior notice (except in the event of an emergency, in which case no prior notice shall be required), to enter the Property or any part thereof and inspect the same.   Lessee hereby waives any claim for damages for any injury or inconvenience to or interference with Lessee's business, any loss of occupancy or quiet enjoyment of the Property and any other loss occasioned by such entry, but, subject to Section 10.01, excluding damages arising as a result of the gross negligence or willful misconduct of Lessor.

**Section 9.03.  Financial Information**.

(a)      ***Financial Statements***.  Within forty five (45) days after the end of each fiscal quarter and within one hundred twenty (120) days after the end of each fiscal year of Lessee and Lessee Reporting Entities, Lessee shall deliver to Lessor (i) complete consolidated financial statements that consolidate Lessee and Lessee Reporting Entities, including a balance sheet, profit and loss statement, statement of stockholders' equity and statement of cash flows and all other related schedules for the fiscal period then ended, such statements to detail separately interest expense, income taxes, non-cash expenses, non-recurring expenses, operating lease expense and current portion of long-term debt – capital leases; (ii) income statements for the business at the Property; and (iii) the supplemental financial information set forth on Schedule 9.03.  All such financial statements shall be prepared in accordance with GAAP, and shall be certified to be accurate and complete by an officer or director of each Lessee Reporting Entity.  In the event that Lessee's business at the Property is ordinarily consolidated with other business for financial statements purposes, a separate profit and loss statement shall be provided showing separately the sales, profits and losses pertaining to the Property with interest expense, income taxes, non-cash expenses, non-recurring expenses and operating lease expense (rent), with the basis for allocation of overhead or other charges being clearly set forth in accordance with Schedule 9.03.  The financial statements delivered to Lessor need not be audited, but Lessee shall deliver to Lessor copies of any

15

audited financial statements of the Lessee Reporting Entities which may be prepared, as soon as they are available.

(b)     ***Other Information***.   Notwithstanding any provision contained herein, upon request at any time, Lessee will provide to Lessor, at no additional cost or expense to Lessee, any and all financial information and/or financial statements of Lessee Reporting Entities (and in the form or forms) as reasonably requested by Lessor including, but not limited to, as requested by Lessor in connection with Lessor's filings with or disclosures to the Securities and Exchange Commission or other Governmental Authority.

**Section 9.04.  OFAC Laws**.   Upon receipt of notice or upon actual knowledge thereof, Lessee shall immediately notify Lessor in writing if any Person owning (directly or indirectly) any interest in any of the Lessee Entities, or any director, officer, shareholder, member, manager or partner of any of such holders is a Person whose property or interests are subject to being blocked under any of the OFAC Laws, or is otherwise in violation of any of the OFAC Laws, or is under investigation by any Governmental Authority for, or has been charged with, or convicted of, drug trafficking, terrorist-related activities or any violation of the Anti-Money Laundering Laws, has been assessed civil penalties under these or related Laws, or has had funds seized or forfeited in an action under these or related Laws; *provided, however*, that the covenant in this Section 9.04 shall not apply to any Person to the extent such Person's interest is in or through a U.S. Publicly Traded Entity.

**Section 9.05.  Estoppel Certificate**.   At any time, and from time to time, Lessee shall, promptly and in no event later than ten (10) days after a request from Lessor or any Lender or mortgagee of Lessor, execute, acknowledge and deliver to Lessor or such Lender or mortgagee, as the case may be, a certificate in the form supplied by Lessor, certifying: (a) that Lessee has accepted the Property; (b) that this Lease is in full force and effect and has not been modified (or if modified, setting forth all modifications), or, if this Lease is not in full force and effect, the certificate shall so specify the reasons therefor; (c) the commencement and expiration dates of the Lease Term; (d) the date to which the Rentals have been paid under this Lease and the amount thereof then payable; (e) whether there are then any existing defaults by Lessor in the performance of its obligations under this Lease, and, if there are any such defaults, specifying the nature and extent thereof; (f) that no notice has been received by Lessee of any default under this Lease which has not been cured, except as to defaults specified in the certificate; (g) the capacity of the Person executing such certificate, and that such Person is duly authorized to execute the same on behalf of Lessee; (h) that neither Lessor nor any Lender or mortgagee has actual involvement in the management or control of decision making related to the operational aspects or the day-to-day operation of the Property, including any handling or disposal of Hazardous Materials or Regulated Substances; and (i) any other information reasonably requested by Lessor or any Lender or mortgagee, as the case may be. If Lessee shall fail or refuse to sign a certificate in accordance with the provisions of this Section within ten (10) days following a request by Lessor, Lessee irrevocably constitutes and appoints Lessor as its attorney-in-fact to execute and deliver the certificate to any such third party, it being stipulated that such power of attorney is coupled with an interest and is irrevocable and binding.

16

# ARTICLE X

## RELEASE AND INDEMNIFICATION

**Section 10.01.  RELEASE AND INDEMNIFICATION**.  LESSEE AGREES TO USE AND OCCUPY THE PROPERTY AT ITS OWN RISK AND HEREBY RELEASES LESSOR AND LESSOR'S AGENTS AND EMPLOYEES FROM ALL CLAIMS FOR ANY DAMAGE OR INJURY TO THE FULL EXTENT PERMITTED BY LAW.  LESSEE AGREES THAT LESSOR SHALL NOT BE RESPONSIBLE OR LIABLE TO LESSEE OR LESSEE'S EMPLOYEES, AGENTS, CUSTOMERS, LICENSEES OR INVITEES FOR BODILY INJURY, PERSONAL INJURY OR PROPERTY DAMAGE OCCASIONED BY THE ACTS OR OMISSIONS OF ANY OTHER LESSEE OR ANY OTHER PERSON.  LESSEE AGREES THAT ANY EMPLOYEE OR AGENT TO WHOM THE PROPERTY OR ANY PART THEREOF SHALL BE ENTRUSTED BY OR ON BEHALF OF LESSEE SHALL BE ACTING AS LESSEE'S AGENT WITH RESPECT TO THE PROPERTY OR ANY PART THEREOF, AND NEITHER LESSOR NOR LESSOR'S AGENTS, EMPLOYEES OR CONTRACTORS SHALL BE LIABLE FOR ANY LOSS OF OR DAMAGE TO THE PROPERTY OR ANY PART THEREOF.  LESSEE SHALL INDEMNIFY, PROTECT, DEFEND AND HOLD HARMLESS EACH OF THE INDEMNIFIED PARTIES FROM AND AGAINST ANY AND ALL LOSSES (EXCLUDING LOSSES SUFFERED BY AN INDEMNIFIED PARTY ARISING OUT OF THE WILLFUL MISCONDUCT OF SUCH INDEMNIFIED PARTY OCCURRING ON OR AFTER THE EFFECTIVE DATE) CAUSED BY, INCURRED OR RESULTING FROM LESSEE'S OPERATIONS OR BY LESSEE'S USE AND OCCUPANCY OF THE PROPERTY, WHETHER RELATING TO ITS ORIGINAL DESIGN OR CONSTRUCTION, LATENT DEFECTS, ALTERATION, MAINTENANCE, USE BY LESSEE OR ANY PERSON THEREON, SUPERVISION OR OTHERWISE, OR FROM ANY BREACH OF, DEFAULT UNDER, OR FAILURE TO PERFORM, ANY TERM OR PROVISION OF THIS LEASE BY LESSEE, ITS OFFICERS, EMPLOYEES, AGENTS OR OTHER PERSONS.   IT IS EXPRESSLY UNDERSTOOD AND AGREED THAT LESSEE'S OBLIGATIONS UNDER THIS SECTION SHALL SURVIVE THE EXPIRATION OR EARLIER TERMINATION OF THIS LEASE FOR ANY REASON WHATSOEVER.

# ARTICLE XI

## CONDEMNATION AND CASUALTY

**Section 11.01. Notification**.   Lessee shall promptly give Lessor written notice of (a) any Condemnation of the Property, (b) the commencement of any proceedings or negotiations which might result in a Condemnation of the Property, and (c) any Casualty to the Property or any part thereof.  Such notice shall provide a general description of the nature and extent of such Condemnation, proceedings, negotiations or Casualty, and shall include copies of any documents or notices received in connection therewith. Thereafter, Lessee shall promptly send Lessor copies of all notices, correspondence and pleadings relating to any such Condemnation, proceedings, negotiations or Casualty.

**Section 11.02. Total Condemnation**.   In the event of a Condemnation of all or substantially all of the Property, and if as a result of such Condemnation: (i) access to the Property to and from the publicly dedicated roads adjacent to the Property as of the Effective Date is permanently and materially impaired such that Lessee no longer has access to such

17

dedicated road; (ii) there is insufficient parking to operate the Property as a Permitted Facility under applicable Laws; or (iii) the Condemnation includes a portion of the building such that the remaining portion is unsuitable for use as a Permitted Facility, as determined by Lessee in the exercise of good faith business judgment (and Lessee provides to Lessor an officer's certificate executed by an officer of Lessee certifying to the same) (each such event, a "Total Condemnation"), then, in such event:

        (a)     **Termination of Lease**.  On the date of the Total Condemnation, all obligations of either party hereunder shall cease; *provided, however*, that Lessee's obligations to the Indemnified Parties under any indemnification provisions of this Lease and Lessee's obligation to pay Rental and all other Monetary Obligations (whether payable to Lessor or a third party) accruing under this Lease prior to the date of termination shall survive such termination.  If the date of such Total Condemnation is other than the first day of a month, the Base Monthly Rental for the month in which such Total Condemnation occurs shall be apportioned based on the date of the Total Condemnation.

        (b)     **Net Award**.  Subject to Section 11.07 below, Lessor shall be entitled to receive the entire Net Award in connection with a Total Condemnation without deduction for any estate vested in Lessee by this Lease, and Lessee hereby expressly assigns to Lessor all of its right, title and interest in and to every such Net Award and agrees that Lessee shall not be entitled to any Net Award or other payment for the value of Lessee's leasehold interest in this Lease.

**Section 11.03. Partial Condemnation or Casualty**.  In the event of a Condemnation which is not a Total Condemnation (each such event, a "Partial Condemnation"), or in the event of a Casualty:

        (a)     **Net Awards**.  All Net Awards shall be paid to Lessor.

        (b)     **Continuance of Lease**. This Lease shall continue in full force and effect upon the following terms:

        (i)     All Rental and other Monetary Obligations due under this Lease shall continue unabated.

        (ii)     Lessee shall promptly commence and diligently prosecute restoration of the Property to the same condition, as nearly as practicable, as prior to such Partial Condemnation or Casualty as approved by Lessor.  Subject to the terms and provisions of the Mortgages and upon the written request of Lessee (accompanied by evidence reasonably satisfactory to Lessor that such amount has been paid or is due and payable and is properly part of such costs, and that Lessee has complied with the terms of Section 7.02 in connection with the restoration), Lessor shall promptly make available in installments, subject to reasonable conditions for disbursement imposed by Lessor, an amount up to but not exceeding the amount of any Net Award received by Lessor with respect to such Partial Condemnation or Casualty.  Prior to the disbursement of any portion of the Net Award with respect to a Casualty, Lessee shall provide evidence

18

reasonably satisfactory to Lessor of the payment of restoration expenses by Lessee up to the amount of the insurance deductible applicable to such Casualty. Lessor shall be entitled to keep any portion of the Net Award which may be in excess of the cost of restoration, and Lessee shall bear all additional Costs of such restoration in excess of the Net Award.

**Section 11.04.  Temporary Taking**.  In the event of a Condemnation of all or any part of the Property for a temporary use (a "Temporary Taking"), this Lease shall remain in full force and effect without any reduction of Base Annual Rental, Additional Rental or any other Monetary Obligation payable hereunder.  Except as provided below, Lessee shall be entitled to the entire Net Award for a Temporary Taking, unless the period of occupation and use by the condemning authorities shall extend beyond the date of expiration of this Lease, in which event the Net Award made for such Temporary Taking shall be apportioned between Lessor and Lessee as of the date of such expiration.  At the termination of any such Temporary Taking, Lessee will, at its own cost and expense and pursuant to the provisions of Section 7.02, promptly commence and complete restoration of the Property.

**Section 11.05. Adjustment of Losses**.  Any loss under any property damage insurance required to be maintained by Lessee shall be adjusted by Lessor and Lessee.  Any Net Award relating to a Total Condemnation or a Partial Condemnation shall be adjusted by Lessor or, at Lessor's election, Lessee.  Notwithstanding the foregoing or any other provisions of this Section 11.05 to the contrary, if at the time of any Condemnation or any Casualty or at any time thereafter an Event of Default shall have occurred and be continuing, Lessor is hereby authorized and empowered but shall not be obligated, in the name and on behalf of Lessee and otherwise, to file and prosecute Lessee's claim, if any, for a Net Award on account of such Condemnation or such Casualty and to collect such Net Award and apply the same to the curing of such Event of Default and any other then existing Event of Default under this Lease and/or to the payment of any amounts owed by Lessee to Lessor under this Lease, in such order, priority and proportions as Lessor in its discretion shall deem proper.

**Section 11.06. Lessee Obligation in Event of Casualty**.  During all periods of time following a Casualty, Lessee shall take reasonable steps to ensure that the affected Property is secure and does not pose any risk of harm to any adjoining property and Persons (including owners or occupants of such adjoining property).

**Section 11.07. Lessee Awards and Payments**.  Notwithstanding any provision contained in this Article XI, Lessee shall be entitled to claim and receive any award or payment from the condemning authority expressly granted for the taking of any personal property owned by Lessee, any insurance proceeds with respect to any personal property owned by Lessee, the interruption of its business and moving expenses (subject, however, to the provisions of Section 6.03(a)(iv) above), but only if such claim or award does not adversely affect or interfere with the prosecution of Lessor's claim for the Condemnation or Casualty, or otherwise reduce the amount recoverable by Lessor for the Condemnation or Casualty.

19

## ARTICLE XII

### DEFAULT, CONDITIONAL LIMITATIONS,
### REMEDIES AND MEASURE OF DAMAGES

**Section 12.01.  Event of Default**.  Each of the following shall be an event of default by Lessee under this Lease (each, an "Event of Default"):

(a)      if any representation or warranty of Lessee set forth in this Lease is false in any material respect when made, or if Lessee renders any materially false statement or account when made;

(b)      if any Rental or other Monetary Obligation due under this Lease is not paid when due if such failure continues for more than five (5) days after written notice from Lessor; *provided, however*, Lessor shall only be required to provide such notice and cure period twice in any twelve (12) month period; and further provided that any technical error in the ACH Method of Payment process caused by Lessor's bank or servicer shall not constitute an Event of Default hereunder; *and further provided,* any delay in the payment of Rental as a result of a technical error in the wiring and/or automated clearinghouse process shall not constitute an Event of Default hereunder so long as the same is corrected within one (1) Business Day of the date Lessee receives notice thereof;

(c)      if Lessee fails to pay, prior to delinquency, any taxes, assessments or other charges the failure of which to pay will result in the imposition of a lien against the Property;

(d)      if Lessee vacates or abandons the Property;

(e)      if there is an Insolvency Event affecting Lessee or any Guarantor;

(f)      if Lessee fails to observe or perform any of the other covenants, conditions or obligations of Lessee in this Lease; *provided, however*, if any such failure does not involve the payment of any Monetary Obligation, is not willful or intentional, does not place the Property or any rights or property of Lessor in immediate jeopardy, and is within the reasonable power of Lessee to promptly cure, all as determined by Lessor in its reasonable discretion, then such failure shall not constitute an Event of Default hereunder, unless otherwise expressly provided herein, unless and until Lessor shall have given Lessee notice thereof and a period of thirty (30) days shall have elapsed, during which period Lessee may correct or cure such failure, upon failure of which an Event of Default shall be deemed to have occurred hereunder without further notice or demand of any kind being required.  If such failure cannot reasonably be cured within such thirty (30)-day period, as determined by Lessor in its reasonable discretion, and Lessee is diligently pursuing a cure of such failure, then Lessee shall have a reasonable period to cure such failure beyond such thirty (30)-day period, which shall in no event exceed ninety (90) days after receiving notice of such failure from Lessor.  If Lessee shall fail to correct or cure such failure within such ninety (90)-day period, an

Event of Default shall be deemed to have occurred hereunder without further notice or demand of any kind being required;

(g)   if a final, nonappealable judgment is rendered by a court against Lessee which has a Material Adverse Effect, and is not discharged or provision made for such discharge within ninety (90) days from the date of entry thereof;

(h)   if Lessee shall be liquidated or dissolved or shall begin proceedings towards its liquidation or dissolution;

(i)   if the estate or interest of Lessee in the Property shall be levied upon or attached in any proceeding and such estate or interest is about to be sold or transferred or such process shall not be vacated or discharged within ninety (90) days after it is made;

(j)   if there is a breach or default under the Franchise Agreement with respect to the Property or if such Franchise Agreement terminates or expires prior to the expiration of the Lease and a substitute agreement for the terminated or expired Franchise Agreement is not entered into prior to such expiration or termination, which substitute agreement shall be in form and substance reasonably satisfactory to Lessor; or

(k)   if there is an "Event of Default" or other breach or default by Lessee or any Guarantor under any of the other Transaction Documents or any Other Agreement , after the passage of all applicable notice and cure or grace periods; *provided, however*, in the event that this Lease has been the subject of a Securitization and any Other Agreement has not been the subject of the same Securitization or any series relating to such Securitization, an "Event of Default" under such Other Agreement shall not constitute an Event of Default under this Lease.

**Section 12.02.  Remedies**.  Upon the occurrence of an Event of Default, with or without notice or demand, except as otherwise expressly provided herein or such other notice as may be required by statute and cannot be waived by Lessee, Lessor shall be entitled to exercise, at its option, concurrently, successively, or in any combination, all remedies available at Law or in equity, including, without limitation, any one or more of the following:

(a)   to terminate this Lease, whereupon Lessee's right to possession of the Property shall cease and this Lease, except as to Lessee's liability, shall be terminated;

(b)   to the extent not prohibited by applicable Law, to (i) re-enter and take possession of the Property (or any part thereof), any or all personal property or fixtures of Lessee upon the Property and, to the extent permissible, all Franchise Agreements, permits and other rights or privileges of Lessee pertaining to the use and operation of the Property, and (ii) expel Lessee and those claiming under or through Lessee, without being deemed guilty in any manner of trespass or becoming liable for any loss or damage resulting therefrom, without resort to legal or judicial process, procedure or action.  No notice from Lessor hereunder or under a forcible entry and detainer statute or similar Law shall constitute an election by Lessor to terminate this Lease unless such

21

notice specifically so states.  If Lessee shall, after default, voluntarily give up possession of the Property to Lessor, deliver to Lessor or its agents the keys to the Property, or both, such actions shall be deemed to be in compliance with Lessor's rights and the acceptance thereof by Lessor or its agents shall not be deemed to constitute a termination of the Lease.   Lessor reserves the right following any re-entry and/or reletting to exercise its right to terminate this Lease by giving Lessee written notice thereof, in which event this Lease will terminate;

(c)      to bring an action against Lessee for any damages sustained by Lessor or any equitable relief available to Lessor and to the extent not prohibited by applicable Law, to seize all personal property or fixtures upon the Property which Lessee owns or in which it has an interest, in which Lessor shall have a landlord's lien and/or security interest, and to dispose thereof in accordance with the Laws prevailing at the time and place of such seizure or to remove all or any portion of such property and cause the same to be stored in a public warehouse or elsewhere at Lessee's sole expense, without becoming liable for any loss or damage resulting therefrom and without resorting to legal or judicial process, procedure or action;

(d)      to relet the Property or any part thereof for such term or terms (including a term which extends beyond the original Lease Term), at such rentals and upon such other terms as Lessor, in its sole discretion, may determine, with all proceeds received from such reletting being applied to the Rental and other Monetary Obligations due from Lessee in such order as Lessor may, in its sole discretion, determine, which other Monetary Obligations include, without limitation, all repossession costs, brokerage commissions, attorneys' fees and expenses, alteration, remodeling and repair costs and expenses of preparing for such reletting.  Except to the extent required by applicable Law, Lessor shall have no obligation to relet the Property or any part thereof and shall in no event be liable for refusal or failure to relet the Property or any part thereof, or, in the event of any such reletting, for refusal or failure to collect any rent due upon such reletting, and no such refusal or failure shall operate to relieve Lessee of any liability under this Lease or otherwise to affect any such liability.  Lessor reserves the right following any re-entry and/or reletting to exercise its right to terminate this Lease by giving Lessee written notice thereof, in which event this Lease will terminate as specified in said notice;

(e)      except to the extent prohibited by applicable Law to accelerate and recover from Lessee all Rental and other Monetary Obligations due and owing and scheduled to become due and owing under this Lease both before and after the date of such breach for the entire original scheduled Lease Term;

(f)      to recover from Lessee all Costs paid or incurred by Lessor as a result of such breach, regardless of whether or not legal proceedings are actually commenced;

(g)      to immediately or at any time thereafter, and with or without notice, at Lessor's sole option but without any obligation to do so, correct such breach or default and charge Lessee all Costs incurred by Lessor therein.  Any sum or sums so paid by Lessor, together with interest at the Default Rate, shall be deemed to be Additional Rental hereunder and shall be immediately due from Lessee to Lessor.  Any such acts

22

by Lessor in correcting Lessee's breaches or defaults hereunder shall not be deemed to cure said breaches or defaults or constitute any waiver of Lessor's right to exercise any or all remedies set forth herein;

(h)     to immediately or at any time thereafter, and with or without notice, except as required herein, set off any money of Lessee held by Lessor under this Lease or any other Transaction Document or any Other Agreement against any sum owing by Lessee hereunder;

(i)     Without limiting the generality of the foregoing or limiting in any way the rights of Lessor under this Lease or otherwise under applicable Laws, at any time after the occurrence, and during the continuance, of an Event of Default, Lessor shall be entitled to apply for and have a receiver appointed under applicable Law by a court of competent jurisdiction (by ex parte motion for appointment without notice) in any action taken by Lessor to enforce its rights and remedies hereunder in order to protect and preserve Lessor's interest under this Lease or in the Property and the Personalty, and in connection therewith, LESSEE HEREBY IRREVOCABLY CONSENTS TO AND WAIVES ANY RIGHT TO OBJECT TO OR OTHERWISE CONTEST THE APPOINTMENT OF A RECEIVER AFTER THE OCCURRENCE, AND DURING THE CONTINUANCE, OF AN EVENT OF DEFAULT; and/or

(j)     to seek any equitable relief available to Lessor, including, without limitation, the right of specific performance.

**Section 12.03. Cumulative Remedies**.   All powers and remedies given by Section 12.02 to Lessor, subject to applicable Law, shall be cumulative and not exclusive of one another or of any other right or remedy or of any other powers and remedies available to Lessor under this Lease, by judicial proceedings or otherwise, to enforce the performance or observance of the covenants and agreements of Lessee contained in this Lease, and no delay or omission of Lessor to exercise any right or power accruing upon the occurrence of any Event of Default shall impair any other or subsequent Event of Default or impair any rights or remedies consequent thereto.  Every power and remedy given by this Section or by Law to Lessor may be exercised from time to time, and as often as may be deemed expedient, by Lessor, subject at all times to Lessor's right in its sole judgment to discontinue any work commenced by Lessor or change any course of action undertaken by Lessor.

**Section 12.04. Lessee Waiver**.   Lessee hereby expressly waives, for itself and all Persons claiming by, through and under Lessee, including creditors of all kinds, (a) any right and privilege which Lessee has under any present or future Legal Requirements to redeem the Property or to have a continuance of this Lease for the Lease Term after termination of Lessee's right of occupancy by order or judgment of any court or by any legal process or writ, or under the terms of this Lease; (b) the benefits of any present or future Legal Requirement that exempts property from liability for debt or for distress for rent; (c) any present or future Legal Requirement relating to notice or delay in levy of execution in case of eviction of a tenant for nonpayment of rent; and (d) any benefits and lien rights which may arise pursuant to any present or future Legal Requirement.

4844-5241-0971.1
STORE/Campbells (Perkins)
Lease Agreement
1601 W. Prospect Road, Ashtabula, OH 44004
File No. 7210/02-588.2

## ARTICLE XIII

## MORTGAGE, SUBORDINATION AND ATTORNMENT

**Section 13.01.  No Liens**.  Lessor's interest in this Lease and/or the Property shall not be subordinate to any liens or encumbrances placed upon the Property by or resulting from any act of Lessee, and nothing herein contained shall be construed to require such subordination by Lessor.  NOTICE IS HEREBY GIVEN THAT LESSEE IS NOT AUTHORIZED TO PLACE OR ALLOW TO BE PLACED ANY LIEN, MORTGAGE, DEED OF TRUST, DEED TO SECURE DEBT, SECURITY INTEREST OR ENCUMBRANCE OF ANY KIND UPON ALL OR ANY PART OF THE PROPERTY OR LESSEE'S LEASEHOLD INTEREST THEREIN, AND ANY SUCH PURPORTED TRANSACTION SHALL BE VOID.

**Section 13.02.  Subordination**.    This Lease at all times shall automatically be subordinate to the lien of any and all ground leases and Mortgages now or hereafter placed upon the Property by Lessor, and Lessee covenants and agrees to execute and deliver, upon demand, such further instruments subordinating this Lease to the lien of any or all such ground leases and Mortgages as shall be desired by Lessor, or any present or proposed mortgagees under trust deeds, upon the condition that Lessee shall have the right to remain in possession of the Property under the terms of this Lease, notwithstanding any default in any or all such ground leases or Mortgages, or after the foreclosure of any such Mortgages, so long as no Event of Default shall have occurred and be continuing.

**Section 13.03.  Attornment**.  In the event any purchaser or assignee of any Lender at a foreclosure sale acquires title to any of the  Property, or in the event that any Lender or any purchaser or assignee otherwise succeeds to the rights of Lessor as landlord under this Lease, Lessee shall attorn to Lender or such purchaser or assignee, as the case may be (a "<u>Successor Lessor</u>"), and recognize the Successor Lessor as lessor under this Lease, and, subject to the provisions of this Article XIII, this Lease shall continue in full force and effect as a direct lease between the Successor Lessor and Lessee, provided that the Successor Lessor shall only be liable for any obligations of Lessor under this Lease which accrue after the date that such Successor Lessor acquires title.  The foregoing provision shall be self-operative and effective without the execution of any further instruments.

**Section 13.04.  Execution of Additional Documents**.  Although the provisions in this Article XIII shall be self-operative and no future instrument of subordination shall be required, upon request by Lessor, Lessee shall execute and deliver such additional reasonable instruments as may be reasonably required for such purposes.

**Section 13.05.  Notice to Lender**.   Lessee shall give written notice to any Lender having a recorded lien upon the Property or any part thereof of which Lessee has been notified of any breach or default by Lessor of any of its obligations under this Lease and give such Lender at least sixty (60) days beyond any notice period to which Lessor might be entitled to cure such default before Lessee may exercise any remedy with respect thereto.

4844-5241-0971.1
STORE/Campbells (Perkins)
Lease Agreement
1601 W. Prospect Road, Ashtabula, OH 44004
File No. 7210/02-588.2

## ARTICLE XIV

## ASSIGNMENT

**Section 14.01. Assignment by Lessor**.   As a material inducement to Lessor's willingness to enter into the transactions contemplated by this Lease (the "Transaction") and the other Transaction Documents, Lessee hereby agrees that Lessor may, from time to time and at any time and without the consent of Lessee, engage in all or any combination of the following, or enter into agreements in connection with any of the following or in accordance with requirements that may be imposed by applicable securities, tax or other Laws: (a) the sale, assignment, grant, conveyance, transfer, financing, re-financing, purchase or re-acquisition of all, less than all or any portion of the Property, this Lease or any other Transaction Document, Lessor's right, title and interest in this Lease or any other Transaction Document, the servicing rights with respect to any of the foregoing, or participations in any of the foregoing; or (b) a Securitization and related transactions.  Without in any way limiting the foregoing, the parties acknowledge and agree that Lessor, in its sole discretion, may assign this Lease or any interest herein to another Person in order to maintain Lessor's or any of its Affiliates' status as a REIT. In the event of any such sale or assignment other than a security assignment, Lessee shall attorn to such purchaser or assignee (so long as Lessor and such purchaser or assignee notify Lessee in writing of such transfer and such purchaser or assignee expressly assumes in writing the obligations of Lessor hereunder from and after the date of such assignment).  At the request of Lessor, Lessee will execute such documents confirming the sale, assignment or other transfer and such other agreements as Lessor may reasonably request, provided that the same do not increase the liabilities and obligations of Lessee hereunder.  Lessor shall be relieved, from and after the date of such transfer or conveyance, of liability for the performance of any obligation of Lessor contained herein, except for obligations or liabilities accrued prior to such assignment or sale.

**Section 14.02.  Assignment by Lessee**.

(a)    ***No Assignment by Lessee***.  Lessee acknowledges that Lessor has relied both on the business experience and creditworthiness of Lessee and upon the particular purposes for which Lessee intends to use the Property in entering into this Lease.  Lessee shall not assign, transfer, convey, pledge or mortgage this Lease or any interest herein or any interest in Lessee, whether by operation of Law or otherwise, without the prior written consent of Lessor.  At the time of any assignment of this Lease which is approved by Lessor, the assignee shall assume all of the obligations of Lessee under this Lease pursuant to a written assumption agreement in form and substance reasonably acceptable to Lessor.   Such assignment of this Lease pursuant to this Section 14.02 shall not relieve Lessee of its obligations respecting this Lease unless otherwise agreed to by Lessor.   Any assignment, transfer, conveyance, pledge or mortgage in violation of this Section 14.02 shall be voidable at the sole option of Lessor. Any consent to an assignment given by Lessor hereunder shall not be deemed a consent to any subsequent assignment.

(b)    ***Permitted Assignment***.   Notwithstanding anything to the contrary contained in this Section 14.02 and provided that no Event of Default has occurred and is continuing at the time of the proposed assignment or other transfer, and provided

4844-5241-0971.1
STORE/Campbells (Perkins)
Lease Agreement
1601 W. Prospect Road, Ashtabula, OH 44004
File No. 7210/02-588.2

further that any assignee agrees to assume all of Lessee's obligations under this Lease by written agreement approved by Lessor, Lessee shall have the right to assign or otherwise transfer all, but not less than all, of its interest in, to and under this Lease without Lessor's consent to a Qualified Operator. A "Qualified Operator" shall mean a Person who (x) for two (2) consecutive years immediately prior to the date of assignment or transfer and (y) on a proforma basis following the consummation of such assignment or transfer (all as determined by Lessor upon review of financial statements provided by the assignee prior to the proposed lease assignment and in a form reasonably satisfactory to Lessor), (A) has a CFCCR (defined below) of at least 1.50x; and (B) has a Lease Adjusted Leverage (defined below) of no more than 5.50x; *provided, however,* that Lessee may satisfy the foregoing conditions of a Qualified Operator by providing, or causing to be provided, a guaranty agreement, in form and substance reasonably acceptable to and approved by Lessor, in writing, which guaranty shall be from an entity that meets the requirements of (A), (B) and (C) set forth in this Section 14.02. Lessee shall provide Lessor with at least thirty (30) days' prior written notice of the proposed assignment to a Qualified Operator, which notice must include financial information satisfying the Qualified Operator requirements set forth herein. In the event that Lessee effects an assignment to a Qualified Operator, Lessee shall be released from any liability arising under this Lease from and after the date of such assignment and Guarantor shall be released from any liability arising under the Guaranty from and after the date of such assignment.

For purposes hereof:

"*CFCCR*" means with respect to the twelve month period of time immediately preceding the date of determination, the ratio calculated for such period of time, each as determined in accordance with GAAP, of (i) the sum of Consolidated Net Income (excluding non-cash income), Depreciation and Amortization, Interest Expense, income taxes, Operating Lease Expense and non-cash expenses to (ii) the sum of Operating Lease Expense (excluding non-cash rent adjustments), scheduled principal payments of long term Debt, scheduled maturities of all Capital Leases, dividends and Interest Expense (excluding non-cash interest expense and amortization of non-cash financing expenses). For purposes of calculating the CFCCR, the following terms shall be defined as set forth below:

"*Capital Lease*" shall mean all leases of any property, whether real, personal or mixed, by a Person, which leases would, in conformity with GAAP, be required to be accounted for as a capital lease on the balance sheet of such Person. The term "Capital Lease" shall not include any operating lease.

"*Consolidated Net Income*" shall mean with respect to the period of determination, the net income or net loss of a Person. In determining the amount of Consolidated Net Income, (i) adjustments shall be made for nonrecurring gains and losses or non-cash items allocable to the period of determination, (ii) deductions shall be made for, among other things, Depreciation and Amortization, Interest Expense, Operating Lease Expense, and (iii) no deductions shall be made for income taxes or charges equivalent to income taxes allocable to the period of determination, as determined in accordance with GAAP.

4844-5241-0971.1
STORE/Campbells (Perkins)
Lease Agreement
1601 W. Prospect Road, Ashtabula, OH 44004
File No. 7210/02-588.2

"*Debt*" shall mean with respect to a Person, and for the period of determination (i) indebtedness for borrowed money, (ii) subject to the limitation set forth in sub item (iv) below, obligations evidenced by bonds, indentures, notes or similar instruments, (iii) obligations under leases which should be, in accordance with GAAP, recorded as Capital Leases, and (iv) obligations under direct or indirect guarantees in respect of, and obligations (contingent or otherwise) to purchase or otherwise acquire, or otherwise to assure a creditor against loss in respect of, indebtedness or obligations of others of the kinds referred to in clauses (i) through (iv) above, except for guaranty obligations of such Person, which, in conformity with GAAP, are not included on the balance sheet of such Person.

"*Depreciation and Amortization*" shall mean the depreciation and amortization accruing during any period of determination with respect to a Person, as determined in accordance with GAAP.

"*Interest Expense*" shall mean for any period of determination, the sum of all interest accrued or which should be accrued in respect of all Debt of a Person, as determined in accordance with GAAP.

"*Operating Lease Expense*" shall mean the sum of all payments and expenses incurred by a Person, under any operating leases during the period of determination, as determined in accordance with GAAP.

"*EBITDA*" means for the twelve (12) month period ending on the date of determination, the sum of a Person's net income (loss) for such period plus, in each case to the extent previously deducted in calculating net income (loss): (i) income taxes, (ii) interest payments on all of its debt obligations (including any borrowings under short term credit facilities), (iii) all non-cash charges including depreciation and amortization, and (iv) Non-Recurring Items (defined below).

"*EBITDAR*" means the sum of a Person's EBITDA and its total land and building rent for the twelve (12) month period ending on the date of determination.

"*Lease Adjusted Leverage*" means with respect to a Person, as of any applicable date, the sum of (i) ten (10) times such Person's total land and building rent for the twelve (12) month period ending on the date of determination, and (ii) the total current balance of such Person's total debt obligations (including any borrowings under short term credit facilities) on such date, divided by EBITDAR.

"*Non-Recurring Items*" shall mean with respect to a Person, items of the sum (whether positive or negative) of revenue minus expenses that, in the judgment of Lessor, are unusual in nature, occur infrequently and are not representative of the ongoing or future earnings or expenses of such Person.

**Section 14.03.  No Sale of Assets**.  Without the prior written consent of Lessor, Lessee shall not sell all or substantially all of Lessee's assets.  Any sale of Lessee's assets in violation of this Section 14.03, shall be voidable at the sole option of Lessor.  Any consent to a sale of

4844-5241-0971.1
STORE/Campbells (Perkins)
Lease Agreement
1601 W. Prospect Road, Ashtabula, OH 44004
File No. 7210/02-588.2

Lessee's assets given by Lessor hereunder shall not be deemed a consent to any subsequent sale of Lessee's assets.

**Section 14.04.  No Subletting**.  Lessee shall not sublet the Property without the prior written consent of Lessor, which may be withheld by Lessor in its sole discretion and any such purported subletting shall be void.

**Section 14.05.  Lease Consolidation**. Notwithstanding any provision contained herein, at any time during the Lease Term where STORE Capital Acquisitions, LLC (or an Affiliate thereof) is the "Lessor" hereunder, upon written notification to Lessee, Lessor may elect, in its sole discretion, to amend and restate the Master Lease Agreement to include the Property in the Master Lease Agreement.  In such event, Lessee shall execute an amendment and restatement of the Master Lease Agreement, in form and substance identical to the Master Lease Agreement, and any other related documents reasonably requested by Lessor, solely to (a) modify the definition of "Properties" as defined in the Master Lease Agreement to include the Property; (b) increase the Base Annual Rental as defined in the Master Lease Agreement to reflect the inclusion of the Property; and (c) make such other changes reasonably deemed necessary by Lessor in its sole discretion to reflect the addition of the Property to the Master Lease Agreement.  In no event shall Lessee have the right to request any further modifications to the amended and restated Master Lease Agreement.  Lessee shall execute any such amended and restated Master Lease Agreement within five (5) Business Days after delivery to Lessee of an execution version thereof.

## ARTICLE XV

## NOTICES

**Section 15.01. Notices**.  All notices, demands, designations, certificates, requests, offers, consents, approvals, appointments and other instruments given pursuant to this Lease shall be in writing and given by any one of the following: (a) hand delivery; (b) express overnight delivery service;  (c) certified or registered mail, return receipt requested;  or (d) email transmission, and shall be deemed to have been delivered upon (i) receipt, if hand delivered; (ii) the next Business Day, if delivered by a reputable express overnight delivery service; (iii) the third Business Day following the day of deposit of such notice with the United States Postal Service, if sent by certified or registered mail, return receipt requested; or (iv) transmission, if delivered by email transmission.  Notices shall be provided to the parties and addresses (or electronic mail addresses) specified below:

|  |  |
|---|---|
| If to Lessee: | 5171 Campbells Land Co., Inc. |
|  | 6201 Steubenville Pike, Suite 100 |
|  | McKees Rocks, PA  15136 |
|  | Attention:  William Kane |
|  | Email: wtkane25@gmail.com |
|  |  |
| If to Lessor: | STORE Capital Acquisitions, LLC |
|  | 8377 E. Hartford Drive, Suite 100 |
|  | Scottsdale, AZ 85255 |
|  | Attention:  Michael T. Bennett |

28

Executive Vice President – General Counsel
Email: mbennett@storecapital.com

With a copy to:          Kutak Rock LLP
                         1801 California Street, Suite 3000
                         Denver, CO 80202
                         Attention:  Nathan Humphrey, Esq. and
                              Kelly Reynoldson, Esq.
                         Email: nathan.humphrey@kutakrock.com and
                              kelly.reynoldson@kutakrock.com

or to such other address or such other person as either party may from time to time hereafter specify to the other party in a notice delivered in the manner provided above.

## ARTICLE XVI

## LANDLORD'S LIEN / SECURITY INTEREST

**Section 16.01. Landlord's Lien and Security Interest**.  Lessee agrees that Lessor shall have a landlord's lien, and Lessee additionally hereby separately grants to Lessor a first and prior security interest, in, on and against all of Lessee's right, title and interest in, to and under all Personalty, which lien and security interest shall secure the payment of all Rental and other Monetary Obligations payable by Lessee to Lessor under the terms hereof and all other obligations of Lessee to Lessor under this Lease.  Lessee agrees that Lessor may file such documents as Lessor then deems appropriate or necessary to perfect and maintain said lien and security interest, and expressly acknowledges and agrees that, in addition to any and all other rights and remedies of Lessor whether hereunder or at Law or in equity, in the Event of Default of Lessee hereunder, Lessor shall have any and all rights and remedies granted a secured party under the Uniform Commercial Code then in effect in the state where the Property is located.  Lessee covenants to promptly notify Lessor of any changes in Lessee's name and/or organizational structure which may necessitate the execution and filing of additional financing statements; *provided, however*, the foregoing shall not be construed as Lessor's consent to such changes.

Lessee hereby ratifies its authorization for Lessor or any of its Affiliates to have filed in any Uniform Commercial Code jurisdiction any initial financing statement and any amendments thereto covering the Personalty pledged herein, if filed prior to the Effective Date.

## ARTICLE XVII

## MISCELLANEOUS

**Section 17.01. Force Majeure**.  Any prevention, delay or stoppage due to strikes, lockouts, acts of God, enemy or hostile governmental action, civil commotion, fire or other casualty beyond the control of the party obligated to perform (each, a "Force Majeure Event") shall excuse the performance by such party for a period equal to any such prevention, delay or

29

stoppage, expressly excluding, however, the obligations imposed upon Lessee with respect to Rental and other Monetary Obligations to be paid hereunder.

**Section 17.02.  No Merger**.  There shall be no merger of this Lease nor of the leasehold estate created by this Lease with the fee estate in or ownership of the Property by reason of the fact that the same person, corporation, firm or other entity may acquire or hold or own, directly or indirectly, (a) this Lease or the leasehold estate created by this Lease or any interest in this Lease or in such leasehold estate, and (b) the fee estate or ownership of the Property or any interest in such fee estate or ownership.  No such merger shall occur unless and until all persons, corporations, firms and other entities having any interest in (i) this Lease or the leasehold estate created by this Lease, and (ii) the fee estate in or ownership of the Property or any part thereof sought to be merged shall join in a written instrument effecting such merger and shall duly record the same.

**Section 17.03.  Interpretation**.  Lessor and Lessee acknowledge and warrant to each other that each has been represented by independent counsel and has executed this Lease after being fully advised by said counsel as to its effect and significance. This Lease shall be interpreted and construed in a fair and impartial manner without regard to such factors as the party which prepared the instrument, the relative bargaining powers of the parties or the domicile of any party.  Whenever in this Lease any words of obligation or duty are used, such words or expressions shall have the same force and effect as though made in the form of a covenant.

**Section 17.04.  Characterization.**  The following expressions of intent, representations, warranties, covenants, agreements, stipulations and waivers are a material inducement to Lessor entering into this Lease:

(a)  Lessor and Lessee intend that (i) this Lease constitutes an unseverable, unitary and single lease of all, but not less than all, of the Property, and, if at any time this Lease covers other real property in addition to the Property, neither this Lease, nor Lessee's obligations or rights hereunder may be allocated or otherwise divided among such properties by Lessee; (ii) this Lease is a "true lease," is not a financing lease, capital lease, mortgage, equitable mortgage, deed of trust, trust agreement, security agreement or other financing or trust arrangement, and the economic realities of this Lease are those of a true lease; and (iii) the business relationship created by this Lease and any related documents is solely that of a long-term commercial lease between Lessor and Lessee, the Lease has been entered into by both parties in reliance upon the economic and legal bargains contained herein, and none of the agreements contained herein is intended, nor shall the same be deemed or construed, to create a partnership (*de facto* or *de jure*) between Lessor and Lessee, to make them joint venturers, to make Lessee an agent, legal representative, partner, subsidiary or employee of Lessor, nor to make Lessor in any way responsible for the debts, obligations or losses of Lessee.

(b)  Lessor and Lessee covenant and agree that: (i) each will treat this Lease as an operating lease pursuant to Statement of Financial Accounting Standards No. 13, as amended, and as a true lease for state Law reporting purposes and for federal income tax purposes; (ii) each party will not, nor will it permit any Affiliate to, at any time, take any action or fail to take any action with respect to the preparation or filing of any

4844-5241-0971.1
STORE/Campbells (Perkins)
Lease Agreement
1601 W. Prospect Road, Ashtabula, OH 44004
File No. 7210/02-588.2

statement or disclosure to Governmental Authority, including without limitation, any income tax return (including an amended income tax return), to the extent that such action or such failure to take action would be inconsistent with the intention of the parties expressed in this Section 17.04; (iii) with respect to the Property, the Lease Term is less than seventy-five percent (75%) of the estimated remaining economic life of the Property; and (iv) the Base Annual Rental is the fair market value for the use of the Property and was agreed to by Lessor and Lessee on that basis, and the execution and delivery of, and the performance by Lessee of its obligations under, this Lease do not constitute a transfer of all or any part of the Property.

(c)     Lessee waives any claim or defense based upon the characterization of this Lease as anything other than a true lease and as a master lease of the Property. Lessee stipulates and agrees (i) not to challenge the validity, enforceability or characterization of the lease of the Property as a true lease and/or as a single, unitary, unseverable instrument pertaining to the lease of all, but not less than all, of the Property; and (ii) not to assert or take or omit to take any action inconsistent with the agreements and understandings set forth in this Section 17.04.

**Section 17.05.  Disclosures**.

(a)     ***Securities Act or Exchange Act***.   The parties agree that, notwithstanding any provision contained in this Lease, any party (and each employee, representative or other agent of any party) may disclose to any and all persons, without limitation of any kind, any matter required under the Securities Act or the Exchange Act.

(b)     ***Lessor Advertising and Related Publications***.   Lessee hereby consents to the use by Lessor of, and Lessor is hereby expressly permitted to use, Lessee's name, trademarks, logos, pictures of stores and signage, and basic Transaction information (collectively "Lessee's Information") solely in connection with Lessor's sales, advertising, and press release materials, including on Lessor's website.  Lessee's consent shall be deemed authorization for the limited use of Lessee's Information by Lessor under all applicable copyright and trademark laws.

(c)     ***Public Disclosures.***  Except as required by Law, Lessee shall not make any public disclosure, including press releases or any form of media release, of this Lease Agreement or any transactions relating hereto without the prior written consent of Lessor.

**Section 17.06. Attorneys' Fees**.   In the event of any judicial or other adversarial proceeding concerning this Lease, to the extent permitted by Law, the prevailing party shall be entitled to recover all of its reasonable attorneys' fees and other Costs in addition to any other relief to which it may be entitled.   In addition, the prevailing party shall, upon demand, be entitled to all attorneys' fees and all other Costs incurred in the preparation and service of any notice or demand hereunder, whether or not a legal action is subsequently commenced.

**Section 17.07. Memoranda of Lease**.   Concurrently with the execution of this Lease, Lessor and Lessee are executing Lessor's standard form memorandum of lease in recordable form, indicating the names and addresses of Lessor and Lessee, a description of the Property,

4844-5241-0971.1
STORE/Campbells (Perkins)
Lease Agreement
1601 W. Prospect Road, Ashtabula, OH 44004
File No. 7210/02-588.2

the Lease Term, but omitting Rentals and such other terms of this Lease as Lessor may not desire to disclose to the public.  Further, upon Lessor's request, Lessee agrees to execute and acknowledge a termination of lease and/or quitclaim deed in recordable form to be held by Lessor until the expiration or sooner termination of the Lease Term; *provided, however, if* Lessee shall fail or refuse to sign such a document in accordance with the provisions of this Section within ten (10) days following a request by Lessor, Lessee irrevocably constitutes and appoints Lessor as its attorney-in-fact to execute and record such document, it being stipulated that such power of attorney is coupled with an interest and is irrevocable and binding.

**Section 17.08.  No Brokerage**.  Lessor and Lessee represent and warrant to each other that they have had no conversation or negotiations with any broker concerning the leasing of the Property.  Each of Lessor and Lessee agrees to protect, indemnify, save and keep harmless the other, against and from all liabilities, claims, losses, Costs, damages and expenses, including attorneys' fees, arising out of, resulting from or in connection with their breach of the foregoing warranty and representation.

**Section 17.09.  Waiver of Jury Trial and Certain Damages**.  LESSOR AND LESSEE HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE THE RIGHT EITHER MAY HAVE TO A TRIAL BY JURY WITH RESPECT TO ANY AND ALL ISSUES PRESENTED IN ANY ACTION, PROCEEDING, CLAIM OR COUNTERCLAIM BROUGHT BY EITHER OF THE PARTIES HERETO AGAINST THE OTHER OR ITS SUCCESSORS WITH RESPECT TO ANY MATTER ARISING OUT OF OR IN CONNECTION WITH THIS LEASE, THE RELATIONSHIP OF LESSOR AND LESSEE, LESSEE'S USE OR OCCUPANCY OF THE PROPERTY, AND/OR ANY CLAIM FOR INJURY OR DAMAGE, OR ANY EMERGENCY OR STATUTORY REMEDY.  THIS WAIVER BY THE PARTIES HERETO OF ANY RIGHT EITHER MAY HAVE TO A TRIAL BY JURY HAS BEEN NEGOTIATED AND IS AN ESSENTIAL ASPECT OF THEIR BARGAIN.   FURTHERMORE, LESSOR AND LESSEE HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE THE RIGHT EITHER MAY HAVE TO SEEK PUNITIVE, CONSEQUENTIAL, SPECIAL AND INDIRECT DAMAGES FROM THE OTHER PARTY AND ANY OF THE AFFILIATES, OFFICERS, DIRECTORS, MEMBERS, MANAGERS OR EMPLOYEES OF LESSOR OR LESSEE, AS APPLICABLE, OR ANY OF THEIR SUCCESSORS WITH RESPECT TO ANY AND ALL ISSUES PRESENTED IN ANY ACTION, PROCEEDING, CLAIM OR COUNTERCLAIM BROUGHT WITH RESPECT TO ANY MATTER ARISING OUT OF OR IN CONNECTION WITH THIS LEASE OR ANY DOCUMENT CONTEMPLATED HEREIN OR RELATED HERETO.   THE WAIVER BY LESSOR AND LESSEE OF ANY RIGHT EITHER MAY HAVE TO SEEK PUNITIVE, CONSEQUENTIAL, SPECIAL AND INDIRECT DAMAGES HAS BEEN NEGOTIATED BY THE PARTIES HERETO AND IS AN ESSENTIAL ASPECT OF THEIR BARGAIN.

**Section 17.10.  Securitizations**.  As a material inducement to Lessor's willingness to enter into the Transactions contemplated by this Lease and the other Transaction Documents, Lessee hereby acknowledges and agrees that Lessor may, from time to time and at any time (a) advertise, issue press releases, send direct mail or otherwise disclose information regarding the Transaction for marketing purposes; and (b) (i) act or permit another Person to act as sponsor, settler, transferor or depositor of, or a holder of interests in, one or more Persons or other arrangements formed pursuant to a trust agreement, indenture, pooling agreement, participation agreement, sale and servicing agreement, limited liability company agreement, partnership agreement, articles of incorporation or similar agreement or document; and

4844-5241-0971.1
STORE/Campbells (Perkins)
Lease Agreement
1601 W. Prospect Road, Ashtabula, OH 44004
File No. 7210/02-588.2

(ii) permit one or more of such Persons or arrangements to offer and sell stock, certificates, bonds, notes, other evidences of indebtedness or securities that are directly or indirectly secured, collateralized or otherwise backed by or represent a direct or indirect interest in whole or in part in any of the assets, rights or properties described in Section 14.01 of this Lease, in one or more Persons or arrangements holding such assets, rights or properties, or any of them (collectively, the "Securities"), whether any such Securities are privately or publicly offered and sold, or rated or unrated (any combination of which actions and transactions described in both clauses (i) and (ii) in this paragraph, whether proposed or completed, are referred to in this Lease as a "Securitization").  Lessee shall cooperate fully with Lessor and any Affected Party with respect to all reasonable requests and due diligence procedures and use reasonable efforts to facilitate such Securitization, provided that such cooperation shall be at no additional cost or expense to Lessee so long as Lessee is not otherwise required to provide such information to Lessor pursuant to the other provisions of this Lease.

**Section 17.11.  State-Specific Provisions**.  The provisions and/or remedies which are set forth on the attached Exhibit D shall be deemed a part of and included within the terms and conditions of this Lease.

**Section 17.12.  Time is of the Essence; Computation**.  Time is of the essence with respect to each and every provision of this Lease.  If any deadline provided herein falls on a non-Business Day, such deadline shall be extended to the next day that is a Business Day.

**Section 17.13.  Waiver and Amendment**.  No provision of this Lease shall be deemed waived or amended except by a written instrument unambiguously setting forth the matter waived or amended and signed by the party against which enforcement of such waiver or amendment is sought.  Waiver of any matter shall not be deemed a waiver of the same or any other matter on any future occasion.  No acceptance by Lessor of an amount less than the Rental and other Monetary Obligations stipulated to be due under this Lease shall be deemed to be other than a payment on account of the earliest such Rental or other Monetary Obligations then due or in arrears nor shall any endorsement or statement on any check or letter accompanying any such payment be deemed a waiver of Lessor's right to collect any unpaid amounts or an accord and satisfaction.

**Section 17.14.  Successors Bound**.  Except as otherwise specifically provided herein, the terms, covenants and conditions contained in this Lease shall bind and inure to the benefit of the respective heirs, successors, executors, administrators and assigns of each of the parties hereto.

**Section 17.15.  Captions**.  Captions are used throughout this Lease for convenience of reference only and shall not be considered in any manner in the construction or interpretation hereof.

**Section 17.16.  Other Documents**.  Each of the parties agrees to sign such other and further documents as may be necessary or appropriate to carry out the intentions expressed in this Lease.

**Section 17.17.  Entire Agreement**.    This Lease and any other instruments or agreements referred to herein, constitute the entire agreement between the parties with respect

4844-5241-0971.1
STORE/Campbells (Perkins)
Lease Agreement
1601 W. Prospect Road, Ashtabula, OH 44004
File No. 7210/02-588.2

to the subject matter hereof, and there are no other representations, warranties or agreements except as herein provided.

**Section 17.18.  Forum Selection; Jurisdiction; Venue; Choice of Law**.  For purposes of any action or proceeding arising out of this Lease, the parties hereto expressly submit to the jurisdiction of all federal and state courts located in the state where the Property is located. Lessee consents that it may be served with any process or paper by registered mail or by personal service within or without the state where the Property is located in accordance with applicable Law.  Furthermore, Lessee waives and agrees not to assert in any such action, suit or proceeding that it is not personally subject to the jurisdiction of such courts, that the action, suit or proceeding is brought in an inconvenient forum or that venue of the action, suit or proceeding is improper.  This Lease shall be governed by, and construed with, the Laws of the applicable state in which the Property is located, without giving effect to any state's conflict of Laws principles.

**Section 17.19.  Counterparts**.  This Lease may be executed in one or more counterparts, each of which shall be deemed an original.  Furthermore, the undersigned agree that transmission of this Lease via e-mail in a ".pdf" or other electronic format shall be deemed transmission of the original Lease for all purposes.

*[Remainder of page intentionally left blank; signature page(s) to follow]*

34

**IN WITNESS WHEREOF**, Lessor and Lessee have entered into this Lease as of the date first above written.

**LESSOR:**

**STORE CAPITAL ACQUISITIONS, LLC**, a Delaware limited liability company

By: _____

Printed Name:   Michael T. Bennett
                Executive Vice President
                General Counsel

Title:_____

STATE OF ARIZONA                    )
                                    ) ss.
COUNTY OF MARICOPA                  )

Before me, the undersigned, a Notary Public of the State and County aforesaid, personally appeared _Michael T. Bennett_____, with whom I am personally acquainted (or proved to me to be on the basis of satisfactory evidence), and who, upon oath, acknowledged himself/herself to be the _____EVP_____ of **STORE CAPITAL ACQUISITIONS, LLC**, a Delaware limited liability company, the within named Lessor, and that he/she as such officer, being authorized so to do, executed the within instrument for the purposes therein contained, by signing the name of _Store Capital Acquisitions LLC_ by himself/herself as such officer.

WITNESS my hand and Official Seal at office, this ___29___ day of ___January___, 2018.

_____
Notary Public

My Commission Expires ___8/8/2015___

[Notary Seal: DONYA NANETTE DERUITER, Notary Public, State of Arizona, Maricopa County, My Commission Expires August 08, 2019]

**IN WITNESS WHEREOF**, Lessor and Lessee have entered into this Lease as of the date first above written.

LESSEE:

**5171 CAMPBELLS LAND CO., INC.**, a
Pennsylvania corporation

By: _[signature]_

Printed Name: _William T KANE_

Title: _President_

STATE OF _Pennsylvania_ ) [~~STATE~~ replaced with handwritten "Commonwealth"]

) ss.

COUNTY OF _Allegheny_ )

Before me, the undersigned, a Notary Public of the State and County aforesaid, personally appeared _William T. Kane_, with whom I am personally acquainted (or proved to me to be on the basis of satisfactory evidence), and who, upon oath, acknowledged himself/herself to be the _President_ of **5171 CAMPBELLS LAND CO., INC.**, a Pennsylvania corporation, the within named Lessee, a _President_, and that he/she as such officer, being authorized so to do, executed the within instrument for the purposes therein contained, by signing the name of _____ by himself/herself as such officer.

WITNESS my hand and Official Seal at office, this _30th_ day of _January_, 2018.

_[signature] Rosanne M Penn_
Notary Public

My Commission Expires _9/13/20_

COMMONWEALTH OF PENNSYLVANIA
NOTARIAL SEAL
Rosanne M. Penn, Notary Public
City of Pittsburgh, Allegheny County
My Commission Expires Sept. 13, 2020
MEMBER, PENNSYLVANIA ASSOCIATION OF NOTARIES

**EXHIBITS**

Exhibit A:                Defined Terms

Exhibit B:                Legal Description and Street Address of the Property

Exhibit C:                Authorization Agreement – Pre-Arranged Payments

Exhibit D:                State-Specific Provisions

Schedule 9.03        Supplemental Financial Information

**EXHIBIT A**

**DEFINED TERMS**

The following terms shall have the following meanings for all purposes of this Lease:

"*Additional Rental*" has the meaning set forth in Section 4.03.

"*Adjustment Date*" has the meaning set forth in Section 1.07.

"*Affected Party*" means each direct or indirect participant or investor in a proposed or completed Securitization, including, without limitation, any prospective owner, any rating agency or any party to any agreement executed in connection with the Securitization.

"*Affiliate*" means any Person which directly or indirectly controls, is under common control with or is controlled by any other Person.  For purposes of this definition, "controls," "under common control with," and "controlled by" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities or otherwise.

"*Anti-Money Laundering Laws*" means all applicable Laws, regulations and government guidance on the prevention and detection of money laundering, including, without limitation, (a) 18 U.S.C. §§ 1956 and 1957; and (b) the Bank Secrecy Act, 31 U.S.C. §§ 5311 et seq., and its implementing regulations, 31 CFR Part 103.

"*Base Annual Rental*" has the meaning set forth in Section 1.05.

"*Base Monthly Rental*" means an amount equal to 1/12 of the applicable Base Annual Rental.

"*Business Day*" means a day on which banks located in Scottsdale, Arizona are not required or authorized to remain closed.

"*Casualty*" means any loss of or damage to any property included within or related to the Property or arising from an adjoining property caused by an Act of God, fire, flood or other catastrophe.

"*Code*" means the Internal Revenue Code of 1986, as the same may be amended from time to time.

"*Condemnation*" means a Taking and/or a Requisition.

"*Costs*" means all reasonable costs and expenses incurred by a Person, including, without limitation, reasonable attorneys' fees and expenses, court costs, expert witness fees, costs of tests and analyses, travel and accommodation expenses, deposition and trial transcripts, copies and other similar costs and fees, brokerage fees, escrow fees, title insurance

A-1

premises, appraisal fees, stamp taxes, recording fees and transfer taxes or fees, as the circumstances require.

"*Default Rate*" means 18% per annum or the highest rate permitted by Law, whichever is less.

"*Effective Date*" has the meaning set forth in the introductory paragraph of this Lease.

"*Environmental Laws*" means federal, state and local Laws, ordinances, common law requirements and regulations and standards, rules, policies and other governmental requirements, administrative rulings and court judgments and decrees having the effect of Law in effect now or in the future and including all amendments, that relate to Hazardous Materials, Regulated Substances, USTs, and/or the protection of human health or the environment, or relating to liability for or Costs of Remediation or prevention of Releases, and apply to Lessee and/or the Property.

"*Environmental Liens*" means any liens and other encumbrances imposed pursuant to any Environmental Law.

"*Event of Default*" has the meaning set forth in Section 12.01.

"*Exchange Act*" means the Securities Exchange Act of 1934, as amended.

"*Extension Option*" has the meaning set forth in Section 3.02.

"*Extension Term*" has the meaning set forth in Section 3.02.

"*Force Majeure Event*" has the meaning set forth in Section 17.01.

"*Franchise Agreement*" has the meaning set forth in Section 5.08.

"*Franchisor*" means Perkins Restaurant and Bakery, a Delaware corporation, or its successors and permitted assigns.

"*GAAP*" means generally accepted accounting principles, consistently applied from period to period.

"*Governmental Authority*" means any governmental authority, agency, department, commission, bureau, board, instrumentality, court or quasi-governmental authority of the United States, any state or any political subdivision thereof with authority to adopt, modify, amend, interpret, give effect to or enforce any federal, state and local Laws, statutes, ordinances, rules or regulations, including common law, or to issue court orders.

"*Guarantor*" means collectively, William Kane, Frank Kane and Ron Linaburg or any additional or replacement guarantor(s) approved by Lessor in its sole and absolute discretion.

A-2

"*Guaranty*" means that certain Unconditional Guaranty of Payment and Performance dated as of the date hereof given by Guarantor for the benefit of Lessor, as the same may be amended from time to time.

"*Hazardous Materials*" includes: (a) oil, petroleum products, flammable substances, explosives, radioactive materials, hazardous wastes or substances, toxic wastes or substances or any other materials, contaminants or pollutants, the presence of which causes the Property to be in violation of any local, state or federal Law or regulation, or Environmental Law, or are defined as or included in the definition of "hazardous substances," "hazardous wastes," "hazardous materials," "toxic substances," "contaminants," "pollutants," or words of similar import under any applicable local, state or federal Law or under the regulations adopted, orders issued, or publications promulgated pursuant thereto, including, but not limited to: (i) the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, 42 U.S.C. § 9601, et seq.; (ii) the Hazardous Materials Transportation Act, as amended, 49 U.S.C. § 5101, et seq.; (iii) the Resource Conservation and Recovery Act, as amended, 42 U.S.C. § 6901, et seq.; and (iv) regulations adopted and publications promulgated pursuant to the aforesaid Laws; (b) asbestos in any form which is friable, urea formaldehyde foam insulation, transformers or other equipment which contain dielectric fluid containing levels of polychlorinated biphenyls in excess of fifty (50) parts per million; (c) underground storage tanks; and (d) any other chemical, material or substance, exposure to which is prohibited, limited or regulated by any Governmental Authority.

"*Indemnified Parties*" means Lessor, its members, managers, officers, directors, shareholders, partners, employees, affiliates, subsidiaries, successors and assigns, including, but not limited to, any successors by merger, consolidation or acquisition of all or a substantial portion of the assets and business of Lessor.

"*Initial Term*" has the meaning set forth in Section 3.01.

"*Insolvency Event*" means (a) a Person's (i) failure to generally pay its debts as such debts become due; (ii) admitting in writing its inability to pay its debts generally; or (iii) making a general assignment for the benefit of creditors; (b) any proceeding being instituted by or against any Person (i) seeking to adjudicate it bankrupt or insolvent; (ii) seeking liquidation, dissolution, winding up, reorganization, arrangement, adjustment, protection, relief, or composition of it or its debts under any Law relating to bankruptcy, insolvency, or reorganization or relief of debtors; or (iii) seeking the entry of an order for relief or the appointment of a receiver, trustee, or other similar official for it or for any substantial part of its property, and in the case of any such proceeding instituted against any Person, either such proceeding shall remain undismissed for a period of one hundred twenty (120) days or any of the actions sought in such proceeding shall occur; or (c) any Person taking any corporate action to authorize any of the actions set forth above in this definition.

"*Insurance Premiums*" has the meaning in Section 6.05.

"*Law(s)*" means any constitution, statute, rule of law, code, ordinance, order, judgment, decree, injunction, rule, regulation, policy, requirement or administrative or judicial determination, even if unforeseen or extraordinary, of every duly constituted Governmental Authority, court or agency, now or hereafter enacted or in effect.

A-3

"*Lease Rate*" means a percentage equal to (a) the then-current Base Monthly Rental multiplied by twelve (12), divided by (b) the aggregate purchase price of the Property paid by Lessor (or Lessor's predecessor-in-interest).

"*Lease Term*" has the meaning described in Section 3.01.

"*Legal Requirements*" means the requirements of all present and future Laws (including, without limitation, Environmental Laws and Laws relating to accessibility to, usability by, and discrimination against, disabled individuals), all judicial and administrative interpretations thereof, including any judicial order, consent, decree or judgment, and all covenants, restrictions and conditions now or hereafter of record which may be applicable to Lessee or to the Property, or to the use, manner of use, occupancy, possession, operation, maintenance, alteration, repair or restoration of the Property, even if compliance therewith necessitates structural changes or improvements or results in interference with the use or enjoyment of the Property.

"*Lender*" means any lender in connection with any loan secured by Lessor's interest in the Property, and any servicer of any loan secured by Lessor's interest in the Property.

"*Lessee Entity*" or "*Lessee Entities*" means individually or collectively, as the context may require, Lessee and Guarantor, and all Affiliates thereof.

"*Lessee Reporting Entities*" means Lessee.

"*Lessee's Information*" has the meaning set forth in Section 17.05(b).

"*Lessor Entity*" or "*Lessor Entities*" means individually or collectively, as the context may require, Lessor and all Affiliates of Lessor.

"*Losses*" means any and all claims, suits, liabilities (including, without limitation, strict liabilities), actions, proceedings, obligations, debts, damages, losses, Costs, diminutions in value, fines, penalties, interest, charges, fees, judgments, awards, amounts paid in settlement and damages of whatever kind or nature, inclusive of bodily injury and property damage to third parties (including, without limitation, attorneys' fees and other Costs of defense).

"*Master Lease Agreement*" that certain Master Lease Agreement of even date herewith between STORE Master Funding XIII, LLC, as lessor, and Lessee with respect to 17 parcels of real property.

"*Material Adverse Effect*" means a material adverse effect on (a) the Property, including without limitation, the operation of the Property as a Permitted Facility and/or the value of the Property; (b) the contemplated business, condition, worth or operations of any Lessee Entity; (c) Lessee's ability to perform its obligations under this Lease; (d) Lessor's interests in the Property, this Lease or the other Transaction Documents; or (e) any Guarantor's ability to perform its obligations under the Guaranty.

"*Monetary Obligations*" means all Rental and all other sums payable or reimbursable by Lessee under this Lease to Lessor, to any third party on behalf of Lessor, or to any Indemnified Party.

A-4

"*Mortgages*" means, collectively, the mortgages, deeds of trust or deeds to secure debt, assignments of rents and leases, security agreements and fixture filings executed by Lessor for the benefit of Lender with respect to the Property, as such instruments may be amended, modified, restated or supplemented from time to time and any and all replacements or substitutions.

"*Net Award*" means (a) the entire award payable with respect to a Property by reason of a Condemnation whether pursuant to a judgment or by agreement or otherwise; or (b) the entire proceeds of any insurance required under Section 6.03 payable with respect to a Property, as the case may be, and in either case, less any Costs incurred by Lessor in collecting such award or proceeds.

"*OFAC Laws*" means Executive Order 13224 issued by the President of the United States, and all regulations promulgated thereunder, including, without limitation, the Terrorism Sanctions Regulations (31 CFR Part 595), the Terrorism List Governments Sanctions Regulations (31 CFR Part 596), the Foreign Terrorist Organizations Sanctions Regulations (31 CFR Part 597), and the Cuban Assets Control Regulations (31 CFR Part 515), and all other present and future federal, state and local Laws, ordinances, regulations, policies, lists (including, without limitation, the Specially Designated Nationals and Blocked Persons List) and any other requirements of any Governmental Authority (including without limitation, the U.S. Department of the Treasury Office of Foreign Assets Control) addressing, relating to, or attempting to eliminate, terrorist acts and acts of war, each as supplemented, amended or modified from time to time after the Effective Date, and the present and future rules, regulations and guidance documents promulgated under any of the foregoing, or under similar Laws, ordinances, regulations, policies or requirements of other states or localities.

"*Other Agreements*" means, collectively, all agreements and instruments now or hereafter entered into between, among or by (a) any of the Lessee Entities; and, or for the benefit of, (b) any of the Lessor Entities, including, without limitation, leases, promissory notes and guaranties, but excluding this Lease and all other Transaction Documents; including, (i) the Master Lease Agreement; (ii) that certain Lease Agreement of even date herewith between Lessor, as lessor, and Lessee with respect to the real property located at 587 E. Main Street, Canfield, OH 44406, (iii) that certain Lease Agreement of even date herewith between Lessor, as lessor, and Lessee with respect to the real property located at 115 Ludlow Street, Warren, PA 16365, (iv) that certain Lease Agreement of even date herewith between Lessor, as lessor, and Lessee with respect to the real property located at 4896 Everhard Road NW, Canton, OH 44718,and/or (v) that certain Lease Agreement of even date herewith between Lessor, as lessor, and Lessee with respect to the real property located at 2945 East State Street, Hermitage, PA 16148, as each may be amended from time to time.

"*Partial Condemnation*" has the meaning set forth in Section 11.03.

"*Permitted Amounts*" shall mean, with respect to any given level of Hazardous Materials or Regulated Substances, that level or quantity of Hazardous Materials or Regulated Substances in any form or combination of forms which does not constitute a violation of any Environmental Laws and is customarily employed in, or associated with, similar businesses located in the state where the Property is located.

A-5

"*Permitted Facility*" means a Perkins Restaurant and Bakery, all related purposes such as ingress, egress and parking, and uses incidental thereto.

"*Person*" means any individual, partnership, corporation, limited liability company, trust, unincorporated organization, Governmental Authority or any other form of entity.

"*Personalty*" means any and all "goods" (excluding "inventory," and including, without limitation, all "equipment," "fixtures," appliances and furniture (as "goods," "inventory," "equipment" and "fixtures" are defined in the applicable Uniform Commercial Code then in effect in the applicable jurisdiction)) from time to time situated on or used in connection with the Property, whether now owned or held or hereafter arising or acquired, together with all replacements and substitutions therefore and all cash and non-cash proceeds (including insurance proceeds and any title and UCC insurance proceeds) and products thereof, and, in the case of tangible collateral, together with all additions, attachments, accessions, parts, equipment and repairs now or hereafter attached or affixed thereto or used in connection therewith.

"*Price Index*" means the Consumer Price Index which is designated for the applicable month of determination as the United States City Average for All Urban Consumers, All Items, Not Seasonally Adjusted, with a base period equaling 100 in 1982 - 1984, as published by the United States Department of Labor's Bureau of Labor Statistics or any successor agency.  In the event that the Price Index ceases to be published, its successor index measuring cost of living as published by the same Governmental Authority which published the Price Index shall be substituted and any necessary reasonable adjustments shall be made by Lessor and Lessee in order to carry out the intent of Section 4.02.  In the event there is no successor index measuring cost of living, Lessor shall reasonably select an alternative price index measuring cost of living that will constitute a reasonable substitute for the Price Index.

"Property" means the parcel of real estate legally described on <u>Exhibit B</u> attached hereto, all rights, privileges, and appurtenances associated therewith, and all buildings, fixtures and other improvements now or hereafter located on such real estate (whether or not affixed to such real estate).

"*Real Estate Taxes*" has the meaning set forth in Section 6.05.

"*Regulated Substances*" means "petroleum" and "petroleum-based substances" or any similar terms described or defined in any of the Environmental Laws and any applicable federal, state, county or local Laws applicable to or regulating USTs.

"*REIT*" means a real estate investment trust as defined under Section 856 of the Code.

"*Release*" means any presence, release, deposit, discharge, emission, leaking, spilling, seeping, migrating, injecting, pumping, pouring, emptying, escaping, dumping, disposing or other movement of Hazardous Materials, Regulated Substances or USTs or any Threatened Release.

"*Remediation*" means any response, remedial, removal, or corrective action, any activity to cleanup, detoxify, decontaminate, contain or otherwise remediate any Hazardous Materials,

4844-5241-0971.1
STORE/Campbells (Perkins)
Lease Agreement
1601 W. Prospect Road, Ashtabula, OH 44004
File No. 7210/02-588.2

Regulated Substances or USTs, any actions to prevent, cure or mitigate any Release, any action to comply with any Environmental Laws or with any permits issued pursuant thereto, any inspection, investigation, study, monitoring, assessment, audit, sampling and testing, laboratory or other analysis, or any evaluation relating to any Hazardous Materials, Regulated Substances or USTs.

"*Rental*" means, collectively, the Base Annual Rental and the Additional Rental.

"*Rental Adjustment*" means an amount equal to the lesser of (a) 2% of the Base Annual Rental in effect immediately prior to the applicable Adjustment Date, or (b) 1.25 multiplied by the product of (i) the percentage change between the Price Index for the month which is two months prior to the Effective Date or the Price Index used for the immediately preceding Adjustment Date, as applicable, and the Price Index for the month which is two months prior to the applicable Adjustment Date; and (ii) the then current Base Annual Rental.

"*Requisition*" means any temporary requisition or confiscation of the use or occupancy of the Property by any Governmental Authority, civil or military, whether pursuant to an agreement with such Governmental Authority in settlement of or under threat of any such requisition or confiscation, or otherwise.

"*Reserve*" has the meaning in Section 6.04.

"*Securities*" has the meaning set forth in Section 17.10.

"*Securities Act*" means of the Securities Act of 1933, as amended.

"*Securitization*" has the meaning set forth in Section 17.10.

"*Successor Lessor*" has the meaning set forth in Section 13.03.

"*Taking*" means (a) any taking or damaging of all or a portion of the Property (i) in or by condemnation or other eminent domain proceedings pursuant to any Law, general or special; (ii) by reason of any agreement with any condemnor in settlement of or under threat of any such condemnation or other eminent domain proceeding; or (iii) by any other means; or (b) any de facto condemnation.  The Taking shall be considered to have taken place as of the later of the date actual physical possession is taken by the condemnor, or the date on which the right to compensation and damages accrues under the Law applicable to the Property.

"*Temporary Taking*" has the meaning set forth in Section 11.04.

"*Threatened Release*" means a substantial likelihood of a Release which requires action to prevent or mitigate damage to the soil, surface waters, groundwaters, land, stream sediments, surface or subsurface strata, ambient air or any other environmental medium comprising or surrounding the Property which may result from such Release.

"*Total Condemnation*" has the meaning set forth in Section 11.02.

"*Transaction*" has the meaning set forth in Section 14.01.

A-7

"*Transaction Documents*" means this Lease, the Guaranty and all documents related thereto.

"*U.S. Publicly Traded Entity*" means an entity whose securities are listed on a national securities exchange or quoted on an automated quotation system in the United States or a wholly-owned subsidiary of such an entity.

"*USTs*" means any one or combination of tanks and associated product piping systems used in connection with storage, dispensing and general use of Regulated Substances.

A-8

**EXHIBIT B**

**LEGAL DESCRIPTION AND
STREET ADDRESS OF THE PROPERTY**

**Street Address:**

| Address | City | ST | Zip | County |
|---|---|---|---|---|
| 1601 W. Prospect Road | Ashtabula | OH | 44004 | Ashtabula |

**Legal Description**:

**721002-588.2 1601 W. Prospect Rd., Ashtabula, OH 44004**

Real property in the City of Ashtabula, County of Ashtabula, State of Ohio, described as follows:

Lands of Sanray Corporation, as recorded in Microfiche 12-6948:

Situated in part of Lots 33 and 34 in the Ruth strong plat as recorded in Volume 2, Page 28 of the Ashtabula County record of Plats, Lot 1, Ashtabula City, Range 3, Township 13, Connecticut western reserve, Ashtabula County, Ohio:

Beginning at railroad spike found in the north line of U.S. route 20 (60 feet wide) and the southeast corner of John C. & Carrie L. Huffman (316-2538), said point being South 59 degrees 33 minutes 34 seconds west, 175.63 feet, thence North 30 degrees 26 minutes 26 seconds west, 30.00 feet from the intersection of fort Avenue and U. S. Route 20;

Course 1: Thence North 30 degrees 26 minutes 26 seconds west along the East line of Huffman 125.00 feet to a 5/8" capped "Slay 5298" iron pin set in the South line of Thelma Felix, et al (704-472);

Course 2: Thence North 59 degrees 33 minutes 34 seconds East along the South line of Felix 13.80 feet to a 5/8" capped "Slay 5298" iron pin set;

Course 3: Thence North 30 degrees 26 minutes 26 seconds west along the east lines of Felix, April L. Smith (338-1041), Wayne F. & Priscilla M. Mohney (319-377), and Thomas L. & Lynda F. Mcfadden (698-604) 157.59 feet to a 5/8" capped "Slay 5298" iron pin set in the southerly line of Charles & Tammy Ditri (353-1358);

B-1

Course 4: Thence North 59 degrees 33 minutes 34 seconds east along tile southerly lines of Ditri and John & Brenda Mullins (318-1271), 56.20 feet to a 5/8" capped "Slay 5298" iron pin set at the northwest corner of Golfview Manor Inc.(756-285):

Course 5: Thence South 30 degrees 26 minutes 26 seconds east along the west line of Golfview Manor Inc. 282.59 feet a capped 5/8" "Slay 5298" iron pin set in the north line of Route 20;

Course 6: Thence South 59 degrees 33 minutes 34 seconds west 70.00 feet along the North line of U.S. route 20 to the Place of Beginning and containing 0.404 acres.

Bearings are to an assumed meridian and indicate angles only as per survey by Jerry Slay, Ohio surveyor Number 5298 dated November 30, 2006.

Intent is to update the legal description for permanent Parcel Number 05-302-00-l30-01

All capped iron pins set marked "Slay 5298" are 5/8" X 30."

Lands of Golfview manor as recorded in deed Volume 756 Page 285:

Situated in all of Lots 35 and 36 and part of Lot 34 in the Ruth Strong Estate plat as recorded in Volume 2 Page 28 Ashtabula County record of plats, Ashtabula City, Range 3, Township 13, Connecticut western reserve, Ashtabula County, Ohio;

Beginning at a 5/8" capped "Slay 5298" iron pin set in tile north line of U.S. route 20 (60 feet wide) and the southeast corner of Sanray Corporation (l2-6948), said point being South 59 degrees 33 minutes 34 seconds west 175.63 feet, thence North 30 degrees 26 minutes 26 seconds west 30.00 feet and North 59 degrees 33 minutes 34 seconds east 70.00 feet from the intersection of Fort Avenue and U.S. Route 20:

Course 1: Thence North 30 degrees 26 minutes 26 seconds west along the east line of San Ray Corporation 282.59 feet to a 5/8" capped "Slay 5298" iron pin set in the south line of John & Brenda Mullins (318-l271);

Course 2: Thence North 59 degrees 33 minutes 34 seconds east along the South line of Mullins and the south line of Carl J. & Velva A. Debarr (53-4187) 187.64 feet to a 5/8" capped "Slay 5298" iron pin set;

Course 3: Thence South 30 degrees 26 minutes 26 seconds east along the West lines of Debarr, Florence M. Stoner, Tr. (334-791) and Barbara & Robert Oxley (116-475) 282.59 feet to a 5/8" iron pin found in the north line of US Route 20;

Course 4: Thence South 59 degrees 33 minutes 34 seconds west along the North line of U.S. Route 20, 187.64 feet to the Place of Beginning and containing 1.217 acres.

Bearings are to an assumed meridian and indicate angles only as per survey by Jerry Slay, Ohio surveyor Number 5298 dated November 31, 2006 Intent is to update permanent Parcel Number 05-302-00-131-00. All capped iron pins set marked

A-2

"Slay 5298" are 5/8" x 30".

BEING ALSO DESCRIBED AS FOLLOWS:

Situated in the City of Ashtabula, County of Ashtabula and State of Ohio, being part of Lot 33 and all of Lots 34, 35 and 36 of "City Plat of the Ruth Strong Estate", as recorded in Plat Volume 2, Page 28 of the Ashtabula County Records, being all of two parcels conveyed to Spirit Master Funding III, LLC [PN 05-302-00-131-00 and PN 05-302-00-130-01] as recorded in OR Bk. 409, Pg. 1005 of said County Records and being more particularly described as follows:

BEGINNING at a stone with "X" found at the southeast corner of Lot 38 of said Ruth Strong Plat, the same being the intersection of the westerly right of way of Dunsmore Avenue (fka Dunsmoor Street, 50') with the northerly right of way of Prospect Road (aka US Route 20, 60'); Thence along the northerly right of way of said Prospect Road S 58°24'37" W, a distance of 127.11 feet to a 5/8" rebar found at the southwest corner of a parcel conveyed to Kelsi Jonson in OR Bk. 423, Pg. 1344 of said County Records, the same being the southwest corner of Lot 37 of said Ruth Strong Plat, and the True Place of Beginning of the parcel herein described, and passing on line a 5/8" rebar found at 77.11 feet;

Course No. 1; Thence continuing along the northerly right of way of said Prospect Road, and along the southerly lines of said Lots 36, 35 and 34 of said County Records, S 58°24'37" W, a distance of 257.56 feet to a mag nail set at the southeast corner of a parcel conveyed to John C. Huffman and Carrie L. Huffman in OR Bk. 316, Pg. 2538 of said County Records, and passing on line a 5/8" rebar found at 187.71 feet;

Course No. 2; Thence along the easterly line of said Huffman parcel, N 31°37'19" W, a distance of 125.14 feet to a 5/8" rebar found on the southerly line of a parcel conveyed to Colleen Rightnour in OR Bk. 589, Pg. 1994 of said County Records;

Course No. 3; Thence along the southerly line of said Rightnour parcel, N 58°24'37" E, a distance of 13.85 feet to an iron pin set at the southeast corner of said Rightnour parcel;

Course No. 4; Thence along the easterly line of said Rightnour parcel, and the easterly lines of parcels conveyed to April L. Smith in OR Bk. 338, Pg. 1401, Colleen M. Hopkins in OR Bk. 499, Pg. 864 and Tammy M. Bliffin in OR Bk. 632, Pg. 1016, all of said County Records, N 31°37'19" W, a distance of 157.48 feet to a 5/8" rebar found on the southerly line of a parcel conveyed to Charles M. D'itri and Lisa A. D'itri in Vol. 27, Pg. 2211 of said County Records, the same being the northerly line of said Lot 33 in said Ruth Strong Plat;

Course No. 5; Thence along the southerly line of said D'itri parcel, and the southerly line of parcels conveyed to Annette Narvaez in OR Bk. 624, Pg. 2033 and Lyle T. Simmons and Nan Simmons in Vol. 90, Pg. 9994, both of said County Records, the same being the northerly lines of said lots 33, 34, 35 and 36 in said Ruth Strong Plat, N 58°24'37" E, a distance of 243.71 feet to an iron pin set a the northwest corner of a parcel conveyed to Michael J. Adkins Jr. and Christine R. Adkins in OR Bk. 505, Pg. 2403 of said County Records, the same being the northwest corner of said Lot 37, and passing on line a 5/8" rebar found at 56.00 feet;

A-3

Course No. 6; Thence along the westerly line of said Adkins parcel and the westerly line of said Jonson parcel, the same being the westerly line of said Lot 37, S 31°37'19" E, a distance of 282.62 feet to the Point of Beginning, containing 1.621 acres (70,612 square feet) [PN 05-302-00-131-00 containing 1.218 Acres (53,051 Sq. Feet) and PN 05-302-00-130-01 containing 0.403 Acres (17,561 Sq. Feet),], more or less, as surveyed by Alaina J. Krejci, P.S. # S-8625 in January 2018, subject to any easements, restrictions, leases and/or right of ways of record. Iron pins set are 5/8" x 30" rebar with pink plastic caps stamped "KREJCI S-8625" Basis of Bearings is the northerly right-of-way line of Prospect Road known as being South 58° 24' 37" West from Grid North, Ohio State Plane Coordinate System, North Zone (3401), NAD 83 (2011). Distances are listed in ground.

A-4

**EXHIBIT C**

**FORM OF AUTHORIZATION AGREEMENT – PRE-ARRANGED PAYMENTS**

Reference Number _____

I (We) (Tenant) authorize /_____\, (Servicer) to initiate entries identified below as required. Tenant further authorizes the bank below to post such entries to the identified checking account beginning with the payment draft date of ____/___/_____.  A minimum of thirty (30) days advance notice is required to process first payment by ACH.

Bank Name_____Branch_____

City_____State_____Zip_____

— — — — — — — — —          — — — — — — — — — — — — — —

          **\*\*\*Transit - ABA**                       **Account Number Information**

ACCOUNT TYPE\*\*\* Please specify checking or savings account (C/S) _____

**PLEASE FILL IN BANK INFORMATION CAREFULLY**
**ATTACH VOIDED CHECK FOR ACCOUNT VERIFICATION**

        Automatic debits will be made on the payment due date established by the relevant lease documents, or the next subsequent business day if such date is not a business day. This authority may be terminated upon thirty days prior written notification from the Tenant to the servicer. Tenant has the right to stop payment of any entry by notification to the bank prior to the scheduled debit date. If an erroneous entry is initiated by the servicer to the Tenant's account, Tenant shall have the right to have the amount of such entry reversed by the bank. To initiate a reversal, the Tenant must notify the bank in writing that an error has occurred and request a reversal. Such notice must be within 15 calendar days after the Tenant receives the statement of account or other written notice from the bank identifying the error. Tenant hereby authorizes the servicer to impose a $60.00 returned item processing fee, subject to change, via ACH debit against the above-referenced account of the Tenant if a non-sufficient funds or stop payment item is charged against the servicer's account.

**Tenant**                                **Tax Identification**

**Name(**s) _____**Number**  _____

**Date**_____

**Print Authorized Name**  _____

**Authorized Signature** _____

**Print Authorized Name**  _____

**Authorized Signature** _____

**Contact Phone Number** _____ **Fax Number**  _____

**Email Address**: _____

**Return Original to**:   /_____\
                     **Attn:** /_____\
                     /_____\
                     /_____\
                     **Fax Number:**/_____\

4844-5241-0971.1
STORE/Campbells (Perkins)
Lease Agreement
1601 W. Prospect Road, Ashtabula, OH 44004
File No. 7210/02-588.2

**EXHIBIT D**

**STATE-SPECIFIC PROVISIONS**

<u>**OHIO**</u>:

Upon receipt of Lessor's invoice, Lessee shall pay its *pro rata* share of the installment of taxes for which Lessee is responsible pursuant to Section 6.01(a) (Taxes) which were a lien during the Lease Term but are due and payable following the expiration of this Lease.

Notwithstanding Section 7.02 (Alterations and Improvements), prior to commencing any alterations to the Property, Lessee shall prepare, record, serve and post a Notice of Commencement in compliance with Ohio Revised Code Section 1311.04.  Upon completion of such improvements, Lessee shall prepare and record a termination of the Notice of Commencement.  Copies of all Notices of Commencement and terminations shall be delivered to Lessor within seven (7) days of recording.

4844-5241-0971.1
STORE/Campbells (Perkins)
Lease Agreement
1601 W. Prospect Road, Ashtabula, OH 44004
File No. 7210/02-588.2

**SCHEDULE 9.03**

**SUPPLEMENTAL FINANCIAL INFORMATION**

Lessee shall deliver the following information in connection with delivery of the corporate financial statements required in Section 9.03 of the Lease.

**<u>Corporate Financial Reporting Certificate</u>**

Company:

For the Qtr or FYE ending                                        _____

# of months represented                                         _____

Number of units operating at the end of reporting period        _____

**<u>EBITDAR Calculation:</u>**

Net Income                                                       _____

    Plus: Interest Expense                                    _____
    Plus: Taxes                                              _____
    Plus: Depreciation & Amortization                        _____
    Plus: Operating Lease Expense                            _____
    Plus: Any non-recurring expenses (please clarify below)  _____
    Plus: Any other non-cash expenses (please clarify below) _____
      **EBITDAR**                                           _____

**Items required to be broken out of Balance Sheet:**
    Current Portion of Long-Term Debt                        _____
    Current Portion of any Capital Leases                    _____
    Senior Third-Party Debt Balances                         _____
    Subordinate/Related Party Debt Balances                  _____

Explanations of non-recurring and non-cash items:

```



```

Lessee shall deliver the following information in connection with delivery of the unit-level financial statements required in Section 9.03 of the Lease.

**STORE Capital Unit-Level Financial Reporting Certificate**

| | 1 | 2 | 3 |
|---|---|---|---|
| Unit ID: | | | |
| For the Qtr or FYE ending | _____ | _____ | _____ |
| # of months represented | _____ | _____ | _____ |

**Store-Level pre-corporate overhead EBITDAR Calculation:**

| | 1 | 2 | 3 |
|---|---|---|---|
| Store-Level Net Income | _____ | _____ | _____ |
| Plus: Interest Expense | _____ | _____ | _____ |
| Plus: Taxes | _____ | _____ | _____ |
| Plus: Depreciation & Amortization | _____ | _____ | _____ |
| Plus: Property Rent Expense (base rent + any % rent) | _____ | _____ | _____ |
| Plus: Any corporate overhead allocations to the unit | _____ | _____ | _____ |
| Plus: Any non-recurring expenses (please clarify below) | _____ | _____ | _____ |
| Plus: Any other non-cash expenses (please clarify below) | _____ | _____ | _____ |
| **EBITDAR** | _____ | _____ | _____ |

**Items required to be broken out on unit-level profit and loss statement:**

| | 1 | 2 | 3 |
|---|---|---|---|
| Cost Goods Sold | _____ | _____ | _____ |
| Labor Expenses | _____ | _____ | _____ |

Explanations of non-recurring and non-cash items:

ii

4844-5241-0971.1
STORE/Campbells (Perkins)
Lease Agreement
1601 W. Prospect Road, Ashtabula, OH 44004
File No. 7210/02-588.2

# EXHIBIT K

## UNCONDITIONAL GUARANTY OF PAYMENT AND PERFORMANCE

**THIS UNCONDITIONAL GUARANTY OF PAYMENT AND PERFORMANCE** (this "<u>Guaranty</u>") is made as of February 12, 2018 by **WILLIAM KANE**, **FRANK KANE** and **RON LINABURG** (each, a "<u>Guarantor</u>" and collectively, "<u>Guarantors</u>"), for the benefit of **STORE CAPITAL ACQUISITIONS, LLC**, a Delaware limited liability company (together with its successors and assigns under the Lease (as defined below), "<u>Lessor</u>").

## RECITALS

A.    Lessor and 5171 Campbells Land Co., Inc., a Pennsylvania corporation ("<u>Lessee</u>"), have entered into that certain Lease Agreement of even date herewith (as the same may be amended from time to time, the "<u>Lease</u>"), pursuant to which Lessor leases to Lessee the real property located at 2945 East State Street, Hermitage, PA 16148 and further described therein and the improvements located thereon (the "<u>Property</u>").

B.    As a condition to Lessor entering into the Lease, Guarantors have agreed to execute and deliver this Guaranty for the benefit of Lessor.

C.    Each Guarantor owns a substantial direct and/or indirect interest in the Lessee and will derive substantial benefit from the Lease.

D.    All capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Lease.

In consideration of the premises and other good and valuable consideration, the receipt of and sufficiency of which are hereby acknowledged, and in order to induce the Lessor to enter into the Lease, each Guarantor hereby agrees as follows:

1.    **Guaranty**.    Each Guarantor unconditionally, absolutely and irrevocably guarantees the punctual and complete payment and performance when due to Lessor of all Monetary Obligations, including, without limitation, Rental, taxes, insurance premiums, impounds, reimbursements, late charges, default interest, damages, indemnity obligations and all other amounts, costs, fees, expenses and charges of any kind or type whatsoever, which may or at any time be due to Lessor under or pursuant to the documents listed on <u>Schedule I</u> attached hereto (collectively, the "<u>Documents</u>").    Each Guarantor also unconditionally guarantees the truthfulness and accuracy of all representations, warranties and certifications of Lessee, the satisfaction of all conditions by Lessee and the full and timely performance of all obligations to be performed by Lessee, under or pursuant to the Documents (the matters which are guaranteed pursuant to this section are hereinafter collectively referred to as the "<u>Obligations</u>"). The obligations of Guarantors under this Guaranty are primary, joint and several and independent of the obligations of Lessee and any and every other guarantor of the Obligations, and a separate action or actions may be brought and executed against each Guarantor or any other such guarantor, whether or not such action is brought against Lessee or any other such guarantor and whether or not Lessee or any other such guarantor be joined in such action or actions.  References in this Guaranty to Guarantor are to each Guarantor signing this Guaranty, and the liability of each such Guarantor is joint and several.  Notwithstanding the

forgoing, Guarantor shall be released from all obligations hereunder and this Guaranty shall terminate upon the release of Lessee from its obligations under the Lease after a permitted assignment of the Lease to a Qualified Operator pursuant to Section 14.02(b)(iii) of the Lease.

This Guaranty shall terminate and be of no further force or effect (the "Termination"), upon Guarantors' request, if at any time following the fifth (5th) anniversary of the Effective Date, Lessee shall have, for two (2) consecutive years immediately prior to the date of determination (all as determined by Lessor upon review of financial statements provided by the Guarantor prior to the determination), (A) maintained an aggregate FCCR (defined below) for the Property and all other real property subject to an Other Agreement (as defined in the Lease) of at least 1.5x; and (B) have generated an Effective Debt to EBITDAR ratio of no more than 5.0x; *provided, however,* the Termination shall be conditioned upon no Event of Default having occurred, nor any event having occurred which, with the delivery of notice and/or the passage of time, could result in an Event of Default.

For purposes hereof:

"*FCCR*" means with respect to the twelve month period of time immediately preceding the date of determination, the ratio calculated for such period of time, each as determined in accordance with GAAP, of (1) the sum of Net Income (excluding non-cash income), Depreciation and Amortization, Interest Expense, Operating Lease Expense and non-cash expenses, minus a G&A allocation equal to the total net sales at the subject properties multiplied by four percent (4%), to (2) the sum of Operating Lease Expense (excluding non-cash rent adjustments), scheduled principal payments of long term Debt, scheduled maturities of all Capital Leases, dividends and Interest Expense (excluding non-cash interest expense and amortization of non-cash financing expenses). For purposes of calculating the FCCR, the following terms shall be defined as set forth below:

"*Capital Lease*" shall mean all leases of any property, whether real, personal or mixed, by a Person, which leases would, in conformity with GAAP, be required to be accounted for as a capital lease on the balance sheet of such Person. The term "Capital Lease" shall not include any operating lease.

"*Debt*" shall mean with respect to a Person, and for the period of determination (i) indebtedness for borrowed money, (ii) subject to the limitation set forth in sub-item (iv) below, obligations evidenced by bonds, indentures, notes or similar instruments, (iii) obligations under leases which should be, in accordance with GAAP, recorded as Capital Leases, and (iv) obligations under direct or indirect guarantees in respect of, and obligations (contingent or otherwise) to purchase or otherwise acquire, or otherwise to assure a creditor against loss in respect of, indebtedness or obligations of others of the kinds referred to in clauses (i) through (iv) above, except for guaranty obligations of such Person, which, in conformity with GAAP, are not included on the balance sheet of such Person.

"*Depreciation and Amortization*" shall mean the depreciation and amortization accruing during any period of determination with respect to a Person, as determined in accordance with GAAP.

2

"*Interest Expense*" shall mean for any period of determination, the sum of all interest accrued or which should be accrued in respect of all Debt of a Person, as determined in accordance with GAAP.

"*Net Income*" shall mean with respect to the period of determination, the net income or net loss as determined in accordance with GAAP.

"*Operating Lease Expense*" shall mean the sum of all payments and expenses incurred by a Person under any operating leases during the period of determination, as determined in accordance with GAAP.

*"EBITDA"* means for the twelve (12) month period ending on the date of determination, the sum of a Person's net income (loss) for such period plus, in each case to the extent previously deducted in calculating net income (loss): (i) income taxes, (ii) interest payments on all of its debt obligations (including any borrowings under short term credit facilities), (iii) all non-cash charges including depreciation and amortization, and (iv) Non-Recurring Items (defined below).

*"EBITDAR"* means the sum of Lessee's EBITDA and its total land and building rent for the twelve (12) month period ending on the date of determination.

"*Effective Debt*" shall mean, for the period of determination, the sum of (i) Lessee's Debt and (ii) eight (8) multiplied by the annual rental payments due under leases which should not be, in accordance with GAAP, recorded as Capital Leases.

*"Non-Recurring Items"* shall mean with respect to a Person, items of the sum (whether positive or negative) of revenue minus expenses that, in the judgment of Lessor, are unusual in nature, occur infrequently and are not representative of the ongoing or future earnings or expenses of such Person.

2.     **Waivers**.   This is an absolute and unconditional guaranty of payment and performance and not of collection and each Guarantor unconditionally (a) waives any requirement that Lessor first make demand upon, or seek to enforce or exhaust remedies against, Lessee or any other Person (including any other guarantor) or any of the collateral or property of Lessee or such other Person before demanding payment from, or seeking to enforce this Guaranty against, Guarantor; (b) waives all rights of subrogation, all rights of indemnity and any other rights to collect reimbursement from Lessee; (c) waives any right to participate in any security now or hereafter held by Lessor or in any claim or remedy of Lessor or any other Person against Lessee with respect to the Obligations; (d) waives diligence, presentment, protest, demand for performance, notice of nonperformance, notice of intent to accelerate, notice of acceleration, notice of protest, notice of dishonor, notice of execution of any Documents, notice of extension, renewal, alteration or amendment, notice of acceptance of this Guaranty, notice of defaults under any of the Documents and all other notices whatsoever; (e) waives and agrees not to assert any and all rights, benefits and defenses which might otherwise be available under the provisions of Ariz. Rev. Stat. §12-1641 and §12–1642 et seq., §44-141, §44-142 or §47-3605, Arizona Rules of Civil Procedure Rule 17(f), or any other laws, statutes or rules (including any laws, statutes or rules amending, supplementing or supplanting same) which may conflict with the terms of this Guaranty or might operate, contrary to Guarantor's

3

agreements in this Guaranty, to limit Guarantor's liability under, or the enforcement of, this Guaranty; (f) covenants that this Guaranty will not be discharged until all of the Obligations are fully satisfied; and (g) agrees that this Guaranty shall remain in full effect without regard to, and shall not be affected or impaired by, any invalidity, irregularity or unenforceability in whole or in part of any of the Documents, or any limitation of the liability of Lessee or Guarantor thereunder, or any limitation on the method or terms of payment thereunder which may now or hereafter be caused or imposed in any manner whatsoever.

3.     **Continuing Guaranty**.   This Guaranty is a continuing guaranty, and the obligations, undertakings and conditions to be performed or observed by Guarantors under this Guaranty shall not be affected or impaired by reason of the happening from time to time of the following with respect to the Documents, all without notice to, or the further consent of, Guarantors: (a) the waiver by Lessor of the observance or performance by Lessee or Guarantor of any of the obligations, undertakings, conditions or other provisions contained in any of the Documents, except to the extent of such waiver; (b) the extension, in whole or in part, of the time for payment of any amount owing or payable under the Documents; (c) the modification or amendment (whether material or otherwise) of any of the obligations of Lessee under, or any other provisions of, any of the Documents, except to the extent of such modification or amendment; (d)  the taking or the omission of any of the actions referred to in any of the Documents (including, without limitation, the giving of any consent referred to therein); (e) any failure, omission, delay or lack on the part of Lessor to enforce, assert or exercise any provision of the Documents, including any right, power or remedy conferred on Lessor in any of the Documents or any action on the part of Lessor granting indulgence or extension in any form; (f) the assignment to or assumption by any third party of any or all of the rights or obligations of Lessee under all or any of the Documents; (g) the release or discharge of Lessee from the performance or observance of any obligation, undertaking or condition to be performed by Lessee under any of the Documents by operation of law, including any rejection or disaffirmance of any of the Documents in any bankruptcy or similar proceedings; (h) the receipt and acceptance by Lessor or any other Person of notes, checks or other instruments for the payment of money and extensions and renewals thereof; (i) any action, inaction or election of remedies by Lessor which results in any impairment or destruction of any subrogation rights of Guarantor, or any rights of Guarantor to proceed against any other Person for reimbursement; (j) any setoff, defense, counterclaim, abatement, recoupment, reduction, change in law or any other event or circumstance which might otherwise constitute a legal or equitable discharge or defense of a guarantor, indemnitor or surety under the laws of the State of Arizona, the state in which the Property is located or any other jurisdiction; and (k) the termination or renewal of any of the Obligations or any other provision thereof.

4.     **Representations and Warranties**.  Each Guarantor represents and warrants to Lessor that: (a) neither the execution nor delivery of this Guaranty nor fulfillment of nor compliance with the terms and provisions hereof will conflict with, or result in a breach of the terms or conditions of, or constitute a default under, any agreement or instrument to which Guarantor is now a party or by which Guarantor may be bound, or result in the creation of any lien, charge or encumbrance upon any property or assets of Guarantor, which conflict, breach, default, lien, charge or encumbrance could result in a material adverse change in the financial condition of Guarantor; (b) no further consents, approvals or authorizations are required for the execution and delivery of this Guaranty by Guarantor or for Guarantor's compliance with the terms and provisions of this Guaranty; (c) this Guaranty is the legal, valid and binding

4826-5082-6587.1
STORE/Campbells (Perkins)
Lease Guaranty
2945 East State Street, Hermitage, PA 16148
File No. 7210/02-588.23

agreement of Guarantor and is enforceable against Guarantor in accordance with its terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, liquidation, reorganization and other laws affecting the rights of creditors generally and subject to general principles of equity; (d) Guarantor has the full power, authority, capacity and legal right to execute and deliver this Guaranty, and, to the extent Guarantor is a corporation, partnership, limited liability company or other form of entity, the parties executing this Guaranty on behalf of Guarantor are fully authorized and directed to execute the same to bind Guarantor; (e) Guarantor is not, and if Guarantor is a "disregarded entity," any owner of the disregarded entity is not, a "nonresident alien," "foreign corporation," "foreign partnership," "foreign trust," "foreign estate," or any other "person" that is not a "United States person," as those terms are defined in the U.S. Internal Revenue Code and the regulations promulgated thereunder; (f) Guarantor is not a party with whom a citizen of the United States is prohibited from engaging in transactions by any trade embargo, economic sanction or other prohibition of United States law, regulation or Executive Order of the President of the United States; (g) all financial statements and other information relating to Guarantor heretofore delivered to Lessor are true, correct and complete in all material respects as of the date of this Guaranty and Guarantor will furnish Lessor, within forty five (45) days after the end of each fiscal quarter of Guarantor and within one hundred twenty (120) days after the end of each fiscal year of Guarantor, complete financial statements of Guarantor, including a balance sheet, profit and loss statement, statement of changes in financial condition and all other related schedules for the fiscal period then ended; (h) during the term of this Guaranty, Guarantor will not transfer or dispose of any material part of Guarantor's assets except in the ordinary course of business for full and fair consideration and reasonably equivalent value; and (i) the Documents are conclusively presumed to have been signed in reliance on this Guaranty, and the assumption by Guarantor of Guarantor's obligations under this Guaranty results in direct financial benefit to Guarantor. Guarantor understands that Lessor is relying on the representations and warranties of Guarantor, and Guarantor represents that such reliance is reasonable.

      5.    **Nature of Guaranty**.  This Guaranty shall commence upon execution and delivery of any of the Documents and shall continue in full force and effect until all of the Obligations are duly, finally and permanently paid, performed and discharged and are not subject to any right of extension by Lessee, and Lessor gives Guarantors written notice of the full and final satisfaction of the Obligations.  The Obligations shall not be considered fully paid, performed and discharged unless and until all payments by Lessee to Lessor are no longer subject to any right on the part of any Person whomsoever, including but not limited to Lessee, Lessee as a debtor-in-possession and/or any trustee in bankruptcy, to disgorge such payments or seek to recoup the amount of such payments or any part thereof.  This Guaranty shall remain in full force and effect and continue to be effective upon an Insolvency Event.  This Guaranty shall continue to be effective or be reinstated, as applicable, if at any time payment and performance of the Obligations, or any part thereof, are, pursuant to applicable law, rescinded or reduced in amount, or must otherwise be restored or returned by Lessor, whether as a "voidable preference," "fraudulent conveyance" or otherwise, all as though such payment or performance had not been made.  In the event that any payment of the Obligations, or any part thereof, is rescinded, reduced, restored or returned, the Obligations shall be reinstated and deemed reduced only by such amount paid to Lessor and not so rescinded, reduced, restored or returned.

4826-5082-6587.1
STORE/Campbells (Perkins)
Lease Guaranty
2945 East State Street, Hermitage, PA 16148
File No. 7210/02-588.23

6.      **Subordination**.  Notwithstanding any provision contained in this Guaranty, in the event that a Guarantor shall have any claims against Lessee, any indebtedness of Lessee now or hereafter held by a Guarantor is hereby subordinated to the indebtedness of Lessee to Lessor, including, without limitation, any and all amounts due to Lessor under the Lease.  Any such indebtedness of Lessee to a Guarantor, if Lessor so requests, shall be collected, enforced and received by such Guarantor as trustee for Lessor and be paid over to Lessor on account of the Obligations, but without reducing or affecting in any manner the liability of such Guarantor under the other provisions of this Guaranty.

7.      **Authority**.  It is not necessary for Lessor to inquire into the powers of Lessee or its officers, directors, partners or agents acting or purporting to act on its behalf, and Guarantors shall be liable for the Obligations in accordance with their terms notwithstanding any lack of authorization or defect in execution or delivery by Lessee.

8.      **Attorneys' Fees and Costs**.  In addition to the amounts guaranteed under this Guaranty, each Guarantor agrees to pay (a) all of Lessor's Costs, and (b) interest (including postpetition interest to the extent a petition is filed by or against Lessee under the Bankruptcy Code) at the Default Rate on any Obligations not paid when due.  Each Guarantor hereby agrees to indemnify and hold harmless Lessor for, from and against all Losses suffered or occasioned by the failure of Lessee to satisfy its obligations under the Documents.  The agreement to indemnify Lessor contained in this Section shall be enforceable notwithstanding the invalidity or unenforceability of the Documents or any of them or the invalidity or unenforceability of any other paragraph contained in this Guaranty.  All moneys available to Lessor for application in payment or reduction of the liabilities of Lessee under the Documents may be applied by Lessor to the payment or reduction of such liabilities of Lessee, in such manner, in such amounts and at such time or times as Lessor may elect.

9.      **Notice**.  All notices, demands, designations, certificates, requests, offers, consents, approvals, appointments and other instruments given pursuant to this Guaranty (collectively called "Notices") shall be in writing and given by any one of the following: (a) hand delivery; (b) express overnight delivery service; (c) certified or registered mail, return receipt requested; or (d) electronic mail message, and shall be deemed to have been delivered upon (i) receipt, if hand delivered, (ii) the next Business Day, if delivered by a reputable express overnight delivery service; (iii) the third Business Day following the day of deposit of such notice with the United States Postal Service, if sent by certified or registered mail, return receipt requested; or (iv) transmission, if delivered by electronic mail.  Notices shall be provided to the parties and addresses (or electronic mail addresses) specified below:

> If to Guarantor:          William Kane
>                           Email: wtkane25@gmail.com
>
>                           Frank Kane
>                           Email: francisjohnnykane@gmail.com
>
>                           Ron Linaburg
>                           Email: dr.rglinaburg@lina4.com

4826-5082-6587.1
STORE/Campbells (Perkins)
Lease Guaranty
2945 East State Street, Hermitage, PA 16148
File No. 7210/02-588.23

| | |
|---|---|
| If to Lessor: | STORE Capital Acquisitions, LLC<br>8377 E. Hartford Drive, Suite 100<br>Scottsdale, AZ  85255<br>Attention:  Michael T. Bennett<br>　　　　　Executive Vice President – General Counsel<br>Email: mbennett@storecapital.com |
| With a copy to: | Kutak Rock LLP<br>1801 California Street, Suite 3000<br>Denver, CO  80202<br>Attention:  Nathan Humphrey, Esq.<br>Telephone: (303) 297-2400<br>Email: nathan.humphrey@kutakrock.com |

or to such other address or such other Person as either party may from time to time hereafter specify to the other party in a notice delivered in the manner provided above.

10.    **Governing Law**.  This Guaranty is delivered in the State of Arizona, and it is the intent of Guarantor and Lessor that this Guaranty shall be deemed to be a contract made under and governed by the internal laws of the State of Arizona, without regard to its principles of conflicts of law.  For purposes of any action or proceeding involving this Guaranty, Guarantor submits to the jurisdiction of all federal and state courts located in the State of Arizona and consents that each Guarantor may be served with any process or paper by registered mail or by personal service within or without the State of Arizona in accordance with applicable law.  Each Guarantor waives and agrees not to assert in any such action, suit or proceeding that Guarantor is not personally subject to the jurisdiction of such courts, that the action, suit or proceeding is brought in an inconvenient forum or that venue of the action, suit or proceeding is improper.  Nothing contained in this section shall limit or restrict the right of Lessor to commence any proceeding in the federal or state courts located in the state in which the Property is located and/or where a Guarantor maintains its residence or chief executive office to the extent Lessor deems such proceeding necessary or advisable to exercise remedies available under the Documents.

11.    **Acknowledgement of Lease**.  Each Guarantor intends for the Lease to be a "true lease" and not a financing lease, capital lease, mortgage, equitable mortgage, deed of trust, security agreement or other financing or trust arrangement, and the economic realities of the Lease are those of a true lease.  Guarantors shall not challenge the validity, enforceability or characterization of the Transaction, and Guarantors shall support the intent of each Guarantor, Lessee and Lessor that the Lease is a "true lease" and does not create a joint venture, partnership, equitable mortgage, trust, financing device or arrangement, trust agreement, security interest or the like.  Each Guarantor acknowledges that Lessor did not prepare or assist in the preparation of any of the projected financial figures used by Lessee in analyzing the economic viability and feasibility of the Transaction.

12.    **Independent Rights**.  All of Lessor's rights and remedies under the Documents and this Guaranty are intended to be distinct, separate and cumulative and no such right and remedy is intended to be in exclusion of or a waiver of any of the others.

7

13.     **Assignment**.  Each Guarantor acknowledges and agrees that (a) Lessor may collaterally assign all of its right, title and interest under the Lease and this Guaranty to a lender; and (b) upon the exercise of any lender's remedies set forth in related loan documents, all of the rights, powers and privileges of Lessor shall be deemed the rights, powers and privileges of such lender and such lender shall be entitled to exercise all of the rights and remedies of "Lessor" under this Guaranty, the Lease and such loan documents.  Each Guarantor hereby consents to, and no further consent by a Guarantor shall be required for, any further assignment of rights of Lessor hereunder or in connection with any transfer by Lessor.   All notices, certificates, reports or other information required to be delivered to Lessor under this Guaranty shall be delivered simultaneously to such lender.  Notwithstanding any provision herein to the contrary, this Guaranty shall not be deemed to create any obligation of or liability for such lender.  Each Guarantor intends that such lender shall be an intended third party beneficiary of this Guaranty but without any corresponding responsibility, liability or obligation to Guarantor.

14.     **Inurement**.  Except as otherwise expressly provided in Section 13 above, this Guaranty is solely for the benefit of Lessor, its successors and assigns and is not intended to nor shall it be deemed to be for the benefit of any third party, including, without limitation, Lessee.  This Guaranty and all obligations of Guarantors hereunder shall be binding upon the successors and assigns of Guarantors (including, a debtor-in-possession on behalf of Guarantor) and shall, together with the rights and remedies of Lessor hereunder, inure to the benefit of Lessor, all future holders of any instrument evidencing any of the Obligations and its successor and assigns.  No sales, participations, assignments, transfers or other dispositions of any agreement governing or instrument evidencing the Obligations or any portion thereof or interest therein shall in any manner affect the rights of Lessor or its successors and assigns hereunder.  Guarantors may not assign, sell, hypothecate or otherwise transfer any interest in or obligation under this Guaranty.

15.     **Severability**.   If any provision of this Guaranty is unenforceable, the enforceability of the other provisions shall not be affected and they shall remain in full force and effect.   Guarantor agrees to take such action and to sign such other documents as may be appropriate to carry out the intent of this Guaranty.  This Guaranty may be executed in one or more counterparts, each of which shall be deemed an original.

16.     **WAIVER OF JURY TRIAL**.  LESSOR, BY ACCEPTING THIS GUARANTY, AND EACH GUARANTOR HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE THE RIGHT THEY MAY HAVE TO A TRIAL BY JURY WITH RESPECT TO ANY AND ALL ISSUES PRESENTED IN ANY ACTION, PROCEEDING, CLAIM OR COUNTERCLAIM BROUGHT BY LESSOR OR A GUARANTOR AGAINST ANY PARTY OR THEIR SUCCESSORS WITH RESPECT TO ANY MATTER ARISING OUT OF OR IN CONNECTION WITH THIS GUARANTY, THE RELATIONSHIP OF LESSOR, LESSEE AND/OR GUARANTORS, LESSEE'S USE OR OCCUPANCY OF THE PROPERTY, AND/OR ANY CLAIM FOR INJURY OR DAMAGE, OR ANY EMERGENCY OR STATUTORY REMEDY. THIS WAIVER BY LESSOR AND GUARANTOR OF ANY RIGHT THEY MAY HAVE TO A TRIAL BY JURY HAS BEEN NEGOTIATED AND IS A MATERIAL INDUCEMENT FOR LESSOR ACCEPTING THIS GUARANTY.   FURTHERMORE, EACH GUARANTOR HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES THE RIGHT IT MAY HAVE TO SEEK PUNITIVE, CONSEQUENTIAL, SPECIAL AND INDIRECT DAMAGES FROM LESSOR OR ANY OF LESSOR'S AFFILIATES, OFFICERS, DIRECTORS, MANAGERS, MEMBERS OR

4826-5082-6587.1
STORE/Campbells (Perkins)
Lease Guaranty
2945 East State Street, Hermitage, PA 16148
File No. 7210/02-588.23

EMPLOYEES OR ANY OF THEIR SUCCESSORS WITH RESPECT TO ANY AND ALL ISSUES PRESENTED IN ANY ACTION, PROCEEDING, CLAIM OR COUNTERCLAIM BROUGHT WITH RESPECT TO ANY MATTER ARISING OUT OF OR IN CONNECTION WITH THIS GUARANTY OR ANY DOCUMENTS CONTEMPLATED HEREIN OR RELATED HERETO. THE WAIVER BY GUARANTORS OF ANY RIGHT IT MAY HAVE TO SEEK PUNITIVE, CONSEQUENTIAL, SPECIAL AND INDIRECT DAMAGES HAS BEEN NEGOTIATED BY THE PARTIES AND IS AN ESSENTIAL ASPECT OF THEIR BARGAIN.

17.    **Final Agreement**.  This Guaranty represents the final agreement between Lessor and Guarantors and may not be contradicted by evidence of prior, contemporaneous or subsequent oral agreements.  Each Guarantor covenants and agrees that there are no unwritten oral agreements between Lessor and Guarantor and all prior or contemporaneous agreements, understandings, representations, and statements, oral or written, are merged into this Guaranty.  Neither this Guaranty nor any provision hereof may be waived, modified, amended, discharged, or terminated except by an agreement in writing signed by the party against which the enforcement of such waiver, modification, amendment, discharge, or termination is sought, and then only to the extent set forth in such agreement.

18.    **Securitizations; Other**.  As a material inducement to Lessor's willingness to complete the Transaction contemplated by the Lease and the other Transaction Documents, each Guarantor hereby acknowledges and agrees that Lessor may, from time to time and at any time (a) advertise, issue press releases, send direct mail or otherwise disclose information regarding the Transaction for marketing purposes; and (b) (i) act or permit another Person to act as sponsor, settler, transferor or depositor of, or a holder of interests in, one or more Persons or other arrangements formed pursuant to a trust agreement, indenture, pooling agreement, participation agreement, sale and servicing agreement, limited liability company agreement, partnership agreement, articles of incorporation or similar agreement or document; and (ii) permit one or more of such Persons or arrangements to offer and sell stock, certificates, bonds, notes, other evidences of indebtedness or securities that are directly or indirectly secured, collateralized or otherwise backed by or represent a direct or indirect interest in whole or in part in any of the assets, rights or properties described in Section 14.01 of the Lease, in one or more Persons or arrangements holding such assets, rights or properties, or any of them (collectively, the "Securities"), whether any such Securities are privately or publicly offered and sold, or rated or unrated (any combination of which actions and transactions described in both clauses (i) and (ii) in this paragraph, whether proposed or completed, are referred to in the Lease as a "Securitization").  At no additional expense to Guarantors, Each Guarantor shall cooperate fully with Lessor and any Affected Party with respect to all reasonable requests and due diligence procedures and to use reasonable efforts to facilitate such Securitization.

*[Remainder of page intentionally left blank; signature page to follow]*

9

IN WITNESS WHEREOF, the undersigned Guarantor has executed this Guaranty effective as of the date set forth in the introductory paragraph of this Guaranty.

GUARANTOR:

**WILLIAM KANE**, an individual

STATE OF Pennsylvania
                                    ) ss.
COUNTY OF Allegheny        )

The foregoing instrument was acknowledged before me this _____ day of January, 2018, by William Kane, an individual.

COMMONWEALTH OF PENNSYLVANIA
NOTARIAL SEAL
Rosanne M. Penn, Notary Public
City of Pittsburgh, Allegheny County
My Commission Expires Sept. 13, 2020
MEMBER, PENNSYLVANIA ASSOCIATION OF NOTARIES

Notary Public

My Commission Expires: 9/13/20

**FRANK KANE**, an individual

STATE OF _____        )
                                    ) ss.
COUNTY OF _____      )

The foregoing instrument was acknowledged before me this _____ day of January, 2018, by Frank Kane, an individual.

Notary Public

My Commission Expires: _____

_____
**RON LINABURG**, an individual

STATE OF Pennsylvania
                              ) ss.
COUNTY OF Allegheny )

The foregoing instrument was acknowledged before me this _____ day of January, 2018, by Ron Linaburg, an individual.

_____
Notary Public

My Commission Expires: ___9/13/20___

COMMONWEALTH OF PENNSYLVANIA
NOTARIAL SEAL
Rosanne M. Penn, Notary Public
City of Pittsburgh, Allegheny County
My Commission Expires Sept. 13, 2020
MEMBER, PENNSYLVANIA ASSOCIATION OF NOTARIES

2

IN WITNESS WHEREOF, the undersigned Guarantor has executed this Guaranty effective as of the date set forth in the introductory paragraph of this Guaranty.

**GUARANTOR**:

_____
**WILLIAM KANE**, an individual

STATE OF _____     )
                         ) ss.
COUNTY OF _____    )

The foregoing instrument was acknowledged before me this _____ day of January, 2018, by William Kane, an individual.

_____
Notary Public

My Commission Expires: _____

_____
**FRANK KANE**, an individual

STATE OF *Pennsylvania*
                         ) ss.
COUNTY OF *Butler*       )

The foregoing instrument was acknowledged before me this 30th day of January, 2018, by Frank Kane, an individual.

_____
Notary Public

My Commission Expires: *July, 20 20*

COMMONWEALTH OF PENNSYLVANIA
NOTARIAL SEAL
Christopher Cole, Notary Public
Cranberry Twp., Butler County
My Commission Expires July 20, 2020
MEMBER, PENNSYLVANIA ASSOCIATION OF NOTARIES

4826-5082-6587.1
STORE/Campbells (Perkins)
Lease Guaranty
2945 East State Street, Hermitage, PA 16148
File No. 7210/02-588.23

**SCHEDULE I**

**DOCUMENTS**

1.      Lease.

2.      Any other document, agreement, instrument or certificate contemplated by the Lease, or any other documents, agreements, instruments or certificates now or hereafter entered into between Lessor and Lessee with respect to the Lease.

3.      Any amendment of the foregoing documents, agreements, instruments or certificates now or hereafter entered into between Lessor and Lessee.

# EXHIBIT L

## UNCONDITIONAL GUARANTY OF PAYMENT AND PERFORMANCE

**THIS UNCONDITIONAL GUARANTY OF PAYMENT AND PERFORMANCE** (this "Guaranty") is made as of February 12, 2018 by **WILLIAM KANE**, **FRANK KANE** and **RON LINABURG** (each, a "Guarantor" and collectively, "Guarantors"), for the benefit of **STORE CAPITAL ACQUISITIONS, LLC**, a Delaware limited liability company (together with its successors and assigns under the Lease (as defined below), "Lessor").

## RECITALS

A.       Lessor and 5171 Campbells Land Co., Inc., a Pennsylvania corporation ("Lessee"), have entered into that certain Lease Agreement of even date herewith (as the same may be amended from time to time, the "Lease"), pursuant to which Lessor leases to Lessee the real property located at 4896 Everhard Road NW, Canton, OH 44718 and further described therein and the improvements located thereon (the "Property").

B.       As a condition to Lessor entering into the Lease, Guarantors have agreed to execute and deliver this Guaranty for the benefit of Lessor.

C.       Each Guarantor owns a substantial direct and/or indirect interest in the Lessee and will derive substantial benefit from the Lease.

D.       All capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Lease.

In consideration of the premises and other good and valuable consideration, the receipt of and sufficiency of which are hereby acknowledged, and in order to induce the Lessor to enter into the Lease, each Guarantor hereby agrees as follows:

1.       **Guaranty**.       Each Guarantor unconditionally, absolutely and irrevocably guarantees the punctual and complete payment and performance when due to Lessor of all Monetary Obligations, including, without limitation, Rental, taxes, insurance premiums, impounds, reimbursements, late charges, default interest, damages, indemnity obligations and all other amounts, costs, fees, expenses and charges of any kind or type whatsoever, which may or at any time be due to Lessor under or pursuant to the documents listed on Schedule I attached hereto (collectively, the "Documents").       Each Guarantor also unconditionally guarantees the truthfulness and accuracy of all representations, warranties and certifications of Lessee, the satisfaction of all conditions by Lessee and the full and timely performance of all obligations to be performed by Lessee, under or pursuant to the Documents (the matters which are guaranteed pursuant to this section are hereinafter collectively referred to as the "Obligations"). The obligations of Guarantors under this Guaranty are primary, joint and several and independent of the obligations of Lessee and any and every other guarantor of the Obligations, and a separate action or actions may be brought and executed against each Guarantor or any other such guarantor, whether or not such action is brought against Lessee or any other such guarantor and whether or not Lessee or any other such guarantor be joined in such action or actions.  References in this Guaranty to Guarantor are to each Guarantor signing this Guaranty, and the liability of each such Guarantor is joint and several.  Notwithstanding the

forgoing, Guarantor shall be released from all obligations hereunder and this Guaranty shall terminate upon the release of Lessee from its obligations under the Lease after a permitted assignment of the Lease to a Qualified Operator pursuant to Section 14.02(b)(iii) of the Lease.

This Guaranty shall terminate and be of no further force or effect (the "Termination"), upon Guarantors' request, if at any time following the fifth (5th) anniversary of the Effective Date, Lessee shall have, for two (2) consecutive years immediately prior to the date of determination (all as determined by Lessor upon review of financial statements provided by the Guarantor prior to the determination), (A) maintained an aggregate FCCR (defined below) for the Property and all other real property subject to an Other Agreement (as defined in the Lease) of at least 1.5x; and (B) have generated an Effective Debt to EBITDAR ratio of no more than 5.0x; *provided, however,* the Termination shall be conditioned upon no Event of Default having occurred, nor any event having occurred which, with the delivery of notice and/or the passage of time, could result in an Event of Default.

For purposes hereof:

"*FCCR*" means with respect to the twelve month period of time immediately preceding the date of determination, the ratio calculated for such period of time, each as determined in accordance with GAAP, of (1) the sum of Net Income (excluding non-cash income), Depreciation and Amortization, Interest Expense, Operating Lease Expense and non-cash expenses, minus a G&A allocation equal to the total net sales at the subject properties multiplied by four percent (4%), to (2) the sum of Operating Lease Expense (excluding non-cash rent adjustments), scheduled principal payments of long term Debt, scheduled maturities of all Capital Leases, dividends and Interest Expense (excluding non-cash interest expense and amortization of non-cash financing expenses). For purposes of calculating the FCCR, the following terms shall be defined as set forth below:

"*Capital Lease*" shall mean all leases of any property, whether real, personal or mixed, by a Person, which leases would, in conformity with GAAP, be required to be accounted for as a capital lease on the balance sheet of such Person.  The term "Capital Lease" shall not include any operating lease.

"*Debt*" shall mean with respect to a Person, and for the period of determination (i) indebtedness for borrowed money, (ii) subject to the limitation set forth in sub-item (iv) below, obligations evidenced by bonds, indentures, notes or similar instruments, (iii) obligations under leases which should be, in accordance with GAAP, recorded as Capital Leases, and (iv) obligations under direct or indirect guarantees in respect of, and obligations (contingent or otherwise) to purchase or otherwise acquire, or otherwise to assure a creditor against loss in respect of, indebtedness or obligations of others of the kinds referred to in clauses (i) through (iv) above, except for guaranty obligations of such Person, which, in conformity with GAAP, are not included on the balance sheet of such Person.

"*Depreciation and Amortization*" shall mean the depreciation and amortization accruing during any period of determination with respect to a Person, as determined in accordance with GAAP.

2

"*Interest Expense*" shall mean for any period of determination, the sum of all interest accrued or which should be accrued in respect of all Debt of a Person, as determined in accordance with GAAP.

"*Net Income*" shall mean with respect to the period of determination, the net income or net loss as determined in accordance with GAAP.

"*Operating Lease Expense*" shall mean the sum of all payments and expenses incurred by a Person under any operating leases during the period of determination, as determined in accordance with GAAP.

"*EBITDA*" means for the twelve (12) month period ending on the date of determination, the sum of a Person's net income (loss) for such period plus, in each case to the extent previously deducted in calculating net income (loss): (i) income taxes, (ii) interest payments on all of its debt obligations (including any borrowings under short term credit facilities), (iii) all non-cash charges including depreciation and amortization, and (iv) Non-Recurring Items (defined below).

"*EBITDAR*" means the sum of Lessee's EBITDA and its total land and building rent for the twelve (12) month period ending on the date of determination.

"*Effective Debt*" shall mean, for the period of determination, the sum of (i) Lessee's Debt and (ii) eight (8) multiplied by the annual rental payments due under leases which should not be, in accordance with GAAP, recorded as Capital Leases.

"*Non-Recurring Items*" shall mean with respect to a Person, items of the sum (whether positive or negative) of revenue minus expenses that, in the judgment of Lessor, are unusual in nature, occur infrequently and are not representative of the ongoing or future earnings or expenses of such Person.

2.     **Waivers**.   This is an absolute and unconditional guaranty of payment and performance and not of collection and each Guarantor unconditionally (a) waives any requirement that Lessor first make demand upon, or seek to enforce or exhaust remedies against, Lessee or any other Person (including any other guarantor) or any of the collateral or property of Lessee or such other Person before demanding payment from, or seeking to enforce this Guaranty against, Guarantor; (b) waives all rights of subrogation, all rights of indemnity and any other rights to collect reimbursement from Lessee; (c) waives any right to participate in any security now or hereafter held by Lessor or in any claim or remedy of Lessor or any other Person against Lessee with respect to the Obligations; (d) waives diligence, presentment, protest, demand for performance, notice of nonperformance, notice of intent to accelerate, notice of acceleration, notice of protest, notice of dishonor, notice of execution of any Documents, notice of extension, renewal, alteration or amendment, notice of acceptance of this Guaranty, notice of defaults under any of the Documents and all other notices whatsoever; (e) waives and agrees not to assert any and all rights, benefits and defenses which might otherwise be available under the provisions of Ariz. Rev. Stat. §12-1641 and §12–1642 et seq., §44-141, §44-142 or §47-3605, Arizona Rules of Civil Procedure Rule 17(f), or any other laws, statutes or rules (including any laws, statutes or rules amending, supplementing or supplanting same) which may conflict with the terms of this Guaranty or might operate, contrary to Guarantor's

3

agreements in this Guaranty, to limit Guarantor's liability under, or the enforcement of, this Guaranty; (f) covenants that this Guaranty will not be discharged until all of the Obligations are fully satisfied; and (g) agrees that this Guaranty shall remain in full effect without regard to, and shall not be affected or impaired by, any invalidity, irregularity or unenforceability in whole or in part of any of the Documents, or any limitation of the liability of Lessee or Guarantor thereunder, or any limitation on the method or terms of payment thereunder which may now or hereafter be caused or imposed in any manner whatsoever.

3.     **Continuing Guaranty**.   This Guaranty is a continuing guaranty, and the obligations, undertakings and conditions to be performed or observed by Guarantors under this Guaranty shall not be affected or impaired by reason of the happening from time to time of the following with respect to the Documents, all without notice to, or the further consent of, Guarantors: (a) the waiver by Lessor of the observance or performance by Lessee or Guarantor of any of the obligations, undertakings, conditions or other provisions contained in any of the Documents, except to the extent of such waiver; (b) the extension, in whole or in part, of the time for payment of any amount owing or payable under the Documents; (c) the modification or amendment (whether material or otherwise) of any of the obligations of Lessee under, or any other provisions of, any of the Documents, except to the extent of such modification or amendment; (d)  the taking or the omission of any of the actions referred to in any of the Documents (including, without limitation, the giving of any consent referred to therein); (e) any failure, omission, delay or lack on the part of Lessor to enforce, assert or exercise any provision of the Documents, including any right, power or remedy conferred on Lessor in any of the Documents or any action on the part of Lessor granting indulgence or extension in any form; (f) the assignment to or assumption by any third party of any or all of the rights or obligations of Lessee under all or any of the Documents; (g) the release or discharge of Lessee from the performance or observance of any obligation, undertaking or condition to be performed by Lessee under any of the Documents by operation of law, including any rejection or disaffirmance of any of the Documents in any bankruptcy or similar proceedings; (h) the receipt and acceptance by Lessor or any other Person of notes, checks or other instruments for the payment of money and extensions and renewals thereof; (i) any action, inaction or election of remedies by Lessor which results in any impairment or destruction of any subrogation rights of Guarantor, or any rights of Guarantor to proceed against any other Person for reimbursement; (j) any setoff, defense, counterclaim, abatement, recoupment, reduction, change in law or any other event or circumstance which might otherwise constitute a legal or equitable discharge or defense of a guarantor, indemnitor or surety under the laws of the State of Arizona, the state in which the Property is located or any other jurisdiction; and (k) the termination or renewal of any of the Obligations or any other provision thereof.

4.     **Representations and Warranties**.  Each Guarantor represents and warrants to Lessor that: (a) neither the execution nor delivery of this Guaranty nor fulfillment of nor compliance with the terms and provisions hereof will conflict with, or result in a breach of the terms or conditions of, or constitute a default under, any agreement or instrument to which Guarantor is now a party or by which Guarantor may be bound, or result in the creation of any lien, charge or encumbrance upon any property or assets of Guarantor, which conflict, breach, default, lien, charge or encumbrance could result in a material adverse change in the financial condition of Guarantor; (b) no further consents, approvals or authorizations are required for the execution and delivery of this Guaranty by Guarantor or for Guarantor's compliance with the terms and provisions of this Guaranty; (c) this Guaranty is the legal, valid and binding

4

agreement of Guarantor and is enforceable against Guarantor in accordance with its terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, liquidation, reorganization and other laws affecting the rights of creditors generally and subject to general principles of equity; (d) Guarantor has the full power, authority, capacity and legal right to execute and deliver this Guaranty, and, to the extent Guarantor is a corporation, partnership, limited liability company or other form of entity, the parties executing this Guaranty on behalf of Guarantor are fully authorized and directed to execute the same to bind Guarantor; (e) Guarantor is not, and if Guarantor is a "disregarded entity," any owner of the disregarded entity is not, a "nonresident alien," "foreign corporation," "foreign partnership," "foreign trust," "foreign estate," or any other "person" that is not a "United States person," as those terms are defined in the U.S. Internal Revenue Code and the regulations promulgated thereunder; (f) Guarantor is not a party with whom a citizen of the United States is prohibited from engaging in transactions by any trade embargo, economic sanction or other prohibition of United States law, regulation or Executive Order of the President of the United States; (g) all financial statements and other information relating to Guarantor heretofore delivered to Lessor are true, correct and complete in all material respects as of the date of this Guaranty and Guarantor will furnish Lessor, within forty five (45) days after the end of each fiscal quarter of Guarantor and within one hundred twenty (120) days after the end of each fiscal year of Guarantor, complete financial statements of Guarantor, including a balance sheet, profit and loss statement, statement of changes in financial condition and all other related schedules for the fiscal period then ended; (h) during the term of this Guaranty, Guarantor will not transfer or dispose of any material part of Guarantor's assets except in the ordinary course of business for full and fair consideration and reasonably equivalent value; and (i) the Documents are conclusively presumed to have been signed in reliance on this Guaranty, and the assumption by Guarantor of Guarantor's obligations under this Guaranty results in direct financial benefit to Guarantor. Guarantor understands that Lessor is relying on the representations and warranties of Guarantor, and Guarantor represents that such reliance is reasonable.

     5.    **Nature of Guaranty**.  This Guaranty shall commence upon execution and delivery of any of the Documents and shall continue in full force and effect until all of the Obligations are duly, finally and permanently paid, performed and discharged and are not subject to any right of extension by Lessee, and Lessor gives Guarantors written notice of the full and final satisfaction of the Obligations.  The Obligations shall not be considered fully paid, performed and discharged unless and until all payments by Lessee to Lessor are no longer subject to any right on the part of any Person whomsoever, including but not limited to Lessee, Lessee as a debtor-in-possession and/or any trustee in bankruptcy, to disgorge such payments or seek to recoup the amount of such payments or any part thereof.  This Guaranty shall remain in full force and effect and continue to be effective upon an Insolvency Event.  This Guaranty shall continue to be effective or be reinstated, as applicable, if at any time payment and performance of the Obligations, or any part thereof, are, pursuant to applicable law, rescinded or reduced in amount, or must otherwise be restored or returned by Lessor, whether as a "voidable preference," "fraudulent conveyance" or otherwise, all as though such payment or performance had not been made.  In the event that any payment of the Obligations, or any part thereof, is rescinded, reduced, restored or returned, the Obligations shall be reinstated and deemed reduced only by such amount paid to Lessor and not so rescinded, reduced, restored or returned.

4844-6230-7163.1
STORE/Campbells (Perkins)
Lease Guaranty
4896 Everhard Road NW, Canton, OH 44718
File No. 7210/02-588.18

6.      **Subordination**.  Notwithstanding any provision contained in this Guaranty, in the event that a Guarantor shall have any claims against Lessee, any indebtedness of Lessee now or hereafter held by a Guarantor is hereby subordinated to the indebtedness of Lessee to Lessor, including, without limitation, any and all amounts due to Lessor under the Lease.  Any such indebtedness of Lessee to a Guarantor, if Lessor so requests, shall be collected, enforced and received by such Guarantor as trustee for Lessor and be paid over to Lessor on account of the Obligations, but without reducing or affecting in any manner the liability of such Guarantor under the other provisions of this Guaranty.

7.      **Authority**.  It is not necessary for Lessor to inquire into the powers of Lessee or its officers, directors, partners or agents acting or purporting to act on its behalf, and Guarantors shall be liable for the Obligations in accordance with their terms notwithstanding any lack of authorization or defect in execution or delivery by Lessee.

8.      **Attorneys' Fees and Costs**.  In addition to the amounts guaranteed under this Guaranty, each Guarantor agrees to pay (a) all of Lessor's Costs, and (b) interest (including postpetition interest to the extent a petition is filed by or against Lessee under the Bankruptcy Code) at the Default Rate on any Obligations not paid when due.  Each Guarantor hereby agrees to indemnify and hold harmless Lessor for, from and against all Losses suffered or occasioned by the failure of Lessee to satisfy its obligations under the Documents.  The agreement to indemnify Lessor contained in this Section shall be enforceable notwithstanding the invalidity or unenforceability of the Documents or any of them or the invalidity or unenforceability of any other paragraph contained in this Guaranty.  All moneys available to Lessor for application in payment or reduction of the liabilities of Lessee under the Documents may be applied by Lessor to the payment or reduction of such liabilities of Lessee, in such manner, in such amounts and at such time or times as Lessor may elect.

9.      **Notice**.  All notices, demands, designations, certificates, requests, offers, consents, approvals, appointments and other instruments given pursuant to this Guaranty (collectively called "Notices") shall be in writing and given by any one of the following: (a) hand delivery; (b) express overnight delivery service; (c) certified or registered mail, return receipt requested; or (d) electronic mail message, and shall be deemed to have been delivered upon (i) receipt, if hand delivered, (ii) the next Business Day, if delivered by a reputable express overnight delivery service; (iii) the third Business Day following the day of deposit of such notice with the United States Postal Service, if sent by certified or registered mail, return receipt requested; or (iv) transmission, if delivered by electronic mail.  Notices shall be provided to the parties and addresses (or electronic mail addresses) specified below:

If to Guarantor:          William Kane
                          Email: wtkane25@gmail.com

                          Frank Kane
                          Email: francisjohnnykane@gmail.com

                          Ron Linaburg
                          Email: dr.rglinaburg@lina4.com

6

| If to Lessor: | STORE Capital Acquisitions, LLC |
| | 8377 E. Hartford Drive, Suite 100 |
| | Scottsdale, AZ  85255 |
| | Attention:  Michael T. Bennett |
| | Executive Vice President – General Counsel |
| | Email: mbennett@storecapital.com |
| | |
| With a copy to: | Kutak Rock LLP |
| | 1801 California Street, Suite 3000 |
| | Denver, CO  80202 |
| | Attention:  Nathan Humphrey, Esq. |
| | Telephone: (303) 297-2400 |
| | Email: nathan.humphrey@kutakrock.com |

or to such other address or such other Person as either party may from time to time hereafter specify to the other party in a notice delivered in the manner provided above.

10.    **Governing Law**.  This Guaranty is delivered in the State of Arizona, and it is the intent of Guarantor and Lessor that this Guaranty shall be deemed to be a contract made under and governed by the internal laws of the State of Arizona, without regard to its principles of conflicts of law.  For purposes of any action or proceeding involving this Guaranty, Guarantor submits to the jurisdiction of all federal and state courts located in the State of Arizona and consents that each Guarantor may be served with any process or paper by registered mail or by personal service within or without the State of Arizona in accordance with applicable law.  Each Guarantor waives and agrees not to assert in any such action, suit or proceeding that Guarantor is not personally subject to the jurisdiction of such courts, that the action, suit or proceeding is brought in an inconvenient forum or that venue of the action, suit or proceeding is improper.  Nothing contained in this section shall limit or restrict the right of Lessor to commence any proceeding in the federal or state courts located in the state in which the Property is located and/or where a Guarantor maintains its residence or chief executive office to the extent Lessor deems such proceeding necessary or advisable to exercise remedies available under the Documents.

11.    **Acknowledgement of Lease**.  Each Guarantor intends for the Lease to be a "true lease" and not a financing lease, capital lease, mortgage, equitable mortgage, deed of trust, security agreement or other financing or trust arrangement, and the economic realities of the Lease are those of a true lease.  Guarantors shall not challenge the validity, enforceability or characterization of the Transaction, and Guarantors shall support the intent of each Guarantor, Lessee and Lessor that the Lease is a "true lease" and does not create a joint venture, partnership, equitable mortgage, trust, financing device or arrangement, trust agreement, security interest or the like.  Each Guarantor acknowledges that Lessor did not prepare or assist in the preparation of any of the projected financial figures used by Lessee in analyzing the economic viability and feasibility of the Transaction.

12.    **Independent Rights**.  All of Lessor's rights and remedies under the Documents and this Guaranty are intended to be distinct, separate and cumulative and no such right and remedy is intended to be in exclusion of or a waiver of any of the others.

7

13.     **Assignment**.  Each Guarantor acknowledges and agrees that (a) Lessor may collaterally assign all of its right, title and interest under the Lease and this Guaranty to a lender; and (b) upon the exercise of any lender's remedies set forth in related loan documents, all of the rights, powers and privileges of Lessor shall be deemed the rights, powers and privileges of such lender and such lender shall be entitled to exercise all of the rights and remedies of "Lessor" under this Guaranty, the Lease and such loan documents.  Each Guarantor hereby consents to, and no further consent by a Guarantor shall be required for, any further assignment of rights of Lessor hereunder or in connection with any transfer by Lessor.   All notices, certificates, reports or other information required to be delivered to Lessor under this Guaranty shall be delivered simultaneously to such lender.  Notwithstanding any provision herein to the contrary, this Guaranty shall not be deemed to create any obligation of or liability for such lender.  Each Guarantor intends that such lender shall be an intended third party beneficiary of this Guaranty but without any corresponding responsibility, liability or obligation to Guarantor.

14.     **Inurement**.  Except as otherwise expressly provided in Section 13 above, this Guaranty is solely for the benefit of Lessor, its successors and assigns and is not intended to nor shall it be deemed to be for the benefit of any third party, including, without limitation, Lessee.  This Guaranty and all obligations of Guarantors hereunder shall be binding upon the successors and assigns of Guarantors (including, a debtor-in-possession on behalf of Guarantor) and shall, together with the rights and remedies of Lessor hereunder, inure to the benefit of Lessor, all future holders of any instrument evidencing any of the Obligations and its successor and assigns.  No sales, participations, assignments, transfers or other dispositions of any agreement governing or instrument evidencing the Obligations or any portion thereof or interest therein shall in any manner affect the rights of Lessor or its successors and assigns hereunder.  Guarantors may not assign, sell, hypothecate or otherwise transfer any interest in or obligation under this Guaranty.

15.     **Severability**.   If any provision of this Guaranty is unenforceable, the enforceability of the other provisions shall not be affected and they shall remain in full force and effect.  Guarantor agrees to take such action and to sign such other documents as may be appropriate to carry out the intent of this Guaranty.  This Guaranty may be executed in one or more counterparts, each of which shall be deemed an original.

16.     **WAIVER OF JURY TRIAL**.  LESSOR, BY ACCEPTING THIS GUARANTY, AND EACH GUARANTOR HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE THE RIGHT THEY MAY HAVE TO A TRIAL BY JURY WITH RESPECT TO ANY AND ALL ISSUES PRESENTED IN ANY ACTION, PROCEEDING, CLAIM OR COUNTERCLAIM BROUGHT BY LESSOR OR A GUARANTOR AGAINST ANY PARTY OR THEIR SUCCESSORS WITH RESPECT TO ANY MATTER ARISING OUT OF OR IN CONNECTION WITH THIS GUARANTY, THE RELATIONSHIP OF LESSOR, LESSEE AND/OR GUARANTORS, LESSEE'S USE OR OCCUPANCY OF THE PROPERTY, AND/OR ANY CLAIM FOR INJURY OR DAMAGE, OR ANY EMERGENCY OR STATUTORY REMEDY. THIS WAIVER BY LESSOR AND GUARANTOR OF ANY RIGHT THEY MAY HAVE TO A TRIAL BY JURY HAS BEEN NEGOTIATED AND IS A MATERIAL INDUCEMENT FOR LESSOR ACCEPTING THIS GUARANTY.   FURTHERMORE, EACH GUARANTOR HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES THE RIGHT IT MAY HAVE TO SEEK PUNITIVE, CONSEQUENTIAL, SPECIAL AND INDIRECT DAMAGES FROM LESSOR OR ANY OF LESSOR'S AFFILIATES, OFFICERS, DIRECTORS, MANAGERS, MEMBERS OR

8

EMPLOYEES OR ANY OF THEIR SUCCESSORS WITH RESPECT TO ANY AND ALL ISSUES PRESENTED IN ANY ACTION, PROCEEDING, CLAIM OR COUNTERCLAIM BROUGHT WITH RESPECT TO ANY MATTER ARISING OUT OF OR IN CONNECTION WITH THIS GUARANTY OR ANY DOCUMENTS CONTEMPLATED HEREIN OR RELATED HERETO.  THE WAIVER BY GUARANTORS OF ANY RIGHT IT MAY HAVE TO SEEK PUNITIVE, CONSEQUENTIAL, SPECIAL AND INDIRECT DAMAGES HAS BEEN NEGOTIATED BY THE PARTIES AND IS AN ESSENTIAL ASPECT OF THEIR BARGAIN.

17.    **Final Agreement**.  This Guaranty represents the final agreement between Lessor and Guarantors and may not be contradicted by evidence of prior, contemporaneous or subsequent oral agreements.  Each Guarantor covenants and agrees that there are no unwritten oral agreements between Lessor and Guarantor and all prior or contemporaneous agreements, understandings, representations, and statements, oral or written, are merged into this Guaranty.  Neither this Guaranty nor any provision hereof may be waived, modified, amended, discharged, or terminated except by an agreement in writing signed by the party against which the enforcement of such waiver, modification, amendment, discharge, or termination is sought, and then only to the extent set forth in such agreement.

18.    **Securitizations; Other**.  As a material inducement to Lessor's willingness to complete the Transaction contemplated by the Lease and the other Transaction Documents, each Guarantor hereby acknowledges and agrees that Lessor may, from time to time and at any time (a) advertise, issue press releases, send direct mail or otherwise disclose information regarding the Transaction for marketing purposes; and (b) (i) act or permit another Person to act as sponsor, settler, transferor or depositor of, or a holder of interests in, one or more Persons or other arrangements formed pursuant to a trust agreement, indenture, pooling agreement, participation agreement, sale and servicing agreement, limited liability company agreement, partnership agreement, articles of incorporation or similar agreement or document; and (ii) permit one or more of such Persons or arrangements to offer and sell stock, certificates, bonds, notes, other evidences of indebtedness or securities that are directly or indirectly secured, collateralized or otherwise backed by or represent a direct or indirect interest in whole or in part in any of the assets, rights or properties described in Section 14.01 of the Lease, in one or more Persons or arrangements holding such assets, rights or properties, or any of them (collectively, the "Securities"), whether any such Securities are privately or publicly offered and sold, or rated or unrated (any combination of which actions and transactions described in both clauses (i) and (ii) in this paragraph, whether proposed or completed, are referred to in the Lease as a "Securitization").  At no additional expense to Guarantors, Each Guarantor shall cooperate fully with Lessor and any Affected Party with respect to all reasonable requests and due diligence procedures and to use reasonable efforts to facilitate such Securitization.

*[Remainder of page intentionally left blank; signature page to follow]*

4844-6230-7163.1
STORE/Campbells (Perkins)
Lease Guaranty
4896 Everhard Road NW, Canton, OH 44718
File No. 7210/02-588.18

IN WITNESS WHEREOF, the undersigned Guarantor has executed this Guaranty effective as of the date set forth in the introductory paragraph of this Guaranty.

**GUARANTOR**:

_____
**WILLIAM KANE**, an individual

STATE OF Pennsylvania )
                 ) ss.
COUNTY OF Allegheny )

The foregoing instrument was acknowledged before me this _____ day of January, 2018, by William Kane, an individual.

COMMONWEALTH OF PENNSYLVANIA
NOTARIAL SEAL
Rosanne M. Penn, Notary Public
City of Pittsburgh, Allegheny County
My Commission Expires Sept. 13, 2020
MEMBER, PENNSYLVANIA ASSOCIATION OF NOTARIES

_____
Notary Public

My Commission Expires: 9/13/20

_____
**FRANK KANE**, an individual

STATE OF _____ )
                 ) ss.
COUNTY OF _____ )

The foregoing instrument was acknowledged before me this _____ day of January, 2018, by Frank Kane, an individual.

_____
Notary Public

My Commission Expires: _____

RON LINABURG, an individual

STATE OF Pennsylvania )
                              ) ss.
COUNTY OF Allegheny )

    The foregoing instrument was acknowledged before me this _____ day of January, 2018, by Ron Linaburg, an individual.

Notary Public

My Commission Expires: 9/13/20

COMMONWEALTH OF PENNSYLVANIA
NOTARIAL SEAL
Rosanne M. Penn, Notary Public
City of Pittsburgh, Allegheny County
My Commission Expires Sept. 13, 2020
MEMBER, PENNSYLVANIA ASSOCIATION OF NOTARIES

2

IN WITNESS WHEREOF, the undersigned Guarantor has executed this Guaranty effective as of the date set forth in the introductory paragraph of this Guaranty.

**GUARANTOR**:

_____
**WILLIAM KANE**, an individual

STATE OF _____   )
                        ) ss.
COUNTY OF _____   )

The foregoing instrument was acknowledged before me this _____ day of January, 2018, by William Kane, an individual.

_____
Notary Public

My Commission Expires: _____

_____
**FRANK KANE**, an individual

STATE OF Pennsylvania   )
                        ) ss.
COUNTY OF Butler        )

The foregoing instrument was acknowledged before me this 30ᵗʰ day of January, 2018, by Frank Kane, an individual.

_Christopher Cole_
Notary Public

My Commission Expires: July, 2020

COMMONWEALTH OF PENNSYLVANIA
NOTARIAL SEAL
Christopher Cole, Notary Public
Cranberry Twp., Butler County
My Commission Expires July 20, 2020
MEMBER, PENNSYLVANIA ASSOCIATION OF NOTARIES

**SCHEDULE I**

**DOCUMENTS**

1.     Lease.

2.     Any other document, agreement, instrument or certificate contemplated by the Lease, or any other documents, agreements, instruments or certificates now or hereafter entered into between Lessor and Lessee with respect to the Lease.

3.     Any amendment of the foregoing documents, agreements, instruments or certificates now or hereafter entered into between Lessor and Lessee.

# EXHIBIT M

**UNCONDITIONAL GUARANTY OF PAYMENT AND PERFORMANCE**

**THIS UNCONDITIONAL GUARANTY OF PAYMENT AND PERFORMANCE** (this "Guaranty") is made as of February 12, 2018 by **WILLIAM KANE**, **FRANK KANE** and **RON LINABURG** (each, a "Guarantor" and collectively, "Guarantors"), for the benefit of **STORE CAPITAL ACQUISITIONS, LLC**, a Delaware limited liability company (together with its successors and assigns under the Lease (as defined below), "Lessor").

**RECITALS**

A.      Lessor and 5171 Campbells Land Co., Inc., a Pennsylvania corporation ("Lessee"), have entered into that certain Lease Agreement of even date herewith (as the same may be amended from time to time, the "Lease"), pursuant to which Lessor leases to Lessee the real property located at 115 Ludlow Street, Warren, PA 16365 and further described therein and the improvements located thereon (the "Property").

B.      As a condition to Lessor entering into the Lease, Guarantors have agreed to execute and deliver this Guaranty for the benefit of Lessor.

C.      Each Guarantor owns a substantial direct and/or indirect interest in the Lessee and will derive substantial benefit from the Lease.

D.      All capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Lease.

In consideration of the premises and other good and valuable consideration, the receipt of and sufficiency of which are hereby acknowledged, and in order to induce the Lessor to enter into the Lease, each Guarantor hereby agrees as follows:

1.      **Guaranty**.      Each Guarantor unconditionally, absolutely and irrevocably guarantees the punctual and complete payment and performance when due to Lessor of all Monetary Obligations, including, without limitation, Rental, taxes, insurance premiums, impounds, reimbursements, late charges, default interest, damages, indemnity obligations and all other amounts, costs, fees, expenses and charges of any kind or type whatsoever, which may or at any time be due to Lessor under or pursuant to the documents listed on Schedule I attached hereto (collectively, the "Documents").      Each Guarantor also unconditionally guarantees the truthfulness and accuracy of all representations, warranties and certifications of Lessee, the satisfaction of all conditions by Lessee and the full and timely performance of all obligations to be performed by Lessee, under or pursuant to the Documents (the matters which are guaranteed pursuant to this section are hereinafter collectively referred to as the "Obligations"). The obligations of Guarantors under this Guaranty are primary, joint and several and independent of the obligations of Lessee and any and every other guarantor of the Obligations, and a separate action or actions may be brought and executed against each Guarantor or any other such guarantor, whether or not such action is brought against Lessee or any other such guarantor and whether or not Lessee or any other such guarantor be joined in such action or actions.  References in this Guaranty to Guarantor are to each Guarantor signing this Guaranty, and the liability of each such Guarantor is joint and several.  Notwithstanding the

forgoing, Guarantor shall be released from all obligations hereunder and this Guaranty shall terminate upon the release of Lessee from its obligations under the Lease after a permitted assignment of the Lease to a Qualified Operator pursuant to Section 14.02(b)(iii) of the Lease.

This Guaranty shall terminate and be of no further force or effect (the "Termination"), upon Guarantors' request, if at any time following the fifth (5th) anniversary of the Effective Date, Lessee shall have, for two (2) consecutive years immediately prior to the date of determination (all as determined by Lessor upon review of financial statements provided by the Guarantor prior to the determination), (A) maintained an aggregate FCCR (defined below) for the Property and all other real property subject to an Other Agreement (as defined in the Lease) of at least 1.5x; and (B) have generated an Effective Debt to EBITDAR ratio of no more than 5.0x; *provided, however,* the Termination shall be conditioned upon no Event of Default having occurred, nor any event having occurred which, with the delivery of notice and/or the passage of time, could result in an Event of Default.

For purposes hereof:

"*FCCR*" means with respect to the twelve month period of time immediately preceding the date of determination, the ratio calculated for such period of time, each as determined in accordance with GAAP, of (1) the sum of Net Income (excluding non-cash income), Depreciation and Amortization, Interest Expense, Operating Lease Expense and non-cash expenses, minus a G&A allocation equal to the total net sales at the subject properties multiplied by four percent (4%), to (2) the sum of Operating Lease Expense (excluding non-cash rent adjustments), scheduled principal payments of long term Debt, scheduled maturities of all Capital Leases, dividends and Interest Expense (excluding non-cash interest expense and amortization of non-cash financing expenses). For purposes of calculating the FCCR, the following terms shall be defined as set forth below:

"*Capital Lease*" shall mean all leases of any property, whether real, personal or mixed, by a Person, which leases would, in conformity with GAAP, be required to be accounted for as a capital lease on the balance sheet of such Person. The term "Capital Lease" shall not include any operating lease.

"*Debt*" shall mean with respect to a Person, and for the period of determination (i) indebtedness for borrowed money, (ii) subject to the limitation set forth in sub-item (iv) below, obligations evidenced by bonds, indentures, notes or similar instruments, (iii) obligations under leases which should be, in accordance with GAAP, recorded as Capital Leases, and (iv) obligations under direct or indirect guarantees in respect of, and obligations (contingent or otherwise) to purchase or otherwise acquire, or otherwise to assure a creditor against loss in respect of, indebtedness or obligations of others of the kinds referred to in clauses (i) through (iv) above, except for guaranty obligations of such Person, which, in conformity with GAAP, are not included on the balance sheet of such Person.

"*Depreciation and Amortization*" shall mean the depreciation and amortization accruing during any period of determination with respect to a Person, as determined in accordance with GAAP.

2

"*Interest Expense*" shall mean for any period of determination, the sum of all interest accrued or which should be accrued in respect of all Debt of a Person, as determined in accordance with GAAP.

"*Net Income*" shall mean with respect to the period of determination, the net income or net loss as determined in accordance with GAAP.

"*Operating Lease Expense*" shall mean the sum of all payments and expenses incurred by a Person under any operating leases during the period of determination, as determined in accordance with GAAP.

"*EBITDA*" means for the twelve (12) month period ending on the date of determination, the sum of a Person's net income (loss) for such period plus, in each case to the extent previously deducted in calculating net income (loss): (i) income taxes, (ii) interest payments on all of its debt obligations (including any borrowings under short term credit facilities), (iii) all non-cash charges including depreciation and amortization, and (iv) Non-Recurring Items (defined below).

"*EBITDAR*" means the sum of Lessee's EBITDA and its total land and building rent for the twelve (12) month period ending on the date of determination.

"*Effective Debt*" shall mean, for the period of determination, the sum of (i) Lessee's Debt and (ii) eight (8) multiplied by the annual rental payments due under leases which should not be, in accordance with GAAP, recorded as Capital Leases.

"*Non-Recurring Items*" shall mean with respect to a Person, items of the sum (whether positive or negative) of revenue minus expenses that, in the judgment of Lessor, are unusual in nature, occur infrequently and are not representative of the ongoing or future earnings or expenses of such Person.

2.    **Waivers**.   This is an absolute and unconditional guaranty of payment and performance and not of collection and each Guarantor unconditionally (a) waives any requirement that Lessor first make demand upon, or seek to enforce or exhaust remedies against, Lessee or any other Person (including any other guarantor) or any of the collateral or property of Lessee or such other Person before demanding payment from, or seeking to enforce this Guaranty against, Guarantor; (b) waives all rights of subrogation, all rights of indemnity and any other rights to collect reimbursement from Lessee; (c) waives any right to participate in any security now or hereafter held by Lessor or in any claim or remedy of Lessor or any other Person against Lessee with respect to the Obligations; (d) waives diligence, presentment, protest, demand for performance, notice of nonperformance, notice of intent to accelerate, notice of acceleration, notice of protest, notice of dishonor, notice of execution of any Documents, notice of extension, renewal, alteration or amendment, notice of acceptance of this Guaranty, notice of defaults under any of the Documents and all other notices whatsoever; (e) waives and agrees not to assert any and all rights, benefits and defenses which might otherwise be available under the provisions of Ariz. Rev. Stat. §12-1641 and §12–1642 et seq., §44-141, §44-142 or §47-3605, Arizona Rules of Civil Procedure Rule 17(f), or any other laws, statutes or rules (including any laws, statutes or rules amending, supplementing or supplanting same) which may conflict with the terms of this Guaranty or might operate, contrary to Guarantor's

3

agreements in this Guaranty, to limit Guarantor's liability under, or the enforcement of, this Guaranty; (f) covenants that this Guaranty will not be discharged until all of the Obligations are fully satisfied; and (g) agrees that this Guaranty shall remain in full effect without regard to, and shall not be affected or impaired by, any invalidity, irregularity or unenforceability in whole or in part of any of the Documents, or any limitation of the liability of Lessee or Guarantor thereunder, or any limitation on the method or terms of payment thereunder which may now or hereafter be caused or imposed in any manner whatsoever.

3.    **Continuing Guaranty**.   This Guaranty is a continuing guaranty, and the obligations, undertakings and conditions to be performed or observed by Guarantors under this Guaranty shall not be affected or impaired by reason of the happening from time to time of the following with respect to the Documents, all without notice to, or the further consent of, Guarantors: (a) the waiver by Lessor of the observance or performance by Lessee or Guarantor of any of the obligations, undertakings, conditions or other provisions contained in any of the Documents, except to the extent of such waiver; (b) the extension, in whole or in part, of the time for payment of any amount owing or payable under the Documents; (c) the modification or amendment (whether material or otherwise) of any of the obligations of Lessee under, or any other provisions of, any of the Documents, except to the extent of such modification or amendment; (d)  the taking or the omission of any of the actions referred to in any of the Documents (including, without limitation, the giving of any consent referred to therein); (e) any failure, omission, delay or lack on the part of Lessor to enforce, assert or exercise any provision of the Documents, including any right, power or remedy conferred on Lessor in any of the Documents or any action on the part of Lessor granting indulgence or extension in any form; (f) the assignment to or assumption by any third party of any or all of the rights or obligations of Lessee under all or any of the Documents; (g) the release or discharge of Lessee from the performance or observance of any obligation, undertaking or condition to be performed by Lessee under any of the Documents by operation of law, including any rejection or disaffirmance of any of the Documents in any bankruptcy or similar proceedings; (h) the receipt and acceptance by Lessor or any other Person of notes, checks or other instruments for the payment of money and extensions and renewals thereof; (i) any action, inaction or election of remedies by Lessor which results in any impairment or destruction of any subrogation rights of Guarantor, or any rights of Guarantor to proceed against any other Person for reimbursement; (j) any setoff, defense, counterclaim, abatement, recoupment, reduction, change in law or any other event or circumstance which might otherwise constitute a legal or equitable discharge or defense of a guarantor, indemnitor or surety under the laws of the State of Arizona, the state in which the Property is located or any other jurisdiction; and (k) the termination or renewal of any of the Obligations or any other provision thereof.

4.    **Representations and Warranties**.  Each Guarantor represents and warrants to Lessor that: (a) neither the execution nor delivery of this Guaranty nor fulfillment of nor compliance with the terms and provisions hereof will conflict with, or result in a breach of the terms or conditions of, or constitute a default under, any agreement or instrument to which Guarantor is now a party or by which Guarantor may be bound, or result in the creation of any lien, charge or encumbrance upon any property or assets of Guarantor, which conflict, breach, default, lien, charge or encumbrance could result in a material adverse change in the financial condition of Guarantor; (b) no further consents, approvals or authorizations are required for the execution and delivery of this Guaranty by Guarantor or for Guarantor's compliance with the terms and provisions of this Guaranty; (c) this Guaranty is the legal, valid and binding

4

agreement of Guarantor and is enforceable against Guarantor in accordance with its terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, liquidation, reorganization and other laws affecting the rights of creditors generally and subject to general principles of equity; (d) Guarantor has the full power, authority, capacity and legal right to execute and deliver this Guaranty, and, to the extent Guarantor is a corporation, partnership, limited liability company or other form of entity, the parties executing this Guaranty on behalf of Guarantor are fully authorized and directed to execute the same to bind Guarantor; (e) Guarantor is not, and if Guarantor is a "disregarded entity," any owner of the disregarded entity is not, a "nonresident alien," "foreign corporation," "foreign partnership," "foreign trust," "foreign estate," or any other "person" that is not a "United States person," as those terms are defined in the U.S. Internal Revenue Code and the regulations promulgated thereunder; (f) Guarantor is not a party with whom a citizen of the United States is prohibited from engaging in transactions by any trade embargo, economic sanction or other prohibition of United States law, regulation or Executive Order of the President of the United States; (g) all financial statements and other information relating to Guarantor heretofore delivered to Lessor are true, correct and complete in all material respects as of the date of this Guaranty and Guarantor will furnish Lessor, within forty five (45) days after the end of each fiscal quarter of Guarantor and within one hundred twenty (120) days after the end of each fiscal year of Guarantor, complete financial statements of Guarantor, including a balance sheet, profit and loss statement, statement of changes in financial condition and all other related schedules for the fiscal period then ended; (h) during the term of this Guaranty, Guarantor will not transfer or dispose of any material part of Guarantor's assets except in the ordinary course of business for full and fair consideration and reasonably equivalent value; and (i) the Documents are conclusively presumed to have been signed in reliance on this Guaranty, and the assumption by Guarantor of Guarantor's obligations under this Guaranty results in direct financial benefit to Guarantor. Guarantor understands that Lessor is relying on the representations and warranties of Guarantor, and Guarantor represents that such reliance is reasonable.

5.    **Nature of Guaranty**.   This Guaranty shall commence upon execution and delivery of any of the Documents and shall continue in full force and effect until all of the Obligations are duly, finally and permanently paid, performed and discharged and are not subject to any right of extension by Lessee, and Lessor gives Guarantors written notice of the full and final satisfaction of the Obligations.  The Obligations shall not be considered fully paid, performed and discharged unless and until all payments by Lessee to Lessor are no longer subject to any right on the part of any Person whomsoever, including but not limited to Lessee, Lessee as a debtor-in-possession and/or any trustee in bankruptcy, to disgorge such payments or seek to recoup the amount of such payments or any part thereof.  This Guaranty shall remain in full force and effect and continue to be effective upon an Insolvency Event.  This Guaranty shall continue to be effective or be reinstated, as applicable, if at any time payment and performance of the Obligations, or any part thereof, are, pursuant to applicable law, rescinded or reduced in amount, or must otherwise be restored or returned by Lessor, whether as a "voidable preference," "fraudulent conveyance" or otherwise, all as though such payment or performance had not been made.  In the event that any payment of the Obligations, or any part thereof, is rescinded, reduced, restored or returned, the Obligations shall be reinstated and deemed reduced only by such amount paid to Lessor and not so rescinded, reduced, restored or returned.

5

6.      **Subordination**.  Notwithstanding any provision contained in this Guaranty, in the event that a Guarantor shall have any claims against Lessee, any indebtedness of Lessee now or hereafter held by a Guarantor is hereby subordinated to the indebtedness of Lessee to Lessor, including, without limitation, any and all amounts due to Lessor under the Lease.  Any such indebtedness of Lessee to a Guarantor, if Lessor so requests, shall be collected, enforced and received by such Guarantor as trustee for Lessor and be paid over to Lessor on account of the Obligations, but without reducing or affecting in any manner the liability of such Guarantor under the other provisions of this Guaranty.

7.      **Authority**.  It is not necessary for Lessor to inquire into the powers of Lessee or its officers, directors, partners or agents acting or purporting to act on its behalf, and Guarantors shall be liable for the Obligations in accordance with their terms notwithstanding any lack of authorization or defect in execution or delivery by Lessee.

8.      **Attorneys' Fees and Costs**.  In addition to the amounts guaranteed under this Guaranty, each Guarantor agrees to pay (a) all of Lessor's Costs, and (b) interest (including postpetition interest to the extent a petition is filed by or against Lessee under the Bankruptcy Code) at the Default Rate on any Obligations not paid when due.  Each Guarantor hereby agrees to indemnify and hold harmless Lessor for, from and against all Losses suffered or occasioned by the failure of Lessee to satisfy its obligations under the Documents.  The agreement to indemnify Lessor contained in this Section shall be enforceable notwithstanding the invalidity or unenforceability of the Documents or any of them or the invalidity or unenforceability of any other paragraph contained in this Guaranty.  All moneys available to Lessor for application in payment or reduction of the liabilities of Lessee under the Documents may be applied by Lessor to the payment or reduction of such liabilities of Lessee, in such manner, in such amounts and at such time or times as Lessor may elect.

9.      **Notice**.  All notices, demands, designations, certificates, requests, offers, consents, approvals, appointments and other instruments given pursuant to this Guaranty (collectively called "Notices") shall be in writing and given by any one of the following: (a) hand delivery; (b) express overnight delivery service; (c) certified or registered mail, return receipt requested; or (d) electronic mail message, and shall be deemed to have been delivered upon (i) receipt, if hand delivered, (ii) the next Business Day, if delivered by a reputable express overnight delivery service; (iii) the third Business Day following the day of deposit of such notice with the United States Postal Service, if sent by certified or registered mail, return receipt requested; or (iv) transmission, if delivered by electronic mail.  Notices shall be provided to the parties and addresses (or electronic mail addresses) specified below:

      If to Guarantor:         William Kane
                                     Email: wtkane25@gmail.com

                                     Frank Kane
                                     Email: francisjohnnykane@gmail.com

                                     Ron Linaburg
                                     Email: dr.rglinaburg@lina4.com

4848-3088-1627.1
STORE/Campbells (Perkins)
Lease Guaranty
115 Ludlow Street, Warren, PA 16365
File No. 7210/02-588.6

<table>
<tr><td>If to Lessor:</td><td>STORE Capital Acquisitions, LLC<br>8377 E. Hartford Drive, Suite 100<br>Scottsdale, AZ  85255<br>Attention:  Michael T. Bennett<br>      Executive Vice President – General Counsel<br>Email: mbennett@storecapital.com</td></tr>
<tr><td>With a copy to:</td><td>Kutak Rock LLP<br>1801 California Street, Suite 3000<br>Denver, CO  80202<br>Attention:  Nathan Humphrey, Esq.<br>Telephone: (303) 297-2400<br>Email: nathan.humphrey@kutakrock.com</td></tr>
</table>

or to such other address or such other Person as either party may from time to time hereafter specify to the other party in a notice delivered in the manner provided above.

10.     **Governing Law**.  This Guaranty is delivered in the State of Arizona, and it is the intent of Guarantor and Lessor that this Guaranty shall be deemed to be a contract made under and governed by the internal laws of the State of Arizona, without regard to its principles of conflicts of law.  For purposes of any action or proceeding involving this Guaranty, Guarantor submits to the jurisdiction of all federal and state courts located in the State of Arizona and consents that each Guarantor may be served with any process or paper by registered mail or by personal service within or without the State of Arizona in accordance with applicable law.  Each Guarantor waives and agrees not to assert in any such action, suit or proceeding that Guarantor is not personally subject to the jurisdiction of such courts, that the action, suit or proceeding is brought in an inconvenient forum or that venue of the action, suit or proceeding is improper. Nothing contained in this section shall limit or restrict the right of Lessor to commence any proceeding in the federal or state courts located in the state in which the Property is located and/or where a Guarantor maintains its residence or chief executive office to the extent Lessor deems such proceeding necessary or advisable to exercise remedies available under the Documents.

11.     **Acknowledgement of Lease**.  Each Guarantor intends for the Lease to be a "true lease" and not a financing lease, capital lease, mortgage, equitable mortgage, deed of trust, security agreement or other financing or trust arrangement, and the economic realities of the Lease are those of a true lease.  Guarantors shall not challenge the validity, enforceability or characterization of the Transaction, and Guarantors shall support the intent of each Guarantor, Lessee and Lessor that the Lease is a "true lease" and does not create a joint venture, partnership, equitable mortgage, trust, financing device or arrangement, trust agreement, security interest or the like.  Each Guarantor acknowledges that Lessor did not prepare or assist in the preparation of any of the projected financial figures used by Lessee in analyzing the economic viability and feasibility of the Transaction.

12.     **Independent Rights**.  All of Lessor's rights and remedies under the Documents and this Guaranty are intended to be distinct, separate and cumulative and no such right and remedy is intended to be in exclusion of or a waiver of any of the others.

7

13.     **Assignment**.  Each Guarantor acknowledges and agrees that (a) Lessor may collaterally assign all of its right, title and interest under the Lease and this Guaranty to a lender; and (b) upon the exercise of any lender's remedies set forth in related loan documents, all of the rights, powers and privileges of Lessor shall be deemed the rights, powers and privileges of such lender and such lender shall be entitled to exercise all of the rights and remedies of "Lessor" under this Guaranty, the Lease and such loan documents.  Each Guarantor hereby consents to, and no further consent by a Guarantor shall be required for, any further assignment of rights of Lessor hereunder or in connection with any transfer by Lessor.   All notices, certificates, reports or other information required to be delivered to Lessor under this Guaranty shall be delivered simultaneously to such lender.  Notwithstanding any provision herein to the contrary, this Guaranty shall not be deemed to create any obligation of or liability for such lender.  Each Guarantor intends that such lender shall be an intended third party beneficiary of this Guaranty but without any corresponding responsibility, liability or obligation to Guarantor.

14.     **Inurement**.  Except as otherwise expressly provided in Section 13 above, this Guaranty is solely for the benefit of Lessor, its successors and assigns and is not intended to nor shall it be deemed to be for the benefit of any third party, including, without limitation, Lessee.  This Guaranty and all obligations of Guarantors hereunder shall be binding upon the successors and assigns of Guarantors (including, a debtor-in-possession on behalf of Guarantor) and shall, together with the rights and remedies of Lessor hereunder, inure to the benefit of Lessor, all future holders of any instrument evidencing any of the Obligations and its successor and assigns.  No sales, participations, assignments, transfers or other dispositions of any agreement governing or instrument evidencing the Obligations or any portion thereof or interest therein shall in any manner affect the rights of Lessor or its successors and assigns hereunder.  Guarantors may not assign, sell, hypothecate or otherwise transfer any interest in or obligation under this Guaranty.

15.     **Severability**.   If any provision of this Guaranty is unenforceable, the enforceability of the other provisions shall not be affected and they shall remain in full force and effect.  Guarantor agrees to take such action and to sign such other documents as may be appropriate to carry out the intent of this Guaranty.  This Guaranty may be executed in one or more counterparts, each of which shall be deemed an original.

16.     **WAIVER OF JURY TRIAL**.  LESSOR, BY ACCEPTING THIS GUARANTY, AND EACH GUARANTOR HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE THE RIGHT THEY MAY HAVE TO A TRIAL BY JURY WITH RESPECT TO ANY AND ALL ISSUES PRESENTED IN ANY ACTION, PROCEEDING, CLAIM OR COUNTERCLAIM BROUGHT BY LESSOR OR A GUARANTOR AGAINST ANY PARTY OR THEIR SUCCESSORS WITH RESPECT TO ANY MATTER ARISING OUT OF OR IN CONNECTION WITH THIS GUARANTY, THE RELATIONSHIP OF LESSOR, LESSEE AND/OR GUARANTORS, LESSEE'S USE OR OCCUPANCY OF THE PROPERTY, AND/OR ANY CLAIM FOR INJURY OR DAMAGE, OR ANY EMERGENCY OR STATUTORY REMEDY. THIS WAIVER BY LESSOR AND GUARANTOR OF ANY RIGHT THEY MAY HAVE TO A TRIAL BY JURY HAS BEEN NEGOTIATED AND IS A MATERIAL INDUCEMENT FOR LESSOR ACCEPTING THIS GUARANTY.   FURTHERMORE, EACH GUARANTOR HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES THE RIGHT IT MAY HAVE TO SEEK PUNITIVE, CONSEQUENTIAL, SPECIAL AND INDIRECT DAMAGES FROM LESSOR OR ANY OF LESSOR'S AFFILIATES, OFFICERS, DIRECTORS, MANAGERS, MEMBERS OR

8

EMPLOYEES OR ANY OF THEIR SUCCESSORS WITH RESPECT TO ANY AND ALL ISSUES PRESENTED IN ANY ACTION, PROCEEDING, CLAIM OR COUNTERCLAIM BROUGHT WITH RESPECT TO ANY MATTER ARISING OUT OF OR IN CONNECTION WITH THIS GUARANTY OR ANY DOCUMENTS CONTEMPLATED HEREIN OR RELATED HERETO.  THE WAIVER BY GUARANTORS OF ANY RIGHT IT MAY HAVE TO SEEK PUNITIVE, CONSEQUENTIAL, SPECIAL AND INDIRECT DAMAGES HAS BEEN NEGOTIATED BY THE PARTIES AND IS AN ESSENTIAL ASPECT OF THEIR BARGAIN.

17.    **Final Agreement**.   This Guaranty represents the final agreement between Lessor and Guarantors and may not be contradicted by evidence of prior, contemporaneous or subsequent oral agreements.  Each Guarantor covenants and agrees that there are no unwritten oral agreements between Lessor and Guarantor and all prior or contemporaneous agreements, understandings, representations, and statements, oral or written, are merged into this Guaranty.  Neither this Guaranty nor any provision hereof may be waived, modified, amended, discharged, or terminated except by an agreement in writing signed by the party against which the enforcement of such waiver, modification, amendment, discharge, or termination is sought, and then only to the extent set forth in such agreement.

18.    **Securitizations; Other**.   As a material inducement to Lessor's willingness to complete the Transaction contemplated by the Lease and the other Transaction Documents, each Guarantor hereby acknowledges and agrees that Lessor may, from time to time and at any time (a) advertise, issue press releases, send direct mail or otherwise disclose information regarding the Transaction for marketing purposes; and (b) (i) act or permit another Person to act as sponsor, settler, transferor or depositor of, or a holder of interests in, one or more Persons or other arrangements formed pursuant to a trust agreement, indenture, pooling agreement, participation agreement, sale and servicing agreement, limited liability company agreement, partnership agreement, articles of incorporation or similar agreement or document; and (ii) permit one or more of such Persons or arrangements to offer and sell stock, certificates, bonds, notes, other evidences of indebtedness or securities that are directly or indirectly secured, collateralized or otherwise backed by or represent a direct or indirect interest in whole or in part in any of the assets, rights or properties described in Section 14.01 of the Lease, in one or more Persons or arrangements holding such assets, rights or properties, or any of them (collectively, the "Securities"), whether any such Securities are privately or publicly offered and sold, or rated or unrated (any combination of which actions and transactions described in both clauses (i) and (ii) in this paragraph, whether proposed or completed, are referred to in the Lease as a "Securitization").  At no additional expense to Guarantors, Each Guarantor shall cooperate fully with Lessor and any Affected Party with respect to all reasonable requests and due diligence procedures and to use reasonable efforts to facilitate such Securitization.

*[Remainder of page intentionally left blank; signature page to follow]*

4848-3088-1627.1
STORE/Campbells (Perkins)
Lease Guaranty
115 Ludlow Street, Warren, PA 16365
File No. 7210/02-588.6

IN WITNESS WHEREOF, the undersigned Guarantor has executed this Guaranty effective as of the date set forth in the introductory paragraph of this Guaranty.

**GUARANTOR**:

_____

**WILLIAM KANE**, an individual

STATE OF Pennsylvania )
) ss.
COUNTY OF Allegheny )

The foregoing instrument was acknowledged before me this _____ day of January, 2018, by William Kane, an individual.

COMMONWEALTH OF PENNSYLVANIA
NOTARIAL SEAL
Rosanne M. Penn, Notary Public
City of Pittsburgh, Allegheny County
My Commission Expires Sept. 13, 2020
MEMBER, PENNSYLVANIA ASSOCIATION OF NOTARIES

_____
Notary Public

My Commission Expires: _9/13/20_

_____

**FRANK KANE**, an individual

STATE OF _____ )
) ss.
COUNTY OF _____ )

The foregoing instrument was acknowledged before me this _____ day of January, 2018, by Frank Kane, an individual.

_____
Notary Public

My Commission Expires: _____

**RON LINABURG**, an individual

STATE OF Pennsylvania
) ss.
COUNTY OF Allegheny )

    The foregoing instrument was acknowledged before me this _____ day of January, 2018, by Ron Linaburg, an individual.

Notary Public

My Commission Expires: 9/13/20

COMMONWEALTH OF PENNSYLVANIA
NOTARIAL SEAL
Rosanne M. Penn, Notary Public
City of Pittsburgh, Allegheny County
My Commission Expires Sept. 13, 2020
MEMBER, PENNSYLVANIA ASSOCIATION OF NOTARIES

2

IN WITNESS WHEREOF, the undersigned Guarantor has executed this Guaranty effective as of the date set forth in the introductory paragraph of this Guaranty.

**GUARANTOR**:

_____
**WILLIAM KANE**, an individual

STATE OF _____   )
                       ) ss.
COUNTY OF _____   )

The foregoing instrument was acknowledged before me this _____ day of January, 2018, by William Kane, an individual.

_____
Notary Public

My Commission Expires: _____

_____
**FRANK KANE**, an individual

STATE OF *Pennsylvania*        )
                               ) ss.
COUNTY OF *Butler*             )

The foregoing instrument was acknowledged before me this 30ᵗʰ day of January, 2018, by Frank Kane, an individual.

*Christopher Cole*
Notary Public

My Commission Expires: *July, 20, 20*

COMMONWEALTH OF PENNSYLVANIA
NOTARIAL SEAL
Christopher Cole, Notary Public
Cranberry Twp., Butler County
My Commission Expires July 20, 2020
MEMBER, PENNSYLVANIA ASSOCIATION OF NOTARIES

4848-3088-1627.1
STORE/Campbells (Perkins)
Lease Guaranty
115 Ludlow Street, Warren, PA 16365
File No. 7210/02-588.6

**SCHEDULE I**

**DOCUMENTS**

1.      Lease.

2.      Any other document, agreement, instrument or certificate contemplated by the Lease, or any other documents, agreements, instruments or certificates now or hereafter entered into between Lessor and Lessee with respect to the Lease.

3.      Any amendment of the foregoing documents, agreements, instruments or certificates now or hereafter entered into between Lessor and Lessee.

# EXHIBIT N

## UNCONDITIONAL GUARANTY OF PAYMENT AND PERFORMANCE

**THIS UNCONDITIONAL GUARANTY OF PAYMENT AND PERFORMANCE** (this "Guaranty") is made as of February 12, 2018 by **WILLIAM KANE**, **FRANK KANE** and **RON LINABURG** (each, a "Guarantor" and collectively, "Guarantors"), for the benefit of **STORE CAPITAL ACQUISITIONS, LLC**, a Delaware limited liability company (together with its successors and assigns under the Lease (as defined below), "Lessor").

## RECITALS

A.      Lessor and 5171 Campbells Land Co., Inc., a Pennsylvania corporation ("Lessee"), have entered into that certain Lease Agreement of even date herewith (as the same may be amended from time to time, the "Lease"), pursuant to which Lessor leases to Lessee the real property located at 587 E. Main Street, Canfield, OH 44406 and further described therein and the improvements located thereon (the "Property").

B.      As a condition to Lessor entering into the Lease, Guarantors have agreed to execute and deliver this Guaranty for the benefit of Lessor.

C.      Each Guarantor owns a substantial direct and/or indirect interest in the Lessee and will derive substantial benefit from the Lease.

D.      All capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Lease.

In consideration of the premises and other good and valuable consideration, the receipt of and sufficiency of which are hereby acknowledged, and in order to induce the Lessor to enter into the Lease, each Guarantor hereby agrees as follows:

1.      **Guaranty**.      Each Guarantor unconditionally, absolutely and irrevocably guarantees the punctual and complete payment and performance when due to Lessor of all Monetary Obligations, including, without limitation, Rental, taxes, insurance premiums, impounds, reimbursements, late charges, default interest, damages, indemnity obligations and all other amounts, costs, fees, expenses and charges of any kind or type whatsoever, which may or at any time be due to Lessor under or pursuant to the documents listed on Schedule I attached hereto (collectively, the "Documents").      Each Guarantor also unconditionally guarantees the truthfulness and accuracy of all representations, warranties and certifications of Lessee, the satisfaction of all conditions by Lessee and the full and timely performance of all obligations to be performed by Lessee, under or pursuant to the Documents (the matters which are guaranteed pursuant to this section are hereinafter collectively referred to as the "Obligations"). The obligations of Guarantors under this Guaranty are primary, joint and several and independent of the obligations of Lessee and any and every other guarantor of the Obligations, and a separate action or actions may be brought and executed against each Guarantor or any other such guarantor, whether or not such action is brought against Lessee or any other such guarantor and whether or not Lessee or any other such guarantor be joined in such action or actions.  References in this Guaranty to Guarantor are to each Guarantor signing this Guaranty, and the liability of each such Guarantor is joint and several.  Notwithstanding the

forgoing, Guarantor shall be released from all obligations hereunder and this Guaranty shall terminate upon the release of Lessee from its obligations under the Lease after a permitted assignment of the Lease to a Qualified Operator pursuant to Section 14.02(b)(iii) of the Lease.

This Guaranty shall terminate and be of no further force or effect (the "Termination"), upon Guarantors' request, if at any time following the fifth (5th) anniversary of the Effective Date, Lessee shall have, for two (2) consecutive years immediately prior to the date of determination (all as determined by Lessor upon review of financial statements provided by the Guarantor prior to the determination), (A) maintained an aggregate FCCR (defined below) for the Property and all other real property subject to an Other Agreement (as defined in the Lease) of at least 1.5x; and (B) have generated an Effective Debt to EBITDAR ratio of no more than 5.0x; *provided, however,* the Termination shall be conditioned upon no Event of Default having occurred, nor any event having occurred which, with the delivery of notice and/or the passage of time, could result in an Event of Default.

For purposes hereof:

"*FCCR*" means with respect to the twelve month period of time immediately preceding the date of determination, the ratio calculated for such period of time, each as determined in accordance with GAAP, of (1) the sum of Net Income (excluding non-cash income), Depreciation and Amortization, Interest Expense, Operating Lease Expense and non-cash expenses, minus a G&A allocation equal to the total net sales at the subject properties multiplied by four percent (4%), to (2) the sum of Operating Lease Expense (excluding non-cash rent adjustments), scheduled principal payments of long term Debt, scheduled maturities of all Capital Leases, dividends and Interest Expense (excluding non-cash interest expense and amortization of non-cash financing expenses). For purposes of calculating the FCCR, the following terms shall be defined as set forth below:

"*Capital Lease*" shall mean all leases of any property, whether real, personal or mixed, by a Person, which leases would, in conformity with GAAP, be required to be accounted for as a capital lease on the balance sheet of such Person.  The term "Capital Lease" shall not include any operating lease.

"*Debt*" shall mean with respect to a Person, and for the period of determination (i) indebtedness for borrowed money, (ii) subject to the limitation set forth in sub-item (iv) below, obligations evidenced by bonds, indentures, notes or similar instruments, (iii) obligations under leases which should be, in accordance with GAAP, recorded as Capital Leases, and (iv) obligations under direct or indirect guarantees in respect of, and obligations (contingent or otherwise) to purchase or otherwise acquire, or otherwise to assure a creditor against loss in respect of, indebtedness or obligations of others of the kinds referred to in clauses (i) through (iv) above, except for guaranty obligations of such Person, which, in conformity with GAAP, are not included on the balance sheet of such Person.

"*Depreciation and Amortization*" shall mean the depreciation and amortization accruing during any period of determination with respect to a Person, as determined in accordance with GAAP.

2

"*Interest Expense*" shall mean for any period of determination, the sum of all interest accrued or which should be accrued in respect of all Debt of a Person, as determined in accordance with GAAP.

"*Net Income*" shall mean with respect to the period of determination, the net income or net loss as determined in accordance with GAAP.

"*Operating Lease Expense*" shall mean the sum of all payments and expenses incurred by a Person under any operating leases during the period of determination, as determined in accordance with GAAP.

"*EBITDA*" means for the twelve (12) month period ending on the date of determination, the sum of a Person's net income (loss) for such period plus, in each case to the extent previously deducted in calculating net income (loss): (i) income taxes, (ii) interest payments on all of its debt obligations (including any borrowings under short term credit facilities), (iii) all non-cash charges including depreciation and amortization, and (iv) Non-Recurring Items (defined below).

"*EBITDAR*" means the sum of Lessee's EBITDA and its total land and building rent for the twelve (12) month period ending on the date of determination.

"*Effective Debt*" shall mean, for the period of determination, the sum of (i) Lessee's Debt and (ii) eight (8) multiplied by the annual rental payments due under leases which should not be, in accordance with GAAP, recorded as Capital Leases.

"*Non-Recurring Items*" shall mean with respect to a Person, items of the sum (whether positive or negative) of revenue minus expenses that, in the judgment of Lessor, are unusual in nature, occur infrequently and are not representative of the ongoing or future earnings or expenses of such Person.

2.    **Waivers**.  This is an absolute and unconditional guaranty of payment and performance and not of collection and each Guarantor unconditionally (a) waives any requirement that Lessor first make demand upon, or seek to enforce or exhaust remedies against, Lessee or any other Person (including any other guarantor) or any of the collateral or property of Lessee or such other Person before demanding payment from, or seeking to enforce this Guaranty against, Guarantor; (b) waives all rights of subrogation, all rights of indemnity and any other rights to collect reimbursement from Lessee; (c) waives any right to participate in any security now or hereafter held by Lessor or in any claim or remedy of Lessor or any other Person against Lessee with respect to the Obligations; (d) waives diligence, presentment, protest, demand for performance, notice of nonperformance, notice of intent to accelerate, notice of acceleration, notice of protest, notice of dishonor, notice of execution of any Documents, notice of extension, renewal, alteration or amendment, notice of acceptance of this Guaranty, notice of defaults under any of the Documents and all other notices whatsoever; (e) waives and agrees not to assert any and all rights, benefits and defenses which might otherwise be available under the provisions of Ariz. Rev. Stat. §12-1641 and §12–1642 et seq., §44-141, §44-142 or §47-3605, Arizona Rules of Civil Procedure Rule 17(f), or any other laws, statutes or rules (including any laws, statutes or rules amending, supplementing or supplanting same) which may conflict with the terms of this Guaranty or might operate, contrary to Guarantor's

3

agreements in this Guaranty, to limit Guarantor's liability under, or the enforcement of, this Guaranty; (f) covenants that this Guaranty will not be discharged until all of the Obligations are fully satisfied; and (g) agrees that this Guaranty shall remain in full effect without regard to, and shall not be affected or impaired by, any invalidity, irregularity or unenforceability in whole or in part of any of the Documents, or any limitation of the liability of Lessee or Guarantor thereunder, or any limitation on the method or terms of payment thereunder which may now or hereafter be caused or imposed in any manner whatsoever.

3. **Continuing Guaranty**.   This Guaranty is a continuing guaranty, and the obligations, undertakings and conditions to be performed or observed by Guarantors under this Guaranty shall not be affected or impaired by reason of the happening from time to time of the following with respect to the Documents, all without notice to, or the further consent of, Guarantors: (a) the waiver by Lessor of the observance or performance by Lessee or Guarantor of any of the obligations, undertakings, conditions or other provisions contained in any of the Documents, except to the extent of such waiver; (b) the extension, in whole or in part, of the time for payment of any amount owing or payable under the Documents; (c) the modification or amendment (whether material or otherwise) of any of the obligations of Lessee under, or any other provisions of, any of the Documents, except to the extent of such modification or amendment; (d)  the taking or the omission of any of the actions referred to in any of the Documents (including, without limitation, the giving of any consent referred to therein); (e) any failure, omission, delay or lack on the part of Lessor to enforce, assert or exercise any provision of the Documents, including any right, power or remedy conferred on Lessor in any of the Documents or any action on the part of Lessor granting indulgence or extension in any form; (f) the assignment to or assumption by any third party of any or all of the rights or obligations of Lessee under all or any of the Documents; (g) the release or discharge of Lessee from the performance or observance of any obligation, undertaking or condition to be performed by Lessee under any of the Documents by operation of law, including any rejection or disaffirmance of any of the Documents in any bankruptcy or similar proceedings; (h) the receipt and acceptance by Lessor or any other Person of notes, checks or other instruments for the payment of money and extensions and renewals thereof; (i) any action, inaction or election of remedies by Lessor which results in any impairment or destruction of any subrogation rights of Guarantor, or any rights of Guarantor to proceed against any other Person for reimbursement; (j) any setoff, defense, counterclaim, abatement, recoupment, reduction, change in law or any other event or circumstance which might otherwise constitute a legal or equitable discharge or defense of a guarantor, indemnitor or surety under the laws of the State of Arizona, the state in which the Property is located or any other jurisdiction; and (k) the termination or renewal of any of the Obligations or any other provision thereof.

4. **Representations and Warranties**.  Each Guarantor represents and warrants to Lessor that: (a) neither the execution nor delivery of this Guaranty nor fulfillment of nor compliance with the terms and provisions hereof will conflict with, or result in a breach of the terms or conditions of, or constitute a default under, any agreement or instrument to which Guarantor is now a party or by which Guarantor may be bound, or result in the creation of any lien, charge or encumbrance upon any property or assets of Guarantor, which conflict, breach, default, lien, charge or encumbrance could result in a material adverse change in the financial condition of Guarantor; (b) no further consents, approvals or authorizations are required for the execution and delivery of this Guaranty by Guarantor or for Guarantor's compliance with the terms and provisions of this Guaranty; (c) this Guaranty is the legal, valid and binding

4

agreement of Guarantor and is enforceable against Guarantor in accordance with its terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, liquidation, reorganization and other laws affecting the rights of creditors generally and subject to general principles of equity; (d) Guarantor has the full power, authority, capacity and legal right to execute and deliver this Guaranty, and, to the extent Guarantor is a corporation, partnership, limited liability company or other form of entity, the parties executing this Guaranty on behalf of Guarantor are fully authorized and directed to execute the same to bind Guarantor; (e) Guarantor is not, and if Guarantor is a "disregarded entity," any owner of the disregarded entity is not, a "nonresident alien," "foreign corporation," "foreign partnership," "foreign trust," "foreign estate," or any other "person" that is not a "United States person," as those terms are defined in the U.S. Internal Revenue Code and the regulations promulgated thereunder; (f) Guarantor is not a party with whom a citizen of the United States is prohibited from engaging in transactions by any trade embargo, economic sanction or other prohibition of United States law, regulation or Executive Order of the President of the United States; (g) all financial statements and other information relating to Guarantor heretofore delivered to Lessor are true, correct and complete in all material respects as of the date of this Guaranty and Guarantor will furnish Lessor, within forty five (45) days after the end of each fiscal quarter of Guarantor and within one hundred twenty (120) days after the end of each fiscal year of Guarantor, complete financial statements of Guarantor, including a balance sheet, profit and loss statement, statement of changes in financial condition and all other related schedules for the fiscal period then ended; (h) during the term of this Guaranty, Guarantor will not transfer or dispose of any material part of Guarantor's assets except in the ordinary course of business for full and fair consideration and reasonably equivalent value; and (i) the Documents are conclusively presumed to have been signed in reliance on this Guaranty, and the assumption by Guarantor of Guarantor's obligations under this Guaranty results in direct financial benefit to Guarantor. Guarantor understands that Lessor is relying on the representations and warranties of Guarantor, and Guarantor represents that such reliance is reasonable.

5.      **Nature of Guaranty**.  This Guaranty shall commence upon execution and delivery of any of the Documents and shall continue in full force and effect until all of the Obligations are duly, finally and permanently paid, performed and discharged and are not subject to any right of extension by Lessee, and Lessor gives Guarantors written notice of the full and final satisfaction of the Obligations.  The Obligations shall not be considered fully paid, performed and discharged unless and until all payments by Lessee to Lessor are no longer subject to any right on the part of any Person whomsoever, including but not limited to Lessee, Lessee as a debtor-in-possession and/or any trustee in bankruptcy, to disgorge such payments or seek to recoup the amount of such payments or any part thereof.  This Guaranty shall remain in full force and effect and continue to be effective upon an Insolvency Event.  This Guaranty shall continue to be effective or be reinstated, as applicable, if at any time payment and performance of the Obligations, or any part thereof, are, pursuant to applicable law, rescinded or reduced in amount, or must otherwise be restored or returned by Lessor, whether as a "voidable preference," "fraudulent conveyance" or otherwise, all as though such payment or performance had not been made.  In the event that any payment of the Obligations, or any part thereof, is rescinded, reduced, restored or returned, the Obligations shall be reinstated and deemed reduced only by such amount paid to Lessor and not so rescinded, reduced, restored or returned.

4846-2916-1819.1
STORE/Campbells (Perkins)
Lease Guaranty
587 E. Main Street, Canfield, OH 44406
File No. 7210/02-588.5

6.     **Subordination**.  Notwithstanding any provision contained in this Guaranty, in the event that a Guarantor shall have any claims against Lessee, any indebtedness of Lessee now or hereafter held by a Guarantor is hereby subordinated to the indebtedness of Lessee to Lessor, including, without limitation, any and all amounts due to Lessor under the Lease.  Any such indebtedness of Lessee to a Guarantor, if Lessor so requests, shall be collected, enforced and received by such Guarantor as trustee for Lessor and be paid over to Lessor on account of the Obligations, but without reducing or affecting in any manner the liability of such Guarantor under the other provisions of this Guaranty.

7.     **Authority**.  It is not necessary for Lessor to inquire into the powers of Lessee or its officers, directors, partners or agents acting or purporting to act on its behalf, and Guarantors shall be liable for the Obligations in accordance with their terms notwithstanding any lack of authorization or defect in execution or delivery by Lessee.

8.     **Attorneys' Fees and Costs**.  In addition to the amounts guaranteed under this Guaranty, each Guarantor agrees to pay (a) all of Lessor's Costs, and (b) interest (including postpetition interest to the extent a petition is filed by or against Lessee under the Bankruptcy Code) at the Default Rate on any Obligations not paid when due.  Each Guarantor hereby agrees to indemnify and hold harmless Lessor for, from and against all Losses suffered or occasioned by the failure of Lessee to satisfy its obligations under the Documents.  The agreement to indemnify Lessor contained in this Section shall be enforceable notwithstanding the invalidity or unenforceability of the Documents or any of them or the invalidity or unenforceability of any other paragraph contained in this Guaranty.  All moneys available to Lessor for application in payment or reduction of the liabilities of Lessee under the Documents may be applied by Lessor to the payment or reduction of such liabilities of Lessee, in such manner, in such amounts and at such time or times as Lessor may elect.

9.     **Notice**.  All notices, demands, designations, certificates, requests, offers, consents, approvals, appointments and other instruments given pursuant to this Guaranty (collectively called "Notices") shall be in writing and given by any one of the following: (a) hand delivery; (b) express overnight delivery service; (c) certified or registered mail, return receipt requested; or (d) electronic mail message, and shall be deemed to have been delivered upon (i) receipt, if hand delivered, (ii) the next Business Day, if delivered by a reputable express overnight delivery service; (iii) the third Business Day following the day of deposit of such notice with the United States Postal Service, if sent by certified or registered mail, return receipt requested; or (iv) transmission, if delivered by electronic mail.  Notices shall be provided to the parties and addresses (or electronic mail addresses) specified below:

If to Guarantor:          William Kane
                          Email: wtkane25@gmail.com

                          Frank Kane
                          Email: francisjohnnykane@gmail.com

                          Ron Linaburg
                          Email: dr.rglinaburg@lina4.com

6

If to Lessor:                     STORE Capital Acquisitions, LLC
8377 E. Hartford Drive, Suite 100
Scottsdale, AZ  85255
Attention:  Michael T. Bennett
                              Executive Vice President – General Counsel
Email: mbennett@storecapital.com

With a copy to:             Kutak Rock LLP
1801 California Street, Suite 3000
Denver, CO  80202
Attention:  Nathan Humphrey, Esq.
Telephone: (303) 297-2400
Email: nathan.humphrey@kutakrock.com

or to such other address or such other Person as either party may from time to time hereafter specify to the other party in a notice delivered in the manner provided above.

10.     **Governing Law**.  This Guaranty is delivered in the State of Arizona, and it is the intent of Guarantor and Lessor that this Guaranty shall be deemed to be a contract made under and governed by the internal laws of the State of Arizona, without regard to its principles of conflicts of law.  For purposes of any action or proceeding involving this Guaranty, Guarantor submits to the jurisdiction of all federal and state courts located in the State of Arizona and consents that each Guarantor may be served with any process or paper by registered mail or by personal service within or without the State of Arizona in accordance with applicable law.  Each Guarantor waives and agrees not to assert in any such action, suit or proceeding that Guarantor is not personally subject to the jurisdiction of such courts, that the action, suit or proceeding is brought in an inconvenient forum or that venue of the action, suit or proceeding is improper. Nothing contained in this section shall limit or restrict the right of Lessor to commence any proceeding in the federal or state courts located in the state in which the Property is located and/or where a Guarantor maintains its residence or chief executive office to the extent Lessor deems such proceeding necessary or advisable to exercise remedies available under the Documents.

11.     **Acknowledgement of Lease**.  Each Guarantor intends for the Lease to be a "true lease" and not a financing lease, capital lease, mortgage, equitable mortgage, deed of trust, security agreement or other financing or trust arrangement, and the economic realities of the Lease are those of a true lease.  Guarantors shall not challenge the validity, enforceability or characterization of the Transaction, and Guarantors shall support the intent of each Guarantor, Lessee and Lessor that the Lease is a "true lease" and does not create a joint venture, partnership, equitable mortgage, trust, financing device or arrangement, trust agreement, security interest or the like.  Each Guarantor acknowledges that Lessor did not prepare or assist in the preparation of any of the projected financial figures used by Lessee in analyzing the economic viability and feasibility of the Transaction.

12.     **Independent Rights**.  All of Lessor's rights and remedies under the Documents and this Guaranty are intended to be distinct, separate and cumulative and no such right and remedy is intended to be in exclusion of or a waiver of any of the others.

7

13.     **Assignment**.  Each Guarantor acknowledges and agrees that (a) Lessor may collaterally assign all of its right, title and interest under the Lease and this Guaranty to a lender; and (b) upon the exercise of any lender's remedies set forth in related loan documents, all of the rights, powers and privileges of Lessor shall be deemed the rights, powers and privileges of such lender and such lender shall be entitled to exercise all of the rights and remedies of "Lessor" under this Guaranty, the Lease and such loan documents.  Each Guarantor hereby consents to, and no further consent by a Guarantor shall be required for, any further assignment of rights of Lessor hereunder or in connection with any transfer by Lessor.   All notices, certificates, reports or other information required to be delivered to Lessor under this Guaranty shall be delivered simultaneously to such lender.  Notwithstanding any provision herein to the contrary, this Guaranty shall not be deemed to create any obligation of or liability for such lender. Each Guarantor intends that such lender shall be an intended third party beneficiary of this Guaranty but without any corresponding responsibility, liability or obligation to Guarantor.

14.     **Inurement**.  Except as otherwise expressly provided in Section 13 above, this Guaranty is solely for the benefit of Lessor, its successors and assigns and is not intended to nor shall it be deemed to be for the benefit of any third party, including, without limitation, Lessee.  This Guaranty and all obligations of Guarantors hereunder shall be binding upon the successors and assigns of Guarantors (including, a debtor-in-possession on behalf of Guarantor) and shall, together with the rights and remedies of Lessor hereunder, inure to the benefit of Lessor, all future holders of any instrument evidencing any of the Obligations and its successor and assigns.  No sales, participations, assignments, transfers or other dispositions of any agreement governing or instrument evidencing the Obligations or any portion thereof or interest therein shall in any manner affect the rights of Lessor or its successors and assigns hereunder.  Guarantors may not assign, sell, hypothecate or otherwise transfer any interest in or obligation under this Guaranty.

15.     **Severability**.   If any provision of this Guaranty is unenforceable, the enforceability of the other provisions shall not be affected and they shall remain in full force and effect.  Guarantor agrees to take such action and to sign such other documents as may be appropriate to carry out the intent of this Guaranty.  This Guaranty may be executed in one or more counterparts, each of which shall be deemed an original.

16.     **WAIVER OF JURY TRIAL**.  LESSOR, BY ACCEPTING THIS GUARANTY, AND EACH GUARANTOR HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE THE RIGHT THEY MAY HAVE TO A TRIAL BY JURY WITH RESPECT TO ANY AND ALL ISSUES PRESENTED IN ANY ACTION, PROCEEDING, CLAIM OR COUNTERCLAIM BROUGHT BY LESSOR OR A GUARANTOR AGAINST ANY PARTY OR THEIR SUCCESSORS WITH RESPECT TO ANY MATTER ARISING OUT OF OR IN CONNECTION WITH THIS GUARANTY, THE RELATIONSHIP OF LESSOR, LESSEE AND/OR GUARANTORS, LESSEE'S USE OR OCCUPANCY OF THE PROPERTY, AND/OR ANY CLAIM FOR INJURY OR DAMAGE, OR ANY EMERGENCY OR STATUTORY REMEDY. THIS WAIVER BY LESSOR AND GUARANTOR OF ANY RIGHT THEY MAY HAVE TO A TRIAL BY JURY HAS BEEN NEGOTIATED AND IS A MATERIAL INDUCEMENT FOR LESSOR ACCEPTING THIS GUARANTY.   FURTHERMORE, EACH GUARANTOR HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES THE RIGHT IT MAY HAVE TO SEEK PUNITIVE, CONSEQUENTIAL, SPECIAL AND INDIRECT DAMAGES FROM LESSOR OR ANY OF LESSOR'S AFFILIATES, OFFICERS, DIRECTORS, MANAGERS, MEMBERS OR

8

EMPLOYEES OR ANY OF THEIR SUCCESSORS WITH RESPECT TO ANY AND ALL ISSUES PRESENTED IN ANY ACTION, PROCEEDING, CLAIM OR COUNTERCLAIM BROUGHT WITH RESPECT TO ANY MATTER ARISING OUT OF OR IN CONNECTION WITH THIS GUARANTY OR ANY DOCUMENTS CONTEMPLATED HEREIN OR RELATED HERETO.  THE WAIVER BY GUARANTORS OF ANY RIGHT IT MAY HAVE TO SEEK PUNITIVE, CONSEQUENTIAL, SPECIAL AND INDIRECT DAMAGES HAS BEEN NEGOTIATED BY THE PARTIES AND IS AN ESSENTIAL ASPECT OF THEIR BARGAIN.

17.    **Final Agreement**.   This Guaranty represents the final agreement between Lessor and Guarantors and may not be contradicted by evidence of prior, contemporaneous or subsequent oral agreements.   Each Guarantor covenants and agrees that there are no unwritten oral agreements between Lessor and Guarantor and all prior or contemporaneous agreements, understandings, representations, and statements, oral or written, are merged into this Guaranty.   Neither this Guaranty nor any provision hereof may be waived, modified, amended, discharged, or terminated except by an agreement in writing signed by the party against which the enforcement of such waiver, modification, amendment, discharge, or termination is sought, and then only to the extent set forth in such agreement.

18.    **Securitizations; Other**.   As a material inducement to Lessor's willingness to complete the Transaction contemplated by the Lease and the other Transaction Documents, each Guarantor hereby acknowledges and agrees that Lessor may, from time to time and at any time (a) advertise, issue press releases, send direct mail or otherwise disclose information regarding the Transaction for marketing purposes; and (b) (i) act or permit another Person to act as sponsor, settler, transferor or depositor of, or a holder of interests in, one or more Persons or other arrangements formed pursuant to a trust agreement, indenture, pooling agreement, participation agreement, sale and servicing agreement, limited liability company agreement, partnership agreement, articles of incorporation or similar agreement or document; and (ii) permit one or more of such Persons or arrangements to offer and sell stock, certificates, bonds, notes, other evidences of indebtedness or securities that are directly or indirectly secured, collateralized or otherwise backed by or represent a direct or indirect interest in whole or in part in any of the assets, rights or properties described in Section 14.01 of the Lease, in one or more Persons or arrangements holding such assets, rights or properties, or any of them (collectively, the "Securities"), whether any such Securities are privately or publicly offered and sold, or rated or unrated (any combination of which actions and transactions described in both clauses (i) and (ii) in this paragraph, whether proposed or completed, are referred to in the Lease as a "Securitization").   At no additional expense to Guarantors, Each Guarantor shall cooperate fully with Lessor and any Affected Party with respect to all reasonable requests and due diligence procedures and to use reasonable efforts to facilitate such Securitization.

*[Remainder of page intentionally left blank; signature page to follow]*

4846-2916-1819.1
STORE/Campbells (Perkins)
Lease Guaranty
587 E. Main Street, Canfield, OH 44406
File No. 7210/02-588.5

IN WITNESS WHEREOF, the undersigned Guarantor has executed this Guaranty effective as of the date set forth in the introductory paragraph of this Guaranty.

GUARANTOR:

_____

**WILLIAM KANE**, an individual

STATE OF Pennsylvania )
                      ) ss.
COUNTY OF Allegheny   )

The foregoing instrument was acknowledged before me this _____ day of January, 2018, by William Kane, an individual.

COMMONWEALTH OF PENNSYLVANIA
NOTARIAL SEAL
Rosanne M. Penn, Notary Public
City of Pittsburgh, Allegheny County
My Commission Expires Sept. 13, 2020
MEMBER, PENNSYLVANIA ASSOCIATION OF NOTARIES

Rosanne M Penn
_____
Notary Public

My Commission Expires: 9/13/20

_____

**FRANK KANE**, an individual

STATE OF _____ )
                    ) ss.
COUNTY OF _____ )

The foregoing instrument was acknowledged before me this _____ day of January, 2018, by Frank Kane, an individual.

_____
Notary Public

My Commission Expires: _____

4846-2916-1819.1
STORE/Campbells (Perkins)
Lease Guaranty
587 E. Main Street, Canfield, OH 44406
File No. 7210/02-588.5

**RON LINABURG**, an individual

STATE OF Pennsylvania
         ) ss.
COUNTY OF Allegheny )

The foregoing instrument was acknowledged before me this _____ day of January, 2018, by Ron Linaburg, an individual.

COMMONWEALTH OF PENNSYLVANIA
NOTARIAL SEAL
Rosanne M. Penn, Notary Public
City of Pittsburgh, Allegheny County
My Commission Expires Sept. 13, 2020
MEMBER, PENNSYLVANIA ASSOCIATION OF NOTARIES

Notary Public

My Commission Expires: 9/13/20

2

IN WITNESS WHEREOF, the undersigned Guarantor has executed this Guaranty effective as of the date set forth in the introductory paragraph of this Guaranty.

**GUARANTOR:**

_____
**WILLIAM KANE**, an individual

STATE OF _____     )
                          ) ss.
COUNTY OF _____     )

The foregoing instrument was acknowledged before me this _____ day of January, 2018, by William Kane, an individual.

_____
Notary Public

My Commission Expires: _____

_____
**FRANK KANE**, an individual

STATE OF _Pennsylvania_ )
                        ) ss.
COUNTY OF _Butler_      )

The foregoing instrument was acknowledged before me this 30ᵀᴴ day of January, 2018, by Frank Kane, an individual.

_____
Notary Public

My Commission Expires: July, 20, 20

```
COMMONWEALTH OF PENNSYLVANIA
         NOTARIAL SEAL
Christopher Cole, Notary Public
Cranberry Twp., Butler County
My Commission Expires July 20, 2020
MEMBER, PENNSYLVANIA ASSOCIATION OF NOTARIES
```

**SCHEDULE I**

**DOCUMENTS**

1.      Lease.

2.      Any other document, agreement, instrument or certificate contemplated by the Lease, or any other documents, agreements, instruments or certificates now or hereafter entered into between Lessor and Lessee with respect to the Lease.

3.      Any amendment of the foregoing documents, agreements, instruments or certificates now or hereafter entered into between Lessor and Lessee.

# EXHIBIT O

## UNCONDITIONAL GUARANTY OF PAYMENT AND PERFORMANCE

**THIS UNCONDITIONAL GUARANTY OF PAYMENT AND PERFORMANCE** (this "Guaranty") is made as of February 12, 2018 by **WILLIAM KANE**, **FRANK KANE** and **RON LINABURG** (each, a "Guarantor" and collectively, "Guarantors"), for the benefit of **STORE CAPITAL ACQUISITIONS, LLC**, a Delaware limited liability company (together with its successors and assigns under the Lease (as defined below), "Lessor").

### RECITALS

A.      Lessor and 5171 Campbells Land Co., Inc., a Pennsylvania corporation ("Lessee"), have entered into that certain Lease Agreement of even date herewith (as the same may be amended from time to time, the "Lease"), pursuant to which Lessor leases to Lessee the real property located at 1601 W. Prospect Road, Ashtabula, OH 44004 and further described therein and the improvements located thereon (the "Property").

B.      As a condition to Lessor entering into the Lease, Guarantors have agreed to execute and deliver this Guaranty for the benefit of Lessor.

C.      Each Guarantor owns a substantial direct and/or indirect interest in the Lessee and will derive substantial benefit from the Lease.

D.      All capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Lease.

In consideration of the premises and other good and valuable consideration, the receipt of and sufficiency of which are hereby acknowledged, and in order to induce the Lessor to enter into the Lease, each Guarantor hereby agrees as follows:

1.      **Guaranty**.      Each Guarantor unconditionally, absolutely and irrevocably guarantees the punctual and complete payment and performance when due to Lessor of all Monetary Obligations, including, without limitation, Rental, taxes, insurance premiums, impounds, reimbursements, late charges, default interest, damages, indemnity obligations and all other amounts, costs, fees, expenses and charges of any kind or type whatsoever, which may or at any time be due to Lessor under or pursuant to the documents listed on Schedule I attached hereto (collectively, the "Documents").      Each Guarantor also unconditionally guarantees the truthfulness and accuracy of all representations, warranties and certifications of Lessee, the satisfaction of all conditions by Lessee and the full and timely performance of all obligations to be performed by Lessee, under or pursuant to the Documents (the matters which are guaranteed pursuant to this section are hereinafter collectively referred to as the "Obligations"). The obligations of Guarantors under this Guaranty are primary, joint and several and independent of the obligations of Lessee and any and every other guarantor of the Obligations, and a separate action or actions may be brought and executed against each Guarantor or any other such guarantor, whether or not such action is brought against Lessee or any other such guarantor and whether or not Lessee or any other such guarantor be joined in such action or actions.  References in this Guaranty to Guarantor are to each Guarantor signing this Guaranty, and the liability of each such Guarantor is joint and several.  Notwithstanding the

forgoing, Guarantor shall be released from all obligations hereunder and this Guaranty shall terminate upon the release of Lessee from its obligations under the Lease after a permitted assignment of the Lease to a Qualified Operator pursuant to Section 14.02(b)(iii) of the Lease.

This Guaranty shall terminate and be of no further force or effect (the "Termination"), upon Guarantors' request, if at any time following the fifth (5th) anniversary of the Effective Date, Lessee shall have, for two (2) consecutive years immediately prior to the date of determination (all as determined by Lessor upon review of financial statements provided by the Guarantor prior to the determination), (A) maintained an aggregate FCCR (defined below) for the Property and all other real property subject to an Other Agreement (as defined in the Lease) of at least 1.5x; and (B) have generated an Effective Debt to EBITDAR ratio of no more than 5.0x; *provided, however,* the Termination shall be conditioned upon no Event of Default having occurred, nor any event having occurred which, with the delivery of notice and/or the passage of time, could result in an Event of Default.

For purposes hereof:

"*FCCR*" means with respect to the twelve month period of time immediately preceding the date of determination, the ratio calculated for such period of time, each as determined in accordance with GAAP, of (1) the sum of Net Income (excluding non-cash income), Depreciation and Amortization, Interest Expense, Operating Lease Expense and non-cash expenses, minus a G&A allocation equal to the total net sales at the subject properties multiplied by four percent (4%), to (2) the sum of Operating Lease Expense (excluding non-cash rent adjustments), scheduled principal payments of long term Debt, scheduled maturities of all Capital Leases, dividends and Interest Expense (excluding non-cash interest expense and amortization of non-cash financing expenses). For purposes of calculating the FCCR, the following terms shall be defined as set forth below:

"*Capital Lease*" shall mean all leases of any property, whether real, personal or mixed, by a Person, which leases would, in conformity with GAAP, be required to be accounted for as a capital lease on the balance sheet of such Person. The term "Capital Lease" shall not include any operating lease.

"*Debt*" shall mean with respect to a Person, and for the period of determination (i) indebtedness for borrowed money, (ii) subject to the limitation set forth in sub-item (iv) below, obligations evidenced by bonds, indentures, notes or similar instruments, (iii) obligations under leases which should be, in accordance with GAAP, recorded as Capital Leases, and (iv) obligations under direct or indirect guarantees in respect of, and obligations (contingent or otherwise) to purchase or otherwise acquire, or otherwise to assure a creditor against loss in respect of, indebtedness or obligations of others of the kinds referred to in clauses (i) through (iv) above, except for guaranty obligations of such Person, which, in conformity with GAAP, are not included on the balance sheet of such Person.

"*Depreciation and Amortization*" shall mean the depreciation and amortization accruing during any period of determination with respect to a Person, as determined in accordance with GAAP.

2

"*Interest Expense*" shall mean for any period of determination, the sum of all interest accrued or which should be accrued in respect of all Debt of a Person, as determined in accordance with GAAP.

"*Net Income*" shall mean with respect to the period of determination, the net income or net loss as determined in accordance with GAAP.

"*Operating Lease Expense*" shall mean the sum of all payments and expenses incurred by a Person under any operating leases during the period of determination, as determined in accordance with GAAP.

"*EBITDA*" means for the twelve (12) month period ending on the date of determination, the sum of a Person's net income (loss) for such period plus, in each case to the extent previously deducted in calculating net income (loss): (i) income taxes, (ii) interest payments on all of its debt obligations (including any borrowings under short term credit facilities), (iii) all non-cash charges including depreciation and amortization, and (iv) Non-Recurring Items (defined below).

"*EBITDAR*" means the sum of Lessee's EBITDA and its total land and building rent for the twelve (12) month period ending on the date of determination.

"*Effective Debt*" shall mean, for the period of determination, the sum of (i) Lessee's Debt and (ii) eight (8) multiplied by the annual rental payments due under leases which should not be, in accordance with GAAP, recorded as Capital Leases.

"*Non-Recurring Items*" shall mean with respect to a Person, items of the sum (whether positive or negative) of revenue minus expenses that, in the judgment of Lessor, are unusual in nature, occur infrequently and are not representative of the ongoing or future earnings or expenses of such Person.

2.      **Waivers**.   This is an absolute and unconditional guaranty of payment and performance and not of collection and each Guarantor unconditionally (a) waives any requirement that Lessor first make demand upon, or seek to enforce or exhaust remedies against, Lessee or any other Person (including any other guarantor) or any of the collateral or property of Lessee or such other Person before demanding payment from, or seeking to enforce this Guaranty against, Guarantor; (b) waives all rights of subrogation, all rights of indemnity and any other rights to collect reimbursement from Lessee; (c) waives any right to participate in any security now or hereafter held by Lessor or in any claim or remedy of Lessor or any other Person against Lessee with respect to the Obligations; (d) waives diligence, presentment, protest, demand for performance, notice of nonperformance, notice of intent to accelerate, notice of acceleration, notice of protest, notice of dishonor, notice of execution of any Documents, notice of extension, renewal, alteration or amendment, notice of acceptance of this Guaranty, notice of defaults under any of the Documents and all other notices whatsoever; (e) waives and agrees not to assert any and all rights, benefits and defenses which might otherwise be available under the provisions of Ariz. Rev. Stat. §12-1641 and §12–1642 et seq., §44-141, §44-142 or §47-3605, Arizona Rules of Civil Procedure Rule 17(f), or any other laws, statutes or rules (including any laws, statutes or rules amending, supplementing or supplanting same) which may conflict with the terms of this Guaranty or might operate, contrary to Guarantor's

3

agreements in this Guaranty, to limit Guarantor's liability under, or the enforcement of, this Guaranty; (f) covenants that this Guaranty will not be discharged until all of the Obligations are fully satisfied; and (g) agrees that this Guaranty shall remain in full effect without regard to, and shall not be affected or impaired by, any invalidity, irregularity or unenforceability in whole or in part of any of the Documents, or any limitation of the liability of Lessee or Guarantor thereunder, or any limitation on the method or terms of payment thereunder which may now or hereafter be caused or imposed in any manner whatsoever.

3. **Continuing Guaranty**.   This Guaranty is a continuing guaranty, and the obligations, undertakings and conditions to be performed or observed by Guarantors under this Guaranty shall not be affected or impaired by reason of the happening from time to time of the following with respect to the Documents, all without notice to, or the further consent of, Guarantors: (a) the waiver by Lessor of the observance or performance by Lessee or Guarantor of any of the obligations, undertakings, conditions or other provisions contained in any of the Documents, except to the extent of such waiver; (b) the extension, in whole or in part, of the time for payment of any amount owing or payable under the Documents; (c) the modification or amendment (whether material or otherwise) of any of the obligations of Lessee under, or any other provisions of, any of the Documents, except to the extent of such modification or amendment; (d)  the taking or the omission of any of the actions referred to in any of the Documents (including, without limitation, the giving of any consent referred to therein); (e) any failure, omission, delay or lack on the part of Lessor to enforce, assert or exercise any provision of the Documents, including any right, power or remedy conferred on Lessor in any of the Documents or any action on the part of Lessor granting indulgence or extension in any form; (f) the assignment to or assumption by any third party of any or all of the rights or obligations of Lessee under all or any of the Documents; (g) the release or discharge of Lessee from the performance or observance of any obligation, undertaking or condition to be performed by Lessee under any of the Documents by operation of law, including any rejection or disaffirmance of any of the Documents in any bankruptcy or similar proceedings; (h) the receipt and acceptance by Lessor or any other Person of notes, checks or other instruments for the payment of money and extensions and renewals thereof; (i) any action, inaction or election of remedies by Lessor which results in any impairment or destruction of any subrogation rights of Guarantor, or any rights of Guarantor to proceed against any other Person for reimbursement; (j) any setoff, defense, counterclaim, abatement, recoupment, reduction, change in law or any other event or circumstance which might otherwise constitute a legal or equitable discharge or defense of a guarantor, indemnitor or surety under the laws of the State of Arizona, the state in which the Property is located or any other jurisdiction; and (k) the termination or renewal of any of the Obligations or any other provision thereof.

4. **Representations and Warranties**.  Each Guarantor represents and warrants to Lessor that: (a) neither the execution nor delivery of this Guaranty nor fulfillment of nor compliance with the terms and provisions hereof will conflict with, or result in a breach of the terms or conditions of, or constitute a default under, any agreement or instrument to which Guarantor is now a party or by which Guarantor may be bound, or result in the creation of any lien, charge or encumbrance upon any property or assets of Guarantor, which conflict, breach, default, lien, charge or encumbrance could result in a material adverse change in the financial condition of Guarantor; (b) no further consents, approvals or authorizations are required for the execution and delivery of this Guaranty by Guarantor or for Guarantor's compliance with the terms and provisions of this Guaranty; (c) this Guaranty is the legal, valid and binding

4

agreement of Guarantor and is enforceable against Guarantor in accordance with its terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, liquidation, reorganization and other laws affecting the rights of creditors generally and subject to general principles of equity; (d) Guarantor has the full power, authority, capacity and legal right to execute and deliver this Guaranty, and, to the extent Guarantor is a corporation, partnership, limited liability company or other form of entity, the parties executing this Guaranty on behalf of Guarantor are fully authorized and directed to execute the same to bind Guarantor; (e) Guarantor is not, and if Guarantor is a "disregarded entity," any owner of the disregarded entity is not, a "nonresident alien," "foreign corporation," "foreign partnership," "foreign trust," "foreign estate," or any other "person" that is not a "United States person," as those terms are defined in the U.S. Internal Revenue Code and the regulations promulgated thereunder; (f) Guarantor is not a party with whom a citizen of the United States is prohibited from engaging in transactions by any trade embargo, economic sanction or other prohibition of United States law, regulation or Executive Order of the President of the United States; (g) all financial statements and other information relating to Guarantor heretofore delivered to Lessor are true, correct and complete in all material respects as of the date of this Guaranty and Guarantor will furnish Lessor, within forty five (45) days after the end of each fiscal quarter of Guarantor and within one hundred twenty (120) days after the end of each fiscal year of Guarantor, complete financial statements of Guarantor, including a balance sheet, profit and loss statement, statement of changes in financial condition and all other related schedules for the fiscal period then ended; (h) during the term of this Guaranty, Guarantor will not transfer or dispose of any material part of Guarantor's assets except in the ordinary course of business for full and fair consideration and reasonably equivalent value; and (i) the Documents are conclusively presumed to have been signed in reliance on this Guaranty, and the assumption by Guarantor of Guarantor's obligations under this Guaranty results in direct financial benefit to Guarantor. Guarantor understands that Lessor is relying on the representations and warranties of Guarantor, and Guarantor represents that such reliance is reasonable.

5.    **Nature of Guaranty**.  This Guaranty shall commence upon execution and delivery of any of the Documents and shall continue in full force and effect until all of the Obligations are duly, finally and permanently paid, performed and discharged and are not subject to any right of extension by Lessee, and Lessor gives Guarantors written notice of the full and final satisfaction of the Obligations.  The Obligations shall not be considered fully paid, performed and discharged unless and until all payments by Lessee to Lessor are no longer subject to any right on the part of any Person whomsoever, including but not limited to Lessee, Lessee as a debtor-in-possession and/or any trustee in bankruptcy, to disgorge such payments or seek to recoup the amount of such payments or any part thereof.  This Guaranty shall remain in full force and effect and continue to be effective upon an Insolvency Event.  This Guaranty shall continue to be effective or be reinstated, as applicable, if at any time payment and performance of the Obligations, or any part thereof, are, pursuant to applicable law, rescinded or reduced in amount, or must otherwise be restored or returned by Lessor, whether as a "voidable preference," "fraudulent conveyance" or otherwise, all as though such payment or performance had not been made.  In the event that any payment of the Obligations, or any part thereof, is rescinded, reduced, restored or returned, the Obligations shall be reinstated and deemed reduced only by such amount paid to Lessor and not so rescinded, reduced, restored or returned.

5

6.     **Subordination**.  Notwithstanding any provision contained in this Guaranty, in the event that a Guarantor shall have any claims against Lessee, any indebtedness of Lessee now or hereafter held by a Guarantor is hereby subordinated to the indebtedness of Lessee to Lessor, including, without limitation, any and all amounts due to Lessor under the Lease.  Any such indebtedness of Lessee to a Guarantor, if Lessor so requests, shall be collected, enforced and received by such Guarantor as trustee for Lessor and be paid over to Lessor on account of the Obligations, but without reducing or affecting in any manner the liability of such Guarantor under the other provisions of this Guaranty.

7.     **Authority**.  It is not necessary for Lessor to inquire into the powers of Lessee or its officers, directors, partners or agents acting or purporting to act on its behalf, and Guarantors shall be liable for the Obligations in accordance with their terms notwithstanding any lack of authorization or defect in execution or delivery by Lessee.

8.     **Attorneys' Fees and Costs**.  In addition to the amounts guaranteed under this Guaranty, each Guarantor agrees to pay (a) all of Lessor's Costs, and (b) interest (including postpetition interest to the extent a petition is filed by or against Lessee under the Bankruptcy Code) at the Default Rate on any Obligations not paid when due.  Each Guarantor hereby agrees to indemnify and hold harmless Lessor for, from and against all Losses suffered or occasioned by the failure of Lessee to satisfy its obligations under the Documents.  The agreement to indemnify Lessor contained in this Section shall be enforceable notwithstanding the invalidity or unenforceability of the Documents or any of them or the invalidity or unenforceability of any other paragraph contained in this Guaranty.  All moneys available to Lessor for application in payment or reduction of the liabilities of Lessee under the Documents may be applied by Lessor to the payment or reduction of such liabilities of Lessee, in such manner, in such amounts and at such time or times as Lessor may elect.

9.     **Notice**.  All notices, demands, designations, certificates, requests, offers, consents, approvals, appointments and other instruments given pursuant to this Guaranty (collectively called "Notices") shall be in writing and given by any one of the following: (a) hand delivery; (b) express overnight delivery service; (c) certified or registered mail, return receipt requested; or (d) electronic mail message, and shall be deemed to have been delivered upon (i) receipt, if hand delivered, (ii) the next Business Day, if delivered by a reputable express overnight delivery service; (iii) the third Business Day following the day of deposit of such notice with the United States Postal Service, if sent by certified or registered mail, return receipt requested; or (iv) transmission, if delivered by electronic mail.  Notices shall be provided to the parties and addresses (or electronic mail addresses) specified below:

If to Guarantor:          William Kane
                          Email: wtkane25@gmail.com

                          Frank Kane
                          Email: francisjohnnykane@gmail.com

                          Ron Linaburg
                          Email: dr.rglinaburg@lina4.com

4828-6637-4491.1
STORE/Campbells (Perkins)
Lease Guaranty
1601 W. Prospect Road, Ashtabula, OH 44004
File No. 7210/02-588.2

| If to Lessor: | STORE Capital Acquisitions, LLC |
|---|---|
| | 8377 E. Hartford Drive, Suite 100 |
| | Scottsdale, AZ 85255 |
| | Attention: Michael T. Bennett |
| | Executive Vice President – General Counsel |
| | Email: mbennett@storecapital.com |
| | |
| With a copy to: | Kutak Rock LLP |
| | 1801 California Street, Suite 3000 |
| | Denver, CO 80202 |
| | Attention: Nathan Humphrey, Esq. |
| | Telephone: (303) 297-2400 |
| | Email: nathan.humphrey@kutakrock.com |

or to such other address or such other Person as either party may from time to time hereafter specify to the other party in a notice delivered in the manner provided above.

10. **Governing Law**.  This Guaranty is delivered in the State of Arizona, and it is the intent of Guarantor and Lessor that this Guaranty shall be deemed to be a contract made under and governed by the internal laws of the State of Arizona, without regard to its principles of conflicts of law.  For purposes of any action or proceeding involving this Guaranty, Guarantor submits to the jurisdiction of all federal and state courts located in the State of Arizona and consents that each Guarantor may be served with any process or paper by registered mail or by personal service within or without the State of Arizona in accordance with applicable law.  Each Guarantor waives and agrees not to assert in any such action, suit or proceeding that Guarantor is not personally subject to the jurisdiction of such courts, that the action, suit or proceeding is brought in an inconvenient forum or that venue of the action, suit or proceeding is improper.  Nothing contained in this section shall limit or restrict the right of Lessor to commence any proceeding in the federal or state courts located in the state in which the Property is located and/or where a Guarantor maintains its residence or chief executive office to the extent Lessor deems such proceeding necessary or advisable to exercise remedies available under the Documents.

11. **Acknowledgement of Lease**.  Each Guarantor intends for the Lease to be a "true lease" and not a financing lease, capital lease, mortgage, equitable mortgage, deed of trust, security agreement or other financing or trust arrangement, and the economic realities of the Lease are those of a true lease.  Guarantors shall not challenge the validity, enforceability or characterization of the Transaction, and Guarantors shall support the intent of each Guarantor, Lessee and Lessor that the Lease is a "true lease" and does not create a joint venture, partnership, equitable mortgage, trust, financing device or arrangement, trust agreement, security interest or the like.  Each Guarantor acknowledges that Lessor did not prepare or assist in the preparation of any of the projected financial figures used by Lessee in analyzing the economic viability and feasibility of the Transaction.

12. **Independent Rights**.  All of Lessor's rights and remedies under the Documents and this Guaranty are intended to be distinct, separate and cumulative and no such right and remedy is intended to be in exclusion of or a waiver of any of the others.

7

13.  **Assignment**.  Each Guarantor acknowledges and agrees that (a) Lessor may collaterally assign all of its right, title and interest under the Lease and this Guaranty to a lender; and (b) upon the exercise of any lender's remedies set forth in related loan documents, all of the rights, powers and privileges of Lessor shall be deemed the rights, powers and privileges of such lender and such lender shall be entitled to exercise all of the rights and remedies of "Lessor" under this Guaranty, the Lease and such loan documents.  Each Guarantor hereby consents to, and no further consent by a Guarantor shall be required for, any further assignment of rights of Lessor hereunder or in connection with any transfer by Lessor.   All notices, certificates, reports or other information required to be delivered to Lessor under this Guaranty shall be delivered simultaneously to such lender.  Notwithstanding any provision herein to the contrary, this Guaranty shall not be deemed to create any obligation of or liability for such lender. Each Guarantor intends that such lender shall be an intended third party beneficiary of this Guaranty but without any corresponding responsibility, liability or obligation to Guarantor.

14.  **Inurement**.  Except as otherwise expressly provided in Section 13 above, this Guaranty is solely for the benefit of Lessor, its successors and assigns and is not intended to nor shall it be deemed to be for the benefit of any third party, including, without limitation, Lessee.  This Guaranty and all obligations of Guarantors hereunder shall be binding upon the successors and assigns of Guarantors (including, a debtor-in-possession on behalf of Guarantor) and shall, together with the rights and remedies of Lessor hereunder, inure to the benefit of Lessor, all future holders of any instrument evidencing any of the Obligations and its successor and assigns.  No sales, participations, assignments, transfers or other dispositions of any agreement governing or instrument evidencing the Obligations or any portion thereof or interest therein shall in any manner affect the rights of Lessor or its successors and assigns hereunder.  Guarantors may not assign, sell, hypothecate or otherwise transfer any interest in or obligation under this Guaranty.

15.  **Severability**.  If any provision of this Guaranty is unenforceable, the enforceability of the other provisions shall not be affected and they shall remain in full force and effect.  Guarantor agrees to take such action and to sign such other documents as may be appropriate to carry out the intent of this Guaranty.  This Guaranty may be executed in one or more counterparts, each of which shall be deemed an original.

16.  **WAIVER OF JURY TRIAL**.  LESSOR, BY ACCEPTING THIS GUARANTY, AND EACH GUARANTOR HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE THE RIGHT THEY MAY HAVE TO A TRIAL BY JURY WITH RESPECT TO ANY AND ALL ISSUES PRESENTED IN ANY ACTION, PROCEEDING, CLAIM OR COUNTERCLAIM BROUGHT BY LESSOR OR A GUARANTOR AGAINST ANY PARTY OR THEIR SUCCESSORS WITH RESPECT TO ANY MATTER ARISING OUT OF OR IN CONNECTION WITH THIS GUARANTY, THE RELATIONSHIP OF LESSOR, LESSEE AND/OR GUARANTORS, LESSEE'S USE OR OCCUPANCY OF THE PROPERTY, AND/OR ANY CLAIM FOR INJURY OR DAMAGE, OR ANY EMERGENCY OR STATUTORY REMEDY. THIS WAIVER BY LESSOR AND GUARANTOR OF ANY RIGHT THEY MAY HAVE TO A TRIAL BY JURY HAS BEEN NEGOTIATED AND IS A MATERIAL INDUCEMENT FOR LESSOR ACCEPTING THIS GUARANTY.  FURTHERMORE, EACH GUARANTOR HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES THE RIGHT IT MAY HAVE TO SEEK PUNITIVE, CONSEQUENTIAL, SPECIAL AND INDIRECT DAMAGES FROM LESSOR OR ANY OF LESSOR'S AFFILIATES, OFFICERS, DIRECTORS, MANAGERS, MEMBERS OR

4828-6637-4491.1
STORE/Campbells (Perkins)
Lease Guaranty
1601 W. Prospect Road, Ashtabula, OH 44004
File No. 7210/02-588.2

EMPLOYEES OR ANY OF THEIR SUCCESSORS WITH RESPECT TO ANY AND ALL ISSUES PRESENTED IN ANY ACTION, PROCEEDING, CLAIM OR COUNTERCLAIM BROUGHT WITH RESPECT TO ANY MATTER ARISING OUT OF OR IN CONNECTION WITH THIS GUARANTY OR ANY DOCUMENTS CONTEMPLATED HEREIN OR RELATED HERETO.  THE WAIVER BY GUARANTORS OF ANY RIGHT IT MAY HAVE TO SEEK PUNITIVE, CONSEQUENTIAL, SPECIAL AND INDIRECT DAMAGES HAS BEEN NEGOTIATED BY THE PARTIES AND IS AN ESSENTIAL ASPECT OF THEIR BARGAIN.

17.    **Final Agreement**.  This Guaranty represents the final agreement between Lessor and Guarantors and may not be contradicted by evidence of prior, contemporaneous or subsequent oral agreements.  Each Guarantor covenants and agrees that there are no unwritten oral agreements between Lessor and Guarantor and all prior or contemporaneous agreements, understandings, representations, and statements, oral or written, are merged into this Guaranty.  Neither this Guaranty nor any provision hereof may be waived, modified, amended, discharged, or terminated except by an agreement in writing signed by the party against which the enforcement of such waiver, modification, amendment, discharge, or termination is sought, and then only to the extent set forth in such agreement.

18.    **Securitizations; Other**.  As a material inducement to Lessor's willingness to complete the Transaction contemplated by the Lease and the other Transaction Documents, each Guarantor hereby acknowledges and agrees that Lessor may, from time to time and at any time (a) advertise, issue press releases, send direct mail or otherwise disclose information regarding the Transaction for marketing purposes; and (b) (i) act or permit another Person to act as sponsor, settler, transferor or depositor of, or a holder of interests in, one or more Persons or other arrangements formed pursuant to a trust agreement, indenture, pooling agreement, participation agreement, sale and servicing agreement, limited liability company agreement, partnership agreement, articles of incorporation or similar agreement or document; and (ii) permit one or more of such Persons or arrangements to offer and sell stock, certificates, bonds, notes, other evidences of indebtedness or securities that are directly or indirectly secured, collateralized or otherwise backed by or represent a direct or indirect interest in whole or in part in any of the assets, rights or properties described in Section 14.01 of the Lease, in one or more Persons or arrangements holding such assets, rights or properties, or any of them (collectively, the "Securities"), whether any such Securities are privately or publicly offered and sold, or rated or unrated (any combination of which actions and transactions described in both clauses (i) and (ii) in this paragraph, whether proposed or completed, are referred to in the Lease as a "Securitization").  At no additional expense to Guarantors, Each Guarantor shall cooperate fully with Lessor and any Affected Party with respect to all reasonable requests and due diligence procedures and to use reasonable efforts to facilitate such Securitization.

*[Remainder of page intentionally left blank; signature page to follow]*

9

IN WITNESS WHEREOF, the undersigned Guarantor has executed this Guaranty effective as of the date set forth in the introductory paragraph of this Guaranty.

GUARANTOR:

_____

**WILLIAM KANE**, an individual

STATE OF Pennsylvania  )
                                            ) ss.
COUNTY OF Allegheny  )

The foregoing instrument was acknowledged before me this _____ day of January, 2018, by William Kane, an individual.

COMMONWEALTH OF PENNSYLVANIA
NOTARIAL SEAL
Rosanne M. Penn, Notary Public
City of Pittsburgh, Allegheny County
My Commission Expires Sept. 13, 2020
MEMBER, PENNSYLVANIA ASSOCIATION OF NOTARIES

_____
Notary Public

My Commission Expires: 9/13/20

_____

**FRANK KANE**, an individual

STATE OF _____  )
                                        ) ss.
COUNTY OF _____  )

The foregoing instrument was acknowledged before me this _____ day of January, 2018, by Frank Kane, an individual.

_____
Notary Public

My Commission Expires: _____

IN WITNESS WHEREOF, the undersigned Guarantor has executed this Guaranty effective as of the date set forth in the introductory paragraph of this Guaranty.

**GUARANTOR:**

_____
**WILLIAM KANE**, an individual

STATE OF _____    )
                        ) ss.
COUNTY OF _____   )

The foregoing instrument was acknowledged before me this _____ day of January, 2018, by William Kane, an individual.

_____
Notary Public

My Commission Expires: _____

_____
**FRANK KANE**, an individual

STATE OF Pennsylvania
                        ) ss.
COUNTY OF Butler        )

The foregoing instrument was acknowledged before me this 30th day of January, 2018, by Frank Kane, an individual.

_____
Notary Public

My Commission Expires: July, 20, 20

COMMONWEALTH OF PENNSYLVANIA
NOTARIAL SEAL
Christopher Cole, Notary Public
Cranberry Twp., Butler County
My Commission Expires July 20, 2020
MEMBER, PENNSYLVANIA ASSOCIATION OF NOTARIES

4828-6637-4491.1
STORE/Campbells (Perkins)
Lease Guaranty
1601 W. Prospect Road, Ashtabula, OH 44004
File No. 7210/02-588.2

**RON LINABURG**, an individual

STATE OF _Pennsylvania_ )
                        ) ss.
COUNTY OF _Allegheny_ )

The foregoing instrument was acknowledged before me this _____ day of January, 2018, by Ron Linaburg, an individual.

Rosanne M Penn
Notary Public

My Commission Expires: _9/13/20_

COMMONWEALTH OF PENNSYLVANIA
NOTARIAL SEAL
Rosanne M. Penn, Notary Public
City of Pittsburgh, Allegheny County
My Commission Expires Sept. 13, 2020
MEMBER, PENNSYLVANIA ASSOCIATION OF NOTARIES

2

4828-6637-4491.1
STORE/Campbells (Perkins)
Lease Guaranty
1601 W. Prospect Road, Ashtabula, OH 44004
File No. 7210/02-588.2

**SCHEDULE I**

**DOCUMENTS**

1.      Lease.

2.      Any other document, agreement, instrument or certificate contemplated by the Lease, or any other documents, agreements, instruments or certificates now or hereafter entered into between Lessor and Lessee with respect to the Lease.

3.      Any amendment of the foregoing documents, agreements, instruments or certificates now or hereafter entered into between Lessor and Lessee.

# EXHIBIT P

# Ballard Spahr
### LLP

- - - - - - - - - - - - - - - - - -
1 East Washington Street, Suite 2300
Phoenix, AZ 85004-2555
TEL 602.798.5400
FAX 602.798.5595
www.ballardspahr.com

Craig S. Ganz
Tel: 602.798.5427
Fax: 602.798.5595
ganzc@ballardspahr.com

May 3, 2019

*Via FedEx and E-mail*

5171 Campbells Land Co., Inc.
6201 Steubenville Pike, Suite 100
McKees Rocks, PA 15136
Attention: William Kane
Email: wtkane25@gmail.com

William Kane
Email: wtkane25@gmail.com

Frank Kane
Email: francisjohnnykane@gmail.com

Ron Linaburg
Email: dr.rglinaburg@lina4.com

Re:    NOTICE OF DEFAULT AND DEMAND FOR PAYMENT re:

   (1) Promissory Note and Mortgage Loan Agreement dated April 3, 2018 by and
   between STORE Capital Acquisitions, LLC and 5171 Campbells Land Co., Inc.

   (2) Lease Agreements dated February 12, 2018 by and between STORE Master
   Funding XIII, LLC, STORE Capital Acquisitions, LLC, and Lessee 5171 Campbells
   Land Co., Inc.

   (3) Unconditional Guarantees of Payment and Performance dated February 12, 2018
   and April 3, 2018 by William Kane, Frank Kane and Ron Linaburg for the benefit of
   STORE Capital Acquisitions, LLC

Dear Sirs:

We hereby notify you that defaults have occurred under the Promissory Note and Mortgage
Loan Agreement dated April 3, 2018 and the Lease Agreements dated February 12, 2018,
identified individually in Exhibit A (collectively, the "Leases," and together with the
Promissory Note and Mortgage Loan Agreement, the "Agreements") by and between STORE

5171 Campbells Land Co., Inc.
William Kane
Frank Kane
Ron Linaburg
May 3, 2019
Page 2


Capital Acquisitions, LLC and Store Master Funding XIII, LLC (together, "Landlord/Lender") and 5171 Campbells Land Co., Inc. ("Tenant/Debtor"). Specifically, as of April 15, 2019, Tenant/Debtor has failed to pay Landlord/Lender certain amounts due under the Promissory Note and Mortgage Loan Agreement in the aggregate past due amount of $1,311,429.67. This amount is further subject to ongoing interest at the Default Rate of 18%. Failure to pay principal or interest constitutes an Event of Default under the Promissory Note and Mortgage Loan Agreement. Additionally, Tenant/Debtor has failed to pay real estate taxes as required by the Leases for the properties listed therein, which constitutes an Event of Default. Pursuant to the applicable "cross-default" provisions, an Event of Default as to any of the Agreements constitutes an Event of Default as to all such Agreements between Lessor/Lender and Tenant/Debtor. As such, default has occurred and is continuing under the Agreements.

Pursuant to those certain Unconditional Guarantees of Payment and Performance dated February 12, 2018 and the Unconditional Guaranty of Payment and Performance dated April 3, 2018 (together, the "Guarantees") executed by William Kane, Frank Kane, and Ron Linaburg (each a "Guarantor" and together, the "Guarantors") for the benefit of Landlord/Lender, Guarantors unconditionally, absolutely, and irrevocably guaranteed punctual and complete payment of all amounts due to Landlord/Lender by Tenant/Debtor.

Landlord/Lender accordingly makes demand upon Tenant/Debtor and the Guarantors to immediately cure the existing defaults by remitting payment in the amount of $1,311,429.67 to Landlord/Lender. If Tenant/Debtor, or the Guarantors, fail to cure the foregoing Events of Default on or before May 8, 2019, Landlord/Lender may exercise any and all rights and remedies available to Landlord/Lender under the Agreements at law or in equity, all without further notice or opportunity to cure. *See* Leases §§ 12.01 – 12.02; Promissory Note § 5; Mortgage Loan Agreement §§ 10 – 11. These rights and remedies include, without limitation, applying the Security Deposit and/or drawing upon the Letter of Credit; termination of the Leases; reentry and repossession of the leased premises and expulsion of Tenant/Debtor; demand for payment of the entire unpaid sum of the Promissory Note and any interest due; and seeking judgment against Tenant/Debtor for obligations owing under the Agreements. *See* Leases § 12.02; Master Lease § 4.09; Promissory Note § 5; Mortgage Loan Agreement § 11. In addition, Landlord/Lender will seek all costs and attorneys' fees it incurs in connection with the enforcement of its rights and remedies under the Agreements and Guarantees. Neither this notice nor any subsequent exercise of Landlord/Lender's remedies constitutes an election by Landlord/Lender to terminate the Leases unless a notice specifically so states.

Landlord/Lender may not have identified each default or Event of Default presently existing under the Agreements. Any failure or delay by Landlord/Lender in identifying such defaults or Events of Default, or exercising any right, power, or remedy under the Agreements, at law

5171 Campbells Land Co., Inc.
William Kane
Frank Kane
Ron Linaburg
May 3, 2019
Page 3

or in equity, or any acceptance of partial performance or partial payment (a) shall not operate as a waiver of such right, power, or remedy, nor shall any single or partial exercise of any such right, power, or remedy preclude any other or further exercise of such right, power, or remedy or the exercise of any other right, power, or remedy; and (b) shall not be sufficient, by itself or together with any other action or inaction by Landlord/Lender, to establish a course of dealing or course of conduct by Landlord/Lender (with any such prior course of dealing or conduct, if any, hereby terminated).

Further, nothing contained in this letter shall be construed to (i) limit the right of Landlord/Lender to receive any and all sums that are or may become due and payable pursuant to the Agreements, the Guarantees, or otherwise, including, without limitation, costs of collection (including reasonable attorneys' fees), default interest and late payment charges; (ii) waive any default or Event of Default under the Agreements, whether or not known to Landlord/Lender; (iii) waive, limit, modify, prejudice, or otherwise adversely affect any right, remedy, or power of Landlord/Lender under the Agreements or the Guarantees by statute, at law, or in equity, all of which rights, remedies, and powers are expressly reserved; or (iv) waive, limit, modify, prejudice, or otherwise adversely affect any of the claims of Landlord/Lender against Tenant/Debtor and/or the Guarantors.

Sincerely,

Craig S. Ganz

CSG

# EXHIBIT Q

# Ballard Spahr
### LLP

_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

1 East Washington Street, Suite 2300
Phoenix, AZ 85004-2555
TEL 602.798.5400
FAX 602.798.5595
www.ballardspahr.com

Craig S. Ganz
Tel: 602.798.5427
Fax: 602.798.5595
ganzc@ballardspahr.com

May 20, 2019

*Via FedEx and E-mail*

5171 Campbells Land Co., Inc.
6201 Steubenville Pike, Suite 100
McKees Rocks, PA 15136
Attention: William Kane
Email: wtkane25@gmail.com

William Kane
Email: wtkane25@gmail.com

Frank Kane
Email: francisjohnnykane@gmail.com

Ron Linaburg
Email: dr.rglinaburg@lina4.com

Re:     NOTICE OF CONTINUING DEFAULT AND RENEWED DEMAND FOR
        PAYMENT re:

        (1) Promissory Note and Mortgage Loan Agreement dated April 3, 2018 by and
        between STORE Capital Acquisitions, LLC and 5171 Campbells Land Co., Inc.

        (2) Lease Agreements dated February 12, 2018 by and between STORE Master
        Funding XIII, LLC, STORE Capital Acquisitions, LLC, and Lessee 5171 Campbells
        Land Co., Inc.

        (3) Unconditional Guarantees of Payment and Performance dated February 12, 2018
        and April 3, 2018 by William Kane, Frank Kane and Ron Linaburg for the benefit of
        STORE Capital Acquisitions, LLC

Dear Sirs:

We write to inform you that the Events of Default referenced in our Notice of Default and
Demand for Payment, sent to you on May 3, 2019 ("Notice of Default"), have not yet been
cured and 5171 Campbells Land Co., Inc.'s ("Tenant/Debtor") default is ongoing.  If you do

DMWEST #36926927 v1

5171 Campbells Land Co., Inc.
William Kane
Frank Kane
Ron Linaburg
May 20, 2019
Page 2

not act immediately to cure Tenant/Debtor's default, STORE Capital Acquisitions, LLC and STORE Master Funding XIII, LLC (collectively, "Landlord/Lender") will pursue their full legal remedies under the Promissory Note, Mortgage Loan Agreement, Lease Agreements, and Guarantees (collectively, the "Agreements") as identified in our Notice of Default including, but not limited to, termination of the Lease Agreements.

More specifically, Tenant/Debtor has failed to pay Landlord/Lender certain amounts due under the Promissory Note and Mortgage Loan Agreement (the "Note and Loan Agreement"), nor has Tenant/Debtor provided necessary documentation to support that it no longer has a Monetary Obligation due and owning under the Note and Loan Agreement. As such, the remaining amounts due and owing under the Note and Loan Agreement are further subject to ongoing interest at the Default Rate of 18%. Failure to pay principal or interest under the Note and Loan Agreement constitutes an Event of Default. In summary, the documents you have provided in support of partial payment of the amount due are woefully insufficient to establish full payment and therefore fail to cure Tenant/Debtor's ongoing default.

Additionally, Tenant/Debtor has failed to pay in full all real estate taxes as required by the Agreements for the properties listed therein, which itself constitutes an Event of Default. In light of correspondence between Tenant/Debtor and Landlord/Lender following our Notice of Default, Landlord/Lender concludes that Tenant/Debtor has paid a portion, but not all of the taxes due pursuant to the Agreements. Therefore, the Event of Default related to the non-payment of taxes is ongoing. Pursuant to the applicable "cross-default" provisions, an Event of Default as to any of the Agreements constitutes an Event of Default as to all such Agreements between Landlord/Lender and Tenant/Debtor. As such, default has occurred and is continuing under the Agreements.

We remind you that pursuant to the Guarantees executed by William Kane, Frank Kane, and Ron Linaburg (the "Guarantors") referenced in our Notice of Default, Guarantors unconditionally, absolutely, and irrevocably guaranteed punctual and complete payment of all amounts due to Landlord/Lender by Tenant/Debtor.

Landlord/Lender accordingly renews demand upon Tenant/Debtor and the Guarantors to cure the existing defaults by remitting full payment of all delinquent Monetary Obligations and taxes to Landlord/Lender and/or the appropriate taxing authority. If Tenant/Debtor or the Guarantors fail to immediately cure the foregoing Events of Default, Landlord/Lender may exercise any and all rights and remedies available to Landlord/Lender under the Agreements at law or in equity, all without further notice or opportunity to cure. *See* Leases §§ 12.01 – 12.02; Promissory Note § 5; Mortgage Loan Agreement §§ 10 – 11. These rights and remedies include, without limitation, applying the Security Deposit and/or drawing upon the Letter of Credit; termination of the Leases; reentry and repossession of the leased premises and

5171 Campbells Land Co., Inc.
William Kane
Frank Kane
Ron Linaburg
May 20, 2019
Page 3

expulsion of Tenant/Debtor; demand for payment of the entire unpaid sum of the Promissory Note and any interest due; and seeking judgment against Tenant/Debtor for obligations owing under the Agreements. *See* Leases § 12.02; Master Lease § 4.09; Promissory Note § 5; Mortgage Loan Agreement § 11. In addition, Landlord/Lender will seek all costs and attorneys' fees it incurs in connection with the enforcement of its rights and remedies under the Agreements and Guarantees. Neither this notice nor any subsequent exercise of Landlord/Lender's remedies constitutes an election by Landlord/Lender to terminate the Leases unless a notice specifically so states.

Landlord/Lender may not have identified each default or Event of Default presently existing under the Agreements. Any failure or delay by Landlord/Lender in identifying such defaults or Events of Default, or exercising any right, power, or remedy under the Agreements, at law or in equity, or any acceptance of partial performance or partial payment (a) shall not operate as a waiver of such right, power, or remedy, nor shall any single or partial exercise of any such right, power, or remedy preclude any other or further exercise of such right, power, or remedy or the exercise of any other right, power, or remedy; and (b) shall not be sufficient, by itself or together with any other action or inaction by Landlord/Lender, to establish a course of dealing or course of conduct by Landlord/Lender (with any such prior course of dealing or conduct, if any, hereby terminated).

Further, nothing contained in this letter shall be construed to (i) limit the right of Landlord/Lender to receive any and all sums that are or may become due and payable pursuant to the Agreements, the Guarantees, or otherwise, including, without limitation, costs of collection (including reasonable attorneys' fees), default interest and late payment charges; (ii) waive any default or Event of Default under the Agreements, whether or not known to Landlord/Lender; (iii) waive, limit, modify, prejudice, or otherwise adversely affect any right, remedy, or power of Landlord/Lender under the Agreements or the Guarantees by statute, at law, or in equity, all of which rights, remedies, and powers are expressly reserved; or (iv) waive, limit, modify, prejudice, or otherwise adversely affect any of the claims of Landlord/Lender against Tenant/Debtor and/or the Guarantors.

Sincerely,

Craig S. Ganz

CSG